1

PAUL HASTINGS LLP

2

Elena R. Baca (SB# 160564)

3

elenabaca@paulhastings.com
Kristen Arabaci (SB# 341682)

4

kristenarabaci@paulhastings.com
515 South Flower Street

5

Twenty-Fifth Floor
Los Angeles, California 90071-2228

6

Telephone: 1(213) 683-6000

7

Facsimile: 1(213) 627-0705

8

Attorneys for Defendants
META PLATFORMS, INC., PINAKI MUKERJI,

9

MARK TSIMELZON, NITIN GUPTA, WILL
CATHCART AND MARK ZUCKERBERG

10

(*Additional counsel listed on next page*)

11

12

UNITED STATES DISTRICT COURT

13

NORTHERN DISTRICT OF CALIFORNIA

14

15

ATTAULLAH BAIG,

CASE NO. 3:25-CV-07604-YGR

16

Plaintiff,

**DEFENDANTS' NOTICE OF**

17

vs.

**MOTION TO DISMISS PURSUANT
TO FEDERAL RULE OF CIVIL
PROCEDURE 12(B)(6);**

18

META PLATFORMS, INC., PINAKI

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT
THEREOF**

19

MUKERJI, MARK TSIMELZON, NITIN
GUPTA, WILL CATHCART AND MARK

20

ZUCKERBERG,

[Filed concurrently with Request for

21

Defendants.

Judicial Notice, Declaration of Elena R.
Baca and [Proposed] Order]

22

23

Date: February 24, 2026
Time: 2:00 p.m.

24

Judge: Yvonne Gonzalez Rogers
Courtroom: 1, 4th Floor

25

26

27

28

Paul C. Evans (*pro hac vice* pending)
paulevans@paulhastings.com
Jeffrey A. Sturgeon (*pro hac vice* pending)
jeffreysturgeon@paulhastings.com
Daniel S. Richards (*pro hac vice* pending)
danrichards@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: 1(212) 318-6000

Attorneys for Defendants
META PLATFORMS, INC., PINAKI MUKERJI,
MARK TSIMELZON, NITIN GUPTA,
WILL CATHCART AND MARK ZUCKERBERG

TO THE PLAINTIFF AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on February 24, 2026, at 2:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable Yvonne Gonzalez Rogers in Courtroom 1, 4th Floor, Oakland Federal District Courthouse, 1301 Clay Street, Oakland, California 94612, Defendants Meta Platforms, Inc., Pinaki Mukerji, Mark Tsimelzon, Nitin Gupta, Will Cathcart and Mark Zuckerberg (collectively, "Defendants") will and hereby do move pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure for dismissal of Plaintiff Attaullah Baig's Complaint with prejudice.

Specifically, this motion is made on the following grounds:

1. Baig's first cause of action fails to state a claim upon which relief can be granted because he did not adequately plead that he engaged in protected activity under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1);

2. Baig's first cause of action fails to state a claim upon which relief can be granted against Gupta, Cathcart, and Zuckerberg because Baig did not adequately plead that they participated in any alleged retaliation;

This Motion is based upon this Notice of Motion, the Memorandum of Points and Authorities in support, the Request for Judicial Notice, the Declaration of Elena R. Baca, the pleadings and record on file with this Court, and any evidence and argument as may be presented by counsel during the hearing on this Motion.

1  DATED: December 9, 2025        PAUL HASTINGS LLP

2                                 By: _____

3                                 Elena R. Baca (SB# 160564)
                                   Kristen Arabaci (SB# 341682)
4                                  Paul C. Evans (*pro hac vice* pending)
                                   Jeffrey A. Sturgeon (*pro hac vice* pending)
5                                  Daniel S. Richards (*pro hac vice* pending)

6                                  Attorneys for Defendants
7                                  META PLATFORMS, INC., PINAKI MUKERJI,
                                   MARK TSIMELZON, NITIN GUPTA, WILL
8                                  CATHCART AND MARK ZUCKERBERG

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................................... 1

II.   RELEVANT BACKGROUND ..................................................................................... 4

III.  ARGUMENT ............................................................................................................... 7

A.    Standard of Review. ........................................................................................... 7

B.    Baig Did Not Engage in Protected Activity Under SOX. ................................... 7

   1.    SOX Does Not Protect Baig's Alleged Complaints About
          Violations of the 2020 Privacy Order, CCPA, and GDPR. ...................... 9

   2.    Baig's Complaints Did Not Reasonably Relate to Violations of the
          SEC's Internal Financial Controls Rule. ................................................ 10

   3.    Baig's Complaints Did Not Reasonably Relate to Shareholder
          Fraud. ...................................................................................................... 14

      a.    Baig Does Not Adequately Plead that Defendants Made a
             Material Misrepresentation or Omission. ..................................... 14

      b.    The Alleged Omissions Were Not Material. .................................. 16

      c.    Baig Failed to Allege the Requisite Scienter. ............................... 18

      d.    WhatsApp's Alleged Cybersecurity Weaknesses Have
             Nothing to Do with Securities. ..................................................... 19

      e.    Baig Failed to Allege Either Loss Causation or Economic
             Loss. .............................................................................................. 20

   4.    Baig's Complaints Did Not Reasonably Relate to Wire Fraud. .............. 21

C.    Baig Failed to State a Claim for Relief Against Zuckerberg, Cathcart, and
       Gupta. .............................................................................................................. 22

IV.   CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Brinker v. Axos Bank*,
No. 22-CV-386-MMA (DDL), 2022 WL 17724408 (S.D. Cal. Dec. 15, 2022) .......... 8, 14, 24

*Brinker v. Axos Bank*,
No. 22-CV-386-MMA (DDL), 2023 WL 4535529 (S.D. Cal. July 13, 2023) .................. 9, 11

*Brinker v. Axos Bank*,
No. 22-cv-386-MMA-DDL, 2023 WL 7167851 (S.D. Cal. Oct. 31, 2023) .......................... 12

*Bury v. Force Protection, Inc.*,
No. CV 09-1708-DCN-BM, 2011 WL 2935916 (D.S.C. June 27, 2011), *report
and recommendation adopted*, 2011 WL 2929827 (D.S.C. July 19, 2011)............... 22, 24, 25

*Cesario v. Biocept, Inc.*,
No. 23-CV-1803-WQH-BLM, 2025 WL 525120 (S.D. Cal. Feb. 18, 2025) ....................... 15

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017) .................................................................................... 10, 12

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005)............................................................................................... 14

*Day v. Staples, Inc.*,
555 F.3d 42 (1st Cir. 2009) ............................................................................................. 16, 19

*Decena v. Allegiant Final Mile, Inc.*,
No. 4:23-CV-03633-YGR, 2024 WL 37221 (N.D. Cal. Jan. 2, 2024) (Gonzalez
Rogers, J.) ............................................................................................................................... 7

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)............................................................................................................. 20

*Erhart v. BofI Holding, Inc.*,
612 F. Supp. 3d 1062 (S.D. Cal. 2020) ............................................................. 11, 13, 14, 20

*Gjovik v. Apple Inc.*,
No. 23-CV-04597-EMC, 2024 WL 2309100 (N.D. Cal. May 20, 2024) .................. 16, 17, 20

*Hartzman v. Wells Fargo & Co.*,
No. 1:14CV808, 2015 WL 1268267 (M.D.N.C. Mar. 19, 2015)............................................ 22

*Jordan v. Sprint Nextel Corp.*,
3 F. Supp. 3d 917 (D. Kan. 2014) ........................................................................................ 24

*KBC Asset Mgmt. NV v. Discover Fin. Servs.*,
No. 23-CV-06788, 2025 WL 976120 (N.D. Ill. Mar. 31, 2025)............................................ 13

*LD v. United Behav. Health*,
　　508 F. Supp. 3d 583 (N.D. Cal. 2020) (Gonzalez Rogers, J.)....................................................7

*Linenweber v. Sw. Airlines Co.*,
　　693 F. Supp. 3d 661 (N.D. Tex. 2023)................................................................................ 11, 13

*Macquarie Infrastructure Corp. v. Moab Partners*,
　　L. P., 601 U.S. 257 (2024) ............................................................................................... 15

*Magnuson v. Exelon Corp.*,
　　658 F. Supp. 3d 652 (C.D. Ill. 2023)................................................................................. 20

*McConville v. United States Sec. & Exchange Comm'n*,
　　465 F.3d 780 (7th Cir. 2006).............................................................................................. 11

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
　　540 F.3d 1049 (9th Cir. 2008)....................................................................................... 18, 20

*Nathanson v. Polycom, Inc.*,
　　87 F. Supp. 3d 966 (N.D. Cal. 2015) .................................................................................. 16

*Nazif v. Computer Scis. Corp.*,
　　No. C-13-5498 EMC, 2015 WL 3776892 (N.D. Cal. June 17, 2015) ..................................... 8

*Nielsen v. AECOM Tech. Corp.*,
　　762 F.3d 214 (2d Cir. 2014).......................................................................... 16, 17, 20, 21

*In re NVIDIA Corp. Sec. Litig.*,
　　768 F.3d 1046 (9th Cir. 2014)........................................................................................... 15

*Plumley v. Sempra Energy*,
　　847 F. App'x 426 (9th Cir. 2021) ...................................................................................... 19

*River Canyon Total Return Bond Fund v. Credit Suisse Sec. USA LLC*,
　　No. CV 24-3993-GW-Ex, 2024 WL 4867562 (C.D. Cal. Sept. 17, 2024) ........................... 15

*Rocheleau v. Microsemi Corp.*,
　　680 F. App'x 533 (9th Cir. 2017) ...................................................................................... 14

*Rok v. Identiv, Inc.*,
　　No. 15-CV-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd sub
　　nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018)................................... 18

*Sec. & Exchange Comm'n v. Panuwat*,
　　702 F. Supp. 3d 883 (N.D. Cal. 2023) ............................................................................... 17

*SEC v. SolarWinds Corp.*,
　　741 F. Supp. 3d 37 (S.D.N.Y. 2024).......................................................................... 3, 11, 12

*Simon v. Abiomed, Inc.*,
  37 F. Supp. 3d 499 (D. Mass. 2014), *aff'd sub nom. Fire & Police Pension
  Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015) ........................................ 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................................ 18

*Tonra v. Kadmon Holdings, Inc.*,
  405 F. Supp. 3d 576 (S.D.N.Y. 2019) ............................................................................. 16

*United States v. Chang*,
  No. 16-CR-00047-EJD-1, 2020 WL 5702131 (N.D. Cal. Sept. 24, 2020) ........................... 21

*United States v. Jinian*,
  725 F.3d 954 (9th Cir. 2013) ......................................................................................... 21

*United States v. Miller*,
  953 F.3d 1095 (9th Cir. 2020) ................................................................................... 21, 22

*Van Asdale v. Int'l Game Tech.*,
  577 F.3d 989 (9th Cir. 2009) ............................................................................... 8, 14, 19

*Wadler v. Bio-Rad Lab'ys, Inc.*,
  916 F.3d 1176 (9th Cir. 2019) ......................................................................................... 9

*Wagner v. S. Cal. Edison Co.*,
  No. 2:16-CV-06259-ODW(PLA), 2019 WL 1746127 (C.D. Cal. Apr. 18,
  2019), *aff'd*, 840 F. App'x 993 (9th Cir. 2021) ............................................................. 14

*Wallender v. Canadian Nat'l Ry. Co.*,
  No. 2:13-CV-2603-DKV, 2015 WL 10818741 (W.D. Tenn. Feb. 10, 2015) ....................... 22

*Westley v. Oclaro, Inc.*,
  897 F. Supp. 2d 902 (N.D. Cal. 2012) .......................................................................... 18

*Wiest v. Lynch*,
  15 F. Supp. 3d 543 (E.D. Pa. 2014) ......................................................................... 22, 24

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ....................................................................................... 21

*Wood v. Dow Chem. Co.*,
  72 F. Supp. 3d 777 (E.D. Mich. 2014) .......................................................................... 24

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ......................................................................................... 18

*Zulfer v. Playboy Enters., Inc.*,
  No. CV 12-08263-MMM, 2013 WL 12132075 (C.D. Cal. Apr. 24, 2013) ........................... 19

**Statutes**

15 U.S.C.A. § 78m(b)(2)(B)(iii) ................................................................ 10

15 U.S.C. § 7241 ........................................................................................ 11

15 U.S.C. § 7262 ........................................................................................ 11

18 U.S.C. § 1514A(a)(1) ............................................................. 8, 9, 11, 22

**Other Authorities**

17 C.F.R. § 240.13a-15(f) .......................................................................... 10

Meta Platforms, Inc., *Annual Report (Form 10-K)*, at 71, SEC, (Jan. 30, 2025),
   https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/met
   a-20241231.htm .................................................................................... 17

Cecilia Kang, *Whistle-Blower Sues Meta Over Claims of WhatsApp Security
   Flaws*, N.Y. TIMES (Sept. 8, 2025) .......................................................... 17

Google Finance, *Meta Platforms Inc (META)*,
   https://www.google.com/finance/quote/META:NASDAQ?hl=en&window=6
   M (last visited Dec. 8, 2025) .................................................................. 18

Daniel Liberto, *Biggest Companies in the World by Market Cap, Investopedia*
   (Aug. 31, 2025),
   https://www.investopedia.com/biggest-companies-in-the-world-by-market-
   cap-5212784 .......................................................................................... 17

*Jonathan Vanian, Ex-Meta employee files whistleblower suit for alleged security
   flaws at WhatsApp, CNBC* (Sept. 8, 2025),
   https://www.cnbc.com/2025/09/08/ex-meta-employee-whistleblower-suit-
   alleged-security-flaws-whatsapp-.html .................................................. 18

1

## I.  **INTRODUCTION**

2

3    Plaintiff Attaullah Baig is not a whistleblower under the Sarbanes-Oxley Act ("SOX"). The

4    crux of his "report" is little more than a technical disagreement among engineers about priorities.

5    Not surprisingly, then, when Baig asserted those very same claims (with reams of "evidence") to

6    the federal government, the Secretary of Labor found Baig could not even make a prima facie

7    showing. In plain terms: the relevant government agency found no misconduct, no retaliation, and

8    no viable claim.

9    That result is no surprise. WhatsApp is a secure messaging platform designed to protect the

10   privacy of its users' messages through end-to-end encryption. Baig is a former Meta Platforms, Inc.

11   ("Meta") software engineering manager whose job included identifying potential WhatsApp

12   cybersecurity risks. During his employment, Baig was insistent that certain cybersecurity risks

13   should take priority and be handled in a particular manner. But his views rested on a fundamental

14   misunderstanding of how WhatsApp's extensive security, integrity, and privacy infrastructure

15   actually worked. WhatsApp and Meta have hundreds of employees working on security- and

16   privacy-related issues concerning WhatsApp, including several hundred within WhatsApp alone

17   across its Privacy Infrastructure, Security, Integrity, Messaging Infrastructure and Mobile

18   Infrastructure teams. Baig's team represented only a small fraction of WhatsApp's security

19   framework. His views and sense of operational priorities, therefore, were formed from a necessarily

20   incomplete understanding of the broader system.

21   Colleagues tried to explain. Baig refused to engage, insisting his ideas were the only "right"

22   ones. Despite repeated counseling and warnings, both formal and informal, Baig stubbornly ignored

23   the viewpoints of other teams charged with securing WhatsApp from internal and external cyber

24   risks and pushed half-baked and ill-conceived solutions that conveniently would have increased the

25   number of his direct reports tenfold. His refusal to work with or listen to others ran contrary to

26

27

28

Meta's culture of encouraging "collaboration," which is one of the performance dimensions on which it rates its managers. Baig's peers found him impossible and repeatedly *complained about Baig* (i.e., he "[d]ismiss[ed] the views of others and question[ed] their experience," "[d]isplay[ed] mannerisms in meetings . . . considered to be aggressive," and was not "fit for the role given the collaboration challenges"). Baig was unmoved. As a Meta employee, Baig was free to do what Meta's policies and the law encourage: he took his concerns and evidence to the government. There, they were considered and rejected.[1]

Baig now reasserts them here. Namely, he contends he "blew the whistle" beginning in 2022 (and that he continued to do so over the next two plus years), and he was later impacted by "Meta's performance-based layoffs." Thus, Baig applies a post hoc fallacy: because he insisted his technical views were the right ones before the performance exercise, they must have caused the termination of his employment. Baig, too, alleges that his "complaints" render him a whistleblower under SOX.

Were Baig's claims to survive the pleading stage, and they should not, Meta submits the evidence would again show what the government has already found: no whistleblowing, no protected activity, and no retaliation. But as pled, Baig's claims cannot proceed. The Complaint fails to allege the element of protected activity, essential to any SOX retaliation claim, and is subject to dismissal on that ground for several distinct reasons.

*First*, Baig alleges his complaints were protected activities because they related to violations

---

[1] Baig's allegations describe the OSHA proceedings. *See* Compl. ¶¶ 11-15. But he self-servingly omits the Secretary of Labor's ultimate finding on his claims. After reviewing Baig's allegations and evidence, OSHA concluded that he could not establish a prima facie case of retaliation. Specifically, OSHA determined that Baig's "asserted protected activity likely does not qualify as objectively reasonable under SOX." Declaration of Elena R. Baca, Ex. A. OSHA further concluded that there was no "nexus between the asserted protected activity and the adverse actions" because any adverse action Baig experienced was likely due to his own "performance and/or behavior." *Id.*

of a modified privacy order with the Federal Trade Commission (the "2020 Privacy Order"), the California Consumer Privacy Act (the "CCPA"), and the European Union's General Data Protection Regulation (the "GDPR"). But SOX only protects complaints about mail fraud, wire fraud, bank fraud, securities fraud, violations of rules or regulations of the Securities and Exchange Commission (the "SEC"), or provisions of federal law relating to fraud against shareholders. No reasonable person would believe that Baig's alleged complaints about violations of a consent decree, state privacy statute, and European privacy law somehow also related to the federal statutes and SEC rules and regulations covered by SOX.

*Second*, Baig's alleged cybersecurity complaints did not reasonably concern violations of SEC rules regarding internal controls. Those rules have a very specific meaning, which does not encompass cybersecurity controls. Instead, alleged internal control violations must relate to a company's *accounting processes* governing the preparation of financial statements for external reporting purposes. Alleged cybersecurity problems, which is all Baig allegedly raised, cannot violate the SEC's internal control rules. The Southern District of New York recently addressed this very question and rejected the idea that cybersecurity control flaws, even material ones, could violate the SEC internal control rules. *SEC v. SolarWinds Corp*., 741 F. Supp. 3d 37, 104-09 (S.D.N.Y. 2024).

*Third*, Baig does not plead facts showing that his complaints plausibly related to fraud against shareholders. His Complaint uses vague descriptors like "shareholder fraud" and "securities fraud" without any additional context. Rather, the Court must consider the alleged factual content of Baig's complaints, which must at least approximate the basic elements of a securities fraud claim. It does not. No objectively reasonable person would think that it did because Baig failed to allege that the internal cybersecurity risks he raised would satisfy even a single element of such a claim. Those risks did not concern or relate to any material misrepresentation or omission of fact

(much less one made with scienter). And Baig did not and could not suggest that they had a connection to the purchase or sale of a security or could reasonably impact Meta's share price.

*Fourth*, Baig's complaints have no connection to wire fraud, which is why his Complaint contains only one reference to it. ECF No. 3 ("Compl.") ¶ 37. There was no fraudulent scheme to deprive anyone of money or property, and Baig certainly never made such a complaint.

*Lastly*, while all the individual defendants should be dismissed from this case because Baig did not engage in protected activity, certain individual defendants (Zuckerberg, Cathcart, and Gupta) should be dismissed for an additional reason: Baig did not (and cannot) adequately allege that they retaliated against him.

For these reasons and as explained in greater detail herein, the Court should dismiss Baig's Complaint with prejudice.

## II.    RELEVANT BACKGROUND

Baig allegedly was WhatsApp's Head of Security. Compl. ¶ 3. He allegedly raised internal concerns about the following *alleged* WhatsApp cybersecurity deficiencies during his employment:

- **Failure to track or monitor user data or its access.** WhatsApp lacked a comprehensive list of user data it collects, a comprehensive inventory of systems storing user data, systems to monitor user data access or detect suspicious activity, and a 24/7 Security Operations Center to detect data breaches. *Id.* ¶ 21.

- **Meta's access to WhatsApp user data.** WhatsApp allowed 1,500 Meta engineers access to user data without business justification. WhatsApp's data warehouse tables were also accessible to 20,000-65,000 Meta employees. *Id.* ¶¶ 21, 30.

- **Failure to prevent daily account takeovers and profile scraping.** Approximately 100,000 WhatsApp users suffered daily account takeovers, which WhatsApp failed to remediate, and which WhatsApp's Contacts feature exacerbated. Profile scraping also affected 400 million WhatsApp users daily. *Id.* ¶¶ 21, 30-31.

- **Failure to address external cybersecurity risks.** WhatsApp faced data exfiltration risks and failed to develop systems to detect and respond to external cyberattacks. *Id.* ¶ 26.

- **Avoidance of cybersecurity risks.** WhatsApp engaged in systemic manipulation of user harm metrics to avoid addressing cybersecurity vulnerabilities. Further, Meta's central security team falsified security reports to cover up decisions not to remediate data

exfiltration risks. *Id.* ¶¶ 29, 31.

- **Cybersecurity understaffing.** WhatsApp's cybersecurity team of ten was understaffed relative to its cybersecurity needs and other comparably sized companies' cybersecurity teams. *Id.* ¶ 20.

- **Cybersecurity regulatory underreporting**. WhatsApp underreported cybersecurity incidents, including profile scraping, to regulators. *Id.* ¶ 31.

Baig alleges that those cybersecurity deficiencies violated the 2020 Privacy Order, the CCPA, and the GDPR. *Id.* ¶¶ 21, 31.

Additionally, in November 2024, Baig filed a Form TCR with the Securities and Exchange Commission ("SEC") alleging Meta failed to inform investors about WhatsApp's failure to track and manage user data collection, identify data storage locations, and address systemic scraping and account takeover issues. *Id.* ¶ 33. Baig does not allege that the SEC acted upon his complaint. *Id.* He also filed a complaint with the Occupational Safety and Health Administration ("OSHA") in January 2025. *Id.* ¶ 35.

Baig allegedly raised his concerns with his first supervisor, Pinaki Mukerji, Baig's second supervisor, Mark Tsimelzon, WhatsApp's Vice President and Head of Engineering, Nitin Gupta, the Vice President and Head of WhatsApp, Will Cathcart, and in correspondence with Meta's CEO, Mark Zuckerberg. *Id.* ¶¶ 5-10, 20, 21, 22, 23, 29, 30, 34, 76(e). Baig only alleges, however, that Mukerji and Tsimelzon retaliated against him for raising concerns.

Specifically, in September 2022, Baig allegedly prepared a document detailing his concerns at Cathcart's request. *Id.* ¶ 21. At around that same time, Mukerji was providing Baig with feedback about his challenges working with other teams. Mukerji allegedly gave Baig negative performance feedback about Baig's written work product, lowered his performance rating to "Needs Support," told him that he was "not performing well" and "the quality of his written work product was insufficient," and gave him a verbal warning about his "unprofessional and disrespectful" behavior with other Meta teams, including his inappropriate "word choice, tone or volume of voice, and

dismissive and/or belittling behavior." *Id.* ¶¶ 40-45, 52. Suren Verma also allegedly told Baig that Baig was "not meeting expectations" and needed additional support. *Id.* ¶ 43.

In February 2023, Mukerji allegedly gave Baig a "Consistently Meets Expectations" annual performance rating, rather than a higher rating, because of Baig's collaboration issues. *Id.* ¶¶ 48-49. Verma allegedly made clear that Baig was only receiving a lower performance rating because of Baig's collaboration issues. *Id.* ¶ 50. Because of that rating, Baig allegedly was not promoted and received less equity and lower bonuses. *Id.* ¶ 51.

Baig's colleagues allegedly refused to allow him to edit pre-read documents, precluded him from adding comments to meetings with senior leadership, and excluded his input from discussions related to cybersecurity issues. *Id.* ¶ 55. Baig allegedly received anonymous negative feedback about his work because he questioned colleagues' competence and made unreasonable demands. *Id.* ¶ 57. Steve Clarke and Chad Greene, members of Meta's central security team, allegedly relayed negative feedback about Baig to Mukerji. *Id.* ¶ 58.

In May 2024, Tsimelzon became Baig's supervisor. *Id.* ¶ 59. He, too, was concerned with Baig's inability to work with other teams on cybersecurity challenges facing WhatsApp. Tsimelzon allegedly sent Baig a letter about Baig's "serious collaboration issues," stating he was "not meeting expectations of his role." *Id.* ¶ 60. In August 2024, Tsimelzon allegedly gave Baig a "Below Expectations" midyear performance rating based on Baig's collaboration issues. *Id.* ¶ 62. In October 2024, Mark Hatton also allegedly relayed to Tsimelzon that Baig had collaboration issues. *Id.* ¶ 64. In December 2024, Tsimelzon allegedly discontinued Baig's Post Compromise Account Recovery solution while (somehow) handing it to another team. *Id.* ¶ 65. Cathcart allegedly refused to restore that solution. *Id.* ¶ 66.

In late 2024, two of Baig's patent proposals allegedly were denied. *Id.* ¶ 67. During 2024 year-end performance reviews, one of Baig's direct reports allegedly was not promoted because his

rating went from "Greatly Exceeds" to "Exceeds"; Baig's team allegedly was not allocated additional staffing; and Baig's team allegedly did not receive proper recognition for its security achievements. *Id.* ¶ 68. Tsimelzon also allegedly ordered the deletion of a November 2024 report documenting the ineffectiveness of existing anti-scraping measures. *Id.* ¶ 69.

Meta terminated Baig's employment on February 10, 2025, for "poor performance" and "as part of Meta's performance-based layoffs." *Id.* ¶ 70.

## III.    ARGUMENT

### A.    Standard of Review.

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face." *LD v. United Behav. Health*, 508 F. Supp. 3d 583, 592 (N.D. Cal. 2020) (Gonzalez Rogers, J.). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation modified).

In particular, "legally conclusory statements, not supported by actual factual allegations, need not be accepted." *Decena v. Allegiant Final Mile, Inc.*, No. 4:23-CV-03633-YGR, 2024 WL 37221, at *2 (N.D. Cal. Jan. 2, 2024) (Gonzalez Rogers, J.). A plausible claim "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted). "Rather, the allegations in the complaint 'must be enough to raise a right to relief above the speculative level.'" *Id.* (citation omitted).

### B.    Baig Did Not Engage in Protected Activity Under SOX.

SOX whistleblower claims are subject to a burden-shifting framework. The employee must first establish a prima facie case that: "(1) the employee engaged in a protected activity or conduct;

(2) the named person knew or suspected, actually or constructively, that the employee engaged in the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action." *Nazif v. Computer Scis. Corp.*, No. C-13-5498 EMC, 2015 WL 3776892, at *5 (N.D. Cal. June 17, 2015). "If the employee can satisfy these four elements, the burden shifts to the employer to demonstrate 'by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity.'" *Id.* (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009)).

To plead the protected activity element of a SOX whistleblower claim, an employee's complaints must pertain to mail fraud, wire fraud, bank fraud, securities fraud, rule or regulations of the Securities and Exchange Commission, or federal laws relating to shareholder fraud. *See* 18 U.S.C. § 1514A(a)(1). "[T]o trigger the protections of the Act, an employee must also have (1) a subjective belief that the conduct being reported violated a listed law, and (2) this belief must be objectively reasonable." *Van Asdale*, 577 F.3d at 1000. "The objective reasonableness component is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Brinker v. Axos Bank*, No. 22-CV-386-MMA (DDL), 2022 WL 17724408, at *8 (S.D. Cal. Dec. 15, 2022) (citation modified). "This evaluation requires an examination of the reasonableness of a complainant's beliefs, but not whether the complainant actually communicated the reasonableness of those beliefs to management or the authorities." *Id.* (citation modified).

Baig alleges he was WhatsApp's "Head of Security" and had "substantial expertise in cybersecurity" at large companies—some of which are financial services companies—like PayPal, Capital One, and Whole Foods. Compl. ¶ 3. As set forth below, no reasonable person with Baig's degree of experience and seniority would have believed that his disagreement with Meta's

prioritization or chosen manner of addressing certain cybersecurity issues—divorced from any accounting or financial issues or shareholder fraud—could concern violations of SOX. He therefore failed to state a SOX claim upon which relief can be granted.

1.    <u>SOX Does Not Protect Baig's Alleged Complaints About Violations of the 2020 Privacy Order, CCPA, and GDPR.</u>

Baig's alleged complaints about violations of the 2020 Privacy Order, CCPA, and GDPR are misplaced in this SOX whistleblower case. *See* Compl. ¶¶ 21, 31. SOX only protects complaints about 18 U.S.C. §§ "1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1). The 2020 Privacy Order, CCPA, and GDPR are not listed there.

Nor do any of those reasonably qualify as an SEC "rule or regulation." The "natural and plain reading" of "rule or regulation" is that the phrase "encompasses only administrative rules or regulations" promulgated by the SEC. *Wadler v. Bio-Rad Lab'ys, Inc.*, 916 F.3d 1176, 1186 (9th Cir. 2019). It does not include consent decrees, state statutes, or European laws. *Id.* (holding that Foreign Corrupt Practices Act's books-and-records provisions were not SEC rules or regulations).

Likewise, the 2020 Privacy Order, CCPA, and GDPR are not federal laws, and they do not relate to shareholder fraud. "The most obvious explanation is that 'law' encompasses *statutes*[.]" *Id.* (emphasis added); *see also Brinker v. Axos Bank*, No. 22-CV-386-MMA (DDL), 2023 WL 4535529, at *9 (S.D. Cal. July 13, 2023) (explaining that federal "law" in SOX "does not mean rule or regulation"). The 2020 Privacy Order, CCPA, and GDPR are not federal statutes. Even if they were, they concern consumer privacy, not "fraud against shareholders." 18 U.S.C. § 1514A(a)(1); *accord Brinker*, 2023 WL 4535529, at *9 ("[F]or an unlisted statute to be covered by § 1514A, it must relate to shareholder fraud.").

Consequently, Baig's alleged complaints about violations of the 2020 Privacy Order,

CCPA, and GDPR did not reasonably concern any statute enumerated in SOX, SEC rules or regulations, or federal laws proscribing shareholder fraud.

2.   Baig's Complaints Did Not Reasonably Relate to Violations of the SEC's Internal Financial Controls Rule.

Baig claims that he raised concerns about "SEC rules relating to internal controls." Compl. ¶¶ 16, 37, 76. He did not. His use of the descriptor "internal controls" in his Complaint does not make it so.

Internal accounting controls refer to a public company's accounting processes that ensure the preparation of accurate financial statements for external reporting. Specifically, the Exchange Act requires public companies to "devise and maintain a system of internal *accounting* controls sufficient to provide reasonable assurances that . . . access to assets is permitted only in accordance with management's general or specific authorization." 15 U.S.C.A. § 78m(b)(2)(B)(iii) (emphasis added). Additionally, the SEC promulgated a rule thereunder directing public company executives to establish "a process" providing "reasonable assurance regarding the reliability of *financial reporting* and the preparation of *financial statements* for external purposes in accordance with generally accepted *accounting* principles . . . ." 17 C.F.R. § 240.13a-15(f). (emphases added).

In other words, "'[i]nternal control over financial reporting' is a defined term in the SEC's regulations, describing a particular set of *accounting processes*" required of public companies to ensure accurate financial statements. *Cutler v. Kirchner*, 696 F. App'x 809, 811–12 (9th Cir. 2017) (emphasis added); *accord Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 521 (D. Mass. 2014) ("The regulations in question define 'internal controls' to mean procedures to ensure accurate and timely accounting and reporting of a company's finances."), *aff'd sub nom. Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015). "Examples of internal controls include manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries

to detect errors." *McConville v. United States Sec. & Exchange Comm'n*, 465 F.3d 780, 790 (7th Cir. 2006).[2]

As the statute, SEC rule, and case law interpreting them make clear, employees cannot assert a SOX whistleblower claim in reliance on the SEC's internal financial controls rule unless their complaints relate to alleged deficiencies in accounting processes. *See Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062, 1093 (S.D. Cal. 2020) (observing that internal accounting controls "do[] not . . . broadly require compliance with all laws or corporate risk management objectives" (citation modified)). Complaints about alleged failures unrelated to accounting processes, even those that could raise important issues, do not implicate the internal financial controls rule. *See, e.g.*, *SolarWinds*, 741 F. Supp. 3d at 108 (holding that internal accounting controls do not "cover *all* systems public companies use to safeguard their valuable assets," because such a construction would have "sweeping ramifications" (emphasis added)); *Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 681 (N.D. Tex. 2023) (granting motion to dismiss SOX retaliation claim because allegations concerned safety issues with Southwest's planes, not internal accounting controls). The key question, then, is whether Baig's complaints about alleged cybersecurity failures implicate flaws in Meta's "*accounting* practices—its ability to accurately track revenues as they are realized

---

[2] Baig also alleges he complained about weaknesses in "internal controls" pursuant to SOX Sections 302 and 404. Compl. ¶ 16. Those sections require executives to certify the accuracy of a public company's financial statements and further require that those statements contain an assessment of the effectiveness of the company's internal controls, respectively. 15 U.S.C. §§ 7241, 7262. Those sections are neither listed within Section 1514A nor SEC "rule[s] or regulation[s]," and they do not "relat[e] to fraud against shareholders." 18 U.S.C. § 1514A(a)(1). Accordingly, inasmuch as Baig pleaded that he disclosed violations of those statutory sections—and he never even tied any alleged conduct to them, Compl. ¶ 16—he failed to state a claim under Section 1514A. *See Brinker*, 2023 WL 4535529, at *9 (granting motion to dismiss SOX whistleblower claim premised upon complaint about SOX Section 404 because it is beyond the scope of Section 1514A). In any event, those SOX statutory sections concern the same internal accounting controls required by the Exchange Act and the SEC's internal financial controls rule. *See Erhart*, 612 F. Supp. 3d at 1092 n.11 (noting that SOX Section 404 and the SEC's rule "concern the same set of required internal controls over financial reporting"). Any reliance on Sections 302 and 404 would therefore be equally unavailing.

and cash as it comes in the door." *Cutler*, 696 F. App'x at 812. They do not. *Cf. Brinker v. Axos Bank*, No. 22-cv-386-MMA-DDL, 2023 WL 7167851, at *5 (S.D. Cal. Oct. 31, 2023) (denying motion to dismiss SOX whistleblower claim because plaintiff allegedly reported bank's underwriting failures and risky loans and resulting possibility that bank's financial statements could be inaccurate or reflect self-interested conclusions of management).

Indeed, the Southern District of New York "state[d] the obvious" just last year: flaws in cybersecurity controls do not implicate accounting processes or financial statements. *SolarWinds*, 741 F. Supp. 3d at 109. In *SolarWinds*, the SEC alleged SolarWinds misleadingly touted its cybersecurity practices and understated its cybersecurity risks by downplaying specific cyberattacks. *Id.* at 48–49. The SEC further alleged SolarWinds failed to secure its source code, databases, and products because of weak access controls and password policies and VPN security gaps, enabling unauthorized access by external actors. *Id.* at 105. The court granted SolarWinds's motion to dismiss on this issue and rejected the SEC's attempt to shoehorn those allegations into a violation of the Exchange Act's internal accounting controls provision. *Id.* at 104–09.

The court underscored that internal controls require the public "issuer to accurately report, record, and reconcile financial transactions and events." *Id.* at 107 (emphasis omitted). "A cybersecurity control does not naturally fit within this term, as a failure to detect a cybersecurity deficiency (*e.g.*, poorly chosen passwords) cannot reasonably be termed an *accounting* problem." *Id.* Indeed, internal controls "provide extra assurance of the accuracy and completeness of the financial information on which the issuer's annual and quarterly reports rely." *Id.* at 109. Whereas "cybersecurity controls are not—and could not have been expected to be—part of the apparatus necessary to the production of accurate such reports." *Id.*

This case is on all fours with *SolarWinds*. Baig's complaints had nothing to do with accounting practices at all. Instead, they concerned WhatsApp's alleged "systemic cybersecurity

failures," Compl. ¶ 17; specifically, allegations about WhatsApp's alleged failure to track or monitor user data or its access, Meta's alleged access to WhatsApp user data, WhatsApp's alleged failure to prevent account takeovers and profile scraping, WhatsApp's alleged failure to address external cybersecurity risks, Meta and WhatsApp allegedly ignoring cybersecurity vulnerabilities, alleged cybersecurity understaffing, and alleged underreporting of cybersecurity incidents to regulators. *Supra* pp. 4-5; Compl. ¶¶ 17-38. Baig's mere disagreement with Meta's prioritization and chosen manner of addressing cybersecurity issues—like a host of other issues a public company might face or internal disagreements a public company might have—does not, on its face, implicate Meta's accounting practices. For that reason, no reasonable person of Baig's alleged sophistication would believe his complaints concerned the entirely inapposite internal accounting controls required by the SEC. *See, e.g.*, *KBC Asset Mgmt. NV v. Discover Fin. Servs.*, No. 23-CV-06788, 2025 WL 976120, at *26 (N.D. Ill. Mar. 31, 2025) (granting motion to dismiss SOX retaliation claim because allegations concerned compliance-related setbacks, not internal accounting controls); *Linenweber*, 693 F. Supp. 3d at 681–82 (granting motion to dismiss SOX retaliation claims because allegations concerned safety issues with Southwest's planes, not internal accounting controls, and rejecting conclusory allegations that Southwest's internal controls "were materially deficient," "not operating effectively," and lacked a "reasonable basis").

Baig's SOX Complaint also is deficient for the separate and independent reason that he never identified what conduct violated the SEC's internal financial controls rule. His passing references to "internal controls" are divorced from any conduct alleged in the Complaint. Compl. ¶¶ 16, 37, 75. "[W]ithout knowing what particular conduct [Baig] asserts he believed constituted a violation of" the internal financial controls rule, "the Court cannot meaningfully analyze whether he plausibly alleges a belief that is objectively reasonable." *Erhart*, 2016 WL 5369470, at *11. Put differently, Baig has improperly "handed this Court a [twenty] page fact pattern and asked it to

specify what conduct could be believed to be a violation" of the SEC's internal financial controls rule. *Id.* (citation modified) (dismissing SOX whistleblower claim); *e.g.*, *Brinker*, 2022 WL 17724408, at *9 (dismissing SOX whistleblower claim because allegation that plaintiff "made oral and written complaints regarding weaknesses in [defendant's] internal financial controls" was untethered to any conduct alleged in the complaint). His Complaint also fails on that basis.

### 3. Baig's Complaints Did Not Reasonably Relate to Shareholder Fraud.

Baig next alleges that his cybersecurity complaints are protected under Section 1514A because they related to a fraud on Meta's shareholders. "To have an objectively reasonable belief there has been shareholder fraud," Baig's "theory of such fraud must at least approximate the basic elements of a claim of securities fraud." *Van Asdale*, 577 F.3d at 1001 (citation modified); *accord Rocheleau v. Microsemi Corp.*, 680 F. App'x 533, 536 (9th Cir. 2017) (same); *Wagner v. S. Cal. Edison Co.*, No. 2:16-CV-06259-ODW(PLA), 2019 WL 1746127, at *4 (C.D. Cal. Apr. 18, 2019) (applying securities fraud elements on motion to dismiss SOX whistleblower claim), *aff'd*, 840 F. App'x 993 (9th Cir. 2021). Those elements include: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Van Asdale*, 577 F.3d at 1001 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005)). Baig did not allegedly complain about any statement or omission that would satisfy any, much less all, of these elements. No reasonable person would believe that his technical disagreement with Meta's cybersecurity solutions and decisions to prioritize certain cybersecurity concerns over others somehow concerned shareholder fraud.

#### a. *Baig Does Not Adequately Plead that Defendants Made a Material Misrepresentation or Omission.*

Baig's Complaint does not identify any actionable material misstatement by Meta. Instead, he claims Meta's alleged *omissions* of "material cybersecurity risks" amounted to shareholder fraud, including WhatsApp's failure to track and manage user data collection, identify data storage

1  locations, and address systemic scraping and account takeover issues. Compl. ¶ 33. Yet, Baig failed

2  to allege that Meta was under any duty to disclose those alleged risks or that a statement Meta

3  actually made was somehow misleading because of any alleged omission.

4      "Pure omissions are not actionable[.]" *Macquarie Infrastructure Corp. v. Moab Partners*,

5  L. P., 601 U.S. 257, 260 (2024); *see also In re NVIDIA Corp. Sec. Litig*., 768 F.3d 1046, 1056 (9th

6  Cir. 2014) (holding that SEC Item 303 creates no affirmative duty to disclose under Section 10(b)

7  of the Exchange Act). "A pure omission occurs when a speaker says nothing, in circumstances that

8  do not give any particular meaning to that silence." *Moab Partners*, 601 U.S. at 263. "Half-truths,

9  on the other hand, are representations that state the truth only so far as it goes, while omitting critical

10  qualifying information." *Id.* (citation modified). Disclosure is required only to complete half-truths:

11  "when necessary to make statements made, in the light of the circumstances under which they were

12  made, not misleading." *Id.* at 264 (citation modified); *see also id*. at 265 ("[T]he failure to disclose

13  information . . . can support a Rule 10b–5(b) claim only if the omission renders affirmative

14  statements made misleading.").

15      Baig *never* alleges that Meta uttered a half-truth in any public statement warranting

16  disclosure of WhatsApp's alleged cybersecurity deficiencies. Compl. ¶¶ 17-38. Nor has he alleged

17  that any specific statement made by Meta was materially false and misleading because of Meta's

18  failure to disclose WhatsApp's alleged "material cybersecurity risks." *Id.* ¶ 33. Therefore, his

19  supposed complaint about "shareholder fraud" based on Meta's alleged omissions is not actionable

20  under SOX. *See, e.g.*, *Cesario v. Biocept, Inc.*, No. 23-CV-1803-WQH-BLM, 2025 WL 525120, at

21  *15 (S.D. Cal. Feb. 18, 2025) (dismissing shareholder fraud claim to the extent premised upon

22  failure to disclose existence of agreement in quarterly report given absence of allegation of half-

23  truth requiring its disclosure); *River Canyon Total Return Bond Fund v. Credit Suisse Sec. USA

24  LLC*, No. CV 24-3993-GW-Ex, 2024 WL 4867562, at *6–8 (C.D. Cal. Sept. 17, 2024) (dismissing

shareholder fraud claim premised upon nine pure omissions, none of which made any "given affirmative statement misleading").

b.      *The Alleged Omissions Were Not Material.*

An omission is only material if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 973 (N.D. Cal. 2015) (citation modified). "[C]omplaints about purely internal practices that are not financial in nature and are not reported to shareholders do not meet the materiality requirement for an objectively reasonable belief in shareholder fraud." *Day v. Staples, Inc.*, 555 F.3d 42, 58 (1st Cir. 2009).

Baig's allegation that Meta's omissions were "material" is conclusory. Compl. ¶¶ 33, 38; *see Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 222 (2d Cir. 2014) (rejecting allegation that plaintiff "reasonably believed that defendants were committing fraud upon [their] shareholders" as conclusory); *Gjovik v. Apple Inc.*, No. 23-CV-04597-EMC, 2024 WL 2309100, at *12 (N.D. Cal. May 20, 2024) ("A conclusory allegation that a misrepresentation or omission is material is not sufficient."). Baig did not allege that WhatsApp's "material cybersecurity risks" impacted Meta's financial condition or results of operations, revenue, or earnings, caused a failure to meet analysts' consensus expectations, or disrupted Meta's business by losing customers. As such, he did not adequately plead materiality. *See, e.g.*, *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 591 (S.D.N.Y. 2019) (dismissing SOX whistleblower claim because plaintiff did not allege how omission of study showing increased risk of liver and kidney damage associated with company's drug "would impact shareholder decision making or how the study results would change the mix of information made available to shareholders").

Nor would alleged omissions about *WhatsApp*, even if financial in nature, be material to

*Meta* investors. Meta, which includes WhatsApp, Facebook, Instagram, Messenger, Threads, Meta Quest, and other products and services, is the sixth largest company in the world by market capitalization. *See* Daniel Liberto, *Biggest Companies in the World by Market Cap*, INVESTOPEDIA (Aug. 31, 2025), https://www.investopedia.com/biggest-companies-in-the-world-by-market-cap-5212784. Meta had approximately $164.5 billion in revenue and $62.3 billion in net income in 2024. Meta Platforms, Inc., *Annual Report (Form 10-K)*, at 71, SEC, (Jan. 30, 2025), https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm.

While WhatsApp is committed to providing its users with best-in-class security and privacy protections, given Meta's size and profitability, there is simply no basis to conclude that alleged cybersecurity risks that Baig raised about WhatsApp—assuming for purposes of this motion that they were accurate—would be material to a Meta investor. *See, e.g.*, *Nielsen*, 762 F.3d at 222–23 (affirming dismissal of SOX whistleblower claim because alleged conduct did not plausibly "have significant repercussions for AECOM or, by extension, its shareholders"); *Gjovik*, 2024 WL 2309100, at *12 (holding that Apple's allegedly false statements about environmental and labor practices "were not demonstrably material to shareholders when viewed in the context of the far more global and consequential business and financial issues facing Apple").

Additionally, "changes in stock price after previously unknown information is disclosed to the market is strong evidence of how reasonable investors understand the significance of that information." *Sec. & Exchange Comm'n v. Panuwat*, 702 F. Supp. 3d 883, 894 (N.D. Cal. 2023) (citation modified). *The New York Times* and *CNBC*, among other news outlets, reported on this lawsuit and Baig's allegations, including WhatsApp's alleged cybersecurity deficiencies that Meta allegedly withheld from shareholders. *See* Cecilia Kang, *Whistle-Blower Sues Meta Over Claims of WhatsApp Security Flaws*, N.Y. TIMES (Sept. 8, 2025), https://www.nytimes.com/2025/09/08/technology/whatsapp-whistleblower-lawsuit.html; Jonathan

Vanian, *Ex-Meta employee files whistleblower suit for alleged security flaws at WhatsApp*, CNBC (Sept. 8, 2025), https://www.cnbc.com/2025/09/08/ex-meta-employee-whistleblower-suit-alleged-security-flaws-whatsapp-.html. Meta's share price nevertheless *increased* by $13.40 the next day. Google Finance, *Meta Platforms Inc (META)* https://www.google.com/finance/quote/META:NASDAQ?hl=en&window=6M (last visited Dec. 8, 2025) (reflecting September 8, 2025, closing price of $752.30 and September 9 closing price of $765.70).[3] Accordingly, Baig could not have reasonably believed that WhatsApp's "material cybersecurity risks" would be important to Meta's investors. *Cf. Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 914 (N.D. Cal. 2012) ("That a reasonable investor might deem the decline in the instant case important is supported by allegations in Plaintiffs' complaint" that "the July 2010 disclosure of the decline in the book-to-bill ratio led to an immediate decline in the stock price").

### c.    Baig Failed to Allege the Requisite Scienter.

Baig also did not allege that he complained about omissions that give "rise to a *strong* inference that [Meta] acted with scienter." *See Rok v. Identiv, Inc.*, No. 15-CV-5775-CRB, 2017 WL 35496, at *10 (N.D. Cal. Jan. 4, 2017) (emphasis added) (citation modified), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). Put differently, Baig must have allegedly complained about omissions that were "highly unreasonable" and "an extreme departure from the standards of ordinary care," and that Meta knew or should have known concealing WhatsApp's alleged cybersecurity deficiencies "present[ed] a danger of misleading buyers or sellers." *Rok*, 2017 WL 35496, at *10 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).

---

[3] The Court may take judicial notice of Meta's SEC filings and publicly accessible stock price. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

Nothing like that appears in Baig's Complaint. He merely asserts in a vague, conclusory manner that Meta's omissions qualified as shareholder fraud. *See* Compl. ¶¶ 16, 37-38, 76. He never alleges that Meta *deliberately* withheld any information from shareholders or why it did so. Therefore, no reasonable person would believe that Baig complained about Meta engaging in shareholder fraud. *See, e.g.*, *Plumley v. Sempra Energy*, 847 F. App'x 426, 428–29 (9th Cir. 2021) (affirming dismissal because plaintiff's allegation that defendants were "financially motivated to withhold information" was conclusory, and plaintiff "fail[ed] to allege who . . . knew, or were deliberately reckless in not knowing, about the" company's issues and "who chose to withhold that information to avoid fines or obtain a rate increase"); *Zulfer v. Playboy Enters., Inc.*, No. CV 12-08263-MMM (SHx), 2013 WL 12132075, at *10 (C.D. Cal. Apr. 24, 2013) (dismissing SOX whistleblower claim because plaintiff never alleged executives "intended to deceive, manipulate, or defraud shareholders by misrepresenting facts concerning their bonuses in [company's] financial statements or otherwise").

          d.    *WhatsApp's Alleged Cybersecurity Weaknesses Have Nothing to Do with Securities.*

Meta's alleged omissions about WhatsApp's alleged cybersecurity deficiencies also lack any "connection with the purchase or sale of a security." *Van Asdale*, 577 F.3d at 1001. Baig does not allege that Meta's capabilities to track and manage user data collection, identify data storage locations, or address scraping or account takeovers are reported to shareholders in the ordinary course. Compl. ¶ 33. Omissions about those things therefore cannot qualify as defrauding shareholders. *See Day*, 555 F.3d at 56 ("A disagreement with management about internal tracking systems which are not reported to shareholders is not actionable.").

Baig's vague allegations that those omissions could have led to regulatory action are equally unavailing for two reasons. *See* Compl. ¶¶ 22 (alleging there was risk of "penalties" and "fines"), 37 (alleging "violations of the 2020 Privacy Order constituting potential shareholder fraud"). First,

that Meta might face regulatory action based on the issues Baig raised is unduly speculative. *See Nielsen*, 762 F.3d at 222–23 (affirming order granting motion to dismiss SOX whistleblower claim where plaintiff alleged company ignored his complaint about fire safety designs even though they "expos[ed] the company to extreme financial risk," because that was a "bald statement"). Second, regulatory action, even fines, lacks any nexus to *defrauding shareholders*. Baig cannot recast his disagreement with Meta's engineers about appropriate cybersecurity solutions into a concern about shareholder fraud simply by mentioning regulators. *See, e.g.*, *Gjovik*, 2024 WL 2309100, at *13 (granting motion to dismiss SOX claim even though plaintiff labeled his complaint about Apple factory's release of toxic substances into the air as "fraud" on EPA, because it was not "the kind of fraud covered by SOX"); *Magnuson v. Exelon Corp.*, 658 F. Supp. 3d 652, 661 (C.D. Ill. 2023) (granting motion to dismiss SOX claim because plaintiff's disclosures to Nuclear Regulatory Commission "pertain[ed] to nuclear safety issues beyond SOX's ambit"); *Erhart*, 612 F. Supp. 3d at 1094 (holding that SOX did not protect allegations that defendant was "defrauding" regulators, including the Office of the Comptroller of the Currency).

e.    *Baig Failed to Allege Either Loss Causation or Economic Loss.*

Baig did not allege that he believed Meta's alleged omissions would, if revealed to the public, cause Meta's share price to plummet. This is so even though to state a claim Baig must plead that he reasonably believed Meta's share price would fall "*significantly* after the truth became known.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (emphasis added) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). In fact, Baig's belief about the potential impact to Meta's share price (reasonable or otherwise) is never mentioned in his Complaint. The Court cannot possibly infer that Baig's belief he was complaining about shareholder fraud was objectively reasonable. *See, e.g.*, *Metzler*, 540 F.3d at 1062–64 (finding loss causation inadequately alleged because there was only "modest" 10% drop in share price, which

recovered three days later in any event); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) (same where stock dropped 4% and then "immediately rebounded")

In short, Baig's complaints did not approximate any element of a shareholder fraud claim. The Court should reject his naked attempt to repackage what are plainly complaints about alleged cybersecurity deficiencies into something they are not and can never be.

### 4.    Baig's Complaints Did Not Reasonably Relate to Wire Fraud.

Likewise, the bare fact that WhatsApp is a cellphone application does not transform Baig's alleged cybersecurity complaints into complaints about wire fraud. "The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud." *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). Baig's failure to allege the first and third elements dooms his reliance on any wire-fraud theory of protected activity.

"A scheme to defraud is a scheme or plan *for obtaining money or property* by means of false or fraudulent pretenses, representations, or promises." *United States v. Chang*, No. 16-CR-00047-EJD-1, 2020 WL 5702131, at *2 (N.D. Cal. Sept. 24, 2020) (citation modified); *accord United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020) (observing that a scheme to defraud requires using deceit "to deprive a victim of money or property"). Baig's lone reference to wire fraud does not mention let alone specifically plead that anyone was deprived of money or property. *See* Compl. ¶ 37 ("Baig's disclosures focused on conduct he reasonably believed constituted . . . wire fraud through systemic failures to protect user data as represented to regulators and the public."). Accordingly, Baig's allegations fall well short of pleading this essential element of a wire fraud claim. *See, e.g.*, *Nielsen*, 762 F.3d at 222 ("Nielsen has not plausibly pled an objectively reasonable belief that AECOM engaged in mail or wire fraud, as both require a scheme to steal money or property—allegations that do not appear in the complaint.").

So, too, did Baig fail to allege the requisite *mens rea* for wire fraud. His complaints needed to reflect "the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions." *Miller*, 953 F.3d at 1101. "In other words, a defendant must intend to deceive *and* cheat." *Id.* Here, Baig failed to allege not only that Meta obtained money or property through deceit but also that Meta specifically intended to do so. No objectively reasonable person would conclude that Baig complained about wire fraud.

### C.    Baig Failed to State a Claim for Relief Against Zuckerberg, Cathcart, and Gupta.

While Baig's claims against all Defendants should be dismissed for the reasons explained above, the Court should dismiss Baig's claims against Gupta, Cathcart, and Zuckerberg for an additional reason. Baig failed to allege that they were involved, let alone materially so, in any alleged retaliation.

SOX imposes individual liability on an employer's "officer, employee, contractor, subcontractor, or agent" who retaliates against a whistleblower. 18 U.S.C. § 1514A(a). To state a claim for individual liability, a plaintiff must allege the individual defendant's "personal involvement" in the alleged retaliation. *See Hartzman v. Wells Fargo & Co.*, No. 1:14CV808, 2015 WL 1268267, at *5 (M.D.N.C. Mar. 19, 2015) (denying plaintiff's request to add individual defendants to SOX complaint given lack of allegations describing any retaliatory acts committed by them against Plaintiff). In other words, an individual defendant "must have been *materially involved in the decision to take the unfavorable personnel action*[.]" *Wallender v. Canadian Nat'l Ry. Co.*, No. 2:13-CV-2603-DKV, 2015 WL 10818741, at *18 (W.D. Tenn. Feb. 10, 2015) (citation modified); *Bury v. Force Protection, Inc.*, No. CV 09–1708-DCN-BM, 2011 WL 2935916, at *4 (D.S.C. June 27, 2011) (same), *report and recommendation adopted*, 2011 WL 2929827 (D.S.C. July 19, 2011). Accordingly, mere knowledge of a plaintiff's alleged protected activity is not enough. *See Wiest v. Lynch*, 15 F. Supp. 3d 543, 565–66 (E.D. Pa. 2014).

Baig's allegations do not reflect that Zuckerberg, Cathcart, or Gupta were involved in any adverse action. Generally, Baig alleges that he experienced retaliatory threats, negative feedback, lower performance ratings, negative performance reviews, financial harm, harsh messages, a verbal warning, a management change, sabotage of his cybersecurity projects, denial of his patent proposals, denial of a promotion to his team member, and termination of employment. *See* Compl. ¶¶ 39-73. He does not allege that Gupta, Cathcart, or Zuckerberg participated in any of those actions. Baig's allegations relating to Zuckerberg, Cathcart, and Gupta, totaling no more than a few lines each, merely reflect the fact that Baig voiced concerns to them. The remainder of Baig's allegations mentioning these Defendants are merely statements about them made by others.

As to Zuckerberg specifically, Baig alleges he sent Zuckerberg two letters. The first, in January 2024, documented Baig's alleged concerns regarding violations of the 2020 Privacy Order and SEC rules and regulations, escalating retaliation against him for raising those concerns, and alleged evidence that Meta's central security team falsified security reports to cover up decisions not to remediate data exfiltration risks. *Id.* ¶ 29. The second, in December 2024, documented alleged cybersecurity problems and escalating retaliation, noted Baig complained to the SEC, and requested action to address both alleged compliance failures and alleged retaliation. *Id.* ¶ 34.

With respect to Cathcart, Baig alleges that, in August 2022, Baig disclosed his cybersecurity concerns to Cathcart, and Cathcart allegedly asked Baig to document them. *Id.* ¶¶ 20-21. In September 2022, Suren Verma allegedly asked Baig rhetorically whether Baig would "tell Will [Cathcart] that the whole system is broken." *Id.* ¶ 39. In October 2022, Baig allegedly presented his concerns to approximately ten WhatsApp senior executives, including Cathcart. *Id.* ¶ 23. And in January 2025, Baig's team member allegedly contacted Cathcart and asked for help restoring a specific security solution, and Cathcart allegedly did not do so. *Id.* ¶ 66.

And as for Gupta, Baig alleges that, in September 2022, Suren Verma allegedly told Baig

that Gupta would fire Baig for preparing a document outlining cybersecurity failures. *Id.* ¶ 39. Then, in October 2022, Baig allegedly presented his cybersecurity concerns to approximately ten WhatsApp senior executives, including Gupta. *Id.* ¶ 23. Lastly, in January 2024, Baig allegedly provided upward feedback to Gupta documenting Meta's alleged "false commitment" to the Irish Data Privacy Commissioner. *Id.* ¶ 30.

At most, those allegations amount to a claim that Baig voiced concerns to Zuckerberg, Cathcart, and Gupta. But their mere knowledge of Baig's alleged protected activity cannot render them liable under SOX. *Compare Bury*, 2011 WL 2935916, at *2 (dismissing individual defendants from SOX case because "Plaintiff ask[ed] the Court to 'infer' that" they "were involved in his termination because of the positions they held"), *with Wood v. Dow Chem. Co.*, 72 F. Supp. 3d 777, 790–91 (E.D. Mich. 2014) (denying motion to dismiss SOX claim against individual defendant because allegations established that "she conducted investigations of [the individual defendant's] activities, particularly activities involving his family, and that he reasonably knew of her conduct and directed her termination").

Crucially, in none of those allegations does Baig suggest, much less plausibly assert, that Zuckerberg, Cathcart, or Gupta participated in any adverse employment action against Baig. Consequently, the Court should dismiss them from the case. *See, e.g.*, *Brinker*, 2022 WL 17724408, at *10–11 (dismissing two individual defendants from plaintiff's SOX whistleblower case because plaintiff did not allege either defendant "was directly or indirectly involved in the adverse employment decision"); *Jordan v. Sprint Nextel Corp.*, 3 F. Supp. 3d 917, 932 (D. Kan. 2014) (dismissing SOX claim against individual defendant because there were no allegations that he participated in any action against plaintiff); *Wiest*, 15 F. Supp. 3d at 566 (dismissing three individual defendants in SOX case because allegations did not establish their knowledge of plaintiff's reports or involvement in his discharge); *Bury*, 2011 WL 2935916, at *2 (recommending

dismissal of two individual defendants in SOX case because allegations did not establish their personal involvement in alleged adverse actions), *report and recommendation adopted*, No. CA 2:09-1708 DCN BM, 2011 WL 2929827 (D.S.C. July 19, 2011).

## IV.   <u>CONCLUSION</u>

Baig complained quite a bit, but his complaints all focused on one issue—his technical disagreement with how Meta was handling or prioritizing cybersecurity risks at WhatsApp, which is not wrongdoing prohibited by SOX. Baig was not and never will be a whistleblower under SOX even if everything in his Complaint is true (which his allegations are not). Baig's claims against Zuckerberg, Cathcart, and Gupta should be dismissed for the additional reason that he cannot connect them to any alleged adverse actions. For these reasons, Baig's Complaint should be dismissed with prejudice.

DATED: December 9, 2025                    PAUL HASTINGS LLP


By: _____
       Elena R. Baca (SB# 160564)
       Kristen Arabaci (SB # 341682)
       Paul C. Evans (*pro hac vice* pending)
       Jeffrey A. Sturgeon (*pro hac vice* pending)
       Daniel S. Richards (*pro hac vice* pending)


       Attorneys for Defendants
       META PLATFORMS, INC., PINAKI
       MUKERJI, MARK TSIMELZON, NITIN
       GUPTA, WILL CATHCART AND MARK
       ZUCKERBERG