Wilmer J. Harris, SBN 150407
wharris@sshhzlaw.com
Amanda E. Johnson, SBN 324500
ajohnson@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES LLP**
715 Fremont Ave., Suite A
South Pasadena, CA. 91030
Telephone No.: (626) 441-4129
Facsimile No.: (626) 283-5770


*Attorneys for Plaintiff, Attaullah Baig*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATTAULLAH BAIG,<br><br>             Plaintiff,<br>    vs.<br><br>META PLATFORMS, INC., a corporation;<br>PINAKI MUKERJI; MARK TSIMELZON;<br>NITIN GUPTA; WILL CATHCART; MARK<br>ZUCKERBERG; and DOES 1-10, inclusive,<br>Defendants.<br><br>      Defendants. | Case No. 3:25-CV-07604<br><br>**PLAINTIFF'S OPPOSITION TO**<br>**DEFENDANT'S MOTION TO DISMISS**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Dage: March 3, 2026<br>Time: 2:00 p.m.<br>Crtm: 1, 4th Floor<br><br>Complaint Filed: September 8, 2025<br>Trial Date:    Not Set |

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 6

II.  STATEMENT OF FACTS ................................................................................. 8

A.  Mr. Baig's Professional Background ......................................................... 8

B.  Meta Is Subject To Stringent Federal Orders Following Prior Privacy Violations .............. 9

C.  Mr. Baig Discovers Systematic Violations of the Privacy Order ......................... 9

D.  Mr. Baig Escalates Concerns and Executives Respond with False Certifications ............. 10

E.  Mr. Baig Subjected to Retaliation ........................................................ 11

F.  The Complaint Pleads Specific Facts Against Each Defendant. ............................ 11

III.  LEGAL STANDARD ..................................................................................... 12

IV.  MR. BAIG ENGAGED IN PROTECTED ACTIVITY UNDER SOX ............................. 14

A.  Mr. Baig Reported Violations of SEC Cybersecurity Regulations ...................... 14

B.  Mr. Baig Reported to External Regulators – SEC AND OSHA ........................ 16

C.  Mr. Baig Reported Conduct He Reasonably Believed Constituted Shareholder Fraud ...... 17

1.  Mr. Baig Reported Affirmative Misrepresentations—Not Pure Omissions .................. 19

D.  The 'Independent Audit' Half-Truth ....................................................... 19

E.  Meta Misled Investors by Framing Security Breaches as "Hypothetical" Risks When in Fact Such Events Were Daily Realities ................................................................................ 20

1.  Mr. Baig Reasonably Suspected Defendants' Conduct Was Deliberate ...................... 22

2.  Although Mr. Baig Is Not Required to Show Materiality for SOX Protection, He Could Readily Do So; Meta's Stock Price Arguments Are Irrelevant ...................... 22

3.  Mr. Baig Alleged Reasonable Belief That Conduct Risked Harm to Shareholders ........ 24

F.  Mr. Baig Reported Circumvention of and Failures to Maintain Internal Controls ............ 25

1.  Obstructing the Audit Function Is a *Per Se* Internal Control Violation ...................... 25

2.  Defendants' Deficient Cybersecurity Reflected Inadequate Internal Control ................ 26

G.  Mr. Baig Reported Wire Fraud Against Users ........................................... 27

V.  INDIVIDUAL DEFENDANTS ARE PROPERLY NAMED ........................................... 28

VI.  CONCLUSION ............................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Allen v. Admin. Review Bd.*,
   514 F.3d 468 (5th Cir. 2008) ................................................................................ 13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................ 13

*Basic Inc. v. Levinson*,
   485 U.S. 224, 246, 248 n. 28 (1988) ................................................................. 23

*Brinker v. Axos Bank*,
   No. 22-cv-386-MMA (DDL), 2023 U.S. Dist. LEXIS 121083 (S.D. Cal. July 13, 2023) ..........
   ................................................................................................................ 17-18, 22

*Erhart v. Bofi Holding, Inc.*,
   269 F. Supp. 3d 1059 (S.D. Cal. 2017) .............................................................. 18

*Gladitsch v. Neo@ogilvy, Ogilvy, Mather, WPP Grp. USA, Inc.*,
   2012 U.S. Dist. LEXIS 41904 (S.D.N.Y. Mar. 21, 2012) ....................................... 22

*In re Alphabet Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ................................................................ 21, 23, 24, 25

*In re Equifax Inc. Securities Litigation*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) ........................................................ 20, 24

*In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844 (9th Cir. 2023)
   ............................................................................................................... 21, 24

*In re Protecting the Nation's Communs. Sys.*,
   2025 FCC LEXIS 2552*10 ...................................................................................... 15

*In re Violin Memory Sec. Litig.*,
   No.: 13-CV-5486 YGR, 2014 U.S. Dist. LEXIS 155428 (N.D. Cal. Oct. 31, 2014) .............. 15

*Jones v. Southpeak Interactive Corp.*
   of Delaware, 777 F.3d 658 (4th Cir. 2015) .............................................................. 28

*Liu v. Tutor-Perini Corp.*,
   No. 2-21-cv-05803-AB-Ex, 2023 U.S. Dist. LEXIS 150845 (C.D. Cal. July 12, 2023) .......... 28

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) ...................................................................................... 19, 20

*Mahony v. KeySpan Corp.*,
No. 04 CV 554 (SJ), 2007 U.S. Dist. LEXIS 22042 (E.D.N.Y. Mar. 12, 2007) ............... 13, 18

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ...................................................................................................... 23

*McEuen v. Riverview Bancorp, Inc.*,
No. C12-5997 RJB, 2013 U.S. Dist. LEXIS 180423 (W.D. Wash. Dec. 19, 2013) ............... 20

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ................................................................................... 15

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...................................................................................... 23

*Prioleau v. Sikorsky Aircraft Corp., ARB Case No. 10-060, ALJ No. 2010-SOX-3 (ARB Nov. 9, 2011)*
2011 DOLSOX LEXIS 85*2 ......................................................................................... 26

*SEC v. SolarWinds Corp.*,
741 F. Supp. 3d 37 (S.D.N.Y. 2024) .......................................................................... 27

*SEC v. Wilcox*,
663 F. Supp. 3d 146 (D. Mass. 2023) ........................................................................ 26

*Sharkey v. J.P. Morgan Chase & Co.*,
805 F. Supp. 2d 45 (S.D.N.Y. 2011) ..................................................................... 18, 25

*Smith v. Corning, Inc.*,
496 F. Supp. 2d 244 (W.D.N.Y. 2007) ....................................................................... 18

*Sylvester v. Parexel Int'l LLC, ARB Case No. 07-123*,
2011 DOLSOX LEXIS 39 ...................................................................................... 17, 18

*Sylvester*,
2011 DOL Ad. Rev. Bd. LEXIS 47*55 ......................................................................... 22

*Thomas v. Tyco Int'l Mgmt. Co.*,
LLC, 262 F. Supp. 3d 1328 (S.D. Fla. 2017) .............................................................. 26

*United States v. Nicholas*,
No. SACR 08-00139 CJC, 2008 U.S. Dist. LEXIS 104377 (C.D. Cal. Dec. 15, 2008) .......... 23

*United States v. Wittig*,
425 F. Supp. 2d 1196 (D. Kan. 2006) ................................................................... 25, 26

*Van Asdale v. Int'l Game Tech.*,
    577 F.3d 989 (9th Cir. 2009) ...................................................................... 8, 13, 18

*Wadler v. Bio-Rad Lab'ys, Inc.*,
    916 F.3d 1176 (9th Cir. 2019) ...................................................................... 13, 17

*Wadler v. Bio-Rad Labs., Inc.*,
    141 F. Supp. 3d 1005 (N.D. Cal. 2015) .............................................................. 28

*Wiest v. Lynch*,
    710 F.3d 121 (3d Cir. 2013) ........................................................................ 17, 18

**Statutes**

15 U.S.C. § 78m(b)(2)(B)(iii) ....................................................................... 8, 26
15 U.S.C.S. § 78m (5) .................................................................................. 8, 25
18 U.S.C. § 1343 ............................................................................................ 14
18 U.S.C. § 1348 ............................................................................................ 14
18 U.S.C. § 1514A ....................................................................................... 6, 8
18 U.S.C. § 1514A(a)(1) .................................................................................. 14
18 U.S.C.S. § 1514A (a)(1) .............................................................................. 13
18 U.S.C.S. § 1514A(a)(1)(A) .......................................................................... 16

**Regulations**

17 C.F.R. § 229.106 ........................................................................................ 15
17 CFR § 229.106(b)-(c) .................................................................................. 15
17 C.F.R. § 240.21F-2(b)(1)(i). ........................................................................ 17
29 C.F.R. § 1980.104(b)(1)(i)-(iv) .................................................................... 18

**Rules**

Fed. R. Civ. P. 8 ............................................................................................... 6
Fed. R. Civ. P. 8 (a)(2) ...................................................................................... 6

**Other**

*149 Cong. Rec. S1725-01, S1725*,
    2003 WL 193278 (Jan. 29, 2003) .................................................................... 11

## I.    INTRODUCTION

While serving as WhatsApp Head of Security, Plaintiff Attaullah Baig discovered that Meta was engaged in massive-scale cybersecurity failures, which caused the company to operate in systematic violation of the 2020 Federal Trade Commission Privacy Order, as well as SEC laws and regulations, and was routinely misrepresenting its cybersecurity practices to investors.

He reported these violations to the highest levels of the company—including to CEO Mark Zuckerberg—and to federal regulators, including the SEC and OSHA. Three days after his first major disclosure, his previously-stellar performance reviews turned negative. Defendants continued their campaign of retaliation against Mr. Baig for more than three years, punishing him with negative reviews, denial of lucrative compensation, and shows of outright hostility. Less than two months after filing an SEC complaint and notifying Zuckerberg of such, Meta terminated his employment for wholly pretextual, retaliatory reasons.

Federal Rule of Civil Procedure 8 requires only a short, plain statement of the claim. *See* Fed. R. Civ. P. 8 (a)(2). Mr. Baig's complaint easily satisfies this threshold and meets the permissive standard for whistleblower claims under the Sarbanes-Oxley Act ("SOX") 18 U.S.C. § 1514A. Critically for purposes of to the instant motion, Mr. Baig has pleaded he engaged in conduct directly within the purview of SOX whistleblower protections.

As detailed in the complaint, Mr. Baig repeatedly disclosed conduct by Meta that he reasonably believed violated SEC regulations, constituted fraud against shareholders, reflected deficient internal controls as well as intentional circumvention of controls, and constituted wire fraud. Mr. Baig's protected conduct included the following:

(1)    **Mr. Baig Reported Violations of the SEC Cybersecurity Risk Disclosure Rules.** The Securities and Exchange Commission ("SEC") expressly requires defendant Meta to disclose cybersecurity deficiencies and to inform the investing public of its cybersecurity risk management processes. Mr. Baig reported that Meta violated these rules on a staggering scale. Meta's 10-K warned that security breaches "could" harm the company and occur "from time to time." This language was materially misleading, as 400 million user profile photos were being scraped *daily,* and 500,000 accounts were being

compromised *daily*. (Compl. ¶¶ 33, 63). By framing realized catastrophic breaches as speculative future possibilities, Meta violated SEC cybersecurity disclosure requirements. It follows then that Mr. Baig's reports of these violations satisfy the protected activity element of his SOX whistleblower claim.

(2)    **Mr. Baig Disclosed Securities Fraud and SEC Violations in Complaints to Federal Regulators and Reports to Mark Zuckerberg**. In addition to Mr. Baig's repeated internal disclosures at Meta, he also filed a Form TCR with the SEC documenting the company's cybersecurity deficiencies and failure to inform investors about material cybersecurity risks. Mr. Baig reported that Meta failed to track and manage user data collection, identify data storage locations, or address systemic scraping and account takeover issues known to senior leadership. Mr. Baig personally informed Defendant Zuckerberg of his SEC filing and was terminated shortly thereafter. Additionally, prior to his termination, Mr. Baig informed Defendants of his filing of a SOX whistleblower complaint with OSHA.[1]

(3)    **Mr. Baig Reported Meta Misled Investors Through Affirmative Misrepresentations in its SEC Filings**. In its SEC filings, Meta made material misrepresentations that would be misleading to investors, including by: (1) assuring investors that its "internal audit function provides independent assessment" of cybersecurity programs – while omitting that the company was actively blocking the internal audit team from such assessments and preventing documentation (Compl. Ex. A ¶ 216); (2) framing security breaches as hypothetical, speculative risks without alerting investors and the public that these harms were being realized on a massive scale on a daily basis; for example, every single day, 400 million user profile photos were being scraped and 500,000 accounts compromised (Compl. ¶¶ 33, 63); (3) stating that it did not identify any material cybersecurity threats in 10-k filings, despite staggering breaches; and (4) concealing that Meta's cybersecurity deficiencies rendered the company in breach of the FTC privacy order and exposed the

---

[1] The Court should note that defendants have neither mentioned their affirmative obligations to disclose cybersecurity deficiencies in SEC filings nor their pre-termination knowledge of Mr. Baig's filings with the SEC or OSHA. This failure is but another grounds to deny their motion.

company and its shareholders to regulatory action, fines, and penalties.

(4) **Mr. Baig Reported Meta Lacked Adequate Internal Controls Over Assets & Circumvented Controls By Blocking Internal Audits**. SOX Section 404 requires companies to maintain controls ensuring "access to assets is permitted only in accordance with management's authorization." 15 U.S.C. § 78m(b)(2)(B)(iii). Mr. Baig reported Meta could not even inventory where user data was stored, allowed up to 100,000 employees unfettered access to sensitive data, and maintained no monitoring systems to detect improper access. (Compl. ¶¶ 17, 21, 30). Moreover, Meta blocked the internal audit function, thus violating the SOX prohibition against circumventing internal controls. *See* 15 U.S.C.S. § 78m (5).

(5) **Mr. Baig Reported Wire Fraud Against Users**. Meta promised users their data was protected through "end-to-end encryption" and robust security measures, while systematically failing to honor those promises and instead tolerating industrial-scale data theft. Compl. ¶¶ 30-31, 63. This constitutes a scheme to obtain property (user data) through false pretenses.

Defendants' motion to dismiss suffers from a fundamental legal error: they conflate the stringent liability standards applicable to *proving* a SOX violation with the far more lenient standard for *whistleblower protection*. Under § 1514A, Mr. Baig need not prove Meta actually violated securities laws. He must only show he *reasonably believed* the conduct he reported constituted violations of SOX, SEC regulations, or fraud against shareholders—<u>even if Meta could ultimately prove no violation occurred</u>. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1000-01 (9th Cir. 2009). This basic error pervades Defendants' motion and requires its denial.

## II.    STATEMENT OF FACTS

### A.  Mr. Baig's Professional Background

Mr. Baig possesses over 20 years of experience as a computer engineer, with more than 15 years specializing in cybersecurity. (Compl. Ex. A ¶ 27). Before joining Meta, he served as Head of Security Architecture & Engineering at Capital One and Chief Technology Officer at nextToken. (*Id.*). He also worked as a cybersecurity consultant for Amazon and designed data

protection systems for PayPal and Mastercard. (*Id.*). His expertise was recognized throughout his tenure at Meta, with early performance reviews praising his "deep security skill" and ability to solve problems "that many people thought could not be solved." (Compl. Ex. A ¶¶ 52, 125).

### B.   Meta Is Subject To Stringent Federal Orders Following Prior Privacy Violations

In June 2019, the SEC brought an action against Meta for misleading investors regarding the risk of data misuse. (Compl. Ex. A ¶ 23). Specifically, the Commission charged that for over two years, Meta knew third-party developers had misused user data yet continued to describe such risks as merely hypothetical—using language such as "our users' data *may* be improperly accessed." (Compl. Ex. A ¶ 24). Meta paid a $100 million penalty to settle these charges. (*Id.*).

Around that time, Meta entered into a binding 2020 Privacy Order with the FTC following the Cambridge Analytica scandal, in which the personal information of over 50 million users was harvested. (Compl. Ex. A ¶¶ 16-18). The FTC imposed a $5 billion penalty—the largest privacy-related fine in history—and required Meta to "restructure its approach to privacy from the corporate board-level down." (Compl. Ex. A ¶¶ 18-19).

The 2020 FTC Order imposed three critical, non-negotiable obligations: (1) establish a Comprehensive Privacy Program to protect "Covered Information" (including names, phone numbers, photos, videos, and IP addresses); (2) "design, implement, and maintain access policies and controls that limit employee access" to user data to only those employees with a business need; and (3) implement safeguards controlling risks from sharing data between WhatsApp and other Meta-owned affiliates. (Compl. Ex. A ¶¶ 20-22). Violation of these orders could result in billions of dollars in future fines and penalties against Meta.

### C.   Mr. Baig Discovers Systematic Violations of the Privacy Order

Upon joining WhatsApp as Head of Security, Mr. Baig quickly identified fundamental gaps in the company's security posture. In September 2021, he executed a "Red Team Exercise" exposing a critical vulnerability at Meta: in derogation of the Privacy Order, approximately 1,500 engineers had unrestricted access to user data, allowing them to move or steal sensitive information without an audit trail. (Compl. ¶¶ 38-39). Mr. Baig also discovered that 20,000 to 65,000 employees could query sensitive data tables, and up to 100,000 employees had access to

certain data warehouse tables. (Compl. ¶ 30).

Meta lacked even the most basic security infrastructure: (1) no 24/7 Security Operations Center to detect breaches in real-time; (2) no monitoring system for user data access; (3) no comprehensive inventory of where user data was stored; (4) no process to audit employee access to data; (5) inadequate measures to prevent account takeovers; and (6) inadequate measures to prevent profile scraping. (Compl. ¶ 21).

Mr. Baig discovered security failures of staggering magnitude: WhatsApp was leaking over 400 million user profile photos *daily* to scrapers—nearly 3 billion photos per week. (Compl. ¶ 63; Compl. Ex. A ¶ 291). Meta leadership knew about this daily theft yet consciously refused to provide necessary staffing to stop it. (Compl. ¶ 63). Additionally, approximately 100,000 to 500,000 WhatsApp users suffered account compromises *every single day*, yet WhatsApp failed to implement adequate preventive measures. (Compl. ¶ 21(f)).

Despite the FTC Order's explicit reporting requirements, Meta failed to notify the FTC of these massive breaches and systematically under-reported security incidents. (Compl. ¶ 31(a), (c)).

**D.  Mr. Baig Escalates Concerns and Executives Respond with False Certifications**

Beginning in September 2021, Mr. Baig flagged these security gaps and warned that WhatsApp was failing to implement the controls promised in the 2020 FTC Consent Decree. (Compl. ¶ 17). He raised these deficiencies on approximately five separate occasions to his supervisors initially, and later formally escalated them to senior leadership. (Compl. ¶¶ 18, 20).

When his concerns were ignored, Mr. Baig escalated directly to CEO Mark Zuckerberg. On January 2, 2024, he sent a detailed letter to Zuckerberg and General Counsel Jennifer Newstead, documenting specific violations of the 2020 FTC Privacy Order and SEC disclosure rules. (Compl. ¶ 29; Compl. Ex. A ¶ 202). The letter explicitly warned that internal security reports had been falsified to cover up leadership's deliberate decisions not to remediate data exfiltration risks. (Compl. ¶ 29).

Despite receiving direct notice of material control weaknesses and fraudulent internal reporting, Zuckerberg continued certifying Meta's compliance to the FTC and SEC failed to inform the appropriate committees of these critical gaps. (Compl. Ex. A ¶ 203).

1   Mr. Baig specifically warned Meta's leadership about the deficient controls over

2   information security, including a lack of comprehensive inventory for user data, failure to prevent

3   unauthorized employees from access, and lack of monitoring systems over improper access, as

4   well as the obstruction of the internal audit. Compl. ¶ 16-18. Despite the fact that these

5   deficiencies amounted to violations of the internal controls requirements under SOX, Meta's

6   executives continued to certify adequate internal controls to the SEC and the public. *See* Plaintiff's

7   Request for Judicial Notice ("RJN") , Exhibits 1-3.

8   **E.  Mr. Baig Subjected to Retaliation**

9   The temporal proximity between Mr. Baig's protected disclosures and adverse employment

10  actions is damning. ***Just 3 days*** after Mr. Baig circulated his September 2022 cybersecurity

11  assessment, he received his first-ever negative performance feedback, despite having received a

12  glowing review just 3 months earlier. (Compl. ¶ 40). ***One month*** after sending formal warning

13  letter to Zuckerberg regarding violations of the FTC Privacy Order and SEC regulations, as well

14  as the falsification of security reports, Mr. Baig was subjected to a retaliatory reporting structure.

15  (Compl. ¶¶ 29, 59). ***Less than two months*** after Mr. Baig notified Zuckerberg that he had filed an

16  SEC complaint, Meta terminated his employment. (Compl. ¶ 10; Compl. Ex. A ¶ 335).

17  **F.  The Complaint Pleads Specific Facts Against Each Defendant.**

18  The retaliation was not some amorphous corporate decision. Instead, it was a systemic

19  campaign executed through specific acts by each of the individual defendants:

20  ▪  **Pinaki Mukerji** (Mr. Baig's direct supervisor, 2021-2024): Immediately after Mr. Baig's

21  September 2022 disclosures, Mr. Mukerji reversed two years of positive evaluations by

22  secretly downgrading Mr. Baig's rating to "Needs Support," denying him a promotion and

23  $600,000 equity grant. Compl. ¶¶ 40-51. On April 14, 2023, Mr. Mukerji explicitly ordered

24  him to stop discussing FTC compliance issues. *Id.* ¶ 54.

25  ▪  **Mark Tsimelzon** (Mr. Baig's supervisor from May 2024): Mr. Tsimelzon gave Mr. Baig a

26  retaliatory "Below Expectations" rating and explicitly reprimanded him for raising FTC

27  Privacy Order compliance issues. Mr. Tsimelzon also ordered deletion of a report documenting

28  security failures and rolled back Mr. Baig's successful security solutions. (Compl. ¶¶ 60-69;

Compl. Ex. A ¶¶ 267, 302).

- **Nitin Gupta** (Vice President, Head of Engineering at WhatsApp): Immediately after Mr. Baig's September 2022 cybersecurity disclosure, Mr. Gupta threatened to fire Mr. Baig for writing the cybersecurity assessment. In 2023, Mr. Gupta denied Mr. Baig a discretionary equity grant in 2023 and subsequently excluded Mr. Baig's security team from 250 additional engineering resources. Finally, he orchestrated and approved Mr. Baig's termination. (Compl. ¶¶ 39, 51, 10; Ex. A ¶¶ 193-194, 229, 323, 335).

- **Will Cathcart** (Vice President, Head of WhatsApp): After being informed of Mr. Baig's whistleblowing, Mr. Cathcart deliberately distanced himself from cybersecurity issues and refused to intervene when Mr. Baig's security solutions were sabotaged. (Compl. ¶¶ 29, 34, 66; Compl. Ex. A ¶¶ 65, 96, 215, 251-252, 335).

- **Mark Zuckerberg** (CEO): On January 2, 2024, Mr. Baig directly reported to Mr. Zuckerberg regarding violations of the FTC privacy order and SEC rules, as well as the central security team's falsification of security reports, which he warned could result in criminal penalties. Compl. ¶ 29. Despite being aware of these issues, Mr. Zuckerberg continued to certify compliance with the Privacy Order to the FTC and with SOX requirements to the SEC. Compl. Ex. A ¶ 203. On December 4, 2024, Mr. Baig sent a second letter to Mr. Zuckerberg documenting continued cybersecurity problems and escalating retaliation and informing him that he filed a complaint with the SEC. Compl. ¶ 34. Zuckerberg was actively involved in the campaign of retaliation against Mr. Baig, including by reassigning him to a new manager, colluding to cover up the retaliation against Mr. Baig, eliciting negative feedback in order to justify a pretextual performance-based layoff, and ultimately participating in the decision to terminate Mr. Baig. *See, e.g.,* Compl. ¶¶ 67-68, 70-73; Compl. Ex. A ¶¶ 251-252, 335). Indeed, Mr. Baig was terminated less than two months after informing Mr. Zuckerberg that he had filed a Form TCR with the SEC. (Compl. ¶ 70).

## III.    LEGAL STANDARD

To establish a prima facie case under SOX's whistleblower protection provision, the

1   employee must show: (1) he engaged in protected activity; (2) the employer knew or suspected the

2   employee engaged in the protected activity; (3) the employee suffered an adverse employment

3   action; and (4) the protected activity was a contributing factor in the adverse action. *Van Asdale,*

4   577 F.3d at 996; 29 C.F.R. § 1980.104(b)(1)(i)-(iv).

5   Throughout their motion, Defendants incorrectly assert that Mr. Baig is required to prove

6   an actual violation of the relevant statutes. It is clear, however, from the language of the SOX

7   whistleblower provision, as well as legislative history and applicable case law, that Mr. Baig need

8   only prove he had a ***reasonable belief*** of violation, not that a violation in fact occurred. *See* 18

9   U.S.C.S. § 1514A (a)(1); *Van Asdale*, 577 F.3d at 1000-01; 149 Cong. Rec. S1725-01, S1725,

10  2003 WL 193278 (Jan. 29, 2003) ("The law was intentionally written to sweep broadly, protecting

11  any employee of a publicly traded company who took such reasonable action to try to protect

12  investors and the market"); *Mahony v. KeySpan Corp.*, No. 04 CV 554 (SJ), 2007 U.S. Dist.

13  LEXIS 22042, at *13-14 (E.D.N.Y. Mar. 12, 2007) ("Given that SOX is a statute designed to

14  promote corporate ethics by protecting whistleblowers from retaliation, it is reasonable to construe

15  the statute broadly.")

16  The "reasonable belief" standard is minimal and forgiving. "To encourage disclosure,

17  Congress chose statutory language which ensures that an employee's reasonable but mistaken

18  belief that an employer engaged in conduct that constitutes a violation of one of the six

19  enumerated categories is protected*." Van Asdale,* 577 F.3d at 1001 (quoting *Allen v. Admin.*

20  *Review Bd*., 514 F.3d 468, 477 (5th Cir. 2008)) (internal citations omitted). The Ninth Circuit has

21  described this "reasonable belief" standard as a "minimal threshold requirement." *Id.* at 1001.

22  A plaintiff must "prove only that he reasonably believed that there might have been a

23  violation and that he was fired for even suggesting further inquiry." *Wadler v. Bio-Rad Lab'ys,*

24  *Inc.*, 916 F.3d 1176, 1187 (9th Cir. 2019) (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989,

25  1001 (9th Cir. 2009)) (internal quotation marks omitted).

26  Defendants bear the burden of showing no reasonable belief existed. At the motion to

27  dismiss stage, courts accept the plaintiff's allegations as true and resolve all reasonable inferences

28  in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts require only that a

---

SOX complaint "allege facts on each element" and need not prove causation or ultimate merits at this stage. Mr. Baig's complaint easily clears this minimal threshold.[2]

## IV.    MR. BAIG ENGAGED IN PROTECTED ACTIVITY UNDER SOX

SOX's whistleblower provision protects employees who provide information they reasonably believe constitutes: (1) federal securities fraud (18 U.S.C. § 1348), (2) wire fraud (18 U.S.C. § 1343), (3) violations of SEC rules or regulations, or (4) violations of any provision of Federal law relating to fraud against shareholders. 18 U.S.C. § 1514A(a)(1). Mr. Baig's disclosures included all four categories.

Mr. Baig reported conduct he reasonably believed constituted: (a) violations of SEC rules and regulations regarding cybersecurity disclosures; (b) securities fraud through misrepresentations about the Meta's cybersecurity risks and audit activities in public filings and statements, as well as failing to disclose rampant violations of the 2020 Privacy Order which risked subjecting the company to enormous fines; (c) violations of the requirement to maintain appropriate internal controls as well as intentional circumvention of controls through blocking the internal audit function; and (d) wire fraud through misrepresentations to regulators and the public regarding systemic failures to protect user data.

In addition to Mr. Baig's repeated internal disclosures at Meta, he also filed a Form TCR with the SEC documenting the company's cybersecurity deficiencies and misrepresentations to investors regarding material risks, as well as a SOX complaint with OSHA. Compl. ¶¶ 12, 33, 70. Following these disclosures, Defendants continued their campaign of escalating retaliation against Mr. Baig, which culminated in his termination shortly after his disclosures to external regulators. Indeed, Mr. Baig was terminated less than two months after he informed Mr. Zuckerberg of his SEC filing and less than one month after he informed Meta that he had filed a SOX retaliation complaint with OSHA. Compl. ¶ 70.

### A.    Mr. Baig Reported Violations of SEC Cybersecurity Regulations

Mr. Baig's reports related to Defendants' noncompliance with SEC regulations requiring a

---

[2] Plaintiff has clearly alleged the other elements of a SOX whistleblower claim: knowledge, adverse employment action, and causation. As Defendants do not challenge these elements in their Motion, Plaintiff does not address them here.

public company to make affirmative disclosures related to cybersecurity in SEC filings.

First, 17 C.F.R. § 229.106 requires companies to disclose certain cybersecurity information in Item 1C to Form 10-K filings. A public company is required to annually disclose its processes for assessing, identifying and managing material cybersecurity risks; material impacts the company has suffered from cybersecurity risks and incidents; management's role and expertise in assessing and managing material cybersecurity risks; and the board of directors' oversight of cybersecurity risks. 17 CFR § 229.106(b)-(c). *See also: In re Protecting the Nation's Communs. Sys.,* 2025 FCC LEXIS 2552, *10.

Meta's Form 10-K affirmatively represented that the company's "internal audit function provides independent assessment and assurance on the overall operations of our cybersecurity and privacy programs and the supporting control frameworks." (Compl. Ex. A ¶¶ 216, 328). *See* RJN, Exs. 2 and 3.[3]

Mr. Baig reported that these statements were demonstrably false. Internal audits had confirmed Meta lacked basic security infrastructure: no process to audit employee access to data, no 24/7 Security Operations Center, no comprehensive inventory of where user data was stored. Moreover, when internal auditors attempted to examine access controls, leadership brazenly blocked them. (Compl. Ex. A ¶ 216). A reasonable person in Mr. Baig's position would interpret that Meta violated these SEC requirements by representing its internal auditors provide "independent assessment" while actively preventing such oversight from occurring.

Second, pursuant to SEC rules, public companies are required to promptly disclose all material cybersecurity incidents, including the nature, scope, and timing of the incident, and the material impact or likely impact on the company, including financial condition and operations. *See* RJN, Ex. 5 (SEC Form 8-K, Item 1.05: Material Cybersecurity Incidents).

Meta systematically failed to disclose incidents that were indisputably material: 400

---

[3] Judicial notice is appropriate for SEC filings and publicly available financial information. *See Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (judicial notice proper for reported stock price history and other publicly available financial documents, including SEC filings); *In re Violin Memory Sec. Litig.*, No.: 13-CV-5486 YGR, 2014 U.S. Dist. LEXIS 155428, at *20 (N.D. Cal. Oct. 31, 2014) ("public records, such as SEC filings, are properly the subject of judicial notice, and routinely considered in deciding a motion to dismiss").

million user profile photos stolen daily through scraping and approximately 500,000 account compromises per day. (Compl. ¶¶ 33, 63). These breaches constituted violations of the $5 billion FTC Privacy Order—which had imposed the largest civil penalty in FTC history. Nevertheless, in its 2023 and 2024 10-K filings, Meta reported that it "did not identify any cybersecurity threats that have materially affected or are reasonably likely to materially affect our business strategy, results of operations, or financial condition." *See* RJN, Exs. 3 and 4.

Because Mr. Baig's disclosures related to SEC cybersecurity regulations constitute protected activity, this is by itself a sufficient basis for denying Defendants' motion.

**B.   Mr. Baig Reported to External Regulators – SEC AND OSHA**

In addition to making internal disclosures at Meta, Mr. Baig also reported Defendants' conduct and potential violations to external federal regulators.

On November 27, 2024, Mr. Baig disclosed to the SEC information pertaining to Meta's cybersecurity deficiencies, misrepresentation to shareholders, violation of cybersecurity regulations and FTC orders, deficient access controls, and obstruction of internal audit. Mr. Baig reported that Meta had failed to track and manage user data collection, identify data storage locations, and address systemic scraping and account takeover issues known to senior leadership. Compl. ¶ 33. Mr. Baig informed Mr. Zuckerberg of his SEC filing on December 4, 2024. Compl. ¶ 34. On January 17, 2025, Mr. Baig filed a pre-termination complaint with OSHA detailing Meta's violations of SOX.[4] Compl. ¶ 12.

Disclosures to "federal regulatory or law enforcement agency" are protected under SOX. 18 U.S.C.S. § 1514A(a)(1)(A). Accordingly, these disclosures constitute independent grounds for establishing defendants' liability in this case.[5]

---

[4] Mr. Baig and Defendant Meta had entered into numerous tolling agreements to extend the deadline for filing the OSHA complaint, based initially on a verbal warning Mr. Baig received in November 2022.

[5] The temporal proximity between Mr. Baig's disclosures to external regulators and his termination is compelling. He was fired less than two months after informing Mr. Zuckerberg that he had filed with the SEC and less than one month after informing Meta that he had filed the SOX complaint with OSHA. Compl. ¶ 70.

**C. Mr. Baig Reported Conduct He Reasonably Believed Constituted Shareholder Fraud**

Mr. Baig reasonably believed Meta's failure to disclose these massive, ongoing breaches was in violation of SEC rules. His belief was objectively reasonable in light of his extensive cybersecurity experience at major corporations and financial institutions where regulatory disclosure requirements were rigorously enforced.

Contrary to Defendants' assertions, Mr. Baig does not need to prove that a shareholder fraud violation actually occurred or establish all elements of such a claim in order to be protected under the SOX retaliation provision. Instead, he need only "possess a reasonable belief" that his disclosure "relates to a possible securities law violation [] that has occurred, is ongoing, or is about to occur." *See* 17 C.F.R. § 240.21F-2(b)(1)(i).

As the Administrative Review Board of the Department of Labor ("ARB") explained in its *Sylvester* decision, "the purposes of the whistleblower protection provision will be thwarted if a complainant must, to engage in protected activity, allege, prove, or approximate that the reported irregularity or misstatement satisfies securities law 'materiality' standards, was done intentionally, was relied upon by shareholders, and that shareholders suffered a loss because of the irregularity." *Sylvester v. Parexel Int'l LLC,* ARB Case No. 07-123, 2011 DOLSOX LEXIS 39 at *53 (Dep't of Labor May 25, 2011) (cited favorably by *Wadler,* 916 F.3d at 1187).

Accordingly, a plaintiff "can engage in protected activity under Section 806 even if he or she fails to allege or prove materiality, scienter, reliance, economic loss, or loss causation." *Id. See also: Wiest v. Lynch*, 710 F.3d 121, 133 (3d Cir. 2013) (adopting ARB interpretation that "a complainant can engage in protected activity under Section 806 even if he or she fails to allege or prove materiality, scienter, reliance, economic loss, or loss causation.").

Here, Mr. Baig has alleged that he reasonably believed that the conduct about which he was reporting may have constituted securities fraud. *See, e.g., Brinker v. Axos Bank,* No. 22-cv-386-MMA (DDL), 2023 U.S. Dist. LEXIS 121083, at *26 (S.D. Cal. July 13, 2023) ("To plausibly state a SOX whistleblower claim, Plaintiff need not plead that [defendant] actually engaged in securities fraud" but instead only "that she held a subjectively and objectively

1    reasonable belief that the conduct she complained of amounted to such a violation."); *Erhart v.*

2    *Bofi Holding, Inc.*, 269 F. Supp. 3d 1059, 1072 (S.D. Cal. 2017) (a plaintiff needs only "an

3    objectively reasonable belief of a violation" of shareholder fraud for purposes of 1514A, even if

4    the plaintiff "fails to allege, prove, or approximate specific elements of fraud"); *Smith v. Corning,*

5    *Inc.*, 496 F. Supp. 2d 244, 248 (W.D.N.Y. 2007) (Rejecting argument that "the complaint is

6    deficient because plaintiff has not alleged that his complaints concerned an actual fraud against

7    shareholders," as SOX whistleblower only needs reasonable belief that problem related to

8    shareholder fraud); *Sharkey v. J.P. Morgan Chase & Co., 80*5 F. Supp. 2d 45, 56 (S.D.N.Y. 2011)

9    (reasonable to believe that interference with investigation and legal compliance could subject the

10   company and shareholders to liability for purposes of SOX retaliation claim); *Mahony*, 2007 U.S.

11   Dist. LEXIS 22042, at *15 ("a fair and reasonable juror could find that Plaintiff reasonably

12   believed that the company was engaging in accounting practices that needed to be corrected before

13   its financial statements misled shareholders," despite plaintiff's lack of personal knowledge of

14   fraud).

15         Accordingly, Mr. Baig's allegations that he reasonably believed the conduct related to

16   shareholder fraud suffices for protected conduct and is itself a basis to deny Defendants' motion.

17         Even if Mr. Baig is required to show that his fraud theory "approximates" the basic

18   elements of a securities fraud claim – which, as noted above, he is not[6] – he has nonetheless

19   clearly done so. *See Van Asdale,* 577 F.3d at 1001 (The elements of a securities fraud claim are:

20   (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the

21   purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.)

22         First, Mr. Baig alleges that Meta engaged in material misrepresentation of facts by (1)

23   submitting SEC filings that stated that the company maintained an internal audit position while

24   omitting that the company actively blocked this function from proceeding; (2) misrepresenting

25

26   _____

     [6] *See Sylvester,* 2011 DOLSOX LEXIS 39, *52 ("Some courts have *<u>misinterpreted</u>* this analysis as
27   a requirement that SOX complainants must allege the elements of a securities fraud claim to
     qualify for protection.") (emphasis added); *Wiest,* 710 F.3d at 133 ("[T]he District Court erred by
28   requiring that an employee's communication reveal the elements of securities fraud, including
     intentional misrepresentation and materiality.").

security breaches as "hypothetical" future threats despite the fact that these were problems that had already materialized at staggering rates; (3) failing to disclose that Meta was in violation of the FTC order and thus that the company and its shareholders may be exposed to enormous fines and enforcement actions. *See* Compl. Ex. A ¶¶ 216, 351. Second, Mr. Baig alleged facts sufficient to show that he reasonably believed such conduct was deliberate, as evidenced by Defendants' systemic efforts to silence and deter his reports. *See* Compl. Ex. A ¶¶ 320, 349-351. Further, Mr. Baig demonstrated that he reasonably believed this conduct posed "material risk to shareholders and constituted fraud against investors who relied on the company's representations about its cybersecurity capabilities and regulatory compliance." Compl. ¶ 38.

### 1. Mr. Baig Reported Affirmative Misrepresentations—Not Pure Omissions

Defendants attempt to dismiss Mr. Baig's protected activity by characterizing his disclosures as complaints about "pure omissions" under *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024).[7] But Mr. Baig did not report that Meta stayed silent; he reported that Meta made affirmative statements to investors that were materially misleading because of critical facts it deliberately concealed. Compl. ¶ 37, Compl. Ex. A ¶¶ 349-354. Mr. Baig's reporting of these "half-truths" is protected activity under SOX.

### D. The 'Independent Audit' Half-Truth

Meta's Form 10-K assured investors: "Our internal audit function provides independent assessment and assurance on the overall operations of our cybersecurity programs..." (Compl. Ex. A ¶ 351). *See* RJN, Exhibits ___ (Meta 2023 10-K and 2024 10-K). This statement was a carefully crafted half-truth designed to mislead: While Meta technically employed an internal audit function, leadership was actively obstructing that function from examining the very risks investors most needed to understand. (Compl. Ex. A ¶¶ 216, 351).

Under *Macquarie*, Meta's statement in SEC filings regarding the internal audit function is precisely the kind of "half-truth" that constitutes actionable fraud. The Supreme Court explained that the failure to disclose information becomes misleading when "the omission renders

---

[7] Moreover, *Macquarie* is a direct securities fraud case, where the plaintiffs were required to actually prove a violation, unlike the instant case in which Plaintiff is required only to show a reasonable belief of a possible infraction.

affirmative statements made misleading." *Macquarie*, 601 U.S. at 265.

Investors reading Meta's 10-K would reasonably believe independent auditors had examined Meta's cybersecurity controls and provided assurance about their adequacy. Compl. Ex. A ¶¶ 216, 351. Under these circumstances, disclosure is required in order "to make statements made, in light of the circumstances under which they were made, not misleading." *Id.* at 264.

Meta's omission of the fact that it blocked those very auditors from assessing critical risks creates precisely such a mistaken impression. *See In re Equifax Inc. Securities Litigation,* 357 F. Supp. 3d 1189, 1228 (N.D. Ga. 2019) (statements about efforts to comply with cybersecurity requirements were misleading because a "reasonable investor would understand these statements to assure that the company was making actual, good faith efforts to maintain a data security protocol that complied with these standards" despite "systemic organizational disregard for cybersecurity"); *McEuen v. Riverview Bancorp, Inc.*, No. C12-5997 RJB, 2013 U.S. Dist. LEXIS 180423, at *11 (W.D. Wash. Dec. 19, 2013) (plaintiff entitled to SOX protection for disclosing defendant's actions to minimize audit findings, which "could mislead the Board as to [company's] actual risks, and materially affect [company's] financial statements and deceive investors").

### E.   Meta Misled Investors by Framing Security Breaches as "Hypothetical" Risks When in Fact Such Events Were Daily Realities

Meta's 10-K Risk Factors informed investors that "[s]ecurity breaches, improper access to or disclosure of our data or user data, other hacking and phishing attacks on our systems, or other cyber incidents *could* harm our reputation and adversely affect our business." (Compl. Ex. A, fn. 2, quoting Meta 2022 Annual Report Form 10-K) (emphasis added). *See also:* RJN, Exhibit 2, Meta 2023 Annual Report Form 10-K; Exhibit 3 2024 Meta 10-K). It further provided that the company experiences cyber-attacks and security incidents "from time to time." *Id.* Relatedly, in its 2023 and 2024 filings, Meta reported that it "did not identify any cybersecurity threats that have materially affected or are reasonably likely to materially affect our business strategy, results of operations, or financial condition." *See* RJN, Exs. 2 and 3.

Meta's SEC filings created the false impression that security breaches were occasional, manageable incidents that the company was monitoring. But as Mr. Baig reported, the risks were

not merely hypothetical events or incidents that occurred "from time to time," but rather massive, constant realities: on a *daily basis*, 400 million user profile photos were scraped and 500,000 user accounts were compromised—a staggering rate of attack that Meta was failing to adequately address. (Compl. ¶¶ 33, 63).

By framing ongoing catastrophic breaches as speculative future risks that "could" cause harm, Meta's affirmative risk disclosures were materially misleading. Indeed, the SEC had deemed similar statements – that user data "*may* be improperly accessed" – to be misleading in its 2019 charges, which resulted in a $100 million settlement against Meta. *See* Compl. Ex. A. ¶¶ 23-24. Moreover, Meta failed to disclose that it was violating the terms of the FTC privacy order and thus exposing the company and its shareholders to the possibility of enormous penalties and enforcement action. *See* Compl. Ex. A. ¶¶ 349-351.

In *In re Facebook, Inc. Sec. Litig.,* 84 F.4th 844 (9th Cir. 2023), the Ninth Circuit found that Meta-owned Facebook materially misled shareholders by representing in a Form 10-K that "third-party misuse of Facebook users' personal data was a purely hypothetical risk that could harm the company if it materialized," despite the fact that there was an ongoing data breach. *Id.* at 860. It explained that although the company was not under an affirmative obligation to disclose the security breach, it was misleading to "represent[] the risk of improper access to or disclosure of Facebook user data as purely hypothetical when that exact risk had already transpired." *Id.* at 859. "Because Facebook presented the prospect of a breach as purely hypothetical when it had already occurred, such a statement could be misleading even if the magnitude of the ensuing harm was still unknown." *Id.* at 860.

Like in *In re Facebook, Inc. Sec. Litig.,* a reasonable investor evaluating WhatsApp's risk of security breaches based on the 10-K would have understood the risk to be "merely conjectural." *Id*. at 949. Defendants' failure to disclose that the company was experiencing industrial-scale security failures every single day – and that leadership was choosing not to fix them – constituted material misrepresentation. *See also: In re Alphabet Sec. Litig.,* 1 F.4th 687, 704 (9th Cir. 2021) (company's "warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when [company] knew that those risks had materialized").

1

**1. Mr. Baig Reasonably Suspected Defendants' Conduct Was Deliberate**

2      Although Mr. Baig is not required to prove scienter to assert a SOX retaliation claim, his

3 allegations are nonetheless sufficient. Mr. Baig reported that: (1) executives were falsifying

4 security reports to conceal deliberate decisions not to remediate data theft risks; (2) leadership was

5 blocking independent audits to prevent documentation of control failures; (3) the company was

6 systematically violating a $5 billion federal consent decree; and (4) Meta was making false

7 statements to the SEC about having "independent assessment" of security programs.

8      Moreover, Defendants engaged in extensive efforts to silence Mr. Baig's reports and deter

9 further whistleblowing, including by expressly prohibiting Mr. Baig from further discussion of the

10 violation of the Privacy Order. *See* Compl. ¶¶ 53-54.

11      Under these circumstances, it was objectively reasonable for Mr. Baig to suspect that

12 Defendants' conduct could have been deliberate. *See Brinker,* 2023 U.S. Dist. LEXIS 121083 at

13 *27 (the company's "efforts to silence Plaintiff or otherwise cover up her concerns" supported

14 SOX whistleblower's reasonable belief of intent to defraud); *Gladitsch v. Neo@ogilvy, Ogilvy,*

15 *Mather, WPP Grp. USA, Inc.,* 2012 U.S. Dist. LEXIS 41904, at *24-25 (S.D.N.Y. Mar. 21, 2012)

16 (warning "to be careful about how you handle this, because heads could roll over something like

17 this," supported plaintiff's reasonable belief of intentional misrepresentation).

18      **2. Although Mr. Baig Is Not Required to Show Materiality for SOX Protection,**

19          **He Could Readily Do So; Meta's Stock Price Arguments Are Irrelevant**

20      Because Mr. Baig need not prove all of the elements of a shareholder fraud claim to be

21 entitled to SOX protection, Defendants' arguments that he fails to establish "materiality" are

22 irrelevant. *See Sylvester,* 2011 DOL Ad. Rev. Bd. LEXIS 47, *55 (no materiality requirement, as

23 "A wide range of conduct may be important to regulatory bodies or a reasonable investor that falls

24 short of satisfying the rigorous requirements for securities violations.")

25      Nevertheless, Mr. Baig's allegations clearly satisfy to demonstrate materiality.

26      Defendants point to a rise in Meta's stock the very next day after this lawsuit became

27 public and argue this proves Mr. Baig's disclosures were immaterial. MTD at 17-18. As an initial

28 matter, Defendants seek to impose a burden that is inappropriate at the pleading stage. Even if Mr.

Baig were required to prove materiality – which he is not – this issue is rarely appropriate on a motion for summary judgment, let alone on a motion to dismiss. *See United States v. Nicholas,* No. SACR 08-00139 CJC, 2008 U.S. Dist. LEXIS 104377, at *5 (C.D. Cal. Dec. 15, 2008) ("materiality is a question of fact that must be decided by a jury").

Moreover, Defendants' argument distorts the standard for determining materiality by urging a bright-line financial test that the Supreme Court has explicitly rejected. In order to show materiality, a plaintiff need not show that the disclosure of information had a dramatic effect on the stock price the very next day. Instead, determining materiality is a "fact-specific inquiry" that assesses "whether a *reasonable* investor would have viewed the nondisclosed information 'as having significantly altered the "total mix" of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28 (2011).

Indeed, the Ninth Circuit has explicitly rejected the "adoption of a bright-line rule requiring an immediate market reaction." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003). As the Court explained, "[t]he market is subject to distortions that prevent the ideal of a 'free and open public market' from occurring" and "these distortions may not be corrected immediately." *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 246, 248 n. 28 (1988). Thus, the "adoption of a bright-line rule assuming that the stock price will instantly react would fail to address the realities of the market." *Id. See also*: *United States v. Nicholas*, No. SACR 08-00139 CJC, 2008 U.S. Dist. LEXIS 104377, at *5-6 (C.D. Cal. Dec. 15, 2008) ("[T]he Ninth Circuit has held that statements or omissions may be material notwithstanding a lack of immediate market response after their disclosure to the public.").[8]

Moreover, the Ninth Circuit has held that "[i]n evaluating whether an omission relating to cybersecurity is materially misleading, we may consider the SEC's interpretive guidance regarding the adequacy of cybersecurity-related disclosures." *In re Alphabet Sec. Litig.,* 1 F.4th 687, 700 (9th Cir. 2021). "Because cybersecurity incidents may cause a range of substantial costs

---

[8] For example, here Meta's stock price dropped below its pre-filing price two days after this lawsuit was announced and did indeed plummet in the weeks and months thereafter.[8] See RJN, Ex. 4.

and harms, reasonable investors would likely find omissions regarding significant cybersecurity incidents material to their decisionmaking." *Id.* at 704-705. Here, Defendants' failure to disclose information that posed serious harm to the company's reputation, customer relationships, and risked significant regulatory action, is material. *Id.* at 703.

### 3. Mr. Baig Alleged Reasonable Belief That Conduct Risked Harm to Shareholders

Mr. Baig clearly alleges that he reasonably believed Meta's conduct "posed material risks to shareholders and constituted fraud against investors who relied on the company's representations about its cybersecurity capabilities and regulatory compliance." Compl. ¶ 38.

The conduct that Mr. Baig complained about included conduct that risked subjecting the company and its shareholders to billions in penalties and fines, raised significant questions about the integrity of Meta's leadership, and violated numerous laws.

Mr. Baig explicitly referenced the potential penalties in his warnings to leadership. On September 8, 2022, Mr. Baig reported Meta's misconduct and warned that "[t]he penalties can be severe both in terms of brand damage and fines," directly referencing the SEC and FTC settlements that had resulted in unprecedented penalties for similar failures. Compl. ¶ 22. In his January 2024 letter to Zuckerberg, Mr. Baig warned that Meta's ongoing falsification of security reports could lead to criminal penalties. Compl. ¶ 29.

Contrary to Defendants' contention (MTD at 19-20), these complaints clearly relate to securities fraud, as they concern misrepresentations to investors regarding key risks. His complaints pertained to misleading statements in public filings, which would have led reasonable investors to misjudge the cybersecurity risks and deficiencies that WhatsApp was facing. *See, e.g., In re Facebook, Inc. Sec. Litig.,* 84 F.4th at 859 ("A reasonable investor reading the 10-K would have understood the risk of a third party accessing and utilizing Facebook user data improperly to be merely conjectural."); *In re Equifax Inc. Sec. Litig.,* 357 F. Supp. 3d at 1251 (plaintiff adequately alleged connection with the purchase or sale of security, as statements regarding cybersecurity "could be highly relevant to analysts evaluating Equifax's stock").

With respect to the risk of regulatory action, courts have held that the failure to disclose

material that risked subjecting the company to liability could constitute material misrepresentation to shareholders. *See In re Alphabet Sec. Litig.,* 1 F.4th at 702-704 (failure to adequately disclose in SEC filings the risk of regulatory scrutiny, litigation, and enforcement action resulting from cybersecurity breaches was "materially misleading to a reasonable investor and significantly altered the total mix of information available to investors."); *Sharkey*, 805 F. Supp. 2d at 56 (company and shareholders could be subject to liability for noncompliance with legal requirements and thus interfering with compliance supported SOX retaliation claim based on shareholder fraud)

Further, the notion that Mr. Baig's concerns about regulatory action was "unduly speculative" must be rejected. MTD at 19-20. Indeed, Mr. Baig's fears were quite well-founded in light of the FTC's recent $5 billion penalty, ongoing enforcement orders, and other regulatory investigations and actions. *See* Compl. Ex. A ¶¶ 351-353.

In sum, Mr. Baig's reports related to possible shareholder fraud provide a separate category of protected activity and thus an independent basis for denying the motion to dismiss.

### F.   Mr. Baig Reported Circumvention of and Failures to Maintain Internal Controls

#### 1.   Obstructing the Audit Function Is a *Per Se* Internal Control Violation

Mr. Baig's reports about the obstruction of the internal audit function clearly constitute protected activity under SOX. For years, Mr. Baig advocated for internal audits of cybersecurity deficiencies and complained about the lack of appropriate audits, as well as Defendants' blocking of such measures. *See, e.g.,* Compl. ¶¶ 17, 28, 55-57; Compl. Ex. A. ¶¶ 300, 310, 332, 351.

The internal controls statute specifically prohibits circumventing a system of internal accounting controls. *See* 15 U.S.C.S. § 78m (5) ("No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls")

"Because the purpose of the [internal accounting controls] statute is to maintain accurate books and records for the company," interfering with audits constitutes a violation of this provision. *United States v. Wittig*, 425 F. Supp. 2d 1196, 1217 (D. Kan. 2006) (finding that "disallowing the Audit Director to conduct an audit of the use of the corporate aircraft (an asset) -- falls within the purview of the [internal controls] statute.")

By reporting that Meta leadership was blocking internal audits from examining access

controls and instructing auditors to claim "they already know about the issues" to avoid documentation, Mr. Baig was disclosing the circumvention of the entire control framework. (Compl. Ex. A ¶¶ 216, 351). *See, e.g., Wittig*, 425 F. Supp. 2d at 1218 ("A jury could reasonably conclude that Wittig circumvented the company's internal controls by blocking an internal audit, and by getting rid of the Audit Director."); *SEC v. Wilcox*, 663 F. Supp. 3d 146, 163 (D. Mass. 2023) (Defendant circumvented internal controls by making misrepresentations regarding compliance with internal controls to auditor).

Contrary to Defendants' characterization, Mr. Baig's allegations are not merely cybersecurity issues masquerading as a control issue. Instead, he reported pure internal control violations that happened to involve cybersecurity subject matter.

### 2. Defendants' Deficient Cybersecurity Reflected Inadequate Internal Control

Mr. Baig's disclosures also pertained to Meta's failure to maintain adequate internal controls and report deficient controls. *See* Compl. ¶¶ 37, 76.

SOX Section 404 requires companies to maintain controls ensuring "access to assets is permitted only in accordance with management's authorization." 15 U.S.C. § 78m(b)(2)(B)(iii). Mr. Baig reported that Meta lacked entirely controls over the user data: it lacked a comprehensive inventory of systems and data; it improperly allowed around 100,000 employees unfettered access to sensitive data without guard rails; and it failed to implement a monitoring systems to detect improper access. (Compl. ¶¶ 17, 21, 30).

The failure to disclose material weaknesses of financial controls related to data management qualifies for SOX whistleblower protection. *See, e.g., Prioleau v. Sikorsky Aircraft Corp.*, ARB Case No. 10-060, ALJ No. 2010-SOX-3 (ARB Nov. 9, 2011) 2011 DOLSOX LEXIS 85, *2 (employee's disclosures regarding deficient information security related to deletion of electronically stored information constituted protected activity under an internal controls theory); *Thomas v. Tyco Int'l Mgmt. Co., LLC*, 262 F. Supp. 3d 1328, 1336-37 (S.D. Fla. 2017) (employee's reports about lack of data security were protected under SOX as complaints about inadequate internal control).

Mr. Baig has thus adequately alleged that he is entitled to whistleblower protection for

1  reporting conduct he reasonably believed constituted a violation of the SOX internal controls

2  requirements.

3      Defendants invoke *SEC v. SolarWinds Corp.*, 741 F. Supp. 3d 37 (S.D.N.Y. 2024) to

4  contend that cybersecurity failures cannot violate internal accounting controls under SOX. *See*

5  MTD at 12. But Defendants wildly overstate the significance of *SolarWinds* and its applicability

6  here. *SolarWinds* was an SEC enforcement action asserting, among other things, that the

7  company's deficient cybersecurity constituted a failure to maintain internal accounting controls

8  under the Exchange Act § 13(b)(2)(B) (internal accounting controls). *Id.* at 49. To prevail in an

9  enforcement action, the SEC must prove an actual violation occurred.

10      Here, by contrast, Plaintiff does not have to prove that Meta *actually* engaged in any

11  specific securities violation, but instead need only show a "reasonable belief" of a potential

12  violation. That the SEC did not ultimately prevail in enforcing internal accounting-controls theory

13  in *SolarWinds* does not negate that a senior cybersecurity executive like Mr. Baig can reasonably

14  perceive Meta's conduct as flouting the internal controls requirement. Indeed, the fact that the

15  SEC prosecuted the *SolarWinds* matter – thus reflecting the agency's conviction that deficient

16  cybersecurity controls did constitute an internal controls violation – underscores just how

17  reasonable it was for Mr. Baig to believe that such a violation occurred.[9]

18      **G.  Mr. Baig Reported Wire Fraud Against Users**

19      Mr. Baig disclosed conduct he reasonably believed pertained to "wire fraud through

20  systemic failures to protect user data as represented to regulators and the public." Compl. ¶ 37.

21      Mr. Baig alleged that WhatsApp systematically misrepresented to users and regulators that

22  it protected data through end-to-end encryption and robust security measures, while

23  simultaneously: (1) allowing over 100,000 employees unfettered access to user data without

24  business justification; (2) failing to monitor who was accessing what data and why; (3) tolerating

25  400 million photos being stolen daily without implementing available countermeasures; and (4)

26  permitting 100,000 to 500,000 account takeovers daily without adequate preventive measures.

27  ─────────────────────────

28  [9] Further, although the court in *SolarWinds* found the cybersecurity failures insufficient for an internal controls theory, it found that the company's statements regarding cybersecurity controls and practices to be materially misleading statements to sustain a securities fraud claim. *Id.* at 83.

1    (Compl. ¶¶ 17-31, 63).

2          These allegations describe a classic scheme to defraud: Meta knowingly made false

3    representations about security practices to induce users to entrust their personal information to

4    WhatsApp. Users provided their data in reliance on WhatsApp's security promises, and WhatsApp

5    systematically failed to honor those promises. It was reasonable for Mr. Baig to believe that he

6    was reporting conduct that constituted wire fraud. *See Liu v. Tutor-Perini Corp.*, No. 2-21-cv-

7    05803-AB-Ex, 2023 U.S. Dist. LEXIS 150845, at *15 (C.D. Cal. July 12, 2023) (plaintiff

8    reasonably believed his disclosure related to defendant reporting false test results to government

9    and regulatory authorities via email constituted wire fraud).

10   **V.    INDIVIDUAL DEFENDANTS ARE PROPERLY NAMED**

11         Contrary to Defendants' contentions to the contrary, Mr. Baig's complaint specifically

12   alleges that each Individual Defendant personally participated in the retaliation against him. (*See,*

13   *e.g.,* Compl. ¶¶ 29, 34, 39-73; Compl. Ex. A ¶¶ 65, 96, 193-194, 203, 215, 229, 323, 251-252, 267,

14   302, 335).

15         As detailed in the Statement of Facts above, each Defendant played a specific, documented

16   role: Mukerji manufactured performance problems and issued explicit gag orders; Tsimelzon

17   intensified harassment and ordered evidence destruction; Gupta threatened termination and

18   excluded Mr. Baig from resources and approved Mr. Baig's termination; Cathcart facilitated

19   retaliation through calculated indifference; and Zuckerberg orchestrated unusual reporting

20   structures and authorized the termination after personally becoming aware of Mr. Baig's

21   whistleblowing activity.

22         These allegations are more than sufficient to support individual liability. *See Jones v.*

23   *Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 675 (4th Cir. 2015) (affirming jury award

24   imposing individual SOX liability on board chairman who was "involved in the decision to

25   terminate"); *Wadler v. Bio-Rad Labs., Inc.,* 141 F. Supp. 3d 1005, 1019 (N.D. Cal. 2015)

26   (interpreting SOX whistleblower provision liberally for broad imposition of individual liability for

27   "those who have the functional ability to retaliate against whistleblowers").

28

---

1

## VI.    CONCLUSION

2

For the foregoing reasons, the Court should deny the Defendants' Motion to Dismiss in its

3    entirety. If, in the alternative, the Court determines that Plaintiff has not pled sufficient facts to

4    establish any of his claims, Plaintiff respectfully requests leave to amend to add sufficient details.

5

6

7    DATED: January 21, 2026            SCHONBRUN SEPLOW HARRIS
                                       HOFFMAN & ZELDES LLP
8

9                                      By:   /s/Amanda E. Johnson
10                                         Wilmer J. Harris
                                           Amanda E. Johnson
11                                         *Attorneys for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28