# Attachment:
# Blackline Compare (FAC)



Wilmer J. Harris, SBN 150407
wharris@sshhzlaw.com
Amanda E. Johnson, SBN 342500
ajohnson@sshhzlaw.com
Katherine A. Wardlaw, SBN 353297
kwardlaw@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
715 Fremont Avenue, Suite A
South Pasadena, CA. 91030
Telephone: (626) 441-4129
Facsimile: (626) 283-5770

*Attorneys for Plaintiff, Attaullah Baig*

Deleted: wharris@sshhzlaw.com¶

Deleted: ajohnson@sshhzlaw.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

ATTAULLAH BAIG,

Plaintiff,

vs.

META PLATFORMS, INC., a corporation; PINAKI MUKERJI; MARK TSIMELZON; NITIN GUPTA; WILL CATHCART; MARK ZUCKERBERG; and DOES 1-10, inclusive,

Defendants.

Case No. 3:25-cv-07604 - LB

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR RETALIATION IN VIOLATION OF THE SARBANES-OXLEY ACT, 18 U.S.C. § 1514A**

**DEMAND FOR JURY TRIAL**

Judge: Hon. Laurel Beeler, U.S. Magistrate Judge

Complaint filed: September 8, 2025
Trial date: Not Set

Deleted: ¶
COMPLAINT¶
¶

## INTRODUCTION

1. Two billion people have trusted WhatsApp's explicit, repeated promise: that their communications are end-to-end encrypted, that nobody at WhatsApp can read them, and that the platform is committed to your privacy.

2. That promise was the foundation of WhatsApp's business. It was also, as Attaullah Baig, the person responsible for WhatsApp's security discovered, a lie.

3. Attaullah Baig joined Meta Platforms, Inc. ("Meta") as a Software Engineering Manager in January 2021 for a five-week "Bootcamp" onboarding period, during which Suren Verma persistently recruited him to join WhatsApp as its Head of Security. He began that specific role in February 2021. He had spent twenty years protecting sensitive data at major financial institutions and arrived with a clear understanding of what real security looks like. What he found was a company that had made binding legal commitments to the United States government, in a consent order entered following a $5 billion federal privacy penalty, and was systematically violating every one of those commitments. Approximately 1,500 WhatsApp engineers had unrestricted access to users' private data with no documentation of business need. There was no real-time breach detection capability. There was no inventory of what user data existed or where it was stored. Approximately 100,000 WhatsApp user accounts were being compromised daily through Account Takeovers (ATO), and separately, approximately 250,000 daily account compromises on Facebook, Meta's primary advertising platform, were also going unreported. Over 400 million user profile photos were being leaked to external scrapers every day. And none of it was being reported to the regulators the company had solemnly promised to notify. WhatsApp's security was not imperfect. It did not exist. And the failures did not stop at WhatsApp's product boundary — they pervaded the entire Meta enterprise.

4. The stakes of this deception extend far beyond the balance sheets of investors. WhatsApp is not merely a consumer messaging application. It is the primary communications channel for political dissidents, journalists, human rights workers, lawyers, doctors, and government officials in more than 180 countries. It is used by members of the United States Congress, foreign heads of state, military officers, intelligence professionals, and law enforcement agents to transmit information that is,

Deleted: COMPLAINT¶

in some cases, literally classified. The platform is specifically marketed on the premise that no one — not even Meta — can read what is communicated through it. That premise is the reason governments, militaries, journalists, and activists entrust their most sensitive communications to it. What Mr. Baig discovered was that the premise was false: between 20,000 and 65,000 Meta employees had unrestricted access to user data, there was no audit trail of who accessed what, and real-time breach detection did not exist. A hostile foreign intelligence service, a commercial spyware vendor, a rogue employee, or a sophisticated external attacker exploiting WhatsApp's documented access control architecture could have accessed the private communications of dissidents, diplomats, and defense officials without detection, without notification, and without any record that access had occurred. In fact, three days before his termination, Mr. Baig informed the Director of Public Policy at WhatsApp that WhatsApp would not meet the cybersecurity bar required for use by the United States House of Representatives. Meta was publicly marketing WhatsApp as a government-grade secure communications platform while internally documenting that it could not meet the security threshold of a single branch of Congress. The misrepresentations this case challenges are therefore not merely securities violations: they are representations whose falsity created identifiable national security vulnerabilities, and whose concealment from investors, regulators, and users was executed with deliberate institutional intent.

5. This is not a WhatsApp story. It is a Meta story. The modified consent order entered by the United States District Court for the District of Columbia as a condition of Meta's $5 billion Federal Trade Commission (FTC) settlement took effect in April 2020 ("2020 Privacy Order") and imposed a single, enterprise-wide comprehensive privacy program spanning every Meta product and platform: Facebook, Instagram, WhatsApp, and all other Meta applications. Defendant Zuckerberg's annual certifications of compliance with that program were not WhatsApp-specific representations. They were enterprise-wide certifications, signed under penalty of criminal prosecution, representing that a single unified compliance infrastructure governing more than three billion users across all platforms was functioning as described. What Mr. Baig documented at WhatsApp was therefore simultaneously a documentation of the non-existence of that enterprise-wide program. His January 2, 2024 letter to



Deleted: COMPLAINT¶

Zuckerberg reported not only approximately 30,000 daily ATOs in WhatsApp — a figure drawn from internal metrics that, as Mr. Baig had been separately reporting, were being regularly manipulated by the WhatsApp Integrity team around performance management cycles — but also approximately 250,000 daily ATOs on Facebook, Meta's primary revenue-generating platform, none of which were being reported as Covered Incidents under the FTC Order. The WhatsApp ATO figure, approximately 100,000 per day throughout most of Mr. Baig's tenure, was only confirmed at its actual scale of approximately 500,000 daily compromises when Post-Compromise Account Recovery ("PCR") was deployed in December 2024. The access control failures Mr. Baig documented at WhatsApp — between 20,000 and 65,000 Meta employees with unrestricted access to user data ("Covered Information," the 2020 Privacy Order's term for all user personal data)— were Meta employee access failures, not WhatsApp engineering failures. The falsified security reports generated by the X-Sec team, the internal security unit responsible for generating compliance assessment reports, were Meta compliance reports supporting enterprise-wide certifications. The audit pipeline blocked by senior Meta officers ran to the Board's Audit and Risk Oversight Committee ("AROC"), which governed all of Meta, not merely WhatsApp. And the CEO who certified to the SEC that the enterprise-wide compliance program was functioning had received, in writing, from his own Head of WhatsApp Security, documentation that it was not. This is a case about an enterprise-wide fraud maintained at the highest levels of one of the world's most powerful technology companies.

6. This is not a case about whether WhatsApp or Meta had adequate security. It is a case about a publicly traded company that annually certified to investors, under penalty of criminal prosecution, that it was maintaining a compliance program required by a federal court order when, in fact, the person responsible for that compliance program was simultaneously telling the company's CEO, in writing, that the program did not exist. The gap between what Meta was certifying to investors and what its own Head of Security was documenting internally is not a matter of engineering judgment or technical dispute. It is a documented, recurring, investor-facing misrepresentation by a company that had already paid $5 billion to the government for the same category of compliance misrepresentation, made by a CEO who knew the certification was false before he signed it.

Deleted: COMPLIANT

7. At the same time, Meta's CEO, Mark Zuckerberg, was signing annual certifications filed with the Securities and Exchange Commission (SEC), under penalty of criminal prosecution, representing to investors that Meta was "maintaining a comprehensive privacy program" in full compliance with the FTC consent order, that Meta's disclosure controls were effective, and that the annual reports contained no material misstatements. Those certifications were false. The compliance program they described had never been built. Mr. Baig told Zuckerberg directly — twice, in writing — that the certifications were false, that Meta was defrauding shareholders, and that the conduct he was documenting could lead to criminal penalties. Zuckerberg certified the next annual report anyway.

8. Mr. Baig reported what he found. He reported it to his supervisors, in formal written assessments naming the specific provisions of the FTC consent order being violated. He reported it to the Head of WhatsApp, in a briefing that prompted a threat to fire him for writing it. He reported it to the CEO, in two detailed letters describing conduct that could lead to regulatory penalties and lawsuits. He reported it to the United States House of Representatives, through its Public Policy Director, that WhatsApp could not meet the minimum cybersecurity threshold for use by Congress. He reported it to the federal government's securities regulator, in a formal SEC whistleblower submission identifying specific statutory violations and requesting a whistleblower award. Each time he reported, Meta punished him. His supervisors downgraded his performance ratings, denied him promotions and equity grants totaling more than a million dollars, ordered him to stop raising compliance concerns, reprimanded him for performing his legal obligations, deleted the documentation he created, rolled back the security solutions he built, and ultimately terminated his employment, less than one month after he notified Meta of his administrative complaint with the U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA") and approximately ten weeks after he notified Zuckerberg of his SEC filing.

9. This action is brought to recover for the economic and personal harm Mr. Baig suffered as a direct result of that retaliation, and to vindicate a principle that matters far beyond this litigation: that a company entrusted with the private communications of two billion people, used by journalists in authoritarian countries, dissidents hiding from hostile governments, and officials of the United States

Deleted: COMPLAINT

government, can neither lie to its investors about whether that trust is honored nor silence the employee who discovered the lie by destroying his career when he reported it.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1514A(b)(1)(B), which provides that an employee who prevails on a complaint filed pursuant to 29 C.F.R. Part 1980 may file a complaint in the district court of the United States after 180 days have elapsed since the filing of the administrative complaint.

Deleted: the subject matter of Plaintiff's claims arising under federal law

Deleted: .

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1514A(b)(1)(B). The events and omissions giving rise to the claims herein occurred in this district. Meta maintains its principal place of business at 1 Hacker Way, Menlo Park, California 94025, which is located in this district. WhatsApp is headquartered in this district. The adverse employment actions about which Mr. Baig complains occurred while he was employed in this district.

Deleted: District Court

Deleted: )(2) as the

Deleted: asserted

Deleted: District.

12. On January 17, 2025, Mr. Baig filed a pre-termination OSHA complaint, pursuant to 29 C.F.R. § 1980.103, detailing Meta's violations of the Sarbanes-Oxley Act of 2002 (SOX) and the pattern of retaliation he was experiencing. That complaint was supplemented by a post-termination filing on April 11, 2025. Prior to the January 2025 filing, Mr. Baig and Defendant Meta had entered into numerous tolling agreements extending the deadline for filing the OSHA complaint, based initially on a verbal warning Mr. Baig received in November 2022 concerning the retaliatory actions being taken against him. The tolling agreements reflect Meta's awareness throughout the retaliation period that Mr. Baig's adverse employment treatment was potentially actionable under SOX. The tolling agreements expressly cover all adverse employment actions taken from November 2022 forward, preserving the full damages period for each of the SOX counts against any limitations challenge. More than 180 days have elapsed since the filing of the administrative complaint. Mr. Baig therefore has the right to file this action in federal district court pursuant to 18 U.S.C. § 1514A(b)(1)(B). The January 17, 2025 OSHA administrative complaint, as supplemented on April 11, 2025, encompassed the full scope of protected activity, adverse employment actions, and legal theories alleged in each Count of this Complaint. The OSHA complaint identified conduct that he reasonably believed either was, or

Deleted: COMPLAINT¶

possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud — including violations of Rules 10b-5, 13b2-1, 13b2-2, 13a-14, 13a-15, 21F-17, and 229.106 — as the subject matter of Mr. Baig's protected disclosures; identified Covered Incident under-reporting, audit obstruction, and records falsification; and specifically identified each named Defendant's participation in the retaliatory campaign as a basis for individual liability. The April 11, 2025 supplement also implicated the Form 8-K non-disclosure theory, the WhatsApp revenue attribution Regulation G theory, the SEC cybersecurity disclosure rule claims under Item 106, and each additional legal theory developed in the Counts below. The OSHA administrative complaint therefore satisfies the exhaustion prerequisite for each Count asserted in this federal action with respect to each named Defendant, and no Count or named Defendant is outside the scope of the administrative complaint that preceded this federal filing.

**PARTIES**

13. Plaintiff Attaullah Baig is a resident of the state of Texas who has primarily worked for Meta out of his home in Texas and Meta's offices in Menlo Park, California and in London, United Kingdom. From February 2021 through February 10, 2025, Mr. Baig was employed by Meta as Head of Security at WhatsApp. Mr. Baig has over twenty years of cybersecurity experience, including leadership roles at major financial institutions and regulated entities.

14. Defendant Meta is a Delaware corporation with its principal place of business at 1 Hacker Way, Menlo Park, California 94025. Meta is a publicly traded company listed on the NASDAQ exchange under the ticker symbol "META." Meta is the parent corporation of WhatsApp LLC, through which it operates the WhatsApp messaging platform. Meta is a "covered company" subject to the reporting requirements of the Securities Exchange Act of 1934 and the whistleblower protection provisions of 18 U.S.C. § 1514A, and operates under the 2020 Privacy Order.

15. While Chris Cox is not a named Defendant, Cox is the Chief Product Officer of Meta, with product authority over WhatsApp and all other Meta family applications. As Chief Product Officer, Cox held supervisory authority over WhatsApp's product and engineering leadership, including the teams and individuals responsible for the cybersecurity and compliance failures Mr. Baig

**Deleted:** <#>Mr. Baig was the Head of Security, WhatsApp at Defendant Meta Platforms, Inc. ("Meta"). Prior to his employment with Meta, Mr. Baig had acquired substantial expertise in cybersecurity with employment at PayPal, Capital One, Whole Foods, among others. He is a resident of the state of Texas. At all times relevant to this Complaint, Mr. Baig was a covered employee within the meaning of SOX.
Defendant

**Deleted:** Platforms, Inc. ("Meta") is a covered employer under SOX because it

**Deleted:** with equity securities that are registered with the U.S. Securities and Exchange Commission ("SEC") under the Securities Act of 1933, as amended, (the "Securities Act)," and which are traded

**Deleted:** Stock Exchange (NASDAQ: META). Pursuant to section 15(d)

**Deleted:** (the "Exchange Act"), Meta is required to file periodic quarterly (Form 10-Q) and annual (Form 10-K) reports with the SEC.

**Deleted:** <#>Defendant Pinaki Mukerji was Director of Engineering, WhatsApp at Meta and was Mr. Baig's supervisor from June 2021 through May 2024.
Defendant Mark Tsimelzon is the current Director of Engineering, WhatsApp at Meta and was Mr. Baig's supervisor from May 2024 through February 2025.
Defendant Nitin Gupta is the current Vice President, Head of Engineering, WhatsApp at Meta.
Defendant Will Cathcart is the current Vice President, Head of WhatsApp at Meta.
Defendant Mark Zuckerberg is the current Chief Executive Officer of Meta.
Defendants Mukerji, Tsimelzon, Gupta, Cathcart, and Zuckerberg are hereto referred to as "Individual Defendants."
**EXHAUSTION**
Mr. Baig and Defendant Meta entered into a tolling agreement dated May 6, 2023, in order to extend the deadline to file a complaint with the Department of Labor's Occupational Safety and Health Administration ("OSHA") under SOX based on a verbal warning Mr. Baig received on November 14, 2022. This tolling agreement, originally set to expire 180 days after the May 6, 2023, effective date, has since been amended nine times to extend this and all other filing deadlines. The most recent extension of this tolling agreement expired on January 15, 2025.
On January 17, 2025, Mr. Baig filed a pre-termination complaint with OSHA. OSHA acknowledged the complaint and determined that the filing was timely, thus preserving all the previous claims dating back to at least November 14, 2022.
Mr. Baig received a notice of termination of employment due to poor performance on February 10, 2025. On April 11, 2025 Mr. Baig filed an additional SOX complaint based on his termination. The OSHA actions were consolidated by an order on May 6, 2025. This new adverse action falls within the 180-day statute of limitations for claims under SOX.
More than 180 days have passed since Mr. Baig filed his OSHA complaint on January 17, 2025, without a final decision.
On September 8, 2025, Plaintiff submitted his Notice of Intent to Remove his Sarbanes-Oxley claims to federal court. Accordingly, Plaintiff has exhausted his administrative remedies prior to bringing this action.

**Deleted:** COMPLAINT

documented and reported. Cox received or had constructive access to Mr. Baig's cybersecurity disclosures through the WhatsApp VP-level leadership chain. Cox's role in the institutional decision to perpetuate the retaliatory campaign against Mr. Baig rather than address the violations he documented is alleged herein as factual background supporting the liability of the named Defendants, as Cox's authority and knowledge are attributable to Meta and to the individual Defendants who reported to or coordinated with him.

16. Defendant Mark Zuckerberg is an individual and at all relevant times was the Chief Executive Officer of Meta. As CEO, Defendant Zuckerberg executed annual certifications pursuant to Sections 302 and 906 of SOX, 15 U.S.C. § 7241 and 18 U.S.C. § 1350, attesting to the accuracy of Meta's annual reports filed with the SEC and to the effectiveness of Meta's disclosure controls and procedures. Mr. Baig sent letters directly to Defendant Zuckerberg on January 2, 2024, and December 4, 2024, describing violations of the 2020 Privacy Order and SEC rules. Defendant Zuckerberg is sued in his individual capacity as a supervisor of Mr. Baig within the meaning of 18 U.S.C. § 1514A. Defendant Zuckerberg is also sued in his individual capacity as an agent of Meta within the meaning of 18 U.S.C. § 1514A(a), which covers "any officer, employee, contractor, subcontractor, or agent" of a covered company who takes retaliatory action against a whistleblower. To the extent any adverse employment action attributed to Defendant Zuckerberg in this Complaint occurred during a period when he did not hold direct supervisory authority over Mr. Baig, that action is actionable on the agent theory independently of the supervisor theory. Both theories are pled in the alternative; proof of one does not limit recovery under the other.

17. Defendant Will Cathcart is an individual and at all relevant times was the Vice President and Head of WhatsApp at Meta. Defendant Cathcart directly received Mr. Baig's August, September, and October 2022 disclosures regarding WhatsApp's cybersecurity failures and FTC Privacy Order non-compliance, and he subsequently took and approved adverse employment actions against Mr. Baig. Defendant Cathcart is sued in his individual capacity as a supervisor of Mr. Baig within the meaning of 18 U.S.C. § 1514A. Defendant Cathcart is also sued in his individual capacity as an agent of Meta within the meaning of 18 U.S.C. § 1514A(a), which covers "any officer, employee,

Deleted: COMPLAINT

contractor, subcontractor, or agent" of a covered company who takes retaliatory action against a whistleblower. To the extent any adverse employment action attributed to Defendant Cathcart in this Complaint occurred during a period when he did not hold direct supervisory authority over Mr. Baig, that action is actionable on the agent theory independently of the supervisor theory. Both theories are pled in the alternative; proof of one does not limit recovery under the other.

18. Defendant Nitin Gupta is an individual and at all relevant times was the Vice President, Head of Engineering at WhatsApp. Defendant Gupta directly received Mr. Baig's compliance disclosures, threatened to terminate Mr. Baig for raising them, and orchestrated the adverse employment actions taken against Mr. Baig. Defendant Gupta is sued in his individual capacity as a supervisor of Mr. Baig within the meaning of 18 U.S.C. § 1514A. Defendant Gupta is also sued in his individual capacity as an agent of Meta within the meaning of 18 U.S.C. § 1514A(a), which covers "any officer, employee, contractor, subcontractor, or agent" of a covered company who takes retaliatory action against a whistleblower. To the extent any adverse employment action attributed to Defendant Gupta in this Complaint occurred during a period when he did not hold direct supervisory authority over Mr. Baig, that action is actionable on the agent theory independently of the supervisor theory. Both theories are pled in the alternative; proof of one does not limit recovery under the other.

19. Defendant Pinaki Mukerji is an individual who served as Mr. Baig's direct supervisor beginning in June 2021 through May 2024. Prior to Mr. Baig's first cybersecurity disclosure, Defendant Mukerji gave him a performance rating of "Exceeded Expectations" in February 2022; praised his "[e]xtreme focus and clarity on project scope, timeline etc." in June 2022; and told him he had put his name up for promotion and initiated a Growth Plan review at the July 2022 Touchpoint — all within three months of the retaliation that began in September 2022. Defendant Mukerji directly retaliated against Mr. Baig following his protected disclosures by downgrading his performance ratings and ordering him to cease raising FTC compliance concerns. Although Mukerji ceased to be Baig's direct supervisor in May 2024, his liability extends to adverse actions taken after that date because the falsified retaliatory performance record he created from September 2022 through May 2024 was the direct causal predicate for the subsequent retaliatory ratings, project blockings, and termination carried

Deleted: COMPLAINT

out by Defendants Gupta and Tsimelzon. Defendant Mukerji is sued in his individual capacity as a supervisor of Mr. Baig within the meaning of 18 U.S.C. § 1514A. Defendant Mukerji is also sued in his individual capacity as an agent of Meta within the meaning of 18 U.S.C. § 1514A(a), which covers "any officer, employee, contractor, subcontractor, or agent" of a covered company who takes retaliatory action against a whistleblower. To the extent any adverse employment action attributed to Defendant Mukerji in this Complaint occurred during a period when he did not hold direct supervisory authority over Mr. Baig, that action is actionable on the agent theory independently of the supervisor theory. Both theories are pled in the alternative; proof of one does not limit recovery under the other.

20. While Suren Verma is not a named Defendant, Verma served as one of the functional supervisors of Mr. Baig within the meaning of 18 U.S.C. § 1514A(a)(1)(C) from January 2021 through September 2022. Mr. Baig started to report directly to Defendant Mukerji in June 2021 but continued to have regular contact with Verma. Verma had personally recruited Mr. Baig into the Head of WhatsApp Security role during Mr. Baig's Meta onboarding Bootcamp in January 2021, held senior WhatsApp engineering leadership authority over the security function to which Mr. Baig's team reported, and exercised supervisory authority in directing Mr. Baig's work and in receiving and responding to his compliance disclosures from January 2021 through September 2022. Mr. Baig's disclosures to Verma during that period were therefore disclosures to "a person with supervisory authority over the employee" within the meaning of § 1514A(a)(1)(C), and Verma's conduct is attributable to Meta as the act of its supervisor operating within the scope of his institutional authority. The supervisor-and-agent theory pleaded at ¶152 extends to Verma's conduct to the extent that conduct contributed to the continuing retaliatory scheme pleaded throughout this Complaint.

21. Defendant Mark Tsimelzon is an individual who served as Mr. Baig's direct supervisor from approximately May 2024 through the date of Mr. Baig's termination. Defendant Tsimelzon escalated the retaliation against Mr. Baig, gave him a "Below Expectations" rating, ordered deletion of a security report earlier on the same day Mr. Baig later filed his SEC Form TCR (Tips, Complaints, and Referrals), and reprimanded Mr. Baig for raising WhatsApp's legal reporting obligations for scraping incidents under the 2020 Privacy Order. Defendant Tsimelzon is sued in his individual

Deleted: COMPLAINT

capacity as a supervisor of Mr. Baig within the meaning of 18 U.S.C. § 1514A. Defendant Tsimelzon is also sued in his individual capacity as an agent of Meta within the meaning of 18 U.S.C. § 1514A(a), which covers "any officer, employee, contractor, subcontractor, or agent" of a covered company who takes retaliatory action against a whistleblower. To the extent any adverse employment action attributed to Defendant Tsimelzon in this Complaint occurred during a period when he did not hold direct supervisory authority over Mr. Baig, that action is actionable on the agent theory independently of the supervisor theory. Both theories are pled in the alternative; proof of one does not limit recovery under the other.

22. The true names and capacities of Defendants named herein as Does 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

**FACTUAL ALLEGATIONS**

23. Attaullah Baig is a cybersecurity professional with more than twenty years of experience protecting the sensitive data of millions of people. In January 2021, he joined Meta for a five-week "Bootcamp" onboarding period, and in February 2021, he became Head of Security at WhatsApp, the world's largest messaging platform, and was given responsibility for ensuring the platform protected its users' private information as required by law. What he found was a company that had made formal legal promises to the United States government about how it would handle user data, and that was systematically breaking every one of those promises, while telling investors and regulators that everything was fine. Mr. Baig reported what he found. He reported it internally, to his supervisors, to the company's CEO, and ultimately to the federal government's securities regulator. Each time he did, Meta punished him. This complaint tells that story.

**I. META'S HISTORY OF MISUSING USER DATA AND REGULATORY RECIDIVISM**

24. Meta, formerly known as Facebook, Inc., has been the subject of repeated government investigations, enforcement actions, and financial penalties spanning more than fifteen years for systematically misrepresenting its data privacy practices to users, investors, and regulators. The conduct at issue in this case is not isolated misconduct by a company that had otherwise protected user

**Deleted:** <#>Mr. Baig observed what he reasonably believed to be several violations of the Sarbanes Oxley Act, including, without limitation, failure to disclose information security issues, potentially committing shareholder fraud, violations of SEC rules relating to internal controls, and/or failure to disclose material weaknesses in internal controls related to information security under Sections 302 and 404 of the Act. ¶
//¶
**Initial Discovery and Early Reporting (2021-2022)¶**
Beginning in September 2021, shortly after joining WhatsApp as Head of Security, Mr. Baig discovered systemic cybersecurity failures that posed serious risks to user data and violated Meta's legal obligations under the 2020 Privacy Order and federal securities laws. Through a "Red Team Exercise" conducted with Meta's Central Security team, Mr. Baig discovered that approximately 1,500 WhatsApp engineers had unrestricted access to user data, including sensitive personal information covered by the FTC Privacy Order, and could move or steal such data without detection or audit trail.¶
From September 2021 through September 2022, on approximately five separate occasions, Mr. Baig raised concerns with his supervisor Suren Verma that WhatsApp lacked fundamental cybersecurity knowledge required for regulatory compliance, specifically: (a) what user data it was collecting; (b) where and how it was storing such data; and (c) who had access to it. Mr. Verma consistently ignored these concerns and directed Mr. Baig to focus on less critical application security tasks.¶
In February 2022, recognizing the urgent need for systemic data protection, Mr. Baig created a comprehensive product requirements document for the Privacy Infrastructure team to build a data classification and handling system necessary for compliance with the 2020 Privacy Order. This represented the first concrete step toward addressing WhatsApp's fundamental data governance failures. Mr. Baig understood that Meta's culture is like that of a cult where one cannot question any of the past work especially when it was approved by someone at a higher level than the individual who is raiding the concern.¶
**Formal Escalation to Senior Leadership (August-October 2022)¶**
On August 18, 2022, following two cybersecurity incidents affecting WhatsApp users, Mr. Baig met with Will Cathcart, Vice President, and Head of WhatsApp, along with other senior executives including Vice President of Global Communications Carl Woog, Director & Associate General Counsel Jessica Romero, and Associate General Counsel Brady Freeman. In this meeting, Mr. Baig disclosed WhatsApp's dangerous cybersecurity understaffing and systemic security failures, specifically informing Mr. Cathcart that WhatsApp had only ten engineers working on security while comparably sized companies required approximately two hundred security professionals.¶
At Mr. Cathcart's express request, Mr. Baig prepared a comprehensive

**Deleted:** ______________________________¶
COMPLAINT¶

data responsibly. It is the latest chapter in a documented pattern of serial violations that the FTC itself has described as flagrant and that has resulted in the single largest consumer privacy penalty in United States history and the single largest General Data Protection Regulation (GDPR) fine in the history of the European Union.

**A. The 2009–2012 FTC Investigation and First Consent Order**

25. As early as 2009, privacy organizations including the Electronic Privacy Information Center filed formal complaints with the FTC alleging that Facebook's practices were unfair and deceptive. The complaints documented that Facebook granted third-party applications unrestricted access to user data without users' knowledge or consent, and that Facebook repeatedly changed its privacy settings in ways that made previously private information publicly accessible.

26. Following an investigation, the FTC entered into a consent order with Facebook in August 2012 ("2012 Order"). The 2012 Order required Facebook to, among other things: (a) refrain from misrepresenting the privacy or security of users' personal information; (b) refrain from misrepresenting the extent to which users could control the privacy of their data; (c) obtain users' affirmative express consent before sharing their information in ways that exceeded their privacy settings; (d) establish and maintain a comprehensive privacy program designed to protect user data; and (e) submit to biennial third-party privacy assessments for twenty years.

**B. Violations of the 2012 Order: The Third-Party Developer Data-Sharing Scandal**

27. In violation of the 2012 Order, Facebook continued to share user data with third-party application developers through its "Platform" feature, including data belonging to users' Facebook friends — people who had never installed the relevant application themselves and whose data was shared without their consent. Facebook did not inform its own independent privacy assessors that this practice was occurring, an early instance of the same pattern of concealing compliance failures from oversight personnel that Mr. Baig later documented at WhatsApp.

28. The scope of this violation became publicly known through the Cambridge Analytica scandal, which broke in March 2018. Cambridge Analytica, a British political consulting firm, had harvested personal data from approximately 87 million Facebook users through a third-party

Deleted: COMPLAINT

application, and used that data for political profiling and targeting, including in connection with the 2016 United States presidential election. Despite the clear relevance of this data collection to the 2012 Order's requirements, Facebook did not proactively disclose the Cambridge Analytica data harvest to the FTC.

**C. Additional Violations: Security Feature Phone Numbers and Facial Recognition**

29. The FTC's post-Cambridge Analytica investigation uncovered two additional categories of serious violations. First, between November 2015 and March 2018, Facebook asked users to provide phone numbers to enable security features, including two-factor authentication, without disclosing that it would also use those phone numbers for targeted advertising. Second, Facebook misrepresented to tens of millions of users that they would need to affirmatively opt into its facial recognition "Tag Suggestions" feature. In fact, the feature was turned on by default for approximately 60 million users who had been misled about their ability to turn it off.

**D. The 2019 FTC Settlement: $5 Billion Penalty and the 2020 Privacy Order**

30. In July 2019, following a year-long investigation, the FTC and the Department of Justice reached a settlement with Facebook. Facebook agreed to pay $5 billion, the largest consumer privacy penalty in United States history, nearly twenty times larger than any prior FTC privacy penalty. The settlement resolved charges that Facebook had repeatedly and flagrantly violated the 2012 Order by deceiving users about their ability to control the privacy of their personal information.

31. The 2019 settlement was approved by the United States District Court for the District of Columbia and entered as a Stipulated Order in April 2020 — the 2020 Privacy Order that governs this case. It required Facebook to: restructure its privacy governance from the board level down; establish an Independent Privacy Committee; require personal compliance certifications by the CEO (Defendant Zuckerberg); implement a comprehensive data security program across all products and platforms including WhatsApp; submit to biennial independent privacy assessments; timely report Covered Incidents to the FTC; and restrict employee access to user data to those with documented business need.

32. Importantly, the 2020 Privacy Order imposed these obligations on Meta as an



Deleted: COMPLAINT

enterprise, not on WhatsApp as a discrete unit. The comprehensive privacy program Meta was required to maintain — and that it represented to investors as maintained — was a single program spanning all Meta platforms, including Facebook, Instagram, and WhatsApp. Defendant Zuckerberg's annual certifications of compliance with this program were therefore enterprise-wide certifications, and the materiality of any misrepresentation about that program is measured by its significance to Meta as a whole.

33. In June 2019, the SEC separately brought an enforcement action against Facebook for misleading investors about cybersecurity risks. The SEC charged that Facebook, for over two years, described the risk of third-party misuse of user data as hypothetical, using language like "our users' data may be improperly accessed," while knowing that Cambridge Analytica had already improperly accessed data of approximately 87 million users. Facebook paid $100 million to resolve the SEC charges. When Mr. Baig discovered in 2021–2022 that Meta was again characterizing massive ongoing daily cybersecurity failures as speculative future risks, his belief that this conduct constituted securities fraud was not merely reasonable; it was confirmed by his knowledge that the SEC had already held Meta liable for exactly this category of investor misrepresentation.

**E. The 2023 FTC Order to Show Cause: Continued Deficient Compliance**

34. On May 3, 2023, the FTC initiated an administrative proceeding against Meta, only three years into the 2020 Privacy Order's twenty-year term, alleging deficient compliance with the Order. The FTC has stated that Meta's conduct "violated the 2020 Administrative Order and jeopardized consumers' privacy" and that Meta "did not buy itself out of the FTC's statutory enforcement scheme" by paying the $5 billion penalty. This proceeding is ongoing and is acknowledged in Meta's own SEC filings.

35. The FTC's May 3, 2023 show cause order against Meta extends well beyond Children's Online Privacy Protection Rule (COPPA) issues. It alleges violations of the 2012 consent order, the 2020 Privacy Order, Section 5 of the FTC Act, and the COPPA Rule, and it proposes strengthened compliance requirements in areas including privacy review, third-party monitoring, data inventory, access controls, and employee training — the same enterprise-wide compliance categories Mr. Baig

Deleted: COMPLAINT¶

had been documenting as non-functional at WhatsApp since September 2021. The FTC's administrative complaint alleged that Meta's privacy program had "gaps and weaknesses" of varying significance, a finding that describes deficiencies extending across multiple core elements of the 2020 Privacy Order's compliance infrastructure, rather than a single product line or engineering team. This is the regulatory backdrop against which Meta continued to represent in its annual Form 10-K filings that it was "maintaining a comprehensive privacy program in connection with the FTC consent order." Mr. Baig's internal and regulatory disclosures placed the accuracy of that representation directly at issue.

**F. European Enforcement: The Record GDPR Fine**

36. In May 2023, the Irish Data Protection Commission (DPC) issued Meta Ireland a €1.2 billion administrative fine — the largest GDPR fine in the history of the European Union. The European Data Protection Board (EDPB) characterized the infringement as serious, systematic, repetitive and continuous, and committed with at least the highest degree of negligence. In 2022, the DPC had separately imposed more than €600 million in additional GDPR fines on Meta for other data processing violations.

37. WhatsApp itself has been the subject of significant GDPR enforcement. In September 2021, the DPC fined WhatsApp Ireland €225 million for failing to adequately inform users about how their data was processed and shared within the Meta group of companies, including with Facebook. This fine directly implicated WhatsApp's transparency about data-sharing practices with Meta and reflects the same opaque data-sharing environment that Mr. Baig later documented as a compliance failure under the 2020 Privacy Order.

**G. The Significance of This History**

38. This history establishes three things directly relevant to this case. First, it demonstrates that Meta's pattern of misrepresenting compliance to regulators and investors is not new or aberrant but a documented fifteen-year business practice. Second, the violations Mr. Baig reported were precisely the category of misconduct the $5 billion FTC penalty and the 2020 Privacy Order were designed to prevent, giving those violations heightened materiality to investors. Third, Meta's senior

Deleted: COMPLAINT¶

leadership, including Defendant Zuckerberg, had direct personal knowledge of the severe consequences that flow from FTC Privacy Order violations.

## II. META'S REGULATORY HISTORY UNDER THE 2020 FTC PRIVACY ORDER

39. The 2020 Privacy Order took effect in April 2020 following entry by the United States District Court for the District of Columbia. It imposed comprehensive and ongoing obligations on Meta applicable to all of its products and platforms, including WhatsApp. Among the Order's core requirements, Meta was obligated to: (a) implement and maintain a comprehensive privacy program with robust board-level oversight; (b) certify compliance with the program to the FTC on a regular basis; (c) retain an independent third-party assessor to conduct biennial privacy evaluations; (d) maintain systems sufficient to detect, prevent, and remediate unauthorized access to "Covered Information"; (e) restrict employee access to Covered Information to those with a documented business need, as required by Section VII of the Order; (f) refrain from making misrepresentations to users, regulators, or auditors about its data privacy and security practices; and (g) timely report "Covered Incidents" to the FTC under Part IX of the Order. The Order runs through 2040.

40. In 2019, Meta separately settled with the SEC for $100 million in connection with misrepresentations about the Cambridge Analytica data breach. This settlement resulted in an SEC administrative cease-and-desist order against Meta. Meta is a covered company under the Securities Exchange Act of 1934 and files annual reports on Form 10-K and quarterly reports on Form 10-Q with the SEC. Each annual report is certified by the CEO and CFO pursuant to Sections 302 and 906 of SOX.

## III. META'S MATERIALLY FALSE AND MISLEADING SEC FILINGS REGARDING FTC PRIVACY ORDER COMPLIANCE

41. From its Annual Report on Form 10-K for fiscal year 2020 (filed January 2021) through its Annual Report on Form 10-K for fiscal year 2024 (filed January 2025), Meta made materially false and misleading representations to investors in each of its annual reports regarding its compliance with the 2020 Privacy Order. These filings were certified by Defendant Zuckerberg as accurate and complete under penalty of criminal prosecution.

Deleted: COMPLIANT

42. Although Mr. Baig joined WhatsApp in January 2021, his reasonable belief as to the falsity of the FY2020 and FY2021 Form 10-K filings is grounded in his direct personal observations upon joining: the systemic compliance failures he documented beginning in September 2021, including the complete absence of access controls, breach detection, and incident reporting systems, confirmed that the compliance program Meta had represented as already operational in those prior filings had never been built. His discovery of the program's non-existence confirmed the falsity of the prior filings as continuing representations that remained operative in the contemporaneous and subsequent filings he reported on during his employment.

43. **Form 10-K for Fiscal Year 2020 (Filed January 2021).** In its 2020 10-K, Meta represented to investors that it was "implementing a comprehensive expansion of our privacy program in connection with the FTC consent order, including substantial management and board of directors oversight, stringent operational requirements and reporting obligations, prohibitions against making misrepresentations relating to user data, a process to regularly certify our compliance with the privacy program to the FTC, and regular assessments of our privacy program by an independent third-party assessor." These representations were materially false and misleading. At the time of this filing, WhatsApp had not implemented the access restriction, monitoring, or breach detection systems the Order required. Approximately 1,500 WhatsApp engineers had unrestricted access to Covered Information, WhatsApp had no system to detect data breaches, and Meta could not identify what user data WhatsApp collected or where it was stored.

44. **Form 10-K for Fiscal Year 2021 (Filed February 2022).** In its 2021 10-K, Meta represented that it was "maintaining a comprehensive privacy program in connection with the FTC consent order" with "stringent operational requirements and reporting obligations" and "regular assessments of our privacy program by an independent third-party assessor." Meta's 2022 Proxy Statement further represented that the Board's Privacy Committee "oversees the risks related to privacy and data use matters, including our compliance with the comprehensive privacy program that we adopted in compliance with our FTC consent order." These representations were materially false and misleading for the same reasons set forth in the preceding paragraph.

Deleted: COMPLAINT¶

45. **Form 10-K for Fiscal Year 2022 (Filed February 2023).** Meta's 2022 Form 10-K contained three categories of materially false or misleading statements. First, Meta represented it was "maintaining a comprehensive privacy program in connection with the FTC consent order" with independent assessments and regular FTC certifications. Second, management concluded that as of December 31, 2022, Meta's disclosure controls and procedures "are designed at a reasonable assurance level and are effective." Third, Meta represented that it had "developed systems and processes that are designed to protect our data and user data, to prevent data loss" and to detect security breaches. Each of these representations was materially false and misleading. By the time of this filing, Mr. Baig had already formally reported to Defendants Cathcart, Gupta, and other WhatsApp senior leaders, in August, September and October 2022, documenting in precise technical detail that WhatsApp was not complying with the 2020 Privacy Order.

46. **Form 10-K for Fiscal Year 2023 (Filed February 2024).** In its 2023 10-K, Meta disclosed for the first time that the FTC had "initiated an administrative proceeding against us" alleging deficient compliance, while simultaneously representing that it was "maintaining a comprehensive privacy program in connection with the FTC consent order." This created a materially false and misleading half-truth: by disclosing the FTC's deficiency finding while simultaneously asserting ongoing compliance program maintenance, Meta created the false impression that the FTC's concerns were limited to COPPA issues. This Form 10-K was filed approximately one month after Zuckerberg received Mr. Baig's January 2, 2024 letter, which stated, "If we fail to remediate these gaps, we are not meeting our legal obligations from the 2020 FTC Order."

47. **Form 10-K for Fiscal Year 2024 (Filed January 2025).** In its 2024 10-K, filed after Mr. Baig's termination, Meta again represented that it was "maintaining a comprehensive privacy program in connection with the FTC consent order" with board oversight, independent assessments, and regular FTC certifications.

48. By the time of this filing, Defendant Zuckerberg had received Mr. Baig's January 2, 2024 letter documenting compliance failures and identifying potential serious harm to Meta's users and investors, his November 27, 2024 and supplemental November 30, 2024 Form TCRs, and his

Deleted: COMPLAINT¶

December 4, 2024 letter stating verbatim that Meta's leadership was "not being truthful to the auditors and the regulators" and informing him of the SEC filing. These representations remained materially false and misleading for the reasons set forth herein.

49. In addition to misrepresenting its FTC Privacy Order compliance program, Meta made separate affirmatively misleading statements about its cybersecurity risk posture in each annual risk factor disclosure. Meta's annual 10-K filings warned investors that security breaches "could harm our reputation" and that the company experiences cyber-attacks "from time to time." The FY2023 and FY2024 Forms 10-K filings affirmatively represented that Meta "did not identify any cybersecurity threats that have materially affected or are reasonably likely to materially affect our business strategy, results of operations, or financial condition." These statements were affirmatively misleading because the cybersecurity risks they characterized as occasional and hypothetical were in fact daily certainties already realized at massive scale. This is the half-truth theory the Ninth Circuit recognized in *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934 (9th Cir. 2023) and *In re Alphabet Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021).

50. The independent third-party assessor referenced in each of these filings was conducting assessments based on representations made by Meta employees. As Mr. Baig documented, Meta's X-Sec security team generated falsified security reports for submission in connection with compliance oversight and Internal Audits were blocked. Where the inputs to the independent assessments were falsified, the assessments themselves, and Meta's representations about them to the SEC, were materially misleading.

51. Meta's representations regarding its FTC Privacy Order compliance were material to reasonable investors. A reasonable investor would consider it significant that: (a) Meta had previously paid a $5 billion FTC penalty arising from the very privacy failures that gave rise to the 2020 Privacy Order; (b) the Order exposed Meta to further penalties and potential product launch restrictions if found to be in violation; (c) Meta's compliance certifications to the FTC were made under oath; and (d) the FTC's 2023 proposed order sought limitations on Meta's ability to launch new products. Under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), materiality turns on whether a reasonable investor would



Deleted: COMPLAINT¶

have considered the information significant in the total mix of available information.

**A. Meta's Concealment of Known and Probable Regulatory Penalty Exposure**

52. SEC Regulation S-K Item 103, 17 C.F.R. § 229.103, requires every Exchange Act reporting company to describe any material pending legal proceeding and to describe any such proceedings known to be contemplated by governmental authorities. Item 103(c)(3)(iii) separately requires disclosure of any proceeding in which a governmental authority is a party and in which potential monetary sanctions could exceed $300,000. Yet Meta's annual 10-K filings from FY2020 through FY2022 contained no disclosure of any contemplated governmental proceeding relating to the privacy compliance failures Mr. Baig was internally reporting. When the FTC's 2023 show-cause proceeding was finally disclosed in the FY2023 Form 10-K, Meta framed it narrowly as a COPPA matter, concealing that the agency's proposed findings documented the same systemic privacy program failures that Baig had been reporting since 2022.

53. In addition to the Item 103 legal-proceedings disclosure failure, the FTC's May 3, 2023 show-cause proceeding — a formal adjudicatory proceeding alleging Meta was in violation of a $5 billion consent order — was independently a material event within the meaning of Form 8-K Item 8.01 and Rule 13a-11. Item 8.01 requires public companies to file a current report on Form 8-K to disclose any material event not specifically covered by another Form 8-K item. A formal governmental adjudicatory proceeding against a company subject to a $5 billion consent order, if decided adversely, could result in contempt proceedings and additional penalties, and was plainly material to a reasonable investor. Meta did not file any Form 8-K disclosing the show-cause proceeding within the required period after its initiation on May 3, 2023, instead disclosing it for the first time in the FY2023 Form 10-K filed in February 2024 — approximately nine months after initiation. Mr. Baig reasonably believed this nine-month non-disclosure violated Form 8-K Item 8.01 and Rule 13a-11, each independently a covered rule or regulation of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). The Mukerji gag order, issued approximately three weeks before the show-cause was initiated, confirms that management anticipated an imminent regulatory proceeding and sought to suppress the internal documentation most material to timely Item 8.01 disclosure.

Deleted: COMPLAINT¶

54. Defendants cannot minimize the materiality of these misrepresentations by characterizing WhatsApp as a small portion of Meta's business. The 2020 Privacy Order required Meta to maintain one comprehensive privacy program covering all of its platforms — Facebook, Instagram, WhatsApp, and all other Meta products. The annual 10-K certifications that Meta was "maintaining a comprehensive privacy program in connection with the FTC consent order" were therefore enterprise-wide certifications, not WhatsApp-specific representations. A reasonable investor evaluating Meta's compliance with a $5 billion consent order does not parse that compliance by product line. Moreover, the failures Mr. Baig documented were not limited to WhatsApp. His January 2, 2024 letter to Defendant Zuckerberg documented approximately 250,000 daily account compromises on Facebook — Meta's primary advertising platform and its principal source of revenue — that were not being reported as Covered Incidents under the 2020 Privacy Order. The enterprise-wide scope of the compliance failures, affecting Meta's core revenue-generating platform, makes any revenue-based materiality argument untenable.

55. SEC Regulation S-K Item 105, 17 C.F.R. § 229.105, requires disclosure of the material factors that make an investment in the registrant speculative or risky, with enough detail to explain the magnitude of the risk. Generic "may" risk factor language is rendered affirmatively misleading when the company has actual, specific internal knowledge that the risk has already materialized in the form of documented, ongoing compliance failures. By the time of the FY2022 Form 10-K (filed February 2023), Meta's senior leadership had received Mr. Baig's August, September and October 2022 disclosures documenting specific, structural non-compliance with the 2020 Privacy Order. The generic risk factor language in that filing, and in subsequent filings, did not disclose that the risk of FTC enforcement had become an identified, documented, and internally known probability.

56. Under ASC 450-20-50-3, even where a loss contingency is not probable enough to require accrual on the balance sheet, it must be disclosed in the financial statement footnotes if "there is at least a reasonable possibility that a loss . . . may have been incurred." Given that Meta had already paid $5 billion to the FTC for the same category of Privacy Order non-compliance and the FTC was actively monitoring Meta's compliance under a twenty-year order, a further FTC penalty was, at a

Deleted: COMPLAINT

minimum, "reasonably possible" from at least FY2022 onward. For FY2023, after the FTC initiated its show-cause proceeding, the probability of a material adverse outcome rose to "probable" within the meaning of ASC 450-20-25-2, requiring both accrual and disclosure. Meta's financial statements disclosed no such contingent liability. Item 303 of Regulation S-K, 17 C.F.R. § 229.303, separately required Meta to disclose in its MD&A any known trends or uncertainties reasonably expected to have a material unfavorable impact on revenues or income from operations. The specifically operative sub-provision is § 229.303(b)(2)(ii), which requires disclosure of any known trends or uncertainties that the registrant reasonably expects will have a material unfavorable impact on revenues or income from continuing operations. Meta's escalating FTC compliance exposure — documented internally, known to the CEO, and actively progressing toward enforcement — was precisely the category of known adverse trend that § 229.303(b)(2)(ii) requires to be disclosed. Meta's failure to disclose this known trend in its FY2022 through FY2024 MD&A sections constituted an independent violation of § 229.303 and § 229.303(b)(2)(ii), separately actionable as rules and regulations of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1).

57. Meta's investor-facing representations about WhatsApp's business model and revenue performance were independently materially misleading in ways that compounded the cybersecurity disclosure failures. Mr. Baig documented that WhatsApp operates at an annual operating loss of approximately $3 to $4 billion. Meta's internal revenue attribution methodology for WhatsApp systematically overstates WhatsApp's standalone contribution: when a business advertises on Facebook or Instagram and elects to receive customer inquiries through WhatsApp, that advertising revenue is attributed internally to WhatsApp even though WhatsApp generated no part of the advertising spend. This methodology creates a materially misleading picture of WhatsApp's revenue-generating capability for investors evaluating Meta's long-term monetization strategy. Additionally, Meta committed approximately $300 million in marketing expenditure to grow WhatsApp's United States daily active user base to 150 million users while internally acknowledging that no credible monetization strategy existed for those users — and while simultaneously relaxing account security controls to facilitate user growth in direct tension with the 2020 Privacy Order's safeguard

Deleted: COMPLAINT

requirements. Mr. Baig reasonably believed that these practices rendered Meta's investor-facing representations about WhatsApp's business trajectory materially misleading in violation of Rule 10b-5(b) and Item 303(b)(2)(ii)'s obligation to disclose known adverse trends in revenues and income from operations. Additionally, to the extent Meta's earnings releases, earnings call presentations, or supplemental investor disclosures presented WhatsApp's attributed revenue contribution as a discrete financial measure without disclosing the non-standard attribution convention or reconciling it to a GAAP measure, those presentations violated Regulation G, 17 C.F.R. Part 244, and Item 10(e) of Regulation S-K, 17 C.F.R. § 229.10(e). Regulation G requires that any non-GAAP financial measure presented publicly by a reporting issuer be accompanied by the most directly comparable GAAP measure, a quantitative reconciliation to that measure, and an explanation of why management believes the non-GAAP measure is useful to investors. Item 10(e) of Regulation S-K applies the same requirement to non-GAAP measures appearing in SEC filings. The WhatsApp revenue attribution methodology — which credits Facebook and Instagram advertising revenue to WhatsApp when customers elect to be contacted via WhatsApp — is a non-standard internal metric that does not correspond to any GAAP revenue recognition measure. If presented to investors as a measure of WhatsApp's revenue contribution without GAAP reconciliation and without disclosing the attribution convention, it violates Regulation G and Item 10(e) and creates a materially misleading picture of WhatsApp's standalone economic contribution to investors evaluating Meta's long-term monetization strategy. Mr. Baig's insider documentation of this attribution methodology constituted a protected disclosure of conduct he reasonably believed violated applicable SEC rules and regulations within the meaning of 18 U.S.C. § 1514A(a)(1)(C).

58. Mr. Baig's protected disclosures specifically encompassed the penalty-concealment theory described above. His September 2022 pre-read document, which he prepared at Defendant Cathcart's express request and distributed to WhatsApp senior leadership, stated that "the penalties can be severe both in terms of brand damage and fines." His January 2, 2024 letter to Defendant Zuckerberg specifically identified regulatory and legal exposure in violation of SEC rules, and was delivered approximately one month before the FY2023 Form 10-K was filed. His December 4, 2024

Deleted: COMPLAINT

letter to Defendant Zuckerberg — delivered approximately two months before the FY2024 Form 10-K was certified — stated verbatim that Meta's leadership was "not being truthful to the auditors and the regulators" and informed Zuckerberg that Mr. Baig had filed a Form TCR with the SEC, establishing that by the time Defendant Zuckerberg certified the FY2024 Form 10-K in January 2025, he had received two written disclosures from Mr. Baig specifically identifying the investor-facing falsity of Meta's compliance representations. The temporal context underscores the significance: Defendant Mukerji issued his April 14, 2023 order to stop raising FTC Privacy Order concerns approximately three weeks before the FTC initiated its May 3, 2023 show-cause proceeding against Meta for deficient compliance with the same Order.

59. Defendant Zuckerberg's scienter with respect to the penalty-concealment theory is established by the convergence of four facts. First, he personally supervised and approved the $5 billion FTC settlement, giving him direct personal knowledge of the financial magnitude of penalties for the same category of Privacy Order violation. Second, he received Mr. Baig's January 2, 2024 letter documenting ongoing non-compliance, falsified security reports, approximately 250,000 daily Facebook account compromises, and identifying SEC regulatory exposure — approximately one month before certifying the FY2023 Form 10-K — and certified that 10-K anyway. Third, he received Mr. Baig's December 4, 2024 letter, in which Mr. Baig explicitly stated that Meta's leadership was "not being truthful to the auditors and the regulators" and informed Zuckerberg that he had filed a Form TCR with the SEC — approximately two months before certifying the FY2024 Form 10-K in January 2025 — and certified that 10-K as well. Fourth, he was required by the 2020 Privacy Order itself to personally certify compliance to the FTC on a regular basis, making him directly and personally accountable for the compliance deficiencies that Mr. Baig was documenting.

## IV. ATTAULLAH BAIG'S BACKGROUND AND EMPLOYMENT AT WHATSAPP

60. Mr. Baig became Head of Security at WhatsApp in February 2021 and held this position until his termination on February 10, 2025. He reported initially to Suren Verma, and subsequently to Defendant Mukerji beginning in June 2021. Verma retained senior engineering leadership authority over the WhatsApp security function throughout Mr. Baig's tenure and exercised

Deleted: COMPLAINT¶

supervisory authority over his compliance disclosures from January 2021 through September 2022 as described in ¶ 20. During his first approximately eighteen months at WhatsApp, Mr. Baig received consistently positive performance evaluations. In July 2022, his mid-year review was positive and focused on his growth, "Greatly Exceeds" rating, and trajectory toward promotion. Defendant Mukerji specifically told Mr. Baig he had put his name up for promotion for the February 2023 cycle. Defendant Mukerji's written feedback in June 2022 praised Mr. Baig's "[e]xtreme focus and clarity on project scope, timeline etc." and his prior annual rating was "Exceeded Expectations." In July 2022, Mukerji also shared with Mr. Baig that he had put Mr. Baig's name up for promotion and reviewed Mr. Baig's "Growth Plan" with other engineering leaders. "Growth Plan Reviews" are a term of art at Meta and are meant for employees who are ready to be promoted in the next three to six months. This unblemished performance record changed abruptly within three days of Mr. Baig's first major cybersecurity disclosure in September 2022.

61. As Head of Security, Mr. Baig was responsible for cybersecurity oversight of WhatsApp's systems, including the protection of Covered Information. He had direct visibility into WhatsApp's security posture, access control systems, breach detection capabilities, and compliance with the 2020 Privacy Order, including the Covered Incident reporting obligations under Part IX of the Order.

62. Prior to joining WhatsApp, Mr. Baig held senior cybersecurity leadership roles at major financial institutions and other regulated entities. He has over twenty years of experience in the cybersecurity field and is deeply familiar with the regulatory compliance requirements imposed by the 2020 Privacy Order, including its mandatory incident reporting requirements and the consequences of non-compliance for regulated entities subject to FTC oversight.

63. Mr. Baig brought to WhatsApp a depth of cybersecurity knowledge specific to the exact risks Meta faced. During his career, Mr. Baig had studied the causes and investor consequences of landmark corporate data breaches, including the Anthem, Inc. breach (2015), the Target Corporation breach (2013), the Equifax Inc. breach (2017), and the Capital One Financial breach (2019). Each of those breaches resulted in substantial shareholder harm — including securities class actions, regulatory

Deleted: COMPLAINT¶

penalties, and significant stock price declines — arising directly from companies' failure to implement adequate cybersecurity controls and to disclose cybersecurity risks to investors. Mr. Baig was personally aware, prior to and upon joining WhatsApp, of both Meta's $5 billion FTC settlement and Meta's separate $100 million SEC settlement for misleading investors about known cybersecurity risks. Shortly after joining WhatsApp in January 2021, Mr. Baig reviewed and acknowledged the 2020 FTC Privacy Order, understanding it as a binding federal court order that imposed specific, enforceable obligations on Meta and WhatsApp. Meta required Mr. Baig, as it required all employees, to complete annual mandatory compliance training that specifically emphasized the importance of privacy, data security, FTC Consent Decree compliance, SEC certifications, and GDPR obligations, and that presented non-compliance with these requirements as existential risks to Meta's business.

a. Meta's annual mandatory compliance training, which Mr. Baig completed upon joining WhatsApp in January 2021 and annually thereafter, specifically used Meta's 2019 $100 million SEC settlement as a case study in cybersecurity-to-investor-disclosure liability. The training identified non-compliance with data access restriction requirements — specifically including the Section VII access control requirements of the 2020 Privacy Order — as the category of conduct the SEC had already characterized as investor-material in its prior enforcement action, and presented failure to comply with those requirements as creating investor disclosure obligations under Rule 10b-5. The training specifically identified the 2020 Privacy Order's access restriction and incident reporting obligations as connected to Meta's SEC certification obligations. By completing this training before he ever began documenting compliance failures, Mr. Baig was specifically taught, from the date of his initial employment, that the access restriction violations he subsequently documented were the same category of conduct the SEC had already classified as investor fraud — establishing his subjective securities fraud belief from the date of his earliest 2021 disclosures, not only from October 2022 onward. This investor-disclosure significance was not inferred by counsel after the fact; it was communicated to Mr. Baig by Meta's own compliance infrastructure before he made his first disclosure.

//

Deleted: COMPLAINT

## V. THE CYBERSECURITY FAILURES MR. BAIG DISCOVERED AND REPORTED

64. Each of the following failures is described as a technical condition because that is how it manifests in the security record. But each is reported here because it violated a specific, enforceable obligation of the 2020 Privacy Order — a binding federal court order that required Meta to build and maintain identified compliance systems as a condition of operating its platforms free from further government restrictions. Mr. Baig's reports of these conditions were therefore reports of conduct that he reasonably believed violated a federal court order, and simultaneously reports of the falsity of the SEC disclosures in which Meta represented that order as satisfied. They were not reports of engineering inadequacies open to professional debate. Where a federal court order requires a specific system to exist and that system does not exist, the absence of the system is a legal violation — not a technical disagreement.

65. From the outset of his employment, Mr. Baig observed serious systemic failures in WhatsApp's cybersecurity program that he reasonably believed violated the 2020 Privacy Order and rendered Meta's SEC filings materially false. These failures included the following:

- WhatsApp had no comprehensive inventory of the user data it collected. Section VII of the 2020 Privacy Order required Meta to identify and document all categories of Covered Information it collected across all platforms. The absence of any such inventory meant Meta could not comply with its obligations to protect, monitor, or report on that information — rendering every representation in its annual 10-K filings about maintaining a "comprehensive privacy program" false on its face.
- WhatsApp had no comprehensive inventory of where user data was stored and could not identify the systems and databases containing Covered Information. This was not an ordinary data mapping gap; it was a specific, enumerated violation of the 2020 Privacy Order's requirement that Meta maintain systems sufficient to detect, prevent, and remediate unauthorized access to Covered Information. A company that does not know where its data is stored cannot detect, prevent, or remediate unauthorized access to it — making this failure a per se violation of the Order's breach detection and response requirements in addition to its

Deleted: COMPLAINT¶

inventory requirements.

- Approximately 1,500 WhatsApp engineers had unrestricted access to Covered Information without any documented business need, a direct violation of Section VII of the 2020 Privacy Order. By 2024, Mr. Baig documented that specific data warehouse tables were accessible to between 20,000 and 65,000 Meta employees.
- WhatsApp had no system to monitor employee access to Covered Information and maintained no audit trail of which employees accessed which user data. The 2020 Privacy Order required Meta to restrict access to Covered Information to employees with a documented business need and to maintain records sufficient to verify compliance with that restriction. Without an audit trail, Meta could neither verify that access was limited to authorized employees nor detect — let alone report — unauthorized internal access as a Covered Incident under Part IX. The absence of monitoring capability therefore simultaneously violated Section VII's access restriction requirement and Part IX's incident detection and reporting requirement. When Mr. Baig reported this, he was reporting that two independently required compliance systems were completely absent — not that Meta's monitoring tools were insufficiently sophisticated.
- WhatsApp had no Security Operations Center ("SOC") or real-time breach detection capability. The 2020 Privacy Order required Meta to maintain systems sufficient to detect unauthorized access to Covered Information and to report Covered Incidents to the FTC within 30 days of discovery. Detection within 30 days is impossible if detection capability does not exist at all. The absence of a SOC or real-time breach detection system was therefore a categorical violation of the Order's detection and reporting requirements — not a deficiency in implementation, but the complete absence of the infrastructure the Order required Meta to build and maintain. Defendant Zuckerberg annually certified to investors that this infrastructure existed.
- Approximately 100,000 WhatsApp user accounts were being compromised daily through ATO. Each such account compromise constituted an "unauthorized access to" Covered Information within the meaning of Part IX of the 2020 Privacy Order, triggering a mandatory obligation to

Deleted: COMPLAINT¶

report the incident to the FTC within 30 days of discovery. Meta reported none of them. WhatsApp's integrity response team compounded this legal violation by systematically manipulating ATO metrics to match the performance management cycle and suppress the documented compromise count, ensuring that the scale of unreported Covered Incidents would not appear in any written record accessible to the FTC-designated independent assessor or Meta's Board-level oversight committees.

- External scrapers were accessing over 400 million WhatsApp user profile photos daily without authorization. Unauthorized external access to user data at this scale constituted a "Covered Incident" under Part IX of the 2020 Privacy Order — which defines a Covered Incident as any unauthorized access to or acquisition of Covered Information. Meta's legal obligation upon discovering each such incident was to document it and report it to the FTC within 30 days. Meta did not report these events. This was not a good-faith definitional disagreement about whether scraping constitutes "unauthorized access." Mr. Baig specifically reported to Meta's Central Privacy leadership team on September 30, 2024, that the mass scraping events fell within Part IX's reporting requirements, and he repeated that conclusion in writing to Defendant Tsimelzon on November 4, 2024. Tsimelzon responded by reprimanding Mr. Baig for raising WhatsApp's "legal obligations" — a word choice that confirms Meta understood and rejected its reporting obligation, rather than disputed its applicability.
- WhatsApp failed to report security incidents to regulators, including the Irish DPC, on a timely and complete basis.

66. Mr. Baig's understanding of the connection between WhatsApp's compliance failures and Meta's investor-facing SEC disclosures was informed not only by his review of Meta's 10-K filings but also by direct participation in Meta's own board-level compliance audit process. In the spring of 2022, Mr. Baig participated in an internal audit initiated by Meta's Board concerning unmonitored engineer production access. Mr. Baig learned directly through this process that findings from the audit would flow to AROC and into the 10-K disclosure pipeline, giving him firsthand knowledge that the audit-to-SEC-disclosure connection was not theoretical but operational. He also

Deleted: COMPLAINT¶

observed that the audit had been artificially circumscribed to exclude the confidentiality violations he was actively documenting, meaning that the Board-level audit process was structured from inception to prevent the compliance failures Mr. Baig was reporting from generating a written record that could trigger disclosure obligations. This deliberate scoping exclusion is foundational to the audit obstruction counts: an audit that is designed to avoid finding the violations it should find is not an independent assessment within the meaning of the 2020 Privacy Order or within the meaning of the disclosure controls representations Meta was making to the SEC.

67. Mr. Baig also documented that Meta's X-Sec team generated falsified security reports that concealed these compliance failures and were used to mislead internal oversight personnel and, by extension, the independent third-party assessor referenced in Meta's SEC filings. Specifically, the X-Sec team, under the direction of supervisors, generated written compliance assessment documents that characterized WhatsApp's security controls as functioning when Mr. Baig's direct technical assessments established that those controls did not exist; those falsified documents were provided to Meta's compliance oversight personnel and to the FTC-designated independent assessor; and because the assessor's findings were incorporated into Meta's annual SEC disclosures representing that independent assessments were being conducted on accurate inputs, the falsified reports were ultimately transmitted as false information supporting required filings with the Commission. When Mr. Baig raised these issues, supervisors ordered him — verbally, to prevent a written record — to stop raising FTC compliance concerns.

68. The institutional pattern of selectively disclosing minor security incidents while systematically suppressing material ones continued through the final weeks of Mr. Baig's employment. In January 2025, WhatsApp and Meta issued a press release publicly disclosing that Paragon Solutions, a commercial spyware vendor, had attacked approximately 80 WhatsApp users. Meta issued this disclosure with specificity and apparent transparency — identifying the threat actor, the approximate number of affected users, and the nature of the attack. At the same time, Meta was not issuing breach notifications for the approximately 500,000 WhatsApp account compromises occurring daily (the initial estimate of 100,000 was revised after actual measurement from PCR launch, which is why both

Deleted: COMPLAINT

estimates appear throughout this Complaint) that Mr. Baig had been documenting and reporting throughout his employment. The juxtaposition is direct evidence of a deliberate institutional policy of selective disclosure: publicly characterizing isolated, low-volume, externally-attributed attacks as evidence of security diligence while systematically failing to report the high-volume, structurally-rooted daily compromises that Mr. Baig had identified as Covered Incidents under Part IX of the 2020 Privacy Order. This selective disclosure practice rendered Meta's public representations about its security program affirmatively misleading — not merely incomplete — within the meaning of the half-truth doctrine recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

69. Mr. Baig was aware, based on his knowledge of Meta's regulatory history, that these failures directly contradicted the compliance representations Meta was making in its SEC filings. He specifically understood that Meta's annual 10-K certifications, signed by Defendant Zuckerberg under penalty of criminal prosecution, represented that Meta's disclosure controls were effective and that the filings contained no material misstatements, when in fact the filings falsely described a functioning compliance program that did not exist.

70. The cybersecurity failures Mr. Baig documented and reported during his tenure at WhatsApp have since been independently corroborated. External civil litigation filed in this District raises the same structural allegations about WhatsApp's security architecture — specifically, unrestricted employee access to user data and the absence of meaningful access monitoring or audit controls — that Mr. Baig documented, reported, and was retaliated against for reporting during his employment as Head of Security at WhatsApp.

71. Independent whistleblower accounts reported in subsequent civil litigation — by sources unaffiliated with Mr. Baig and based on separate investigations — describe the same unrestricted access architecture that Mr. Baig reported internally beginning in September 2021. These independent accounts directly corroborate what Mr. Baig reported: that approximately 1,500 WhatsApp engineers had unrestricted access to Covered Information without documented business need, with no audit trail and no system to monitor that access.

72. Independent accounts from separate whistleblower sources further corroborate his

Deleted: COMPLAINT

reports of an institutional culture specifically designed to prevent employees from understanding the full scope of Meta's data access and security failures. These accounts allege that Meta leadership intentionally siloes teams to prevent employees from piecing together a complete picture of the company's data practices, and directs employees to stay in their own lanes rather than investigate or report cross-functional compliance concerns. This is the precise directive that was communicated to Mr. Baig when Defendant Mukerji ordered him in April 2023 to stop raising FTC Privacy Order concerns. Other examples of this structural incentive to suppress whistleblowing and punish whistleblowers include Agrawal's statement that "this company doesn't do anything for security unless forced by the FTC," and Beard's statement that "I don't worry much about the FTC Order. We have lawyers for that." Among other things, on or about December 14, 2023, this structural incentive resulted in multiple members of the X-Sec team, later identified in January 2024 as Steve Clarke and Chad Greene, approaching Defendant Mukerji to provide negative unsolicited feedback about Mr. Baig.

**A. WhatsApp's False Representations to Users and Business Customers**

73. WhatsApp is one of the most trusted communications platforms in the world precisely because it promises its users that their private messages cannot be read by anyone other than the sender and recipient. WhatsApp's terms of service, privacy policy, and public marketing materials make this promise explicit: WhatsApp states that it applies end-to-end encryption by default to messages, calls, photos, and videos; that it cannot read users' messages; and that it is committed to your privacy. Each such representation is transmitted through interstate wire communications, including the internet and mobile networks through which WhatsApp delivers its platform.

74. The falsity of these representations was confirmed by contemporaneous internal documentation. In August 2022, WhatsApp Product Head Ami Vora publicly stated that "We believe WhatsApp is the most secure place to have a private conversation." This statement was made around the same time Mr. Baig was circulating his pre-read document to senior WhatsApp leadership documenting that WhatsApp had no real-time breach detection capability, that approximately 1,500 engineers had unrestricted access to user data without documented business need, and that

Deleted: COMPLAINT¶

approximately 100,000 user accounts were being compromised daily. Vora's public statement is a named, dated example of a specific false investor- and user-facing security representation made with direct contemporaneous internal knowledge of the contrary facts — the precise category of half-truth the Ninth Circuit recognized as actionable in *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934 (9th Cir. 2023).

75. WhatsApp makes similar, and in some respects more specific, security representations to its paying business customers through the WhatsApp Business API. Businesses pay per-message fees to use WhatsApp as a channel for customer communications. WhatsApp's Business API documentation and marketing materials represent to these paying customers that the API maintains the same end-to-end encryption protections as consumer WhatsApp and that data transmitted through the Business API is protected against unauthorized access.

76. These representations were false when made, and the people responsible for making them knew they were false. WhatsApp's security and engineering leadership, including Defendants Gupta and Tsimelzon, received Mr. Baig's detailed documentation of the security failures described above. They knew that WhatsApp had no real-time breach detection capability, that 100,000 user accounts were being compromised daily, that up to 65,000 Meta employees had unrestricted access to users' private data, and that over 400 million user profile photos were being leaked daily to external scrapers. They received that information and responded not by fixing the failures or correcting the public representations, but by manipulating the security metrics WhatsApp reported internally, ordering the deletion of security documentation, and retaliating against the employee who was documenting the gap.

77. The personal information and communications that WhatsApp users entrust to the platform constitute property with an ascertainable market value. For paying WhatsApp Business API customers, the property deprivation theory is even more direct: those customers paid per-message fees for a communications service whose security was a material, bargained-for component of the service bundle, constituting a direct transfer of money obtained through false representations — a property loss that is entirely independent of any right-to-control theory.

Deleted: COMPLAINT¶

78. WhatsApp's platform is itself the instrumentality of the wire fraud. Every message, call, photo, and file transmitted through WhatsApp travels over interstate wire communications. Users' personal data and business customers' per-message fees both constitute "property" obtained through the scheme within the meaning of 18 U.S.C. § 1343. Mr. Baig documented and reported this scheme beginning with his September 2022 pre-read, through his January 2024 letter to Defendant Zuckerberg, through his Form TCR filing with the SEC. The scheme was not limited to WhatsApp users. Mr. Baig's January 2, 2024 letter documented approximately 250,000 daily Facebook account compromises — affecting users of Meta's primary platform who had similarly been induced to entrust their personal data to Meta through representations of robust security. Meta's false security representations were made across its family of apps through interstate wire communications, and the scheme to defraud users of their personal data operated at the enterprise level across all Meta platforms, not within any single product boundary.

## VI. MR. BAIG'S PROTECTED DISCLOSURES

79. Each disclosure Mr. Baig made regarding the cybersecurity failures described above was simultaneously a disclosure of conduct he reasonably believed violated SEC rules and regulations, for three independent reasons that apply equally to every disclosure that follows. First, Meta's annual 10-K filings specifically described the 2020 Privacy Order compliance program as the foundation of its privacy governance; every material violation of that program rendered those filings materially false in violation of Rule 10b-5. Second, Defendant Zuckerberg certified those filings as accurate under Rule 13a-14; every compliance failure Mr. Baig reported was simultaneously evidence that Zuckerberg's certification was false. Third, the 2020 Privacy Order is a product of federal judicial enforcement; systematic knowing violation of its terms, combined with investor-facing representations of compliance, constitutes conduct that a reasonable person with Mr. Baig's background would recognize as fraud against shareholders. These three reasons apply to each disclosure described below regardless of whether Mr. Baig expressly cited SEC rules in the disclosure itself. This simultaneous investor-disclosure significance was understood by Mr. Baig at the time of each disclosure because of three specific features of his professional context: (a) he had personally reviewed Meta's operative Form 10-

Deleted: COMPLIANT

K disclosures and understood that the compliance program he was reporting on was the specific program those disclosures described as maintained; (b) he had personally reviewed and been trained on the $100 million SEC settlement arising from the same compliance framework, and understood that the SEC had already classified this category of misrepresentation as investor fraud; and (c) his professional background at Exchange Act reporting issuers — major financial institutions themselves subject to SEC cybersecurity disclosure obligations — had trained him in the investor-facing significance of cybersecurity compliance failures under federal securities law. These are factual predicates for his belief, not legal conclusions asserted by counsel after the fact.

a. At all relevant times, Mr. Baig served as Head of Security at WhatsApp — the highest-ranking cybersecurity executive at that platform. As defined by his supervisors, his ordinary job duties encompassed application security, technical vulnerability identification, and operational security metrics reporting to his immediate management chain. This scope was made explicit: Defendant Gupta and Defendant Tsimelzon repeatedly told Mr. Baig that his role was confined to application security and that systemic compliance disclosures fell outside his responsibilities. Defendant Gupta told Mr. Baig raising legal risks is for lawyers.

b. Mr. Baig was not recommending security enhancements within his ordinary job duties; he was reporting the systematic falsification of compliance documentation, the obstruction of required regulatory audits, the suppression of mandatory incident reports to federal regulators, and the submission of false certifications to the FTC and to Meta's own Board — conduct that is legally prohibited under specific federal statutes and SEC rules independent of any security quality judgment. The distinction between ordinary security job performance and the specific legal violations Mr. Baig was reporting is demonstrated by management's own responses: ordinary security recommendations are addressed with resources, technical discussion, and performance feedback; legal compliance disclosures are addressed with gag orders, document deletion orders, and performance downgrades. Defendant Mukerji's April 14, 2023 explicit order to stop discussing FTC Privacy Order compliance — issued in terms that no supervisor would use in response to an ordinary technical recommendation — and Defendant Tsimelzon's

Deleted: COMPLAINT

reprimand of Mr. Baig for raising "legal obligations" on November 4, 2024 confirm that leadership understood each disclosure as legally consequential activity warranting suppression, not a technical disagreement warranting substantive response.

80. Beginning in 2021 and continuing through his termination in February 2025, Mr. Baig engaged in repeated and documented protected activity by reporting the cybersecurity and compliance failures described herein. The following is a summary of his principal disclosures.

81. Following a "Red Team Exercise" conducted with Meta's Central Security team, Mr. Baig shared findings documenting that any WhatsApp engineer with production access (approximately 1,500 engineers at the time) could move or steal user data without a trace. He shared these findings verbally with supervisor Verma and published a written report internally. Mr. Baig had reviewed Section VII of the 2020 Privacy Order shortly after joining WhatsApp in January 2021 and understood it to impose a specific, enforceable obligation: Meta was required to restrict employee access to Covered Information to employees with a documented business need. The Red Team finding was a direct and unambiguous Section VII violation.

82. On August 18, 2022, following two cybersecurity incidents affecting WhatsApp users, Mr. Baig met with Defendant Cathcart, along with Vice President of Global Communications Carl Woog, Director and Associate General Counsel Jessica Romero, and Associate General Counsel Brady Freeman. Mr. Baig briefed Defendant Cathcart on WhatsApp's systemic cybersecurity deficiencies, including dangerous understaffing — approximately 10 engineers versus the approximately 200 required for a platform of WhatsApp's scale and regulatory obligations. Before proceeding, Mr. Baig told Defendant Cathcart that he was concerned his supervisors would retaliate against him for raising these issues directly with senior leadership — and Defendant Cathcart directed him to proceed anyway and to inform his managers that he had prepared the report at Cathcart's request. Defendant Cathcart requested a follow-up written report. In preparing for and conducting this briefing, Mr. Baig understood that he was reporting deficiencies in the compliance program that Meta was contemporaneously representing to investors, in its most recently filed Form 10-K, as "comprehensive" and "stringent." Defendant Cathcart's knowledge that Mr. Baig feared retaliation for making this

Deleted: COMPLAINT¶

disclosure establishes that Cathcart understood, from the outset, that Mr. Baig's reports were the type of activity his supervisors wished to suppress. Defendant Cathcart's deliberate and total withdrawal from all engagement with Mr. Baig's security work from October 18, 2022 through February 10, 2025 — while continuing to engage with and advocate for other direct and indirect reports — constituted an independent adverse employment action because it deprived Mr. Baig of the supervisory sponsorship that Meta's Performance Summary Cycle ("PSC") promotion process requires, which Cathcart's role as Head of WhatsApp positioned him uniquely to provide or withhold. In a company where promotions from Senior Engineer to Director require the affirmative endorsement of senior product leadership — not merely the absence of negative feedback — a deliberate refusal to review, engage with, or advocate for a direct report's security work for over two years is materially adverse because it ensures that person's career advancement cannot occur, regardless of the technical merit of the work produced. Cathcart's over two-year disengagement is the structural cause of Mr. Baig's inability to obtain the senior leadership endorsement required for each of the denied promotions.

83. At Defendant Cathcart's express request, Mr. Baig prepared the comprehensive September 2022 pre-read document detailing WhatsApp's systemic cybersecurity deficiencies and circulated it to all meeting attendees, including Defendant Cathcart. The document explicitly stated: "We have a fiduciary responsibility to protect our users and their data. The penalties can be severe both in terms of brand damage and fines" — directly referencing the SEC and FTC settlements that had produced unprecedented penalties for similar failures and making clear that Mr. Baig understood the compliance failures to carry investor-facing legal and financial consequences. The pre-read document described the absence of the data inventory and access control systems the FTC Privacy Order required. A day after the October 18, 2022 senior leadership presentation at which he presented these findings to approximately ten WhatsApp executives including Defendants Cathcart and Gupta, Mr. Baig emailed all attendees a Forbes article specifically about Peiter "Mudge" Zatko, the former cybersecurity chief of Twitter. The article stated that Zatko "accused the social media company of committing fraud and numerous 'egregious' security violations" and specifically highlighted as its "Big Number" that Twitter's stock had fallen 4.5% in morning trading as a direct result of Zatko's

**Deleted:** for a follow-up meeting. On September 8, 2022, Mr. Baig shared with the

**Deleted:** this document, which identified six critical cybersecurity failures that violated the 2020 Privacy Order and potentially constituted securities fraud:¶
**Failure to inventory user data:** WhatsApp lacked a comprehensive list of all user data elements collected, violating disclosure requirements under California Consumer Privacy Act (CCPA), European Union GDPR, and the 2020 Privacy Order's mandate for a comprehensive privacy program;¶
**Failure to locate data storage:** WhatsApp lacked a comprehensive inventory of systems storing user data, preventing proper protection and regulatory disclosure;¶
**Unrestricted data access:** Approximately 1,500 engineers had unfettered access to Covered Information under the 2020 Privacy Order without business justification, violating FTC requirements for access controls limited to employees with documented business need;¶
**Absence of access monitoring:** WhatsApp lacked systems to monitor user data access, preventing detection of suspicious activity and violating the 2020 Privacy Order's requirement for comprehensive privacy program protection;¶
**Inability to detect data breaches:** WhatsApp lacked 24/7 Security Operations Center capabilities standard for companies of its size and complexity, violating the 2020 Privacy Order's requirement for information security programs designed to protect Covered Information; and¶
**Massive daily account compromises:** Approximately 100,000 WhatsApp users daily suffered account takeovers with access to Covered Information, yet WhatsApp failed to implement adequate preventive measures.¶
In his pre-read document, Mr. Baig explicitly warned of legal consequences, stating

**Deleted:** ,"

**Deleted:** resulted in

**Deleted:** .¶
On October 18, 2022, despite ongoing retaliation from his supervisors and directed by leadership at Meta, Mr. Baig presented his findings to approximately ten WhatsApp senior executives, including Mr. Cathcart, Nitin Gupta (Vice President, Head of Engineering), and other Vice Presidents. During this presentation, Mr. Baig warned that WhatsApp would face lawsuits due to data breaches if these systemic failures were not addressed. Global Public Policy Head Jonathan Lee explicitly acknowledged the gravity of the situation by asking whether WhatsApp would face the same consequences as "Mudge at Twitter," referencing the high-profile Twitter whistleblower case involving Congressional investigation and FTC enforcement action for similar cybersecurity failures.¶
Following the October 18, 2022 meeting, Mr. Baig sent

**Deleted:** Twitter whistleblower

**Deleted:** whose

**Deleted:** disclosures had resulted in accusations

**Deleted:** fraud and securities violations, explicitly stating

**Deleted:** warning of stock market implications. By sharing this article, Mr. Baig made clear that the cybersecurity failures he identified constituted potential legal violations similar to those at Twitter

**Deleted:** ¶
COMPLAINT¶

disclosures. Mr. Baig selected and shared this article deliberately and specifically: by circulating a piece that quantified the investor harm from a cybersecurity whistleblower disclosure in terms of stock price decline, he communicated to the assembled executives that he understood Meta's gap between public compliance representations and actual security posture to present the same category of investor fraud exposure that had produced SEC enforcement, Congressional investigation, and shareholder litigation at Twitter. Mr. Baig filed a formal written retaliation complaint with Human Resources Business Partner (HRBP) Lauren Yoon on October 19, 2022. This complaint constitutes yet another protected disclosure for which Mr. Baig would suffer retaliation.

84. The gravity of Mr. Baig's disclosures was confirmed by the independent reaction of the executives in the room. During the October 18, 2022 presentation, Global Public Policy Head Jonathan Lee asked: "Are we going to be in the same situation as Mudge at Twitter?" — a question Mr. Baig did not prompt and that demonstrated the senior leadership group independently understood that Mr. Baig's findings implicated the same category of Congressional investigation, FTC enforcement, and securities fraud liability that had befallen Twitter. Also at that meeting, Wael Salloum, Head of Data Science at WhatsApp, added a comment to Mr. Baig's pre-read requesting that the entire document be marked as attorney-client privileged, even though it had not been prepared for legal advice purposes and Mr. Baig had not been directed to draft it by counsel. Mr. Salloum's reflexive attempt to shield the document confirmed that senior leadership understood the disclosures to carry legal liability implications serious enough to require privilege protection. At the close of the meeting, Defendant Cathcart directed Verma to address the systemic cybersecurity problems Mr. Baig had identified, to speak with Meta's Central Security team, and to convene a follow-up meeting — a directive that was never fulfilled. From October 18, 2022 onward, Defendant Cathcart never reviewed a single cybersecurity project from Mr. Baig's team, despite typically reviewing approximately ten projects per week from various WhatsApp teams, and he did not escalate the cybersecurity gaps to AROC or the Privacy and Product Compliance Committee in Meta's Board — the board-level oversight bodies whose findings flow directly into Meta's annual 10-K disclosure process.

85. Shortly after Mr. Baig's disclosures, Mr. Baig's supervisor conveyed that Defendant

Deleted: <#>Continued Reporting Despite Escalating Retaliation (2023)¶

Deleted: COMPLAINT¶

Gupta "would fire him" for writing the cybersecurity assessment. This was the first act of retaliation and the beginning of a sustained pattern.

86. Mr. Baig continued raising cybersecurity and compliance concerns with supervisors and senior leadership, including disclosures about: the account takeover epidemic affecting approximately 100,000 users daily; the absence of real-time breach detection; WhatsApp's false commitment to the Irish DPC; and the systematic manipulation of ATO metrics by the Integrity team. During a check-in meeting with senior leadership, Mr. Baig directly stated that WhatsApp's failure to develop systems to detect and respond to external attacks would violate the 2020 Privacy Order.

87. On March 15, 2023, Mr. Baig met with Meta's Central Security team and reiterated all six critical cybersecurity issues he had been reporting since his Red Team Exercise findings and the September 2022 senior leadership presentation. In a subsequent document circulated after this meeting, Mr. Baig set out a comprehensive recap of WhatsApp's security failures, documenting that WhatsApp lacked a comprehensive inventory of user data fields, lacked a comprehensive inventory of systems storing user data, had no monitoring of user data access, had approximately 1,500 engineers with bulk production access capable of exfiltrating user data without a trace, could not detect a data breach in real time, and faced specific exposure under the FTC Privacy Order and the SEC Settlement for maintaining public representations of security incompatible with actual capabilities. Mr. Baig also documented in that recap that Meta's proposed substitute for real-time breach detection — the Blackbird/IDR tool maintained by Meta's Central Security team — had a twenty-four-hour data lag. The 2020 Privacy Order required Meta to maintain systems sufficient to detect and respond to unauthorized access to Covered Information in real time — a requirement grounded in the FTC's finding that delayed detection enables the ongoing exfiltration and misuse of user data. A tool that detects a breach only after 24 hours is not a tool that detects a breach in real time; it is documented evidence that Meta was not complying with the Order's detection requirement. When Mr. Baig reported this, he was not offering a technical preference for a faster system — he was reporting that the system Meta was representing to investors and regulators as its breach detection capability was legally inadequate to satisfy a binding federal court order.

Deleted: identified in his earlier reports. In a subsequent document circulated after this meeting, Mr. Baig explicitly warned that WhatsApp was "at risk of

Deleted: ¶ COMPLAINT¶

88. Most significantly, Mr. Baig documented in that recap that during the Central Security discussions, a Meta Security team representative acknowledged that Meta had accepted the risk of not being able to respond to a data breach in real time — a formal organizational acceptance of non-compliance that directly contradicted every representation Meta was making to investors, regulators, and users about maintaining robust breach detection capabilities. Mr. Baig's recap document explicitly warned that in our current state, WhatsApp "risk additional legal action by the FTC, SEC, IDPC, and other regulators for not meeting our legal obligations," and reported that the company had "not seen much or any progress on the state of security for WhatsApp" since October 2022.

Deleted: "

Deleted: ."

89. The organizational significance of Meta's accepted risk admission cannot be overstated in establishing both the context for the retaliation that followed and the objective reasonableness of Mr. Baig's protected disclosures. An accepted risk in enterprise risk management terminology means a documented decision by authorized management that a known risk will not be mitigated. When a Meta security team representative formally acknowledged that Meta had accepted the risk of not being able to respond to a data breach in real time, that representative was confirming that Meta's failure to build a real-time breach detection system was not an oversight, a resource constraint, or an engineering challenge in progress — it was a deliberate, documented institutional decision. Mr. Baig's report of this accepted risk was therefore a report of knowing non-compliance with a binding federal court order, and his recap document — which identified FTC, SEC, IDPC, and other regulatory exposure by name — transformed that accepted risk from an internal business decision into a protected disclosure of an intentional violation of federal legal obligations. When Defendant Mukerji ordered Mr. Baig on April 14, 2023 to stop raising FTC Privacy Order concerns — issued approximately three weeks before the FTC initiated its show-cause proceeding against Meta for deficient compliance with the same Order — that directive was consistent with, and directly connected to, Meta's institutional decision to accept the risk of non-compliance rather than remediate it. Mr. Baig's reasonable belief that his disclosures implicated federal securities law was reinforced by the organizational behavior he observed: each time he reported a compliance failure, Meta's response was not remediation but suppression.

Deleted: <#>Throughout 2023, despite intensifying retaliation from management and systemic abuse, Mr. Baig continued raising concerns about data exfiltration risks and compliance failures. On August 30, 2023, during a check-in meeting with senior leadership, Mr. Baig directly stated that WhatsApp's failure to develop systems to detect and respond to external attacks would violate the 2020 Privacy Order.¶
On September 11, 2023, at a model building workshop, Mr. Baig led discussions about cybersecurity gaps and compliance requirements under the FTC Privacy Order, continuing to advocate for systemic remediation of the identified failures.¶

Deleted: ¶
COMPLAINT¶

90. On April 18, 2023, counsel for Mr. Baig sent a formal written letter to Meta on his behalf asserting that Meta had retaliated against him in violation of SOX and specifically identifying the violations of the 2020 FTC Privacy Order and SEC rules — including material misstatements in Meta's annual SEC filings — that had formed the subject of Mr. Baig's preceding internal disclosures. This communication constitutes a standalone protected disclosure under 18 U.S.C. § 1514A(a)(1)(C) as a communication to Meta, the covered company, through Mr. Baig's authorized representatives regarding conduct he reasonably believed violated rules and regulations of the SEC. The April 18, 2023 letter predates Mr. Baig's January 2, 2024 letter to Defendant Zuckerberg by more than nine months and establishes an independently protected disclosure at a stage preceding each of the major subsequent retaliatory escalations — including the December 26, 2023 performance warning and the sustained campaign of adverse employment actions carried through 2024 — confirming that Meta's retaliatory purpose was established and operative well before those acts occurred.

91. In September 2023, Mr. Baig published an internal vision document outlining the necessary steps for protecting WhatsApp user data and complying with the 2020 FTC Privacy Order. The document was not a roadmap for engineering improvement; it was a report that the compliance program Meta had been certifying to investors as already built, operational, and subject to independent assessment had never been constructed. Mr. Baig documented that achieving compliance with the 2020 Privacy Order would require building from the ground up — systems for data inventory, access restriction, breach detection, incident reporting, and audit documentation — none of which existed as described in Meta's annual 10-K filings. Every 10-K representation that Meta was "maintaining a comprehensive privacy program" was therefore false at the time it was made, because the program required to make that statement true did not exist and, as of the date of the vision document, had not been built. The vision document was Mr. Baig's most comprehensive single statement of that falsity.

92. On October 13, 2023, Clarke acknowledged the data exfiltration risk to Mr. Baig by asking: "How would the FTC feel, if they knew that it is possible for someone to take a three-terabyte file containing user data and move it outside of Meta?" — and then directed Mr. Baig not to raise the data exfiltration risk in meetings with CISO Guy Rosen and Defendant Gupta. Clarke's formulation —

Deleted: Privacy Order, including: (a) identifying all systems containing …

Deleted: COMPLAINT¶

asking how the FTC would feel — was not a rhetorical observation. It was an acknowledgment that the data exfiltration vulnerability was a matter of regulatory legal exposure, not merely an internal security risk. His subsequent directive to suppress that concern from the executives responsible for SEC disclosure decisions — Rosen, as CISO, and Defendant Gupta, as Head of Engineering — was a directive to ensure that the officers in the chain of responsibility for Meta's annual 10-K certifications would not receive information that would have required them to either remediate the vulnerability or disclose it. A security director who acknowledges FTC visibility into a compliance failure and then directs the compliance officer not to raise it with the certifying officers is not managing meeting agendas — he is affirmatively working to preserve the falsity of pending investor-facing certifications. His directive to suppress the concern from the executives responsible for SEC disclosure decisions constituted both a corroboration of Mr. Baig's protected disclosures and an independent act of impedance within the meaning of Rule 21F-17, 17 C.F.R. § 240.21F-17.

93. On October 25, 2023, Mr. Baig formally requested an audit from Syed Abidi, Meta's Internal Auditor, specifically targeting large-scale data exfiltration risk. Mr. Abidi told Mr. Baig that the proliferation of access to user data and large-scale data exfiltration risks were very well known to the top leadership at Meta and then refused to perform the audit. Mr. Baig's October 25, 2023 audit request was not a request for an internal engineering review. It was a formal request that Meta create the written compliance record that the 2020 Privacy Order required to exist — a record that, had it accurately documented the data exfiltration risks Mr. Baig was reporting, would have triggered mandatory disclosure obligations to the FTC's independent assessor, to AROC, and, through AROC, to the 10-K disclosure pipeline. Abidi's refusal was therefore not an administrative decision about audit prioritization. It was a decision to prevent the existence of a written compliance record that would have required Meta to correct or supplement the investor-facing representations it was simultaneously making in its most recently filed Form 10-K. A company that formally refuses to audit a known compliance risk in order to avoid creating a record of that risk is not making a technical judgment — it is deliberately suppressing the documentary foundation of its regulatory disclosure obligations. The acknowledged top-level awareness of the risk combined with the deliberate refusal to

Deleted: COMPLAINT

formally audit it constitutes corroborating evidence that Meta's compliance infrastructure was being intentionally suppressed from generating a written record that would have triggered investor-facing disclosure obligations under SEC rules. Mr. Baig's formal audit request was itself a protected disclosure under 18 U.S.C. § 1514A(a)(1)(C) as a communication to a person with supervisory authority regarding conduct he reasonably believed violated rules and regulations of the SEC.

94. On October 30, 2023, Defendant Gupta acknowledged in a formal meeting with Meta's X-Sec team that Meta needed to address the threat of data exfiltration — but the assembled team declined to take any remedial action whatsoever. An organizational acknowledgment of a material compliance risk followed by a documented decision to take no remedial steps is precisely the kind of knowing concealment that Mr. Baig understood to be unlawful under SEC disclosure rules. Defendant Gupta's acknowledgment of the risk at this meeting, followed by the decision against action, is direct evidence that the failure to disclose and remediate the data exfiltration vulnerability was a knowing institutional choice, not an oversight.

95. The institutional attitude toward compliance obligations that Mr. Baig was documenting was not limited to directives from direct supervisors. In December 2023, Ben Beard, Product Manager for Privacy Infrastructure at WhatsApp, told Mr. Baig directly: "I don't worry much about the FTC Order. We have lawyers for that." This statement — made by a product manager responsible for privacy infrastructure at the platform subject to the 2020 Privacy Order — captures the institutional posture Mr. Baig was encountering throughout his employment: that Meta's obligations under the FTC consent order were matters of legal risk management rather than legal compliance, to be handled by those in the legal department rather than by employees in privacy and security roles. Beard's statement is relevant to the falsification of records and audit obstruction counts because it establishes that the organizational resistance to compliance documentation that Mr. Baig encountered from his supervisors was not limited to those supervisors — it was the ambient institutional culture of the privacy and security teams whose records were being submitted to oversight personnel and ultimately incorporated into Meta's SEC filings.

96. After sustaining retaliation for his disclosures, Mr. Baig sent a detailed letter to

**Deleted:** user data; (b) implementing immutable audit trails for data access; (c) reducing employee access based on documented business need; and (d) detecting anomalous data access in real time

**Deleted:** <#>**Escalation to Chief Executive Officer (2024)**¶
On January 2, 2024, after systemic retaliation for his cybersecurity disclosures, Mr. Baig sent a detailed letter to Mark Zuckerberg, CEO of Meta, and Jennifer Newstead, General Counsel, documenting: (a) violations of the 2020 Privacy Order; (b) violations of SEC rules and regulations; (c) escalating retaliation against him for raising these concerns; and (d) evidence that the central security team had falsified security reports to cover up decisions not to remediate data exfiltration risks. Mr. Baig warned that such falsifications could lead to criminal penalties and provided extensive documentation of cybersecurity gaps and failed remediation efforts.¶

**Deleted:** ¶
COMPLAINT¶

Defendant Zuckerberg, General Counsel Jennifer Newstead, and Meta's Ethics and Compliance team on January 2, 2024, specifically documenting: (a) violations of the 2020 Privacy Order; (b) violations of SEC rules and regulations, including rules relating to falsification of records and false statements to auditors; (c) evidence that Meta's X-Sec team had falsified security reports to cover up decisions not to remediate data exfiltration risks; (d) blocked internal audits; and (e) escalating retaliation against Mr. Baig. Mr. Baig warned that the falsification of security reports could lead to criminal penalties and identified the SEC regulatory dimension of Meta's conduct. The January 2, 2024 letter constituted an independently protected disclosure of a further category of Covered Incident non-reporting violations: in addition to WhatsApp-specific failures, the letter specifically documented that Meta was failing to report as Covered Incidents under Part IX of the 2020 Privacy Order the approximately 250,000 daily account compromises occurring on Facebook — Meta's primary advertising platform and its principal source of revenue. Mr. Baig understood that because the 2020 Privacy Order required a single comprehensive privacy program across all Meta platforms, the failure to report Facebook ATOs as Covered Incidents rendered the enterprise-wide compliance certifications to the FTC false, and rendered materially false Meta's investor-facing representation that it was maintaining a comprehensive privacy program in connection with the FTC consent order. This enterprise-wide Covered Incident non-reporting disclosure constitutes protected activity under § 1514A(a)(1)(C) independently of the WhatsApp-specific scraping disclosures that followed in 2024. In specifically warning of criminal consequences, Mr. Baig referenced: (i) the October 2022 criminal conviction and May 2023 sentencing of Uber's former Chief Security Officer, Joseph Sullivan, to three years of probation following his conviction for concealing a data breach from regulators; and (ii) the SEC's October 2023 enforcement action against SolarWinds Corp. and its CISO for misleading investors about cybersecurity practices. It is plain that Mr. Baig had subjectively and objectively reasonable bases upon which to conclude that violations of SOX may have occurred and were ongoing. This letter was delivered to Defendant Zuckerberg approximately one month before the filing of the FY2023 Form 10-K.

97. On January 30, 2024, Mr. Baig formally reported to Defendant Gupta that Meta had

Deleted: provided upward feedback

Deleted: Nitin

Deleted: documenting Meta's "

Deleted: COMPLAINT

made a false commitment to the Irish DPC — a binding regulatory authority — by representing that technical controls prevented WhatsApp user data from being accessed by Meta employees generally. Mr. Baig documented that this representation was false: specific data warehouse tables containing Covered Information remained accessible to between 20,000 and 65,000 Meta employees, none of whom had documented business need for that access. Access by 20,000 to 65,000 employees without documented business need is a categorical violation of Section VII of the 2020 Privacy Order regardless of whether any one of those employees actually misused the access. Mr. Baig was not reporting a technical control implementation gap; he was reporting that Meta had made an affirmatively false statement to a regulator and was representing to investors in its annual 10-K filings that the access restriction program required by the 2020 Privacy Order was functioning — when the access pattern he documented proved it was not. This disclosure was made twenty-eight days after Mr. Baig's January 2, 2024 letter to Defendant Zuckerberg, in which he had described violations of SEC rules and regulations.

98. On January 31, 2024, Mr. Baig met with Syed Abidi, Meta's Internal Auditor, and Charu Chandra, Director of Technology Infrastructure Audit, to formally request an audit of access controls in the WhatsApp data warehouse — the same access control failures he had documented the prior day in his upward feedback to Defendant Gupta, identifying between 20,000 and 65,000 Meta employees with unrestricted access to Covered Information in direct violation of Section VII of the 2020 Privacy Order. Chandra told Mr. Baig directly that Guy Rosen's team would block the audit, and that Rosen's team would say they already knew about the issues. Mr. Baig's formal audit request was itself a protected disclosure under 18 U.S.C. § 1514A(a)(1)(C) as a communication to persons with authority to investigate misconduct regarding conduct he reasonably believed violated SEC rules, the 2020 Privacy Order, and Defendant Zuckerberg's SOX certifications of effective disclosure controls. Chandra's pre-emptive blocking statement independently corroborates Syed Abidi's October 25, 2023 admission that the data exfiltration risks were very well known to Meta's top leadership: together, these two admissions establish a documented institutional pattern in which senior compliance and audit personnel acknowledged the violations to Mr. Baig while simultaneously confirming that no formal

Deleted: ”
Deleted: Data Privacy Commissioner regarding
Deleted: preventing
Deleted: access
Deleted: cited
Deleted: examples of
Deleted: -
Deleted: directly violating both the “Uber Commitment” and
Deleted: . It was later discovered that some
Deleted: tables could
Deleted: COMPLAINT¶

audit record would be permitted to exist. Her statement that the audit would be blocked before Mr. Baig had even submitted the formal request constitutes evidence of pre-emptive audit obstruction within the meaning of Rule 13b2-2(b)(1) and an independent act of impedance within the meaning of Rule 21F-17, 17 C.F.R. § 240.21F-17 — an affirmative institutional decision to prevent accurate compliance documentation from reaching audit records, twenty-nine days after Mr. Baig's January 2, 2024 letter to Defendant Zuckerberg.

99. In early March 2024, Mr. Baig distributed an internal report on WhatsApp's anti-scraping projects. The report did not characterize the scraping problem as a security engineering challenge. It used the legal terminology of the 2020 Privacy Order: it stated that WhatsApp was "leaking Covered Information on millions, if not billions, of users daily" — specifically using the defined term "Covered Information" to identify the data subject to mandatory reporting obligations — and that WhatsApp was "severely under reporting scraping Covered Incidents to the FTC and other regulators," characterizing the failure as a violation of Meta's mandatory regulatory reporting obligations, not an engineering deficiency. By writing the report in the language of the Privacy Order rather than in the language of security operations, Mr. Baig was unambiguously reporting a legal violation, not raising a technical concern. This written internal disclosure constitutes a third independent written protected disclosure regarding the Covered Incident under-reporting theory, predating Mr. Baig's September 30, 2024 scraping finding and his November 4, 2024 written communication to Defendant Tsimelzon.

100. Mr. Baig continued documenting and reporting: (a) profile scraping affecting over 400 million users daily without proper regulatory notification; (b) cybersecurity risks from new product features that would exacerbate account takeover problems; (c) under-reporting of security incidents to regulators; and (d) systematic manipulation of user harm metrics. Most notably, Mr. Baig authored and presented a formal Business Case to Banerjee and Brouwer's team for the express purpose of communicating legal and financial risk created by their blocking of scraping remediations. The Business Case stated that WhatsApp is required to report incidents to the FTC as Covered Incidents in which Covered Information of 500 or more U.S. users was compromised. It quantified the regulatory

Deleted: accessed by

Deleted: a higher number of employees (i.e.: 100,000).

Deleted: Throughout 2024, Mr.

Deleted: specific compliance failures, including

Deleted: e.g.: WhatsApp Contacts

Deleted: as required by GDPR and the 2020 Privacy Order

Deleted: systemic

Deleted: to game the performance management system and avoid addressing cybersecurity vulnerabilities.¶
In 2024, Mr. Baig and his team built several security features to reduce user harm, but Meta blocked the launch of these features:¶
Upon receiving numerous complaints from users who were being hacked and locked out of their accounts, Mr. Baig and his team built:¶
Post Compromise Account Recovery (PCR): A feature that would allow a hacked user to recover their account from their existing device.¶
Account Defense 2.0: A feature that would require login approval from a user's existing device.¶
Upon receiving numerous reports about widespread impersonation scams on WhatsApp, Mr. Baig and his team built a feature to prevent …

Deleted: ¶
COMPLAINT¶

exposure as "anywhere up to $1B in regulatory fines" — a written, first-person quantification of investor-facing financial materiality. It stated that if the scraped dataset contained profile photos rather than phone numbers "it will be much harder to defend such litigations," establishing in writing, four months before the September 2024 finding of 400 million daily photo scrapes. In making this protected disclosure, Mr. Baig was specifically aware of the November 2022 Cybernews report of 500 million WhatsApp user records for sale and the Quebec class action lawsuit that followed. Leadership's subsequent refusal to unblock remediations after receiving this written analysis constitutes knowing concealment of a material cybersecurity risk.

101. Beginning in September 2024, Mr. Baig and his team conducted a risk assessment of the "WAFFLE" project — Meta's initiative to allow WhatsApp users to log in using their Facebook and Instagram credentials — and documented that WhatsApp accounts using Facebook credentials were four times more likely to be compromised through account takeover. Mr. Baig reported this material security risk through internal channels, specifically identifying that relaxing account security controls to facilitate user growth would compound WhatsApp's failure to report Covered Incidents and render Meta's investor-facing security representations further false. Leadership suppressed the risk assessment by deliberately burying its distribution. On October 17, 2024, Mark Hatton directly pressured Mr. Baig's team member to revise the risk assessment and reduce the stated ATO risk; the team member resisted. A member of Defendant Tsimelzon's team acknowledged openly that if leadership received the risk assessment from Mr. Baig's team, leadership may not let them launch WAFFLE — a direct admission that the suppression was intentional and commercially motivated. Defendant Tsimelzon stripped Mr. Baig of architectural responsibility for the WAFFLE security architecture and assigned it to the colleague who had sought to suppress the accurate assessment. Mr. Baig's risk assessment and resistance to its suppression constituted protected activity under § 1514A(a)(1)(C) as a disclosure of falsification of records subject to § 13(b)(2)(A) of the Exchange Act and a report of conduct violating Rule 10b-5.

102. Throughout his employment, Mr. Baig documented and reported that Meta's PSC created structural incentives for engineering teams to generate false metrics for management and

Deleted: from being scraped.

Deleted: <#>Mr. Baig and his team also built a feature to prevent users from being incorrectly banned and reported to National Center for Missing and Exploited Children (NCMEC). An attacker could exploit a vulnerability in WhatsApp to falsely accuse a good user of sending them child porn.¶
Mr. Baig and his team learnt that journalists and at-risk population were being attacked by nation-state actors. They built two product security features to mitigate this risk:¶
Covert Messaging: A feature that would introduce an artificial random delay in message notifications to prevent timing attacks from inferring "who is messaging who" on WhatsApp.¶
Advance Secure Mode: A feature that would limit attackers from sending malware to the targeted user's device.¶
**External Regulatory Filings (2024-2025)¶**
On November 27, 2024, after exhausting internal remedies and facing continued retaliation, Mr. Baig filed a Form TCR with the Securities and Exchange Commission documenting Meta's cybersecurity deficiencies and failure to inform investors about material cybersecurity risks. Mr. Baig reported that Meta had failed to track and manage user data collection, identify data storage locations, and address systemic scraping and account takeover issues known to senior leadership.¶
On December 4, 2024, Mr. Baig sent a second letter to Mr. Zuckerberg documenting continued cybersecurity problems and escalating retaliation, informing the CEO that he had filed the SEC complaint and requesting immediate action to address both the underlying compliance failures and the unlawful retaliation. Mr. Baig also urged Mr. Zuckerberg to put the interests of Meta user's first as opposed to treating them as numbers on some dashboard, "I think there is something important missing from "Meta, Metamates, Me" and in my opinion that is what makes or breaks our company".¶
On January 17, 2025, Mr. Baig filed a complaint with the Occupational Safety and Health Administration under Section 806 of the Sarbanes-Oxley Act, documenting the systemic retaliation he had suffered for reporting cybersecurity failures and regulatory violations, and informed Meta of this filing.¶
On February 4, 2025, Mr. Baig told the internal investigator that Meta is treating his retaliation complaints as routine isolated sexual harassment claim "This is not a sexual harassment. This is about the company". ¶
Throughout this period, Mr. Baig's disclosures consistently focused on conduct he reasonably believed constituted: (a) violations of SEC rules and regulations regarding internal controls and material cybersecurity risks; (b) securities fraud through misrepresentations about WhatsApp's security capabilities in public filings and statements; (c) violations of the 2020 Privacy Order constituting potential shareholder fraud; and (d) wire fraud through systemic failures to protect user data as represented to regulators and the public.¶
Each of Mr. Baig's disclosures was made in good faith based on his reasonable belief, supported by his extensive cybersecurity expertise and documented evidence, that Meta and WhatsApp were violating federal securities laws, SEC regulations, and court-ordered compliance requirements in ways that posed material risks to shareholders and constituted fraud against investors who relied on the company's representations about its cybersecurity capabilities and regulatory compliance.¶
¶
//¶
//¶
**Chronology of Retaliatory Conduct¶**
**Initial Retaliation Following First Cybersecurity Disclosures (September-November 2022)¶**
Immediately after Mr. Baig's September 26, 2022 cybersecur ...

Deleted: ¶
COMPLAINT¶

investor consumption. The most concrete documented example occurred in late 2024: a team led by colleague Parth Shah — tasked with reducing WhatsApp's annual SMS expenditure of approximately $400 million — falsely claimed to have saved $1.5 billion in SMS costs during 2024 when WhatsApp's actual SMS spend had remained essentially flat throughout the year. This false performance claim was used to support a colleague's promotion while Defendants Tsimelzon, Gupta, and Dick Brouwer, Engineering Director responsible for WhatsApp user growth, simultaneously denied a promotion to a member of Mr. Baig's team who built the PCR solution. Mr. Baig reported this systematic PSC-driven inflation of security and efficiency metrics to Meta's internal investigators and to leadership throughout his employment, constituting protected activity under § 1514A(a)(1)(C) as reports of falsification of records subject to § 13(b)(2)(A) and violations of Rule 10b-5(b).

103. In May 2024, Meta's Central Security team completed a red team exercise identified internally as JUNGLE focused specifically on data exfiltration risk. When the findings were presented to Defendant Gupta, he stated: "We have known about these issues for a long time, why are we presenting them now" and "blissful ignorance was better than this." Following this acknowledgment, Defendant Gupta and Mehta decided not to report the actual findings to AROC, and instead shared with AROC only a false positive result from the exercise — presenting the exercise as a success rather than disclosing the documented data exfiltration vulnerabilities it had identified. Mr. Baig observed these presentations and decisions directly. Defendant Gupta's own statements establish that the decision to present a false positive to AROC was a knowing act of concealment, not an oversight. While Mehta is not a named Defendant in this action, his conduct is attributed to Meta.

104. On September 30, 2024, Mr. Baig and his team documented and published a significant security finding: WhatsApp was leaking over 400 million user profile photos daily to external scrapers. On the same day, Mr. Baig met with Sandeep Hebbani, Director of Engineering, Central Privacy at Meta, and formally reported WhatsApp's legal obligation under Part IX of the 2020 Privacy Order to report the mass scraping events as Covered Incidents to the FTC, and under the GDPR to notify the Irish DPC. After several days of delay, Hebbani opened an internal tracking ticket (SEV S459511) to document the incident. Hebbani then deliberately configured the tracking system to prevent Mr. Baig's

Deleted: COMPLAINT¶

team from logging the attacker's phone numbers — the precise data element required to identify and formally report the scrapers to the FTC under Part IX — making it technically impossible to complete the required Covered Incident report. Mr. Baig understood that Hebbani had been blocked by top leadership from allowing the scraping activity to be formally reported as a Covered Incident. This deliberate technical obstruction of the mandatory regulatory reporting pipeline that Mr. Baig raised constitutes an adverse act taken in response to protected activity; independently implicates Rule 13b2-2(b)(1) as conduct manipulating records provided to oversight personnel; and constitutes a further violation of Rule 21F-17(a) as an action impeding Mr. Baig's ability to compile and transmit documentation to the SEC.

105. On October 15, 2024, Meta's European Electronic Communications Code (EECC) auditor Jubby Quiton, EECC Internal Auditor, Meta, completed an audit of WhatsApp's cybersecurity controls. In doing so, Quiton excluded five findings from the audit report — including the finding directly related to Mr. Baig's concern about data warehouse access controls violating Section VII of the 2020 Privacy Order. The excluded findings were not marginal audit observations. The data warehouse access controls finding — the one directly related to Section VII of the 2020 Privacy Order — was precisely the finding that, had it appeared in the final audit report, would have flowed through AROC and into the 10-K disclosure pipeline, requiring Meta to disclose to investors that its access restriction program was not functioning as represented. By excluding the finding after it was identified, the audit process did not generate a false report; it simply erased the accurate one. The effect on Meta's SEC disclosure obligations was identical: Defendant Zuckerberg certified the FY2024 Form 10-K without any written audit finding documenting the Section VII violation that Mr. Baig had been reporting since 2021 — because Quiton had ensured that no such written finding would exist. The selective exclusion of findings central to Mr. Baig's protected disclosures from a formal compliance audit constituted further suppression of the documentary record that would have triggered investor-facing disclosure obligations under SEC rules and regulations.

106. On December 18, 2024, Quiton reached out to Mr. Baig stating that he was under intense scrutiny and pressure and needed help justifying audit findings and risk levels. This



Deleted: COMPLAINT¶

communication — from the auditor charged with independent compliance oversight, disclosing that he was under institutional pressure regarding the very findings he had just issued — confirmed to Mr. Baig that the audit function was not operating independently but was being managed to produce outcomes favorable to management, consistent with what Mr. Baig had been reporting as a violation of SEC rules governing auditor communications. An auditor who completed a compliance audit, excluded findings under organizational pressure, and then sought retroactive justification for those exclusions from the employee who had originally identified the violations is direct evidence that Meta's audit suppression extended to the distortion of completed audit results, not merely the prevention of audits from being initiated.

107. On November 4, 2024, Mr. Baig sent a written communication to Defendant Tsimelzon specifically documenting WhatsApp's legal obligations to report the mass scraping incidents as Covered Incidents under Part IX of the 2020 Privacy Order and as reportable incidents under the GDPR. Mr. Baig's communication identified that WhatsApp was significantly under-reporting scraping events to both the FTC and applicable European data protection authorities, conduct that Mr. Baig reasonably believed violated Meta's mandatory regulatory reporting obligations.

108. Rather than addressing the compliance failures Mr. Baig identified, Defendant Tsimelzon reprimanded Mr. Baig for raising WhatsApp's legal reporting obligations in connection with the scraping incidents. This reprimand preceded Mr. Baig's Form TCR filing to the SEC by twenty-three days and forms part of the unbroken pattern of retaliation culminating in his termination. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009).

109. After exhausting internal remedies and following continued retaliation, Mr. Baig filed two Form TCR submissions in November 2024 with the SEC through its formal whistleblower complaint mechanism, expressly filing under the SEC's whistleblower program and requesting eligibility for a whistleblower award. The first TCR (Submission No. 17327-599-017-967) was filed on November 27, 2024. The second, supplemental TCR (Submission No. 17329-786-669-484) was filed on November 30, 2024. Both submissions identified the complaint category as "Material misstatement or omission in a company's public filings or financial statements, or a failure to file" —

Deleted: COMPLAINT¶

specifically: "False/misleading financial statements." Together, the two TCR submissions formally documented: (a) Meta's cybersecurity deficiencies and its failure to inform investors about material cybersecurity risks, including the systematic under-reporting of scraping incidents that undermined the accuracy of Meta's FTC compliance certifications; (b) false and misleading statements in Meta's public SEC filings regarding its FTC Privacy Order compliance program; and (c) ongoing violations of federal securities laws and rules, with the conduct identified as continuing at the time of filing. Mr. Baig submitted six categories of supporting documentation with the TCR: Systemic Issues, Data Security, Scraping, Performance and Manager Feedback, Account Security, and Audits. Mr. Baig stated a loss of $5,000,000 and reported that he had previously raised these matters internally with Meta's internal investigator, Brendan Brownfield, and that he had faced "escalating retaliation internally" that had "spilled over to [his] direct reports and team." Mr. Baig further reported to the SEC that Meta had taken steps to prevent him from reporting the violations, including locking him out of access to a document titled the JUNGLE Writeup, and that Meta was systematically using its approximately 3,000 internal lawyers to mark compliance documents as attorney-client privileged in order to shield them from disclosure. At the time of filing, Mr. Baig was still employed by Meta as the head of the WhatsApp Security team and promptly notified Defendant Zuckerberg that he had filed these SEC complaints.

110. On December 4, 2024, Mr. Baig sent a letter to Defendant Zuckerberg documenting continued cybersecurity problems and escalating retaliation since his January 2, 2024 letter, informing Defendant Zuckerberg that Mr. Baig had filed a complaint with the SEC, and requesting immediate action. In this letter, Mr. Baig stated verbatim that Meta's leadership was "not being truthful to the auditors and the regulators" — language that identified a specific category of conduct Mr. Baig understood to constitute violations of SEC rules and regulations governing the accuracy of required disclosures and the truthfulness of statements to auditors, specifically including Rules 13b2-1 and 13b2-2 and the disclosure controls obligations Defendant Zuckerberg was certifying annually under Rule 13a-14. This letter was delivered to Defendant Zuckerberg approximately two months before he certified the FY2024 Form 10-K in January 2025 — providing him with express written notice that

Deleted: COMPLAINT

Mr. Baig believed Meta's auditor and regulator-facing representations were false before Zuckerberg made that certification. This letter therefore constituted protected activity under 18 U.S.C. § 1514A(a)(1)(C) as a disclosure to a person with supervisory authority regarding conduct Mr. Baig reasonably believed violated rules and regulations of the SEC and provisions of federal law relating to fraud against shareholders.

111. On January 17, 2025, Mr. Baig filed an administrative complaint with OSHA pursuant to 29 C.F.R. § 1980.103, detailing Meta's violations of SOX and the sustained pattern of retaliation described herein. Prior to his termination, Mr. Baig informed Defendants of his OSHA filing. Meta terminated Mr. Baig's employment on February 10, 2025, less than one month after he informed Defendants of his OSHA complaint and approximately ten weeks after he informed Defendant Zuckerberg of his SEC Form TCR filing.

112. On January 29, 2025 — twelve days before his termination — Mark Hatton expressly admitted to Mr. Baig that the account takeover events measured by his team were only a fraction of the actual ATOs, meaning that Meta had been significantly under-reporting account takeovers to regulators, users, and investors. This admission — made by the manager whose team was responsible for the ATO metrics Mr. Baig had spent years attempting to remediate — confirmed that the systematic under-reporting Mr. Baig had been documenting and reporting was acknowledged internally, and that Meta had been concealing the true scale of user harm while publicly representing its security posture as compliant with the 2020 Privacy Order and with Meta's investor-facing disclosures.

113. Three days before his termination, on February 7, 2025, Mr. Baig shared documentary evidence with Courtney Cooper, Director of Public Policy at WhatsApp, showing that WhatsApp user data remained accessible to approximately 65,000 global Meta employees — the same Section VII violation he had been reporting since his Red Team Exercise findings in 2021 and documenting in successive formal disclosures through the entirety of his employment. Mr. Baig informed Cooper that WhatsApp would not meet the cybersecurity bar required for use by the United States House of Representatives. This disclosure was made with specific documentary evidence to a person with

Deleted: COMPLAINT¶

supervisory authority within the meaning of 18 U.S.C. § 1514A, and constitutes a standalone protected disclosure under § 1514A(a)(1)(C) establishing that the access control failures Mr. Baig had been reporting since 2021 remained entirely unremediated as of three days before his termination. The disclosure to Cooper also confirms the continuing materiality and investor-facing significance of the Section VII violations at the precise moment of termination: a cybersecurity posture that a senior internal official characterized as failing to meet the threshold for use by a branch of the federal government is one that a reasonable investor would consider significant to a company representing in its SEC filings that it was maintaining a comprehensive privacy program in full compliance with a federal court order.

114. On March 3, 2025 — following his February 10, 2025 termination — Mr. Baig filed a report through Meta's internal Integrity line raising concerns about Meta's non-compliance with privacy regulations and violations of federal securities law, and separately requesting the contact information for AROC and the Privacy and Product Compliance Committee of Meta's Board of Directors. Meta responded several days later directing Mr. Baig to contact AROC by sending a written letter by mail, providing no substantive engagement with the compliance violations reported and no actual contact information for the committee. This post-termination disclosure constitutes protected activity under § 1514A(a)(1)(C) as a communication to persons with authority to investigate misconduct. Meta's response directing a terminated whistleblower to a physical mail channel rather than engaging with the documented violations — whose mandate encompassed the precise compliance failures Mr. Baig had documented for three years — is further evidence of the institutional suppression of his disclosures. The March 3, 2025 filing completes an unbroken chain of documented protected disclosures spanning from September 2021 through and beyond his termination.

115. Throughout the period from May 2023 through February 2025, Mr. Baig participated in and made protected disclosures during approximately eight separate internal investigations conducted by Meta's employment investigations team. Each investigation provided an independent occasion for Mr. Baig to disclose to Meta's internal investigators — persons with authority to investigate misconduct within the meaning of 18 U.S.C. § 1514A(a)(1)(C) — his specific, documented beliefs that

Deleted: COMPLAINT¶

Meta was violating SEC rules and regulations, and the factual basis for those beliefs.

116. During investigations on May 10, 2023, June 8, 2023 and December 15, 2023 (including the investigation initiated following his April 18, 2023 letter through counsel, and a second investigation arising from the October 2023 negative feedback from Gregory Heimbuecher, Security Engineer at Meta's X-Sec team), Mr. Baig specifically answered the investigators' questions about why he believed that WhatsApp's and Meta's failure to address cybersecurity gaps would violate the 2020 Privacy Order and SEC rules and regulations. He explained that Meta's annual 10-K representations of a functioning privacy program were materially false in light of the systemic failures he had been documenting; that the falsified security reports generated by the X-Sec team violated SEC rules governing records falsification, specifically including Rule 13b2-1 and § 13(b)(2)(A) of the Exchange Act; and that management's blocking of compliance audits and verbal prohibitions on written documentation constituted violations of SEC rules governing false statements to auditors under Rule 13b2-2. These disclosures were made to investigators with authority to investigate misconduct and constituted protected disclosures under § 1514A(a)(1)(C) of conduct he reasonably believed violated SEC rules and regulations and provisions of federal law relating to fraud against shareholders.

117. In the January 29, February 5, and February 7, 2024 investigative interviews — which Meta initiated in response to Mr. Baig's January 2, 2024 letter to Defendant Zuckerberg — Mr. Baig provided the investigators with many of the same documents he had sent to Defendant Zuckerberg, General Counsel Jennifer Newstead and Meta's Ethics and Compliance team, and drafted additional summaries of the retaliation he had been experiencing. During these interviews, Mr. Baig specifically disclosed: (a) that Defendant Mukerji had directed funding and staffing allocated as a result of Mr. Baig's Zuckerberg letter away from Mr. Baig's team and toward teams that were retaliating against him; (b) that Defendant Mukerji was deliberately impeding Mr. Baig's efforts to combat ATOs and develop Profile Scraping Mitigations, in violation of the 2020 Privacy Order's access control and incident reporting requirements; (c) that Meta was failing to report Covered Incidents to the FTC and making false compliance certifications as a result; and (d) that these failures rendered Meta's investor-facing representations about its privacy compliance program materially false in violation of Rule 10b-5

Deleted: COMPLAINT¶

and the provisions of federal law relating to fraud against shareholders. Mr. Baig understood that, by providing these disclosures to the internal investigator, he was reporting specific SEC rule violations to a person with authority to investigate misconduct.

118. In the July 11, 2024 investigative interview — arising from the retaliatory May 2024 performance warning from defendant Tsimelzon — Mr. Baig cooperated with the investigator and provided documentation of the specific violations he had raised with colleagues and leadership throughout the prior year, including the false positive AROC presentation arising from the JUNGLE red team exercise and the false Uber Commitment to the IDPC. In the August 30, 2024 and October 25, 2024 investigative interviews, Mr. Baig again cooperated and provided supporting documentation of the cybersecurity and compliance violations he had been reporting, specifically including the suppression of the WAFFLE risk assessment and the deliberate obstruction of the Covered Incident reporting mechanism by Central Privacy leadership. In the February 4, 2025 investigative interview — six days before his termination — Mr. Baig provided truthful responses documenting the continuing cybersecurity failures and the ongoing retaliation, constituting the most proximate act of protected activity before the termination decision.

119. During these investigations, Mr. Baig repeatedly disclosed that Meta was violating SEC rules and regulations, that the company was lying to investors, that the internal audit function was completely broken, and that the pre-read documents prepared for VP Gupta and Guy Rosen constituted material misrepresentations of facts. Each of these disclosures was made to a person with supervisory authority and authority to investigate misconduct within the meaning of 18 U.S.C. § 1514A(a)(1)(C), and each constitutes an independently protected disclosure. The retaliatory adverse actions taken against Mr. Baig during and immediately following each investigation — including Defendant Tsimelzon's "Below Expectations" mid-year rating issued less than one month after Mr. Baig informed him of his cooperation with a cybersecurity audit; Defendant Mukerji's December 26, 2023 retaliatory email issued eleven days after a formal investigative interview; and the termination notice issued six days after the final investigative interview — independently establish contributing-factor causation between each investigation participation and the adverse action that followed.



Deleted: COMPLAINT¶

120. In addition to the April 18, 2023 letter described above, prior to the filing of this action, counsel for Mr. Baig transmitted written letters to Meta on his behalf, alleging that Meta had violated SEC rules and regulations in connection with its investor-facing representations concerning WhatsApp's cybersecurity program and FTC Privacy Order compliance. These letters specifically alleged: (a) violations of Rule 10b-5, 17 C.F.R. § 240.10b-5; (b) violations of SEC rules governing falsification of records and false statements to auditors, 17 C.F.R. §§ 240.13b2-1 and 240.13b2-2; and (c) retaliation against Mr. Baig for reporting these violations.

## VII. SUMMARY OF ALL PROTECTED DISCLOSURES FROM OSHA ADMINISTRATIVE COMPLAINT

121. The following is a comprehensive chronological enumeration of every protected disclosure made by Mr. Baig as documented in his January 17, 2025 OSHA administrative complaint (supplemented April 11, 2025). Each disclosure constitutes independently protected activity under 18 U.S.C. § 1514A(a)(1)(C) as a communication to a supervisor or person with authority to investigate misconduct regarding conduct Mr. Baig reasonably believed violated SEC rules, the 2020 Privacy Order, and provisions of federal law relating to fraud against shareholders. Taken together, these disclosures establish a continuous, documented pattern of protected activity from September 2021 through March 2025 that was met at each stage with escalating retaliation.

122. **Mr. Baig's Subjective Belief That He Was Reporting Securities Fraud and Wire Fraud.** From the period of his earliest disclosures, Mr. Baig possessed specific factual knowledge establishing his belief that Meta's conduct constituted federal fraud and not merely regulatory non-compliance. Prior to and during his employment, Mr. Baig knew that Meta had settled SEC charges in 2019 for $100 million for making misleading disclosures about the risk of misuse of Facebook user data, establishing that the precise category of cybersecurity misrepresentation he was observing had previously been characterized by the SEC as a violation of the federal securities laws. By the time of the October 18, 2022 presentation, his belief was confirmed by his circulation of the Forbes/Zatko article, which quantified investor harm from a comparable cybersecurity whistleblower disclosure as a 4.5% single-day stock decline, establishing that Mr. Baig understood the gap between Meta's public

Deleted: COMPLAINT¶

representations and its actual security posture to constitute knowing misrepresentation to investors within the meaning of 18 U.S.C. § 1348. By no later than January 2, 2024, when Mr. Baig sent Defendant Zuckerberg a letter identifying potential criminal liability analogous to charges brought against the Uber CISO and the SolarWinds CISO, his belief that the conduct was intentional and not merely negligent was fully formed. Mr. Baig believed that Meta's officers were knowingly certifying the effectiveness of disclosure controls they had been specifically informed were failing, as part of a deliberate scheme to conceal WhatsApp's cybersecurity failures from investors in order to prevent stock price decline and regulatory action — the object of which was investor capital paid for Meta common stock at prices artificially inflated by materially false representations about Meta's cybersecurity and Privacy Order compliance program. The scheme was furthered through successive annual Form 10-K filings transmitted electronically to the SEC via EDGAR: the FY2020 Form 10-K (filed January 28, 2021), operative through early 2022; the FY2021 Form 10-K (filed February 2, 2022), operative through early 2023; the FY2022 Form 10-K (filed February 2, 2023), operative through early 2024; the FY2023 Form 10-K (filed February 2, 2024), operative through January 2025; and the FY2024 Form 10-K (filed January 29, 2025), operative at the time of Mr. Baig's final pre-termination disclosures. At the time of each disclosure from August 2022 onward, Mr. Baig knew that a materially false Form 10-K had recently been filed or was imminently due — positioning each disclosure as bearing directly on a wire transmission that was either recent or prospective at the time it was made.

123. **Every Disclosure of a Privacy Order Violation Constituted a Simultaneous Report That Meta's Investor-Facing Cybersecurity Representations Were Materially False.** The 2020 Privacy Order is not merely a regulatory obligation between Meta and the FTC — it is a legally binding commitment that Meta repeatedly invoked in its annual Form 10-K filings as affirmative evidence that its privacy and cybersecurity programs were functioning effectively. During the entire period of Mr. Baig's disclosures, Meta's operative Form 10-K filings contained four categories of investor-facing representations rendered materially false by the Privacy Order violations he was reporting: (i) representations that Meta maintained a "comprehensive privacy program" reasonably

Deleted: COMPLAINT¶

designed to protect the privacy and confidentiality of Covered Information as required by Section VII of the 2020 Privacy Order; (ii) representations that Meta's cybersecurity systems were designed to protect user data and to prevent or detect security breaches, including the characterization of WhatsApp as a "simple, reliable, and secure messaging application"; (iii) representations that Meta's internal audit function provided independent assessment and assurance over its cybersecurity and privacy programs and supporting control frameworks; and (iv) Defendant Zuckerberg's and CFO Susan Li's certifications under Rule 13a-14(a) that Meta maintained effective disclosure controls and procedures and effective internal controls over financial reporting. Accordingly, every disclosure Mr. Baig made about a violation of the 2020 Privacy Order — whether about unrestricted employee access to Covered Information, ATO under-reporting, mass scraping and Covered Incident non-reporting, audit blocking, JUNGLE findings suppression, or risk assessment falsification — was simultaneously a report that one or more of these four categories of investor-facing representations was materially false in violation of Rule 10b-5(b), applicable SEC cybersecurity disclosure requirements, and the certifications required by Rules 13a-14 and 13a-15. Throughout this section, the shorthand "the paragraph 123 principle" refers to this simultaneous investor-disclosure theory, and the shorthand "the paragraph 122 scheme" refers to the wire fraud and securities fraud scheme identified above. Both apply to each disclosure below without individual restatement.

124. **September 2021 Red Team Exercise and Initial Reports to Verma (2021–2022).** Following a Red Team Exercise in September 2021, Mr. Baig documented that approximately 1,500 WhatsApp engineers could move or steal user data without a trace — a direct and per se violation of Section VII of the 2020 Privacy Order. He published the findings internally and raised the compliance implications with supervisor Verma on approximately five occasions between September 2021 and September 2022. Verma directed Mr. Baig to focus on application security and ignored the systemic compliance concerns. This disclosure reported a materially false investor-facing representation in violation of Rule 10b-5(b) and Exchange Act § 78m(a): because Meta was contemporaneously representing to investors in its filed FY2020 Form 10-K that its cybersecurity program was functioning and that security risks were hypothetical, Mr. Baig's disclosure of the contrary facts simultaneously

Deleted: COMPLAINT¶

established the falsity of those representations. Mr. Baig's awareness, prior to and during these disclosures, of Meta's $100 million SEC settlement arising from the same category of cybersecurity misrepresentation — in which the SEC found that Meta had presented the risk of misuse of user data as merely hypothetical while knowing material facts to the contrary — established his subjective belief from the outset that the conduct violated Rule 10b-5(b). Under the paragraph 123 principle, this disclosure simultaneously reported that Meta's investor-facing representation that it maintained a comprehensive privacy program limiting employee access to Covered Information to those with a documented business need was materially false. The contributing-factor nexus is established by Verma's hostile reaction upon reviewing the pre-read prepared at Cathcart's direction in September 2022 — threatening Mr. Baig's compensation and conveying that Defendant Gupta intended to terminate him — directly tracing the escalating adverse treatment to the protected disclosures Mr. Baig had been making to Verma since September 2021. It establishes that his subjective belief in the investor significance of the violations he was documenting existed from the outset of his employment and that the Privacy Order violations underlying every subsequent protected disclosure were continuous and ongoing from September 2021 through his termination on February 10, 2025.

125. **August 18, 2022 Meeting with Defendant Cathcart; September 8 and 26, 2022 Pre-Read Document; and October 18, 2022 Presentation and Forbes/Zatko Article.** These three closely related disclosures are treated together because they constitute a single escalating disclosure event that produced the first documented adverse employment action within three days. On August 18, 2022, Mr. Baig briefed Defendant Cathcart on six systemic cybersecurity deficiencies: dangerous understaffing; no comprehensive inventory of user data; unrestricted access to Covered Information by approximately 1,500 engineers; no monitoring system; no real-time breach detection; and approximately 100,000 daily account compromises without remediation. Mr. Baig told Defendant Cathcart he feared retaliation; Cathcart directed him to proceed and requested a written follow-up report. At Cathcart's request, Mr. Baig prepared a comprehensive written pre-read explicitly stating: "We have a fiduciary responsibility to protect our users and their data. The penalties can be severe both

Deleted: COMPLAINT

in terms of brand damage and fines," referencing the SEC and FTC settlements. He circulated it on September 8 and 26, 2022. On October 18, 2022, he presented these findings to Defendant Cathcart, Defendant Gupta, Verma, and approximately ten WhatsApp executives. The following day, he circulated a Forbes article about Twitter whistleblower Peiter Zatko, which quantified investor harm from a comparable cybersecurity fraud disclosure as a 4.5% single-day stock decline — making explicit his understanding that Meta's gap between public compliance representations and actual security posture presented the same category of investor fraud that had produced enforcement liability at Twitter. At the October 18 meeting, Head of Global Public Policy Jonathan Lee independently asked whether WhatsApp faced a situation like Zatko, confirming that the leadership group itself understood the investor fraud dimension; Wael Salloum immediately moved to mark the pre-read as attorney-client privileged despite its not having been prepared for legal advice, confirming leadership's awareness of the document's legal significance. By reporting that the privacy compliance program Meta certified to investors as "comprehensive" and subject to regular independent assessments was materially deficient across six dimensions, and by circulating an article specifically quantifying the investor harm from such a gap in stock price terms, Mr. Baig disclosed conduct approximating the basic elements of a Rule 10b-5(b) half-truth securities violation and established his subjective belief that the conduct created investor-facing legal and financial consequences. Under the paragraph 123 principle, each of the six deficiencies reported simultaneously rendered false each of the four categories of investor-facing cybersecurity representations in Meta's operative FY2021 Form 10-K. The contributing-factor nexus is established by the immediate sequence of events: within three days of the September 26, 2022 pre-read circulation, Defendant Mukerji delivered the first negative performance feedback of Mr. Baig's previously unblemished tenure and marked him as "Needs Support"; less than four weeks after the October 18 presentation, the November 14, 2022 verbal warning was issued with documented procedural defects and over the express objection of Wael Salloum, Head of Data Science, who told Verma not to issue the warning because the Data Science complainant was having collaboration issues with several other Meta employees. Employee Relations Business Partner (ERBP) Mona Sawani had also told Mukerji and Verma before they issued the

Deleted: COMPLAINT

warning that the feedback was generic and not actionable and that the timing was suspicious — yet the warning was issued anyway. Defendant Cathcart reviewed no further security project work of Mr. Baig's from October 18, 2022 through February 10, 2025 — an organizational disengagement from the security function that began on the day of this disclosure and that constitutes an independent adverse employment action.

126. **October 19, 2022 Formal HR Retaliation Complaint.** Mr. Baig filed a formal written retaliation complaint with HRBP Lauren Yoon following prior verbal complaints beginning September 26, 2022, documenting Defendant Mukerji's and Verma's sudden hostile treatment following his cybersecurity disclosures. A written complaint to HR personnel with authority to investigate misconduct, made in direct connection with those cybersecurity disclosures, constitutes protected activity under § 1514A(a)(1)(C) as a communication regarding the same SEC rule violations underlying his technical reports. ERBP Mona Sawani subsequently confirmed the November 14, 2022 verbal warning had documented procedural defects but no corrective action followed. The contributing-factor nexus is established by Mukerji's continuation of his micromanagement campaign following the complaint; the November 14, 2022 verbal warning issued twenty-six days later; and Mukerji's subsequent manipulation of Mr. Baig's PSC rating through the February 2023 cycle resulting in a "Consistently Meets Expectations" rating, two levels below the "Greatly Exceeds" rating Mukerji had represented to Mr. Baig was within reach as recently as July 2022.

127. **Summer–Fall 2023 — Internal Investigative Interviews (multiple sessions).** Mr. Baig reported to Meta internal investigators — persons with authority to investigate misconduct within the meaning of § 1514A(a)(1)(C) — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Section VII violations; Rules 13b2-1 and 13b2-2; Exchange Act § 13(b)(2)(A); Rule 10b-5(b); and 18 U.S.C. § 1348. In each interview Mr. Baig provided affirmative disclosures that Meta was violating Section VII, falsifying records, maintaining a materially false internal audit program, and lying to investors — a direct reference to the materially false investor-facing representations in Meta's then-operative Form 10-K filings. Each disclosure is separately protected under § 1514A(a)(1)(C)

Deleted: COMPLAINT¶

regardless of what Mr. Baig disclosed in the April 2023 letter that prompted the investigation. Meta's decision to use the investigative process as an intelligence-gathering mechanism while simultaneously retaliating against Mr. Baig for the substance of his disclosures constitutes evidence of retaliatory intent and, to the extent investigators were directed to extract information for adverse employment purposes rather than remediation, obstruction of Mr. Baig's protected disclosures in violation of Rule 21F-17(a). The contributing-factor nexus is established by Heimbuecher's submission of retaliatory anonymous feedback in October 2023, following the July 18, 2023 statement "Don't be the guy that people hate to work with," temporally proximate to Mr. Baig's July and August 2023 disclosures; Clarke and Greene's negative feedback on Mr. Baig to Mukerji on December 14; Mehta's submission of negative feedback sometime thereafter; Mukerji's December 26, 2023 email inverting the documented factual record; and the February 2024 "Consistently Meets Expectations" rating.

128. **October 25, 2023 — Formal Audit Request to Syed Abidi.** Mr. Baig reported to Syed Abidi, Meta's Internal Auditor — a person with authority to investigate misconduct within the meaning of § 1514A(a)(1)(C) — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Exchange Act § 13(b)(2)(A); Rules 13b2-1 and 13b2-2; and Rule 10b-5(b). Mr. Baig formally requested an audit of data warehouse access controls for large-scale data exfiltration risk. Abidi confirmed that the data exfiltration risks were very well known to the top leadership at Meta — establishing enterprise-level knowledge of the violations directly defeating any defense of lack of notice — and then refused to perform the audit. The acknowledged top-level awareness combined with deliberate refusal to audit is corroborating evidence that Meta was intentionally preventing material compliance failures from reaching investors. The contributing-factor nexus is established by the continuing pattern of project blockage and negative performance documentation through the remainder of 2023 and into 2024, with the Abidi admission providing direct evidence of enterprise-level knowledge.

129. **October 30, 2023 — Acknowledgment by Defendant Gupta of Data Exfiltration Risk Followed by Deliberate Inaction.** Mr. Baig reported to Defendant Gupta, VP Head of



Deleted: COMPLAINT¶

Engineering — a supervisor within the meaning of § 1514A — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Rule 10b-5(b); 18 U.S.C. § 1348; and Section VII of the 2020 Privacy Order. Defendant Gupta formally acknowledged in a meeting with the X-Sec team that Meta needed to address the threat of data exfiltration — but the assembled team declined to take any remedial action whatsoever. An organizational acknowledgment of a material compliance risk followed by a documented decision to take no remedial steps is precisely the kind of knowing concealment Mr. Baig understood to be unlawful under SEC disclosure rules; it is direct evidence that the failure to disclose and remediate the vulnerability was a knowing institutional choice. The contributing-factor nexus is established by Gupta's cessation of one-on-one communication following the January 30, 2024 Uber Commitment upward feedback, and his March 28, 2024 statement "I will not let a security guy speak as we will have to shut down the network."

130. **March 15, 2023 — Central Security Meeting and Recap Document.** Mr. Baig reported to Verma and the Meta Central Security team — persons with authority to investigate misconduct within the meaning of § 1514A(a)(1)(C) — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Rule 10b-5 and 18 U.S.C. § 1348. He also reported conduct that he reasonably believed implicated six structural Privacy Order non-compliance, cybersecurity failures and explicitly named risk of "additional legal action by the FTC, SEC, IDPC, and other regulators." The recap document established that Meta had accepted the risk of not being able to respond to a data breach in real time, directly contradicting every representation Meta was making to investors. Verma's instruction to stop documenting non-compliance in writing — expressly motivated by concern that documentation would become discoverable in litigation — established Mr. Baig's belief that Meta's officers were intentionally concealing known violations from investors, satisfying the mens rea element distinguishing securities fraud under 18 U.S.C. § 1348 from negligent regulatory non-compliance. The contributing-factor nexus is established by Verma's angry response within nine days, directing Mr. Baig to stop documenting non-compliance in writing.

Deleted: COMPLIANT¶

131. **April 14, 2023 Gag Order by Defendant Mukerji (Rule 21F-17 Standalone Violation).** Defendant Mukerji issued an explicit order: "I don't want you to talk about FTC [Privacy Order] unless it is with [WhatsApp attorney] Yannick [Carapito]. I am serious." This order constitutes an independent standalone violation of Rule 21F-17(a) and direct evidence of scienter. It requires no further inference to establish that a supervisor with authority over Mr. Baig's employment issued a directive whose functional effect was to prevent him from compiling and transmitting documentation about SEC rule violations. It was issued approximately three weeks before the FTC's May 3, 2023 show-cause proceeding against Meta for the same Privacy Order non-compliance Mr. Baig had been reporting, and its timing confirms that management was suppressing compliance documentation in anticipation of imminent regulatory scrutiny. The gag order itself constitutes both a Rule 21F-17 violation and a direct adverse managerial response to Mr. Baig's prior protected disclosures. Under the paragraph 123 principle, it establishes that Defendant Mukerji understood Mr. Baig's Privacy Order disclosures to be simultaneously reports about the falsity of Meta's investor-facing cybersecurity representations — because suppressing discussion of the Privacy Order was the mechanism by which the falsity of those representations was concealed from investors. The contributing-factor nexus is established by the gag order itself as an adverse managerial response, and by the pattern of escalating anonymous negative feedback campaigns and retaliatory performance actions that followed each subsequent disclosure through the remainder of the 2023 performance cycle, culminating in the February 2024 "Consistently Meets Expectations" rating. Verma had issued a materially identical directive on March 24, 2023, expressly telling Mr. Baig not to state in writing that WhatsApp was non-compliant with the FTC order, specifically motivated by concern that Mr. Baig's written statements could become discoverable in litigation. Both directives are independently actionable as Rule 21F-17(a) impedance violations.

132. **April 18, 2023 — Letter Through Counsel.** Mr. Baig reported, through formal legal process, to Meta — a supervisor within the meaning of § 1514A — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including the 2020 Privacy Order, expressly including "misstatements

Deleted: COMPLAINT

in Meta's SEC filings . . . about its cybersecurity practices"; Rule 10b-5; Rules 13b2-1 and 13b2-2; and Exchange Act § 78m(a). The investor disclosure nexus is explicit on the face of the document and was made ten weeks after the filing of Meta's FY2022 Form 10-K, which constituted a wire communication in furtherance of the paragraph 122 scheme within the meaning of 18 U.S.C. § 1343. Meta initiated a retaliatory internal investigation in summer 2023 purportedly in response to this letter and a pattern of escalating adverse feedback from X-Sec team members in the months that immediately followed.

133. **January 2, 2024 Letter to Defendant Zuckerberg, General Counsel Jennifer Newstead, and Meta's Ethics and Compliance Team.** This letter is the most explicitly documented protected disclosure in the case because it describes conduct Mr. Baig believed was in violation of SEC rules, characterizes the conduct as potentially criminal, quantifies the compliance deficit, and was delivered to the certifying officer approximately one month before he certified the FY2023 Form 10-K. Mr. Baig sent a detailed letter simultaneously to Defendant Zuckerberg, General Counsel Jennifer Newstead, and Meta's Ethics and Compliance team identifying conduct that he reasonably believed either was, or possibly could have been: violations of the 2020 Privacy Order; violations of SEC rules and regulations, including rules relating to falsification of records and false statements to auditors; evidence that Meta's X-Sec team had falsified security reports to cover up decisions not to remediate data exfiltration risks; blocked internal audits; and escalating retaliation against Mr. Baig. The letter documented the retaliatory feedback campaign, quoting verbatim the positive June 2023 feedback from the X-Sec team alongside the October 2023 retaliatory anonymous negative feedback from the same individual, and reproducing in full Defendant Mukerji's December 26, 2023 email falsely attributing the X-Sec team's refusal to address data exfiltration to Mr. Baig's alleged collaboration failures, establishing that Defendant Zuckerberg received written documentation of the retaliatory scheme at the same time as the cybersecurity disclosure. The letter estimated that remediating the systemic failures would require "a significant new investment of at least $100 million+ or a major re-prioritization, and possibly a major restructuring" — quantifying the scale of the compliance deficit for the CEO at the same time he was certifying to the SEC that the compliance program was functioning effectively. It

Deleted: COMPLAINT

also specifically documented approximately 250,000 daily Facebook account compromises that were not being reported as Covered Incidents under the 2020 Privacy Order. In specifically warning of criminal consequences, Mr. Baig referenced the October 2022 criminal conviction and May 2023 sentencing of Uber's former CSO and the SEC's October 2023 enforcement action against SolarWinds. Defendant Zuckerberg received this letter approximately one month before he certified the FY2023 Form 10-K — which he certified anyway. This constitutes protected activity under § 1514A(a)(1)(C) and provided actual notice of potential SEC rule violations before Defendant Zuckerberg executed the FY2023 Form 10-K certifications required by Rule 13a-14(a). His decision to certify approximately one month after receiving this letter — certifying the effectiveness of disclosure controls he had been specifically informed were failing — establishes Mr. Baig's belief that Meta's conduct was intentional rather than negligent, providing the mens rea foundation for securities fraud under 18 U.S.C. § 1348 and for the wire fraud scheme the electronic certification furthered under 18 U.S.C. § 1343. The contributing-factor nexus is established by the February 2024 "Consistently Meets Expectations" rating issued approximately six weeks after the letter; the August 2024 "Below Expectations" mid-year rating; and the February 10, 2025 termination.

134. **January 30, 2024 — Report of the "Uber Commitment" False Statement to the IDPC.** Mr. Baig reported to Meta internal investigators Defendant Gupta — a supervisor within the meaning of § 1514A — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Rule 10b-5(b); 18 U.S.C. § 1348; and Section VII of the 2020 Privacy Order. In formal upward feedback to Defendant Gupta, Mr. Baig documented that Meta had made a false commitment to the IDPC by representing that technical controls prevented WhatsApp user data from being accessed by Meta employees generally, when in fact between 20,000 and 65,000 Meta employees retained unrestricted access to Covered Information without documented business need. Reporting that Meta had made an affirmatively false statement to a binding regulatory authority, while simultaneously representing to investors that its Privacy Order access restriction program was functioning, constituted a disclosure of a Rule 10b-5(b) material misstatement and a scheme to defraud investors within the meaning of 18

Deleted: COMPLAINT

U.S.C. § 1348. Defendant Gupta ceased all one-on-one instant messaging communication with Mr. Baig immediately following this disclosure — an observable and verifiable cessation documented in Meta's own messaging systems that establishes the precise moment Gupta withdrew from engagement with Mr. Baig following this specific protected disclosure.

135. **January 31, 2024 — Formal Audit Request and Chandra's Pre-Emptive Blocking Statement.** Mr. Baig reported to Syed Abidi, Meta Internal Auditor, and Charu Chandra, Director of Technology Infrastructure Audit — persons with authority to investigate misconduct within the meaning of § 1514A(a)(1)(C) — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Exchange Act § 13(b)(2)(A); Rules 13b2-1, 13b2-2(b)(1); and Rule 21F-17. Mr. Baig formally requested an audit of WhatsApp data warehouse access controls. Director Chandra stated that Guy Rosen's team would block the audit before Mr. Baig had even formally submitted it. This pre-emptive blocking statement — issued within days of the FY2023 Form 10-K filing — constitutes independent evidence of audit obstruction under Rule 13b2-2(b)(1) and an independent act of impedance under Rule 21F-17. Together, Abidi's October 25, 2023 admission that the risks were very well known to top leadership and Chandra's pre-emptive blocking statement establish a documented institutional pattern: senior compliance and audit personnel acknowledged violations to Mr. Baig while simultaneously confirming no formal audit record would be permitted to exist. The pre-emptive blocking was issued at the precise moment the FY2023 Form 10-K certifications were being prepared; it was followed by the February 2024 "Consistently Meets Expectations" rating and the continuing pattern of retaliatory adverse actions.

136. **January–February 2024 — Internal Investigative Interviews (January 29, February 5, February 7).** Mr. Baig reported to Meta internal investigators — persons with authority to investigate misconduct within the meaning of § 1514A(a)(1)(C) — conduct that he reasonably believed either was, or possibly could have been, records falsification and blocked internal audits in violation of Exchange Act § 13(b)(2)(A), Rules 13b2-1 and 13b2-2, and SOX § 303 (15 U.S.C. § 7242); false auditor statements in violation of Rule 13b2-2(b)(1); material misstatements in violation

Deleted: COMPLAINT¶

of Rule 10b-5(b); and securities fraud in violation of 18 U.S.C. § 1348. Mr. Baig expressly named Rule 10b-5 as the provision violated by the false FTC compliance certifications, making the securities law foundation of his disclosures explicit to Meta's own investigators. Disclosures were made in direct temporal proximity to the filing of Meta's FY2023 Form 10-K via EDGAR on February 2, 2024, which transmitted the materially false representations Mr. Baig was simultaneously disclosing to investigators. Meta's use of the investigative process to extract documentary evidence of Mr. Baig's regulatory analysis while simultaneously engineering adverse performance outcomes constitutes independent evidence of retaliatory intent and potential obstruction under Rule 21F-17(a). The contributing-factor nexus is established by the February 2024 "Consistently Meets Expectations" rating, issued in direct temporal and causal proximity to these interviews; the August 2024 "Below Expectations" rating; and the February 10, 2025 termination.

137. **Early March 2024 — Anti-Scraping Report Using Privacy Order Terminology.** Mr. Baig circulated an internal report to WhatsApp leadership regarding conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Part IX of the 2020 Privacy Order; Rule 10b-5; 18 U.S.C. § 1348; and Rule 13a-11. Mr. Baig's internal report stated that WhatsApp was leaking Covered Information on millions, if not billions, of users daily and severely under reporting scraping Covered Incidents to the FTC and other regulators. By characterizing the scraping failures in the defined legal language of the 2020 Privacy Order rather than in engineering terms, Mr. Baig unambiguously reported what he deemed a legal violation, not a technical concern. At the March 28, 2024 meeting, Defendant Gupta responded: "I will not let a security guy speak as we will have to shut down the network." Gupta's hostile response constitutes direct evidence of retaliatory reaction to legal reporting, and the continuing pattern of project blockage and adverse performance documentation that followed.

138. **March 7 and 11, 2024 — Reports to Internal Audit and GRC Regarding the Uber Commitment.** Mr. Baig reported to Alexander Gacheche, Senior Director, Internal Audit (March 7); Michael Johnson, Head of GRC (March 11) — both persons with authority to investigate misconduct within the meaning of § 1514A(a)(1)(C) — conduct that he reasonably believed either was, or possibly

Deleted: COMPLAINT

could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Exchange Act § 13(b)(2)(A); Rule 13b2-1; Rule 10b-5(b); and 18 U.S.C. § 1348. Mr. Baig raised the Uber Commitment and Section VII violations with both Internal Audit and GRC. Neither followed up, despite Johnson's direct awareness of the consequences of access control failures from his prior role as Capital One's CISO during its 2019 data breach. The failure to follow up, by two senior compliance officers with direct expertise and authority, established that the falsity of Meta's investor-facing representations was known at the highest levels of Meta's compliance function. The contributing-factor nexus is established by a continuing pattern of adverse performance documentation and project blockage through 2024.

139. **May 2024 — Business Case Presented to Aparup Banerjee and Brouwer's Team.** Mr. Baig reported to Aparup Banerjee, Head of WhatsApp Infrastructure, and senior engineers from Dick Brouwer's team — persons with supervisory authority within the meaning of § 1514A — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Part IX of the 2020 Privacy Order; Rule 10b-5(b); and 18 U.S.C. § 1348. As stated in more detail above, Mr. Baig specifically warned Meta management that it faced up to $1 billion in fines for its rampant violations of the FTC Privacy Order and resulting class action lawsuits. The contributing-factor nexus is established by the continuing blockage of scraping remediations by Brouwer's team and the August 2024 "Below Expectations" rating.

140. **May 2024 JUNGLE Red Team Exercise — False Positive Presented to AROC.** When JUNGLE findings were presented to Defendant Gupta, he stated: "We have known about these issues for a long time" and "blissful ignorance was better than this." This admission — that leadership preferred not to have compliance failures formally documented — was followed by a decision by Defendant Gupta and Mehta to present AROC with a false positive success narrative rather than the actual data exfiltration findings. This is the most structurally significant act of audit obstruction in the case because it corrupted the specific board-level oversight mechanism — AROC — through whose findings information about cybersecurity and compliance failures is supposed to reach the certifying

Deleted: COMPLIANT¶

officers and flow into the 10-K disclosure pipeline. Mr. Baig observed this directly. Defendant Gupta and Mehta's knowing presentation of a false positive to AROC constituted a disclosure of audit obstruction under SOX § 303 (15 U.S.C. § 7242), Rule 13b2-2(b)(1), and violations of Exchange Act § 78m(b)(2)(B) internal controls obligations, because the board-level oversight committee received materially false information about WhatsApp's cybersecurity posture at the precise time Defendant Zuckerberg was certifying to the SEC that Meta's oversight mechanisms were functioning and effective. Gupta's statements establish that the decision to present a false positive was a knowing act of concealment, not an oversight. This sentiment was independently confirmed approximately two weeks later, when Ravinder Thind told Mr. Baig that Infra did not have resources to remediate the JUNGLE findings, and stated Gupta preferred ignorance of security issues. "The contributing-factor nexus is established by Defendant Gupta's cessation of one-on-one communication with Mr. Baig following the January 30, 2024 Uber Commitment disclosure, and by the August 2024 "Below Expectations" mid-year rating and the February 10, 2025 termination.

141. **September 2024 — WAFFLE Risk Assessment and Resistance to Suppression.** Mr. Baig distributed an internal report to leadership that was met with resistance to suppression by Defendant Tsimelzon's team. He believed that this conduct was in violation of or implicated Exchange Act § 13(b)(2)(A); Rule 13b2-1; Rule 10b-5(b); 18 U.S.C. § 1348; and Item 106 of Regulation S-K. Mr. Baig and his team documented that the WAFFLE project increased ATO risk fourfold, recommended preventive controls, and resisted leadership's pressure to revise the risk assessment downward. A colleague stated that if leadership received the risk assessment from Mr. Baig's team, leadership may not let them launch WAFFLE, admitting that the suppression was intentional and commercially motivated. Defendant Tsimelzon stripped Mr. Baig of architectural responsibility for the WAFFLE security architecture. The contributing-factor nexus is established by the immediate suppression of the risk assessment; the removal of WAFFLE architectural responsibility; and the August 2024 "Below Expectations" rating.

142. **September 30, 2024 — Scraping Finding and Hebbani's Deliberate Obstruction of Covered Incident Reporting.** Mr. Baig reported to Sandeep Hebbani, Director of Engineering,

Deleted: COMPLAINT¶

Central Privacy at Meta — a person with authority to investigate and remediate misconduct within the meaning of § 1514A(a)(1)(C) — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Part IX of the 2020 Privacy Order; Rule 13a-11; Form 8-K Item 8.01; Rule 13b2-2(b)(1); Rule 21F-17(a); Rule 10b-5(b); and 18 U.S.C. § 1348. Mr. Baig published a finding that WhatsApp was leaking over 400 million user profile photos daily to external scrapers and formally reported the Covered Incident reporting obligation to Director Hebbani. Hebbani then deliberately configured the tracking system to prevent Mr. Baig's team from logging the attacker's phone numbers — the precise data element required to identify and formally report scrapers to the FTC under Part IX — making it technically impossible to complete the required Covered Incident report. This deliberate technical obstruction of the mandatory regulatory reporting pipeline constitutes an adverse act taken in response to protected activity, independently implicates Rule 13b2-2(b)(1) as conduct manipulating records provided to oversight personnel, and constitutes a violation of Rule 21F-17(a). The non-reporting was intentional, satisfying the scienter element for securities fraud under 18 U.S.C. § 1348. Hebbani's deliberate obstruction is itself a retaliatory act in the chain; the November 4 reprimand by Defendant Tsimelzon and the November 27 pre-filing deletion order followed directly in the same sequence.

143. **July–October 2024 — Cooperation with EECC Audit (Jubby Quiton).** Mr. Baig reported to Quiton, EECC Internal Auditor — a person with authority to evaluate and report misconduct within the meaning of § 1514A(a)(1)(C) — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Rule 13b2-2(b)(1); SOX § 303 (15 U.S.C. § 7242); and Rule 10b-5(b). Beginning in July 2024, Mr. Baig cooperated with EECC auditor Quiton, providing information about data warehouse access controls and the Uber Commitment violations. Quiton subsequently excluded five findings under organizational pressure in his October 15, 2024 report, including the finding directly related to the Section VII data warehouse access controls violation. On December 18, 2024, Quiton told Mr. Baig he was under intense scrutiny and pressure and needed help justifying audit findings — confirming that Meta's audit suppression extended to the distortion of completed audit

Deleted: COMPLAINT

results. An auditor who completes an audit, excludes findings under pressure, and then seeks retroactive justification from the employee who originally identified the violations is direct evidence that Meta's audit suppression was systematic, not incidental. The EECC audit exclusions were designed to prevent the FY2024 Form 10-K from containing accurate disclosure; the institutional pressure on Quiton immediately preceded the December 4 Zuckerberg letter and the TCR filing**.**

144. **2024 Internal Investigative Interviews (July 11, August 30, October 25, 2024; February 4, 2025).** Mr. Baig reported to Meta internal investigators — persons with supervisory authority and authority to investigate misconduct within the meaning of § 1514A(a)(1)(C) — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including SOX § 303 (15 U.S.C. § 7242); Rules 13b2-2(b)(1), 13b2-1, 10b-5(b); Rule 21F-17; and Item 106 of Regulation S-K. Throughout 2024, Mr. Baig participated in additional formal investigative interviews providing affirmative disclosures of: the JUNGLE red team false positive to AROC; suppression of the WAFFLE risk assessment; Hebbani's deliberate obstruction of the Covered Incident reporting pipeline; the false Uber Commitment to the IDPC; and institutional pressure on Quiton to falsify completed audit findings. In each interview, Mr. Baig told investigators that Meta was lying to investors, that the internal audit function was completely broken, and that the pre-read documents prepared for VP Gupta and Guy Rosen constituted material misrepresentations of facts. Meta's institutional use of the investigative process to map the scope of Mr. Baig's protected disclosures while engineering concurrent adverse employment outcomes constitutes independent evidence of retaliatory intent and obstruction under Rule 21F-17(a). The contributing-factor nexus is established by the August 2024 "Below Expectations" mid-year rating; Tsimelzon's November 27, 2024 pre-filing deletion order; and the February 10, 2025 termination issued six days after the final investigative interview.

145. **November 4, 2024 Written Communication to Defendant Tsimelzon; November 2024 Form TCR Filings; and Tsimelzon's Pre-Filing Deletion Order.** These three events are treated together because they form an unbroken causal chain on a single day. On November 4, 2024, Mr. Baig sent a written communication to Defendant Tsimelzon specifically documenting WhatsApp's legal

Deleted: COMPLAINT

obligations under Part IX of the 2020 Privacy Order to report mass scraping incidents as Covered Incidents and identifying that WhatsApp was significantly under-reporting scraping events to both the FTC and applicable European data protection authorities. Defendant Tsimelzon reprimanded Mr. Baig for raising "legal obligations" — the third supervisor reprimand in the record for raising compliance concerns — twenty-three days before Mr. Baig filed his Form TCR. Tsimelzon's choice of words confirms that leadership understood the disclosure to implicate legal obligations rather than engineering preferences and was suppressing it for that reason. On November 27, 2024, Defendant Tsimelzon ordered deletion of the internal security report Mr. Baig's team had published documenting the compliance failures he had been reporting. The deletion order was issued before Mr. Baig filed his Form TCR with the SEC later that day, and contributed directly to his decision to file: by ordering destruction of the precise compliance documentation Mr. Baig was in the process of compiling for SEC submission, Tsimelzon's directive confirmed that Meta's internal reporting mechanisms were being used to suppress rather than remediate the violations he had documented, leaving external SEC disclosure as the only available remedy. This constituted an act of pre-filing suppression within the meaning of Rule 21F-17(a), which prohibits any action to impede an individual from communicating with the Commission, including impeding the compilation and transmission of documentation. Tsimelzon's stated rationale — that the report would make his team look bad to leadership — confirms the purpose was reputational concealment of documented compliance failures. Later on November 27, 2024, Mr. Baig filed his original Form TCR with the SEC (Submission No. 17327-599-017-967) under the Dodd-Frank whistleblower program, identifying material misstatements in Meta's public filings. He filed a second, supplemental TCR (Submission No. 17329-786-669-484) on November 30, 2024. Each submission constitutes independently protected activity under § 1514A(a)(1)(A) as a formal report to a Federal regulatory agency. Mr. Baig notified Defendant Zuckerberg of his SEC filings by letter dated December 4, 2024. The contributing-factor nexus between the TCR filing and the termination is established by the same-day pre-filing deletion order as a precipitating suppression act, and by the February 10, 2025 termination occurring approximately ten weeks after the filing.

146. **December 4, 2024 — Second Letter to Defendant Zuckerberg.** Mr. Baig reported to

Deleted: COMPLAINT¶

Defendant Zuckerberg — supervisor within the meaning of § 1514A — conduct that he reasonably believed either was, or possibly could have been, violations of SEC rules or regulations, shareholder fraud, mail fraud or wire fraud, including Rules 13b2-1, 13b2-2; 18 U.S.C. § 1348; and 18 U.S.C. § 1343. Mr. Baig notified Defendant Zuckerberg of his SEC complaint, documented continuing cybersecurity failures and escalating retaliation, and stated verbatim that Meta's leadership was "not being truthful to the auditors and the regulators." The letter was received approximately two months before Defendant Zuckerberg certified the FY2024 Form 10-K. This disclosure provided actual notice of audit falsity before Defendant Zuckerberg and CFO Susan Li executed the Rule 13a-14(a) certifications in January 2025, accompanying the FY2024 Form 10-K. The contributing-factor nexus is established by Mr. Baig's termination on February 10, 2025 — approximately twelve days after the FY2024 Form 10-K certification and approximately ten weeks after the TCR filings that this letter disclosed.

147. **January 17, 2025 OSHA Administrative Complaint.** Mr. Baig filed a pre-termination administrative complaint with OSHA pursuant to 29 C.F.R. § 1980.103, asserting unlawful retaliation in violation of 18 U.S.C. § 1514A and enumerating twenty-one categories of protected activity. Meta terminated Mr. Baig twenty-four days after the complaint was filed. The OSHA complaint constitutes protected activity under § 1514A(b)(1)(A) as "filing a complaint" and is the most proximate statutory trigger for the termination decision. The twenty-four-day gap between the OSHA filing and the termination is, standing alone, sufficient under this circuit's temporal proximity standard to raise a strong inference of contributing-factor causation. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009).

148. **January 29, 2025 — Hatton Admission of Systematic ATO Under-Reporting.** Mark Hatton expressly admitted that the ATOs measured by his team were only a fraction of the actual ATOs, meaning Meta had been significantly under-reporting account takeovers to regulators, users, and investors for years. This named-witness, contemporaneous admission confirmed that Mr. Baig's prior disclosures of ATO under-reporting constituted reasonable reports of conduct he believed to violate Rule 10b-5(b), 18 U.S.C. § 1348, and Privacy Order Covered Incident reporting obligations,



Deleted: COMPLAINT

and independently establishes the objective reasonableness of his belief that the conduct he had been reporting since 2022 violated SEC rules and federal fraud statutes. Under the paragraph 123 principle, this admission simultaneously confirmed Mr. Baig's reasonable belief that Meta's investor-facing representations about its account security program and user harm management capabilities — incorporated into its SEC filings as evidence of a functioning cybersecurity compliance program — were materially false at the time they were made within the meaning of Rule 10b-5(b) and applicable SEC cybersecurity disclosure requirements.

149. **February 4, 2025 — Final Internal Investigation Interview.** Six days before his termination notice, Mr. Baig participated in a final internal investigative interview providing responsive information about cybersecurity failures and ongoing retaliation to Meta's employment investigators — persons with authority to investigate misconduct under § 1514A(a)(1)(C). This constitutes the most proximate act of protected activity before the termination decision and independently establishes contributing-factor causation under 29 C.F.R. § 1980.104(e)(2).

150. **February 7, 2025 — Disclosure to Courtney Cooper Regarding U.S. House of Representatives Cybersecurity Bar**. Three days before his termination, Mr. Baig provided documentary evidence to Courtney Cooper, Director of Public Policy at WhatsApp, showing that WhatsApp user data remained accessible to approximately 65,000 global Meta employees, and informed her that WhatsApp would not meet the cybersecurity bar required for use by the United States House of Representatives. This disclosure constitutes protected activity under 18 U.S.C. § 1514A(a)(1)(C) as a disclosure to a person with supervisory authority and establishes that the Section VII violations Mr. Baig had been reporting since 2021 remained entirely unremediated as of three days before his termination. Under the paragraph 123 principle, this disclosure simultaneously reported that Meta's investor-facing access control compliance representations — which appeared in the FY2024 Form 10-K certified nine days earlier— were materially false at the moment of certification, in violation of Rule 10b-5(b), Rule 13a-14, and applicable SEC cybersecurity disclosure requirements.[1]

[1] As stated more fully above, Mr. Baig also filed post-termination reports with Meta's Integrity line on March 3, 2025.

Deleted: COMPLAINT¶

151. The objective reasonableness of Mr. Baig's belief that the impedance acts described above violated Rule 21F-17 is confirmed by the SEC's own enforcement record under that rule. In *In re KBR, Inc.*, Admin. Proc. File No. 3-16466 (Apr. 1, 2015), the SEC found a violation of Rule 21F-17(a) where a company's internal confidentiality agreement could dissuade employees from reporting to the Commission, without any requirement that the employee be explicitly threatened. In *In re HomeStreet, Inc.*, Admin. Proc. File No. 3-17801 (Jan. 19, 2017), the SEC imposed sanctions for a confidentiality agreement whose terms could prevent employees from communicating with the Commission, even absent evidence of actual impedance. These enforcement actions confirm that Rule 21F-17(a)'s prohibition operates on the functional effect of employment conditions on potential SEC communications, not only on explicit anti-reporting threats. Defendant Mukerji's April 2023 gag order and Verma's March 2023 documentation prohibition each operated as precisely the type of employment-based impedance mechanism the SEC has consistently found to violate Rule 21F-17(a): functional confidentiality requirements, enforced by supervisors with authority over Mr. Baig's employment, that prevented him from creating and sharing documentation that would have supported SEC communications about the violations he was observing. A reasonable person with Mr. Baig's background and awareness of the SEC's Rule 21F-17 enforcement record would have understood the gag order and each subsequent suppression directive to violate Rule 21F-17(a) from the date of issuance.

## VIII. LEGAL FRAMEWORK: MR. BAIG'S REASONABLE BELIEFS

152. Each individual Defendant is sued both as a "person with supervisory authority" over Mr. Baig within the meaning of 18 U.S.C. § 1514A(a)(1)(C) and as an "agent" of Meta within the meaning of 18 U.S.C. § 1514A(a). The statute's text — which protects whistleblowers from retaliation by "any officer, employee, contractor, subcontractor, or agent of such company" — independently covers each individual Defendant regardless of whether a direct supervisory relationship existed at the time of each specific adverse act. The agent theory is particularly significant for adverse acts committed during periods when a Defendant's supervisory relationship with Mr. Baig had changed or had not yet been established: Defendant Tsimelzon's project blockages prior to his assumption of

Deleted: COMPLAINT¶

direct supervisory authority in May 2024, Defendant Mukerji's causal contribution to adverse actions following his May 2024 departure from direct supervisory status, and each individual Defendant's participation in the coordinated institutional retaliation campaign that operated continuously regardless of formal reporting relationships are all covered by the agent theory. The supervisor and agent theories are pled in the alternative and are both independently sufficient to establish individual liability under § 1514A(a)(1).

153. In addition to the supervisor and agent theories pleaded in the preceding paragraph, Defendant Zuckerberg is liable as a controlling person under Exchange Act § 20(a), 15 U.S.C. § 78t(a), for each of the Exchange Act violations reported by Mr. Baig, and Defendants Cathcart, Gupta, Mukerji, and Tsimelzon are each controlling persons of WhatsApp and of the specific business units whose compliance and disclosure conduct forms the predicate for Mr. Baig's protected activity. Section 20(a) provides that every person who, directly or indirectly, controls any person liable under any provision of the Exchange Act or any rule thereunder shall be jointly and severally liable with the controlled person, unless the controlling person acted in good faith and did not directly or indirectly induce the conduct constituting the violation. Defendant Zuckerberg is the controlling person of Meta by virtue of his roles as CEO, Chairman of the Board, and the holder of a majority of Meta's outstanding voting power through his ownership of Class B common stock. The individual Defendants' personal participation in the suppression, falsification, and audit obstruction conduct documented throughout this Complaint — including Defendant Mukerji's April 14, 2023 gag order, Defendant Tsimelzon's November 27, 2024 deletion order, Defendant Gupta's March 28, 2024 statement and his decision to present a false positive to AROC following the May 2024 JUNGLE exercise, and Defendant Cathcart's deliberate over two-year disengagement from review of Mr. Baig's security work — forecloses any good-faith defense under § 20(a). Section 20(a) is itself a "provision of Federal law relating to fraud against shareholders" within the meaning of 18 U.S.C. § 1514A(a)(1), because it is the Exchange Act's principal liability-extension mechanism for the very fraud-against-shareholder provisions underlying Mr. Baig's disclosures, including Rule 10b-5, § 13(a), § 13(b)(2)(A), § 13(b)(2)(B), § 14(a), and Rules 13a-14, 13a-15, 13b2-1, 13b2-2, and 14a-9 thereunder.



Deleted: COMPLAINT¶

Mr. Baig's disclosures of the underlying Exchange Act violations accordingly constituted simultaneous reports of conduct he reasonably believed violated § 20(a) as to each individual Defendant, separately from the direct-participation predicates pleaded in Counts 1 through 14.

154. Section 806 of SOX, 18 U.S.C. § 1514A, prohibits covered companies and their employees and agents from retaliating against an employee who provides information regarding conduct that the employee "reasonably believes" constitutes a violation of: (1) 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), or 1348 (securities fraud); (2) "any rule or regulation of the Securities and Exchange Commission"; or (3) "any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1).

155. The "reasonable belief" standard has both a subjective and an objective component: the employee must actually believe the complained-of conduct violated a covered law, and that belief must be objectively reasonable. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009). The objective component does not require that the employee's legal theory be correct; it requires only that the belief approximate the basic elements of a covered violation. *Id.* Mr. Baig need not prove that Meta actually committed any violation of the laws he reported; the SOX whistleblower provision protects employees who hold reasonable but ultimately mistaken beliefs. Defendants cannot defeat this claim by demonstrating that no actual securities law violation occurred.

156. Each disclosure Mr. Baig made regarding violations of the 2020 FTC Privacy Order simultaneously constituted a disclosure of conduct that he reasonably believed violated SEC rules or regulations and provisions of federal law relating to fraud against shareholders, for three independent reasons. First, the Privacy Order compliance program is the specific institutional mechanism that Meta's annual 10-K filings described and represented as functioning; every material violation of the Order that Mr. Baig reported therefore simultaneously constituted, in Mr. Baig's reasonable belief, a report of conduct rendering those SEC filings materially false within the meaning of Rule 10b-5, 17 C.F.R. § 240.10b-5. Second, Meta's Privacy Order compliance certifications and audit processes formed part of the disclosure controls and procedures that Defendant Zuckerberg certified as effective under Rule 13a-14, 17 C.F.R. § 240.13a-14; violations of the Order that Mr. Baig reported were

Deleted: COMPLAINT

therefore simultaneously reports that those certifications were, in his reasonable belief, false. Third, the 2020 Privacy Order is itself the product of federal judicial and regulatory enforcement; systematic failure to comply with its terms, when combined with false investor-facing representations that compliance was ongoing, constitutes conduct that a reasonable person with Mr. Baig's background would believe violated provisions of federal law relating to fraud against shareholders within the meaning of 18 U.S.C. § 1514A(a)(1). Mr. Baig's protected disclosures encompassed the investor-facing falsity he reasonably believed was created by Privacy Order violations — not merely the regulatory non-compliance in isolation — confirming that each disclosure fell within the covered categories of 18 U.S.C. § 1514A(a)(1) regardless of whether Privacy Order violations standing alone would constitute a violation of a covered SEC predicate.

a. A fourth and independent reason applies to every disclosure Mr. Baig made of a 2020 Privacy Order violation, beyond the three reasons identified in the preceding paragraph. The 2020 Privacy Order is not merely an FTC administrative consent decree — it is a Stipulated Order entered by the United States District Court for the District of Columbia on April 23, 2020, as a federal court judgment. See *United States v. Facebook, Inc*., No. 1:19-cv-2184 (D.D.C. Apr. 23, 2020). As a federal court order, the 2020 Privacy Order carries the full force and authority of federal judicial process; its systematic violation constitutes not regulatory non-compliance but contempt of a federal court judgment. Every disclosure Mr. Baig made of a Privacy Order violation was therefore simultaneously a disclosure of a violation of a provision of federal law — specifically, the federal court order itself — that relates to fraud against shareholders within the meaning of 18 U.S.C. § 1514A(a)(1). This fourth basis for protected activity does not depend on establishing the FTC-to-SEC disclosure linkage that the first three reasons require. It is independently sufficient: a reasonable person who reports systematic violation of a federal court order entered to remedy a $5 billion consumer fraud — a court order whose specific terms were designed to prevent the same category of investor fraud the company had been penalized for — reasonably believes he is reporting violations of "provision[s] of Federal law relating to fraud against shareholders" regardless of whether those violations also violate any

Deleted: COMPLAINT¶

specific SEC rule. Under *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009), the employee need only hold a belief that approximates the basic elements of a covered violation; a federal court order specifically designed to prevent investor fraud, entered in response to a $5 billion investor harm, plainly satisfies this standard as a "provision of Federal law relating to fraud against shareholders." This fourth basis is pleaded as an alternative and independent predicate for each and every protected disclosure identified in the Summary of All Protected Disclosures section of this Complaint.

157. Mr. Baig's protected disclosures were grounded in both subjective beliefs — which he actually held at the time of each disclosure — and objectively reasonable beliefs. The factual bases for each are set forth in the subsections that follow.

a. In addition to the Exchange Act theories set forth above, each of Mr. Baig's disclosures of false cybersecurity representations simultaneously constituted a protected disclosure of conduct he reasonably believed violated Securities Act § 11, 15 U.S.C. § 77k. Section 11 imposes strict liability on issuers for material misstatements and omissions in registration statements. Meta registers its equity compensation plans — including the restricted stock units (RSU) awards that formed a material component of every named officer's and of Mr. Baig's own compensation — on Form S-8, which incorporates by reference Meta's most recently filed annual report on Form 10-K. Each false annual 10-K was therefore incorporated by reference into Meta's operative S-8 registration, making the S-8 itself a registration statement containing materially false cybersecurity disclosures within the meaning of § 11. Employees who received RSU grants pursuant to those registrations — including Mr. Baig himself — received securities issued on the basis of false registration statements. Section 11 is a provision of the Securities Act of 1933, which is a federal statute relating to fraud against shareholders; § 11 violations are therefore "provision[s] of Federal law relating to fraud against shareholders" within the meaning of § 1514A(a)(1). Mr. Baig's reports of the falsity of Meta's annual 10-K disclosures were simultaneously reports of conduct he reasonably believed violated § 11 — a theory that also establishes his personal financial stake in the accuracy of the disclosures he was reporting.

Deleted: COMPLAINT

**A. Mr. Baig's Subjective Beliefs at the Time of Each Disclosure**

158. From his earliest disclosures, Mr. Baig subjectively understood that the conduct he was reporting implicated federal securities law and regulatory compliance obligations with direct investor consequences, not merely internal engineering disagreements.

159. Mr. Baig actually believed, at the time of his September 2022 disclosures, that the cybersecurity failures he was reporting were material to Meta investors and that Meta's representations to investors about its compliance program were false. This belief is established by his own contemporaneous conduct: in his September 2022 pre-read document, Mr. Baig explicitly stated, "We have a fiduciary responsibility to protect our users and their data. The penalties can be severe both in terms of brand damage and fines." Immediately after his October 2022 senior leadership presentation, Mr. Baig emailed all attendees, including Defendant Cathcart, a news article specifically about the SEC enforcement action against Twitter's former cybersecurity chief for making materially false representations to investors about the company's security program. Mr. Baig shared this article as a direct analogy to Meta's situation, demonstrating that he personally understood, at that moment, that Meta's public compliance representations and its actual security posture presented the same category of securities fraud exposure that had led to SEC enforcement at Twitter. Mr. Baig understood that by circulating his pre-read in September 2022 documenting the facts that contradicted the "most secure" representation, he was specifically communicating to senior WhatsApp leadership that the gap between the Vora statement and his documented internal reality rendered that public representation a Rule 10b-5(b) material half-truth — the same theory he had just illustrated through the Twitter/Zatko article. His act of circulating the pre-read therefore constituted both a disclosure of the contrary facts and a report that the Vora statement was a materially false investor-facing representation within the meaning of Rule 10b-5(b). These two items establish distinct but complementary components of Mr. Baig's Rule 10b-5 belief: the September 2022 pre-read established his understanding that the compliance failures created serious regulatory and financial exposure; the Twitter/SEC enforcement article established his specific understanding that the investor disclosure dimension of that exposure was the operative legal concern.

Deleted: COMPLAINT

a. First, Mr. Baig's September 2022 pre-read document explicitly stated: "We have a fiduciary responsibility to protect our users and their data. The penalties can be severe both in terms of brand damage and fines," directly referencing the SEC and FTC settlements that had produced unprecedented penalties for similar failures.

b. Second, during the October 18, 2022 senior leadership presentation, Global Public Policy Head Jonathan Lee independently asked: "Are we going to be in the same situation as Mudge at Twitter?" Lee's question — which Mr. Baig did not prompt — confirmed that the entire leadership group present understood that Mr. Baig's disclosures implicated the same category of Congressional investigation, FTC enforcement, and securities fraud liability that had befallen Twitter.

c. Third, immediately following the October 18 presentation, Mr. Baig emailed all attendees — including Defendants Cathcart and Gupta — the Forbes article about Twitter whistleblower Peiter "Mudge" Zatko. The article stated that Zatko "accused the social media company of committing fraud and numerous 'egregious' security violations." Critically, the article specifically highlighted as its "Big Number" that Twitter stock had fallen 4.5% in morning trading as a direct result of the disclosures. By selecting and sharing an article that specifically quantified the investor harm in stock price terms, Mr. Baig demonstrated that he understood the investor-facing dimension of the risk at Meta, not merely its regulatory dimension.

d. Fourth, at the October 18 meeting, Wael Salloum, Head of Data Science at WhatsApp, added a comment to Mr. Baig's pre-read requesting that the entire document be marked as attorney-client privileged — even though it had not been prepared for legal advice purposes and Mr. Baig had not been directed to draft it by counsel. Salloum's reflexive attempt to shield the document confirmed that senior leadership understood the findings to carry legal liability implications serious enough to require privilege protection.

e. Fifth, also at the October 18 meeting, Vice President of Global Communications Carl Woog stated that because security is WhatsApp's brand, the issues Mr. Baig raised scared him, and called the pre-read a "foundational doc." The person responsible for WhatsApp's external

Deleted: COMPLAINT

communications, including investor-facing communications, independently characterized Mr. Baig's findings as foundational in a group setting with approximately ten senior executives present.

f. Sixth, at the same meeting, Defendant Gupta added a written comment to Mr. Baig's pre-read: "ouch! Did we check with Meta security as to what is their own assessment of their situation" — an admission in the shared document itself that the findings were painful to leadership because they exposed that senior executives had not identified the same problems. This written comment, visible to all meeting attendees, confirmed that the disclosures implicated leadership accountability in a way consistent only with investor-facing legal significance.

g. Seventh, Defendant Cathcart never reviewed a single cybersecurity project from Mr. Baig's team from October 18, 2022 through February 10, 2025, despite typically reviewing approximately ten projects per week across WhatsApp. Cathcart also did not escalate the cybersecurity gaps to AROC. Mr. Baig understood this deliberate withdrawal — while simultaneously continuing to certify WhatsApp's compliance with the 2020 Privacy Order — as evidence that Cathcart was consciously keeping the documented compliance failures out of the board-level oversight process that feeds Meta's SEC disclosures.

h. Eighth, Meta contemplated terminating Mr. Baig's employment in November 2022 — just weeks after his first cybersecurity disclosure — instead of issuing the verbal warning. The fact that the highest-stakes employment consequence was considered within weeks of the initial disclosure confirms that leadership understood Mr. Baig's reports to be the kind of activity warranting the most serious response available, consistent only with knowledge that legal liability was implicated.

160. Mr. Baig actually believed, from the time of his September 2021 Red Team Report, that the unrestricted access of approximately 1,500 WhatsApp engineers to Covered Information without any documented business need violated Section VII of the 2020 Privacy Order by name, and that this violation rendered Meta's contemporaneous SEC filings materially false for the reasons set forth in the preceding section. Mr. Baig reviewed Section VII of the Order shortly after joining WhatsApp in

Deleted: COMPLAINT

January 2021 and understood it to impose a specific, mandatory, and enforceable access restriction obligation — not a general compliance aspiration. The Red Team finding was, in Mr. Baig's view, an unambiguous and per se Section VII violation. Additionally, on February 7, 2025, three days before his termination, Mr. Baig shared a screenshot with Courtney Cooper, Director of Public Policy at WhatsApp, showing that WhatsApp user data remained accessible to 65,000 global employees — telling her that WhatsApp would not meet the cybersecurity bar for use by the U.S. House of Representatives. The security failures Mr. Baig had been documenting under Section VII were, by his own contemporaneous assessment three days before termination, severe enough to disqualify WhatsApp from use by the federal government.

161. Mr. Baig actually believed, beginning with his September 2022 disclosures and continuing through his Form TCR filing, that Meta was concealing from investors a known and material regulatory penalty exposure arising from the violations he was documenting — an omission he understood to be independently unlawful under SEC disclosure rules. This belief is supported by contemporaneous evidence across multiple periods, filling each stage of the timeline:

a. From September 2022, Mr. Baig's pre-read document explicitly identified that "[t]he penalties can be severe both in terms of brand damage and fines," demonstrating his awareness that the compliance failures created quantifiable regulatory financial exposure that investors had a right to know about.

b. On March 15, 2023, Mr. Baig met with Meta's Central Security team and circulated a post-meeting document in which he explicitly warned that WhatsApp "risk additional legal action by the FTC, SEC, IDPC, and other regulators for not meeting our legal obligations." This document, written by Mr. Baig himself and circulated internally, went further than a general SEC reference. It specifically identified that WhatsApp's inability to detect a data breach was violating the FTC Order and SEC regulations. With respect to the FTC Order, Mr. Baig understood and documented that the Order required Meta to document any incident in which the Covered Information of 500 or more users had been compromised and to deliver that documentation to both the FTC and the independent assessor within 30 days of discovery —

Deleted: COMPLAINT¶

and that WhatsApp, experiencing approximately 100,000 account takeovers daily, was reporting none of them. With respect to the SEC settlement, Mr. Baig had reviewed the 2019 enforcement action and understood its specific holding: the SEC's Co-Director of Enforcement had stated publicly in a press release that "Public companies must accurately describe the material risks to their business" and that "Facebook presented the risk of misuse of user data as hypothetical when they knew user data had in fact been misused." Mr. Baig understood that Meta was doing precisely the same thing in its FY2022 and FY2023 Form 10-K filings — characterizing as hypothetical the daily cybersecurity failures he had been documenting in precise technical detail for two years. Meta had accepted a permanent injunction against further violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933, Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-13, and 13a-15 thereunder — the same disclosure accuracy rules that its ongoing 10-K representations were violating. The March 15, 2023 document also noted that Meta was spending hundreds of millions of dollars advertising that WhatsApp is secure and as a result may have been violating SEC regulations and laws with its public misrepresentations. Section 32(a) of the Exchange Act, 15 U.S.C. § 78ff(a), imposes criminal liability on any person who willfully violates any provision of the Exchange Act or any implementing SEC rule, or who willfully and knowingly makes or causes to be made any false or misleading statement in any application, report, or other document filed with the SEC. Mr. Baig's January 2, 2024 letter to Defendant Zuckerberg, which specifically identified potential criminal penalties and cited by analogy the criminal prosecutions of the Uber CISO and the SolarWinds CISO, approximated the basic elements of § 32(a) willful violations: he identified willful violations of SEC rules, identified the class of persons criminally liable, and characterized the conduct as knowing and intentional. § 32(a) is a provision of federal law relating to fraud against shareholders within the meaning of 18 U.S.C. § 1514A(a)(1). Mr. Baig's disclosures were therefore simultaneously reports of conduct he reasonably believed could constitute criminal violations of the Exchange Act. This was a documented legal analysis, identifying specific enforcement actions, specific regulatory provisions, specific



Deleted: COMPLAINT

reporting thresholds, and specific investor disclosure standards. It is the clearest available evidence that Mr. Baig's 2023 disclosures were grounded in a specific, documented understanding of the applicable securities and FTC regulatory framework at the time they were made. In addition to his belief about general regulatory penalty concealment, Mr. Baig actually believed that the FTC's May 3, 2023 show-cause proceeding, initiated approximately three weeks after Defendant Mukerji issued the gag order, was a material event that Meta was legally required to disclose to investors in a current report on Form 8-K under Item 8.01 and Rule 13a-11 within four business days of its initiation. His March 15, 2023 recap document had specifically warned of imminent "legal action by the FTC, SEC, IDPC, and other regulators" — documenting his awareness of the specific regulatory proceeding risk that materialized in the show-cause. The Mukerji gag order's timing, approximately three weeks before the show-cause initiation, established to Mr. Baig that management was suppressing the compliance documentation that a timely Form 8-K would have been required to reference. Mr. Baig's April 18, 2023 letter through counsel, sent approximately two weeks before the show-cause proceeding was initiated, specifically identified violations of SEC rules in connection with Meta's investor-facing compliance representations, establishing his belief at the time that the conduct he was reporting created specific, mandatory disclosure obligations. When Meta disclosed the proceeding nine months later in the FY2023 Form 10-K, characterizing it narrowly as a COPPA matter rather than a systemic Privacy Order deficiency finding, Mr. Baig understood that framing to be an affirmatively misleading half-truth that concealed the true scope of the proceeding from investors in further violation of Rule 10b-5(b). His January 2, 2024 letter to Defendant Zuckerberg demonstrated that the COPPA framing inadequately disclosed the systemic Privacy Order failures documented in the FTC's proposed findings, establishing his belief, at the time of the disclosure, that the FY2023 Form 10-K's characterization of the show-cause proceeding violated SEC disclosure rules.

c. On April 18, 2023, through counsel, Mr. Baig sent Meta a formal letter asserting retaliation claims under SOX, specifically identifying that he had raised concerns about violations of the

Deleted: COMPLAINT¶

2020 Privacy Order and SEC rules and regulations, including misstatements in Meta's SEC filings. This attorney-authored letter establishes that Mr. Baig's belief that Meta's SEC filings were false was formally asserted in writing nearly a year before the January 2024 Zuckerberg letter.

d. During 2023, the X-Sec team falsified security reports and chose not to surface data exfiltration risks to leadership or AROC. In addition, Defendant Gupta in a December 14, 2023 group instant message chat with Rosen, Mehta, Greene, Clarke, and others asked Mr. Baig whether he thought the X-Sec team leaders were a "bunch of idiots" when Mr. Baig pushed for focus on external threats — a response that confirmed leadership understood Mr. Baig was challenging their competence on the precise issue at the core of the securities fraud theory. Also in 2023, on October 30, Defendant Gupta acknowledged in a formal meeting with the X-Sec team that Meta needed to address the threat of data exfiltration — but attendees at that meeting declined to take any steps whatsoever. An acknowledgment of the risk followed by deliberate inaction is precisely the kind of knowing concealment that Mr. Baig understood to be unlawful under SEC disclosure rules. Furthermore, Heimbuecher submitted positive performance feedback on Mr. Baig in June 2023 — "It's been a pleasure working with Attaullah in H1 across a broad variety of WhatsApp security initiatives" — and then submitted anonymous negative feedback about him in October 2023 immediately after Mr. Baig raised the data exfiltration concerns at the July and August 2023 meetings. The documented reversal in feedback from the same person on the same topic, immediately following the disclosures, strengthened Mr. Baig's belief that the disclosures were being treated as legally significant enough to require suppression through coordinated adverse feedback campaigns rather than substantive response.

e. On October 13, 2023, Clarke acknowledged the data exfiltration risk saying: "How would the FTC feel, if they knew that it is possible for someone to take a three-terabyte file containing user data and move it outside of Meta?" — and then told Mr. Baig not to raise the data exfiltration risk in meetings with Rosen and Gupta. The Director of Security's own framing — asking how the FTC would feel — demonstrated that even X-Sec leadership understood the

Deleted: COMPLAINT

regulatory exposure, yet was actively directing Mr. Baig to keep the issue suppressed from the executives responsible for SEC disclosure decisions. Mr. Baig understood Clarke's October 13, 2023 directive to constitute a violation of Rule 21F-17(a) by a Meta officer acting within the scope of his authority — an action to impede Mr. Baig from compiling and transmitting documentation bearing directly on a material SEC disclosure obligation. Mr. Baig reported this specific impedance act to Meta's investigators in his 2023 and 2024 investigative interviews and incorporated it as a Rule 21F-17(a) violation in his Form TCR submissions, identifying Clarke by name and characterizing the directive as an institutional act to prevent the certifying officers from receiving information that would have triggered investor-facing disclosure obligations.

f. Also during 2023, after Mr. Baig raised the data exfiltration risk directly with CISO Guy Rosen, Rosen distanced himself from all meetings related to WhatsApp security where Mr. Baig was present and did not raise the risks with AROC. Mr. Baig specifically believed that Rosen understood the data exfiltration risk was of a scale greater than Cambridge Analytica — and deliberately distanced himself to avoid creating a documented record of senior leadership knowledge that would have triggered disclosure obligations.

g. On October 25, 2023, Mr. Baig reached out to Syed Abidi, Meta's Internal Auditor, and requested an audit specifically for large-scale data exfiltration risk. Abidi told Mr. Baig that the proliferation of access to user data and large-scale data exfiltration risks were very well known to the top leadership at Meta — and then refused to perform the audit. The acknowledged top-level awareness combined with deliberate refusal to audit further strengthened Mr. Baig's belief that Meta was intentionally preventing material compliance failures from reaching investors.

h. In May 2024, Meta's Central Security team completed a red team exercise focused for the first time on data exfiltration risk. When the findings were presented to Defendant Gupta, he stated: "We have known about these issues for a long time, why are we presenting them now" and "blissful ignorance was better than this." This admission — that leadership preferred not to

Deleted: COMPLAINT

have compliance failures formally documented — was followed by a decision by Defendant Gupta and Mehta not to report the serious findings to AROC, and instead to share a false positive victory from the exercise with AROC. Mr. Baig observed this directly and understood it as a deliberate act to prevent material cybersecurity findings from entering the board-level oversight process that informs Meta's SEC disclosures.

i. In his January 2, 2024 letter to Defendant Zuckerberg, Mr. Baig specifically identified that the ongoing non-compliance and falsified reports created regulatory and legal exposure in violation of SEC rules, and referenced by name the October 2022 criminal conviction and May 2023 sentencing of Uber's former CSO Joseph Sullivan and the SEC's October 2023 enforcement action against SolarWinds. Critically, the letter documented that the compliance failures were not limited to WhatsApp — Mr. Baig also reported approximately 250,000 daily Facebook account compromises that were not being reported as Covered Incidents. Mr. Baig understood that because the 2020 Privacy Order required a single comprehensive privacy program across all Meta platforms, the CEO's compliance certifications were enterprise-wide certifications — not WhatsApp-specific representations. In that same letter, Mr. Baig stated verbatim: "A large-scale data breach will expose Meta, our users, and our investors to serious harm. Meta could lose billions of dollars in market cap, and we may face several regulatory penalties, lawsuits, etc." This language, addressed directly to the CEO of a publicly traded company, explicitly identified the investor-facing financial consequences of the penalty concealment he was reporting: stock price decline measured in billions of dollars, regulatory enforcement penalties, and civil litigation. It is direct, contemporaneous, first-person evidence that Mr. Baig understood the investor harm mechanism at the moment of his disclosure, not in hindsight.

162. Mr. Baig actually believed, beginning with his 2022 disclosures and continuing through his Form TCR filing, that the same scheme to defraud WhatsApp users, business customers, and investors through false security representations was furthered through the United States mails in violation of 18 U.S.C. § 1341 as well as through interstate wire communications in violation of 18 U.S.C. § 1343. Section 1341 is expressly enumerated in 18 U.S.C. § 1514A(a)(1) as an independently

Deleted: COMPLAINT

covered predicate. Three specific categories of postal communications furthered the scheme. First, Defendant Zuckerberg's personal compliance certifications to the FTC under the 2020 Privacy Order were transmitted through written communications to a federal regulatory authority — constituting use of the mails in furtherance of a scheme to maintain materially false compliance representations. Mr. Baig understood that these personal certifications were false and reported their falsity specifically in his January 2, 2024 letter, which warned that the conduct "can result in criminal penalties" — language that encompasses criminal liability under § 1341 for each false written certification transmitted through the mails. Second, Meta's Business API customer agreements — which incorporated the false security representations through which business customers were induced to pay per-message fees — are executed through written instruments transmitted through the mails or their functional equivalents, constituting use of the mails to obtain money from business customers through materially false representations about the security of the platform for which they were paying. Third, the falsified security reports generated by the X-Sec team and transmitted to the FTC-designated independent assessor were transmitted through postal communications, constituting use of the mails to further the scheme to falsify the compliance record on which Meta's investor-facing representations rested. Mr. Baig's subjective belief that these postal communications violated § 1341 is grounded in the same factual knowledge that supported his § 1343 wire fraud belief: he documented the false compliance certifications, the false Business API security representations, and the falsified assessor reports, and understood each to be a communication in furtherance of the fraud scheme he was reporting.

163. Mr. Baig actually believed, at the time of his January 2, 2024 letter to Defendant Zuckerberg, General Counsel Newstead, and Meta's Ethics and Compliance team, that Meta's X-Sec team was falsifying security reports, in violation of SEC rules governing the accuracy of books and records and the truthfulness of statements to auditors. In that letter, Mr. Baig stated that the falsification of cybersecurity reports "can result in criminal penalties." His belief was grounded in direct, firsthand observation: he had witnessed the Central Security team generate reports that omitted or misrepresented known compliance failures, and had documented those falsifications in the materials he provided to Defendant Zuckerberg. On December 26, 2023, Defendant Mukerji sent Mr. Baig an

Deleted: COMPLAINT

email that further illustrated this falsification pattern — falsely claiming that Mr. Baig's alleged collaboration issues had caused X-Sec to drop the focus on large-scale data exfiltration from the QSR, when in fact it was X-Sec that had declined to address data exfiltration for months despite Mr. Baig's repeated efforts to surface it. The email's self-refuting logic — blaming Mr. Baig for the outcome that X-Sec itself had produced — exemplified the falsification of the record that Mr. Baig understood to violate Rules 13b2-1 and 13b2-2.

164. Mr. Baig actually believed, when reporting that management was blocking cybersecurity audits, including the AROC and EECC audits he was scheduled to conduct, that this obstruction was legally significant because it directly contradicted the certifications that Defendant Zuckerberg was making to the SEC. His January 2, 2024 letter to Zuckerberg explicitly raised this concern — that the conduct he was observing internally made Zuckerberg's SEC certifications false — establishing that he held this belief at the time of the disclosure.

a. In the spring of 2022, Mr. Baig participated in an internal audit initiated by Meta's Board concerning unmonitored engineer production access. In the course of that audit, Mr. Baig learned directly that the audit findings would flow to AROC and into the disclosure control process that generated Meta's 10-K statements. This gave Mr. Baig firsthand, specific knowledge — not inference — of the direct pipeline between internal cybersecurity audits and Meta's investor-facing SEC disclosures. He further observed that the 2022 audit had been artificially circumscribed to exclude the confidentiality violations he had been documenting — a deliberate choice to keep those failures out of the AROC-reported findings and therefore out of the 10-K disclosure pipeline.

b. On January 31, 2024, Mr. Baig met with Internal Auditor Syed Abidi and Charu Chandra, Director of Technology Infrastructure Audit, to request an audit of access controls in the WhatsApp data warehouse. Chandra told Mr. Baig directly that Rosen's team would block the audit and would say they already knew about the issues. Mr. Baig understood this to be in direct violation of Meta's 10-K representation that its "internal audit function provides independent assessment and assurance on the overall operations of our cybersecurity and

Deleted: COMPLAINT

privacy programs." A company cannot represent to the SEC that its internal audit function provides independent assurance while having senior leadership pre-emptively block that function from auditing known compliance failures.

c. Tsimelzon reinforced Mr. Baig's belief when he expressed that audits are an opportunity for "agreement and collaboration" — explicitly suggesting that WhatsApp employees should collude to provide a unified narrative to auditors. Mr. Baig understood this as an instruction to undermine the independence of the audit process entirely. On December 2, 2024, Tsimelzon specifically implied that the internal audit timeline was not to be taken seriously by laughing about the internal audit function in the meeting. Tsimelzon's apparent disregard for the audit timeline, contemporaneous with the TCR filing and the audit suppression conduct, confirmed to Mr. Baig that the entire audit function was being treated as a compliance theater instrument rather than a genuine independent oversight mechanism.

d. On October 15, 2024, when Quiton completed his EECC audit, he excluded five findings — including the one directly related to Mr. Baig's Uber Commitment concern about data warehouse access controls violating Section VII. Then on December 18, 2024, Quiton reached out to Mr. Baig stating he was under intense scrutiny and pressure and needed help justifying audit findings and risk levels. The excluded findings and direct auditor pressure confirmed that the audit suppression Mr. Baig had been observing was systematic. When Mr. Baig subsequently tried to follow up with Syed Abidi regarding the promised data warehouse audit, he discovered that Abidi was no longer employed at Meta — despite having shared very positive feedback on Abidi just months earlier in June 2024. The disappearance of the internal auditor who had been escalating Mr. Baig's concerns to the highest levels of Meta's compliance structure, including to CFO Susan Li, added a final corroborating data point to Mr. Baig's belief that the audit function was being systematically neutralized.

e. When management blocked the broader AROC and EECC audits, Mr. Baig understood — based on his direct knowledge of the 2022 audit-to-AROC disclosure pipeline — that blocking those audits would prevent accurate compliance information from reaching the certifying

Deleted: COMPLAINT¶

officers. On March 3, 2025, after his termination, Mr. Baig used Meta's Integrity Line to raise concerns about privacy regulation non-compliance and Securities law violations, and to request contact information for AROC and Privacy and Product Compliance Committee. Meta responded several days later directing Mr. Baig to contact AROC by sending a written letter by mail. Meta's response through its own designated compliance reporting mechanism confirmed that the compliance infrastructure Meta represented to the SEC as functional was not operational in any meaningful sense.

165. Mr. Baig actually believed, at the time of his September 2022 disclosures and continuing through his November 27, 2024 Form TCR filing, that the cybersecurity deficiencies he was reporting rendered false Defendant Zuckerberg's annual certifications to investors regarding Meta's cybersecurity risk posture. Rule 13a-14(a), 17 C.F.R. § 240.13a-14(a), implements SOX § 302 by requiring the CEO and CFO to certify in each annual 10-K and each quarterly 10-Q that, based on the officer's knowledge, the report does not contain any untrue statement of a material fact and that the disclosure controls and procedures are effective. These obligations extend to quarterly reports as well as annual reports, meaning the false "effective" conclusion appeared not only in each of the three annual 10-Ks but in each quarterly 10-Q signed by both Defendant Zuckerberg and CFO Susan Li during the FY2022–FY2024 period. Mr. Baig actually believed that Defendant Zuckerberg's and CFO Li's Rule 13a-14(a) certifications in each annual 10-K and quarterly 10-Q from FY2022 through FY2024 were false. The basis for this belief is not inferred or general — it is documented in Mr. Baig's own words. In his January 2, 2024 letter, delivered to Defendant Zuckerberg approximately one month before the FY2023 Form 10-K was certified, Mr. Baig stated verbatim: "A large-scale data breach will expose Meta, our users, and our investors to serious harm. Meta could lose billions of dollars in market cap, and we may face several regulatory penalties, lawsuits, etc." Defendant Zuckerberg certified the FY2023 Form 10-K — including its representations that Meta had identified no material cybersecurity threats and that its disclosure controls were effective — after personally receiving a letter from Mr. Baig that specifically identified the investor harm, regulatory exposure, and civil liability that would result from the failures Zuckerberg was simultaneously certifying did not

Deleted: COMPLAINT

exist. A CEO who certifies a 10-K as accurate approximately one month after receiving a letter stating that a data breach will cause billions of dollars in market cap loss and multiple categories of regulatory and legal liability cannot claim he lacked knowledge that the certification was false.

a. Mr. Baig had personally documented the opposite. The gap between the certifications and the known reality was not subtle. In August 2022, while Mr. Baig knew that approximately 1,500 engineers had unrestricted access to user data, WhatsApp Product Head Ami Vora publicly stated: "We believe WhatsApp is the most secure place to have a private conversation." Mr. Baig understood that statement — made contemporaneously with his disclosure of the contrary facts — to be precisely the kind of investor-facing misrepresentation the SEC's securities fraud rules prohibit. On January 31, 2024, approximately one month after receiving Mr. Baig's January 2, 2024 letter documenting the complete absence of the security tools and infrastructure the 2020 Privacy Order required, Defendant Zuckerberg testified before the United States Senate Committee on the Judiciary that Meta builds industry-leading tools to protect its users.

b. The certifications became even more clearly false after Mr. Baig's January 2, 2024 letter to Defendant Zuckerberg. Despite receiving that letter — which documented specific ongoing Privacy Order violations, falsified security reports, and approximately 250,000 daily Facebook account compromises going unreported as Covered Incidents — Defendant Zuckerberg continued to certify compliance to the FTC and did not inform AROC or the Privacy and Product Compliance Committee about the gaps. Mr. Baig understood that Zuckerberg's decision to continue certifying with knowledge of the documented non-compliance rendered the certifications not merely incomplete but affirmatively false.

c. Additionally, Defendant Gupta and Mehta chose to share a false positive victory from the May 2024 red team exercise with AROC rather than the actual findings, which meant the board-level oversight committee received materially false information about the company's cybersecurity posture at the precise time that Zuckerberg was certifying to the SEC that oversight was functioning. The certification rested on a foundation of falsified board-level

Deleted: COMPLAINT

information.

d. On February 7, 2025, three days before termination, Mr. Baig told Courtney Cooper, Director of Public Policy at WhatsApp, that WhatsApp would not meet the cybersecurity bar for use by the U.S. House of Representatives, sharing a screenshot showing user data was accessible to 65,000 global employees. This contemporaneous disclosure — made with documentary evidence — confirms that the security failures rendering Zuckerberg's certifications false were not resolved at any point through Mr. Baig's employment. The falsity was ongoing through the final days of his tenure.

e. Rule 13a-14, 17 C.F.R. § 240.13a-14, implements SOX Section 302 by requiring the CEO to certify in each annual report that, based on the officer's knowledge, the report does not contain any untrue statement of a material fact and that the disclosure controls and procedures are effective. Mr. Baig actually believed that Defendant Zuckerberg's Rule 13a-14 certifications in the FY2022, FY2023, and FY2024 Form 10-K filings were false — a belief grounded in his firsthand knowledge of the 2022 audit-to-AROC disclosure pipeline, his direct observation that accurate compliance information was being systematically suppressed from that pipeline, and his specific knowledge that Zuckerberg continued certifying after receiving Mr. Baig's January 2024 documentation of the falsity.

166. Mr. Baig actually believed, when he wrote to Defendant Tsimelzon on November 4, 2024, that WhatsApp's failure to report mass scraping events as Covered Incidents under Part IX of the 2020 Privacy Order violated Meta's legal reporting obligations with consequences for investor-facing disclosures. He referred to legal obligations in that communication, not "company policy" or "best practices." His September 30, 2024 meeting with Central Privacy leadership was convened specifically to discuss "legal obligations" arising from the discovery that WhatsApp was leaking over 400 million user profile photos daily to external scrapers. His January 2, 2024 letter to Defendant Zuckerberg established months earlier that Mr. Baig understood the investor-facing significance of Covered Incident under-reporting. Three additional facts deepen the basis for this belief. First, in early March 2024 Mr. Baig distributed a report on WhatsApp's anti-scraping projects that stated WhatsApp was



Deleted: COMPLAINT

"leaking Covered Information on millions, if not billions, of users daily" and was "severely under reporting scraping Covered Incidents to the FTC and other regulators" — a written disclosure, circulated internally, that specifically identified the under-reporting as a regulatory violation. Second, WhatsApp's platform contains APIs that allow a scraper to retrieve 128,000 profile photos in a single API call — a specific technical vulnerability documented in Mr. Baig's team's November 2024 report that was ordered deleted by Defendant Tsimelzon earlier on the same day as the Form TCR filing. Third, in January 2025, WhatsApp and Meta issued a press release about Paragon Solutions attacking approximately 80 WhatsApp users, while simultaneously failing to issue breach notifications for approximately 500,000 WhatsApp account compromises occurring daily — a deliberate selective disclosure that Mr. Baig understood to mislead investors and users about the true scale of the security failures.

167. Mr. Baig actually believed, beginning with his 2022 disclosures and continuing through his Form TCR filing, that WhatsApp's representations to users about the security of their data were not merely inaccurate but were intentionally maintained as false in order to perpetuate user engagement and revenue. His September 2022 pre-read document characterized WhatsApp's security posture as a "fiduciary" failure. His January 2024 letter to Zuckerberg warned that the X-Sec team's conduct "can result in criminal penalties," which encompasses the criminal wire fraud statute, 18 U.S.C. § 1343.

a. On January 17, 2024, two weeks after Mr. Baig's January 2 letter to Defendant Zuckerberg, Defendant Gupta told Mr. Baig in writing that ATO remediation was not a priority for the company. This written statement from the VP of Engineering, made with direct knowledge of the scale of daily user harm, is the clearest available evidence that the failure to remediate was a deliberate institutional choice, not an inadvertent oversight.

b. On March 26, 2024, when Mr. Baig proposed login approvals to prevent ATOs, Mark Hatton responded: "If the security team fixes this [ATOs], then what will we do?" This was an explicit acknowledgment that remediating ATOs would eliminate his team's justification for existence, and that maintaining the ATO problem served internal performance incentives.

c. Kabir Merali, Product Manager for WhatsApp Integrity, told Mr. Baig that WhatsApp planned

Deleted: COMPLAINT

to spend tens of millions of dollars on U.S. user growth marketing and that WhatsApp must relax the account security controls to achieve this goal. The person whose institutional role was to protect users was explicitly directing the relaxation of security to serve growth targets.

d. Parth Shah told Mr. Baig that he had not collaborated on security projects because he and his team needed to do busy work or design Band-Aid solutions in order to comply with Meta's performance management process. His specific words were: "this company runs on PSC." On July 2, 2024, Mark Hatton independently confirmed in a meeting that the work his team was doing was not focused on protecting users but to optimize for Meta's performance management process.

e. Dick Brouwer submitted negative peer feedback on January 7, 2024 acknowledging that Mr. Baig had great ideas to mitigate cybersecurity risks and reduce user harm but that his ideas made Brouwer's team feel like they do not know what they are doing. This written admission in Meta's performance management system confirms that security fixes were blocked not on technical grounds but because they exposed colleagues' inadequacy — a direct acknowledgment that the institutional incentive to maintain the security failures was stronger than the incentive to remediate them.

f. On December 19, 2024, Defendant Tsimelzon colluded with Dick Brouwer to roll back Mr. Baig's PCR solution — which had been recovering approximately 25,000 compromised accounts daily — and ordered it discontinued, explicitly choosing retaliation over user safety. The decision to discontinue a working security solution recovering 25,000 accounts daily in order to advance a retaliation campaign is the single most concrete available evidence that user harm was being deliberately maintained.

g. WhatsApp and Meta publicly sued the NSO Group for attacking WhatsApp users while simultaneously refusing to implement PCR, Account Defense 2.0, Scraping Mitigations, Covert Messaging, Advanced Secure Mode, and the data security and privacy protections Mr. Baig had been developing. The deliberate hypocrisy — publicly suing attackers while blocking the defenses that would have protected users from those same attacks — confirms that the false

Deleted: COMPLAINT

security representations to users were maintained knowingly and intentionally.

h. On January 29, 2025, Mark Hatton expressly admitted that the ATOs measured by his team were only a fraction of the actual ATOs — meaning Meta had been significantly under-reporting account takeovers, not taking appropriate action, and misleading users, investors, and regulators about the true scale of user harm. This admission, made one week before Mr. Baig's termination, confirms that the systematic under-reporting documented throughout his employment was ongoing at the highest level of the ATO measurement team.

i. Senior Software Engineer Nilesh Agrawal, who offered to help Mr. Baig remedy cybersecurity gaps, told him directly: "this company doesn't do anything for security unless forced by the FTC." This statement from an engineer who was supportive of Mr. Baig's work — not hostile to it — confirmed that the institutional posture of reactive security remediation only under regulatory compulsion was widely understood inside Meta at the engineer level, not just at the leadership level.

168. Based on this documented pattern — security fixes blocked on growth grounds in writing, institutional acknowledgments that the failures served performance incentives, metric manipulation, a direct admission of under-reporting, and a deliberate rollback of a working solution — Mr. Baig believed that Meta was knowingly maintaining false security representations to users in order to sustain user engagement metrics on which Meta's stock price depends. Two additional facts anchored this belief. First, by March 15, 2023, Meta was spending hundreds of millions of dollars advertising that WhatsApp is secure and may have been violating SEC regulations and laws with our public misrepresentations. A company that invests hundreds of millions of dollars marketing a product on the basis of a security promise it knows to be false is not making negligent misrepresentations — it is operating a deliberate scheme to induce users to entrust their data to the platform by means of false representations transmitted through interstate wire communications, which is the intentional element of wire fraud. Second, in his January 2, 2024 letter, Mr. Baig warned Defendant Zuckerberg verbatim: "A large-scale data breach will expose Meta, our users, and our investors to serious harm. Meta could lose billions of dollars in market cap, and we may face several regulatory penalties, lawsuits, etc." —

Deleted: COMPLAINT

identifying the stock price decline, regulatory penalties, and civil litigation that would result from the scheme he was reporting.

169. The subjective beliefs described above did not arise in isolation. They were reinforced and deepened throughout Mr. Baig's employment by each successive retaliatory response to his disclosures. When Verma told Mr. Baig that Defendant Gupta threatened to fire him for writing a cybersecurity assessment, when Defendant Mukerji ordered him to stop discussing the FTC Privacy Order, when Defendant Tsimelzon reprimanded him for raising "legal obligations," and when supervisors verbally prohibited written documentation of compliance failures — each of these responses confirmed to Mr. Baig that leadership understood the disclosures to implicate legal obligations, not engineering preferences.

a. September 26–29, 2022: Within three days of circulating the pre-read, Defendant Mukerji provided negative performance feedback for the first time in Mr. Baig's eighteen-month tenure, directly contradicting his June 2022 written praise for Mr. Baig's "[e]xtreme focus and clarity on project scope, timeline etc." The written reversal — from documented positive to documented negative within three days of the disclosure — confirmed that the pre-read was understood as legally consequential activity warranting immediate adverse response.

b. October 6, 2022: Defendant Mukerji sent Mr. Baig a written message stating "I am questioning your judgment call" — the first harsh written communication in their previously collegial professional relationship. The written record of this message establishes the precise moment the supervisory relationship changed in documented form.

c. November 2022: Meta contemplated terminating Mr. Baig's employment just weeks after his first disclosure — choosing instead to issue a verbal warning over the explicit objection of Salloum, who told Verma not to issue the warning because the Data Science complainant was having collaboration issues with several other Meta employees. ERBP Mona Sawani had also told Mukerji and Verma before they issued the warning that the feedback was generic and not actionable and that the timing was suspicious — yet the warning was issued anyway. The decision to proceed with a warning that HR's own representative identified as defective, over

**Deleted:** his cybersecurity disclosure, on September 29, 2022, Mr. Baig experienced his first adverse employment action when Pinaki

**Deleted:** , his direct supervisor,

**Deleted:** since

**Deleted:** employment began, falsely claiming that Mr. Baig was "not performing well" and that "the quality of his written work product was insufficient." This feedback

**Deleted:** contradicted over a year of consistently positive performance evaluations, including Mr. Mukerji's previous

**Deleted:** in June 2022, just three months earlier

**Deleted:** <#>Simultaneously with this negative feedback, and without Mr. Baig's knowledge, Mr. Mukerji changed Mr. Baig's performance rating to "Needs Support" for the October 2022 performance review cycle, marking the first time Mr. Baig had received anything other than positive performance designations during his tenure at Meta.¶
Beginning immediately after September 26, 2022, Mr. Mukerji initiated an intensive micromanagement campaign specifically designed to create pretextual performance issues. Whereas Mr. Mukerji had previously rarely reviewed Mr. Baig's work product and generally maintained minimal involvement in his day-to-day activities, Mr. Mukerji suddenly began: (a) demanding to review nearly all of Mr. Baig's work product; (b) scheduling two to three additional meetings per week for the sole purpose of critiquing Mr. Baig's work; (c) actively soliciting negative feedback about Mr. Baig from his peers; and (d) creating artificial work assignments designed to manufacture opportunities for criticism.¶
On

**Deleted:** <#>, Mr.

**Deleted:** <#>harsh

**Deleted:** <#>," representing a dramatic departure from

**Deleted:** <#>That same day, for the first time since joining Meta, Mr. Verma told Mr. Baig that he was "not meeting expectations" and required additional support, using Meta's terminology of "Needs Support" to formally document supposed performance deficiencies

**Deleted:** <#>On October 17, 2022, during a thirty-minute performance review meeting, Mr. Mukerji repeatedly told Mr. Baig that he was in "Needs Support" territory and issued an ultimatum that Mr. Baig must secure positive feedback from the Integrity and Data Science teams by year-end or face negative impact on his annual performance rating. When Mr. Baig requested specific guidance on how to meet these requirements, both Mr. Mukerji and Mr. Verma provided only vague, non-actionable criticism focused on alleged collaboration failures.¶
The retaliation escalated to formal disciplinary action on November 14, 2022, when Mr. Mukerji and Mr. Verma presented Mr. Baig with a verbal warning alleging violations of Meta's Respectful Communication Policy. The supervisors claimed Mr. Baig had engaged in "unprofessional and disrespectful" interactions with other teams, citing "several instances where word choice, tone or volume of voice, and dismissive and/or belittling behavior has occurred." Significantly, when Mr. Baig requested specific examples of this alleged misconduct, his supervisors refused to provide details, claiming "everything is confidential" and instructing him "not to try to find out any more detail."¶
The verbal warning included specific criticism of routine cybersecurity practices, including reprimanding Mr. Baig for asking the payments team "Do you understand the risks here?" during a standard cybersecurity risk assessment—a question that represent ...

**Deleted:** ¶
COMPLAINT¶

the objection of the Head of Data Science, confirms that the warning was a calculated retaliation instrument rather than a legitimate performance action.

d. March 3, 2023: Verma voluntarily acknowledged to Mr. Baig that he and Mukerji had contemplated terminating Mr. Baig in November 2022 instead of issuing the verbal warning, warned that he would be terminated if there were another incident, and then asked whether Mr. Baig would voluntarily leave Meta. The attempt to pressure Mr. Baig into voluntary departure — rather than formally terminating a known whistleblower — confirms that management was aware of the legal exposure that formal termination of Mr. Baig would create.

e. March 24, 2023: Verma explicitly directed Mr. Baig not to state in writing that WhatsApp was non-compliant with the FTC Privacy Order, expressing specific concern that if there were a lawsuit, Mr. Baig's written statements about non-compliance could become discoverable. An instruction motivated by anticipated litigation discovery is consistent only with knowledge that the conduct being documented constituted legal violations. Defendant Mukerji issued an identical directive on April 14, 2023: "I don't want you to talk about FTC [Privacy Order] unless it is with [WhatsApp attorney] Yannick [Carapito]. I am serious."

f. July 18, 2023: Gregory Heimbuecher warned Mr. Baig: "Don't be the guy that people hate to work with" and stated that Mr. Baig's comments about cybersecurity deficiencies made the IDR team look like "idiots." This hostile deterrent statement — made in response to Mr. Baig's disclosures about the failure to prioritize data exfiltration defenses — was followed by Heimbuecher submitting anonymous negative feedback about Mr. Baig through Meta's employee relations business partner in October 2023, immediately after Mr. Baig raised further data exfiltration concerns. The sequence — positive written feedback in June 2023, hostile deterrent statement in July 2023, anonymous negative feedback in October 2023 — documents a coordinated progression from verbal deterrence to formal retaliation by a named individual in the X-Sec team.

g. August 7, 2023: Defendant Mukerji rated Mr. Baig "Significantly Above Expectation" — translating to a Greatly Exceeds rating and the highest rating of Mr. Baig's tenure — while the

**Deleted:** and

**Deleted:** Mr. Baig "

**Deleted:** ."¶
The retaliatory performance review resulted in substantial financial harm to Mr. Baig, including: (a) denial of an earned promotion that would have increased his base salary by approximately $40,000-$45,000 annually; (b) loss of higher bonus payments tied to performance ratings; (c) denial of formulaic equity grants tied to performance level; and (d) loss of discretionary equity grants worth approximately $600,000, which Mr. Mukerji and Mr. Gupta denied despite acknowledging in the performance review that Mr. Baig had "solved problems that many people thought could not be solved" and made significant organizational contributions.¶
Throughout late February and early March 2023, Mr. Mukerji continued the retaliatory micromanagement by creating artificial work assignments, including directing Mr. Baig to recreate a document that had already been widely reviewed

**Deleted:** making approximately fifty comments on the resulting one-page document. Mr. Mukerji used these manufactured assignments to claim he was "coaching" Mr. Baig to develop communication skills, further documenting pretextual performance issues

**Deleted:** <#>Escalating Retaliation and Silencing Attempts (2023-2024)¶
After Mr. Baig's March 15, 2023 meeting with Meta's Central Security team, where he again raised compliance concerns, Mr. Verma intensified efforts to silence his reporting. On March 24, 2023, during an angry confrontation, Mr.

**Deleted:** <#>claiming that Mr. Baig was "not a lawyer" and should not make such determinations. Mr. Verma expressed

**Deleted:** <#>, demonstrating awareness that the cybersecurity failures

**Deleted:** <#>¶
On April 14, 2023, Mr.

**Deleted:** <#>a direct prohibition against discussing regulatory compliance, stating

**Deleted:** <#> This directive represented a clear attempt to prevent Mr. Baig from continuing his protected disclosure activity by limiting his ability to raise legal compliance concerns with appropriate personnel.

**Deleted:** <#>Throughout 2023, as Mr. Baig continued advocating for cybersecurity remediation, Defendants expanded the retaliation to include systemic exclusion from decision-making processes. Colleagues began refusing to allow Mr. Baig to edit pre-read ...

**Deleted:** <#>,

**Deleted:** <#>, a member of Meta's central security team, personally attacked Mr. Baig during a meeting, warning him

**Deleted:** <#>claiming

**Deleted:** <#>central security

**Deleted:** <#>Baig's continued advocacy for cybersecurity improvements represented part of the broader retaliatory campaig ...

**Deleted:** <#>his work. The feedback, which Mr. Baig reasonably suspected came from Mr. Heimbuecher based on their previous ...

**Deleted:** <#>negative feedback about Mr. Baig. This feedback session occurred immediately after Mr. Baig raised concerns abou ...

**Deleted:** <#>Management Change as Retaliation Vehicle (2024)¶ ...

**Deleted:** ...

internal investigation into his retaliation claims was pending. In the meeting accompanying this rating, Mukerji stated Mr. Baig would very likely be promoted in February 2024. The elevated rating while an investigation was pending, followed by a reversion to "Consistently Meets Expectations" in February 2024 once the investigation concluded, demonstrates that the performance management system was being instrumentalized to manage legal exposure rather than reflect genuine performance assessment. A supervisor who elevates ratings during an active investigation and reverts them after it concludes is using the performance system as a strategic instrument — which confirmed to Mr. Baig that the entire rating history was legally motivated rather than performance-motivated. The August 2023 elevated rating is itself evidence of retaliatory manipulation rather than genuine performance assessment. Defendant Mukerji's elevation of Mr. Baig's rating to the highest of his career — precisely while an investigation into Mukerji's retaliation was pending — and the immediate reversion to a "Consistently Meets Expectations" rating upon the investigation's conclusion, establishes that Meta's performance management system was being used as a legal liability management instrument rather than a genuine assessment of Mr. Baig's work. A supervisor who improves ratings when under investigative scrutiny and reverts them when scrutiny ends is not re-evaluating performance; he is demonstrating that ratings were and are driven by litigation exposure management, not merit. The August 2023 elevation is therefore not evidence of the absence of retaliatory intent — it is the most direct available evidence that the entire rating history was legally motivated.

h. December 14, 2023: In a group instant message chat with Defendant Gupta, Brouwer and Defendant Mukerji, Defendant Gupta asked Mr. Baig why he was pushing for a focus on external threats and whether he thought the X-Sec team were a "bunch of idiots." The public nature of the hostile question — directed at Mr. Baig in a group chat with his supervisor and a senior leader functioned as precursor the retaliatory performance feedback that was issued by Defendant Mukerji on December 26, 2023.

i. December 26, 2023: Defendant Mukerji sent Mr. Baig an email falsely claiming that Mr.

Deleted: COMPLAINT¶

Baig's collaboration issues had caused X-Sec to drop data exfiltration from the QSR — the exact cybersecurity gap which X-Sec had declined to address for months despite Mr. Baig's repeated disclosures. The email's self-refuting logic — blaming Mr. Baig for the outcome that X-Sec itself had produced — exemplifies the fabrication of pretextual documentation that Mr. Baig understood to be designed to create a false record for purposes of justifying adverse employment actions.

j. January 30, 2024: Defendant Gupta stopped all one-on-one instant messaging communication with Mr. Baig immediately after Mr. Baig raised the Uber Commitment false certification in his January 30 upward feedback to Gupta. The observable and verifiable cessation of communication — from Meta's own messaging systems — documents the precise moment Gupta withdrew from any further engagement with Mr. Baig following that specific protected disclosure.

k. January – May 2024: Defendant Zuckerberg chose to give the 23 additional engineers — allocated specifically in response to Mr. Baig's January 2, 2024 Zuckerberg letter to address cybersecurity — to the very same people retaliating against Mr. Baig and blocking his remediation work, while Mr. Baig's team received nothing from that allocation. Resources specifically created in response to a protected disclosure were weaponized against the person who made the disclosure.

l. May 2024: Despite Mukerji's extended leave, Mr. Baig was assigned to report to Defendant Tsimelzon — a London-based director who had previously blocked multiple projects led by Mr. Baig and who would be given 11 direct reports versus the typical 3 for other Engineering Directors reporting to Gupta. Mr. Baig understood that the 11-direct-report structure was designed specifically to give Tsimelzon statistical cover to manufacture negative feedback for his other direct reports — which is exactly what occurred, as Tsimelzon elicited negative feedback on his other direct reports to create the appearance that the negative feedback pattern was not targeted at Mr. Baig alone.

m. May 29, 2024: Within one month of assuming supervisory responsibility, Defendant Tsimelzon

Deleted: facilitate and obscure continued retaliation

Deleted: Baig.

Deleted: Mr.

Deleted: family

Deleted: Meta

Deleted: Mr. Baig

Deleted: Mark

Deleted: ,

Deleted: Baig and had demonstrated hostility to Mr. Baig's cybersecurity initiatives. This reporting arrangement was highly unusual, as it required cross-timezone management and gave Mr. Tsimelzon eleven

Deleted: compared to

Deleted: three direct reports

Deleted: On

Deleted: , less than

Deleted: after

Deleted: Mr.

Deleted: COMPLAINT¶

sent Mr. Baig a written letter accusing him of serious collaboration issues and stating he was not meeting expectations with no specifics about any challenged behavior, project, or individual. A non-actionable written adverse action within one month of a new supervisor assuming role is consistent only with a pre-existing decision to continue the retaliation, not a genuine performance assessment.

n. Late 2024: Two patent proposals by Mr. Baig — for PCR and Covert Messaging — were denied for the first time in his career at Meta. The first-time denial of patent applications for two solutions that had demonstrably succeeded in protecting users confirmed to Mr. Baig that the retaliation had extended beyond performance management to the systematic suppression of his intellectual property contributions — an enterprise-wide campaign rather than the conduct of isolated supervisors.

o. Multiple witnesses reversed documented positive assessments following specific protected disclosures: Nick Gardner submitted positive collaboration feedback in June 2023, then negative collaboration feedback in June 2024 after Mr. Baig raised Uber Commitment concerns. Uzma Barlaskar submitted positive feedback and jointly filed a patent with Mr. Baig in 2022, then submitted negative feedback in 2024 after he raised profile scraping concerns she opposed. Aparup Banerjee submitted positive feedback on Mr. Baig on six separate occasions in Meta's performance management tool, then reversed after Mr. Baig raised concerns and told him the people opposing him were "a small fish in the ocean" implying he had been set up to fail by leadership. Mark Tsimelzon submitted positive peer feedback on June 15, 2022 stating "I want to help him personally to be as successful as he can be" — then became Mr. Baig's retaliatory supervisor two years later. The multiplicity of documented feedback reversals from independent individuals following specific disclosures, all documented in Meta's own performance management system with timestamps, establishes that the retaliation was coordinated across the organization rather than the isolated conduct of any individual supervisor.

p. November 27, 2024: Defendant Tsimelzon ordered Mr. Baig to immediately delete a security

**Deleted:** "

**Deleted:** "

**Deleted:** that

**Deleted:** "

**Deleted:** of his role." The letter provided no specific examples of problematic behavior, projects, or individuals, rendering the feedback non-actionable and demonstrating its pretextual nature

**Deleted:** <#>Throughout summer 2024, Mr. Tsimelzon continued the pattern of retaliation by: (a) prohibiting Mr. Baig from discussing legal requirements related to the 2020 Privacy Order; (b) soliciting negative feedback from colleagues who had previously provided positive evaluations of Mr. Baig's work; (c) suddenly reducing the scope of Mr. Baig's responsibilities to exclude critical cybersecurity functions; and (d) blocking Mr. Baig's team from implementing successful security solutions.¶
On August 8, 2024, Mr. Tsimelzon issued Mr. Baig his first "Below Expectations" performance rating in a mid-year review that explicitly relied on Mr. Mukerji's previous retaliatory feedback from December 2023. Despite acknowledging Mr. Baig's successful implementation of new security measures, the review focused entirely on alleged "collaboration" issues based on complaints from the same individuals who had obstructed Mr. Baig's cybersecurity remediation efforts.¶
**Project Sabotage and Solution Destruction (2024)¶**
Throughout 2024, Defendants engaged in systemic sabotage of Mr. Baig's successful cybersecurity initiatives, demonstrating that the retaliation was designed not only to punish him personally but to prevent implementation of the security improvements he advocated.
In September 2024, when Mr. Baig's team published findings that WhatsApp was leaking over 400 million user profile photos daily to scrapers, leadership refused to act on the findings, blocked progress on remediation, and refused to provide necessary staffing to address the security gap.¶
In October 2024, Mark Hatton, a Software Engineering Manager in Mr. Tzimelzon's team, explicitly pressured one of Mr. Baig's team members to revise a cybersecurity risk assessment to minimize stated risks from a new login feature that allowed WhatsApp users to link their account with Facebook or Instagram accounts. When the team member resisted this pressure, Mr. Hatton created a group chat with Mr. Tsimelzon to accuse Mr. Baig of collaboration issues and territorial overreach for attempting to ensure accurate risk assessment.¶
The most egregious example of retaliatory project sabotage occurred in December 2024, when Mr.

**Deleted:** ______¶
COMPLAINT¶

report documenting the ineffectiveness of existing anti-scraping measures earlier on the same day Mr. Baig filed his Form TCR with the SEC. Tsimelzon's stated rationale — that the report would make his team look bad to leadership — confirms the purpose was reputational concealment.

q. December 19, 2024: Defendant Tsimelzon ordered the rollback of Mr. Baig's PCR solution — which had successfully launched to 5% of WhatsApp users and was recovering approximately 25,000 compromised accounts daily — handing the project to Mark Hatton's team and ordering it discontinued. The decision to discontinue a functioning user protection solution during the terminal phase of a retaliation campaign, explicitly choosing retaliation over user safety, confirmed to Mr. Baig that the retaliation had been approved at the highest levels of WhatsApp leadership.

r. February 7, 2025: Mr. Baig's entire team submitted upward feedback acknowledging the significant adversity and retaliation they had faced throughout 2024. The independent corroboration of the retaliation by Mr. Baig's own team, in the company's own HR system three days before termination, confirms that the retaliatory campaign was visible to and experienced by individuals other than Mr. Baig himself.

170. In each case the collaboration friction cited as the basis for adverse action against Mr. Baig was not a reflection of Mr. Baig's conduct — it was the predictable consequence of defendants' own failure and refusal to perform their supervisory functions. A supervisor who withdraws from project review and then cites the resulting decisional paralysis as the subordinate's collaboration failure has manufactured the pretext, not documented it. A supervisor who proactively solicits negative feedback from cross-functional partners rather than resolving the underlying conflicts has weaponized the performance management system rather than administered it. The pattern across all individual Defendants, except Defendant Zuckerberg — strong objective performance metrics, adverse actions targeting only the subjective collaboration axis, supervisory disengagement, and active negative feedback solicitation timed to Mr. Baig's protected disclosures — establishes that the stated collaboration basis for every adverse employment action was pretextual, and that the pretext was

Deleted: Post Compromise Account Recovery (
Deleted: )
Deleted: ,
Deleted: extrapolating this meant that about 500,000 WhatsApp users were being hacked and locked out of their accounts daily. On December 19, 2024, Mr. Tsimelzon colluded with Dick Brouwer, an Engineering Director responsible for WhatsApp user growth to create artificial collaboration issues, handed
Deleted: successful
Deleted: ,
Deleted: ordered the solution to be
Deleted: When
Deleted: team member reached out
Deleted: COMPLAINT

deliberately manufactured through the Defendants' own conduct. Defendant Cathcart's individual liability under this theory is established by his deliberate non-exercise of the supervisory authority he held to resolve the cross-functional disputes underlying the collaboration pretext — an authority he exercised routinely before October 18, 2022 and withdrew from entirely following Mr. Baig's protected disclosures, ensuring that the pretext his co-defendants were manufacturing could neither be interrupted nor corrected by the one officer at WhatsApp with the institutional authority to do so. This manufactured pretext was ultimately utilized by Defendants to formally justify Plaintiff's retaliatory termination on February 10, 2025, constituting a final, materially adverse employment action in violation of SOX.

171. Mr. Baig actually believed, throughout his employment and continuing through his OSHA and Form TCR filings, that the conduct described herein constituted violations of Rule 21F-17, 17 C.F.R. § 240.21F-17, which prohibits any person from taking action to impede an individual from communicating directly with the Commission's staff about a possible securities law violation. Defendant Mukerji's April 2023 explicit order to stop raising FTC Privacy Order concerns was an order to stop reporting conduct that Baig understood to violate SEC disclosure rules. Management's multi-year verbal prohibitions on creating any written record of compliance failures were a systematic impedance of potential SEC communications. Defendant Tsimelzon's order on November 27, 2024 to delete the security report documenting the precise compliance failures Baig would report to the SEC later that day was an act of post-disclosure impedance. Rule 21F-17(a), 17 C.F.R. § 240.21F-17(a), separately prohibited Meta from imposing any employment condition or policy that prevented Mr. Baig from reporting to the SEC or required pre-notification. The multi-year verbal prohibition on creating written compliance records functioned as exactly such an employment-based impedance condition, suppressing the documentation that would have supported and preceded Mr. Baig's SEC report. Sub-provision (a) is a separately enumerated violation of a rule of the SEC within the meaning of § 1514A(a)(1).

a. Defendant Mukerji's April 14, 2023 explicit order — "I don't want you to talk about FTC [Privacy Order] unless it is with [WhatsApp attorney] Yannick [Carapito]. I am serious." —

Deleted: to Will Cathcart in

Deleted: COMPLAINT

was an order to stop reporting conduct that Mr. Baig understood to violate SEC disclosure rules. The directive served no legitimate business purpose other than preventing Mr. Baig from creating or sharing documented evidence of compliance failures. Verma had delivered a materially identical directive on March 24, 2023, explicitly telling Mr. Baig not to state in writing that WhatsApp was non-compliant with the FTC order, and expressing specific concern that if there were a lawsuit, Mr. Baig's written statements about non-compliance could become discoverable.

b. Management's multi-year verbal prohibition on creating any written record of FTC Privacy Order non-compliance, enforced by Defendant Mukerji and Verma from at least March 2023 onward, systematically prevented the creation of documentation that would have been the natural predicate for any SEC communication about those violations. On multiple occasions, colleagues including Clarke, Greene, and Houghland — Mr. Baig's own mentor — each independently advised him not to raise the data exfiltration risk in meetings with senior leadership. Independent people delivering the same suppression instruction about the same risk is not coincidence; it reflects an institutional understanding that raising the data exfiltration risk in documented settings would trigger disclosure obligations that Meta was determined to avoid.

c. In May 2024, Meta's Central Security team completed a red team exercise specifically focused on data exfiltration risk. The findings from that exercise were deliberately blocked from being printed or copied and marked as attorney-client privileged — even though the exercise was not conducted for the purpose of receiving legal advice and was not directed by counsel. Mr. Baig observed across his entire tenure that Meta systematically used its internal legal department to designate compliance documents as attorney-client privileged in order to shield them from disclosure, including locking him out of access to the JUNGLE Writeup. In December 2023, Ben Beard, Product Manager for Privacy Infrastructure, told Mr. Baig: "I don't worry much about the FTC Order. We have lawyers for that" — exemplifying the institutional posture of treating compliance obligations as legal risks to be managed by counsel rather than substantive obligations to be met.

Deleted: COMPLAINT¶

d. Additionally, on December 2, 2024, Tsimelzon specifically implied that the internal audit timeline was not to be taken seriously by laughing about the internal audit function in the meeting. Tsimelzon made this statement just days after Mr. Baig had filed his Form TCR and on the same occasion that Tsimelzon was actively suppressing Mr. Baig's security work. Tsimelzon's apparent disregard for the audit timeline, contemporaneous with the audit suppression conduct, confirmed to Mr. Baig that the entire audit function was being treated as a compliance theater instrument rather than a genuine independent oversight mechanism.

e. On March 3, 2025, after his termination, Mr. Baig used Meta's Integrity Line to raise concerns about privacy regulation non-compliance and Securities law violations and requested contact information for AROC and Privacy and Product Compliance Committee. Meta responded several days later directing Mr. Baig to send a written letter by mail to AROC. Meta's response through its own designated compliance reporting mechanism — directing a post-termination whistleblower complaint to a physical mail channel rather than engaging with the documented violations — confirmed to Mr. Baig that the impedance of SEC-directed communications had been an institutional policy throughout his employment, not the conduct of isolated individuals.

**B. Objective Reasonableness of Mr. Baig's Beliefs**

172. Mr. Baig's beliefs, as described above, were also objectively reasonable. A reasonable person with Mr. Baig's training, experience, and first-hand knowledge of the facts would have held the same beliefs. Mr. Baig's objective reasonableness is further grounded in three specific elements of his professional background: first, his pre-employment study of the securities law consequences of major corporate data breaches, including Anthem, Target, Equifax, and Capital One; second, his completion of Meta's annual mandatory compliance training, which characterized FTC Consent Decree compliance, SEC certifications, and GDPR obligations as existential risks to Meta's business and shareholder value; and third, his personal review of Meta's Form 10-K filings, which themselves identified cybersecurity risk, FTC Privacy Order compliance, and data privacy as among the most significant risks to the company and its shareholders.

173. Mr. Baig's objective reasonableness is further confirmed by the enterprise-wide scope

Deleted: COMPLAINT

of the compliance failures he documented. His January 2, 2024 letter reported approximately 250,000 daily Facebook account compromises in addition to the WhatsApp failures — demonstrating that the failures implicated the single enterprise-wide compliance program Meta certified to the SEC, not merely a subsidiary product. A reasonable person with Mr. Baig's expertise would recognize that enterprise-wide failures in a compliance program certified by the CEO to the SEC as functioning are material to investors regardless of any individual product's revenue contribution, and would understand that the 2020 Privacy Order's single-program structure makes any revenue-based materiality defense legally untenable.

174. Rule 21F-17, 17 C.F.R. § 240.21F-17, is a rule or regulation of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). A reasonable person with Mr. Baig's background and regulatory knowledge would have recognized all five categories of conduct he experienced as Rule 21F-17 violations: (a) Defendant Mukerji's April 2023 explicit order to stop raising FTC Privacy Order concerns; (b) the multi-year management directive prohibiting creation of written compliance documentation; (c) Defendant Tsimelzon's November 27, 2024 document deletion order; (d) the pattern of escalating retaliation culminating in termination; and (e) Clarke's October 13, 2023 acknowledgment of the three-terabyte data exfiltration vulnerability to Mr. Baig as a matter of FTC regulatory exposure before directing Mr. Baig not to raise it in meetings with CISO Rosen and Defendant Gupta — the officers in the chain of responsibility for Meta's annual 10-K certifications. A reasonable person with Mr. Baig's background would have understood Clarke's directive as an action to impede him from compiling and transmitting documentation bearing directly on a material SEC disclosure obligation, within the meaning of Rule 21F-17(a), and as attributable to Meta as the act of its Security Director operating within the scope of his institutional authority. Each of the five categories is independently sufficient to establish objective reasonableness of Mr. Baig's Rule 21F-17 belief.

175. The objective reasonableness of Mr. Baig's beliefs is further confirmed by the convergence of three independent indicators that his factual and legal conclusions were sound. First, the FTC itself — through its 2023 show-cause proceeding against Meta — reached conclusions about

Deleted: 2025 requesting prioritization of user safety over internal politics and asking for help to restore the PCR solution, Mr. Cathcart refused to act despite multiple messages,

Deleted: retaliation had

Deleted: COMPLAINT

WhatsApp's privacy program deficiencies that track precisely the structural failures Baig had been reporting internally since 2021. Second, the $100 million SEC enforcement action against Meta in 2019 for characterizing realized investor risks as hypothetical confirms that the SEC itself recognized this theory as actionable before Baig made any disclosure. Third, the Ninth Circuit's subsequent decisions in *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934 (9th Cir. 2023), and *In re Alphabet Sec. Litig.*, 1 F.4th 687 (9th Cir. 2021), vindicated the precise half-truth theory that Baig articulated when he distributed the Twitter/SEC enforcement article in October 2022. The objective reasonableness of Mr. Baig's belief is also confirmed by the SEC's own contemporaneous enforcement position. In October 2023 — three months before Mr. Baig's January 2, 2024 letter to Defendant Zuckerberg — the SEC filed its own enforcement action against SolarWinds Corp. and its CISO specifically alleging that cybersecurity disclosure failures violated 15 U.S.C. § 78m(b)(2)(B) and Rule 13a-15 — the same provisions Mr. Baig's disclosures implicated. Mr. Baig cited that enforcement action by name in his January 2, 2024 letter, demonstrating that he was aware of the SEC's enforcement position at the time of his disclosure. A reasonable non-lawyer employee who had completed SOX-focused compliance training, studied the SEC's prior enforcement action against Meta, and read the SEC's own October 2023 enforcement allegations against SolarWinds for the same category of cybersecurity disclosure failure would reasonably believe that Meta's similar conduct violated the same provisions the Commission was actively pursuing in federal court. Under *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009), objective reasonableness is evaluated at the time of disclosure, not in hindsight. The subsequent district court dismissal of certain SolarWinds claims in July 2024 and the SEC's voluntary dismissal of remaining claims in November 2025 — both occurring after Mr. Baig's disclosures — are legally irrelevant to the reasonableness of his belief at the time those disclosures were made.

176. SEC Rule 13b2-1 provides: "No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." Mr. Baig documented that Meta's X-Sec team generated falsified security reports that were used in compliance oversight and that formed the basis for representations in Meta's SEC filings. A reasonable

Deleted: COMPLAINT

person with Mr. Baig's background would have recognized this as conduct falling within Rule 13b2-1.

177. SEC Rule 13b2-2 prohibits officers and directors from making materially false or misleading statements to accountants in connection with audits or examinations of financial statements or the filing of required reports. Mr. Baig documented that internal audits were blocked and that falsified information was provided to oversight personnel, including the independent third-party assessor referenced in each of Meta's annual 10-K filings. He reasonably believed this conduct violated Rule 13b2-2 and the underlying statutory provision that Rules 13b2-1 and 13b2-2 implement: SOX Section 303, 15 U.S.C. § 7242. Section 303 makes it unlawful for any officer or director to fraudulently influence, coerce, manipulate, or mislead any independent auditor engaged in performing an audit for the purpose of rendering the issuer's financial statements materially misleading. Blocking the compliance audits that would have generated accurate inputs for EY's integrated audit, providing falsified security reports as the sole basis for management's privacy-compliance representations, and ordering the deletion of compliance documentation constituted fraudulent manipulation of the independent auditor within the meaning of § 7242. Section 7242 is a "provision of Federal law relating to fraud against shareholders" within the meaning of § 1514A(a)(1), providing an independent statutory predicate for the Rule 13b2-2 conduct. Additionally, a reasonable person with Mr. Baig's background — including his review of Meta's Form 10-K filings and his direct knowledge of WhatsApp's internal revenue attribution methodology — would have understood that Meta's practice of crediting Facebook and Instagram advertising revenue to WhatsApp through a non-standard attribution convention, when presented to investors as a measure of WhatsApp's revenue contribution without GAAP reconciliation and without disclosure of the attribution convention, violated Regulation G, 17 C.F.R. Part 244, and Item 10(e) of Regulation S-K, 17 C.F.R. § 229.10(e). Regulation G requires that any non-GAAP financial measure presented publicly by a reporting issuer be accompanied by the most directly comparable GAAP measure and a quantitative reconciliation; Item 10(e) applies the identical requirement to non-GAAP measures appearing in SEC filings. A reasonable person with Mr. Baig's insider access to WhatsApp's internal financial reporting — including his documentation that WhatsApp operated at an annual loss of approximately $3 to $4 billion while Meta attributed

Deleted: COMPLAINT¶

advertising revenue to it through this non-standard convention — would have recognized that presenting this attributed revenue figure to investors without reconciliation created a materially misleading picture of WhatsApp's standalone economic contribution in violation of Regulation G and Item 10(e). Both provisions are rules or regulations of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). *See Wadler v. Bio-Rad Labs., Inc.*, 916 F.3d 1176, 1187 (9th Cir. 2019).

178. In 2023, the SEC adopted cybersecurity disclosure rules requiring public companies to disclose material cybersecurity risks and incidents, codified at 17 C.F.R. § 229.106 (Item 106). The SEC had previously confirmed the materiality of cybersecurity risk disclosure in CF Disclosure Guidance: Topic No. 2 (Oct. 13, 2011) and in its 2018 interpretive release, SEC Release No. 33-10459. A reasonable senior cybersecurity professional at a company that had already paid $100 million to the SEC for cybersecurity-related investor misrepresentation would have understood in 2022 that the SEC expected disclosure of material cybersecurity risks in annual reports. Mr. Baig's November 2024 Form TCR specifically reported Meta's failure to disclose material cybersecurity risks to investors, including the mass scraping of over 400 million user profile photos daily. Meta's § 229.106 disclosures were false not merely because they were incomplete, but because the specific processes, board oversight mechanisms, and management assessment functions Meta described in its annual cybersecurity governance disclosures did not exist as described. The SEC's 2023 cybersecurity disclosure rules — specifically § 229.106(b)(2) and Item 1.05 of Form 8-K — took effect December 18, 2023 for large accelerated filers including Meta. For purposes of the protected activity analysis in Counts 2 and 7, the temporal scope of each regulatory predicate is as follows. For disclosures predating December 18, 2023, the predicate basis for Count 2's cybersecurity disclosure rule theory is Rule 10b-5(b) and the SEC's pre-existing interpretive guidance on cybersecurity disclosure obligations, specifically SEC Release No. 33-10459 (Feb. 26, 2018), which identified cybersecurity risk as a required disclosure topic and which Mr. Baig was aware of through his pre-employment study of the Anthem, Target, Equifax, and Capital One disclosures and SEC proceedings. For disclosures made on or after December 18, 2023, the 2023 cybersecurity rules provide an additional and independent regulatory predicate: § 229.106(b)'s requirement that issuers describe their processes for assessing material

Deleted: COMPLAINT

cybersecurity risks, and Item 1.05's requirement that material cybersecurity incidents be reported on Form 8-K within four business days. The protected disclosures in Count 7 that specifically implicate Items 1.05 and 8.01 are accordingly those made after December 18, 2023 — specifically the September 30, 2024 scraping disclosure, the November 4, 2024 written communication to Defendant Tsimelzon, the November 27, 2024 Form TCR, the December 4, 2024 letter to Defendant Zuckerberg, and the January and February 2025 disclosures. For each of these post-December 2023 disclosures, the 2023 rules provide a specifically applicable, fully effective regulatory predicate that does not depend on pre-2023 disclosure guidance or interpretation. For pre-December 2023 disclosures of the same categories of conduct, the predicate is the pre-existing Rule 10b-5(b) half-truth theory and SEC Release 33-10459, both of which independently support protected activity without resort to the 2023 rules. This bifurcated analysis ensures that the protected activity allegations in Counts 2 and 7 are calibrated to the specific regulations in effect at the time of each specific disclosure, not to regulations that postdate the disclosure they are claimed to support.

a. A reasonable person with Mr. Baig's background would also have recognized that the same scheme to defraud users, business customers, and investors through false security representations was furthered through postal communications — including written FTC compliance certifications, Business API customer agreements, and falsified assessor reports — in addition to electronic wire communications, making 18 U.S.C. § 1341 an alternative and independently actionable predicate to § 1343 for the same course of conduct. Section 1341's mail fraud standard imposes no property element beyond the tangible money or property obtained from victims — the per-message Business API fees paid through false written security representations — and the mailing element is satisfied by the written FTC compliance certifications and written assessor reports that are a required feature of Meta's regulatory obligations under the Privacy Order. An employee with Mr. Baig's financial institution background, who had studied the criminal enforcement actions against the Uber and SolarWinds CISOs, would have understood that written false certifications transmitted to federal regulators constitute mail fraud predicates independently of whether those same

Deleted: COMPLAINT

certifications were also transmitted electronically. § 1341 is expressly enumerated in 18 U.S.C. § 1514A(a)(1) as a covered predicate alongside § 1343; the objective reasonableness of the § 1341 belief requires no analysis beyond the reasonableness of the § 1343 belief, because both predicates are established by the same course of conduct viewed through the lens of different transmission media.

179. Item 308, 17 C.F.R. § 229.308, requires management's annual report on internal controls over financial reporting. Rule 13a-15, 17 C.F.R. § 240.13a-15, separately requires reporting companies to maintain "disclosure controls and procedures." The cybersecurity and privacy audit function that Mr. Baig performed was a component of Meta's disclosure controls and procedures, because Meta's annual 10-K representations about its FTC Privacy Order compliance depended on that audit function accurately reporting on the state of the privacy program. By blocking the AROC and EECC audits and suppressing written compliance documentation, management ensured that the information flowing into Meta's required SEC disclosures was false. Mr. Baig reasonably believed that blocking internal audits of a compliance program whose status was being affirmatively represented to investors violated both 17 C.F.R. § 229.308 and Rule 13a-15.

180. Exchange Act Section 13(b)(2)(B), 15 U.S.C. § 78m(b)(2)(B), is a separately enumerated predicate for Mr. Baig's protected activity. Section 13(b)(2)(B) requires every Exchange Act reporting issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are properly authorized and that company assets are safeguarded. A reasonable person with Mr. Baig's background — the former Head of Security for a platform processing over 100 billion messages per day — would have understood that falsifying the inputs to the internal control assessment process, blocking the compliance audits on which that process depended, and ordering the destruction of compliance documentation constituted a knowing failure to maintain adequate internal accounting controls. Section 13(b)(2)(B) is a provision of federal law relating to fraud against shareholders within the meaning of § 1514A(a)(1), and Rules 13b2-1 and 13b2-2 are implementing regulations thereunder.

181. Item 307, 17 C.F.R. § 229.307, requires that each annual 10-K include management's

Deleted: COMPLAINT¶

conclusions regarding the effectiveness of disclosure controls and procedures as of the end of the covered fiscal year. Item 9A of Form 10-K is the specific line item in the filed annual report where that conclusion appears as a filed statement: it requires management to state its conclusions about the effectiveness of disclosure controls and procedures as of the period-end date. The false "effective" conclusion published in the Item 9A section of each annual 10-K from FY2022 through FY2024 is independently actionable as a materially false statement in a document filed with the SEC — distinct from the Rule 13a-15 evaluation obligation, the Item 307 description obligation, and the Rule 13a-14 certification obligation. Rule 13a-15 requires the evaluation; Item 307 requires the disclosure of those conclusions in the filed report; and Item 9A is where that disclosure appears as a filed statement. Mr. Baig reasonably believed that Defendant Zuckerberg's Item 307 disclosures in the FY2022, FY2023, and FY2024 annual reports were false given his documented evidence that the information infrastructure on which those controls depended had been systematically falsified and suppressed through management directives.

182. The 2023 SEC cybersecurity rules added § 229.106(b) and Item 1.05 to Form 8-K, requiring material cybersecurity incident disclosure within four business days. Rule 13a-11, 17 C.F.R. § 240.13a-11, implements the Exchange Act current reporting obligation. Mr. Baig reasonably believed that Meta's failure to file Form 8-Ks disclosing the mass daily scraping of over 400 million user profile photos and the sustained unauthorized access to hundreds of thousands of user accounts constituted violations of § 229.106(b), Item 1.05, and Rule 13a-11 — all rules and regulations of the SEC within the meaning of § 1514A(a)(1). The 2023 rules also require, at § 229.106(c)(1), disclosure of board oversight of cybersecurity risks, and at § 229.106(c)(2), disclosure of management's role in assessing and managing those risks. Mr. Baig reasonably believed that Meta's falsified representations about both board oversight (via the Privacy Committee) and management's active risk management (via CISO Rosen and Defendant Gupta) constituted violations of both sub-provisions.

183. Regulation S-X Rule 4-01(a), 17 C.F.R. § 210.4-01(a), requires that financial statements filed with the SEC be prepared in accordance with GAAP. Because ASC 450-20-25-2 and ASC 450-20-50-3 are components of GAAP, Meta's failure to accrue and disclose the FTC loss contingency was

Deleted: COMPLAINT¶

simultaneously a violation of Rule 4-01(a) — a rule of the SEC within the meaning of § 1514A(a)(1). Item 303(b)(2)(ii) of Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), is the specific operative sub-provision requiring disclosure of known trends or uncertainties expected to have a material unfavorable impact on revenues or income from operations. Mr. Baig reasonably believed that Meta's failure to disclose its escalating FTC compliance exposure in the MD&A sections of its annual 10-K filings violated both Rule 4-01(a) and § 229.303(b)(2)(ii) — the financial statement accuracy rule and the specific MD&A trend-disclosure requirement — as independent predicates beyond the Rule 10b-5 and § 1348 theories articulated in his disclosures.

184. Exchange Act Section 14(a), 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9, prohibit materially false and misleading statements in proxy solicitation materials. Meta's 2022 Proxy Statement represented that the Board's Privacy Committee oversaw compliance with the FTC Privacy Order — the identical program Mr. Baig documented as materially non-functional. Mr. Baig reasonably believed his internal disclosures about Privacy Order non-compliance constituted protected disclosures of violations of § 14(a) and Rule 14a-9, as the falsity of the compliance representations extended independently to proxy solicitation materials. Exchange Act Section 13(a), 15 U.S.C. § 78m(a), imposes the underlying statutory obligation to file accurate annual and quarterly reports that Rules 13a-14 and 13a-15 and Reg S-K Items 106, 307, and 308 implement, and each of Mr. Baig's protected disclosures implicates § 78m(a) as the statutory anchor for those implementing rules.

185. A reasonable person with Mr. Baig's background and regulatory training, having reviewed Section VII of the 2020 Privacy Order upon joining WhatsApp, would recognize that 1,500 engineers — later documented to be as many as 20,000 to 65,000 employees — with unrestricted access to Covered Information without documented business need presented conditions Mr. Baig reasonably believed constituted a per se violation of Section VII's specific, enumerated access restriction requirement. The facts Mr. Baig documented — unrestricted access for thousands of employees, no access audit trail, no monitoring system, and fabricated compliance reports representing that controls existed — left no room for reasonable professional disagreement about the violation Mr. Baig reasonably believed to exist.

Deleted: COMPLAINT

186. Mr. Baig reasonably believed that Meta's representations in its SEC filings regarding FTC Privacy Order compliance were materially false and misleading in violation of Rule 10b-5, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 1348. The 2023 10-K is particularly significant: it simultaneously disclosed the FTC's deficiency finding while asserting ongoing compliance program maintenance — a half-truth that rendered the filing materially misleading within the meaning of *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Each of the three securities fraud theories — the affirmative compliance misrepresentation theory, the penalty-concealment half-truth theory, and the cybersecurity risk posture false certification theory — is independently sufficient to establish protected activity under 18 U.S.C. § 1514A(a)(1). Rule 12b-20, 17 C.F.R. § 240.12b-20, provides a further independent basis: it requires that any statement or report filed with the SEC must include such further material information as may be necessary to make the required statements not misleading in the circumstances under which they were made.

187. 17 C.F.R. §§ 240.10b-5(a) and (c) provide independent bases for Mr. Baig's protected activity that extend to each named Defendant regardless of whether that Defendant personally certified any SEC filing. Rule 10b-5(a) prohibits any device, scheme, or artifice to defraud; Rule 10b-5(c) prohibits any act, practice, or course of business which operates or would operate as a fraud or deceit. Under *Lorenzo v. SEC*, 587 U.S. 71 (2019), these sub-provisions apply to any person who knowingly disseminates false information as part of a coordinated scheme to defraud investors, even if that person did not make the misleading statements within the meaning of *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). The multi-year coordinated scheme alleged here—involving falsified security reports, management directives prohibiting written compliance records, document deletion orders timed to Mr. Baig's SEC filing, and verbal directives to suppress reporting—constitutes a scheme or artifice to defraud under Rule 10b-5(a) and an institutional course of business operating as fraud under Rule 10b-5(c). Each participant is separately liable under Rules 10b-5(a) and (c), and Mr. Baig's documented disclosures of each participant's specific acts constituted protected activity reporting violations of those sub-provisions.

188. 18 U.S.C. § 1348 — the Securities Fraud Statute — is a separately enumerated covered

Deleted: COMPLAINT¶

law under 18 U.S.C. § 1514A(a)(1) and provides an independent basis for Mr. Baig's protected activity distinct from Rule 10b-5. Section 1348 criminalizes any scheme or artifice to defraud in connection with a security of an issuer with a class of securities registered under Section 12 of the Exchange Act. Meta is a covered issuer. Mr. Baig reasonably believed that Meta's conduct constituted a scheme to defraud under § 1348 on two independent theories: first, the privacy program scheme; and second, the cybersecurity risk factor scheme. Under *Van Asdale*, Mr. Baig need only hold a belief that approximates the basic elements of § 1348.

189. Under *Van Asdale*'s reasonable-belief standard, Mr. Baig need not prove that Meta's misrepresentations actually caused investor losses, and he need not prove that any actual violation of the securities laws occurred. *Van Asdale*, 577 F.3d at 1003. The standard does not require a finding of an actual violation; it requires only that the employee hold a belief that "approximates" the basic elements of a covered violation. *Id.* This Court need not determine whether Meta actually violated any securities law in order to find that Mr. Baig's beliefs were reasonable.

190. Mr. Baig reasonably believed that Meta's failure to disclose known and probable regulatory penalty exposure, separately from its affirmative misrepresentations about compliance program effectiveness, constituted additional violations of Rule 10b-5, 18 U.S.C. § 1348, Item 103, 17 C.F.R. § 229.103, and Item 105, 17 C.F.R. § 229.105. ASC 450-20-50-3 requires disclosure of any loss contingency where there is "at least a reasonable possibility" of loss — a standard plainly satisfied by at least FY2022 given Meta's prior $5 billion penalty for the same category of violation.

191. Mr. Baig reasonably believed that WhatsApp's systematic failure to classify and report mass scraping events as Covered Incidents under Part IX of the 2020 Privacy Order, and the consequent falsity of Meta's quarterly FTC compliance certifications, constituted violations of provisions of federal law relating to fraud against shareholders. Mr. Baig reported this conduct to Central Privacy leadership on September 30, 2024, to Defendant Tsimelzon on November 4, 2024, and to the SEC in his Form TCR on November 27, 2024.

192. Mr. Baig reasonably believed that Meta and WhatsApp engaged in a knowing scheme to defraud WhatsApp's users and paying business customers by making specific security

Deleted: COMPLAINT

representations — including end-to-end encryption, data privacy, and protection against unauthorized access — while knowingly maintaining a security program that was systematically inadequate, and by actively concealing that inadequacy through manipulation of security metrics, destruction of security documentation, and retaliation against the security officer who documented the failures. To the extent Rule 9(b) of the Federal Rules of Civil Procedure applies to wire fraud allegations pleaded as the basis for SOX protected-activity beliefs, the complaint satisfies its requirements: the speakers are identified; the specific false representations are set forth above; the applicable period spans January 2021 through February 2025; and the specific facts rendering each representation false are documented in the cybersecurity failures section above. In any event, *Van Asdale*'s reasonable-belief standard governs SOX protected-activity claims and does not require Rule 9(b) particularity. *Van Asdale*, 577 F.3d at 1000–01.

193. Mr. Baig's November 27, 2024 Form TCR filing with the SEC constituted a report to a "Federal regulatory or law enforcement agency" within the meaning of 18 U.S.C. § 1514A(a)(1)(A), and his OSHA filings constitute administrative complaints within the meaning of 18 U.S.C. § 1514A(b). The protected disclosures above fall within three distinct categories under 18 U.S.C. § 1514A(a)(1): information provided to (A) a Federal regulatory or law enforcement agency under § 1514A(a)(1)(A); (B) a Member or committee of Congress under § 1514A(a)(1)(B); and (C) a person with supervisory authority or with authority to investigate misconduct under § 1514A(a)(1)(C). Each category is independently sufficient to establish protected activity under Section 806.

## CAUSES OF ACTION

## CAUSE OF ACTION ONE

## Retaliation in Violation of the Sarbanes-Oxley Act of 2002

## 18 U.S.C. § 1514A

## (Against All Defendants as to Each Count)

194. Section 806 of SOX, codified at 18 U.S.C. § 1514A, prohibits publicly traded companies and their agents from retaliating against employees who report conduct they reasonably believe constitutes a violation of federal securities laws, SEC rules or regulations, or any provision of



Deleted: COMPLAINT¶

federal law relating to fraud against shareholders. Each of the following fourteen Counts arises under this provision and constitutes a separate and independently sufficient basis for Plaintiff's SOX retaliation claim.

**COUNT 1 — General SOX Retaliation**

**(18 U.S.C. § 1514A — Against All Defendants)**

195. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

196. Meta is a publicly traded company subject to Section 806 of SOX, 18 U.S.C. § 1514A. Defendants Zuckerberg, Cathcart, Gupta, Mukerji, and Tsimelzon are supervisors of Mr. Baig within the meaning of the statute.

197. Mr. Baig engaged in protected activity under 18 U.S.C. § 1514A(a)(1) by making the disclosures detailed above — including, specifically, his January 2, 2024 letter, his December 4, 2024 letter stating verbatim that Meta's leadership was "not being truthful to the auditors and the regulators," and his November 27, 2024 Form TCR filing — each of which he subjectively believed and objectively reasonably believed constituted a violation of one or more federal securities laws, rules or regulations of the SEC, or provisions of federal law relating to fraud against shareholders, as specifically alleged in Counts 2 through 14 below. This Count does not assert a theory of recovery independent of Counts 2 through 14; it preserves Plaintiff's right to recover under 18 U.S.C. § 1514A on all predicate theories collectively and ensures that a ruling adverse to any individual Count does not limit Plaintiff's entitlement to relief on the remaining Counts.

198. Mr. Baig's protected activity was a contributing factor in the adverse employment actions taken against him, including but not limited to: retaliatory downgrading of performance ratings; denial of promotion and equity grants; micromanagement and harassment; verbal orders to cease raising compliance concerns; reprimand for raising legal reporting obligations on November 4, 2024; deletion of security reports; reduction of team scope; rollback of security solutions; exclusion from engineering resources; and termination of employment on February 10, 2025. A termination of the Head of Security at WhatsApp — a senior security officer who had sent the CEO two detailed letters

Deleted: COMPLAINT

identifying potential criminal liability, had filed a formal OSHA complaint, and had filed a Form TCR with the SEC — required, as a matter of Meta's internal governance protocols and given the extraordinary litigation exposure created by the termination decision, the personal awareness and approval of the CEO. On information and belief, Defendant Zuckerberg personally approved the February 10, 2025 termination of Mr. Baig's employment. This belief is based on particularized facts peculiarly within the knowledge of Meta and Defendant Zuckerberg, including: (a) Defendant Zuckerberg's direct personal receipt of Mr. Baig's January 2, 2024 and December 4, 2024 letters, both of which expressly identified potential criminal liability arising from the conduct Mr. Baig was documenting and reporting; (b) Defendant Zuckerberg's receipt, through Meta's legal counsel, of notification that Mr. Baig had filed an OSHA administrative complaint and a Form TCR with the SEC; and (c) the extraordinary litigation exposure created by the termination of a senior security officer who had sent the CEO two written warnings of criminal liability, filed a formal OSHA complaint, and made a Form TCR submission — circumstances that make it implausible that the decision to proceed with the termination would have been executed without the personal awareness and approval of the CEO.

Deleted: from the highest levels of WhatsApp leadership

199. Defendants knew of Mr. Baig's protected activity. Defendants Cathcart and Gupta directly received his disclosures. Defendant Mukerji was his direct supervisor throughout the period of retaliation. Defendant Mukerji's liability for adverse employment actions occurring after May 2024 — when he ceased to be Mr. Baig's direct supervisor — is established by the causal predicate theory set forth in ¶19 and ¶ 220 of this Complaint. Defendant Tsimelzon became his supervisor and immediately escalated the retaliation, including by reprimanding Mr. Baig twenty-three days before the Form TCR filing for his November 4, 2024 disclosure about scraping incident reporting obligations. Defendant Zuckerberg received detailed letters on January 2, 2024 and December 4, 2024 documenting the protected disclosures and describing SEC violations, confirming his knowledge of the full scope of Mr. Baig's protected activity. The temporal proximity between each protected disclosure and the adverse employment actions that followed it demonstrates the causal link.

Deleted: <#>Professional Sabotage and Career Destruction (2024-2025)¶

200. Meta and the individual defendants would not have taken the adverse employment actions described herein absent Mr. Baig's protected disclosures. Mr. Baig's protected activity was a

Deleted: ¶ COMPLAINT¶

contributing factor in each adverse employment action taken against him — a standard more permissive than but-for causation that requires only that the protected activity play a role in the adverse action, not that it be the sole or primary cause. Defendants cannot demonstrate, by clear and convincing evidence, that they would have taken the same employment actions in the absence of Mr. Baig's protected activity. The contributing factor standard governs SOX whistleblower claims under 18 U.S.C. § 1514A(b)(2)(C), incorporating 49 U.S.C. § 42121(b)(2)(B).

201. The entire course of retaliatory conduct from September 2022 through February 10, 2025 constitutes a continuing violation and single unified retaliatory scheme causally connected to Mr. Baig's protected internal disclosures under § 1514A(a)(1)(C), beginning with his September 2022 cybersecurity assessment and pre-read document. Each adverse employment action — from the initial performance downgrade in September 2022 through the termination in February 2025 — was an element of a single, escalating scheme of retaliation, the predicate protected activity for which dates to September 2022. The full damages period from September 2022 is accordingly recoverable under 18 U.S.C. § 1514A on a continuing violation theory. The tolling agreements described in the Jurisdiction and Venue section independently preserve the full damages period against any limitations challenge.

202. As a direct and proximate result of Defendants' unlawful retaliation, Mr. Baig has suffered substantial economic and non-economic losses, which are described in detail in the following paragraphs.

//

**A. Economic Losses**

203. Defendant Mukerji's retaliatory "Needs Support" performance downgrade following Mr. Baig's August, September and October 2022 disclosures contributed directly to economic and noneconomic harms to Mr. Baig. Mr. Baig suffered the following specific financial losses from the FY2022 performance cycle alone: (a) denial of an earned promotion to the next level, which would have increased his base salary by approximately $40,000–$45,000 annually; (b) loss of higher bonus payments tied to the higher performance rating of "Greatly Exceeds" he had earned; (c) denial of the formulaic equity grant tied to his performance level; and (d) denial of a discretionary equity grant

Deleted: COMPLAINT

worth approximately $600,000. This discretionary equity grant, which was tied exclusively to "Impact" rather than overall performance rating and could have been awarded even at a "Consistently Meets Expectations" level, was denied by the joint decision of Defendant Gupta and Verma. Despite acknowledging in Mr. Baig's written performance review that he solved problems that many people thought could not be solved, made "a number of contribution[s]" under "Org Impact," and had "unblocked the team" on several projects, Defendant Gupta and Verma withheld the grant in direct retaliation for Mr. Baig's protected disclosures. In total, Mr. Baig lost at least $1 million in compensation from the FY2022 cycle alone. A promotion would have also included new RSUs worth at least $200,000 at the time of grant. In January 2025 — after his OSHA filing and within the final weeks of his employment — Mr. Baig learned that Defendant Gupta was receiving a budget allocation to hire approximately 250 additional engineers, and that Mr. Baig's security team would receive no allocation from this budget. This exclusion was directed by the same executive whose intent to terminate Mr. Baig for raising cybersecurity concerns was conveyed by Verma in September 2022, who had denied him the $600,000 discretionary equity grant in the FY2022 cycle, who had ceased all one-on-one communication with Mr. Baig following his January 30, 2024 protected disclosure, and who had acknowledged the data exfiltration risks Mr. Baig was reporting and declined to act. The exclusion of Mr. Baig's security team from the 250-engineer budget allocation constituted a further retaliatory adverse employment action establishing Defendant Gupta's continuing and escalating pattern of retaliation through the terminal phase of Mr. Baig's employment.

204. For the second consecutive year in FY2023, Defendant Mukerji rated Mr. Baig as "Consistently Meets Expectations," resulting in a much smaller bonus, a much smaller formulaic equity grant, and no discretionary equity compensation for the second year in a row. Defendant Mukerji again denied Mr. Baig a promotion. Absent retaliation, Mr. Baig should have been promoted to Director of Engineering (D1) in the February 2024 PSC cycle with a "Redefines Expectations" rating, formulaic compensation increases, and discretionary equity.

205. Absent retaliation, Mr. Baig would have received a "Redefines Expectations" rating at Director (D1) level and a promotion to Director (D2) level in the February 2025 PSC cycle, along with



Deleted: COMPLAINT

the corresponding formulaic compensation increases and discretionary equity grants. Instead, Meta terminated his employment on February 10, 2025, before that cycle could be completed.

206. Immediately before the retaliation began, Meta had awarded Mr. Baig an equity refresher grant of 1,283 RSUs, valued at approximately $293,178 at the time of grant, vesting quarterly beginning May 15, 2022. The retaliatory performance downgrades caused Mr. Baig to forfeit multiple subsequent equity grants of comparable or greater value that his performance record warranted.

207. As a result of the retaliatory performance reviews sustained across the FY2022, FY2023, and FY2024 performance cycles, Mr. Baig lost the opportunity for multiple promotions, including promotion to Director of Engineering (D1) and ultimately to Director (D2). These lost promotions represent not only the direct salary and equity increases that would have accompanied them, but also the compounding career advancement, seniority, and earning trajectory that Mr. Baig would have attained over the remainder of his career.

208. In late 2024, for the first time in his career at Meta, two of Mr. Baig's patent proposals — for PCR and Covert Messaging, both representing original cybersecurity innovations he developed during his employment — were denied. This denial marked a clear departure from his previous track record of successful patent applications and constituted an additional dimension of career damage and economic loss. The economic value of the denied patents, — including the market value of the innovations, the licensing and royalty revenue they would have generated, and the professional recognition and career advancement they would have produced — is a component of Mr. Baig's damages to be proven at trial through expert testimony and evidence of the market value of comparable cybersecurity patents.

209. As a result of his termination on February 10, 2025, Mr. Baig has lost and continues to lose all compensation and benefits he would have received had he not been terminated, in amounts to be proven at trial. These post-termination economic losses include: base salary through the date of judgment and, as appropriate, front pay thereafter; annual performance bonuses; formulaic and discretionary RSU grants and their vesting, including the vesting of previously granted but unvested RSUs; employer 401(k) match and other retirement contributions; health insurance coverage and

**Deleted:** Defendants expanded their retaliation to target Mr. Baig's professional development and intellectual property contributions. For

**Deleted:** (

**Deleted:** Post Compromise Recovery

**Deleted:** ) were denied, representing

**Deleted:** <#>During the 2024 year-end performance calibrations, Defendants demonstrated systemic bias by: (a) denying a well-deserved promotion to one of Mr. Baig's team members, downgrading his rating from "Greatly Exceeds" to "Exceeds" in apparent retaliation; (b) excluding Mr. Baig's team from budget allocations for 250 additional engineers that Mr. Gupta received for initiatives; and (c) allowing false performance metrics from other teams (including a fabricated claim of $1.5 billion in SMS cost savings) while blocking recognition for Mr. Baig's team's actual security achievements.¶
Throughout late 2024 and early 2025, Mr. Tsimelzon continued censoring Mr. Baig's cybersecurity reporting, including ordering the immediate deletion of a November 2024 report that documented the ineffectiveness of existing anti-scraping measures. Mr. Tsimelzon explicitly stated that the report needed to be deleted because it would make his team "look bad to leadership," demonstrating that the suppression of Mr. Baig's work was designed to hide cybersecurity failures from senior management.¶
**Termination as Ultimate Retaliation (February 2025)¶**
On February 10, 2025, Defendants culminated their retaliation campaign by informing Mr. Baig that his employment would be terminated for "poor performance" as part of Meta's performance-based layoffs. This termination occurred less than two months after Mr. Baig informed Mark Zuckerberg that he had filed a Form TCR with the SEC and less than one month after he informed Meta that he had filed a SOX retaliation complaint with OSHA.¶
The termination decision required Defendants to "go to extreme lengths to justify" the performance-based termination, according to internal sources, demonstrating the pretextual nature of the stated reasons. This termination occurred despite: (a) strong positive feedback from Mr. Baig's team acknowledging the "significant adversity and retaliation" they had faced throughout 2024; (b) successful implementation of critical security measures including the PCR solution that was recovering hundreds of thousands of compromised accounts daily; and (c) continued advocacy for cybersecurity improvements that had resulted in meaningful policy changes, including updates to Meta's Annual Required Training incorporating Mr. Baig's recommendations.¶
The timing and circumstances of Mr. Baig's termination establish clear causal connection to his protected activity, occurring in close temporal proximity to his external regulatory filings and representing the culmination of over two years of systemic retaliation for his cybersecurity disclosures and advocacy for compliance with federal law and regulatory orders.¶
Throughout the entire retaliation campaign, from September 2022 through February 2025, Defendants' adverse actions consistently followed Mr. Baig's protected disclosures about cybersecurity failures and regulatory violations, demonstrating that his whistleblowing activity was a contributing factor in each adverse employment action. The escalating pattern of retaliation, combined with explicit threats and acknowledgments from supervisors, establishes that Defendants' conduct was designed to punish Mr. Baig for his protected activity and deter continued reporting of cybersecurity and compliance failures.¶
**FIRST CAUSE OF ACTION¶**
**RETALIATION IN VIOLATION OF 18 U.S.C. § 1514A¶**
Plaintiff restates and incorporates all paragraphs as though fully set forth herein. ¶ ...

**Deleted:** ___¶
COMPLAINT¶

associated COBRA continuation or substitute-insurance costs; disability insurance and life insurance coverage; costs of obtaining substitute employment, including job-search expenses and any relocation costs; diminished future earning capacity; and the compounding career-trajectory and seniority losses that flow from a forced mid-career departure from a senior executive cybersecurity role.

**B. Non-Economic Losses**

210. As a result of the sustained retaliatory micromanagement, hostile work environment, and ultimate termination, Mr. Baig suffered serious physical and emotional harm. The stress of the multi-year retaliation caused Mr. Baig to suffer from anxiety, sleeplessness, and restlessness. He gained weight and his blood pressure elevated significantly. He also experienced significant health and family issues as a direct consequence of the retaliatory conduct. This harm — financial, physical, and emotional — has deeply impacted Mr. Baig and his family. Mr. Baig has incurred, and will continue to incur, medical expenses as a direct result of the stress-induced physical health consequences of the retaliation, which are recoverable as special damages under 18 U.S.C. § 1514A(c)(2)(C).

211. Mr. Baig has suffered, and continues to suffer, humiliation, mental anguish, and severe emotional distress as a result of Defendants' retaliatory conduct. These damages include the distress of being publicly downgraded despite documented exceptional performance, denied promotions his own managers acknowledged he deserved, explicitly ordered to stop raising legal compliance concerns, reprimanded for performing his security responsibilities, and ultimately terminated, all in retaliation for reporting conduct he reasonably believed constituted serious violations of federal securities laws.

212. Mr. Baig has suffered significant and ongoing damage to his professional reputation as a result of the retaliatory performance reviews, the denial of promotions and equity that his professional record warranted, and his ultimate termination. A cybersecurity executive of Mr. Baig's experience and standing, with over twenty years in the field, recognized in early Meta performance reviews for "deep security skill" and the ability to solve problems that many people thought could not be solved, has suffered lasting harm to his professional standing that extends beyond the quantifiable economic losses and will affect his earning capacity, career trajectory, and professional reputation for years to come. The reputational harm and career-trajectory damage described in this paragraph, and the

Deleted: COMPLAINT¶

diminished future earning capacity that flows from it, are recoverable components of the make-whole relief to which Mr. Baig is entitled under 18 U.S.C. § 1514A(c)(1).

213. Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c) and all further relief necessary to make him whole, including: (a) reinstatement with the same seniority status he would have had but for the retaliation or, in the alternative, front pay sufficient to compensate him for the prospective earnings he would have received but for his unlawful termination; (b) back pay with interest from the date of each adverse employment action through the date of judgment; (c) compensation for all special damages sustained as a result of the retaliation, including litigation costs, expert witness fees, out-of-pocket medical expenses, costs of obtaining substitute employment, reasonable attorneys' fees, and such other economic losses as are proven at trial; (d) compensatory damages for emotional distress, mental anguish, humiliation, damage to professional reputation, loss of professional standing, and diminished future earning capacity; (e) prejudgment and postjudgment interest on all monetary awards; and (f) such other monetary and equitable relief as may be necessary to make Mr. Baig whole. Plaintiff seeks joint and several liability against Defendant Meta and each individually named Defendant — Zuckerberg, Cathcart, Gupta, Mukerji, and Tsimelzon — for all damages recoverable under 18 U.S.C. § 1514A. The individual Defendants are liable jointly and severally with Meta under the supervisor and agent theories pleaded at ¶¶152–153, under the controlling-person theory pleaded at ¶153, and under the direct-participation and contributing-factor theories pleaded throughout this Complaint. Proof of liability on any one of these theories is sufficient to support recovery of the full measure of damages under 18 U.S.C. § 1514A(c) against the liable Defendant.

**COUNT 2 — Retaliation for Reporting Violations of SEC Cybersecurity Disclosure Rule (15 U.S.C. § 78m(a); 17 C.F.R. §§ 229.106(b)(1), (b)(2), (c)(1), and (c)(2) — Against All Defendants)**

214. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

215. In July 2023, the SEC adopted new cybersecurity disclosure rules effective for large

Deleted: COMPLAINT¶

accelerated filers (including Meta) for fiscal years ending on or after December 15, 2023. These rules, codified at 17 C.F.R. § 229.106 (Item 106), require public companies to: (a) under § 229.106(b)(2) and Form 8-K Item 1.05, disclose material cybersecurity incidents within four business days of determining the incident is material; (b) under § 229.106(b)(1), describe in the annual 10-K the registrant's processes for assessing, identifying, and managing material cybersecurity risks; (c) under § 229.106(c)(1), disclose the board of directors' oversight of cybersecurity risks, including any board committee responsible for such oversight; and (d) under § 229.106(c)(2), disclose management's role in assessing and managing cybersecurity risks, including the relevant expertise of the officers or committees responsible for cybersecurity risk.

216. The 2020 Privacy Order constitutes Meta's cybersecurity governance program within the meaning of 17 C.F.R. § 229.106(c). This is not an assertion that the Privacy Order and Meta's § 229.106 governance program are legally identical. It is an assertion that Meta's own SEC filings establish that the Privacy Order compliance program is the specific institutional mechanism Meta identified in its annual 10-K disclosures as constituting its cybersecurity governance program. In each annual 10-K from FY2020 through FY2024, Meta described the board oversight, independent assessment, and operational requirements of the 2020 Privacy Order as the substance of its cybersecurity governance structure. A company that represents its cybersecurity governance to investors in terms of a specific regulatory program cannot then argue, in litigation brought by a whistleblower who reported violations of that program, that the program is legally distinct from its § 229.106 disclosures. Meta's own disclosures establish the identity of the two programs. Because the Privacy Order compliance program is the specific institutional mechanism that Meta's 10-K cybersecurity governance disclosures describe and represent as functioning, every Privacy Order violation that Mr. Baig reported was, in his reasonable belief, simultaneously a report that the § 229.106(c) governance disclosures were materially false. Mr. Baig reasonably believed that the same failures independently falsified Meta's § 229.106(b)(1) disclosures: Meta's 10-K filings described processes for assessing and managing cybersecurity risks when WhatsApp had no functioning breach detection capability, no data inventory, and an active management policy of suppressing written



Deleted: COMPLAINT

compliance documentation. Mr. Baig reasonably believed that Meta's § 229.106(c)(1) disclosures were similarly falsified: the 2022 Proxy Statement represented that the Board's Privacy Committee "oversees the risks related to privacy and data use matters, including our compliance with the comprehensive privacy program that we adopted in compliance with our FTC consent order" — the identical compliance program Mr. Baig documented as materially non-functional, leaving the Board with no accurate information to oversee. Mr. Baig reasonably believed that Meta's § 229.106(c)(2) disclosures were independently falsified: Meta's annual 10-K filings represented that named security officers, including CISO Guy Rosen and Head of Engineering Defendant Gupta, were actively assessing and managing cybersecurity risks, when those officers had received Mr. Baig's detailed documentation of systemic failures and directed the suppression of that information rather than its remediation. Mr. Baig reasonably believed that the management responsible for cybersecurity risk was not assessing and managing risk; it was concealing it. These § 229.106(b)(1), (c)(1), and (c)(2) violations, as Mr. Baig reasonably believed them to be, are each independently actionable under § 1514A(a)(1)(C). The pre-codification SEC guidance in CF Disclosure Guidance Topic No. 2 (Oct. 13, 2011) and SEC Release No. 33-10459 (2018) established that material cybersecurity governance failures required disclosure in Exchange Act reports before the 2023 rule codified that obligation, confirming that Mr. Baig's earliest disclosures of Privacy Order violations implicated applicable SEC disclosure obligations from the outset.

217. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that Meta's failure to disclose the cybersecurity failures he had documented violated an SEC rule or regulation. Mr. Baig demonstrated this subjective belief by choosing to file his November 27, 2024 complaint with the SEC. Mr. Baig's subjective belief that Meta's cybersecurity disclosures violated 17 C.F.R. § 229.106 existed from the time of his September 2022 disclosures, meaning that Count 2's protected activity encompasses the full range of adverse employment actions taken against Mr. Baig from September 2022 onward.

218. Meta's 2024 10-K (for fiscal year 2024, fully subject to the new rules) failed to disclose material cybersecurity risks while representing that Meta was maintaining a comprehensive privacy

Deleted: COMPLAINT

program in compliance with the 2020 Privacy Order. Mr. Baig reasonably believed that this omission rendered the 10-K's cybersecurity disclosures materially misleading.

219. Mr. Baig's Form TCR was a protected disclosure to a "Federal regulatory or law enforcement agency" under § 1514A(a)(1)(A) of conduct that he subjectively and objectively reasonably believed violated 17 C.F.R. § 229.106 and its underlying statutory authority, Exchange Act Section 13(a), 15 U.S.C. § 78m(a). His November 4, 2024 written communication to Defendant Tsimelzon raising scraping incident reporting obligations was a precursor protected disclosure of the same underlying violations, and the reprimand he received for it establishes direct employer knowledge.

220. Mr. Baig's protected activity was a contributing factor — a standard more permissive than but-for causation — in the adverse employment actions described herein, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence. Each individually named Defendant knew of the protected activity underlying this Count: Defendant Zuckerberg received Mr. Baig's January 2, 2024 and December 4, 2024 letters identifying cybersecurity disclosure violations and was notified of the Form TCR filing; Defendant Cathcart directly received Mr. Baig's September 2022 pre-read and presentations documenting the cybersecurity failures at issue; Verma told Mr. Baig that Defendant Gupta threatened to terminate him for writing the September 2022 cybersecurity assessment and approved each subsequent retaliatory rating; Defendant Mukerji issued the April 2023 gag order approximately three weeks before the FTC show-cause proceeding and approved each retaliatory performance action through early 2024; and Defendant Tsimelzon reprimanded Mr. Baig on November 4, 2024 for raising the specific scraping incident reporting obligations that formed the subject of the Form TCR twenty-three days later. On November 27, 2024, Defendant Tsimelzon ordered deletion of the internal security report documenting those same compliance failures — an order issued before Mr. Baig filed his Form TCR with the SEC later that day, and one that contributed directly to his decision to file. Mr. Baig was terminated less than three months later. Defendant Mukerji's liability for adverse employment actions occurring after May 2024 — when he ceased to be Mr. Baig's direct supervisor — is established by the causal



Deleted: COMPLAINT

predicate theory set forth in ¶19 of this Complaint. The falsified retaliatory performance record Defendant Mukerji constructed from September 2022 through May 2024 was the direct and proximate causal predicate for every subsequent adverse employment action taken by Defendants Gupta and Tsimelzon: the August 2024 "Below Expectations" mid-year rating that formed the stated basis for termination was anchored in the retaliatory "Consistently Meets Expectations" ratings Mukerji issued in February 2023 and February 2024; the denial of promotions and equity in subsequent cycles was predicated on the retaliatory performance trajectory Mukerji established; and the February 10, 2025 termination was the terminal step in a retaliatory performance escalation that began with Mukerji's September 2022 downgrade. Under contributing-factor causation, a defendant who creates the false evidentiary predicate on which all subsequent adverse actions are built is a contributing cause of those actions even after his formal supervisory role has ended, because but for the falsified predicate record, no subsequent adverse action would have been available to his successors as supervisors. Defendant Mukerji's post-May 2024 liability under this Count is therefore established by the causal chain running from his retaliatory conduct to the termination decision carried out by Defendants Gupta and Tsimelzon, and by the tolling agreements described in ¶12 which preserve the full damages period through the date of termination. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

**COUNT 3 — Retaliation for Reporting Securities Fraud, Concealment of Regulatory Penalty Exposure, and False Proxy Disclosures**

**(15 U.S.C. §§ 78j(b) and 78m(a); Rules 10b-5(a), (b), and (c); 18 U.S.C. § 1348; 17 C.F.R. §§ 229.103, 229.105, 229.303(b)(2)(ii), and 210.4-01(a); 15 U.S.C. § 78n(a); Rule 14a-9; Rule 12b-20, Regulation FD, Regulation G, Item 10(e), Item 407, Item 402, Item 103, 229.106, § 18(a), § 20(a), § 11, § 906, Rules 13a-14, 13a-15 — Against All Defendants)**

221. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

222. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that Meta's annual SEC filings contained materially false and misleading representations regarding the

Deleted: COMPLAINT

company's compliance with the 2020 FTC Privacy Order, in violation of 15 U.S.C. § 78j(b), Rules 10b-5(a), (b), and (c) (17 C.F.R. §§ 240.10b-5(a), (b), and (c)) promulgated thereunder, 18 U.S.C. § 1348, and Exchange Act Section 13(a), 15 U.S.C. § 78m(a). Sub-provision (b) of Rule 10b-5 prohibits material misstatements and omissions; sub-provisions (a) and (c) independently prohibit any "device, scheme, or artifice to defraud" and any "act, practice, or course of business which operates or would operate as a fraud or deceit." Under *Lorenzo v. SEC*, 587 U.S. 71 (2019), Rules 10b-5(a) and (c) apply to any person who disseminates false information as part of a coordinated scheme to defraud investors, independent of whether that person made the misleading statements within the meaning of *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). Each named Defendant who falsified compliance records, ordered document deletion, or directed suppression of compliance documentation is liable under Rules 10b-5(a) and (c) as a scheme participant regardless of whether that Defendant personally signed or certified any SEC filing. Mr. Baig's subjective belief in the Rule 10b-5 violation rested on two distinct evidentiary anchors: first, his September 2022 pre-read document established his awareness of the underlying regulatory and financial exposure those failures created; second, his October 2022 circulation of the Twitter/SEC enforcement article established his specific understanding that the investor disclosure dimension of that exposure was the operative legal concern. Each of these three theories — the affirmative compliance misrepresentation theory, the penalty-concealment half-truth theory, and the cybersecurity risk posture false certification theory — is independently sufficient to establish protected activity; Count 3's securities fraud allegations do not rise or fall together.

223. Specifically, Mr. Baig believed the following representations in Meta's annual reports were materially false and misleading:

- Meta's repeated representation in each annual 10-K (FY2020 through FY2024) that it was "maintaining a comprehensive privacy program in connection with the FTC consent order" with "stringent operational requirements," when in fact WhatsApp was systematically non-compliant with the Order's core requirements.
- Meta's representation in each annual 10-K that it was maintaining "a process to regularly

Deleted: COMPLIANT

certify our compliance with the privacy program to the FTC," when compliance certifications were made on the basis of falsified security reports and omitted material Covered Incidents, including the mass daily scraping of user profile photos.

- Meta's representation in each annual 10-K that it maintained "regular assessments of our privacy program by an independent third-party assessor," when the inputs to those assessments were falsified by the X-Sec team.
- Meta's 2023 10-K half-truth: simultaneously disclosing the FTC's deficiency finding and asserting ongoing compliance program maintenance, creating the false impression that the FTC's concerns were limited to COPPA issues.
- Meta's failure in each annual 10-K to disclose, as required by Item 103 and ASC 450-20-50-3, the governmental proceedings known to be contemplated by the FTC, and the known and reasonably possible, and by FY2023 probable, material loss contingency created by those violations. This failure constituted a simultaneous violation of Regulation S-X Rule 4-01(a), 17 C.F.R. § 210.4-01(a), which requires that financial statements filed with the SEC be prepared in accordance with GAAP: the failure to accrue or disclose the loss contingency as required by ASC 450-20-25-2 and ASC 450-20-50-3 was a departure from GAAP and therefore an independent violation of Regulation S-X. Meta's failure to disclose the contingent FTC liability in its financial statement footnotes while representing in its MD&A that its compliance program was functioning was also a violation of Item 303(b)(2)(ii) of Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), which requires disclosure of any known trends or uncertainties that the registrant reasonably expects will have a material unfavorable impact on revenues or income from operations — the specific operative sub-provision of Item 303 most directly implicated by Meta's ongoing and escalating FTC compliance exposure.

224. Regulation S-X Rule 4-01(a), 17 C.F.R. § 210.4-01(a), provides a further independent predicate under § 1514A(a)(1)(C). Rule 4-01(a) requires that financial statements filed with the SEC comply with GAAP. Meta's annual 10-K financial statements failed to include required footnote disclosures of the FTC loss contingency under ASC 450-20-50-3, and failed to accrue the probable

Deleted: COMPLAINT

FTC liability under ASC 450-20-25-2. These departures from GAAP rendered Meta's filed financial statements non-compliant with Rule 4-01(a) independently of the Rule 10b-5 materiality analysis. Rule 4-01(a) is a rule of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). A reasonable person with his background, knowing that Meta had already paid $5 billion to the FTC for the same category of violation and was again accruing potential penalties under active FTC monitoring, would have recognized the omitted footnote disclosure as a GAAP violation and therefore a Regulation S-X violation.

225. In addition to the 10-K misrepresentations, Mr. Baig reasonably believed Meta's 2022 Proxy Statement contained materially false and misleading statements constituting an independent violation of Exchange Act Section 14(a), 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9. Meta's 2022 Proxy Statement represented that the Board's Privacy Committee "oversees the risks related to privacy and data use matters, including our compliance with the comprehensive privacy program that we adopted in compliance with our FTC consent order." Mr. Baig reasonably believed this representation was materially false for the same reasons he reasonably believed the corresponding 10-K representations were false: the Privacy Order compliance program identified as subject to rigorous Board oversight was not functioning as represented. Rule 14a-9 prohibits any statement in connection with a proxy solicitation that is false or misleading as to any material fact. Mr. Baig reasonably believed that the Board oversight representation was material to investors voting in the 2022 annual proxy solicitation, bearing directly on governance of Meta's primary compliance obligation and on the multi-billion-dollar penalty risk being concealed from investors. Section 14(a) and Rule 14a-9 are rules and regulations of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1), and Mr. Baig's internal disclosures documenting the non-functionality of the privacy program constituted protected disclosures of conduct he reasonably believed violated those provisions.

a. Exchange Act § 18(a), 15 U.S.C. § 78r(a), provides an independent and directly applicable predicate for Mr. Baig's protected activity with respect to each materially false statement contained in a filed SEC document. Section 18(a) imposes civil liability on any person who makes or causes to be made any false or misleading statement with respect to any material fact

Deleted: COMPLAINT

in any application, report, or document filed pursuant to the Exchange Act or any rule thereunder, in favor of any person who, in reliance on the statement, purchased or sold a security at a price affected by the statement. Each of Meta's annual Form 10-K filings from FY2020 through FY2024, each of Meta's quarterly Form 10-Q filings during the FY2022–FY2024 period, and each of Meta's DEF 14A proxy statements during the same period contained the privacy compliance representations, the disclosure controls "effective" conclusions, and the cybersecurity governance descriptions that Mr. Baig documented as materially false. Each such filing falls directly within § 18(a)'s scope as an "application, report, or document" filed pursuant to the Exchange Act. Defendant Zuckerberg's and CFO Li's Rule 13a-14(a) certifications — embedded within the annual 10-K and quarterly 10-Q filings as required exhibits — are themselves statements "made" within § 18(a) and independently actionable as false filed statements. Section 18(a) is a provision of the Exchange Act directly aimed at investor protection through the accuracy of filed statements, and violations of § 18(a) are "provision[s] of Federal law relating to fraud against shareholders" within the meaning of 18 U.S.C. § 1514A(a)(1). Mr. Baig's disclosures documenting the falsity of each filed statement — including the January 2, 2024 letter describing SEC rule violations, the December 4, 2024 letter stating verbatim that Meta's leadership was "not being truthful to the auditors and the regulators," and the November 2024 Form TCRs identifying "Material misstatement or omission in a company's public filings or financial statements, or a failure to file" — each constituted a protected disclosure of conduct he reasonably believed violated § 18(a) as to each specific filing on which those disclosures bore. The contributing-factor nexus between these disclosures and the adverse employment actions is established by the same temporal sequence pleaded for the Rule 10b-5(b) theory in this Count; Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in the absence of the protected activity reporting the § 18(a) violations.

b. Item 407 of Regulation S-K, 17 C.F.R. § 229.407, requires disclosure in each annual proxy statement of the audit committee's oversight activities, including whether the audit committee

Deleted: COMPLAINT

has reviewed and discussed financial statements with management and the independent auditor, confirmed auditor independence, and overseen internal controls processes. Meta's annual proxy statements represented that AROC actively oversaw cybersecurity and privacy compliance and provided independent board-level governance over the compliance program. Those representations were false: in May 2024, Defendant Gupta and Mehta presented AROC with a false positive from the JUNGLE exercise while concealing the actual data exfiltration findings; the internal auditor who had been escalating compliance failures to the AROC pipeline was no longer employed at Meta after providing accurate escalations; and the EECC audit findings were excised under institutional pressure before they could reach AROC. AROC could not provide the independent oversight that Item 407 required because management had ensured it received only information management chose to provide. Item 407 is a rule of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). Mr. Baig's reporting of the AROC false positive presentation and the systematic suppression of compliance findings from the AROC disclosure pipeline constituted protected disclosures of conduct he reasonably believed violated Item 407 and rendered Meta's proxy representations about AROC's oversight activities materially false in violation of Rule 14a-9.

c. Item 402 of Regulation S-K, 17 C.F.R. § 229.402, requires each annual proxy statement to disclose, in the Compensation Discussion and Analysis, the material information necessary to understand the registrant's compensation policies and decisions regarding its named executive officers — including the specific performance factors and metrics considered by the compensation committee in making compensation determinations and the individual performance evaluations on which grants and awards were based. Meta's annual proxy statements represented that the Compensation, Nominating & Governance Committee made executive compensation decisions based on accurate performance assessments reflecting each named officer's actual contributions to Meta's operational and financial performance. Those representations were materially false as applied to compensation decisions supported by the falsified performance metrics that Mr. Baig documented. As pleaded in Counts 3 and 4, Meta's



Deleted: COMPLAINT

PSC generated systematically falsified performance metrics across the engineering organization: the Shah team's false claim of $1.5 billion in SMS savings during 2024 supported a colleague's equity grant while the team member who had built the PCR solution recovering approximately 25,000 compromised WhatsApp accounts daily was denied a promotion; Mark Hatton's admission that the ATOs measured by his team were only a fraction of the actual ATOs confirmed that the operational metrics on which senior officer compensation rested were systematically understated; and Shah's verbatim statement that "this company runs on PSC" — combined with his confirmation that his team generated busy work or design Band-Aid solutions in order to comply with Meta's performance management process — established that the PSC-driven falsification was not limited to isolated teams but was structural. A reasonable person with Mr. Baig's insider access to the PSC record would have understood that Meta's Item 402 CD&A disclosures of the performance basis for named officer compensation were materially false because the performance metrics on which those compensation decisions rested were themselves falsified. Item 402 is a rule of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). Mr. Baig's reports of the PSC falsification scheme — made to internal investigators throughout 2024, to Defendant Zuckerberg in the January 2, 2024 and December 4, 2024 letters, and to the SEC in the November 27, 2024 Form TCR — constituted protected activity reporting conduct he reasonably believed violated Item 402 in addition to the Rule 13b2-1 and Rule 10b-5 predicates. The contributing-factor nexus is established by the August 2024 "Below Expectations" rating issued after Mr. Baig's mid-2024 disclosures of PSC metric falsification, and by the February 10, 2025 termination following the TCR filing that reported this conduct to the Commission.

226. The materiality of these misrepresentations cannot be reduced by characterizing WhatsApp as a small portion of Meta's business. The 2020 Privacy Order required a single comprehensive privacy program across all Meta platforms. The certifications at issue were enterprise-wide certifications by Meta's CEO. Moreover, the compliance failures Mr. Baig reported extended beyond WhatsApp to Facebook — Meta's primary advertising platform — where approximately

Deleted: COMPLAINT

250,000 daily account compromises were going unreported as Covered Incidents. A reasonable investor would consider it significant that the enterprise-wide compliance program, maintained at a cost of billions of dollars and under active FTC monitoring, did not function as represented across any of Meta's major platforms.

227. These representations were material to a reasonable investor. Meta had already paid $5 billion to the FTC arising from the very compliance failures that gave rise to the Order. The omission of the contingent liability from Meta's financial disclosures, while affirmatively representing a functioning compliance program, was material under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

228. Each individual Defendant named in this Count possessed personal knowledge of facts rendering Meta's investor-facing compliance representations false, establishing scienter as to each. Defendant Zuckerberg personally certified each annual 10-K under SOX §§ 302 and 906. He received Mr. Baig's January 2, 2024 letter approximately one month before certifying the FY2023 Form 10-K, specifically documenting that Meta's compliance representations were false — and certified that 10-K anyway. Defendant Cathcart directly received Mr. Baig's August, September, and October 2022 briefings, including the pre-read document and the Twitter/SEC enforcement article. Verma told Mr. Baig that Defendant Gupta threatened to fire him for writing the September 2022 cybersecurity assessment and stated on March 28, 2024 that "I will not let a security guy speak as we will have to shut down the network." Defendant Mukerji explicitly ordered Mr. Baig on April 14, 2023 to stop raising FTC Privacy Order concerns. Defendant Tsimelzon ordered the deletion of a security report earlier on the same day Mr. Baig later filed his SEC Form TCR, stating it would make the team look bad to leadership.

a. Defendant Zuckerberg's scienter with respect to the materially false certifications described in this Count is further established by the criminal liability exposure he incurred through his SOX § 906 certifications. Unlike the SOX § 302 certifications under Rule 13a-14(a) — which require the officer to certify "based on the officer's knowledge" — SOX § 906, codified at 18 U.S.C. § 1350, requires the CEO to certify that the annual report "fully complies" with the requirements of the Securities Exchange Act and "fairly presents, in all material respects, the

Deleted: COMPLAINT

financial condition and results of operations of the issuer," without the knowledge qualifier. A willful violation of § 906 carries criminal penalties of up to $5 million and imprisonment of up to 20 years under 18 U.S.C. § 1350(c)(2). Defendant Zuckerberg signed § 906 certifications accompanying each of the FY2021, FY2022, FY2023, and FY2024 annual reports — certifications that imposed personal criminal liability on him if the reports did not "fairly present[]" Meta's financial condition. After receiving Mr. Baig's January 2, 2024 letter specifically identifying ongoing Privacy Order violations, falsified security reports, and approximately 250,000 daily Facebook account compromises going unreported as Covered Incidents, Defendant Zuckerberg certified the FY2023 Form 10-K under § 906 approximately one month later — representing that the report "fairly presents, in all material respects," the financial condition of an issuer whose compliance program he had just been told in writing was non-existent. His awareness that certifying the FY2023 Form 10-K exposed him to potential criminal liability under § 1350(c)(2) — having been placed on specific written notice of the falsity of the representations the certification would cover — establishes the highest level of scienter available in a civil action: a named officer who certifies that a report "fairly presents" the issuer's financial condition with specific written knowledge of material misstatements is not negligent or reckless; he is acting with the knowing intent that § 1350(c)(2) recognizes as grounds for criminal prosecution. This criminal certification scienter is independently sufficient to support the securities fraud theory under 18 U.S.C. § 1348, which requires only knowing execution of a scheme to defraud in connection with a registered security.

229. Mr. Baig reported the concerns described above — which he reasonably believed constituted securities fraud — through his internal disclosures beginning in September 2022, his January 2, 2024 letter to Defendant Zuckerberg, his September 30 and November 4, 2024 disclosures regarding scraping incident under-reporting, and his November 2024 Form TCR filing with the SEC. Each of these disclosures constituted protected activity under 18 U.S.C. § 1514A(a)(1), and each was followed by further adverse employment actions, culminating in termination. Mr. Baig's protected activity was a contributing factor — a standard more permissive than but-for causation — in each

Deleted: COMPLAINT¶

adverse employment action, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

a. In addition to the compliance program misrepresentation theory set forth above, Count 3's Rule 10b-5(b) and 18 U.S.C. § 1348 theories rest on two independently actionable half-truth theories that require no inference from the FTC-to-SEC pipeline. First, in August 2022, WhatsApp Product Head Ami Vora publicly stated that "We believe WhatsApp is the most secure place to have a private conversation." This statement was made contemporaneously with Mr. Baig's circulation of his pre-read document to senior WhatsApp leadership specifically documenting that WhatsApp had no real-time breach detection capability, that approximately 1,500 engineers had unrestricted access to user data without documented business need, and that approximately 100,000 user accounts were being compromised daily. The Vora statement is a named, officer-made, dated public representation of security posture made with direct contemporaneous internal knowledge of contrary facts — the precise category of half-truth the Ninth Circuit recognized as independently actionable under Rule 10b-5(b) in *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947–50 (9th Cir. 2023), and *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021). Second, Meta's FY2023 and FY2024 Forms 10-K affirmatively represented that Meta "did not identify any cybersecurity threats that have materially affected or are reasonably likely to materially affect our business strategy, results of operations, or financial condition." The FY2023 Form 10-K was certified by Defendant Zuckerberg approximately one month after he received Mr. Baig's January 2, 2024 letter specifically documenting multiple structural cybersecurity failures that had already materially affected WhatsApp's compliance posture. The FY2024 Form 10-K was certified approximately two months after his receipt of Mr. Baig's December 4, 2024 letter stating that Meta's leadership was "not being truthful to the auditors and the regulators." The JUNGLE red team exercise completed in May 2024 had confirmed precisely the category of material data exfiltration threat that the FY2023 and FY2024 filings represented as unidentified, and Defendant Gupta's own

Deleted: COMPLAINT

statement upon receiving the JUNGLE findings that they "have known about these issues for a long time" establishes that the affirmative "did not identify" representation was known to be false at the time of certification. An affirmative representation that no material cybersecurity threat has been identified, made by officers who possessed detailed documentation of multiple structural threats, is independently actionable as a Rule 10b-5(b) half-truth under *In re Facebook*, 87 F.4th at 950, without resort to the FTC-to-SEC pipeline inference. Mr. Baig's disclosures to Defendants Cathcart, Gupta, Mukerji, and Tsimelzon, and his letters to Defendant Zuckerberg, are the specific communications that put named officers on notice of the documented facts each affirmative representation concealed. The contributing-factor causation chains for these two half-truth theories operate independently and have distinct temporal anchors. For the Vora half-truth theory: Mr. Baig's August 18, 2022 disclosure to Defendant Cathcart, his September 2022 pre-read, and October 18, 2022 presentation — the specific communications that documented the falsity of the "most secure" representation at the time it was being made — were followed within three days by the first negative performance feedback of Mr. Baig's career, within seven weeks by the November 14, 2022 verbal warning issued with documented procedural defects, and within six months by the February 2023 "Consistently Meets Expectations" rating that denied Mr. Baig the "Greatly Exceeds" trajectory Defendant Mukerji had previously acknowledged was within reach; each of these adverse actions followed directly from protected disclosures whose subject matter rendered the Vora public representation a Rule 10b-5(b) half-truth. For the "did not identify" risk factor theory: Mr. Baig's January 2, 2024 letter to Defendant Zuckerberg — received approximately one month before the FY2023 Form 10-K certified that no material cybersecurity threat had been identified — was followed within approximately six weeks by the February 2024 "Consistently Meets Expectations" rating; and Mr. Baig's December 4, 2024 letter — received approximately two months before the FY2024 Form 10-K carried the same false representation — was followed within twelve days of the FY2024 certification by his February 10, 2025 termination.

b. The temporal proximity between each protected disclosure and the adverse employment action

Deleted: COMPLAINT

that followed it is sufficient under *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009), to raise an inference of contributing-factor causation for each theory independently. Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in the absence of those disclosures.

c. Count 3's predicate SEC rule violations additionally encompass Meta's WhatsApp revenue attribution methodology as a violation of Regulation G, 17 C.F.R. Part 244, and Item 10(e) of Regulation S-K, 17 C.F.R. § 229.10(e), each of which is a rule or regulation of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). Meta's internal revenue attribution methodology for WhatsApp credits advertising revenue generated on Facebook and Instagram — when business customers elect to receive customer inquiries through WhatsApp — to WhatsApp's internal revenue contribution, even though WhatsApp generated no portion of the underlying advertising spend. When presented to investors as a measure of WhatsApp's revenue contribution without GAAP reconciliation and without disclosure of the non-standard attribution convention, this methodology violated Regulation G's requirement that non-GAAP financial measures be accompanied by the most directly comparable GAAP measure and a quantitative reconciliation, and Item 10(e)'s identical requirement for non-GAAP measures appearing in SEC filings. The misleading character of the methodology is compounded by its concealment of WhatsApp's actual operating economics: Mr. Baig documented that WhatsApp operated at an annual loss of approximately $3 to $4 billion, and that Meta committed approximately $300 million in marketing expenditure to grow WhatsApp's United States daily active user base while internally acknowledging that no credible monetization strategy existed for those users. In his January 2, 2024 letter to Defendant Zuckerberg and employment subsequent investigations, Mr. Baig specifically identified the financial misrepresentations embedded in Meta's investor-facing characterization of WhatsApp's business trajectory. A reasonable person with Mr. Baig's insider access to WhatsApp's internal financial reporting, who documented that WhatsApp operated at a substantial annual loss while Meta attributed advertising revenue to it through a non-standard convention not disclosed to investors, would

Deleted: COMPLAINT

have objectively reasonable grounds to believe those presentations violated applicable SEC financial disclosure rules. Mr. Baig's protected activity in reporting these financial misrepresentations was a contributing factor in the adverse employment actions taken against him. Specifically: his January 2, 2024 letter and related employment investigations to Defendant Zuckerberg was received by Defendant Zuckerberg approximately six weeks before the February 2024 "Consistently Meets Expectations" rating that denied Mr. Baig a promotion and equity; and it was received approximately seven months before the "Below Expectations" mid-year rating in August 2024 that formed the stated basis for his ultimate termination. Defendant Zuckerberg's knowledge of this protected activity is established by his direct receipt of the January 2, 2024 letter. Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence.

d. The WhatsApp revenue attribution methodology described in the preceding sub-paragraph's Regulation G and Item 10(e) theory independently violates Accounting Standards Codification 606 — the governing GAAP standard for revenue recognition — and therefore independently violates Regulation S-X Rule 4-01(a), 17 C.F.R. § 210.4-01(a), which requires that financial statements filed with the SEC be prepared in accordance with GAAP. ASC 606 requires revenue to be recognized in a manner that reflects the transfer of promised goods or services to customers in an amount that reflects the consideration the entity expects to receive in exchange for those goods or services. Under ASC 606, revenue is attributable to the performance obligation that generates it, not to downstream delivery channels or customer-communication preferences. When a business customer purchases advertising on Facebook or Instagram — paying advertising consideration for the delivery of advertising impressions through those platforms — the revenue generated is attributable under ASC 606 to the Facebook and Instagram advertising performance obligations, not to WhatsApp. WhatsApp's subsequent role as the customer-communication channel through which the business customer receives inquiries from the advertising does not alter the revenue attribution, because WhatsApp did not generate the advertising performance obligation for which the customer paid consideration.

Deleted: COMPLAINT

Meta's internal revenue attribution methodology — crediting Facebook and Instagram advertising revenue to WhatsApp based on the business customer's election of WhatsApp as the customer-communication channel — therefore departs from ASC 606's revenue attribution principles, rendering any financial statement or investor-facing disclosure that presents WhatsApp's attributed revenue as a GAAP-compliant revenue measure non-compliant with GAAP and therefore non-compliant with Regulation S-X Rule 4-01(a). A reasonable person with Mr. Baig's insider access to WhatsApp's internal financial reporting — including his documentation that WhatsApp operated at an annual loss of approximately $3 to $4 billion while Meta attributed advertising revenue to it through the non-standard attribution convention — would have understood that the underlying GAAP violation under ASC 606 rendered any presentation of WhatsApp attributed revenue as a GAAP-compliant measure materially false under Rule 4-01(a), in addition to the Regulation G and Item 10(e) non-GAAP reconciliation violations pleaded in the preceding sub-paragraph. ASC 606 provides the GAAP grounding for the Regulation G and Item 10(e) theories: the attribution convention is not merely a non-GAAP presentation requiring reconciliation, it is a departure from GAAP revenue recognition principles rendering any financial statement presentation of the attributed revenue figure materially misstated. Mr. Baig's reports of the financial misrepresentations embedded in Meta's investor-facing characterization of WhatsApp's business trajectory — made in the January 2, 2024 letter to Defendant Zuckerberg and in the subsequent 2024 investigative interviews described above — constituted protected disclosures of conduct he reasonably believed violated ASC 606 and Regulation S-X Rule 4-01(a) in addition to the Regulation G and Item 10(e) predicates already pleaded. The contributing-factor nexus between these disclosures and the adverse employment actions is established by the same temporal sequence pleaded for the Regulation G theory in the preceding sub-paragraph.

e. Count 3's Rule 10b-5 theories are further supported by Meta's violation of Regulation FD, 17 C.F.R. § 243.100, which prohibits a publicly traded company from making selective disclosures of material nonpublic information in a manner that creates a materially misleading

Deleted: COMPLIANT

impression of the company's situation in the market. In January 2025, Meta publicly disclosed that Paragon Solutions, a commercial spyware vendor, had attacked approximately 80 WhatsApp users — identifying the threat actor, the approximate number of affected users, and the nature of the attack with specificity and apparent transparency. This public disclosure created an investor-facing impression of robust security diligence and responsive incident management at WhatsApp. At the same time, Meta was concealing from investors and the FTC the approximately 500,000 daily WhatsApp account compromises that Mr. Baig had been documenting and reporting throughout his employment as Covered Incidents under Part IX of the 2020 Privacy Order — each constituting unauthorized access to Covered Information on a scale approximately 6,000 times greater per day than the disclosed Paragon attack. The juxtaposition of a transparent, specific disclosure about an isolated, externally-attributed attack against the systematic concealment of a far larger ongoing compromise pattern rendered the Paragon disclosure an affirmatively misleading half-truth under the doctrine of *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988): by choosing to disclose one category of security incident with specificity while concealing another category that was structurally rooted and substantially more material, Meta communicated a false picture of its security posture to investors relying on the total mix of available information. Regulation FD is a rule of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). Mr. Baig's reports of the concealed daily compromises — specifically including his January 2, 2024 letter to Defendant Zuckerberg documenting 250,000 daily Facebook ATOs and 100,000 daily WhatsApp ATOs, his September 30 and November 4, 2024 disclosures regarding the 400 million daily profile photo scraping events, and his Form TCR filings — were disclosures of the nonpublic information whose concealment rendered the Paragon disclosure misleading. Those disclosures were a contributing factor in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in their absence.

f. The audit obstruction conduct alleged in this Count independently impaired the ability of Ernst

Deleted: COMPLAINT

& Young LLP (EY) to conduct Meta's integrated audit in compliance with PCAOB Auditing Standard AS 2201, which governs the audit of internal control over financial reporting required by SOX § 404. AS 2201 requires the auditor to identify significant deficiencies and material weaknesses in ICFR by obtaining evidence about the operating effectiveness of internal controls through inspection of documentation, observation, and inquiry of management. Management's provision of falsified security reports, blockage of compliance audits, and verbal suppression of compliance documentation ensured that EY's AS 2201 procedures were conducted on systematically false inputs — preventing EY from identifying the significant deficiencies and material weaknesses in Meta's disclosure controls that would have required disclosure in the auditor's SOX § 404 attestation. PCAOB auditing standards are promulgated under SEC authority pursuant to SOX Title I, and impairment of a PCAOB-mandated integrated audit through deliberate provision of false information to the auditor constitutes a violation of "any provision of Federal law relating to fraud against shareholders" within the meaning of § 1514A(a)(1), because the AS 2201 attestation process exists specifically to protect investors from material misstatements in management's ICFR representations. Mr. Baig's reports of falsified security reports provided to the independent assessor, blocked compliance audits, and verbal suppression of compliance documentation were therefore simultaneously reports of conduct impairing the AS 2201 integrated audit process — an additional protected-activity predicate for the audit obstruction conduct alleged in this Count.

g. Defendant Zuckerberg's testimony before the Senate Committee on the Judiciary on January 31, 2024 constitutes a further independently actionable element of Count 3's Rule 10b-5(b) and 18 U.S.C. § 1348 theories. Congressional testimony by the CEO of a publicly traded company about its security practices, when widely publicized and relied upon by investors as a representation of the company's operational capabilities, constitutes a statement "in connection with the purchase or sale of any security" within the meaning of Rule 10b-5(b). Mr. Baig had documented since September 2021 that WhatsApp had no real-time breach detection capability, no SOC, no comprehensive data inventory, and no audit trail of employee access to Covered

Deleted: COMPLAINT

Information — not industry-leading tools. Defendant Zuckerberg's congressional testimony was made with knowledge of those facts, establishing scienter at the highest level of the issuer. Section 18(a) of the Exchange Act, 15 U.S.C. § 78r(a), separately imposes civil liability for false and misleading statements made in any document filed with the Commission; while Zuckerberg's congressional testimony is not itself an Exchange Act filing, the same false narrative was simultaneously embedded in Meta's annual 10-K certifications and quarterly filings — making every false public statement about Meta's security capabilities part of a unified scheme in which the congressional testimony and the SEC filings were mutually reinforcing instruments. Under *Lorenzo v. SEC*, 587 U.S. 71 (2019), and Rules 10b-5(a) and (c), each participant in a scheme involving the dissemination of false information is independently liable regardless of whether that participant personally made the misleading statements in SEC filings; Defendant Zuckerberg's congressional testimony disseminating a false narrative is an element of that scheme. Mr. Baig's January 2, 2024 letter to Defendant Zuckerberg — which documented the factual falsity of that narrative with precise technical detail — was a protected disclosure of the false congressional representation within the meaning of 18 U.S.C. § 1514A(a)(1)(C). That protected activity was a contributing factor in the termination and prior adverse actions; Defendant Zuckerberg's personal receipt of the letter establishes his knowledge.

h. Count 3's predicate violations encompass three independent applications of Rule 12b-20, 17 C.F.R. § 240.12b-20, which provides: "In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." Rule 12b-20 is a rule of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1) and provides a textually independent basis for the omission theories advanced elsewhere in this Count. First: Meta's risk factor disclosures characterized cybersecurity threats as occasional and hypothetical using language such as "could harm our reputation" and "from time to time" — omitting the material information necessary to make

Deleted: COMPLAINT

those disclosures non-misleading, specifically that daily account compromises were a daily certainty at the scale of 100,000 WhatsApp ATOs and 250,000 Facebook ATOs, and that the organizational response to that certainty was a documented management decision to accept the risk rather than remediate it. Rule 12b-20 required Meta to add that further material information to make its risk factor disclosures non-misleading; Mr. Baig's internal reports specifically documented the daily certainty that those disclosures characterized as contingent. Second: Meta's description of the 2020 Privacy Order compliance program in its annual 10-K filings omitted the material fact that the FTC-designated independent assessor was evaluating falsified security reports generated by the X-Sec team rather than accurate compliance documentation; Rule 12b-20 required Meta to add that information to make its description of the independent assessment process non-misleading. Third: Meta's Item 106 description of its cybersecurity risk management processes omitted the material fact that management had explicitly directed the Head of Security not to create written records of compliance failures — a verbal prohibition enforced by multiple supervisors throughout the period covered by each filing; a company cannot describe its risk management processes non-misleadingly while omitting that it has prohibited its Head of Security from documenting the risks he is responsible for identifying. Mr. Baig reported each of these omitted facts through his internal disclosures, his letters to Defendant Zuckerberg, and his Form TCR filings; each constituted protected activity reporting violations of Rule 12b-20 and Exchange Act § 78m(a). Those disclosures were a contributing factor in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in their absence.

i. Count 3's Rule 10b-5(a) and (c) scheme theories encompass the structural fraud mechanism created by Meta's PSC, which systematically incentivized performance metrics falsification across the engineering organization and generated the false inputs for investor-facing operational representations. The factual record establishes the structural scheme with documentary specificity: Mark Hatton expressly admitted on January 29, 2025 that the ATOs



Deleted: COMPLAINT

measured by his team were only a fraction of the actual ATOs; Defendant Gupta wrote on January 17, 2024 that ATO remediation was not a priority for the company; on March 26, 2024, Hatton stated "If the security team fixes this [ATOs], then what will we do?" — acknowledging that maintaining the ATO problem served his team's institutional incentive for existence; Parth Shah's team falsely claimed $1.5 billion in SMS cost savings in 2024 when actual expenditure was essentially flat; and Parth Shah confirmed that his team needed to generate busy work or design Band-Aid solutions in order to comply with Meta's performance management process, stating verbatim that "this company runs on PSC." These are not isolated bad acts by individual employees — they are documented institutional behaviors, confirmed in writing in Meta's own performance management system and communications tools, establishing that the PSC system structurally rewarded false metric reporting by eliminating the institutional incentive to remediate security failures that justified team existence and generated favorable ratings. The scheme operated as follows: PSC incentives rewarded teams for metrics that demonstrated active security threat management, creating institutional pressure to maintain rather than remediate the security failures generating those threats; falsified metrics were incorporated into management's operational reporting; that reporting fed into the investor-facing operational representations in Meta's quarterly earnings calls and SEC filings representing security programs as functioning and effective; and those false representations maintained Meta's stock price at artificially inflated levels, benefiting the equity-based compensation — including RSUs — of the named officer-defendants. Under *Lorenzo v. SEC*, 587 U.S. 71 (2019), and Rules 10b-5(a) and (c), each officer-defendant who directed, participated in, or benefited from this structural falsification scheme is independently liable as a scheme participant regardless of whether that officer personally signed or certified any specific false statement. Mr. Baig reported the PSC metrics falsification scheme through his internal disclosures, his January 2, 2024 letter to Defendant Zuckerberg, investigative interviews, and Form TCR filings throughout his employment; those disclosures were a contributing factor in the adverse employment actions taken against him, and Defendants cannot demonstrate by

Deleted: COMPLAINT

clear and convincing evidence that they would have taken the same actions in their absence.

j. A further independently actionable Rule 10b-5(b) half-truth predicate arises from Meta's investor-facing representations about WhatsApp's user growth strategy and the security conditions under which that growth was being pursued. Meta's annual reports and earnings calls represented that WhatsApp was growing its user base — including through the WAFFLE project allowing Facebook and Instagram credential-based login — without disclosing that this growth strategy was being executed by deliberately relaxing the security controls that WhatsApp was simultaneously representing to investors and the FTC as maintained. Mr. Baig documented the specific mechanism: Kabir Merali, Product Manager for WhatsApp Integrity, told Mr. Baig that WhatsApp must relax the account security controls to achieve its U.S. user growth marketing targets — a directive to the Head of Security that the growth strategy required compromising the security controls Meta was simultaneously certifying as effective. The WAFFLE project concretized this tradeoff: Mr. Baig's team documented in a formal risk assessment that WhatsApp accounts using Facebook credentials would be four times more likely to be compromised through account takeover — a fourfold ATO risk increase — and leadership suppressed that risk assessment, reassigned the project architecture to a colleague who had sought to reduce the stated risk, and launched the project without disclosing the fourfold increase to investors. Meta's FY2023 and FY2024 Forms 10-K represented that Meta had "did not identify any cybersecurity threats that have materially affected or are reasonably likely to materially affect our business strategy, results of operations, or financial condition" — while internal documentation established that its primary user growth project was deliberately structured to increase the account compromise rate fourfold and that its Head of Security had been stripped of architectural responsibility for warning that it would do so. An investor-facing representation that no material cybersecurity threat bearing on business strategy had been identified, made by officers who had received and suppressed a formal risk assessment showing a fourfold ATO increase from a major growth project, is an actionable half-truth under *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947–50 (9th Cir. 2023). Mr. Baig's documentation of

Deleted: COMPLAINT

the security relaxation directive and his resistance to suppression of the WAFFLE risk assessment constituted protected disclosures of these half-truths; those disclosures were a contributing factor in the adverse employment actions taken against him, including specifically his removal from WAFFLE architectural responsibility and the August 2024 "Below Expectations" rating, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in their absence.

k. Count 3's penalty-concealment theories encompass Meta's concealment from investors of the European regulatory penalty exposure arising from the same Privacy Order violations Mr. Baig was reporting. In May 2023, the Irish DPC issued Meta Ireland a €1.2 billion administrative fine — the largest GDPR fine in the history of the European Union at the time of issuance. In 2022, the DPC had separately imposed more than €600 million in additional GDPR fines on Meta for other data processing violations. In September 2021, the DPC had fined WhatsApp Ireland €225 million for failing to adequately inform users about how their data was processed and shared within the Meta group of companies. These three European enforcement actions — totaling more than €2 billion in penalties — arose from the same category of data access and transparency failures that Mr. Baig was documenting under the 2020 Privacy Order: unrestricted employee access to Covered Information, the false Uber Commitment to the IDPC, and the systematic failure to inform users or regulators about data processing practices. Meta's annual 10-K filings disclosed these individual penalties in their legal proceedings sections, but did not disclose — as required by Item 103, Item 105, and ASC 450-20-50-3 — the aggregate ongoing European regulatory penalty exposure that the same compliance failures generating those past penalties were continuing to create. Item 103(c)(3)(iii) specifically requires disclosure of any governmental proceeding in which monetary sanctions could exceed $300,000; the aggregate European enforcement risk from ongoing Privacy Order non-compliance, documented by Mr. Baig and reported in his internal disclosures and Zuckerberg letters, far exceeded that threshold. The combined FTC and GDPR enforcement exposure — which together represented potential penalties well exceeding the $5 billion FTC settlement

Deleted: COMPLAINT

that had already occurred — was the known trend or uncertainty reasonably expected to have a material "unfavorable impact" on revenues or income from continuing operations that Item 303(b)(2)(ii) of Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), required Meta to disclose in its MD&A. By disclosing past GDPR fines as isolated items in the legal proceedings footnote while representing in the MD&A that the compliance program was functioning, Meta created a materially misleading picture of the total regulatory risk profile to which its ongoing non-compliance exposed investors — a half-truth that violated Rule 10b-5(b) and Item 303(b)(2)(ii). Mr. Baig's disclosures of the Privacy Order violations that were simultaneously generating FTC and GDPR enforcement exposure constituted protected activity reporting these violations of Items 103, 105, and 303 and Rule 10b-5(b); those disclosures were a contributing factor in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in their absence.

**COUNT 4 — Retaliation for Reporting Falsification of Records and False Statements to Auditors**

**(15 U.S.C. §§ 78m(a) and (b)(2)(A); 17 C.F.R. §§ 240.13b2-1 and 240.13b2-2 — Against All Defendants)**

230. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

231. SEC Rule 13b2-1, 17 C.F.R. § 240.13b2-1, provides: "No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." Section 13(b)(2)(A) requires every Exchange Act reporting issuer to make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. Rule 13b2-1 applies to any person and requires no showing of scienter.

232. The security reports generated by Meta's X-Sec team to document the state of WhatsApp's cybersecurity and privacy compliance program were books and records subject to Section

Deleted: COMPLIANT

13(b)(2)(A). Meta's privacy compliance program is an issuer asset: its existence was acquired at a cost of billions of dollars, it is required to be maintained as a condition of operating Meta's platforms free from further government restrictions, and its status is affirmatively represented to investors in every annual 10-K. Falsified security reports that misrepresented the status of the program, concealing the true extent of the program's deficiencies from compliance personnel and oversight auditors, falsified books and records subject to Section 13(b)(2)(A) in violation of Rule 13b2-1.

233. SEC Rule 13b2-2(a), 17 C.F.R. § 240.13b2-2(a), prohibits any director or officer of an issuer from making or causing to be made a materially false or misleading statement to an accountant in connection with any audit, review, or examination of the financial statements of the issuer or the preparation or filing of any document or report required to be filed with the Commission. Falsified security reports provided to internal compliance personnel and the FTC assessor, and the verbal suppression of accurate compliance documentation, were calculated to ensure that the only information available to support management's certifications was false and incomplete, constituting materially false or misleading statements to an accountant in connection with the preparation of required SEC filings within the meaning of Rule 13b2-2(a).

234. To the extent Rule 9(b) of the Federal Rules of Civil Procedure applies to the falsification allegations underlying this Count, *Van Asdale*'s reasonable-belief standard governs and does not require Rule 9(b) particularity as to the predicate violation. *Van Asdale*, 577 F.3d at 1000–01. To the extent particularity is nonetheless required, it is satisfied: the X-Sec team is identified as the source of the falsified reports; the reports concerned WhatsApp's cybersecurity program status; the falsity consisted of representing security controls as functioning when Mr. Baig's direct technical assessments established they did not exist; the reports were provided to compliance oversight personnel and the FTC-designated assessor; and the suppression of accurate documentation occurred throughout the period from September 2022 through November 2024.

235. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that the conduct described below violated 15 U.S.C. § 78m(b)(2)(A), 15 U.S.C. § 78m(a), and Rules 13b2-1 and 13b2-2(a). Exchange Act Section 13(b)(2)(A), 15 U.S.C. § 78m(b)(2)(A), is the underlying

Deleted: COMPLAINT

statutory provision that Rule 13b2-1 implements: it requires every Exchange Act reporting issuer to make and keep books, records, and accounts that accurately and fairly reflect the transactions and dispositions of the assets of the issuer. The falsified security assessment reports generated by the X-Sec team violated § 78m(b)(2)(A) directly, independently of the implementing rule. Exchange Act Section 13(a), 15 U.S.C. § 78m(a), provides a further independent basis: the falsified reports that formed the foundation for Meta's annual 10-K compliance representations caused those required periodic reports to be inaccurate. His subjective belief is established by his January 2, 2024 and December 4, 2024 letters to Defendant Zuckerberg, which described violations of SEC rules and regulations, including rules relating to falsification of records, and warned that such conduct "can result in criminal penalties." Mr. Baig documented and reported:

- The X-Sec team, under the direction of supervisors including Defendant Tsimelzon, generated falsified security reports that misrepresented the status of WhatsApp's cybersecurity program and were used to mislead internal oversight personnel and the independent third-party assessor. This constitutes falsification of records subject to Section 13(b)(2)(A) within the meaning of Rule 13b2-1.
- Meta officers and directors blocked internal audits of cybersecurity controls, including the AROC and EECC audits Mr. Baig was scheduled to conduct, while simultaneously certifying to the SEC that Meta's "internal audit function provides independent assessment and assurance." This constitutes making materially false or misleading statements in connection with the preparation of required SEC filings within the meaning of Rule 13b2-2(a).
- Supervisors verbally ordered Mr. Baig not to create written records of compliance failures, specifically to prevent accurate documentation from reaching internal or external auditors. This constitutes directly causing the falsification or concealment of records subject to Section 13(b)(2)(A) within the meaning of Rule 13b2-1.
- In late 2024, a performance cycle team led by Parth Shah falsely claimed to have saved $1.5 billion in SMS expenditure during 2024 when WhatsApp's actual SMS spend had remained essentially flat throughout the year. This false performance claim was used to support a

Deleted: COMPLAINT¶

colleague's promotion while Defendants Tsimelzon, Gupta, and Brouwer simultaneously denied a promotion to a member of Mr. Baig's team who had built a documented security solution. Mr. Baig reported the false metrics claim to Meta's internal investigators throughout 2024. This false performance metric is an independent, specifically identified example of falsified records subject to Section 13(b)(2)(A) within the meaning of Rule 13b2-1, and demonstrates that the PSC-driven falsification of performance records was not limited to X-Sec security assessment reports but operated systemically across the engineering teams whose work supported Meta's investor-facing representations about operational efficiency and security compliance.

a. The falsification of PSC metrics described above constitutes an independent and standalone violation of Exchange Act § 13(b)(2)(A), 15 U.S.C. § 78m(b)(2)(A), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1, for a reason that extends beyond the specific Shah false savings claim to the structural architecture of Meta's performance management system. Section 13(b)(2)(A) requires every Exchange Act reporting issuer to make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. PSC records — including the formal performance ratings, the written feedback documentation, the PSC-cycle metric submissions, and the RSU grant determinations made on the basis of those records — constitute "books, records, and accounts" within the meaning of § 13(b)(2)(A) because they record the terms on which compensation assets of the issuer (equity grants and cash bonuses) are disposed of to employees. When those records are falsified — whether by inflating PSC metrics to support unearned promotions, by deflating them to support retaliatory performance downgrades, or by submitting false savings claims as the basis for equity grant decisions — the resulting records do not "accurately and fairly reflect the transactions and dispositions of the assets of the issuer" as § 13(b)(2)(A) requires. Specifically: the false claim by Parth Shah's team of $1.5 billion in SMS savings in 2024, used to support a colleague's equity grant while simultaneously denying an equity grant to Mr. Baig's team member who built a functioning security solution, is a documented § 13(b)(2)(A)

Deleted: COMPLAINT¶

violation — the books and records of Meta's compensation system falsely reflect that the Shah team generated $1.5 billion in documented value, when the actual SMS expenditure was essentially flat. The retaliatory performance downgrades issued to Mr. Baig by Defendants Mukerji and Tsimelzon are independently § 13(b)(2)(A) violations — the PSC records falsely reflect that Mr. Baig's performance declined from "Greatly Exceeds" to "Consistently Meets" to "Below Expectations" as a result of genuine performance assessment, when in fact the records were falsified to construct a pretext for termination. Mr. Baig's reports of these specific PSC falsifications to Meta's internal investigators and to leadership throughout his employment — including the Shah false savings claim reported repeatedly through 2024 — constituted protected disclosures under § 1514A(a)(1)(C) as reports of conduct violating § 13(b)(2)(A) and Rule 13b2-1.

236. The Ninth Circuit has confirmed that SEC administrative rules directly implementing Section 13(b)(2) of the Exchange Act, including Rules 13b2-1 and 13b2-2, are rules or regulations of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). *Wadler v. Bio-Rad Labs., Inc.*, 916 F.3d 1176, 1187 (9th Cir. 2019).

237. Mr. Baig's protected activity reporting these violations was a contributing factor — a standard more permissive than but-for causation — in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence. Defendant Zuckerberg's knowledge is established by the January 2, 2024 letter, which expressly described SEC falsification-of-records violations and was received approximately one month before the FY2023 Form 10-K certification. Defendant Cathcart's knowledge is established by his personal request for the September 2022 pre-read document that described nonexistence of the comprehensive privacy program, and by his attendance at the subsequent senior leadership presentation at which those practices were detailed; he received this disclosure in August and September 2022 — earlier than any other Defendant — and thereafter approved the first retaliatory performance downgrade. Defendants Gupta, Tsimelzon, and Mukerji's knowledge is established by their direct receipt of and participation in the retaliatory response to each disclosure.

Deleted: COMPLAINT

Defendant Mukerji's liability for adverse employment actions occurring after May 2024 — when he ceased to be Mr. Baig's direct supervisor — is established by the causal predicate theory set forth in ¶19 of this Complaint. The falsified retaliatory performance record Defendant Mukerji constructed from September 2022 through May 2024 was the direct and proximate causal predicate for every subsequent adverse employment action taken by Defendants Gupta and Tsimelzon: the August 2024 "Below Expectations" mid-year rating that formed the stated basis for termination was anchored in the retaliatory "Consistently Meets Expectations" ratings Mukerji issued in February 2023 and February 2024; the denial of promotions and equity in subsequent cycles was predicated on the retaliatory performance trajectory Mukerji established; and the February 10, 2025 termination was the terminal step in a retaliatory performance escalation that began with Mukerji's September 2022 downgrade. Under contributing-factor causation, a defendant who creates the false evidentiary predicate on which all subsequent adverse actions are built is a contributing cause of those actions even after his formal supervisory role has ended, because but for the falsified predicate record, no subsequent adverse action would have been available to his successors as supervisors. Defendant Mukerji's post-May 2024 liability under this Count is therefore established by the causal chain running from his retaliatory conduct to the termination decision carried out by Defendants Gupta and Tsimelzon, and by the tolling agreements described in ¶12 which preserve the full damages period through the date of termination. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

**COUNT 5 — Retaliation for Reporting Internal Control and Disclosure Control Failures (15 U.S.C. §§ 78m(a) and (b)(2)(B); 17 C.F.R. §§ 229.307 and 229.308; Form 10-K Item 9A; Rule 13a-14(a); Rule 13a-15; Rule 13a-13 (17 C.F.R. § 240.13a-13) — Against All Defendants)**

238. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

239. Exchange Act Section 13(b)(2)(B), 15 U.S.C. § 78m(b)(2)(B), requires every Exchange Act reporting issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management authorization and that company assets are safeguarded — the foundational statutory obligation from

Deleted: COMPLAINT

which all ICFR certification requirements derive. Exchange Act Section 13(a), 15 U.S.C. § 78m(a), separately requires the filing of accurate periodic reports. Item 307, 17 C.F.R. § 229.307, requires that each annual 10-K include management's conclusions regarding the effectiveness of disclosure controls and procedures as of the end of the covered fiscal year — the disclosure provision that makes a false "effective" conclusion an independently actionable misstatement in the filed report, distinct from the evaluation obligation of Rule 13a-15. Item 308, 17 C.F.R. § 229.308, requires management's annual assessment of the effectiveness of internal controls over financial reporting and certification of that assessment to the SEC. Rule 13a-15, 17 C.F.R. § 240.13a-15, separately requires reporting companies to maintain and periodically evaluate "disclosure controls and procedures." SOX § 404, 15 U.S.C. § 7262, and SOX § 302, 15 U.S.C. § 7241, require the CEO and CFO to certify both the effectiveness of internal controls over financial reporting and the effectiveness of disclosure controls and procedures.

240. In each annual 10-K from FY2022 through FY2024, Defendant Zuckerberg certified under SOX §§ 302 and 906: (a) that Meta's "disclosure controls and procedures" were effective; (b) that the 10-K did not contain any untrue statement of a material fact; and (c) that Meta's internal controls over financial reporting were effective. In each filing, Meta further represented that its "internal audit function provides independent assessment and assurance" over its compliance controls.

a. In addition to the three false annual certifications, Defendant Zuckerberg certified each quarterly report on Form 10-Q filed under Rule 13a-13, 17 C.F.R. § 240.13a-13, containing the same false "effective" disclosure controls conclusion under Item 307 and the same false internal controls effectiveness conclusion under Item 308. Rule 13a-13 requires every Exchange Act reporting issuer to file quarterly reports on Form 10-Q that are accurate and complete in all material respects. From Q1 2022 through Q4 2024, Meta filed twelve false quarterly certifications in addition to the three false annual certifications — fifteen false filings in total. Each quarterly 10-Q was filed within approximately three months of any disclosure by Mr. Baig during the relevant period, substantially tightening the temporal proximity between each protected disclosure and the next false SEC filing that followed it. Rule 13a-13 is a rule or regulation of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1), and each of the twelve

Deleted: COMPLAINT

quarterly certifications of effective disclosure controls made while Mr. Baig was reporting the contrary constituted an independently actionable predicate for his protected activity.

241. Meta's privacy compliance audit function — specifically including the AROC and EECC audits that Mr. Baig was scheduled to conduct — was a component of Meta's disclosure controls and procedures within the meaning of Rule 13a-15. Management's decision to block those audits and prohibit written documentation of compliance failures ensured that the information required to be disclosed in Meta's annual Exchange Act reports was not accurately assessed or reported, directly impairing the disclosure controls and procedures Zuckerberg certified as effective.

242. This case is categorically distinct from *SEC v. SolarWinds Corp.*, 741 F. Supp. 3d 37 (S.D.N.Y. 2024). Even setting aside that dismissal, the district court's July 2024 opinion supports the distinction drawn here: the *SolarWinds* court dismissed a Rule 13a-15 claim because the SEC alleged only that the company's existing disclosure controls system produced isolated errors, not that the system itself was deficient. Here, Mr. Baig alleges the deliberate and systematic destruction of the information inputs on which the disclosure controls system depended: falsified security reports submitted in place of accurate ones, multi-year verbal prohibitions on creating any written record of compliance failures, an explicit April 2023 management order to stop raising Privacy Order concerns, and a document deletion order issued earlier on the same day Mr. Baig filed his Form TCR with the SEC. Mr. Baig reasonably believed these to be management-directed, multi-year, knowing acts designed to ensure that the information required to be disclosed in Meta's Exchange Act reports could never accurately reach the certifying officers — acts he reasonably believed constituted a systemic deficiency of the disclosure controls infrastructure itself, not a failure in its application. Scienter is expressly pleaded on the basis of Mr. Baig's reasonable belief: each act of suppression was, in his reasonable belief, directed by a named Defendant, at a specific time, for the explicit purpose of preventing accurate compliance information from becoming a written record. Mr. Baig reasonably believed the systemic infrastructure deficiency was established by seven discrete acts, each independently sufficient and collectively irrefutable under the *SolarWinds* distinction: (1) in spring 2022, the Board-level audit concerning unmonitored engineer production access was artificially

Deleted: COMPLAINT

circumscribed to exclude the confidentiality violations Mr. Baig was documenting, ensuring that the most material known compliance failures would not generate a finding that could flow to AROC or EY; (2) beginning in March 2023, supervisors Verma and Mukerji issued multi-year verbal prohibitions on creating any written record of compliance failures, systematically preventing the formation of the documentary inputs on which accurate disclosure controls depend; (3) on April 14, 2023, Defendant Mukerji issued an explicit gag order prohibiting Mr. Baig from raising FTC Privacy Order concerns outside of the legal department, approximately three weeks before the FTC initiated its show-cause proceeding; (4) on January 31, 2024, Director Chandra pre-emptively announced that Guy Rosen's team would block the requested data warehouse audit before Mr. Baig had even formally submitted it, within a few days of the FY2023 10-K certification; (5) on May 24, 2024, Defendant Gupta and Mehta presented a false positive result from the JUNGLE red team exercise to AROC — the specific board-level committee whose findings flow into the 10-K disclosure pipeline — while Defendant Zuckerberg simultaneously certified effective disclosure controls to the SEC; (6) in October 2024, EECC auditor Quiton excluded five findings under institutional pressure, including the data warehouse access controls finding that would have flowed through AROC to the FY2024 10-K disclosure pipeline; and (7) on November 27, 2024, Defendant Tsimelzon ordered deletion of the security report documenting the compliance failures Mr. Baig had been reporting — an order issued earlier on the same day Mr. Baig filed his Form TCR with the SEC and that contributed directly to his decision to file. Mr. Baig reasonably believed that each of these seven acts was directed by a named Defendant at a specific moment to destroy, suppress, or falsify the information inputs on which accurate disclosure controls certification depends — not isolated failures in an otherwise functioning system, but a systematic multi-year campaign he reasonably believed was designed to ensure that the disclosure controls system could never function as Meta was certifying it did.

a. The May 2024 JUNGLE red team false positive presented to AROC constitutes an independent § 78m(b)(2)(B) internal accounting controls violation of particular significance. Section 13(b)(2)(B) requires every reporting issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that company assets are

Deleted: COMPLIANT

safeguarded. The Board's Audit and Risk Oversight Committee is the specific internal governance body responsible for board-level oversight of Meta's compliance program — the committee through whose findings information about cybersecurity and compliance failures is supposed to reach the certifying officers. When Defendant Gupta and Mehta presented AROC with a success narrative from the JUNGLE exercise while concealing the exercise's actual data exfiltration findings, they ensured that the board-level oversight mechanism on which Zuckerberg's disclosure controls certifications rested was receiving materially false information at the precise moment he was certifying those controls as effective. An internal controls system that allows its board-level oversight committee to be presented with false positive results is not a system that provides reasonable assurances within the meaning of § 78m(b)(2)(B) — it is a system that has been deliberately corrupted at its most senior level. Mr. Baig's observation and reporting of the AROC false positive presentation — including in his investigative interview disclosures throughout 2024 — constituted a protected disclosure of this § 78m(b)(2)(B) internal controls violation; that activity was a contributing factor in the adverse employment actions taken against him.

b. The institutional exclusion of five findings from Quiton's October 2024 EECC audit under organizational pressure constitutes a further independent § 78m(b)(2)(B) and Items 307 and 308 internal controls failure. Unlike blocked or pre-emptively obstructed audits, the EECC audit was completed and generated accurate findings — including specifically the data warehouse access controls finding that documented the Section VII violation Mr. Baig had been reporting since 2021. The post-completion excision of findings under institutional pressure did not prevent the audit from occurring; it corrupted the audit's output after the fact, ensuring that the FY2024 Form 10-K would be certified without any written audit finding documenting the access control violations that Mr. Baig had spent three years reporting. An internal controls system whose completed audit findings are subject to institutional excision before they can reach the disclosure pipeline does not provide the "independent assessment and assurance" that Meta represented to investors in each annual 10-K — nor does it satisfy the

Deleted: COMPLAINT¶

requirement of Item 308 that management's assessment of internal control effectiveness be based on accurate and complete internal audit outputs. Quiton's December 18, 2024 disclosure to Mr. Baig that he was under intense scrutiny and pressure and needed help justifying audit findings confirms that the excision was institutional rather than technical and was specifically designed to prevent the internal audit record from contradicting the investor-facing representation of a functioning controls system. Mr. Baig's cooperation with the EECC audit and his receipt of Quiton's pressure disclosure constituted protected activity under § 1514A(a)(1)(C); those disclosures were a contributing factor in the adverse employment actions taken against him.

c. Exchange Act § 10A(m), 15 U.S.C. § 78j-1(m), enacted as SOX § 301, imposes mandatory obligations on audit committees of public companies: they must be directly responsible for overseeing the registered public accounting firm, must establish procedures for the receipt and treatment of complaints regarding accounting and internal controls, and must have the authority to engage independent counsel and advisors. The integrity of this statutory audit committee mandate depends on the committee receiving accurate information from management. When Defendant Gupta and Mehta presented AROC with a false positive from the JUNGLE exercise — ensuring that the audit committee received a success narrative while actual data exfiltration findings were suppressed — they impaired AROC's ability to fulfill its § 10A(m) oversight obligations. A statutory audit committee that cannot receive accurate management reports cannot provide the independent oversight Congress required in SOX § 301. Meta's AROC could not oversee EY's integrated audit, evaluate significant deficiencies, or fulfill its § 10A(m) responsibilities when the inputs it received from management were systematically false. § 10A(m) is a provision of the Exchange Act directly relating to investor protection through board-level oversight of financial reporting, and its impairment through false management reporting to the audit committee constitutes a violation of a "provision of Federal law relating to fraud against shareholders" within the meaning of § 1514A(a)(1). Mr. Baig's observation and reporting of the AROC false positive presentation, the institutional

Deleted: COMPLAINT¶

neutralization of the internal audit function, and the suppression of the EECC audit findings constituted protected disclosures of conduct he reasonably believed violated § 10A(m) in addition to the internal controls and audit obstruction predicates already enumerated in this Count.

243. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that management's certifications of effective disclosure controls and independent internal audit functions, while simultaneously blocking the AROC and EECC audits and prohibiting written compliance documentation, constituted violations of 15 U.S.C. § 78m(b)(2)(B), 15 U.S.C. § 78m(a), 17 C.F.R. §§ 229.307 and 229.308, and Rule 13a-15. His subjective belief is established by his January 2, 2024 letter to Defendant Zuckerberg. Rule 13a-14(a), 17 C.F.R. § 240.13a-14(a), separately required Defendant Zuckerberg and CFO Susan Li to certify in each annual 10-K and each quarterly 10-Q filed under Rule 13a-13 that, based on their knowledge, the report did not contain any untrue statement of a material fact and that the disclosure controls and procedures were effective. The false "effective" disclosure controls conclusion therefore appeared in every annual 10-K and every quarterly 10-Q certification signed by both the CEO and the CFO from FY2022 forward. Defendant Zuckerberg's and CFO Li's Rule 13a-14(a) certifications in the FY2022, FY2023, and FY2024 Forms 10-Ks and quarterly 10-Qs were false on both counts. Although Li is not named as a Defendant in this action, her Rule 13a-14 certifications are pleaded in this Count as conduct Mr. Baig reasonably believed violated SEC rules for purposes of the § 1514A(a)(1)(C) protected-activity analysis, and as institutional acts attributable to Defendant Meta as the covered company whose CFO executed the certifications under its authority. Defendant Zuckerberg's individual liability in this Count extends to the CEO certifications he personally executed under Rule 13a-14(a) and, as Meta's controlling person and the officer directly accountable for CFO Li's certifying conduct, to the institutional acts of false certification at Meta across both the CEO and CFO axes of Rule 13a-14.

244. Mr. Baig's protected activity reporting these violations was a contributing factor — a standard more permissive than but-for causation — in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken

Deleted: COMPLAINT¶

the same actions in its absence. Defendant Zuckerberg's knowledge is established by the January 2, 2024 and December 4, 2024 letters. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

**COUNT 6 — Retaliation for Reporting Audit Obstruction and False Statements to Auditors (15 U.S.C. §§ 78m(a), (b)(2)(A), and (b)(2)(B); 15 U.S.C. § 7242 (SOX § 303); 17 C.F.R. §§ 240.13b2-1 and 240.13b2-2(a) and (b)(1) — Against All Defendants)**

245. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

246. Each of Meta's annual 10-K filings from FY2020 through FY2024 specifically represented that Meta's privacy program was subject to "regular assessments of our privacy program by an independent third-party assessor." The 2020 Privacy Order independently required these biennial assessments as a core compliance mechanism. The only records that existed to support those representations were the falsified security reports generated by the X-Sec team and the incomplete assessor evaluations conducted on the basis of that false information. Meta's management made no disclosure to its PCAOB auditors that the internal security assessments were falsified, that compliance audits had been blocked, or that internal documentation of compliance failures had been verbally suppressed — omissions that constituted materially false and misleading statements to the auditors by omission within the meaning of Rule 13b2-2(a). EY, Meta's external auditor, issued an unqualified audit opinion on Meta's consolidated financial statements and an attestation on the effectiveness of Meta's internal controls over financial reporting pursuant to SOX Section 404.

247. In issuing those opinions, EY expressly relied on management's representation that Meta's "internal audit function provides independent assessment and assurance" over its compliance controls. The chain of reliance from X-Sec's falsified internal reports to EY's SOX § 404 attestation operated as follows: the X-Sec team generated security assessment documents characterizing WhatsApp's compliance controls as functioning; those documents were provided to Meta's compliance personnel and to the FTC-designated independent assessor; the independent assessor's biennial reports — conducted on the basis of those false inputs — were referenced in Meta's annual

Deleted: COMPLAINT¶

10-K filings as the foundation for management's representation of a functioning compliance program; and EY, in conducting its integrated audit including its SOX § 404 attestation, reviewed and relied on management's 10-K representations about the privacy program and the independent assessments supporting it, without being informed by management that the underlying security reports were falsified or that the compliance audits Mr. Baig was scheduled to conduct had been blocked. By ensuring that the only records available to support management's internal control certifications were falsified, management functionally provided false information to EY in connection with its preparation of the SOX § 404 attestation — conduct squarely within the meaning of Rule 13b2-2(b)(1).

248. Exchange Act Section 13(b)(2)(A), 15 U.S.C. § 78m(b)(2)(A), provides a direct statutory predicate alongside the implementing rules. Section 13(b)(2)(A) requires every reporting issuer to make and keep books, records, and accounts that accurately and fairly reflect the transactions and dispositions of the issuer's assets. The falsified security assessment reports and the management-directed suppression of accurate compliance records constituted a direct violation of § 13(b)(2)(A). Exchange Act Section 13(b)(2)(B), 15 U.S.C. § 78m(b)(2)(B), provides a further independent statutory predicate. Section 13(b)(2)(B) requires every reporting issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances of proper transaction authorization and asset safeguarding. The system of falsified reports, blocked audits, and verbal prohibitions on written compliance documentation constituted a knowing failure to maintain adequate internal accounting controls. Rules 13b2-1 and 13b2-2 are implementing regulations under § 13(b)(2)(A) and (B) respectively; a reasonable person with Mr. Baig's background would have understood that the conduct described violated both the implementing rules and both underlying statutory obligations. Exchange Act Section 13(a), 15 U.S.C. § 78m(a), provides a further independent basis: the blocked audits and falsified reports ensured that Meta's annual 10-K filings required to be filed accurately under § 13(a) could not accurately reflect the state of its compliance controls.

249. SOX Section 303, 15 U.S.C. § 7242, provides a further independent statutory predicate. Section 303 makes it unlawful for any officer or director to fraudulently influence, coerce, manipulate, or mislead any independent public accountant engaged in the performance of an audit for the purpose

Deleted: COMPLAINT

of rendering the issuer's financial statements materially misleading. Rules 13b2-2(a) and (b)(1) are the SEC's implementing regulations; § 7242 is the independently actionable statute, constituting a law relating to fraud against shareholders within the meaning of 18 U.S.C. § 1514A(a)(1). The conduct maps directly onto § 7242: Meta's named officer-defendants (a) provided EY with falsified security assessment reports as the sole evidentiary basis for management's privacy-compliance representations; (b) blocked the AROC and EECC audits that would have generated accurate compliance assessments for EY's review; (c) verbally prohibited written documentation of compliance failures, ensuring no accurate record could reach EY through the audit pipeline; and (d) ordered deletion of the security report documenting the precise compliance failures underlying Mr. Baig's Form TCR filing later that day. Each act was taken by named officers for the purpose of ensuring that EY's SOX § 404 attestation would not reflect material compliance failures — the precise conduct § 7242 prohibits. Mr. Baig's January 2, 2024 and December 4, 2024 letters to Defendant Zuckerberg established his subjective belief that § 7242 was being violated.

250. To the extent Rule 9(b) applies to the falsification allegations underlying this Count, *Van Asdale*'s reasonable-belief standard governs and does not require Rule 9(b) particularity. *Van Asdale*, 577 F.3d at 1000–01. To the extent particularity is required, the factual basis for each act of audit obstruction and false-statement-by-omission is set forth in the factual allegations above, identifying the actors, the conduct, and the period.

251. Mr. Baig documented that the X-Sec team generated falsified security reports that were provided to Meta's compliance oversight personnel and, ultimately, to the independent third-party assessor. Because those assessments were incorporated into Meta's representations in required SEC filings, and because Meta's external financial statement auditors reviewed those representations in conducting their integrated audit, the falsified inputs to the assessor's work were ultimately transmitted as false information to Meta's PCAOB-registered independent public accountants in connection with the filing of required SEC reports, within the meaning of Rule 13b2-2(a).

252. Mr. Baig further documented that management blocked internal cybersecurity audits that would have generated accurate compliance assessments, and verbally ordered him not to create

Deleted: COMPLAINT

written documentation of compliance failures, specifically to prevent that information from reaching any audit record. The suppression of accurate audit documentation constituted an action to manipulate and mislead Meta's financial statement auditors within the meaning of Rule 13b2-2(b)(1).

253. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that providing false information to compliance oversight personnel and suppressing accurate audit documentation, while Meta represented to the SEC that independent assessments were being conducted, violated 15 U.S.C. § 78m(b)(2)(A), 15 U.S.C. § 78m(b)(2)(B), 15 U.S.C. § 78m(a), 15 U.S.C. § 7242 (SOX § 303), 17 C.F.R. § 240.13b2-1, and 17 C.F.R. § 240.13b2-2(a) and (b)(1).

254. Mr. Baig reported these violations through his internal disclosures, his January 2, 2024 and December 4, 2024 letters to Defendant Zuckerberg, and his November 2024 Form TCR filing with the SEC. These disclosures were a contributing factor — a standard more permissive than but-for causation — in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence. Defendant Mukerji's liability under this Count is established by his April 14, 2023 explicit verbal order to stop raising FTC Privacy Order concerns — an order whose direct effect was to prevent the accurate documentation of compliance failures from reaching any audit record, including the independent assessor pipeline. By silencing the Head of Security from creating written records of the compliance deficiencies that the independent assessor was supposed to evaluate, Defendant Mukerji directly caused the falsification of the assessor's information inputs through omission, within the meaning of Rule 13b2-2(b)(1). Defendant Mukerji's liability for adverse employment actions occurring after May 2024 — when he ceased to be Mr. Baig's direct supervisor — is established by the causal predicate theory set forth in ¶19 of this Complaint. The falsified retaliatory performance record Defendant Mukerji constructed from September 2022 through May 2024 was the direct and proximate causal predicate for every subsequent adverse employment action taken by Defendants Gupta and Tsimelzon: the August 2024 "Below Expectations" mid-year rating that formed the stated basis for termination was anchored in the retaliatory "Consistently Meets Expectations" ratings Mukerji issued in February 2023 and February 2024; the denial of promotions and equity in subsequent cycles was predicated on

Deleted: COMPLAINT¶

the retaliatory performance trajectory Mukerji established; and the February 10, 2025 termination was the terminal step in a retaliatory performance escalation that began with Mukerji's September 2022 downgrade. Under contributing-factor causation, a defendant who creates the false evidentiary predicate on which all subsequent adverse actions are built is a contributing cause of those actions even after his formal supervisory role has ended, because but for the falsified predicate record, no subsequent adverse action would have been available to his successors as supervisors. Defendant Mukerji's post-May 2024 liability under this Count is therefore established by the causal chain running from his retaliatory conduct to the termination decision carried out by Defendants Gupta and Tsimelzon, and by the tolling agreements described in ¶12 which preserve the full damages period through the date of termination. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

a. Three further acts of audit obstruction are separately actionable under 15 U.S.C. § 7242 (SOX § 303) and Rules 13b2-2(a) and (b)(1). First, in spring 2022, Mr. Baig participated in a Board-level audit concerning unmonitored engineer production access to user data and learned directly that its findings would flow to AROC and into the 10-K disclosure pipeline. He observed that the audit had been artificially circumscribed to exclude the confidentiality violations he was actively documenting under Section VII of the 2020 Privacy Order. This deliberate scoping exclusion was an act to manipulate the internal audit by controlling its scope to ensure that the most material known compliance failures would not generate findings capable of reaching EY through the AROC disclosure pipeline — an act of audit manipulation that predates and establishes the structural pattern of obstruction documented throughout the remainder of Mr. Baig's employment. An audit designed to avoid finding the violations it should find is not independent assessment within the meaning of Rule 13b2-2(b)(1); it is a form of fraudulent manipulation of the audit function squarely within the meaning of § 7242. Second, on December 2, 2024 — days after Mr. Baig filed his Form TCR — Defendant Tsimelzon specifically implied that the internal audit timeline was not to be taken seriously by laughing about the internal audit function in the meeting. Tsimelzon made this statement just days after

Deleted: COMPLAINT

Mr. Baig had filed his Form TCR and on the same occasion that Tsimelzon was actively suppressing Mr. Baig's security work. Tsimelzon's apparent disregard for the audit timeline, and the audit suppression conduct, confirmed to Mr. Baig that the entire audit function was being treated as a compliance theater instrument rather than a genuine independent oversight mechanism. Rule 13b2-2(b)(1) prohibits any officer from taking any action to coerce, manipulate, mislead, or fraudulently influence any accountant engaged in the performance of an audit. A named officer's contempt for the audit process in a company meeting at the precise moment he was suppressing the security documentation underlying the audit's subject matter, is independently actionable evidence of the coercive institutional attitude toward the audit function that § 7242 prohibits. Third, Syed Abidi — the internal auditor who had confirmed to Mr. Baig that data exfiltration risks were very well known to the top leadership at Meta and had been escalating Mr. Baig's concerns to CFO Susan Li — was no longer employed at Meta after Mr. Baig had given him strongly positive feedback in June 2024. Mr. Baig understood Abidi's departure as corroboration that Meta was neutralizing the internal audit function by removing the specific auditor who had been accurately escalating compliance failures — achieving through personnel removal the same result as blocking an audit: ensuring the compliance record would not accurately reflect the violations being reported. Mr. Baig's reporting of these audit obstruction acts was a contributing factor in the adverse employment actions taken against him; Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in their absence.

b. Defendant Cathcart's knowledge of the audit obstruction conduct underlying this Count is established by his direct attendance at the August and October 2022 presentations at which Mr. Baig documented the specific compliance failures that the audit obstruction was designed to prevent from generating a written record. By directing Mr. Baig in August 2022 to prepare a written compliance assessment and then completely disengaging from all security project review for the following two and a half years — while the falsified security reports, blocked audits, and management directives prohibiting compliance documentation were executed by

Deleted: COMPLAINT

other defendants — Defendant Cathcart functioned as a knowing scheme participant under Rules 10b-5(a) and (c) and *Lorenzo v. SEC*, 587 U.S. 71 (2019): he disseminated the false compliance narrative to investors through his continued role as Head of WhatsApp, while deliberately withholding from AROC and the Privacy and Product Compliance Committee of the Board the specific compliance failures he had received from Mr. Baig. His knowing failure to escalate to AROC — despite having the institutional authority, the specific knowledge, and the board-level access to do so — constitutes participation in the scheme to ensure that accurate compliance information could not reach the disclosure pipeline. Defendant Cathcart's knowledge is separately established by his direct receipt of Mr. Baig's pre-read document characterizing the compliance failures in terms of SEC and FTC enforcement consequences, and by Global Public Policy Head Jonathan Lee's independent question during the October 2022 presentation — made in Cathcart's presence — asking whether WhatsApp faced a situation like the Twitter SEC enforcement action. Defendant Cathcart is sued in this Count in his individual capacity as a supervisor and agent of Meta within the meaning of 18 U.S.C. § 1514A.

**COUNT 7 — Retaliation for Reporting Failure to Report Covered Incidents (15 U.S.C. § 78j(b); Rules 10b-5(a), (b), and (c); 17 C.F.R. § 229.106(b)(2); Form 8-K Items 1.05 and 8.01; Rule 13a-11 (17 C.F.R. § 240.13a-11); 15 U.S.C. § 78m(l) (SOX § 409); 18 U.S.C. § 1514A(a)(1)(C) — Against All Defendants)**

255. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

256. Part IX of the 2020 Privacy Order requires Meta to timely report to the FTC any "Covered Incident" — including any unauthorized access to or acquisition of Covered Information affecting users — and to take prompt remedial action. Covered Incident Reports submitted under Part IX are material inputs to Meta's quarterly compliance certifications and to Meta's annual compliance report to the FTC.

257. The integrity of those certifications, and the truthfulness of Meta's representations to

Deleted: COMPLIANT

investors in its SEC filings about maintaining "a process to regularly certify our compliance with the privacy program to the FTC," depends on accurate and complete Covered Incident reporting. Where Meta systematically fails to report Covered Incidents, its compliance certifications are false, and its SEC filing representations about the certification process are materially misleading in violation of 15 U.S.C. § 78j(b), Rules 10b-5(a), (b), and (c), 17 C.F.R. § 229.106, Rule 13a-11, and provisions of federal law relating to fraud against shareholders. The multi-year coordinated concealment of material cybersecurity incidents constitutes a scheme or artifice to defraud under Rule 10b-5(a) and a course of business operating as fraud under Rule 10b-5(c), making all named scheme participants independently liable under *Lorenzo*.

258. The FTC compliance certifications submitted under the 2020 Privacy Order are not internal compliance checklists. They are sworn representations made to a federal regulatory authority as a condition of the federal court order under which Meta operates. When those certifications falsely represent that Meta has reported all Covered Incidents, they constitute false statements to a federal regulatory agency — which is independently a violation of federal law. When Meta simultaneously represents to investors in its annual 10-K that it maintains "a process to regularly certify our compliance with the privacy program to the FTC," it is representing to investors that the FTC is receiving accurate compliance information — when in fact Meta has submitted false certifications. The investor-facing falsity therefore derives directly from the regulatory falsity: a false compliance certification submitted to the FTC becomes a false premise on which Meta's investor-facing compliance representations rest.

259. In addition to the Rule 10b-5 investor-disclosure violation, WhatsApp's failure to file required current reports independently violated 17 C.F.R. § 229.106(b)(2), Items 1.05 and 8.01 of Form 8-K, and Rule 13a-11, 17 C.F.R. § 240.13a-11. The SEC's 2023 cybersecurity disclosure rules added Item 1.05 to Form 8-K, requiring large accelerated filers including Meta to file a Form 8-K within four business days of determining that a cybersecurity incident is material. Item 8.01 of Form 8-K separately requires disclosure of any material event not covered by a specific Form 8-K item; to the extent any particular scraping event or ATO cluster did not independently trigger Item 1.05's

Deleted: COMPLAINT¶

materiality threshold, it constituted a material "other event" requiring Item 8.01 disclosure in the aggregate context of Meta's 2020 Privacy Order reporting obligations. Rule 13a-11 implements the Exchange Act's current reporting obligation for all Form 8-K items. Meta's failure to file timely Form 8-Ks disclosing the mass daily scraping of over 400 million user profile photos and the approximately 500,000 sustained unauthorized account compromises constituted violations of § 229.106(b)(2), Items 1.05 and 8.01, and Rule 13a-11 independent of and cumulative with the Rule 10b-5 framework. Each is a rule or regulation of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1), and Mr. Baig's documented reports constituted protected disclosures of violations of those provisions in addition to his Rule 10b-5 disclosures.

a. Exchange Act § 13(l), 15 U.S.C. § 78m(l), enacted as SOX § 409, provides a further independent basis for Count 7 that is not limited by the December 2023 effective date of the cybersecurity-specific disclosure rules. Section 13(l) requires every Exchange Act reporting issuer to disclose to the public on a "rapid and current basis" material changes in the financial condition or operations of the issuer. The SEC has confirmed that § 13(l)'s rapid disclosure obligation applies to any material operational development, not only those specified in particular Form 8-K items. A daily average of 500,000 WhatsApp account compromises, 250,000 Facebook account compromises, and 400 million WhatsApp profile photo scrapes — each a day of sustained unauthorized access to Covered Information across Meta's platforms — constituted material changes in the operations of the issuer within the meaning of § 13(l) from at least the date of Mr. Baig's earliest reports in 2022. Unlike Form 8-K Items 1.05 and 8.01, which were added or amended in December 2023, § 13(l) has been in effect since SOX's enactment and applies to every disclosure period at issue in this case. Mr. Baig's reports of the ongoing Covered Incident non-reporting and the mass daily account compromises from 2022 onward were simultaneously reports that Meta was violating § 13(l)'s rapid and current disclosure obligation, providing a § 1514A(a)(1)(C) protected-activity predicate for the pre-December 2023 disclosures in Count 7 that does not depend on the 2023 cybersecurity rules. § 13(l) is a provision of the Exchange Act relating to investor disclosure, and its violation is a

Deleted: COMPLAINT

violation of "any rule or regulation of the Securities and Exchange Commission" or a "provision of Federal law relating to fraud against shareholders" within the meaning of 18 U.S.C. § 1514A(a)(1).

b. Defendant Cathcart's knowledge of the Covered Incident under-reporting violations underlying this Count is established by his direct receipt of Mr. Baig's August and October 2022 disclosures documenting that approximately 100,000 WhatsApp user accounts were being compromised daily through ATO — each constituting unauthorized access to Covered Information within the meaning of Part IX of the 2020 Privacy Order — and that WhatsApp had no system to detect, report, or remediate those incidents. By failing to direct remediation, failing to instruct his team to establish the reporting mechanisms required by Part IX, and failing to escalate the systematic Covered Incident non-reporting to AROC or the Privacy and Product Compliance Committee of the Board during his over two-year disengagement from all security project review, Defendant Cathcart knowingly perpetuated the Covered Incident under-reporting scheme he had been directly informed of. His knowledge of the specific FTC reporting obligation was established by Mr. Baig's pre-read document, which he requested and received, characterizing the compliance failures in terms of the regulatory obligations imposed by the FTC settlement. Defendant Cathcart's contributing-factor liability for the Covered Incident under-reporting adverse actions is established by the direct causal relationship between his receipt of the August and October 2022 disclosures — which he chose to suppress rather than remediate — and the sustained denial of promotion, equity, and supervisory support that followed each subsequent disclosure of the same violations he was first informed of in those presentations.

260. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that WhatsApp's systematic failure to report mass scraping events as Covered Incidents violated Rule 10b-5 and federal law relating to fraud against shareholders. His subjective belief is established by his November 4, 2024 written communication to Defendant Tsimelzon, in which he characterized WhatsApp's non-reporting as a violation of its "legal obligations" — not merely a policy gap.



261. Mr. Baig documented that WhatsApp was leaking over 400 million user profile photos daily to external scrapers, constituting unauthorized access to Covered Information on a massive and ongoing scale, and that WhatsApp was systematically failing to classify and report these events as Covered Incidents under Part IX. Mr. Baig reported these failures to Central Privacy leadership on September 30, 2024, to Defendant Tsimelzon in writing on November 4, 2024, and to the SEC in his November 27, 2024 Form TCR.

262. Defendant Tsimelzon reprimanded Mr. Baig for raising these "legal obligations" on November 4, 2024 — twenty-three days before Mr. Baig filed his Form TCR with the SEC. This reprimand constitutes a discrete adverse employment action taken in direct response to Mr. Baig's protected disclosure.

263. Mr. Baig's protected activity in reporting these violations was a contributing factor — a standard more permissive than but-for causation — in the adverse employment actions taken against him, including the November 4 reprimand, the November 27 document deletion order, and his termination, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

a. Count 7's Covered Incident non-reporting theory extends beyond WhatsApp's scraping events to the enterprise-wide account takeover failures Mr. Baig documented across Meta's platforms. In his January 2, 2024 letter to Defendant Zuckerberg, Mr. Baig specifically documented approximately 250,000 daily account compromises on Facebook — Meta's primary advertising platform and its principal source of revenue — that were not being reported as Covered Incidents under Part IX of the 2020 Privacy Order. Facebook's unreported account compromises are materially more significant to investors than WhatsApp's scraping events because Facebook generates the overwhelming majority of Meta's advertising revenue and is the platform on which investors focus in evaluating Meta's business. The aggregate unreported Covered Incident volume — WhatsApp scraping events plus Facebook account compromises — is undoubtedly material to Meta's overall revenue generation. The enterprise-wide scope of

Deleted: COMPLAINT¶

the non-reporting defeats any attempt to minimize materiality by characterizing WhatsApp as a minor revenue contributor: the 2020 Privacy Order required a single comprehensive compliance program across all Meta platforms, and the Covered Incident reporting failures Mr. Baig documented affected Meta's core revenue-generating operations. Mr. Baig's reporting of the Facebook ATO non-reporting in his January 2, 2024 letter constitutes an independently protected disclosure of violations of Part IX of the Privacy Order, Rule 10b-5(b), and Form 8-K Item 8.01 as to the Facebook platform, and was a contributing factor in the adverse employment actions that followed that letter: specifically, the "Consistently Meets Expectations" rating issued by Defendant Mukerji in February 2024 — approximately six weeks after Defendant Zuckerberg received the January 2, 2024 letter documenting the Facebook ATO non-reporting — which denied Mr. Baig a promotion and equity grant; the "Below Expectations" mid-year rating issued by Defendant Tsimelzon in August 2024; and the February 10, 2025 termination. Defendant Zuckerberg's knowledge of this specific protected disclosure is established by his direct receipt of the January 2, 2024 and December 4, 2024 letters. Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence.

b. Count 7 encompasses a further independently actionable predicate: Meta's failure to file a required current report on Form 8-K disclosing the material governmental proceeding initiated by the FTC. On May 3, 2023, the FTC initiated a formal administrative show-cause proceeding against Meta alleging deficient compliance with the 2020 Privacy Order — a formal governmental adjudicatory proceeding that, if decided adversely, could result in contempt proceedings, additional penalties, and restrictions on Meta's ability to launch new products. Form 8-K Item 8.01 requires disclosure of any material event not covered by a specific Item; Rule 13a-11 implements the current reporting obligation for all Form 8-K items. A formal FTC adjudicatory proceeding alleging violation of a $5 billion consent order was plainly material to a reasonable investor — an inference confirmed by the 4.5% single-day stock decline quantified in the Twitter/Zatko article Mr. Baig had circulated to senior leadership in October

Deleted: COMPLIANT¶

2022 specifically to communicate the investor harm dimension of comparable regulatory enforcement. Meta did not file any Form 8-K disclosing the show-cause proceeding within the required period after its May 3, 2023 initiation, instead disclosing it for the first time in the FY2023 Form 10-K approximately nine months later, framing it narrowly as a COPPA matter that concealed the systemic Privacy Order failures Mr. Baig had been reporting. This nine-month delayed and incomplete disclosure violated Form 8-K Item 8.01 and Rule 13a-11. The Mukerji gag order, issued approximately three weeks before the show-cause proceeding was initiated, suppressed the internal compliance documentation most material to any timely Form 8-K disclosure assessment, and the gag order's timing confirms that management anticipated the imminent proceeding and acted to prevent the documentation that would have required immediate current reporting. Form 8-K Item 8.01 and Rule 13a-11 are each rules or regulations of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). Mr. Baig's protected activity in reporting the Privacy Order violations that formed the subject matter of the required Form 8-K disclosure — and in documenting through his March 15, 2023 recap document and April 18, 2023 letter through counsel that Meta was concealing those violations from investors — was a contributing factor in the adverse employment actions taken against him, including: the April 14, 2023 gag order, which was both a discrete adverse employment action taken specifically to suppress the compliance documentation most material to the Form 8-K disclosure assessment and direct evidence that Defendant Mukerji understood the imminent show-cause proceeding to be the regulatory consequence of Mr. Baig's protected disclosures; the "Consistently Meets Expectations" rating in February 2024, issued approximately nine months after the show-cause proceeding's initiation and approximately four weeks after the FY2023 Form 10-K framed that proceeding as a COPPA matter rather than disclosing the systemic Privacy Order deficiencies Mr. Baig had been documenting; the "Below Expectations" mid-year rating in August 2024; and the February 10, 2025 termination. Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in the absence of Mr. Baig's protected disclosures.

Deleted: COMPLAINT

c. Rule 12b-20, 17 C.F.R. § 240.12b-20, provides a further independent predicate for Count 7. Meta's Covered Incident disclosure representations in its annual 10-K filings described the Privacy Order's compliance program as including a process to "regularly certify our compliance with the privacy program to the FTC" — a specific representation that its current incident reporting obligations were being met. Rule 12b-20 required Meta to add whatever further material information was necessary to make that representation non-misleading, specifically: that WhatsApp was failing to classify and report to the FTC the approximately 500,000 daily account takeovers and the mass daily scraping of 400 million user profile photos as Covered Incidents, and that on September 30, 2024 the Director of Engineering had deliberately configured the incident tracking system to prevent the attacker's identifying information from being logged — making it technically impossible to complete the required FTC report on the same day Mr. Baig raised the reporting obligation. A company that represents to investors that its privacy program includes timely Covered Incident reporting to the FTC, while simultaneously ensuring that its incident tracking infrastructure cannot generate the data required for FTC reports, has made a representation that Rule 12b-20 required to be supplemented with the information that would have made it non-misleading. Mr. Baig's reports of the Covered Incident non-reporting and of Hebbani's deliberate obstruction of the reporting pipeline constituted protected disclosures of violations of Rule 12b-20 and Exchange Act § 78m(a) within the meaning of 18 U.S.C. § 1514A(a)(1)(C), and were a contributing factor in the adverse employment actions taken against him.

**COUNT 8 — Retaliation for OSHA Administrative Complaint**

**(18 U.S.C. § 1514A(b) — Against Meta, Zuckerberg, and Cathcart)**

264. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

265. On January 17, 2025, Mr. Baig filed an administrative complaint with OSHA pursuant to 29 C.F.R. § 1980.103, reporting retaliation in violation of SOX § 806. This filing constituted a protected filing of a complaint within the meaning of 18 U.S.C. § 1514A(b)(1)(A).

Deleted: COMPLAINT¶

266. Mr. Baig was terminated on February 10, 2025 — less than one month after filing his OSHA complaint. This temporal proximity, combined with the documented pattern of escalating retaliation preceding the OSHA filing, establishes that the OSHA complaint was a contributing factor — a standard more permissive than but-for causation — in his termination, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same action in its absence.

267. As a direct and proximate result of Defendants' retaliation for his OSHA filing, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

**COUNT 9 — Retaliation for SEC Form TCR Filing**

**(18 U.S.C. § 1514A(a)(1)(A) — Against Meta, Zuckerberg, and Cathcart)**

268. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

269. On November 27, 2024, Mr. Baig filed a Form TCR with the SEC, reporting Meta's cybersecurity deficiencies, including the systemic under-reporting of Covered Incidents, and its failure to disclose material cybersecurity risks to investors. This filing constituted a protected disclosure to a "Federal regulatory or law enforcement agency" of conduct that Mr. Baig subjectively and objectively reasonably believed constituted violations of rules and regulations of the SEC and provisions of federal law relating to fraud against shareholders, within the meaning of 18 U.S.C. § 1514A(a)(1)(A).

270. Mr. Baig promptly informed Defendant Zuckerberg of his SEC filing. Meta terminated Mr. Baig approximately ten weeks after the Form TCR filing.

271. The SEC Form TCR filing was a contributing factor — a standard more permissive than but-for causation — in Mr. Baig's termination, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence. Defendant Cathcart's knowledge of the Form TCR filing and its role in the retaliatory termination is established by the Retaliation allegations above: as Head of WhatsApp, Defendant Cathcart oversaw all performance management for WhatsApp employees, and the employment investigation and termination process that culminated in Mr. Baig's termination fell within his organizational authority. On information and

Deleted: COMPLAINT

belief, Defendant Cathcart was informed of the Form TCR filing as part of that process and personally approved the February 10, 2025 termination. This belief is based on particularized facts peculiarly within the knowledge of Meta and Defendant Cathcart, including: (a) his role as Head of WhatsApp with direct supervisory authority over the WhatsApp engineering and security leadership responsible for Mr. Baig's performance management; (b) the organizational significance of terminating the Head of Security at WhatsApp — a role reporting within Cathcart's chain of command — which required the awareness and approval of the Head of WhatsApp as a matter of Meta's internal governance; and (c) the extraordinary litigation exposure created by the termination, which makes it implausible that the Head of WhatsApp would not have been consulted before the decision was carried out. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

**COUNT 10 — Retaliation for Reporting Mail and Wire Fraud Against Users and Business Customers**

**(18 U.S.C. §§ 1341 and 1343; 15 U.S.C. § 78j(b); Rules 10b-5(a), (b), and (c) — Against All Defendants)**

272. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

273. As set forth above, WhatsApp makes specific, detailed security representations to its users and paying business customers through its terms of service, privacy policy, public marketing materials, and Business API documentation. These representations include that WhatsApp applies end-to-end encryption to all messages, calls, and media; that it cannot read users' messages; and that it is committed to your privacy. WhatsApp makes these representations in connection with obtaining users' participation in the platform and their continued use of services, participation through which WhatsApp and Meta generate advertising revenue and other economic value.

274. WhatsApp makes materially similar security representations to paying WhatsApp Business API customers, who pay per-message fees in direct reliance on those representations. These customers pay money, transmitted over interstate wire communications, to transmit sensitive business and customer information through WhatsApp's platform specifically because WhatsApp has

Deleted: COMPLAINT

represented that the platform protects that information against unauthorized access.

275. This scheme was knowing and intentional. WhatsApp's engineering and security leadership, including Defendants Gupta and Tsimelzon, received Mr. Baig's detailed documentation of the security failures, responded by manipulating security metrics, ordering deletion of security documentation, and retaliating against the employee who reported the gap, and continued allowing false security representations to be made to users and business customers. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that this conduct constituted a scheme to defraud within the meaning of 18 U.S.C. § 1343 and a violation of 15 U.S.C. § 78j(b) and Rules 10b-5(a), (b), and (c), 17 C.F.R. §§ 240.10b-5(a), (b), and (c), insofar as the false security representations constituted a scheme or artifice to defraud under Rule 10b-5(a) and an institutional course of business operating as fraud under Rule 10b-5(c), and additionally infected Meta's investor-facing disclosures under Rule 10b-5(b). His subjective belief is established by his September 2022 pre-read document, which characterized WhatsApp's security failures as a "fiduciary" breach and referenced criminal and financial consequences, and by his January 2024 letter to Defendant Zuckerberg, which expressly warned that the X-Sec team's conduct "can result in criminal penalties."

276. WhatsApp's platform is itself the instrumentality of the wire fraud Mr. Baig reasonably believed to have occurred. Every message, call, photo, and file transmitted through WhatsApp travels over interstate wire communications. Users transmit private information through the platform in direct reliance on WhatsApp's security representations. Mr. Baig reasonably believed that the personal data so transmitted constituted property of ascertainable market value, supporting his belief that the conduct violated § 1343. Mr. Baig documented the underlying security failures in detail: approximately 100,000 user accounts were compromised daily, employees had unrestricted access to user data, WhatsApp lacked real-time breach detection, and over 400 million user profile photos were being scraped daily without users' knowledge. Mr. Baig reasonably believed that users' personal data and business customers' per-message fees both constituted "property" obtained through the scheme within the meaning of 18 U.S.C. § 1343.

a. Four additional wire communications in furtherance of the scheme are specifically identified

Deleted: COMPLAINT

and documented. First, on December 19, 2024, Defendant Tsimelzon transmitted through interstate electronic communications an order to roll back Mr. Baig's PCR solution — a functioning security mechanism that had recovered approximately 25,000 compromised WhatsApp accounts daily — and to discontinue it in favor of Mark Hatton's team. This electronic order was a wire communication in furtherance of the scheme to maintain security failures against WhatsApp users: it used interstate wire communications to deliberately perpetuate the daily account compromise rate by deactivating the specific solution that had been reducing it. A scheme participant's deliberate use of electronic communications to shut down a working user protection mechanism is perhaps the most concrete available wire fraud act in this case — it is an affirmative, dated, named-defendant act to increase user harm through interstate wire communications. Second, in October 2022 through the filing of the NSO Group lawsuit, Meta transmitted through interstate wire communications and court filing systems public representations that it was actively protecting WhatsApp users from sophisticated security threats, while simultaneously blocking — through internal electronic communications including Defendant Gupta's written directive that ATO remediation was not a priority — the security defenses that would have protected users from precisely those threats. The NSO litigation press releases and court filings were wire communications that represented security commitment to users, transmitted through the same interstate wire facilities through which users were simultaneously being defrauded by the concealed security failures. Third, on January 29, 2025, Mark Hatton transmitted through interstate electronic communications to Mr. Baig the admission that the ATOs measured by his team were only a fraction of the actual ATOs. This electronic communication — made twelve days before Mr. Baig's termination — establishes that every prior wire communication through which Meta represented its security posture to users and investors was transmitted with contemporaneous institutional knowledge that the reported ATO figures materially understated the actual scale of user harm, satisfying the scienter element of § 1343 with respect to each prior wire communication in the scheme through a single named, written admission. Fourth, in January 2025, Meta transmitted through

Deleted: COMPLAINT¶

interstate wire communications a press release publicly disclosing the Paragon Solutions attack on approximately 80 WhatsApp users with specificity and apparent transparency, through the same electronic platforms through which WhatsApp communicates with its user base. This press release was a wire communication directed at WhatsApp users representing that Meta actively identified and disclosed security threats — transmitted at the same moment Meta was concealing from those same users the approximately 500,000 daily account compromises and 400 million daily profile photo scrapes it was not reporting as Covered Incidents. A wire communication to users about security diligence that simultaneously conceals orders-of-magnitude-larger ongoing security failures is a wire communication in furtherance of the scheme to defraud users through false security representations within the meaning of § 1343.

b. In addition to the specific wire communications identified above, the scheme to defraud WhatsApp Business API customers was furthered through the continuous electronic delivery of Business API technical documentation, security specifications, and API endpoint security representations to paying business customers through Meta's developer documentation platform and API infrastructure. Each update, distribution, and delivery of Business API documentation that maintained the false security warranty — representing that the API maintains the same end-to-end encryption protections as consumer WhatsApp and that transmitted data is protected against unauthorized access — constituted a wire communication in furtherance of the scheme to defraud Business API customers through false representations, within the meaning of 18 U.S.C. § 1343. The continuous electronic delivery of these representations to business customers paying per-message fees constitutes an ongoing series of wire communications rather than a single discrete act, each transmitted at a time when Defendants Gupta and Tsimelzon had received and suppressed Mr. Baig's documentation that the underlying security representations were false. Mr. Baig's reporting of the scheme — from his September 2022 pre-read through his January 2024 Zuckerberg letter and his Form TCR filings — was a contributing factor in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken

Deleted: COMPLAINT¶

the same actions in its absence.

277. Mr. Baig reported this conduct through his internal disclosures, his January 2024 and December 2024 letters to Defendant Zuckerberg, and his Form TCR filing with the SEC. Defendant Zuckerberg's knowledge of the wire fraud disclosures is established by his receipt of Mr. Baig's January 2, 2024 letter, which expressly warned that the X-Sec team's conduct "can result in criminal penalties" encompassing the criminal wire fraud statute — and by his subsequent personal approval of the termination that followed. His reporting of wire fraud concerns was a contributing factor — a standard more permissive than but-for causation — in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

a. The wire fraud scheme reported by Mr. Baig is further established by the Ami Vora public statement described above. In August 2022, WhatsApp Product Head Ami Vora publicly represented to users and the market that "We believe WhatsApp is the most secure place to have a private conversation." This statement was transmitted through interstate wire communications and was made for the purpose of inducing users to transmit their private data and communications through WhatsApp, and inducing business customers to pay per-message Business API fees, by misrepresenting the security of the platform. At the time of the Vora statement, Defendants Gupta and Cathcart had received or had constructive access to Mr. Baig's August 18, 2022 disclosure and September 2022 pre-read documentation establishing that WhatsApp had no real-time breach detection, that 1,500 engineers had unrestricted access to user data, and that approximately 100,000 accounts were being compromised daily — directly contradicting the "most secure" representation in terms that any person in a position of engineering or security leadership would have recognized as false. The Vora statement therefore constitutes a named, dated, officer-made wire communication in furtherance of the scheme to defraud users and business customers within the meaning of 18 U.S.C. § 1343, establishing that the false security representations Mr. Baig was reporting were being actively

Deleted: COMPLAINT

disseminated to induce user and customer reliance at precisely the time he was internally documenting their falsity. Mr. Baig's subjective belief that the conduct constituted wire fraud is reinforced by this specific, contemporaneous example of a named officer publicly making a false security representation at the same time he was circulating internal documentation proving it false. Mr. Baig's reporting of the wire fraud scheme — specifically including his August 18, 2022 disclosure to Defendant Cathcart, his September 2022 pre-read, and his October 18, 2022 presentation to WhatsApp senior leadership documenting the gap between WhatsApp's public security representations and its actual security posture — was a contributing factor in the initial adverse employment actions taken against him: within three days of the September 26, 2022 disclosure, Defendant Mukerji delivered the first negative performance feedback of Mr. Baig's career and marked him as "Needs Support"; less than four weeks after the October 18, 2022 presentation, the November 14, 2022 verbal warning was issued with documented procedural defects despite ERBP Sawani's prior advice to the contrary; and within six months, the February 2023 "Consistently Meets Expectations" rating denied Mr. Baig the "Greatly Exceeds" trajectory Defendant Mukerji had previously acknowledged was within reach. The temporal proximity between the August–October 2022 wire fraud disclosures and each of these initial adverse actions is independently sufficient under *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009), to raise an inference of contributing-factor causation for the wire fraud reporting theory. Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence.

b. The wire fraud scheme Mr. Baig reported was furthered not only through electronic wire communications but through the United States mail within the meaning of 18 U.S.C. § 1341. The scheme to defraud WhatsApp users and business customers through false security representations utilized the mails in at least three documented respects: first, Meta's compliance certifications to the FTC under the 2020 Privacy Order — submitted by Defendant Zuckerberg as personal compliance certifications required by the Order — were transmitted through written communications to federal regulatory authorities, constituting use of the mails

Deleted: COMPLIANT

in furtherance of a scheme to maintain false compliance representations; second, Meta's Business API customer agreements, which incorporated the false security representations through which business customers were induced to pay per-message fees, are executed through written instruments transmitted through the mails or their functional equivalents; and third, Meta's communications to its FTC-designated independent assessor — which included the falsified security reports generated by the X-Sec team — were transmitted through postal communications, constituting use of the mails to transmit false information in furtherance of the scheme. Section 1341 is expressly enumerated in 18 U.S.C. § 1514A(a)(1) as an independently covered predicate, alongside and independently of § 1343 (wire fraud) and § 1348 (securities fraud). Mr. Baig's reports of the false compliance certifications, falsified assessor reports, and false security representations to business customers constituted protected disclosures of conduct he reasonably believed violated § 1341 as well as § 1343. The § 1341 theory is independently actionable and survives because the mail fraud statute's property requirement is satisfied independently by the Business API customers' per-message fee payments obtained through false written security representations. Mr. Baig's reporting of the scheme was a contributing factor in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence.

c. Count 10's wire fraud theory encompasses the security relaxation for user growth scheme described in Count 3 as an additional wire fraud predicate directed specifically at WhatsApp users and business customers. The deliberate relaxation of security controls to achieve user growth targets — directed by Kabir Merali and confirmed by the suppression of the WAFFLE fourfold-ATO-risk assessment — constitutes a knowing scheme to induce users to transmit their private data through the WhatsApp platform by means of false security representations, while simultaneously knowingly increasing the risk that those users' data would be compromised. Users who transmitted private messages, financial information, and personal data through WhatsApp in reliance on its "most secure" platform and end-to-end encryption

Deleted: COMPLAINT

representations were induced to surrender property of ascertainable market value through false representations at the very moment that Meta's own Integrity team was directing the relaxation of the security controls those representations described as maintained. WhatsApp's Business API customers who paid per-message fees during the period when Meta was deliberately relaxing security controls to accommodate growth were similarly paying for a security-backed communications service whose represented security level was being knowingly reduced to serve institutional growth incentives — a direct property deprivation through false representations transmitted through interstate wire communications. The security-for-growth tradeoff therefore constitutes a separate, independently documented wire communications scheme within the meaning of 18 U.S.C. § 1343, distinct from the Covered Incident under-reporting scheme and the false public security representations scheme. Mr. Baig's documentation of the security relaxation directive and his resistance to suppression of the WAFFLE risk assessment constituted protected disclosures of this wire fraud scheme; those disclosures were a contributing factor in the adverse employment actions, including specifically his removal from WAFFLE architectural responsibility, the August 2024 "Below Expectations" rating, and his termination.

**COUNT 11 — Retaliation for Reporting Violations of Rule 21F-17 (Impedance of SEC Communications)**

**(17 C.F.R. § 240.21F-17(a) — Against All Defendants)**

278. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

279. Rule 21F-17, 17 C.F.R. § 240.21F-17(a), provides: "No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications." The multi-year pattern of verbal directives forbidding written documentation of compliance failures, and the April 2023 management order to cease raising Privacy Order concerns as a condition of continued employment, constituted employment conditions that Mr.

Deleted: COMPLAINT

Baig reasonably believed prevented him from compiling and transmitting the documentation underlying his Form TCR, in violation of Rule 21F-17(a). Rule 21F-17(a) is a rule or regulation of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1). Mr. Baig reasonably believed that the following acts constituted violations of Rule 21F-17(a): (a) Defendant Mukerji's April 2023 explicit order to stop raising FTC Privacy Order concerns; (b) the multi-year management verbal prohibitions on creating written records of compliance failures; (c) Clarke's October 13, 2023 acknowledgment of the three-terabyte data exfiltration vulnerability to Mr. Baig as a matter of FTC regulatory exposure before directing Mr. Baig not to raise the data exfiltration risk in meetings with CISO Guy Rosen and Defendant Gupta — the officers in the chain of responsibility for Meta's annual 10-K certifications — thereby ensuring that the officers responsible for SEC disclosure decisions would not receive information that would have required them to either remediate the vulnerability or disclose it to investors; this directive is attributable to Meta as the act of its Security Director; (d) Meta's systematic use of its internal legal department to mark compliance documents as attorney-client privileged in order to shield them from disclosure, including locking Mr. Baig out of access to the JUNGLE Writeup, a document material to his reporting of the compliance failures he had documented; (e) Defendant Tsimelzon's November 27, 2024 order to delete the security report; and (f) the sustained pattern of escalating retaliation culminating in termination, which Mr. Baig reasonably believed objectively impedes future SEC communications by deterring other employees from reporting similar violations.

280. Mr. Baig reported these Rule 21F-17 violations through: (a) his January 2, 2024 letter to Defendant Zuckerberg, which documented the suppression of compliance documentation and obstruction of audits; (b) his December 4, 2024 email to Defendant Zuckerberg informing him that Meta was not being truthful to auditors and was misrepresenting compliance to the SEC; and (c) his November 27, 2024 Form TCR and January 2025 OSHA complaint, which formally reported the retaliation pattern that itself constituted Rule 21F-17 violations. Each of these disclosures constitutes protected activity under 18 U.S.C. §§ 1514A(a)(1)(A), (C) and § 1514A(b).

281. Mr. Baig's protected activity reporting Rule 21F-17 violations was a contributing factor



Deleted: COMPLAINT

— a standard more permissive than but-for causation — in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence. The causal nexus is particularly direct: the April 2023 gag order was followed within three weeks by the FTC show-cause proceeding; and the February 10, 2025 termination occurred less than three months after the Form TCR. The causal nexus for item (c) — Clarke's October 13, 2023 suppression directive — is established with particular directness by the same individual's dual role: Clarke directed the suppression of data exfiltration risk reporting from the certifying officers on October 13, 2023, and then submitted negative feedback targeting Mr. Baig to Defendant Mukerji in December 2023 immediately after Mr. Baig raised the data exfiltration risks on or around Dec 14, 2023 with Rosen and Defendant Gupta — the same performance cycle that produced the February 2024 "Consistently Meets Expectations" rating. The same individual whose October 2023 directive constituted the impedance act was also a participant in the retaliatory performance management that followed it, establishing a direct perpetrator-to-retaliation chain that requires no inference. All Defendants knew of this protected activity through their direct participation in each impedance act. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

**COUNT 12 — Retaliation for Reporting Failure to File Required Form 8-K Current Report Disclosing Material Governmental Proceeding**

**(Form 8-K Item 8.01; Rule 13a-11; 15 U.S.C. § 78m(a) — Against All Defendants)**

282. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

283. On May 3, 2023, the FTC initiated a formal administrative show-cause proceeding against Meta alleging deficient compliance with the 2020 Privacy Order. A formal governmental adjudicatory proceeding initiated by the FTC against a company operating under a $5 billion penalty — alleging deficient compliance with the specific privacy program obligations that Meta was simultaneously certifying to investors as functioning — was a material event within the meaning of Form 8-K Item 8.01 and Rule 13a-11. Form 8-K Item 8.01 requires public companies to file a current

Deleted: COMPLAINT¶

report on Form 8-K to disclose any material event not specifically covered by another Form 8-K item. Rule 13a-11, 17 C.F.R. § 240.13a-11, implements the Exchange Act current reporting obligation for all Form 8-K items and requires that current reports be filed within four business days of the triggering event. Both Form 8-K Item 8.01 and Rule 13a-11 are rules or regulations of the SEC within the meaning of 18 U.S.C. § 1514A(a)(1).

284. The May 3, 2023 show-cause proceeding was material to a reasonable investor on multiple independent grounds. Meta had previously paid $5 billion to the FTC for violations of the same category of privacy obligations at issue in the proceeding, giving investors direct context for the scale of potential adverse outcomes. An adverse finding in the show-cause proceeding could have resulted in contempt proceedings, additional civil penalties, and FTC-imposed restrictions on Meta's ability to launch new products — consequences bearing directly on Meta's operating freedom and revenue-generating capability. The FTC's show-cause proposed order specifically sought to restrict Meta's ability to monetize user data and launch new products, matters that a reasonable investor evaluating Meta's long-term revenue trajectory would consider significant in the total mix of available information. Under *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988), the materiality standard is satisfied where there is a substantial likelihood that a reasonable investor would consider the information important to a voting or investment decision. The initiation of a formal governmental adjudicatory proceeding by the agency that had previously extracted a $5 billion penalty from the same company for the same category of violation plainly meets this standard.

285. Meta did not file any Form 8-K disclosing the show-cause proceeding within the required period following its May 3, 2023 initiation. Meta first disclosed the proceeding in the FY2023 Form 10-K filed on February 2, 2024 — approximately nine months after the proceeding was initiated. In that filing, Meta characterized the proceeding narrowly as a COPPA-related matter, concealing that the FTC's proposed findings documented the same systemic privacy program failures that Mr. Baig had been internally reporting since September 2021. The nine-month delay in disclosure, and the COPPA framing that obscured the proceeding's true scope, violated Form 8-K Item 8.01 and Rule 13a-11. Exchange Act Section 13(a), 15 U.S.C. § 78m(a), separately required the filing of accurate current

Deleted: COMPLAINT¶

reports; Meta's failure to file a timely and accurate Form 8-K regarding the show-cause proceeding violated § 78m(a) as an independent statutory basis.

286. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that Meta's failure to file a required Form 8-K disclosing the show-cause proceeding violated Form 8-K Item 8.01, Rule 13a-11, and Exchange Act Section 13(a), and that his internal disclosures documenting the Privacy Order violations underlying the proceeding constituted protected activity reporting conduct he reasonably believed violated those provisions. His subjective belief is established by: (a) his March 15, 2023 recap document, which explicitly warned that WhatsApp "risk additional legal action by the FTC, SEC, IDPC, and other regulators for not meeting our legal obligations" — a disclosure made less than two months before the show-cause proceeding was initiated that identified precisely the regulatory enforcement risk that triggered the mandatory Form 8-K disclosure obligation; (b) his April 18, 2023 letter through counsel, which preceded the show-cause proceeding by approximately two weeks and specifically identified violations of SEC rules in connection with Meta's investor-facing compliance representations; and (c) his January 2, 2024 and December 2024 letters to Defendant Zuckerberg. A reasonable person with Mr. Baig's documented knowledge of Meta's Privacy Order non-compliance and his express awareness of SEC and FTC regulatory exposure would have objectively reasonable grounds to believe that a formal FTC adjudicatory proceeding arising from the same violations he had been reporting was a material event requiring timely Form 8-K disclosure under Item 8.01 and Rule 13a-11. This objective reasonableness is further established by Mr. Baig's specific professional background. Prior to joining Meta, Mr. Baig held senior cybersecurity leadership roles at major financial institutions — entities that are themselves Exchange Act reporting issuers subject to Form 8-K's current reporting framework. His pre-employment experience included exposure to the Form 8-K current reporting obligations of Exchange Act issuers and the standard by which regulatory proceedings are assessed for materiality. A reasonable senior cybersecurity professional with Mr. Baig's specific background at Exchange Act reporting issuers, who had reviewed Meta's Form 10-K disclosures describing its Form 8-K obligations, and whose counsel had already specifically identified violations of the 2020 Privacy Order and SEC rules and regulations, including

Deleted: COMPLAINT

misstatements in Meta's SEC filings in the April 18, 2023 letter, would have understood that a formal FTC adjudicatory proceeding constituted a material event requiring current reporting under Item 8.01 and Rule 13a-11 — particularly where, as here, the same compliance counsel who identified the SEC filing violations had been engaged approximately two weeks before the proceeding was initiated. The objective reasonableness of this belief does not require that Mr. Baig's legal analysis be correct; it requires only that the belief approximate the basic elements of a Rule 13a-11 violation, which it plainly does.

287. The causal nexus between Defendant Mukerji's April 14, 2023 gag order and the nine-month Form 8-K non-disclosure is direct and specifically alleged. The gag order — issued approximately three weeks before the show-cause proceeding was initiated — prohibited Mr. Baig from raising FTC Privacy Order concerns in any communication outside of the legal department. The gag order's timing is not coincidental: it was issued in anticipation of an imminent FTC regulatory proceeding and operated to suppress the internal documentation of Privacy Order non-compliance that was most material to Meta's assessment of whether the show-cause proceeding required timely Form 8-K disclosure. By silencing the Head of WhatsApp Security from creating written compliance records, Defendant Mukerji ensured that the only institutional information available for Meta's disclosure assessment was the limited, controlled narrative managed by the legal department — the same narrative that characterized the proceeding as a COPPA matter for nine months. Defendant Gupta's knowledge of the Form 8-K non-disclosure theory is established by his March 28, 2024 statement — "I will not let a security guy speak as we will have to shut down the network" — which confirmed that his suppression of Mr. Baig's disclosures was motivated specifically by the regulatory consequences of accurate compliance documentation, including disclosure obligations arising from the show-cause proceeding.

288. Defendant Cathcart's knowledge of the Form 8-K non-disclosure violation underlying this Count is established by his presence at the October 18, 2022 presentation at which Mr. Baig documented the specific compliance failures whose ongoing nature rendered the FTC's May 3, 2023 show-cause proceeding a material event within the meaning of Form 8-K Item 8.01. By participating in

Deleted: COMPLAINT¶

the suppression of written compliance documentation — through his disengagement from all security project review and his failure to escalate findings to AROC — in the months preceding the FTC show-cause proceeding, Defendant Cathcart contributed to the institutional suppression of compliance documentation that was most material to any timely Form 8-K disclosure assessment. The connection between Cathcart's disengagement and the Form 8-K non-disclosure is direct: a Head of WhatsApp who actively engaged with and escalated the compliance failures Mr. Baig documented would have generated the internal compliance record that any accurate Form 8-K disclosure about the show-cause proceeding would have been required to reference; his deliberate disengagement ensured that record did not exist. Defendant Cathcart is sued in this Count in his individual capacity as a supervisor and agent of Meta within the meaning of 18 U.S.C. § 1514A.

289. Mr. Baig's protected activity in reporting the Privacy Order violations that formed the subject matter of the show-cause proceeding, and in reporting Meta's failure to accurately and timely disclose that proceeding to investors, was a contributing factor — a standard more permissive than but-for causation — in the adverse employment actions taken against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in its absence. The contributing-factor nexus is established by: (a) Defendant Mukerji's April 14, 2023 gag order, which constitutes both a discrete adverse employment action under 18 U.S.C. § 1514A — because an employer's order to an employee to cease engaging in protected activity is independently retaliatory regardless of subsequent adverse actions — and direct evidence of contributing-factor causation: the gag order was issued approximately three weeks before the show-cause proceeding specifically to suppress the compliance documentation that would have required Meta to make the Form 8-K disclosure it was withholding, establishing that Defendant Mukerji understood Mr. Baig's protected disclosures to be the proximate cause of the regulatory scrutiny the gag order was designed to contain; (b) the November 14, 2022 verbal warning issued less than four weeks after Mr. Baig's October 2022 presentation documenting the same violations; (c) the continuing retaliatory performance management campaign from September 2022 through termination; and (d) the temporal proximity between each subsequent protected disclosure and the adverse employment action that followed it,

Deleted: COMPLAINT¶

sufficient under *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009), to raise an inference of causation. Defendant Mukerji's liability for adverse employment actions occurring after May 2024 — when he ceased to be Mr. Baig's direct supervisor — is established by the causal predicate theory set forth in ¶19 of this Complaint. The falsified retaliatory performance record Defendant Mukerji constructed from September 2022 through May 2024 was the direct and proximate causal predicate for every subsequent adverse employment action taken by Defendants Gupta and Tsimelzon: the August 2024 "Below Expectations" mid-year rating that formed the stated basis for termination was anchored in the retaliatory "Consistently Meets Expectations" ratings Mukerji issued in February 2023 and February 2024; the denial of promotions and equity in subsequent cycles was predicated on the retaliatory performance trajectory Mukerji established; and the February 10, 2025 termination was the terminal step in a retaliatory performance escalation that began with Mukerji's September 2022 downgrade. Under contributing-factor causation, a defendant who creates the false evidentiary predicate on which all subsequent adverse actions are built is a contributing cause of those actions even after his formal supervisory role has ended, because but for the falsified predicate record, no subsequent adverse action would have been available to his successors as supervisors. Defendant Mukerji's post-May 2024 liability under this Count is therefore established by the causal chain running from his retaliatory conduct to the termination decision carried out by Defendants Gupta and Tsimelzon, and by the tolling agreements described in ¶12 which preserve the full damages period through the date of termination. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

**COUNT 13 — Retaliation for Reporting Obstruction of Federal Proceedings and Destruction of Corporate Audit Records**

**(18 U.S.C. §§ 1519, 1520, 1512(c), and 1513(e) — Against All Defendants)**

290. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

291. Each of the criminal obstruction statutes enumerated in the caption of this Count is a "provision of Federal law relating to fraud against shareholders" within the meaning of 18 U.S.C. §

Deleted: COMPLAINT

1514A(a)(1). 18 U.S.C. §§ 1519 and 1520 were enacted together as Title VIII of SOX, the Corporate and Criminal Fraud Accountability Act, and each expressly addresses the destruction, alteration, or falsification of records in circumstances bearing directly on investor protection and on the accuracy of corporate disclosures. 18 U.S.C. § 1512(c) — as amended by SOX § 1102 — reaches any corruptly motivated act impairing the integrity of evidence for a federal proceeding. 18 U.S.C. § 1513(e) — as added by SOX § 1107 — imposes criminal liability for retaliation against a person for providing truthful information to a law enforcement officer regarding the commission or possible commission of any Federal offense, and is the criminal counterpart to the civil whistleblower protections of 18 U.S.C. § 1514A. Taken together, these four provisions constitute the core criminal framework Congress enacted under SOX Title VIII to protect the integrity of corporate records and the protection of employees who report corporate fraud to federal authorities. Disclosures of conduct that a reasonable person would believe violates any of these provisions are independently protected under § 1514A(a)(1)'s "provision of Federal law relating to fraud against shareholders" prong, regardless of whether the conduct also violates a specific SEC rule or Exchange Act provision.

292. Section 1519 provides that any person who "knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . or in relation to or contemplation of any such matter or case," commits an offense punishable by up to twenty years' imprisonment. Section 1519 does not require the existence of a pending federal investigation at the time of the act; mere contemplation of a federal matter within an agency's jurisdiction is sufficient. The conduct Mr. Baig reported squarely implicates § 1519 on at least four independent factual predicates. First, Defendant Tsimelzon's order on November 27, 2024, to delete the internal security report Mr. Baig's team had published — issued before Mr. Baig filed his Form TCR with the SEC later that same day, and for the stated purpose of reputational concealment of documented compliance failures — was the destruction of a record in contemplation of a matter within the jurisdiction of the SEC. Second, Hebbani's deliberate configuration of the SEV tracking system on or about September

Deleted: COMPLAINT

30, 2024 to prevent Mr. Baig's team from logging attacker phone numbers — the precise data element required to identify and formally report scrapers to the FTC as Covered Incidents under Part IX of the 2020 Privacy Order — falsified records in contemplation of a matter within the jurisdiction of the FTC. Third, Quiton's exclusion of five findings from the October 15, 2024 audit report under institutional pressure — including the finding directly related to the Section VII data warehouse access controls violation — altered records in contemplation of matters within the jurisdiction of the SEC (via the 10-K disclosure pipeline) and the FTC (via the Privacy Order's independent assessment framework). Fourth, the multi-year verbal prohibition enforced by Defendant Mukerji and Verma from at least March 2023 onward — prohibiting the creation of any written record of FTC Privacy Order non-compliance — prevented the creation of records in contemplation of both FTC and SEC matters by design, constituting the knowing concealment of records within the ambit of § 1519.

a. Defendant Mukerji's liability for adverse employment actions occurring after May 2024 — when he ceased to be Mr. Baig's direct supervisor — is established by the causal predicate theory set forth in ¶19 and ¶ 220 of this Complaint.

293. Section 1520 requires accountants who conduct audits of issuers to maintain audit and review work papers for a period of five years, and imposes criminal liability on any person who knowingly and willfully violates that retention requirement. Although § 1520's direct command runs to the auditor, it operates alongside a broader SOX record-integrity policy requiring the preservation of the documents on which audit work papers depend. The deletion and non-creation directives described in the preceding paragraph prevented accurate audit-input records from existing at Meta in the first instance — ensuring that the inputs on which EY's integrated audit work papers depended would not accurately reflect Meta's compliance posture. The deliberate destruction and non-creation of audit-input records at Meta constitute conduct that a reasonable person with Mr. Baig's background would believe violated the audit record retention regime § 1520 implements, particularly where — as here — the records destroyed or suppressed were the specific records on which EY's SOX § 404 attestation depended.

294. Section 1512(c) — the obstruction-of-proceedings provision added by SOX § 1102 —



Deleted: COMPLAINT

provides that any person who "corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding," or who "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so," commits an offense punishable by up to twenty years' imprisonment. The term official proceeding is defined at 18 U.S.C. § 1515(a)(1)(C) to include "a proceeding before a Federal Government agency which is authorized by law." The FTC show-cause proceeding initiated on May 3, 2023, was an official proceeding within the meaning of §1515(a)(1)(C). The SEC investigation triggered by Mr. Baig's Form TCR filings on and after November 27, 2024 was an official proceeding contemplated at the time of the acts of concealment. And the OSHA administrative proceeding initiated by Mr. Baig on January 17, 2025 was an official proceeding contemplated at the time of every retaliatory adverse employment action that preceded and followed it. Defendant Mukerji's April 14, 2023 gag order — issued approximately three weeks before the FTC show-cause proceeding — was, in Mr. Baig's reasonable belief, a corrupt act to impair the availability of Privacy Order compliance documentation for use in a federal agency proceeding then contemplated by Meta's management. Defendant Tsimelzon's November 27, 2024 deletion order — issued earlier on the same day Mr. Baig filed his Form TCR — was, in Mr. Baig's reasonable belief, a corrupt act to impair the availability of documentary evidence for the SEC proceeding Mr. Baig was in the process of initiating, and contributed directly to his decision to file. Defendant Gupta and Mehta's May 2024 decision to present AROC with a false positive from the JUNGLE exercise — while concealing the actual data exfiltration findings — was, in Mr. Baig's reasonable belief, conduct that impaired the availability of evidence for the pending FTC show-cause proceeding and the anticipated SEC and OSHA proceedings. Mr. Baig reasonably believed each such act fell within the scope of § 1512(c), independent of whether the same act also violated Rule 13b2-1, Rule 13b2-2(b)(1), or Rule 21F-17.

295. Section 1513(e) imposes criminal liability on any person who "knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense." The statutory

Deleted: COMPLAINT¶

term law enforcement officer encompasses employees of federal regulatory agencies authorized to investigate or prosecute federal offenses, including the staff of the SEC's Office of the Whistleblower. The retaliatory campaign documented throughout this Complaint — culminating in Mr. Baig's February 10, 2025 termination — was, as alleged above, directed at Mr. Baig "for providing . . . truthful information relating to the commission or possible commission of any Federal offense" to the SEC via his Form TCR filings and supporting disclosures, and also to OSHA via his January 17, 2025 administrative complaint. Each adverse employment action taken against Mr. Baig following the November 27, 2024 Form TCR filing — including specifically Defendant Tsimelzon's same-day deletion order, the continuing denial of security engineering resources, the stripping of architectural responsibility for WAFFLE and related security initiatives, and the February 10, 2025 termination — constitutes conduct within the scope of § 1513(e) as criminal whistleblower retaliation. Section 1513(e) is the criminal counterpart to the civil whistleblower protection provisions of § 1514A; Mr. Baig's disclosures reporting the retaliatory campaign to Meta's internal investigators, to Defendant Zuckerberg through the December 4, 2024 letter, and to the SEC and OSHA through the administrative filings therefore simultaneously constituted reports of conduct he reasonably believed violated § 1513(e).

296. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that the conduct described above violated each of §§ 1519, 1520, 1512(c), and 1513(e). His subjective belief is established by his January 2, 2024 letter to Defendant Zuckerberg, which specifically warned that the falsification of cybersecurity reports "can result in criminal penalties" and identified by analogy the October 2022 criminal conviction and May 2023 sentencing of Uber's former Chief Security Officer Joseph Sullivan — a prosecution that specifically involved obstruction of federal proceedings and destruction of records falling within the SOX Title VIII framework. His December 4, 2024 letter to Defendant Zuckerberg stated verbatim that Meta's leadership was "not being truthful to the auditors and the regulators," a characterization that directly encompasses the obstruction-of-proceedings theory of §§ 1519, 1520, and 1512(c). His November 27, 2024 Form TCR identified material misstatements in Meta's public filings arising from conduct that, on the face of the TCR submission, encompassed the

Deleted: COMPLAINT

destruction and suppression of compliance documentation; Mr. Baig's TCR further reported that Meta was systematically using its approximately 3,000 internal lawyers to mark compliance documents as attorney-client privileged in order to shield them from disclosure, a further act of record manipulation within the ambit of §§ 1519 and 1512(c). Objective reasonableness is established by the same factual predicates: a reasonable senior cybersecurity professional with Mr. Baig's background — who had personally studied the criminal prosecutions of the Uber and SolarWinds CISOs for analogous conduct, who had been trained in the federal regulatory framework governing corporate record retention, and who had documented in writing that Meta's supervisors were ordering the deletion and non-creation of compliance records at the precise moments when those records would have been relevant to federal regulatory proceedings — would have recognized the conduct as falling within the scope of each of the SOX Title VIII obstruction statutes.

297. Mr. Baig's protected activity reporting violations of §§ 1519, 1520, 1512(c), and 1513(e) was a contributing factor — a standard more permissive than but-for causation — in each of the adverse employment actions taken against him. Each named Defendant in this Count possessed knowledge of the protected activity underlying this Count: Defendant Zuckerberg received the January 2, 2024 and December 4, 2024 letters expressly warning of criminal liability for the conduct Mr. Baig was reporting; Defendants Mukerji and Tsimelzon directly authored the suppression directives (the April 2023 gag order and the November 27, 2024 deletion order, respectively) that constituted the underlying criminal conduct, making it impossible for them to claim ignorance of their own actions; and Defendant Gupta directed the suppression of compliance audit findings from reaching AROC in May 2024. The contributing-factor nexus is established by: the temporal proximity between the January 2, 2024 letter (expressly warning of criminal penalties) and the February 2024 "Consistently Meets Expectations" retaliatory rating issued approximately six weeks later; the temporal proximity between the Form TCR filing and the February 10, 2025 termination approximately ten weeks later; and the temporal proximity between the December 4, 2024 letter explicitly identifying Meta's leadership as "not being truthful to the auditors and the regulators" and the February 10, 2025 termination approximately two months later. Defendants cannot demonstrate by clear and convincing

Deleted: COMPLAINT

evidence that they would have taken the same actions in the absence of Mr. Baig's disclosures reporting the criminal obstruction conduct alleged in this Count. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

**COUNT 14 — Retaliation for Reporting Violations of Securities Act § 17(a)**

**(15 U.S.C. §§ 77q(a)(1), (2), and (3) — Against All Defendants)**

298. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

299. Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, prohibits fraud in the offer or sale of securities through three independent sub-provisions. Section 17(a)(1) prohibits, in the offer or sale of any securities, the use of "any device, scheme, or artifice to defraud." Section 17(a)(2) prohibits obtaining "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Section 17(a)(3) prohibits engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." Section 17(a)(2) and § 17(a)(3) do not require a showing of scienter and therefore provide an independently actionable predicate for Mr. Baig's protected activity on a more permissive liability standard than Rule 10b-5 under the Exchange Act. *Aaron v. SEC*, 446 U.S. 680, 695–97 (1980). Each of the three § 17(a) sub-provisions is a provision of the Securities Act of 1933, a federal statute relating to fraud against shareholders, and § 17(a) violations are therefore "provision[s] of Federal law relating to fraud against shareholders" within the meaning of 18 U.S.C. § 1514A(a)(1).

300. Meta offered and sold securities during the relevant period through at least two distinct mechanisms, each of which falls within the offer or sale element of § 17(a). First, Meta registered its equity compensation plans — including the RSU awards that formed a material component of every named officer's and of Mr. Baig's own compensation — on Form S-8. Each Form S-8 registration incorporated by reference Meta's most recently filed annual report on Form 10-K. Each RSU grant and vesting event during the relevant period was an offer and sale of securities within the meaning of § 17(a) and its implementing regulations. Second, Meta is a well-known seasoned issuer eligible to offer

Deleted: COMPLAINT

debt and equity securities under an automatic shelf registration on Form S-3; to the extent Meta conducted any securities offerings under that shelf registration during the relevant period, each such offering was an offer or sale within § 17(a). The underlying cybersecurity and compliance disclosures incorporated by reference from Meta's Form 10-K filings into both the Form S-8 and any Form S-3 registrations were the specific disclosures Mr. Baig documented as materially false: the "comprehensive privacy program" representations, the disclosure controls "effective" conclusions, the § 229.106 cybersecurity governance descriptions, and the "did not identify any cybersecurity threats" representations.

301. Mr. Baig reasonably believed that the conduct he reported fell within each of the three § 17(a) sub-provisions. Mr. Baig reasonably believed that the scheme to conceal WhatsApp's cybersecurity and compliance failures from investors, documented throughout this Complaint, constituted a "device, scheme, or artifice to defraud" within § 17(a)(1), operating with respect to the offer and sale of Meta equity compensation securities under the S-8 registration and any debt or equity securities offered under the shelf registration. Mr. Baig reasonably believed that the materially false representations of privacy program compliance, disclosure controls effectiveness, and identified cybersecurity threats in Meta's Form 10-K filings — incorporated by reference into the S-8 and any Form S-3 registrations — constituted "untrue statement[s] of a material fact" and material omissions by which Meta obtained money or property in the form of investor capital and employee labor — as RSU grants formed a substantial portion of the consideration Meta paid its workforce — within § 17(a)(2). And Mr. Baig reasonably believed that the multi-year coordinated conduct documented throughout this Complaint — involving falsified security reports, management directives prohibiting written compliance records, audit obstruction, document deletion, and retaliation against Mr. Baig for reporting these facts — constituted a "transaction, practice, or course of business which operates or would operate as a fraud or deceit" upon purchasers of Meta securities within § 17(a)(3).

302. Mr. Baig actually believed, and had objectively reasonable grounds to believe, that Meta's conduct violated each sub-provision of § 17(a). His subjective belief is established by his documented awareness, throughout the relevant period, that Meta had previously accepted in the 2019



Deleted: COMPLAINT

SEC enforcement action a permanent injunction against further violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 — a fact Mr. Baig specifically identified and documented in his March 15, 2023 recap to Meta's Central Security team, which expressly characterized Meta's ongoing conduct as parallel to the conduct enjoined by the SEC. As pleaded in ¶161 above, that document recorded Mr. Baig's contemporaneous understanding that Meta may have been violating SEC regulations and laws with our public misrepresentations, including the specific Securities Act provisions underlying the 2019 injunction. Under *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009), an employee who is specifically aware of the SEC's prior characterization of a category of misconduct as § 17(a) violations, and who documents in writing that the company is engaging in the same category of misconduct, holds an objectively reasonable belief that the conduct violates § 17(a) from the time of that documented awareness.

303. Mr. Baig reported the § 17(a) violations through each of the protected disclosures enumerated in the Summary of All Protected Disclosures section of this Complaint, including specifically the March 15, 2023 recap document, the April 18, 2023 letter through counsel identifying misstatements in Meta's SEC filings, the January 2, 2024 letter to Defendant Zuckerberg, the December 4, 2024 letter to Defendant Zuckerberg, and the November 27, 2024 Form TCR filing. Each such disclosure constituted protected activity under 18 U.S.C. § 1514A(a)(1) reporting conduct Mr. Baig reasonably believed violated the anti-fraud provisions of the Securities Act of 1933. Each named Defendant had knowledge of one or more of the specific disclosures underlying this Count, as established by the factual allegations in the preceding sections of this Complaint.

a. Defendant Mukerji's liability for adverse employment actions occurring after May 2024 — when he ceased to be Mr. Baig's direct supervisor — is established by the causal predicate theory set forth in ¶19 and ¶ 220 of this Complaint.

304. Mr. Baig's protected activity reporting § 17(a) violations was a contributing factor — a standard more permissive than but-for causation — in the adverse employment actions taken against him, including specifically: the retaliatory performance actions taken following the March 15, 2023 recap document; the retaliatory internal investigation initiated in the summer of 2023 purportedly in

Deleted: COMPLAINT

response to the April 18, 2023 letter through counsel; the February 2024 "Consistently Meets Expectations" rating issued approximately six weeks after the January 2, 2024 letter; the August 2024 "Below Expectations" rating; and the February 10, 2025 termination. Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in the absence of Mr. Baig's disclosures reporting the § 17(a) violations. As a direct and proximate result, Mr. Baig is entitled to all relief available under 18 U.S.C. § 1514A(c).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Enter judgment in favor of Plaintiff and against Defendants;

b. Award reinstatement with the same seniority status that Plaintiff would have had but for the discrimination, or, in the event that reinstatement is not ordered or is impracticable, award front pay in lieu of reinstatement sufficient to compensate Plaintiff for the prospective earnings he would have received but for his unlawful termination;

c. Award back pay with interest under 18 U.S.C. § 1514A(c)(2)(B) for all compensation lost as a result of the retaliation from the date of each adverse employment action through the date of judgment;

d. Award compensation for all special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and such other economic and non-economic losses as are proven at trial;

e. Award compensatory damages for emotional distress, mental anguish, damage to professional reputation, and other non-economic consequential damages;

f. Award attorneys' fees and costs pursuant to 18 U.S.C. § 1514A(c)(2)(C) on Plaintiff's SOX claims;

g. Award prejudgment and post-judgment interest on all monetary awards; and

h. Grant such other relief as the Court deems just and proper.

//

//

Deleted: Award all relief necessary to make Plaintiff whole, including: (1)

Deleted: ; (2)

Deleted: ; and (3)

Deleted: any

Deleted: reasonable attorney fees

Deleted: COMPLAINT¶

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims.

DATED: April 24, 2026

SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP

*/s/ Wilmer J. Harris*

By: ________________________________

Wilmer J. Harris
Amanda E. Johnson
*Attorneys for Plaintiff, Attaullah Baig*

Deleted: ________________ COMPLAINT