PAUL HASTINGS LLP
Elena R. Baca (SB# 160564)
elenabaca@paulhastings.com
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, California 90071-2228
Telephone: 1(213) 683-6000
Facsimile: 1(213) 627-0705

Attorneys for Defendants
META PLATFORMS, INC., PINAKI MUKERJI,
MARK TSIMELZON, NITIN GUPTA, WILL
CATHCART AND MARK ZUCKERBERG

(*Additional counsel listed on next page*)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATTAULLAH BAIG,<br><br>        Plaintiff,<br><br>    vs.<br><br>META PLATFORMS, INC., PINAKI MUKERJI, MARK TSIMELZON, NITIN GUPTA, WILL CATHCART AND MARK ZUCKERBERG,<br><br>        Defendants. | CASE NO. 3:25-CV-07604-YGR<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**<br><br>[Filed concurrently with [Proposed] Order]<br><br>Date: September 17, 2026<br>Time: 2:00 p.m.<br>Judge: Hon. Laurel D. Beeler<br>Courtroom: B, 15th Floor |

Paul C. Evans (admitted *pro hac vice*)
paulevans@paulhastings.com
Jeffrey A. Sturgeon (admitted *pro hac vice*)
jeffreysturgeon@paulhastings.com
Daniel S. Richards (admitted *pro hac vice*)
danrichards@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: 1(212) 318-6000

Attorneys for Defendants
META PLATFORMS, INC., PINAKI MUKERJI,
MARK TSIMELZON, NITIN GUPTA,
WILL CATHCART AND MARK ZUCKERBERG

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     RELEVANT BACKGROUND .......................................................................... 3

        A.      Baig's Allegations of Supposed Protected Activity..................................... 3

        B.      Baig's Allegations Against Cathcart and Zuckerberg................................. 5

        C.      Procedural History ...................................................................................... 6

III.    ARGUMENT ....................................................................................................... 7

        A.      The SAC Is an Impermissible Shotgun Pleading........................................ 7

        B.      Baig Failed to Administratively Exhaust Much of His Newly Alleged

                Protected Activity........................................................................................ 9

        C.      Baig Did Not Engage in Protected Activity Under Section 806.......................... 11

        D.      Baig Failed to State a Claim for Relief Against Zuckerberg and Cathcart............ 26

IV.     CONCLUSION ..................................................................................................... 27

**CASES**

*A.B. v. Hilton Worldwide Holdings Inc.*,
484 F. Supp. 3d 921 (D. Or. 2020) ..................................................................................... 9

*Baig v. Meta Platforms, Inc.*,
No. 25-CV-07604-LB, 2026 WL 821002 (N.D. Cal. Mar. 19, 2026) ............................ *passim*

*Baker v. Smith & Wesson, Inc.*,
40 F.4th 43 (1st Cir. 2022) ............................................................................................. 13

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ....................................................................................................... 21

*Blantz v. California Department of Corrections & Rehabilitation*,
727 F.3d 917 (9th Cir. 2013) .......................................................................................... 27

*Boyd v. Accuray, Inc.*,
593 F. App'x 647 (9th Cir. 2015) .................................................................................... 16

*Brinker v. Axos Bank*,
No. 22-cv-386-MMA (DDL), 2022 WL 17724408 (S.D. Cal. Dec. 15, 2022) ...................... 27

*Brinker v. Axos Bank*,
No. 22-CV-386-MMA (DDL), 2023 WL 4535529 (S.D. Cal. July 13, 2023) ................. 12, 13

*Brinker v. Axos Bank*,
No. 22-cv-386-MMA-DDL, 2023 WL 7167851 (S.D. Cal. Oct. 31, 2023) ......................... 13

*Bury v. Force Protection, Inc.*,
No. CV 09-1708-DCN-BM, 2011 WL 2935916 (D.S.C. June 27, 2011), *report
and recommendation adopted*, 2011 WL 2929827 (D.S.C. July 19, 2011) ...................... 28

*Clegg v. Amcor Rigid Packaging USA, LLC*,
No. CV 5:21-232-DCR, 2022 WL 23215 (E.D. Ky. Jan. 3, 2022) ................................... 22

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F. Supp. 2d 134 (E.D.N.Y. 2008) ............................................................................ 20

*Dawson, et al. v. Meta Platforms, Inc. and WhatsApp, LLC*,
Case No. 26-cv-0751 (N.D. Cal.) ..................................................................................... 1

*Erhart v. BofI Holding, Inc.*,
612 F. Supp. 3d 1062 (S.D. Cal. 2020) ........................................................................... 11

*Feldman v. Venture Agency Holdings, Inc.*,
No. CV 23-8951-GW-RAOx, 2024 WL 7000725 (C.D. Cal. Sep. 20, 2024) ..................... 11

*Freeman v. Oakland Unified Sch. Dist.*,
291 F.3d 632 (9th Cir. 2002) ............................................................................................ 9

*Frezza v. Google Inc.*,
No. 5:12-CV-00237-RMW, 2013 WL 1736788 (N.D. Cal. Apr. 22, 2013) ...................... 28

*Fuqua v. SVOX AG*,
No. 14 C 216, 2014 WL 3811047 (N.D. Ill. Aug. 1, 2014) ............................................. 21

*Gibson v. City of Portland*,
165 F.4th 1265 (9th Cir. 2026) ..................................................................................... 7, 9

*Gjovik v. Apple Inc.*,
No. 23-CV-04597-EMC, 2024 WL 2309100 (N.D. Cal. May 20, 2024) ........................... 21

*Johnson v. Alameda Cnty. Soc. Servs. Agency*,
No. 26-CV-01920-TSH, 2026 WL 974502 (N.D. Cal. Apr. 10, 2026) ................................... 9

*Kang v. PayPal Holdings, Inc.*,
620 F. Supp. 3d 884 (N.D. Cal. 2022) ................................................................................. 19

*Katzel v. Am. Int'l Grp.*,
No. 20 CIV. 7220 (AKH), 2022 WL 17251362 (S.D.N.Y. Nov. 28, 2022),
*aff'd sub nom. Katzel v. Am. Int'l Grp., Inc.*, No. 22-2764, 2024 WL 3063461
(2d Cir. June 20, 2024) ......................................................................................................... 16

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024) .............................................................................................................. 19

*Magnuson v. Exelon Corp.*,
658 F. Supp. 3d 652 (C.D. Ill. 2023) .................................................................................... 21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .............................................................................................. 22

*Neely v. Boeing Co.*,
No. C16-1791 RAJ, 2018 WL 2216093 (W.D. Wash. May 15, 2018) ................................... 17

*Nordstrom v. U.S. Bank, N.A., Inc.*,
No. 11-CV-1554 BEN (KSC), 2012 WL 3000416 (S.D. Cal. July 23, 2012) ....................... 16

*In re PG&E Corp. Sec. Litig.*,
806 F. Supp. 3d 962 (N.D. Cal. 2025) .................................................................................. 19

*Platone v. U.S. Dep't of Lab.*,
548 F.3d 322 (4th Cir. 2008) ................................................................................................ 16

*RJ v. Cigna Health & Life Ins. Co.*,
625 F. Supp. 3d 951 (N.D. Cal. 2022) .................................................................................. 25

*SEC v. Collector's Coffee, Inc.*,
No. 19 CIV. 4355 (VM), 2025 WL 752221 (S.D.N.Y. Mar. 10, 2025), *appeal
docketed*, No. 25-924 (2d Cir. Apr. 17, 2025) ..................................................................... 26

*SEC v. SolarWinds Corp.*,
741 F. Supp. 3d 37 (S.D.N.Y. 2024) ..................................................................................... 24

*United States v. Facebook, Inc.*,
456 F. Supp. 3d 115 (D.D.C. 2020) ...................................................................................... 13

*United States v. Miller*,
953 F.3d 1095 (9th Cir. 2020) .............................................................................................. 25

*Van Asdale v. Int'l Game Tech.*,
577 F.3d 989 (9th Cir. 2009) ................................................................................... 12, 14, 18

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ............................................................................ 18, 20

*Wadler v. Bio-Rad Lab'ys, Inc.*,
916 F.3d 1176 (9th Cir. 2019) ......................................................................................... 12, 13

*Wallace v. Tesoro Corp.*,
796 F.3d 468 (5th Cir. 2015) .................................................................................................. 9

*Wallender v. Canadian Nat'l Ry. Co.*,
No. 2:13-CV-2603-DKV, 2015 WL 10818741 (W.D. Tenn. Feb. 10, 2015) ........................ 26

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .............................................................................................. 22

DEFENDANTS' MEMORANDUM OF POINTS
AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 3:25-CV-07604-YGR

**STATUTES**

15 U.S.C. § 78m................................................................................................................. 12, 23

18 U.S.C. § 1514A .................................................................................................... 9, 11, 12, 13

**OTHER AUTHORITIES**

Cecilia Kang, *Whistle-Blower Sues Meta Over Claims of WhatsApp Security
    Flaws*, N.Y. TIMES (Sept. 8, 2025)................................................................................... 22

*FTC Proposes Blanket Prohibition Preventing Facebook from Monetizing Youth
    Data*, FED. TRADE COMM'N (May 3, 2023), https://www.ftc.gov/news-
    events/news/press-releases/2023/05/ftc-proposes-blanket-prohibition-
    preventing-facebook-monetizing-youth-data ................................................................... 20

*Form 8-K*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
    https://www.sec.gov/files/form8-k.pdf, at p. 37 (last visited June 26, 2026) ........................ 19

Google Finance, Meta Platforms Inc (META),
    https://www.google.com/finance/quote/META:NASDAQ?hl=en&window=6
    M (last visited June 26, 2025) ...................................................................................... 22

Jonathan Vanian, *Ex-Meta employee files whistleblower suit for alleged security
    flaws at WhatsApp*, CNBC (Sep. 8, 2025),
    https://www.cnbc.com/2025/09/08/ex-meta-employee-whistleblower-suit-
    alleged-security-flaws-whatsapp-.html ........................................................................ 22

**REGULATIONS**

17 C.F.R. § 240.13a-15 ................................................................................................... 23, 24

17 C.F.R. § 240.13b2 ........................................................................................................ 23

17 C.F.R. § 240.21F-17.................................................................................................... 25

## I.    <u>INTRODUCTION</u>

This is not a Sarbanes-Oxley ("SOX") case. It is an engineering dispute repeatedly repackaged in the hope of finding one. Plaintiff Attaullah Baig worked at WhatsApp with hundreds of capable engineers. He disagreed with many of them, including people to whom he reported. Baig believed his technical judgments were right. He believed contrary judgments were wrong. That describes a workplace dispute. It describes an engineering disagreement. It does not describe protected activity under SOX.

SOX is not a general cybersecurity statute. It is not a privacy statute. It is not a tool for relitigating internal disputes about access controls, scraping, staffing, data inventory, incident response, or technical risk. SOX protects reports about specific categories of fraud, violations of Securities and Exchange Commission ("SEC") rules, and shareholder deception. Baig's alleged disclosures did not relate to any of those things.

The procedural history confirms the point. Baig first went to the Occupational Safety and Health Administration ("OSHA"); the agency charged with investigating SOX retaliation complaints. OSHA dismissed his claim. Baig then came to this Court. He scoured federal regulations and statutes in the hope of finding a theory that would transform his alleged disclosures into SOX-covered reports. It did not work. This Court dismissed his initial claim, finding that Baig had not pleaded protected activity and had not alleged facts tying Mark Zuckerberg or Will Cathcart to any alleged employment action.

Baig then tried again. He initially filed an amended complaint that borrowed heavily from *Dawson, et al. v. Meta Platforms, Inc. and WhatsApp, LLC*, Case No. 26-cv-0751 (N.D. Cal.), a recently filed consumer class action attacking WhatsApp's privacy representations. The purpose was apparent: to attempt to bolster and mask Baig's deficient SOX retaliation claim by suggesting that *Dawson*'s technology allegations paralleled his own concerns. There was just one problem: the borrowed *Dawson* allegation was and is untrue and is expressly contradicted by Baig's OSHA submission. Faced with threatened Rule 11 sanctions, Baig withdrew that pleading.

A new pleading was then born. It reflects the same search for a theory that might stick, but now on a much larger scale. The Second Amended Complaint ("SAC") runs 203 pages. It contains

DEFENDANTS' MEMORANDUM OF POINTS
AND AUTHORITIES ISO MOTION TO DISMISS
CASE No. 3:25-CV-07604-YGR

423 paragraphs. It asserts 14 counts. It invokes securities fraud, SEC rules, shareholder fraud, audit obstruction, accounting controls, mail fraud, wire fraud, criminal statutes, Federal Trade Commission ("FTC") obligations, privacy commitments, business contracts, public statements, and regulatory orders. It repeats allegations. It shifts theories. It piles labels and conclusions on top of cybersecurity complaints that remain outside SOX.

But labels are not facts. Volume is not protected activity. And burying the reader does not create a legally cognizable claim. The defects that doomed Baig's claim from the outset remain. Baig complained about cybersecurity, privacy, and engineering issues. Nothing more. His current theories are after-the-fact, counsel-created legal constructions. They do not match what Baig allegedly reported. They do not fit SOX. Many were never exhausted before OSHA. Many concern laws SOX does not cover. Many were never reported to Defendants at all.

Accordingly, the SAC should be dismissed for four independent reasons.

First, it is an impermissible shotgun pleading. It forces Defendants and the Court to sift through hundreds of paragraphs and overlapping theories to guess which facts support which counts against which Defendants.

Second, Baig failed to exhaust many of his new allegations before OSHA. He cannot use this lawsuit to litigate theories OSHA never had a chance to investigate.

Third, even accepting the SAC's allegations as true, Baig still does not plead protected activity under SOX. His alleged disclosures concerned cybersecurity and privacy practices. They were not objectively reasonable reports of securities fraud, shareholder fraud, wire fraud, mail fraud, SEC rule violations, or accounting misconduct.

Fourth, Baig fails to state any claim against Zuckerberg or Cathcart. The SAC alleges, at most, that they received certain complaints and then speculates that they approved his termination. This Court already held that knowledge alone is not enough. Speculation is not enough either.

Baig has had enough chances. OSHA dismissed his claim. This Court dismissed his original Complaint. His first amended pleading was withdrawn after Defendants raised Rule 11 objections. The current SAC is longer, but not stronger. Once the rhetoric and volume are stripped away, there is still no SOX claim here. The SAC should be dismissed with prejudice.

## II.    RELEVANT BACKGROUND

### A.    Baig's Allegations of Supposed Protected Activity

The SAC alleges Baig became WhatsApp's Head of Security in February 2021, "responsible for cybersecurity oversight of WhatsApp's systems[.]" *Id.* ¶ 62. In September 2021, Baig claims to have complained that 1,500 WhatsApp engineers could move or steal user data in violation of the FTC Privacy Order. *Id.* ¶¶ 84, 127. In spring 2022, he allegedly reported that Meta's X-Sec team generated falsified security reports. *Id.* ¶ 70. Then, in August 2022, he claims to have briefed Cathcart on six alleged cybersecurity deficiencies: "dangerous understaffing; no comprehensive inventory of user data; unrestricted access to Covered Information by approximately 1,500 engineers; no monitoring system; no real-time breach detection; and approximately 100,000 daily account compromises without remediation." *Id.* ¶¶ 85, 128.

In September 2022, the SAC alleges Baig prepared a pre-read document identifying the absence of data inventory and access control systems required by the FTC Privacy Order. *Id.* ¶¶ 86, 125. It stated: "We have a fiduciary responsibility to protect our users and their data. The penalties can be severe both in terms of brand damage and fines." *Id.* Baig claims to have presented these findings to WhatsApp executives, including Cathcart and Gupta, on October 18, 2022. *Id.* The next day, Baig sent them a Forbes article about Peiter "Mudge" Zatko, a former Twitter employee who accused Twitter of cybersecurity violations. *Id.* That same day, Baig claims that he submitted a written retaliation complaint to human resources. *Id.* ¶¶ 86, 129.

In March 2023, Baig circulated a recap document, which purportedly stated that WhatsApp "risk[ed] additional legal action by the FTC, SEC, [Irish Data Protection Commission ("IDPC")], and other regulators for not meeting our legal obligations" and that Meta's Blackbird/IDR tool had a 24-hour data lag. *Id.* ¶¶ 90-91. In April, Baig's counsel sent a letter to Meta asserting that it retaliated against him in violation of SOX, claiming violations of the FTC Privacy Order and SEC rules, and alleging that there were misstatements in Meta's SEC filings about its cybersecurity practices. *Id.* ¶¶ 93, 135. In September, Baig allegedly "published" an internal vision document stating that achieving compliance with the FTC Privacy Order would require building systems for data inventory, access restriction, breach detection, incident reporting, and audit documentation.

*Id.* ¶ 94. In October, Baig allegedly requested an audit from Meta's Internal Auditor of large-scale data exfiltration risk. *Id.* ¶¶ 96, 131. Shortly thereafter, Baig allegedly reported threats of data exfiltration to Gupta and Guy Rosen. *Id.* ¶¶ 132, 164(f).

On January 2, 2024, Baig sent a letter to Zuckerberg, which allegedly disclosed: (a) violations of the [FTC] Privacy Order; (b) violations of SEC rules and regulations, including rules relating to falsification of records and false statements to auditors; (c) evidence that Meta's X-Sec team had falsified security reports to cover up decisions not to remediate data exfiltration risks; (d) blocked internal audits; and (e) escalating retaliation against Mr. Baig. *Id.* ¶ 99.

On January 30, 2024, Baig claims he told Gupta that Meta's Uber Commitment to the IDPC was false because data warehouse tables containing Covered Information remained accessible to between 20,000 and 65,000 Meta employees. *Id.* ¶¶ 100, 137. The next day, Baig allegedly requested an audit of access controls in WhatsApp's data warehouse. *Id.* ¶¶ 101, 138. He also allegedly disclosed to Jubby Quiton, Meta's European Electronic Communications Code ("EECC") auditor, information about data access controls and Uber Commitment violations. *Id.* ¶ 146.

In March 2024, Baig claims that he distributed an internal report, stating that WhatsApp was "leaking Covered Information on millions, if not billions, of users daily" and "severely under reporting scraping Covered Incidents to the FTC and other regulators[.]" *Id.* ¶¶ 102, 140. He also allegedly raised Meta's Uber Commitment and FTC Privacy Order violations to Internal Audit and Governance, Risk, and Compliance. *Id.* ¶¶ 141.

In May 2024, the SAC claims that Baig presented a Business Case to Aparup Banerjee and senior engineers from Dick Brouwer's team, which stated that WhatsApp faced "anywhere up to $1B in regulatory fines" from FTC Privacy Order violations and resulting lawsuits. *Id.* ¶¶ 103, 142. It further allegedly stated that, if the scraped dataset contained profile photos rather than phone numbers, then "it will be much harder to defend such litigations." *Id.* In September 2024, Baig and his team allegedly complained that allowing WhatsApp accounts to use Facebook credentials (called the "WAFFLE" project) would make account takeover more likely. Baig allegedly recommended preventive controls to "leadership" and resisted "leadership" pressure to revise the risk assessment downward. *Id.* ¶¶ 104, 144.

Around the same time, Baig and his team allegedly reported to Sandeep Hebbani, Director of Engineering in Central Privacy, that WhatsApp was leaking 400 million user profile photos daily to external scrapers, which it needed to report to the FTC and Irish DPC. *Id.* ¶¶ 107, 145. In November 2024, Baig claims that he filed two Form TCRs with the SEC that allegedly documented violations of SOX. *Id.* ¶¶ 112, 148. Baig does not allege that the Form TCRs were sent to Meta (because they never were).

On December 4, 2024, Baig sent Zuckerberg a second letter, stating that Baig complained to the SEC (without disclosing the substance of his complaints), there were cybersecurity failures and retaliation, and Meta's leadership was "not being truthful to the auditors and the regulators." *Id.* ¶¶ 113, 149. On January 17, 2025, Baig filed an OSHA complaint "detailing Meta's violations of SOX and the sustained pattern of retaliation" he experienced. *Id.* ¶¶ 114, 150. Finally, on February 7, 2025, Baig allegedly shared a screenshot showing that WhatsApp user data remained accessible to approximately 65,000 global Meta employees. *Id.* ¶¶ 116, 153. He also allegedly reported that WhatsApp would not meet the cybersecurity bar required for use by the United States House of Representatives. *Id.*[1]

Meta terminated Baig's employment on February 10, 2025. *Id.* ¶ 114.

**B.      Baig's Allegations Against Cathcart and Zuckerberg**

Baig alleges that, in August 2022, Cathcart encouraged Baig to report any cybersecurity concerns he had by preparing a September 2022 pre-read document and to say he was doing so at Cathcart's request. *Id.* ¶ 85. Baig alleges Cathcart directed Verma to address the issues Baig identified. *Id.* ¶ 87. Cathcart then purportedly withdrew from all engagement with Baig's security work thereafter. *Id.* ¶¶ 85, 87. "On information and belief," Baig claims that Cathcart personally approved Baig's termination of employment. *Id.* ¶ 274.

Baig sent Zuckerberg letters in January and December 2024. *Id.* ¶¶ 59, 99, 113, 149. Zuckerberg certified Meta's annual SEC filings. *Id.* ¶¶ 8, 59. And "[o]n information and belief," Baig alleges that Zuckerberg personally approved Baig's termination of employment. *Id.* ¶ 201.

---

[1] During Meta's investigations into Baig's complaints, Baig allegedly repeated much of his reporting to Meta's internal investigators. SAC ¶¶ 119-122.

## C.      Procedural History

On September 8, 2025, Baig commenced this action, submitting a corrected Complaint later that day. ECF Nos. 1-3. On December 9, 2025, Meta moved to dismiss Baig's Complaint pursuant to Rule 12(b)(6). ECF No. 29. The Court granted Meta's motion on March 23, 2026, affording Baig leave to amend. ECF No. 70; *Baig v. Meta Platforms, Inc.*, No. 25-CV-07604-LB, 2026 WL 821002 (N.D. Cal. Mar. 19, 2026) ("*Baig I*"). Baig filed the First Amended Complaint ("FAC") on April 24, 2026, and corrected it on May 5, 2026. ECF Nos. 76, 78.

The very first two paragraphs of the Corrected FAC falsely alleged that WhatsApp messages are not end-to-end encrypted even though Baig previously told OSHA the complete opposite. *Compare* ECF No. 78 ¶¶ 1-2 ("Two billion people have trusted WhatsApp's explicit, repeated promise: that their communications are end-to-end encrypted, that nobody at WhatsApp can read them, and that the platform is committed to your privacy. That promise was . . . as Attaullah Baig, the person responsible for WhatsApp's security discovered, a lie."),[2] *with* ECF No. 3, Ex. A 61 ("Although the content of WhatsApp messages is secure and encrypted . . . ."). After Meta sent Baig a letter warning that it would seek sanctions under Rule 11, Baig withdrew his Corrected First Amended Complaint, ECF Nos. 79-80, and filed the SAC ECF No. 81. The SAC completely recants the false allegation that WhatsApp messages are not end-to-end encrypted and affirmatively admits that Meta employees cannot read the content of WhatsApp messages. SAC ¶¶ 3 ("To be clear at the outset . . . Mr. Baig's allegations do not challenge WhatsApp's end-to-end encryption protocol itself. The encryption of message content—the actual text of user communications—functions as designed."), 68 ("Mr. Baig has never alleged that Meta has broken or backdoored WhatsApp's message-content encryption protocol and agrees that WhatsApp has end-to-end encryption of consumer messages and calls.").

---

[2] Baig further falsely alleged that WhatsApp lied to its users that their private "messages cannot be read by anyone other than the sender and recipient," WhatsApp "applies end-to-end encryption by default to messages, calls, photos, and videos," and WhatsApp cannot read users' messages. ECF No. 78 at ¶¶ 73-76, 273.

## III.    ARGUMENT

### A.    The SAC Is an Impermissible Shotgun Pleading.

Although this is a single-plaintiff case with one cause of action, Baig burdened Defendants and the Court with a 203-page, 423-paragraph (inclusive of subparts) pleading replete with overlapping, confusing, and misplaced allegations. It is next to impossible to decipher his legal theories and the facts supporting them. Rather than undertaking that herculean effort, the Court should dismiss the SAC for violating well-established shotgun-pleading rules.

"[D]istrict courts do not have to accept such shotgun pleadings. It is not the job of the district courts to make sense of the pleading, to supply facts to support the claim, or to imagine the claims that might fit the facts." *Gibson v. City of Portland*, 165 F.4th 1265, 1289 (9th Cir. 2026). There are four main types of shotgun pleadings: "(1) a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to be a combination of the entire complaint; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) a complaint that fails to separate into a different count each cause of action or claim for relief; and (4) a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1288 (citation omitted). The SAC is subject to dismissal for all of those reasons.

First, each of the 13 substantive Counts[3] incorporates by reference each allegation contained in the preceding paragraphs. *E.g.*, SAC ¶¶ 224, 233. Accordingly, each Count incorporates irrelevant allegations to that Count, including allegations set forth within the preceding Counts, and it is impossible to determine the scope of factual allegations supporting any of Baig's legal theories.

Second, Baig alleges a plethora of irrelevant facts about conduct and violations of laws he never reported. *Infra* § III.C.2. He also inconsistently alleges the same facts dozens of times. Consider the number of times Baig describes his January 2024 letter to Zuckerberg in varying degrees of detail. SAC ¶¶ 8, 17, 59-60, 81, 99, 125, 136, 164(i), 228(a), 228(c), 231(a), 232, 232(c),

---

[3] There are 14 Counts, but Count 1 "does not assert a theory of recovery independent of Counts 2 through 14[.]" SAC ¶ 200.

232(d), 232(e), 232(f), 232(h), 232(i), 238, 246, 252, 256-57, 262(a), 278, 283, 289, 299, 305. Moreover, many paragraphs contain multiple facts, legal arguments, and "statutory predicates" that, in some cases, bear no relationship to one another. *E.g.*, *id.* ¶ 232(a) (spanning three pages and alleging two different "half-truth theories," two different statutory predicates, and at least a dozen separate facts).

Third, many Counts assert multiple theories of protected activity and, within those theories, multiple "independent statutory predicate[s]." *E.g.*, *id.* ¶¶ 225 (Count 3 asserts "three theories" of shareholder fraud with *26* statutory or regulatory predicates), 275-80(c) (Count 10 asserts both mail and wire fraud with six statutory or regulatory predicates). Other Counts are wholly redundant of one another. *Compare id.* ¶¶ 233-40 (Count 4 asserts falsification of records and false statements to auditors under Rules 13b2-1 and 13b2-2), *with id.* ¶¶ 248-57(b) (Count 6 asserts audit obstruction and false statements to auditors under Rules 13b2-1 and 13b2-2). Still other Counts are partially overlapping. *Compare id.* ¶ 232(h) (Count 3 asserts violation of Rule 12b-20 based on failure to disclose in SEC filings daily account takeovers), *with id.* ¶ 266(c) (same in Count 7); *see also id.* ¶ 262 (asserting violations of SEC cybersecurity rules in Count 7 even though Count 2 is entitled "Retaliation for Reporting Violations of SEC Cybersecurity Disclosure Rule"). And some paragraphs assert theories of protected activity that bear no relationship to the title of the Count. *E.g.*, *id.* ¶ 221 (alleging in Count 2 (SEC cybersecurity rules) that Meta's 10-K's omissions were materially misleading, not in Count 3 (shareholder fraud)).

Fourth, Baig indiscriminately raises all 13 substantive Counts against all Defendants. It cannot be, however, that all six Defendants retaliated against him for 13 different reasons. Baig pleaded many factual allegations indiscriminately against Defendants, too. For example, Baig alleges that "Meta's named-officer defendants" all gave falsified security reports to Ernst & Young LLP ("EY"), blocked audits, prohibited documentation of compliance failures, and ordered deletion of a security report. *Id.* ¶ 252; *see also, e.g.*, *id.* ¶ 307 (vaguely attributing several alleged adverse actions to all individual Defendants).

Accordingly, the SAC "seek[s] to overwhelm [D]efendants with an unclear mass of allegations and make it . . . impossible for the [D]efendants to make informed responses to" Baig's

allegations. *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 943 (D. Or. 2020). It should be dismissed. *See, e.g.*, *Gibson*, 165 F.4th at 1291–95 (affirming dismissal because claims incorporated allegations for all preceding counts, failed to specify which defendants were responsible for which counts, contained multiple undifferentiated counts, and failed to make clear which of the hundreds of factual allegations supported which counts); *Johnson v. Alameda Cnty. Soc. Servs. Agency*, No. 26-CV-01920-TSH, 2026 WL 974502, at *6 (N.D. Cal. Apr. 10, 2026) (dismissing complaint because it incorporated all preceding paragraphs into each cause of action).[4]

### B.    Baig Failed to Administratively Exhaust Much of His Newly Alleged Protected Activity.

Section 806 allegations that do not appear in an OSHA complaint "generally may not be considered by a federal court[.]" *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002) (citation omitted); *accord* 18 U.S.C. § 1514A(b)(1). The only exception is for those that "fell within the scope of [OSHA's] *actual* investigation or an [OSHA] investigation which *can reasonably be expected* to grow out of the" OSHA complaint. *Freeman*, 291 F.3d at 636 (emphasis in original); *accord Wallace v. Tesoro Corp.*, 796 F.3d 468, 476 (5th Cir. 2015) ("The scope of a judicial complaint is limited to the sweep of the OSHA investigation that can be reasonably be expected to ensue from the administrative complaint.").

For the very first time, Baig alleges the following conduct in the SAC that never appeared in his OSHA complaint (ECF No. 3, Ex. A):

- The FTC initiated a for-cause administrative proceeding against Meta on May 3, 2023, which Meta failed to timely and accurately disclose to investors, SAC ¶¶ 35, 54, 226 (Count 3), 262-62(b) (Count 7), 266(b) (Count 7), 286-89 (Count 12);

- Several specific representations in Meta's annual Form 10-Ks, Form 10-Qs, and Proxy Statements were materially false: Meta was implementing and maintaining a comprehensive privacy program in connection with the FTC Privacy Order; cybersecurity threats were occasional and hypothetical and Meta had not identified any material ones;

---

[4] Despite being told to do so at the hearing on March 19, 2026, ECF No. 73, and in the opinion dismissing his original complaint, *Baig I*, at *4, Baig again inexplicably failed to provide pin cites for Meta's SEC filings.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 3:25-CV-07604-YGR

Meta based compensation decisions on accurate performance assessments; and the Board's Privacy Committee and AROC oversaw compliance with Meta's privacy program, *id.* ¶¶ 44-50, 53, 219 (Count 2), 221 (Count 2), 226-226(b) (Count 3), 228 (Count 3), 228(a)-(c) (Count 3), 232(h) (Count 3), 249 (Count 6), 303-04 (Count 14);

- Cathcart deliberately and totally withdrew from Baig's security work, *id.* ¶¶ 85, 162(g);

- Zuckerberg and Cathcart personally approved Baig's termination of employment, *id.* ¶ 201, 272 (Count 8);

- Zuckerberg's and CFO Susan Li's certifications of SEC filings were knowingly false, *id.* ¶¶ 231(a) (Count 3), 232(a) (Count 3), 243-243(a) (Count 5), 246 (Count 5);

- Meta's compliance certifications to the FTC were false and those certifications rendered its SEC filings false, *id.* ¶¶ 259-61 (Count 7), 266(c) (Count 7), 280(b) (Count 10);

- Meta failed to include a required footnote in its Form 10-Ks disclosing the FTC loss contingency and failed to accrue probable FTC liability, *id.* ¶ 227 (Count 3);

- Meta misled investors by attributing advertising revenue to WhatsApp without GAAP reconciliation or disclosure of this non-standard attribution convention, which was needed because WhatsApp generated no advertising spend, *id.* ¶¶ 58, 232(c)-(d) (Count 3);

- Meta provided false information to EY and obstructed EY's integrated audit, *id.* ¶¶ 232(f) (Count 3), 249-50 (Count 6), 252 (Count 6), 257(a) (Count 6);

- Zuckerberg's January 2024 testimony before the Senate Judiciary Committee "disseminat[ed] a false narrative," *id.* ¶ 232(g) (Count 3);

- Baig participated in a Board-level audit concerning unmonitored engineer production access that was artificially circumscribed to exclude confidentiality violations of the FTC Privacy Order, *id.* ¶ 257(a) (Count 6);

- WhatsApp Business API customers pay per-message fees in reliance on false representations in WhatsApp's terms of service, privacy policy, public marketing materials, Business API documentation, security specifications, and API endpoint representations, *id.* ¶¶ 76-81, 276-79(b) (Count 10), 280(b) (Count 10);

- Press releases and court filings concerning NSO Group and Paragon Solutions were false

or misleading, *id.* ¶ 279(a) (Count 10);

- Meta's legal department systematically marks documents as privileged to shield them from disclosure, *id.* ¶ 282 (Count 11); and

- Baig presented a Business Case to Banerjee and Brouwer's team containing specific complaints about FTC Privacy Order violations and their ramifications, *id.* ¶¶ 103, 142.

Baig cannot bootstrap his claim with these brand-new allegations as a matter of law. For instance, Baig's OSHA complaint only identified two alleged misstatements in Meta's SEC filings, which were different than those he raises in the SAC: that WhatsApp is "a simple, reliable, and secure messaging application," and that Meta's "internal audit function provides independent assessment and assurance on the overall operations of our cybersecurity and privacy programs and the supporting control frameworks." ECF No. 3, Ex. A ¶ 351. Baig also did not allege that he reported or believed there had been shareholder fraud; he was just "particularly concerned about *regulatory action.*" *Id.* (emphasis added). OSHA therefore had no cause to investigate whether Defendants engaged in shareholder fraud.[5] *See, e.g.*, *Feldman v. Venture Agency Holdings, Inc.*, No. CV 23-8951-GW-RAOx, 2024 WL 7000725, at *7 (C.D. Cal. Sep. 20, 2024) (dismissing Section 806 claim on exhaustion ground because plaintiff's theory of employment relationship with defendants advanced in OSHA complaint relied on written producer agreement, whereas plaintiff's federal pleading raised new theory based on oral employment agreement); *Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062, 1087 (S.D. Cal. 2020) (same to the extent Section 806 claim was premised on allegation of altered financial statements because plaintiff's "OSHA Complaint did not mention this conduct").

### C. Baig Did Not Engage in Protected Activity Under Section 806.

Worse still, Baig never cured the deficiencies that doomed his original complaint. He still fails to plead that he plausibly "engaged in a protected activity or conduct." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009) (citation modified). Section 806 only protects

---

[5] Meta discharged Baig on February 10, 2025, SAC ¶ 114, and he still has not raised these allegations to OSHA. Thus, his new allegations are all time-barred, too. 18 U.S.C. § 1514A(b)(2)(D) (providing 180 days to raise Section 806 claims to OSHA).

reports of violations of enumerated categories of law. And "to trigger the protections of the Act, an employee must also have (1) a subjective belief that the conduct being reported violated a listed law, and (2) this belief must be objectively reasonable." *Id.* at 1000.

### 1.    Section 806 Does Not Cover Most of Baig's Complaints.

Section 806 only protects objectively reasonable complaints about (i) 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), or 1348 (securities fraud); (ii) SEC rules or regulations; or (iii) federal laws relating to fraud against shareholders. 18 U.S.C. § 1514A(a)(1). The "natural and plain reading" of SEC "rule or regulation" is that the phrase "encompasses only administrative rules or regulations" promulgated by the SEC. *Wadler v. Bio-Rad Lab'ys, Inc.*, 916 F.3d 1176, 1186 (9th Cir. 2019). "The most obvious explanation" for the limiting principle in the third category "is that 'law' encompasses *statutes*[.]" *Id.* (emphasis added). Any "unlisted statute[s] . . . must relate to shareholder fraud." *Brinker v. Axos Bank*, No. 22-CV-386-MMA (DDL), 2023 WL 4535529, at *9 (S.D. Cal. July 13, 2023).

The following statutes identified in the SAC are not SEC rules or regulations, are unlisted in Section 806, and do not relate to shareholder fraud: 15 U.S.C. §§ 78m(a) (requires issuers to make SEC filings), (b) (requires issuers to make and keep accurate books and devise internal accounting controls), 78n(a) (prohibits soliciting proxies in violation of SEC rules), 7241 (requires executives to certify accuracy of financial statements), 7242 (prohibits issuers from obstructing accountants performing audits of financial statements), 7262 (requires executives' certifications to assess effectiveness of internal controls) 18 U.S.C. §§ 1350 (requires CEO and CFO certifications in SEC filings), 1512(c) (criminalizes corruptly altering or concealing records or otherwise obstructing official proceedings), 1513(e) (criminalizes retaliating against witnesses who provide information to law enforcement officers about federal crimes), 1519 (criminalizes the alteration or concealment of records to obstruct federal investigations), 1520 (criminalizes "accountant[s']" failure to maintain audit or review workpapers).[6] Therefore, these statutes cannot support Baig's

---

[6] Other legal "requirements" identified in the SAC are also beyond the scope of Section 806: Form 10-K Item 9A, Form 8-K Items 1.05 and 8.01, and PCAOB Auditing Standard AS 2201, and GAAP ASC 606, 450-20-50-3, and 450-20-25-2. *Contra* SAC ¶¶ 57, 184, 186, 193, 218 (Count 2), 226-27 (Count 3), 232(d) (Count 3), 232(f) (Count 3), 232(k) (Count 3), 262 (Count 7), 266(a)-(b)

Section 806 claim. *See Wadler*, 916 F.3d at 1186 (holding that Foreign Corrupt Practices Act's books-and-records provisions are beyond the scope of Section 806); *Baker v. Smith & Wesson, Inc.*, 40 F.4th 43, 50 (1st Cir. 2022) (same for 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), or 78d-1(a)); *Brinker v. Axos Bank*, No. 22-cv-386-MMA-DDL, 2023 WL 7167851 (S.D. Cal. Oct. 31, 2023) (same for 15 U.S.C. § 78m(b)(2)(B)(ii)); *Brinker v. Axos Bank*, No. 22-cv-386-MAA (DDL), 2023 WL 4535529, at *9 (S.D. Cal. July 13, 2023) (same for 15 U.S.C. § 7262). And Baig's misguided allegations that he reported violations of those statutes are omnipresent in nearly all the Counts. SAC ¶¶ 222 (Count 2), 225 (Count 3), 228 (Count 3), 231(a) (Count 3), 232(h) (Count 3), 238-38(a) (Count 4), 242 (Count 5), 243 (Count 5), 245(a)-46 (Count 5), 249-52 (Count 6), 256 (Count 6), 257(a) (Count 6), 266(c) (Count 7), 288 (Count 12), 294-300 (Count 13)[7].

Baig's alleged reports of FTC Privacy Order violations—his professed protected activity underlying Counts 2, 3, and 14, in part, SAC ¶¶ 65-66, 219, 221, 225-26, 228-232, 303-04—are equally unavailing. The FTC Privacy Order is a stipulated order entered by a district court. *Id.* ¶ 65; *accord United States v. Facebook, Inc.*, 456 F. Supp. 3d 115 (D.D.C. 2020). It does not fit within any of Section 806's categories of protected law. Accordingly, Counts 2, 3, and 14 should be dismissed to the extent they rely on Baig's FTC Privacy Order reporting.

> 2. Baig Does Not Allege that He Complained About Most of the Conduct Described in the SAC.

To state a Section 806 claim, Baig must have alleged that he "provide[d] information, cause[d] information to be provided, or otherwise assist[ed] in an investigation" about a violation of covered law, 18 U.S.C. § 1514A(a)(1), and that Defendants "knew or suspected, actually or constructively," about it. *Van Asdale*, 577 F.3d at 996 (citation omitted). Baig does not allege that he complained about any of the following alleged misconduct described in the SAC, however:

- Allegations that several specific representations in Meta's annual Form 10-Ks, Form 10-Qs, and Proxy Statements that were materially false: Meta was implementing and

---

(Count 7), 286-91 (Count 12).

[7] Count 13 is subject to dismissal in its entirety on this ground because all four alleged statutory predicates are beyond Section 806's ambit.

maintaining a comprehensive privacy program in connection with the FTC Privacy Order; cybersecurity threats were occasional and hypothetical and Meta had not identified any material ones; Meta based compensation decisions on accurate performance assessments; and the Board's Privacy Committee and AROC oversaw compliance with Meta's privacy program, SAC ¶¶ 44-51, 53, 219 (Count 2), 221 (Count 2), 226-226(b) (Count 3), 228 (Count 3), 228(a)-(c) (Count 3), 232(h) (Count 3), 249 (Count 6), 303-04 (Count 14);

- Zuckerberg and Li filed (as applicable) false quarterly and annual certifications concerning Meta's disclosure controls, internal controls over financial reporting, and the veracity of Meta's Form 10-Ks, *id.* ¶¶ 243-243(a) (Count 5), 246 (Count 5);

- In its 2023 Form 10-K, Meta misleadingly framed the FTC's show-cause proceeding as limited to COPPA issues, and Meta failed to file a current report about the proceeding within the required reporting period, *id.* ¶¶ 47, 53;

- WhatsApp operated at an annual loss of $3 to $4 billion, Meta committed approximately $300 million in marketing expenditure to grow WhatsApp's daily active user base while internally acknowledging no credible monetization strategy existed for those users, and Meta misled investors by attributing advertising revenue to WhatsApp even though WhatsApp generated no part of the advertising spend, *id.* ¶¶ 58, 232(c)-(d) (Count 3);

- WhatsApp's integrity response team systematically manipulated account takeover metrics to ensure the scale of unreported Covered Incidents would not reach the FTC's independent assessor or Meta's Board, *id.* ¶ 66;

- On April 14, 2023, Mukerji ordered Baig to stop raising FTC Privacy Order concerns, *id.* ¶¶ 75, 92;

- During Baig's October 18, 2022 presentation, Wael Salloum, Head of Data Science at WhatsApp, added a comment to Baig's pre-read requesting that the entire document be marked as attorney-client privileged, *id.* ¶ 87;

- On January 31, 2024, Charu Chandra, Director of Technology Infrastructure Audit, told Baig that Guy Rosen's team would block an audit of access controls, *id.* ¶ 101;

- On March 24, 2023, Verma directed Baig not to state in writing that WhatsApp was

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 3:25-CV-07604-YGR

non-compliant with the FTC Privacy Order because that might be discoverable, *id.* ¶ 172(e);

- Meta failed to disclose to PCAOB auditors that the internal security assessments were falsified, compliance audits had been blocked, and internal documentation of compliance failures was verbally suppressed, *id.* ¶ 249 (Count 6);

- WhatsApp Business API customers pay per-message fees in reliance on false representations in WhatsApp's terms of service, privacy policy, public marketing materials, Business API documentation, security specifications, and API endpoint representations, *id.* ¶¶ 76-81, 276-79(b) (Count 10), 80(b) (Count 10);

- Meta's compliance certifications to the FTC under the FTC Privacy Order were transmitted through written communications to federal regulatory authorities, Meta's Business API customer agreements are executed through written instruments transmitted through the mail, and Meta's communications to its FTC-designated independent assessor were transmitted through postal communications, *id.* ¶ 280(b)

- WhatsApp Product Head Ami Vora publicly represented that "We believe WhatsApp is the most secure place to have a private conversation," *id.* ¶ 280(a) (Count 10);

- Press releases and court filings concerning NSO Group and Paragon Solutions were false or misleading, *id.* ¶ 279(a) (Count 10);

- Meta impaired EY's ability to conduct an integrated audit because EY reviewed representations from the X-Sec team's falsified security reports, *id.* ¶¶ 232(f) (Count 3), 254 (Count 6);

- A Board-level audit was artificially circumscribed to exclude confidentiality violations under the FTC Privacy Order, *id.* ¶ 257(a) (Count 6); Zuckerberg's January 2024 testimony before the Senate Judiciary Committee "disseminat[ed] a false narrative," *id.* ¶ 232(g) (Count 3); and

- Meta's legal department systematically marks documents as privileged to shield them from disclosure, *id.* ¶ 282 (Count 11).

Given Baig's failure to disclose any of the foregoing, none of it can anchor his claimed protected activity. *See, e.g.*, *Boyd v. Accuray, Inc.*, 593 F. App'x 647, 648 (9th Cir. 2015) (affirming

order dismissing Section 806 claim because employee failed to show he "shared his concern with [employer], or that anyone with supervisory authority over him knew or suspected that [he] was engaged in SOX-protected activity"); *Nordstrom v. U.S. Bank, N.A., Inc.*, No. 11-CV-1554 BEN (KSC), 2012 WL 3000416, at *4 (S.D. Cal. July 23, 2012) (granting motion to dismiss Section 806 claim because, "[w]hile Plaintiff alleges that he believed SOX violations occurred, he does not indicate that he actually reported such violations to management or supervisors").

Baig's lawyers also attempt to connect his internal complaints about the FTC Privacy Order to almost every single SEC rule or federal statute concerning shareholder fraud, calling these rhetorical gymnastics their "FTC-to-SEC pipeline" theory. Their theory goes that Baig's alleged reporting of FTC Privacy Order violations was necessarily also reporting about Meta's alleged misrepresentations to the SEC and the public concerning its FTC Privacy Order compliance. *Contra* SAC ¶¶ 65-72. But the SAC fails to allege that he raised any complaints about Meta's SEC filings contemporaneously, which is the only thing that matters here. A theory cannot change facts. Employees complain all the time about conduct that can be very serious (sexual harassment or product defects, as examples) and that violates laws or regulations not covered by Section 806. Just because the conduct (if true) may relate downstream to subject matter that appears in SEC filings does not mean that the employee reasonably believed they were complaining about shareholder fraud. Were it otherwise, nearly every employee complaint would be cloaked in SOX's protections. That is not the law. *See Platone v. U.S. Dep't of Lab.*, 548 F.3d 322, 327 (4th Cir. 2008) (affirming dismissal of Section 806 claim because employee reported billing discrepancy, not mail, wire, or shareholder fraud); *Katzel v. Am. Int'l Grp.*, No. 20 CIV. 7220 (AKH), 2022 WL 17251362, at *3 (S.D.N.Y. Nov. 28, 2022) (dismissing Section 806 claim because complaint was about gaps in company's process for pursuing strategic transactions, not defrauding shareholders), *aff'd sub nom. Katzel v. Am. Int'l Grp., Inc.*, No. 22-2764, 2024 WL 3063461 (2d Cir. June 20, 2024); *Neely v. Boeing Co.*, No. C16-1791 RAJ, 2018 WL 2216093, at *4 (W.D. Wash. May 15, 2018) (same because complaint was about "Boeing[']s alleged failure to comply with FAA regulations," not "that these actions were defrauding Boeing's shareholders").

3.    Baig Did Not Reasonably Believe He Engaged in Protected Activity.

Even assuming the Court can get past the foregoing deficiencies in the SAC, Baig still failed to state a claim. His attorneys concocted 13 unsuitable legal theories of protected activity that have nothing to do with his alleged cybersecurity complaints.

a.    *Baig Did Not Reasonably Believe He Reported Violations of the SEC's Cybersecurity Rules.*

Nowhere in the 203-page SAC did Baig adequately allege he reported violations of the SEC's cybersecurity rules. He premises Count 2 upon his alleged FTC Privacy Order reporting—which he cannot do, *supra* § III.C.1—and the form TCRs he allegedly submitted to the SEC. SAC ¶¶ 217-23. But his allegations about the Form TCRs do not suggest he was disclosing violations of the SEC's cybersecurity regulations. Nor does Baig allege that he ever provided the Form TCRs to Meta. Thus, Baig does not even allege that Meta was on notice of their substance.

Baig alleges his Form TCRs reported Meta's "failure to inform investors about material cybersecurity risks, including the systematic under-reporting of scraping incidents," "misleading statements in Meta's public SEC filings regarding its FTC Privacy Order compliance program," and "ongoing violations of federal securities laws and rules." SAC ¶ 112. That vague allegation tracks his original Complaint's allegation that his Form TCR "document[ed] Meta's cybersecurity deficiencies and failure to inform investors about material cybersecurity risks," including WhatsApp's failure to track and manage user data collection, identify data storage locations, and address systemic scraping and account takeover issues. ECF No. 3, ¶ 33. This Court previously ruled that this allegation lacked sufficient detail to state a claim under the SEC's cybersecurity rules. *Baig I*, at *4. The SAC did not add anything that would alter the Court's prior ruling.

b.    *Baig Did Not Reasonably Believe He Reported Shareholder Fraud.*

In support of Counts 2, 3, 12, and 14—*see* SAC ¶¶ 219, 221, 226, 228, 228(a)-(c), 232(h)—Baig alleges the following misrepresentations in and omissions from Meta's SEC filings: (i) Meta stated it was implementing or maintaining (as applicable) a comprehensive privacy program in connection with the FTC Privacy Order that was overseen by the Board's Privacy Committee, *id.* ¶¶ 44-48; (ii) Meta failed to disclose "contemplated" governmental proceedings related to FTC

- 17 -

DEFENDANTS' MEMORANDUM OF POINTS
AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 3:25-CV-07604-YGR

Privacy Order violations, failed to disclose the FTC's show-cause proceeding for nine months, and omitted the findings of the FTC's show-cause proceeding, *id.* ¶ 53; (iii) Meta stated it experienced cyberattacks only from time to time and that it had not identified material cybersecurity threats, *id.* ¶¶ 50, 56; (iv) Meta stated it had effective disclosure controls, *id.* ¶ 46; and (v) Baig documented Meta's annual losses, WhatsApp did not really contribute to advertising revenue that was internally attributed to it, and Meta committed $300 million for WhatsApp marketing to grow its user base even though there was no monetization strategy for new users, *id.* ¶ 58.

Setting aside the fact that Baig never administratively exhausted or complained about these alleged misrepresentations and omissions, *supra* §§ III.B, III.C.2, they do not "approximate" the elements of a shareholder fraud claim, *Baig I*, at *5. These elements include: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Van Asdale*, 577 F.3d at 1001 (citation omitted). By failing to approximate these elements, Baig failed to plead he had an objectively reasonable belief sufficient to support Counts 2, 3, 12, and 14.

(1)     Baig Did Not Allege Any Actionable Misrepresentations or Omissions.

The first three alleged misrepresentations or omissions concern Meta's supposed noncompliance with the FTC Privacy Order. Those are inactionable because they are either true or not the type of statement that could form a claim.

The statements Baig seizes on were not "detailed factual assertions," but rather "vague, highly subjective claims" that are "not capable of objective verification" and are inactionable under the securities laws. *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (citation omitted). Meta's statements about implementing or maintaining a "comprehensive" privacy program are, at worst, what courts deem to be inactionable "corporate optimism and puffery." *Id.* The Court cannot verify whether Meta's privacy program was "comprehensive." *See, e.g.*, *In re PG&E Corp. Sec. Litig.*, 806 F. Supp. 3d 962, 992, 995 (N.D. Cal. 2025) (holding that PG&E's statement that it was maintaining "one of, if not, the most *comprehensive* management programs in the country" was corporate puffery (emphasis added)).

Baig's reliance on Meta's failure to disclose supposed "contemplated" proceedings by the FTC in its 2020[8] through 2022 SEC filings should be rejected. Meta was under "no obligation or requirement to elaborate on any alleged non-compliance" with the FTC Privacy Order "because it had not yet been found to be non-compliant" by the FTC.[9] *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 897 (N.D. Cal. 2022) (citation omitted) (holding that PayPal's statement it was "cooperat[ing] and engag[ing]" with CFPB "to ensure compliance with [c]onsent [o]rder" was not a misstatement despite alleged noncompliance, because CFPB had not found any noncompliance) *Id*. at 898.

Nor can Baig base a reasonable belief on the alleged nine-month delay before Meta disclosed the FTC's May 2023 show-cause proceeding. "Pure omissions are not actionable[.]" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 260 (2024). "A pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." *Id.* at 263. "Half-truths, on the other hand, are representations that state the truth only so far as it goes, while omitting critical qualifying information." *Id.* (citation modified). Disclosure is required only to complete half-truths. *Id.* at 264 (citation modified).

Baig does not allege that, before Meta's FY 2023 Form 10-K—which Baig admits disclosed the FTC's show-cause proceeding, SAC ¶ 288—Meta disclosed any half-truths about regulatory compliance that compelled earlier disclosure of the proceeding. Nor did Form 8-K Item 8.01 *require* Meta to file an earlier current report disclosing it. Item 8.01 allows Meta "*at its option*" to disclose events or file reports for events it deems of importance.[10] *Form 8-K*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/files/form8-k.pdf, at p. 37 (last visited June 26, 2026) (emphasis added); *accord In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp.

---

[8] Baig's allegation that he was raising concerns about SEC filings submitted *before* his employment even began in February 2021 strains credulity. *Contra* SAC ¶ 44.

[9] For the same reason, Baig's allegation that he was reporting violations of SEC rules concerning loss-contingency footnotes in financial statements is unreasonable. *Contra* SAC ¶ 57. There was and is nothing for Meta to report.

[10] For this reason, Count 12 fails in its entirety. That Count is based on Baig's professed belief he was reporting Meta's failure to file a current Form 8-K for the FTC's show-cause proceeding. SAC ¶¶ 285-92.

2d 134, 154 (E.D.N.Y. 2008) (observing that "Item 8.01 is generally used to disclose information that the registrant is *not required* by law to disclose" (emphasis added)).

Baig also takes umbrage with Meta's framing of the FTC's show-cause proceeding. But "companies are not required to engage in 'self-flagellation' by disclosing unproven allegations." *Veal*, 423 F. Supp. 3d at 806 (citation omitted) (holding that company's disclosure of FTC investigation was sufficient because it need not "confess" to FTC's allegation). Meta only had to disclose what the FTC alleged, not accept the truth of those allegations. So, that is what Meta did. The FTC "alleg[ed] that [Meta] has failed to fully comply with the order, misled parents about their ability to control with whom their children communicated through its Messenger Kids app, and misrepresented the access it provided some app developers to private user data." *FTC Proposes Blanket Prohibition Preventing Facebook from Monetizing Youth Data*, FED. TRADE COMM'N (May 3, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-proposes-blanket-prohibition-preventing-facebook-monetizing-youth-data. Likewise, Meta disclosed in Form 10-Ks that: [t]he FTC also continues to monitor us and our compliance with the modified consent order and initiated an administrative proceeding against us, which we are challenging, that alleges deficient compliance and violations of the Children's Online Privacy Protection Act (COPPA), the COPPA Rule, and Section 5 of the Federal Trade Commission Act and seeks changes to our business. ECF No. 50-3, at 12 (emphasis added); *see also* ECF No. 50-4, at 11. Meta further made clear that, if the FTC were successful, "it would limit our ability to provide certain features and services, engage in certain business practices, require us to further increase the time, resources, and costs we spend on compliance and oversight efforts, and would adversely affect our business and financial results." ECF Nos. 50-3, at 43; 50-4, at 42.

Meta did not downplay the risk of cyberattacks as merely hypothetical, either. The SAC selectively quotes from Meta's securities filings to create the impression that Meta hid something material when making a certain statement about cybersecurity. To the contrary, Meta informed the public that it "*regularly* experience[s] such cyber-attacks," was a "particularly attractive target" for them, and that they "have occurred on our systems, and will occur on our systems in the future." ECF No. 50-4, at 44-45 (emphasis added)].

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 3:25-CV-07604-YGR

Finally, Baig failed to allege specific facts demonstrating how Meta's representations about its disclosure controls and WhatsApp's "business trajectory" and financials were misleading. As to the former, he vaguely alleges his reporting of FTC Privacy Order violations rendered Meta's disclosure-controls representation misleading without explaining why. *Contra* SAC ¶ 46; *see also infra* § III.C.3.d (explaining why Baig's allegations do not concern Meta's disclosure controls). As to the latter, he fails to identify any particular misrepresentation in any SEC filing. *Contra* SAC ¶ 58. *See, e.g.*, *Magnuson v. Exelon Corp.*, 658 F. Supp. 3d 652, 663 (C.D. Ill. 2023) (granting motion to dismiss SOX whistleblower because it lacked "basic details" about the misrepresentations); *Fuqua v. SVOX AG*, No. 14 C 216, 2014 WL 3811047, at *7 (N.D. Ill. Aug. 1, 2014) (same).

(2)    The Alleged Misstatements and Omissions Were Immaterial.

None of the alleged misstatements or omissions were material in any event. A misstatement's materiality depends on whether "there is a substantial likelihood that a reasonable shareholder would consider" the information to be "important." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). For an omission, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231–32 (citation omitted).

Baig did not allege that any of the alleged misstatements or omissions impacted Meta's financial condition or results of operations, revenue, or earnings, caused a failure to meet analysts' consensus expectations, or disrupted Meta's business by losing customers. Instead, he repeatedly describes the alleged misstatements and omissions in conclusory fashion as "material"—a word and its variants appearing 237 times throughout the SAC. *See Gjovik v. Apple Inc.*, No. 23-CV-04597-EMC, 2024 WL 2309100, at *12 (N.D. Cal. May 20, 2024) ("A conclusory allegation that a misrepresentation or omission is material is not sufficient."). Baig's limited attempts to get more specific undermine his argument. He alleges he told the SEC that Meta's securities violations would cause a "$5,000,000" loss. SAC ¶ 112. That is a tiny fraction (and certainly not a material one) of Meta's $164.5 billion in revenue and $62.3 billion in net income in 2024. ECF No. 50-4, at 71. *See, e.g.*, *Clegg v. Amcor Rigid Packaging USA, LLC*, No. CV 5:21-232-DCR, 2022 WL 23215, at *3

(E.D. Ky. Jan. 3, 2022) (granting motion to dismiss Section 806 claim based on report of employer-subsidiary's loss that represented 0.035% of parent company's revenue).

           (3)     Baig Failed to Allege Loss Causation and Economic Loss.

Baig did not reasonably believe Meta's share price would fall "*significantly* after the truth became known" about his cybersecurity disclosures. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (emphasis added) (citation modified). The New York Times and CNBC, among others, reported on this lawsuit and Baig's allegations, including WhatsApp's alleged cybersecurity deficiencies that Meta allegedly withheld from shareholders. *See* Cecilia Kang, *Whistle-Blower Sues Meta Over Claims of WhatsApp Security Flaws*, N.Y. TIMES (Sept. 8, 2025), https://www.nytimes.com/2025/09/08/technology/whatsapp-whistleblower-lawsuit.html; Jonathan Vanian, *Ex-Meta employee files whistleblower suit for alleged security flaws at WhatsApp*, CNBC (Sep. 8, 2025), https://www.cnbc.com/2025/09/08/ex-meta-employee-whistleblower-suit-alleged-security-flaws-whatsapp-.html. Meta's share price nevertheless *increased* by $13.40 the next day. Google Finance, Meta Platforms Inc (META), https://www.google.com/finance/quote/META:NASDAQ?hl=en&window=6M (last visited June 26, 2025) (reflecting September 8, 2025, closing price of $752.30 and September 9 closing price of $765.70). The same thing happened after Baig filed the SAC. *Id.* (reflecting April 24, 2026, closing price of $675.03 and April 27, 2026, closing price of $678.62). Accordingly, Baig's alleged belief that Meta's alleged misstatements and omissions would cause shareholders economic loss was verifiably unreasonable. *See, e.g.*, *Metzler*, 540 F.3d at 1062–64 (finding loss causation inadequately alleged because there was only "modest" 10% drop in share price, which recovered three days later in any event); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) (same where stock dropped 4% and then "immediately rebounded").

           c.     *Baig Did Not Reasonably Believe He Reported Violations of SEC Rules Prohibiting Audit Obstruction and Falsification of Accounting Records.*

Baig supposedly also believed he was reporting violations of SEC rules prohibiting the falsification of accounting books and records and financial statements and making false statements

to or otherwise coercing accountants. SAC ¶¶ 233-40 (Count 4), 248-57(b) (Count 6). That belief, even if sincerely held, is unreasonable. Counts 4 and 6 should be dismissed.

Baig's alleged complaints about the X-Sec team's alleged falsification of security reports misapprehend the nature of the SEC rules he cites. He describes those security reports as "written compliance assessment documents that characterized WhatsApp's security controls as functioning" that were "provided to Meta's compliance oversight personnel and to the FTC-designated independent assessor[.]" *Id.* ¶ 70. Plainly, they were not "book[s], record[s], and account[s]," 17 C.F.R. § 240.13b2-1, which "reflect the *transactions and dispositions of the assets* of" Meta, 15 U.S.C. § 78m(b)(2)(A) (emphasis added). They also were not "*financial statements*" subject to the "audit or review" of an "independent public or certified public *accountant*." 17 C.F.R. § 240.13b2-2(b)(1) (emphases added). Nor were they "false or misleading statement[s] made to an *accountant*." 17 C.F.R. § 240.13b2-2(a)(1) (emphases added).

Past that, Counts 4 and 6 rest on the thinnest of reeds. Meta's representations about its internal audit function's effectiveness in auditing cybersecurity controls were not false statements to an "accountant." *Id.* The hypothetical written records of FTC Privacy Order violations Baig was allegedly instructed not to make were not "book[s], record[s], and account[s]," 17 C.F.R. § 240.13b2-1, which "reflect the transactions and dispositions of the assets of" Meta, 15 U.S.C. 78m(b)(2)(A). Nor was the allegedly false performance metric used to support a colleague's promotion or any resulting compensation decisions for that colleague vis-à-vis Baig.

d.    *Baig Did Not Reasonably Believe He Reported Violations of the SEC's Internal Financial Controls or Disclosure Controls and Procedures Rules.*

As this Court previously explained, the internal financial controls rule, 17 C.F.R. § 240.13a-15(f), "applies to financial reporting, and the plaintiff's reporting concerned cybersecurity," *Baig I*, at *6. The SAC does not and cannot change the nature of Baig's reporting. Count 5 should therefore be dismissed to the extent it relies on Baig's reprised and unreasonable belief he reported violations of the internal financial controls rule. *Contra* SAC ¶¶ 242-47.

The disclosure controls and procedures rule requires Meta to maintain a system of controls that ensure information required to be disclosed in SEC filings is "recorded, processed, summarized

and reported." 17 C.F.R. § 240.13a-15(a), (e). In *SEC v. SolarWinds Corp.*, the SEC pleaded three instances in which SolarWinds did not properly characterize or elevate information through one of its disclosure controls: an Incident Response Plan. 741 F. Supp. 3d 37, 111–12 (S.D.N.Y. 2024). In granting SolarWinds's motion to dismiss, the court explained that such isolated "errors happen without systemic deficiencies." *Id.* at 111. The court found it significant that the SEC did not allege that SolarWinds lacked disclosure controls altogether. *Id.* at 110.

This case is (once again) on all fours with *SolarWinds*. Baig never alleges that Meta lacked disclosure controls and procedures or facts showing there were systemic deficiencies in its controls. Instead, he alleges that: a false positive was reported to the AROC; the EECC auditor was pressured to exclude certain cybersecurity findings from his audit of WhatsApp's cybersecurity controls; the X-Sec team submitted falsified security reports; Baig was instructed to stop documenting FTC Privacy Order compliance failures; and Tsimelzon ordered the deletion of Baig's team's internal security report. SAC ¶¶ 244-45. Those alleged isolated incidents—most of which have no nexus to information Meta must report in SEC filings in any event—do not lead to an inference that the design of Meta's unalleged disclosure controls and procedures had systemic deficiencies or that it had no disclosure controls and procedures at all.

e.    *Complaining to OSHA and the SEC Does Not Mean Baig Engaged in Protected Activity.*

This Court previously rejected Baig's argument that his disclosures to OSHA and the SEC "are independently protected under SOX regardless of content." *Baig I*, at *4. Counts 8 and 9 inexplicably repeat that theory of protected activity. SAC ¶¶ 267-74. Additionally, for the reasons set forth herein, the *substance* of Baig's OSHA complaint did not concern violations of any specific protected category of law under Section 806, and the complaints Baig allegedly sent to the SEC were vague and never sent to Meta in any event. Accordingly, Counts 8 and 9 should be dismissed.

f.    *Baig Did Not Reasonably Believe He Reported Wire or Mail Fraud.*

Baig alleges that he reported wire and mail fraud. The SAC contains no allegations that he reported anything even remotely resembling violations of either statute.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 3:25-CV-07604-YGR

"The elements of mail fraud and wire fraud are essentially identical." *RJ v. Cigna Health & Life Ins. Co.*, 625 F. Supp. 3d 951, 961 (N.D. Cal. 2022). To establish he reasonably believed he was reporting wire fraud, Baig must plead "(1) the existence of a scheme to defraud; (2) the use of wire, [mail,] radio, or television to further the scheme; and (3) a specific intent to defraud." *Baig I*, at *7 (citation omitted); *accord Cigna Health*, 625 F. Supp. 3d at 961. He failed to do so. His new theory is that WhatsApp used wires and mail to make cybersecurity misrepresentations to Business API customers and induced them to pay per-message fees for WhatsApp. SAC ¶¶ 275-78. But Baig failed to exhaust those allegations with OSHA, plead that he complained about that conduct, or even identify a single Business API customer supposedly defrauded by Defendants. *Supra* §§ III.B, III.C.2.

Baig also failed to allege the requisite mens rea for wire fraud. He needed to allege "the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions." *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020). "In other words, a defendant must intend to deceive and cheat." *Id.* Yet, Baig alleges that Defendants' purported wire and mail fraud scheme "was knowing and intentional" based solely on Gupta's and Tsimelzon's receipt of Baig's cybersecurity reporting. SAC ¶ 278. That defies common sense.

g.     *Baig Did Not Reasonably Believe He Reported Impedance of his Communications with the SEC.*

Nor did Baig reasonably believe he reported an "action to impede an individual from communicating directly with the [SEC] staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications." 17 C.F.R. § 240.21F-17(a). This rule is designed to outlaw confidentiality agreements that thwart whistleblowing. *See generally SEC v. Collector's Coffee, Inc.*, No. 19 CIV. 4355 (VM), 2025 WL 752221, at *20 (S.D.N.Y. Mar. 10, 2025), *appeal docketed*, No. 25-924 (2d Cir. Apr. 17, 2025). It has no applicability here.

Even if it did, nothing allegedly impeded Baig from communicating with the SEC; he admits he *did* file two Form TCRs. SAC ¶¶ 112, 148. Moreover, the alleged "impedance" conduct

Baig relies on was, according to Baig's allegations, intended to stop him from raising cybersecurity and FTC Privacy Order compliance concerns, not from communicating with the *SEC*. *Id.* ¶ 282 (relying on, *inter alia*, Mukerji's alleged "April 2023 explicit order to stop raising FTC Privacy Order concerns," prohibitions on documenting FTC Privacy Order compliance failures, and Clarke allegedly directing Baig not to raise data exfiltration risks in meetings).

h.      *Baig Did Not Reasonably Believe He Reported Criminal Activity.*

Finally, and perhaps worst of all, is Baig's allegation that he reported Defendants' violations of four criminal statutes: 18 U.S.C. §§ 1512(c), 1513(e), 1519, 1520. None are covered by Section 806 or even facially applicable to the conduct alleged in the SAC. *Supra* §§ II.A, III.C.1. Baig's belief is also undermined by the fact that he never allegedly complained to criminal authorities.

**D.      Baig Failed to State a Claim for Relief Against Zuckerberg and Cathcart.**

The Court should dismiss Baig's claims against Cathcart and Zuckerberg for an additional, independent reason. Baig failed to allege that they were "materially involved" in any alleged retaliation. *Wallender v. Canadian Nat'l Ry. Co.*, No. 2:13-CV-2603-DKV, 2015 WL 10818741, at *18 (W.D. Tenn. Feb. 10, 2015) (citation modified).

Baig allegedly raised concerns to Cathcart in late 2022 and to Zuckerberg via two letters in 2024. *Supra* § II.B. This Court has already ruled that their mere knowledge of Baig's alleged concerns does not state claims against them individually. *Baig I*, at *7. Beyond this, Cathcart allegedly *encouraged* Baig to report his concerns, directed Verma *to address them*, and then withdrew from Baig's security work. *Supra* § II.B. If anything, those allegations undermine any inference that Cathcart retaliated against Baig. As for Zuckerberg, Baig vaguely alleges Zuckerberg allocated engineers "to the very same people retaliating against" Baig, which is different from an adverse employment action *against Baig*. *Id.*

Baig's claims against Zuckerberg and Cathcart are not saved by his allegation that, "[o]n information and belief," they personally approved his discharge. *Id.* In *Blantz v. California Department of Corrections & Rehabilitation*, a prison's nurse practitioner asserted a wrongful termination action against the prison healthcare system's Chief Medical Officer, basing the claim

on her allegation that, "on information and belief," "he directed the other defendants to take the actions that form the basis of the complaint." 727 F.3d 917, 926 (9th Cir. 2013) (citation modified). The Ninth Circuit affirmed dismissal of her claim for two reasons. First, there were no other specific facts alleged about his involvement. *Id.* at 927. Second, it was "not plausible on its face" that the Chief Medical Officer would participate in any adverse actions involving the plaintiff. *Id.*

Baig's claims against Zuckerberg and Cathcart suffer from the same two flaws. There are no allegations in the SAC about the nature or extent of their involvement in Baig's discharge. Nor would there be. They operated four and three levels above him, respectively. Indeed, Baig allegedly reported directly to Mukerji and (later) Tsimelzon, who both reported to Gupta, WhatsApp's Head of Engineering, who, in turn, reported to Cathcart, Meta's Head of WhatsApp who, in turn, reported to Zuckerberg, Meta's CEO. SAC ¶¶ 17-20, 22.

The alleged "particularized facts peculiarly within the knowledge of" Zuckerberg and Cathcart do not authorize Baig's strained information-and-belief allegation. *Contra* SAC ¶¶ 201, 274. Again, that Zuckerberg and Cathcart allegedly received some of Baig's complaints does not suggest they personally approved his discharge. Nor does the supposed "extraordinary litigation exposure" that would result from Baig's firing. Besides, accepting his argument would mean that any employee could name endless managers in lawsuits just by complaining to them and being litigious. That is a bridge too far. *See, e.g.*, *Brinker v. Axos Bank*, No. 22-cv-386-MMA (DDL), 2022 WL 17724408, at *10–11 (S.D. Cal. Dec. 15, 2022) (dismissing Section 806 claims against Chief Legal and Credit Officers because plaintiff did not allege facts about their involvement in her discharge and company was too large and they were too senior to reasonably infer they were involved); *Bury v. Force Protection, Inc.*, No. CV 09–1708-DCN-BM, 2011 WL 2935916, at *2-4 (D.S.C. June 27, 2011) (same for Section 806 claims against company's CEO and President), *report and recommendation adopted*, 2011 WL 2929827 (D.S.C. July 19, 2011).

IV.    **CONCLUSION**

Baig has now twice failed to state a claim upon which relief can be granted. Rather than addressing the deficiencies identified in *Baig I*, he filed false allegations and a shotgun pleading replete with countless redundancies, improper legal argument, indiscriminate pleading, and alleged

beliefs he could not have possibly held. Simply put, he cannot magically transform his cybersecurity allegations into complaints about securities fraud. And his claims against Zuckerberg and Cathcart should be dismissed for the additional reason that he cannot connect them to any alleged adverse actions. For these reasons, the SAC should be dismissed with prejudice. *See, e.g.*, *Frezza v. Google Inc.*, No. 5:12-CV-00237-RMW, 2013 WL 1736788, at *5 (N.D. Cal. Apr. 22, 2013) (dismissing claim with prejudice because plaintiffs twice failed to state a claim).

DATED: June 29, 2026

PAUL HASTINGS LLP

By: _____

Elena R. Baca (SB# 160564)
Paul C. Evans (admitted *pro hac vice*)
Jeffrey A. Sturgeon (admitted *pro hac vice*)
Daniel S. Richards (admitted *pro hac vice*)

Attorneys for Defendants
META PLATFORMS, INC., PINAKI
MUKERJI, MARK TSIMELZON, NITIN
GUPTA, WILL CATHCART AND MARK
ZUCKERBERG

DEFENDANTS' MEMORANDUM OF POINTS
AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 3:25-CV-07604-YGR