Wilmer J. Harris, SBN 150407
wharris@sshhzlaw.com
Amanda E. Johnson, SBN 324500
ajohnson@sshhzlaw.com
Emily C. Barbour, SBN 337185
ebarbour@sshhzlaw.com
Katherine A. Wardlaw, SBN 353297
Kwardlaw@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
715 Fremont Ave., Suite A
South Pasadena, CA. 91030
Telephone No.: (626) 441-4129
Facsimile No.: (626) 283-5770

*Attorneys for Plaintiff, Attaullah Baig*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATTAULLAH BAIG,<br><br>               Plaintiff,<br>   vs.<br><br>META PLATFORMS, INC., a corporation; PINAKI MUKERJI; MARK TSIMELZON; NITIN GUPTA; WILL CATHCART; MARK ZUCKERBERG; and DOES 1-10, inclusive, Defendants.<br><br>  Defendants. | Case No. 3:25-CV-07604-LB<br><br>**PLAINTIFF'S *CORRECTED* OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date: September 17, 2026<br>Time: 2:00 p.m.<br>Judge: Hon. Laurel D. Beeler<br>Crtm: 1, 4th Floor<br><br>*[Filed concurrently: Request for Judicial Notice]*<br><br>Complaint Filed: September 8, 2025<br>Trial Date: Not Set |

---

**TABLE OF CONTENTS**

I.      INTRODUCTION................................................................................................9

II.     STATEMENT OF FACTS................................................................................ 10

    A.    Baig Was Already Familiar with Meta's Troubling History at Hire................................. 10

    B.    Baig Reported that Meta's Rampant FTC and SEC Problems Were Ongoing. .................. 11

    C.    Baig Blew the Whistle for Three Years as the Problems Grew. ......................................... 11

    D.    Zuckerberg and Cathcart Personally Approved Baig's Termination. ................................. 14

III.    THE STANDARD GOVERNING A SECTION 806 CLAIM ......................................... 14

    A.    Whistleblowing of Suspected Violation of SEC Rules or Regulations Does Not Require Any Showing of Fraud at All. .......................................................................... 15

IV.     The Motion Fails to Attack Dozens of Legal Predicates Pled in the SAC.......................... 16

    A.    Motion's Scant Discussion of Count 14 is its Most Notable Failure. ................................ 16

    B.    Defendants' Sole Challenge to Many Claims Is Simply Incorrect. ................................... 17

V.      BAIG HAS PLEADED PROTECTED ACTIVITY MANY TIMES OVER. .................... 18

    A.    Baig's Internal Reports Satisfy this Lenient Standard for Protected Activity. .................. 19

VI.     SAC PLEADS A REASONABLE BELIEF IN VIOLATIONS OF 30 SEC RULES........ 19

    A.    Count 2: Reports Relating to Violations of Item 106, The SEC Cybersecurity Rule. ........ 19

        1.    Meta's Attack on the Link Between the FTC Order and Meta's SEC Filings Fails. ....... 20

        2.    Meta's Arguments About the Form TCRs Are Irrelevant............................................... 21

        3.    Meta Does Not Contest Two of the Three Bases for Item 106 Liability. ....................... 22

    B.    Count 5: Reports Relating to False Certifications That Disclosure Controls Worked........ 22

    C.    Counts 4 and 6: Reports Relating to Violations of Rules 13b2-1 and 13b2-2 ................... 23

    D.    Count 7: Reports Relating to Violations of Item 1.05 and Rule 13a-11 ............................ 24

    E.    Baig's Whistleblowing Reports Relate Directly to Meta's Misleading SEC Filing About the FTC Proceeding in Violation of Item 8.01 and Rule 13a-11 (Count 12). ..................... 25

    F.    Baig's Whistleblowing Count 11: Reports Relating to Violation of Rule 21F-17 ............. 26

VII.    SAC PLEADS A REASONABLE BELIEF IN META'S COMMISSION OF FRAUD... 26

    A.    Count 3: Reports Relating to Meta's Conduct Constituting Securities Fraud ................... 26

        1.    *SolarWinds* Approved A Securities-Fraud Theory on Analogous Facts........................ 27

        2.    Baig Alleges Misrepresentations to Shareholders........................................................... 28

        3.    Meta Fails to Address All of the SEC Rules At Issue in Count 3.................................. 28

        4.    The SAC Approximates Fraud Pleading As Required by *Van Asdale.* ......................... 29

    G.    Count 10: Reports Relating to Mail and Wire Fraud. ....................................................... 30

H.    Count 13: Reports Relating to Shareholder Fraud and Obstructing Proceedings ............... 31

VIII.    COUNTS 8 AND 9: FILINGS THEMSELVES ARE PROTECTED ACTIVITY. ........... 32

IX.    THERE IS NO MERIT TO META'S CLAIMS OF PUFFERY ....................................... 33

X.    INDIVIDUAL DEFENDANTS ARE LIABLE ON FOUR SEPARATE GROUNDS. ...... 33

XI.    BAIG EXHAUSTED EACH OF HIS CLAIMS .................................................................. 35

XII.    THE SAC IS NOT A SHOTGUN PLEADING .................................................................. 37

XIII.    CONCLUSION ................................................................................................................ 38

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,.................... 30
   320 F.3d 920 (9th Cir. 2003)

*Aaron v. SEC*,................................................................................................................................ 16
   446 U.S. 680 (1980)

*Beacom v. Oracle Am., Inc.*,................................................................................................ 15, 27
   825 F.3d 376 (8th Cir. 2016)

*Blantz v. Cal. Dep't of Corr. & Rehab.*,.................................................................................. 34
   727 F.3d 917 (9th Cir. 2013)

*Boyd v. Accuray, Inc.*, ............................................................................................................. 18
   593 F. App'x 647 (9th Cir. 2015)

*Brinker v. Axos Bank*,.............................................................................................................. 34
   2022 WL 17724408 (S.D. Cal. Dec. 15, 2022)

*Bury v. Force Protection, Inc.*,................................................................................................ 34
   2011 WL 2935916 (D.S.C. June 27, 2011)

*Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*, ............................................... 38
   147 F.4th 1341, 1350 (11th Cir. 2025)

*Clegg v. Amcor Rigid Packaging USA, LLC*,.......................................................................... 29
   No. CV 5:21-232-DCR, 2022 WL 23215 (E.D. Ky. Jan. 3, 2022)

*Dawson v. Meta Platforms, Inc.*,............................................................................................. 37
   2026 U.S. Dist. LEXIS 164043 (N.D. Cal. July 23, 2026)

*Eminence Capital, LLC v. Aspeon, Inc.*, ................................................................................. 38
   316 F.3d 1048 (9th Cir. 2003)

*Erhart v. BofI Holding, Inc.*, ................................................................................................... 37
   612 F. Supp. 3d 1062 (S.D. Cal. 2020)

*Feldman v. Law Enforcement Assocs. Corp.*, .......................................................................... 37
   752 F.3d 339 (4th Cir. 2014)

*First-Citizens Bank & Tr. Co. v. HSBC Holdings PLC*,.......................................................... 37
   No. 23-cv-02483-LB, 2024 U.S. Dist. LEXIS 5668 (N.D. Cal. Jan. 10, 2024)

*Freeman v. Oakland Unified Sch. Dist.*, ............................................................................ 35, 36
   291 F.3d 632 (9th Cir. 2002)

*Gibson v. City of Portland*,................................................................................................. 37, 38
   165 F.4th 1265 (9th Cir. 2026)

*Gjovik v. Apple Inc.*,................................................................................................................. 29
   No. 23-CV-04597-EMC, 2024 WL 2309100 (N.D. Cal. May 20, 2024)

*Gladitsch v. Neo@ogilvy, Ogilvy, Mather, WPP Grp. USA, Inc.*, ......................................... 31

2012 U.S. Dist. LEXIS 41904 (S.D.N.Y. Mar. 21, 2012)(S.D.N.Y. Mar. 21, 2012)

*Grossman v. Novell, Inc.*, ............................................................................................................... 33
    120 F.3d 1112 (10th Cir. 1997)

*Hashimoto v. Dalton*, ...................................................................................................................... 33
    118 F.3d 671 (9th Cir. 1997)

*In re Alphabet, Inc. Sec. Litig.*, .......................................................................................... 22, 25, 30
    1 F.4th 687 (9th Cir. 2021)

*In re Facebook, Inc. Sec. Litig.*, ......................................................................................... 22, 25, 29
    87 F.4th 934 (9th Cir. 2023)

*In re Meta Pixel Tax Filing Cases*, ............................................................................................... 37
    724 F. Supp. 3d 987 (N.D. Cal. 2024)

*In re PG&E Corp. Sec. Litig.*, ....................................................................................................... 33
    806 F. Supp. 3d 962 (N.D. Cal. 2025)

*Jones v. Southpeak Interactive Corp. of Del.*, .............................................................................. 34
    777 F.3d 658 (4th Cir. 2015)

*Kang v. PayPal Holdings, Inc.*, .................................................................................................... 20
    620 F. Supp. 3d 884 (N.D. Cal. 2022)

*Kappouta v. Valiant Integrated Servs.*, ................................................................................... 10, 15
    60 F.4th 1213 (9th Cir. 2023)

*Katzel v. Am. Int'l Grp.*, ............................................................................................................... 19
    2022 U.S. Dist. LEXIS 213950 (S.D.N.Y. Nov. 28, 2022)

*Khoja v. Orexigen Therapeutics, Inc.*, .......................................................................................... 22
    899 F.3d 988 (9th Cir. 2018)

*Koerner v. Grigas*, ........................................................................................................................ 16
    328 F.3d 1039 (9th Cir. 2003)

*Kousisis v. United States*, .............................................................................................................. 31
    605 U.S. 114 (2025)

*Liu v. Tutor-Perini Corp.*, ............................................................................................................. 31
    No. 2:21-cv-05803-AB-Ex, 2023 U.S. Dist. LEXIS 150845 (C.D. Cal. July 12, 2023)

*Lockheed Martin Corp. v. ARB*, ................................................................................................... 31
    717 F.3d 1121 (10th Cir. 2013)

*Lorenzo v. SEC*, ............................................................................................................................ 28
    587 U.S. 71 (2019)

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, ....................................................... 25, 28
    601 U.S. 257 (2024)

*Murray v. UBS Sec., LLC*, ............................................................................................................ 34
    601 U.S. 23 (2024)

*Neder v. United States*, ................................................................................................................. 30

527 U.S. 1 (1999)

*Neely v. Boeing Co.*, ......................................................................................................... 19
  No. C16-1791 RAJ, 2018 U.S. Dist. LEXIS 81771 (W.D. Wash. May 15, 2018)

*Nielsen v. AECOM Tech. Corp.*, ...................................................................................... 24
  762 F.3d 214 (2d Cir. 2014)

*Nordstrom v. U.S. Bank, N.A.*, ......................................................................................... 18
  No. 11-CV-1554 BEN (KSC), 2012 WL 3000416 (S.D. Cal. July 23, 2012)

*Park v. Thompson*, ............................................................................................................ 34
  851 F.3d 910 (9th Cir. 2017)

*Potyondy v. Pac. Coast Energy Co., LP*, .................................................................... 27, 37
  2025 U.S. Dist. LEXIS 116919 (C.D. Cal. Apr. 10, 2025)

*Rhinehimer v. U.S. Bancorp Invs., Inc.*, ........................................................ 15, 22, 27, 33
  787 F.3d 797 (6th Cir. 2015)

*Rocheleau v. Microsemi Corp.*, ........................................................................................ 27
  680 F. App'x 533 (9th Cir. 2017)

*SEC v. Facebook, Inc.*, ..................................................................................................... 17
  No. 3:19-cv-04241-JD (N.D. Cal.)

*SEC v. SolarWinds Corp.*, ........................................................................................*passim*
  741 F. Supp. 3d 37 (S.D.N.Y. 2024)

*SEC v. Wilcox*, ................................................................................................................. 24
  663 F. Supp. 3d 146 (D. Mass. 2023)

*Sosa v. Hiraoka*, .............................................................................................................. 37
  920 F.2d 1451 (9th Cir. 1990)

*Staub v. Proctor Hospital*, ............................................................................................... 34
  562 U.S. 411 (2011)

*Stone v. Instrumentation Laboratory Co.*, ........................................................................ 35
  591 F.3d 239 (4th Cir. 2009)

*TSC Indus., Inc. v. Northway, Inc.*, ................................................................................. 28
  426 U.S. 438 (1976)

*United States v. Facebook, Inc.*, ...................................................................................... 11
  456 F. Supp. 3d 115 (D.D.C. 2020)

*United States v. Jinian*, ................................................................................................... 30
  725 F.3d 954 (9th Cir. 2013)

*United States v. Nicholas*, ........................................................................................... 29, 30
  No. SACR 08-00139 CJC, 2008 U.S. Dist. LEXIS 104377 (C.D. Cal. 2008)

*United States v. Singh*, .................................................................................................... 32
  979 F.3d 697 (9th Cir. 2020)

*Van Asdale v. Int'l Game Tech.*, ..............................................................................*passim*

577 F.3d 989 (9th Cir. 2009)

*Veal v. LendingClub Corp.*,.................................................................................................... 26, 33
423 F. Supp. 3d 785 (N.D. Cal. 2019)

*Vess v. Ciba-Geigy Corp. USA*,............................................................................................... 15
317 F.3d 1097 (9th Cir. 2003)

*Wadler v. Bio-Rad Labs, Inc.*, ................................................................................... 10, 15, 16, 20
916 F.3d 1176 (9th Cir. 2019)

*Wallace v. Tesoro Corp.*,........................................................................................................ 35, 37
796 F.3d 468 (5th Cir. 2015)

*Wallender v. Canadian Nat'l Ry. Co.*,.................................................................................... 34
2015 U.S. Dist. LEXIS 199719 (W.D. Tenn. 2015)

*Wiest v. Lynch.* .......................................................................................................................... 20, 26
710 F.3d 121, 134 (3d Cir. 2013)

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.* ............................................... 28
655 F.3d 1039 (9th Cir. 2011)

*Yates v. United States*,.............................................................................................................. 32
574 U.S. 528 (2015)

*Zamani v. Carnes*, .................................................................................................................... 16
491 F.3d 990 (9th Cir. 2007)

**Administrative Decisions**

*Sylvester v. Parexel Int'l LLC*, ............................................................................................... 26, 27
ARB No. 07-123, 2011 DOLSOX LEXIS 39 (ARB May 25, 2011) (en banc)

Hansen, SEC Release No. 94703 (Apr. 12, 2022) ................................................................. 26

*KBR*, SEC Release No. 74619 (Apr. 1, 2015)........................................................................ 26

**Statutes**

15 U.S.C. § 7217 ........................................................................................................................ 17
15 U.S.C. § 7217(b) ................................................................................................................... 17
15 U.S.C. § 77q(a)...................................................................................................................... 16, 17
15 U.S.C. § 78j(b) ...................................................................................................................... 16
15 U.S.C. § 78m(a)..................................................................................................................... 19
15 U.S.C. § 78m(l) ..................................................................................................................... 16, 24
18 U.S.C. § 1341 ......................................................................................................................... 30
18 U.S.C. § 1343 ......................................................................................................................... 30, 31
18 U.S.C. § 1348 ......................................................................................................................... 16
18 U.S.C. § 1512(c)..................................................................................................................... 31, 32
18 U.S.C. § 1513(e)..................................................................................................................... 31, 32
18 U.S.C. § 1514A ...................................................................................................................... *passim*
18 U.S.C. § 1514A(a)(1) ............................................................................................................ 14-15, 16
18 U.S.C. § 1519 ......................................................................................................................... 31, 32
18 U.S.C. § 1520 ......................................................................................................................... 31, 32

**Regulations**

17 CFR § 210.4-01 (Regulation S-x Rule 4.01)..............................................................17
17 C.F.R. § 229.106 (Regulation S-K Item 106) ...............................................................*passim*
17 C.F.R. § 240.10b-5 ................................................................................. 12, 16, 19, 28
17 C.F.R. § 240.12b-20 (Rule 12b-20) ........................................................................ 16, 29
17 C.F.R. § 240.13a-11 (Rule 13a-11)........................................................................ 16, 24, 25
17 C.F.R. § 240.13a-14 (Rule 13a-14)...................................................................... 15, 17, 22, 23
17 C.F.R. § 240.13a-15 (Rule 13a-15) ....................................................................... 17, 22, 23
17 C.F.R. § 240.13b2-1 (Rule 13b2-1) ....................................................................... 12, 23, 24
17 C.F.R. § 240.13b2-2 (Rule 13b2-2) ....................................................................... 12, 23, 24
17 C.F.R. § 240.14a-9 (Rule 14a-9)........................................................................... 16, 28
17 C.F.R. § 240.21F-9 (Rule 21F-9) ...........................................................................21
17 C.F.R. § 240.21F-17 (Rule 21F-17) .........................................................................26
17 C.F.R. § 229.307 .................................................................................................17
17 C.F.R. § 229.308 .................................................................................................17
Form 8-K, Item 1.05.......................................................................................... 17, 24, 25
Form 8-K, Item 8.01.................................................................................................25
Regulation G .........................................................................................................16
Regulation S-K, Item 9A...........................................................................................17

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 8 .............................................................................................. 35, 38
Fed. R. Civ. P. 9(b).................................................................................................15
Fed. R. Civ. P. 12(b)(6).............................................................................................37

**Other Authorities**

*Commission Statement and Guidance on Public Company Cybersecurity Disclosures*, 83 Fed. Reg. 8166, 8169–70 (Feb. 26, 2018)...............................................................................20

Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure, 88 Fed. Reg. 51896 (Aug. 4, 2023) ....................................................................................... 17, 25, 29

PCAOB Auditing Standard 2201 (AS 2201) ........................................................... 16, 29

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Plaintiff's Second Amended Complaint ("SAC") systematically details Attaullah Baig's career at Meta. It starts with his hopeful beginning, immediate success, and upward career trajectory—all of which stopped abruptly when he started blowing the whistle on Meta's campaign to mislead investors and the Securities and Exchange Commission ("SEC") about defendant's rampant violations of the Sarbanes Oxley Act ("SOX") and many other federal laws. The SAC is lengthy because it recounts dozens of protected activities and provides the Court with the detail the Court found lacking in Baig's original complaint.

Plaintiff previously filed a shorter, plainer, and substantially less detailed pleading—but the Court required greater specificity. Specifically, this Court found the original complaint's invocation of SEC rules and regulations too unspecific to support a reasonable belief that any one of them was violated. The SAC cures that defect: it identifies 30 SEC rules and regulations by name and pleads specifically how the conduct Baig reported related directly to each. SAC ¶¶ 217–66, 275–92.

This Court also held the complaint lacked the detail to support a reasonable belief that Baig reported possible securities or wire fraud. Dkt. 70 at 7. The SAC pleads dated reports, named recipients, and the substance of what Baig told them. SAC ¶¶ 125, 224-32, 275-80.

Baig's original complaint did not point the Court directly to the contents of his SOX complaint filed with the Occupational Safety and Health Administration ("OSHA"). The SAC cures that deficiency by pleading the 21 acts of protected whistleblowing set out in the OSHA filing itself. SAC ¶¶ 124-54. Any of those 21 acts themselves requires denial of the motion.

Finally, this Court held the original complaint did not plead that Zuckerberg and Cathcart personally participated in the retaliation against Baig. The SAC corrects that defect by naming each officer's conduct giving rise to liability, including their personal participation in the termination of Baig. SAC ¶¶ 85, 87, 162(g), 172(k), 201, 230, 274.

Because the Court must view this detailed pleading through the lens of a permissive standard governing SOX retaliation claims, it is clear that it must deny the motion in full. The Ninth Circuit

has described a SOX whistleblower's burden as "relatively forgiving," even on fraud-based[1] Counts. *Kappouta v. Valiant Integrated Servs.*, 60 F.4th 1213, 1218 (9th Cir. 2023). It is a "minimal threshold" that the SAC readily satisfies. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009).

Defendants' glaring failure to mention, much less discuss, each of the predicates of liability pleaded in the SAC's fourteen counts reinforces the need for full and summary denial. The motion simply fails to discuss many of the theories of liability Baig has pleaded and only attacks them in broad terms which must be readily rejected.

Finally, the motion makes the clear mistake of asserting that Count 2, which asserts violations of SEC rules, requires pleading a reasonable belief that Baig reported fraud. However, SOX retaliations claims based on SEC rules or regulations do not require any pleading of fraud or its elements. *Wadler v. Bio-Rad Lab*s, Inc., 916 F.3d 1176, 1189 (9th Cir. 2019).

Baig has complied with this Court's order and pleaded his nearly three-year effort to stop Meta's ongoing deceptions in the necessary detail. The motion must be denied.

## II.   STATEMENT OF FACTS

### A.   Baig Was Already Familiar with Meta's Troubling History at Hire.

In February 2021, Meta made Baig Head of Security of WhatsApp, a platform used by dissidents, journalists, human rights workers, and government officials in more than 180 countries to transmit sensitive, and, in some cases, classified information. SAC ¶¶ 4–5.

A 20-year cybersecurity veteran, Baig knew the cost of downplaying a data breach to investors and regulators. SAC ¶¶ 34, 41, 305. Baig was aware, for example, that in 2019, the SEC fined Meta $100 million for calling data-misuse risk "hypothetical"—after Cambridge Analytica had already misused 87 million users' data. SAC ¶¶ 34, 41, 305. Baig knew, too, that, as part of a 2020 consent order, Meta paid a $5 billion FTC penalty and committed to building a comprehensive cybersecurity program (to ensure the privacy of its users' data) replete with data inventories, access controls, breach detection, and incident reporting (the "Privacy Order")—indeed, Meta trained Baig

---

[1] Most of Baig's counts are based on allegations of retaliation for reporting suspected violations of SEC rules and regulations which require neither pleading nor proof of fraud, or approximation of fraud. *See,* Section III.A *supra*.

on that very settlement when he started. SAC ¶¶ 27–28, 62–65, 64(a); *accord United States v. Facebook, Inc.*, 456 F. Supp. 3d 115 (D.D.C. 2020). In the wake of that 2020 FTC Consent Order, Meta, certified in its annual 10-K reports filed with the SEC each year it was maintaining a privacy and cybersecurity program "in connection with" that FTC Privacy Order and promising shareholders through proxy statements that the Board's Privacy Committee "oversees the risks related to privacy and data use matters, including our compliance with the comprehensive privacy program." SAC ¶¶ 187, 228; *see also* Plaintiff's Request for Judicial Notice in Support of Opposition to Second Amended Complaint ("RJN"): Ex. 1 at 37, Ex. 2 at 38, Ex. 3 at 22; Dkt. 50-2 at 53; Dkt. 50-3 at 57; Dkt. 50-4 at 49. Zuckerberg personally certified that compliance under penalty of perjury—even though, as pled in the SAC, it was materially misleading if not actually false. SAC ¶¶ 8, 42, 44–48, 126, 159, 219; RJN: Ex. 1 at 118, Ex. 2 at 116; Dkt. 50-2 at 159; Dkt. 50-3 at 164; Dkt. 50-4 at 155.

Baig excelled at his job. Meta rated him positively throughout his first eighteen months: an "Exceeded Expectations" rating in February 2022; written praise from Mukerji in June 2022 for his "[e]xtreme focus and clarity"; and a "Significantly Above Expectations"—*i.e.*, a "Greatly Exceeds"—rating in 2023 that put Baig on a trajectory for a likely promotion. SAC ¶¶ 20, 61, 172. But Baig's career path abruptly changed within three days of the disclosure below.

**B.  Baig Reported that Meta's Rampant FTC and SEC Problems Were Ongoing.**

In the course of his tenure, Baig discovered that the comprehensive privacy and cybersecurity program the FTC required—and that Meta represented (in its SEC filings) that it was maintaining—had never been built, certainly not to the requirements specified in the FTC Consent Order, and the cybersecurity deficiencies undermining the privacy of user data (which the FTC Consent Order was meant to eliminate) were still present, wholly unremediated. SAC ¶¶ 8, 43, 94; RJN: Ex. 1 at 37, Ex. 2 at 38; Dkt. 50-2 at 53; Dkt. 50-3 at 57; Dkt. 50-4 at 49. Commercial spyware vendors exploited these vulnerabilities to enable them to bypass WhatsApp's encryption and read users' message content from compromised devices. SAC ¶ 5.

**C.  Baig Blew the Whistle for Three Years as the Problems Grew.**

Baig engaged in a persistent (albeit futile) campaign to get Meta to comply with the law and avoid huge legal consequences. The list of whistleblowing below is illustrative:

• **September 2021—Red Team findings.** Baig reported that roughly 1,500 engineers could move or steal user data undetected, documenting a direct violation of the Privacy Order's access-control provision while Meta was certifying to the SEC it was "maintaining a comprehensive privacy program." Baig reported this to his supervisor, Verma, SAC ¶¶ 8, 21, 42, 44–48, 84, 127, 163; RJN: Ex. 1 at 37, Ex. 2 at 38, Ex. 3 at 22; Dkt. 50-2 at 53; Dkt. 50-3 at 57; Dkt. 50-4 at 49.

• **August–October 2022—Cathcart Briefing.** Baig briefed his supervisor, Cathcart (SAC ¶ 18), on six cybersecurity deficiencies he discovered that violated the FTC Consent Order including: Meta's lack of a comprehensive inventory of user data, its unrestricted access/lack of access controls for Meta 1,500 engineers, the lack of any monitoring or real-time breach detection system, and, *inter alia*, the hundred thousand or so daily account compromises that went unreported and unremediated. SAC ¶ 128. Three days after Baig circulated his findings, Baig's direct supervisor, Pinaki Mukerji (SAC ¶ 20), gave Baig his first-ever negative performance review, and supervisor Verma warned Baig that the WhatsApp's Head of Engineering, Gupta, would fire Baig for making the report. SAC ¶¶ 85, 87–88, 128–29, 172(a).

• **October 2022–April 2023—Complaints to HR and Through Counsel.** Believing that his downgraded performance review and the threat to his job security were both forms of whistleblower retaliation, Baig filed an HR complaint documenting the retaliation on or around October 19, 2022. SAC ¶ 86. On or around April 18, 2023, Baig's counsel sent a formal written letter to Meta asserting retaliation and specifically identifying violations of the SEC rules relating to the cybersecurity deficiencies Baig had reported, including violations of SEC Rules 10b-5, 13b2-1, and 13b2-2. SAC ¶¶ 86, 93, 119, 129, 135.

• **2023–2025—Eight Internal Investigations.** Baig's whistleblowing resulted in eight internal investigations during his employment. During each of these investigations, Baig continued to report that Meta's claims in its annual 10-K reports that it had built and was maintaining a privacy/cybersecurity program in connection with the FTC Consent Order were false. SAC ¶¶ 118–22, 139, 152. And, in his final interview, Baig again reiterated that "Meta was violating SEC rules . . . [and] lying to investors." SAC ¶¶ 122, 130, 147.

• **September 2023—"Vision Document."** Baig circulated an internal "vision document"

stating that Meta's claims in its annual 10-K reports that it had built and was maintaining a privacy/cybersecurity program in connection with the FTC Consent Order were false or materially misleading because the program had "never been built." SAC ¶¶ 8, 42, 94; RJN: Ex. 1 at 37, 118, Ex. 2 at 38, 116; Dkt. 50-2 at 53, 159; Dkt. 50-3 at 57, 164; Dkt. 50-4 at 49, 155.

• **2021–2024—Corrupted Audits.** Baig reported specific facts showing that Meta's cybersecurity disclosure controls were deficient because audits were designed to suppress, rather than uncover, information about cybersecurity risk that might need to be disclosed and present it to the Board for assessment. Specifically, Baig reported that a Board-level cybersecurity audit had been "artificially circumscribed" to avoid finding cybersecurity deficiencies; cybersecurity assessments were falsified before being fed to the Board's Audit Risk and Oversight Committee and Ernst & Young; and an EECC cybersecurity auditor was pressured to exclude certain findings. SAC ¶¶ 69, 96, 107–109, 118–122, 131, 138, 145, 164(e), 238–240, 249–252.

• **January 2, 2024—Letter to Zuckerberg.** Baig wrote a letter to CEO Zuckerberg reporting falsified cybersecurity reports, roughly 250,000 daily unreported account compromises, and blocked audits (i.e., deficient disclosure controls). SAC ¶¶ 99, 136, 164, 166–68, 172(k). Baig warned that the SEC's *SolarWinds* enforcement action meant Meta was at risk. *Id.* Zuckerberg certified the FY2023 10-K a month later. SAC ¶¶ 99, 136, 164, 166–68, 172(k); Dkt. 50-3 at 164.

• **May 2024—Business Case Memo.** Baig presented a Business Case memo to the Head of WhatsApp Infrastructure (Banerjee) and senior engineers quantifying Meta's potential regulatory exposure at "up to $1B." SAC ¶¶ 103, 142. Leadership's refusal to act constitutes knowing concealment of a material cybersecurity risk. SAC ¶¶ 103, 142.

• **2024—Suppression of Scraping and Exfiltration Risks.** Baig reported that WhatsApp private user data was being scraped "on millions, if not billions, of users daily." SAC ¶¶ 102, 140. A security "JUNGLE" test (assessing exfiltration risk from unrestricted employee access) confirmed a related risk—but WhatsApp's Head of Engineering, Gupta, hid the result from the Meta Board's oversight committee and reported a false success to the Board instead. SAC ¶¶ 106, 143. In September 2024, Baig surfaced that 400 million user photos were being scraped daily, and Meta's Director of Engineering, Central Privacy blocked Baig's team from recording the attackers' phone

numbers so the incident could be reported to regulators. SAC ¶¶ 104, 106–07, 137, 140, 143–45.

• **November 2024–January 2025—Reports to SEC, Zuckerberg, and OSHA**. In November 2024, Baig sent his new direct supervisor SAC ¶ 22 Defendant Tsimelzon written findings that WhatsApp was significantly under-reporting mass scraping incidents to the FTC and other regulators. SAC ¶110, ¶148. Tsimelzon reprimanded him for it. SAC ¶¶ 111, 148. Baig then went to file his first Form TCR (the SEC's formal whistleblower submission form), but, before he could file it, Tsimelzon ordered the deletion of an internal report that documented the cybersecurity and compliance failures Baig had been compiling. SAC ¶148. Nevertheless, on or around November 27, 2024, Baig filed his first Form TCR, and he filed a second, supplemental TCR on November 30, 2024. SAC ¶¶ 112, 148. The following month, December 2024, Baig wrote to Defendant Zuckerberg a second time, reiterating that Meta's cybersecurity protocols were deficient, reporting escalating retaliation, stating that he had filed a complaint with the SEC, and emphasizing that Meta's leadership was "not being truthful to the auditors and the regulators." SAC ¶¶ 113, 149. In January 2025, Baig filed a SOX complaint with OSHA. SAC ¶¶ 114, 150.

• **Final Days Before Termination.** Baig told WhatsApp's Director of Public Policy that user data remained accessible to roughly 65,000 employees and that WhatsApp would not meet the House of Representatives' cybersecurity bar. SAC ¶¶ 116, 153.

### D. Zuckerberg and Cathcart Personally Approved Baig's Termination.

As detailed above, Baig presented the factual basis for his concerns that Meta was not complying with SEC rules to his supervisor and the Head of WhatsApp, Cathcart, and to Meta CEO, Zuckerberg, repeatedly: Cathcart in the 2022 briefing (SAC ¶¶ 85, 87, 128, 231) and Zuckerberg in two 2024 letters (SAC ¶¶ 99, 113, 136, 149, 202, 231). Both are sued as Baig's supervisors and agents of Meta under 18 U.S.C. § 1514A, Zuckerberg as CEO who executed the certifications at issue, and Cathcart as Head of WhatsApp who approved adverse actions against Baig. SAC ¶¶ 17–18, 155. Both personally approved Baig's termination. SAC ¶¶ 201, 269.

### III.   THE STANDARD GOVERNING A SECTION 806 CLAIM

Section 806 of SOX protects an employee who reasonably believes his employer's conduct violates one of six enumerated categories of law, including any rule or regulation of the SEC. 18

U.S.C. § 1514A(a)(1). The employee's belief need not be correct, only reasonable, and, ergo, Baig need not prove that the underlying violation occurred—only that a reasonable person with his training, experience, and knowledge would believe it had. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1000–01 (9th Cir. 2009) (holding a "reasonable but mistaken belief" is sufficient). The Ninth Circuit calls this bar a "minimal threshold requirement." *Id*. at 1001. **Indeed, a plaintiff need only "prove . . . that he reasonably believed that there might have been a violation and that he was fired for even suggesting further inquiry**." *Wadler v. Bio-Rad Lab*s, Inc., 916 F.3d 1176, 1187 (9th Cir. 2019) (emphasis added). Notably, the law does not require the whistleblower to know or cite the law or regulation at issue.[2] *See, e.g., Van Asdale,* 577 F.3d at 1002 (employee need not cite a code section he believes was violated); *Wadler*, 916 F.3d at 1187-1189.

Ultimately, reasonableness is a fact-intensive, totality-of-the-circumstances question rarely suited to resolution on summary judgment, let alone a motion to dismiss. *See Beacom v. Oracle Am., Inc.*, 825 F.3d 376, 380 (8th Cir. 2016). If reasonable minds could disagree whether the belief was objectively reasonable, the issue cannot be decided as a matter of law. *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811–12 (6th Cir. 2015). But Meta repeatedly inverts this standard, demanding dismissal on the grounds that Baig failed to affirmatively plead that Meta actually committed fraud or another violation—a standard that has no basis in the law.

**A. Whistleblowing of Suspected Violation of SEC Rules or Regulations Does Not Require Any Showing of Fraud at All.**

The motion groups Counts 2, 3, 12 and 14 as claims all requiring approximation of a fraud claim to support the SOX cause of action. However, Count 2 is based on Baig's reasonable belief that defendants were violating an SEC rule or regulation. Significantly, such claims do not require any pleading or proof of suspected fraud.

*Wadler v. Bio-Rad Labs., In*c. makes this point clear and indisputable. The Ninth Circuit

---

[2] Rule 9(b) has no place here: its particularity requirement attaches only to a claim grounded in fraud, and a § 806 claim is an employment claim, grounded in retaliation for an employee's reasonable belief. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003). Accordingly, even Baig's complaints expressing a reasonable belief that a fraud had occurred, or would imminently occur, are evaluated by the reasonableness of his belief, not whether the alleged fraud occurred. *See Kappouta v. Valiant Integrated Servs.*, 60 F.4th 1213, 1218 (9th Cir. 2023).

sustained a SOX verdict resting entirely on Wadler's reasonable belief that Bio-Rad had falsified its books and records—an SEC rule violation, nothing more—without ever requiring him to also prove fraud. 916 F.3d at 1189. Defendants' motion does not address this fundamental distinction and instead suggests that Baig must plead and prove fraud to recover for whistleblowing based on suspected violations of SEC rules and regulations. Again, defendants' motion fails to address this fundamental aspect of Baig's claims in this action.

## IV.   The Motion Fails to Attack Dozens of Legal Predicates Pled in the SAC.

The SAC alleges that Baig's protected disclosures gave Meta notice of violations of *dozens* of acts of fraud and violations of distinct statutes and SEC rules and regulations.[3] In response, Meta's motion has addressed roughly half of Plaintiff's theories and never mentions the rest. It is too late now, on a reply brief, for Meta to try to correct the error by contending there is some defect in the way Plaintiff pled his reasonable belief that the conduct and deficiencies he reported also violated these statutes, rules, and regulations. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("the district court need not consider arguments raised for the first time in a reply brief"); *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003). On these grounds alone, the motion must be denied.

### A.   Motion's Scant Discussion of Count 14 is its Most Notable Failure.

As the Securities Act's core anti-fraud provision, §17(a) is a federal law related to shareholder fraud under § 1514A(a)(1). As §§ 17(a)(2) and 17(a)(3) require no showing of scienter at all, only negligence, and contain no loss-causation or economic-loss element *Aaron v. SEC*, 446

---

[3] For example:

**Count 3** (seventeen theories): scheme liability under Rule 10b-5(a) and (c), (SAC ¶ 225); 18 U.S.C. § 1348, SAC ¶ 225; Item 103, SAC ¶ 226; Item 105, SAC ¶ 232(k); Item 303 (SAC ¶ 226); Rule 14a-9 (SAC ¶ 228); Rule 12b-20 (SAC ¶ 232(h)); Regulation FD (SAC ¶ 232(e)); Regulation G (SAC ¶ 232(c)); Item 10(e) (SAC ¶ 232(c)); Item 407 (SAC ¶ 228(b)); Item 402 (SAC ¶ 228(c)); § 18(a) (SAC ¶ 228(a)); § 20(a) (SAC ¶ 224); § 11(SAC ¶ 224); and Rule 13a-14 (SAC ¶ 231(a)).
**Count 5** (five theories): § 78m(b)(2)(B), SAC ¶ 245(a); Item 307 (SAC ¶ 245(b)), Item 308 (SAC ¶ 245(b)); Rule 13a-14(a), SAC ¶ 246; and Rule 13a-13 (SAC ¶ 243(a).)
**Count 6** (one theory): § 78m(b)(2)(B) (SAC ¶ 251.)
**Count 7** (seven theories): § 78j(b), SAC ¶ 260; Rule 10b-5(a), (b), and (c) (SAC ¶ 260); Item 106(b)(2), SAC ¶ 262; Rule 13a-11, SAC ¶ 262; and § 78m(l) (SAC ¶ 262(a).)
**Count 10** (four theories): § 78j(b) and Rule 10b-5(a), (b), and (c) (SAC ¶ 278.)
**Count 12** (one theory): Rule 13a-11 (SAC ¶ 286.)
**Count 14** (two theories): § 17(a)(2) and § 17(a)(3) (SAC ¶¶ 302, 304.)

---

U.S. 680, 701-02 (1980). Accordingly, Count 14 is immune from all such attacks.

Moreover, Baig satisfied the requirement under § 17(a) that the misstatements be made in an offer or sale of securities: Meta's 10-Ks were incorporated into the Form S-8 through which Meta continuously sold RSUs to its own workforce, and into the Form S-3 shelf through which it raised capital. SAC ¶ 303. Every RSU grant, every capital raise, was an offer or sale made on the strength of those same misstatements.

Section 17(a) directly establishes the reasonableness of Baig's belief Meta as violating SOX. Indeed, Meta had already been enjoined, in 2019 from violating §§ 17(a)(2) and 17(a)(3) based on similar conduct: presenting the risk of user-data misuse as merely hypothetical while knowing the risk had already materialized. *SEC v. Facebook, Inc.*, No. 3:19-cv-04241-JD (N.D. Cal.). A reasonable person would readily believe that Meta's repetition of that same conduct would similarly violate § 17(a).[4] Meta's argument that Baig never complained about the conduct underlying Count 14, Mot. at 13–14, must be swiftly rejected: the SAC pleads that he raised them, repeatedly, for years. SAC ¶¶ 302, 305–06. As a result, the Court must deny the motion.

**B. Defendants' Sole Challenge to Many Claims Is Simply Incorrect.**

Footnote 6 in the motion contains Meta's only answer to several theories, and it is wrong on its own terms: every provision it waves away as not an SEC "rule or regulation" is one the SEC itself wrote. Each of the predicates in the motion's footnote 6 are such rules or regulations. Item 9A implements Rules 13a-14 and 13a-15 and Items 307 and 308 of Regulation S-K. 17 C.F.R. §§ 229.307, 229.308; SAC ¶¶ 182, 184. Regulation S-X Rule 4-01(a) makes GAAP compliance mandatory by SEC regulation, answering Meta's loss-contingency objection along the way; ASC 450's disclosure trigger is mandatory under that same regulation, and Meta's prior multi-billion-dollar payment for the same non-compliance is exactly the "reasonable possibility" of loss the standard requires disclosed. SAC ¶¶ 57, 186, 227. AS 2201 took effect only by the SEC's own approval order under SOX § 107, 15 U.S.C. § 7217(b). Item 1.05 was adopted in the same 2023 rulemaking as Item 106, 88 Fed. Reg. 51896, making it an SEC rule or regulation by definition. Because Meta's only challenge to these claims is meritless, the instant motion must be denied.

---

[4] *SolarWinds* sustained a § 17(a) claim on materially the same security representations.

## V.    BAIG HAS PLEADED PROTECTED ACTIVITY MANY TIMES OVER.

To plead a prima facie case, Baig need only allege that he made an internal report that "relate[s] in an understandable way to one of the stated provisions of federal law" in Section 806. *Wiest v. Lynch*, 710 F.3d 121, 134 (3d Cir. 2013). "[T]he whistleblower's communication need not ring the bell on each element of one of the stated provisions of federal law." *Id*. It is enough that the employee communicated to a supervisor "facts sufficient to alert the employer to fraudulent conduct," or another enumerated violation. *Id*. And for nearly two decades, the Ninth Circuit has held that, contrary to Meta's argument, "[a]n employee need not cite a code section he believes was violated to trigger the protections of § 1514A." *Van Asdale,* F.3d at 997; *see also Wiest,* 710 F.3d at 134 (holding whistleblower also need not use the word "fraud" for his complaint to be protected).

As noted above in the Statement of Facts, the SAC alleges that Baig repeatedly made internal complaints containing sufficient factual detail to alert Meta to the possibility that it had: falsely certified in SEC filings the truth of its cybersecurity disclosures required by Item 106 of Regulation S-K (17 C.F.R. § 229.106); failed to implement the cybersecurity protocols the FTC Privacy Order required; suppressed information about those failures and their exfiltration risks by maintaining deficient disclosure controls; and suppressed information from investors about the scale of account hacking occurring on a daily basis. This pleading establishes multiple instances of protected whistleblowing as a matter of law.

Meta's contrary authorities are distinguishable. *Boyd v. Accuray, Inc.*, 593 F. App'x 647, 648 (9th Cir. 2015), and *Nordstrom v. U.S. Bank, N.A., Inc.*, No. 11-CV-1554 BEN (KSC), 2012 WL 3000416, at *4 (S.D. Cal. July 23, 2012). (Mot. 15–16.) *Boyd* was decided on summary judgment after discovery, not on its pleadings, and turned on the plaintiff never having told Human Resources or any supervisor *at all* about his concerns, unlike the instant case (*See* SAC ¶ 114). *Boyd*, 873 F. Supp. 2d at 1161, *aff'd*, 593 F. App'x at 648. *Nordstrom* is the same: the plaintiff failed to allege he *ever* reported his SOX concerns to management. *Nordstrom,* 2012 WL 3000416, at *10. Thus, both cases turned not on the content of the plaintiff's reports, but on the plaintiff's failure to ever actually make an internal report to anyone with authority. In contrast, the SAC plainly alleges that Baig <u>widely</u> reported his concerns.

## A. Baig's Internal Reports Satisfy this Lenient Standard for Protected Activity.

Each disclosure in the Statement of Facts, *supra*, linked Baig's complaints to Meta's securities-law obligations. In October 2022, Baig briefed Cathcart on cybersecurity deficiencies violating the FTC Consent Order, then circulated a Forbes article on comparable harm. SAC ¶ 128. His 2023 report to Verma named the risk of "additional legal action by the FTC, SEC, IDPC, and other regulators." SAC ¶ 133. His April 2023 counsel letter identified "misstatements in Meta's SEC filings . . . about its cybersecurity practices" and invoked Rule 10b-5. SAC ¶¶ 93, 135. His 2023–2025 investigator interviews reported Meta falsifying records and "lying to investors." SAC ¶¶ 130, 147. His 2024 letter to Zuckerberg reported falsified reports and blocked audits, citing SolarWinds. SAC ¶¶ 99, 136, 164, 166–68, 172(k).

In response, Meta cites two unpublished cases, *Katzel* and *Neely* (Mot. 16), but both are inapposite. *Katzel* involved a plaintiff who admitted in deposition that he did not believe his employer had violated any law. *Katzel v. Am. Int'l Grp.*, 2022 U.S. Dist. LEXIS 213950, at *8 (S.D.N.Y. Nov. 28, 2022). *Neely* involved a claim that the employer violated FAA regulations having no relationship to SOX. *Neely v. Boeing Co.*, No. C16-1791 RAJ, 2018 U.S. Dist. LEXIS 81771, at *11 (W.D. Wash. May 15, 2018). The SAC stands in stark contrast to both cases.

## VI.    SAC PLEADS A REASONABLE BELIEF IN VIOLATIONS OF 30 SEC RULES.

None of the following theories require Baig to approximate the elements of securities fraud because each rests on a violation of an SEC rule or regulation—a wrong with or without fraud. Defendants' failure to address this fundamental issue requires denial of their motion.

## A. Count 2: Reports Relating to Violations of Item 106, The SEC Cybersecurity Rule.

In 2023, the SEC adopted Item 106, requiring every public company to disclose in its annual report: how it identifies and manages serious cybersecurity risks, whether a cybersecurity problem has hurt or is likely to hurt the company, and how its board oversees that work. 17 C.F.R. § 229.106. And whatever a company tells the SEC must be accurate. 15 U.S.C. § 78m(a).

Baig repeatedly alerted Meta to specific facts showing deficiencies in all three areas. First, he reported that WhatsApp did not know what user data it collected or where that data was stored, had no security team monitoring access or intrusions, and had not built the access controls the FTC

Privacy Order required—leaving roughly 1,500 WhatsApp engineers able to take user data undetected. SAC ¶ 127. Meta never investigated or disclosed this information. Second, Baig reported that Meta's managers concealed this information from the Board: they narrowed an audit to exclude the problems he was documenting, told him not to put his concerns in writing, and gave the Board's AROC a false report claiming a security test had succeeded when it had not. SAC ¶¶ 69, 101, 106, 108, 133–34, 143. Third, Baig reported that hackers were taking over roughly 100,000 WhatsApp accounts daily—later confirmed at closer to 500,000—and scraping some 400 million user photos, and that Meta was underreporting these incidents. SAC ¶¶ 6, 85, 102, 107, 140, 145. Despite Item 106, Meta disclosed none of this.

Baig's reports of these same defects made between 2021 and 2023 are also protected. Item 106 did not take effect until Meta's FY 2023 annual report, but in 2018 the SEC issued guidance that the rules then in place already required disclosure of material cybersecurity risks, and that boilerplate warnings were not enough once an incident had occurred. *Commission Statement and Guidance on Public Company Cybersecurity Disclosures*, 83 Fed. Reg. 8166, 8169–70 (Feb. 26, 2018). The Court must judge Baig's belief by his own knowledge, training, and experience—not as though he were a lawyer skilled in securities law. *Wadler*, 916 F.3d at 1188. Under that standard, Baig's belief was reasonable given the SEC's own explanation of its rules.

### 1. Meta's Attack on the Link Between the FTC Order and Meta's SEC Filings Fails.

Meta's motion attacks two narrow points on Count 2: that the FTC's 2020 order is not itself an SEC rule, and that Baig's Form TCRs do not adequately describe a cybersecurity-rule violation. (Mot. 13, 17.) But Baig has never claimed the FTC order is an SEC rule. He claims Meta lied to the SEC and its shareholders about implementing the cybersecurity protocols that order required in SEC Filings. Specifically, the FTC order required Meta to build systems that track where user data is, control who can access it, and detect a breach within 30 days—cybersecurity systems Meta said would be run by the same team that ran its privacy program. SAC ¶¶ 13, 15–22, 66; *see also* Dkt. 46-3 at pp. 11-16 and 18-19. Meta's annual reports then told the SEC and shareholders that Meta had built this FTC-mandated program and that a Board Committee oversaw it. SAC ¶ 126; RJN: Ex. 1 at 37, Ex. 2 at 38, Ex. 3 at 22; Dkt. 50-2 at 53; Dkt. 50-3 at 57; Dkt. 50-4 at 49. But Meta

never built the program. It never implemented the FTC-mandated protocols. However, Meta lied to the SEC and investing public that it had done so. Baig blew the whistle and was fired for it.

Meta's fallback—that it had no duty to disclose noncompliance until a regulator formally found it noncompliant (Mot. 19)—misses the point: Meta had an affirmative and independent obligation under Item 106 of Regulation S-K to disclose details about its cybersecurity risk exposure and cybersecurity risk management program. Accordingly, the case Meta relies on, *Kang v. PayPal Holdings, Inc*., 620 F. Supp. 3d 884, 897 (N.D. Cal. 2022), is inapposite. In *Kang*, PayPal told the SEC it was "cooperating" with a regulator, but no SEC rule—like Item 106 here—required PayPal to separately disclose how it was implementing the regulator's demands. Here, Item 106 required Meta to disclose known cybersecurity risks and describe its risk assessment, identification, and management processes. As stated in the SAC, Meta violated Regulation S-K and falsely certified that it did not. Baig's belief of Meta's SEC violations was thus very reasonable.

### 2.  Meta's Arguments About the Form TCRs Are Irrelevant.

Meta argues that Baig's only report of a cybersecurity-rule violation was in his Form TCRs—his formal submissions to the SEC to initiate an investigation—and that those submissions were too vague and never sent to Meta. (Mot. 17.) First, Baig alleges that he told Zuckerberg he had filed a Form TCR less than three months before he was fired (SAC ¶¶ 59-60, 112-113, 148-149)— and, plainly, Section 806 of SOX prohibits firing an employee for asking the SEC to initiate an investigation. Further, as already shown, Baig need not have cited the specific rule he believed was violated for his Form TCRs to be protected. By the time Baig filed the first TCR, Meta already knew that Baig had retained counsel and notified Meta of his concerns that Meta had violated SEC rules and regulations and was lying to investors about the efficacy of its cybersecurity program. (*See* SAC ¶ 164(c).) Section 1514A protects an employee who does just this: who gives a federal regulator information about conduct he reasonably believes violates the law, and Section 1514A separately protects an employee who, like Baig, files a report of an alleged violation with a federal agency. 18 U.S.C. § 1514A(a)(1)(A), (a)(2); *see also* 17 C.F.R. § 240.21F-9 (Form TCR procedure). Baig's Form TCRs fall within both categories of protected activity.

### 3. Meta Does Not Contest Two of the Three Bases for Item 106 Liability.

Finally, Meta argues it never described cyberattacks as merely hypothetical, apparently to suggest Baig could not reasonably believe certain of Meta's Item 106 disclosures fell short. (Mot. 20.). That argument, even if true, wins Meta one of Item 106's three independent bases — and concedes the other two. Meta says nothing about the governance failures Baig reported: no monitoring, no access controls, 1,500 engineers with undetected reach into user data. SAC ¶ 85. Meta says nothing about the Board concealment Baig reported: an audit narrowed to hide the problem, an order not to put concerns in writing, a false report telling AROC a security test succeeded when it had not. SAC ¶ 85. Meta's capitulation on two of the three pleaded theories compels denial of the motion.  Moreover, the argument Meta did choose to make fails on its own terms as well.:

Under the law, a warning that a risk "could" or "may" happen becomes misleading once the company already knows the risk has happened. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021); *accord In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949–52 (9th Cir. 2023); *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1015–16 (9th Cir. 2018). In *SEC v. SolarWinds Corp*., the court found a company's cybersecurity warning adequate because it told investors, in the court's words, "sobering terms"—that its systems "are vulnerable to damage or interruption," that attacks were growing more frequent and sophisticated, and that the company "may be unable to anticipate" them. *SEC v. SolarWinds Corp*., 741 F. Supp. 3d 37, 93 (S.D.N.Y. 2024).

Meta's disclosures, as quoted in its motion (Mot. 20), do neither. Meta described experiencing regular cyberattacks, but not its lack of defenses and vulnerability to them. (*See* Mot. 20.) Meta disclosed nothing of the roughly half a million daily account takeovers Baig had already reported, or its failure to build and implement the FTC mandated cybersecurity program to protect user data. SAC ¶¶ 6, 103, 145. At a minimum, reasonable people could disagree whether the warnings were sufficiently "sobering," which requires denial of the motion. *See Rhinehimer*, 787 F.3d at 811–12.

### B. Count 5: Reports Relating to False Certifications That Disclosure Controls Worked

"Disclosure controls" are internal systems designed to identify information required to be disclosed—including cybersecurity risks and processes—for management, including the officers who sign SEC filings. *See* 17 C.F.R. § 240.13a-15(e). Together, SEC Rules 13a-15 and 13a-14

---

require Meta to maintain those controls, test their effectiveness every quarter, and certify their effectiveness in every annual and quarterly report.[5] *See* 17 C.F.R. §§ 240.13a-15(a), (b), 240.13a-14. Count 5 rests on Meta's separate duty under Rule 13a-15(a), (b), (e) and Rule 240.13a-14 to certify that it had evaluated its disclosure controls and found them effective.

Meta argues the SAC lacks specific facts about a broken disclosure-control system. (Mot. 21, 23–24.) It does not. Over 30 months, Baig watched the people responsible for cybersecurity keep information from the Board's AROC Committee and, ergo, from the people who determined what to disclose to the SEC. In spring 2022, Baig joined a board-ordered audit to assess who internally had access to private user data and learned the audit's scope had been narrowed to avoid confirming deficits he had reported. SAC ¶ 69. In March 2023, Baig's supervisor told him to stop communicating in writing regarding Meta's failure to implement the FTC Privacy Order's cybersecurity protocols. SAC ¶¶ 133–34. In January 2024, Baig asked for a formal audit of WhatsApp's data-warehouse access controls but was told the security team would block it. SAC ¶ 101. In May 2024, after a security test found serious data-theft risks, Meta withheld the results from its Board and reported the test as a success. SAC ¶¶ 106, 143. Zuckerberg certified the effectiveness of Meta's disclosure controls shortly after Baig told Zuckerberg that they were not working. He certified their effectiveness anyway. SAC ¶¶ 99, 149, 231, 246.

Meta leans on *SEC v. SolarWinds Corp.* for the idea that isolated mistakes do not prove a broken system. (Mot. 23–24.) But in *SolarWinds*[6], the company's system worked—it identified incidents for disclosure—and simply missed two by accident. 741 F. Supp. 3d at 110–11. The SAC alleges the opposite: a system built to intentionally suppress and rarely, if ever, disclose.

**C. Counts 4 and 6: Reports Relating to Violations of Rules 13b2-1 and 13b2-2**

The sole question for Counts 4 and 6 is whether a cybersecurity engineer—not a lawyer or accountant—could reasonably believe Meta violated SEC Rules 13b2-1 (falsifying records) or

---

[5] This Court's earlier order does not bar Count 5, which rests on a different rule than the one it addressed—namely, Rule 13a-15(f) (17 C.F.R. § 240.13a-15(f)), which governs internal controls over financial accounting but not disclosure controls. *See* Dkt. 70 at 10-11.

[6] Notably, the same *SolarWinds* court that rejected an internal-controls theory on those facts separately found the company's cybersecurity statements misleading enough to sustain a fraud claim. 741 F. Supp. 3d at 83.

13b2-2 (misleading auditors). 17 C.F.R. §§ 240.13b2-1, 240.13b2-2. Baig believed Meta violated both, telling Zuckerberg twice in 2024 and citing SolarWinds on the same theory. SAC ¶ 238. That belief tracked settled law: blocking an audit function is itself circumvention. *See SEC v. Wilcox*, 663 F. Supp. 3d 146, 160 (D. Mass. 2023).

Baig's belief rested on specific facts: altered compliance reports (SAC ¶ 70); a false result to the Board's audit committee (SAC ¶¶ 106, 143); an EECC auditor's finding struck under pressure (SAC ¶¶ 108, 146); and orders to stop documenting failures (SAC ¶ 238(a)). Meta answers that these were not "books, records, and accounts" reviewed by an accountant. Mot. 23. But that is the wrong question: the Court asks only whether Baig—an engineer, not a lawyer—reasonably believed it occurred. See *Nielsen v. AECOM Tech. Corp.,* 762 F.3d 214, 221 (2d Cir. 2014). That belief was well grounded: the SEC sued SolarWinds on a similar theory, and no court rejected it until six months after Baig raised it. 741 F. Supp. 3d 37. Baig's position was reasonable when raised.

Baig also reported conduct which violated Rule 13b2-2(b), which reaches indirect influence on an auditor, not just direct lies. 17 C.F.R. § 240.13b2-2(b)(1). Falsified assessments fed Meta's certification that its audit function provides "independent assessment." SAC ¶¶ 238–40, 249–50. Meta never explains why that falls outside paragraph (b).

### D. Count 7: Reports Relating to Violations of Item 1.05 and Rule 13a-11

In Count 7, Baig alleges he reported conduct that evinced a reasonable belief that Meta was violating Item 1.05 and SEC Rule 13a-11 (17 C.F.R. § 240.13a-11). Under those rules, a public company must file a Form 8-K after determining it experienced a material cybersecurity incident. Form 8-K, Item 1.05; 17 C.F.R. § 240.13a-11; *see also* 15 U.S.C. § 78m(l) (requiring real-time disclosure of material changes).

Baig reported—to Central Privacy and to Tsimelzon that WhatsApp was "leaking Covered Information [*i.e.*, private user data] on millions, if not billions, of users daily" and "severely under reporting scraping." SAC ¶¶ 102, 140, 263–64. He also knew Meta had disclosed the 80-user Paragon cyberattack in January 2025, without similarly divulging incidents that were "6,000 times greater." SAC ¶¶ 71, 232(e), 257. These facts gave rise to Baig's reasonable belief that a Form 8-K disclosure was required. Whether he was ultimately correct is not before the Court. The dispositive

fact is that Baig's belief was reasonable, particularly given the SEC's guidance doubts about reporting cyberincidents should be resolved in favor of reporting. 88 Fed. Reg. 51896, 51906 (Aug. 4, 2023).

Meta fails to address, much less refute, Baig's Item 1.05 argument. Meta's 10-Ks stated its Board oversaw cybersecurity risk and had not identified any material threats, even though Meta knew it was experiencing daily cyber incidents on a massive scale. SAC ¶¶ 50, 219, 232(a), (j). Under *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263–64 (2024), those statements created a duty to disclose the full story.

### E. Baig's Whistleblowing Reports Relate Directly to Meta's Misleading SEC Filing About the FTC Proceeding in Violation of Item 8.01 and Rule 13a-11 (Count 12).

Meta's 10-K disclosure about the FTC OSC proceeding only told a part of the story which rendered its disclosure misleading.[7] The 10-K warned that "[i]f we are unable to successfully implement and comply with the mandates of the FTC consent order … we may be subject to" regulatory consequences. Dkt. 50-3 at 57. Meta was not waiting to find out whether it could comply. It already knew it could not: it had no functioning privacy program, no access controls, falsified assessments—and Zuckerberg had it in writing: Baig's January 2, 2024 letter, received one month before this filing, warned that "[i]f we fail to remediate these gaps, we are not meeting our legal obligations from the 2020 FTC Order." SAC ¶ 47, 285, 288; Dkt. 50-3 at 15, 56-57. A risk factor phrased as "if" when the company knows the risk has already materialized is an actionable half-truth, not the pure omission *Macquarie exempts. Macquarie Infrastructure Corp.*, 601 U.S. at 263–64; *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021); *In re Facebook, Inc. Sec. Litig.*,

---

[7] Baig concedes that reasonable minds could differ as to whether the FY2023 10-K minimized the nature of the FTC proceeding. However, it is beyond dispute that Meta failed to disclose the truth that its compliance efforts with the Privacy Order, to the extent they existed at all were woeful. This is the classic half-truth actionable in securities fraud cases and a viable predicate for SOX whistleblower liability in this case.

In any event, this SEC filing completely undermines defendants' contention that Baig's whistleblowing based on the ongoing violations of the Privacy Order has no relevance to a SOX retaliation claim. This filing concedes that failure to comply with the Privacy Order could have material effects on Meta's operations, thus confirming the materiality of Baig's reports on noncompliance.

---

87 F.4th 934, 950 (9th Cir. 2023). And *Veal* protects a company that declines to confess an unproven allegation; it says nothing about a company making affirmative statements about its own compliance that its own correspondence contradicts. *Veal v. LendingClub Corp*., 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019).

### F. Baig's Whistleblowing Count 11: Reports Relating to Violation of Rule 21F-17

Rule 21F-17 forbids "any action to impede" an individual from communicating with the SEC about a possible securities-law violation. Violations of this rule do not require materiality, scienter, or reliance. *See* 17 C.F.R. § 240.21F-17(a)).

Meta construes Rule 21F-17 as applying only to confidentiality agreements. However, this misreads the Rule's plain text, which lists such agreements as an *illustration*, rather than the entire scope, of prohibited impeding conduct. *See id.* (barring actions to impede "***including*** enforcing, or threatening to enforce, a confidentiality agreement") (emphasis added). Accordingly, the SEC has enforced it broadly. *See, e.g., In re David Hansen*, Release No. 94703 (Apr. 12, 2022) (removing an employee's system access after he reported potentially fraudulent data). That Baig ultimately filed his Form TCRs despite Tsimelzon's deletion of critical evidence does not defeat his claim; the rule targets the impeding action (*i.e.*, the deletion itself), and it is enforced based on potential chilling effect without proof that any employee was in fact silenced. *See In re KBR*, Release No. 74619 (Apr. 1, 2015).

Meta's remaining argument, that the alleged impedance concerned the FTC, not the SEC, similarly fails. The information Meta suppressed—the data-exfiltration risk and the Privacy Order compliance failures—was the same information underlying Meta's false SEC disclosures. Further, Tsimelzon ordered deletion of the internal security report as Baig was assembling his SEC submission, which he filed later that very same day. SAC ¶¶ 112, 148, 284.

### VII.  SAC PLEADS A REASONABLE BELIEF IN META'S COMMISSION OF FRAUD.

### A.  Count 3: Reports Relating to Meta's Conduct Constituting Securities Fraud

The Third, Sixth, and Eighth Circuits hold that to plead a viable SOX whistleblower claim premised on a reasonable belief in securities fraud a plaintiff is not required to allege or approximate the elements of a securities fraud claim, *i.e.*, he is not required to plead materiality, scienter, reliance,

or loss causation. *Sylvester v. Parexel Int'l LLC*, ARB No. 07-123, 2011 DOLSOX LEXIS 39 (ARB May 25, 2011) (en banc) at *52-53; *accord Wiest*, 710 F.3d at 133 (concluding district court errs by requiring an employee's communication to reveal the elements of securities fraud); *Rhinehimer*, 787 F.3d at 811; *Beacom*, 825 F.3d at 380. The Ninth Circuit, as it did in *Van Asdale*, will very likely follow and "defer to the ARB's reasonable interpretation." *Van Asdale*, 577 F.3d at 997; *see also Lum Rocheleau v. Microsemi Corp.*, 680 F. App'x 533, 535 n.2 (9th Cir. 2017) (not expressly adopting *Sylvester*); *Potyondy v. Pac. Coast Energy Co., LP*, 2025 U.S. Dist. LEXIS 116919, at *17–18 (C.D. Cal. Apr. 10, 2025). The Court must, therefore, summarily reject Meta's attacks on Baig's whistleblowing based on his securities fraud suspicions—which is based on pre-*Sylvester* case law (like *Van Asdale*).

But, if this Court opts to follow the *Van Asdale*'s rule, the result is the same. Baig need not prove Meta committed securities fraud; he needs only a reasonable belief that *approximates* its basic elements: a material misrepresentation with scienter connected to Meta's securities. *Van Asdale*, 577 F.3d at 1001. Baig easily meets this standard.

### 1.    *SolarWinds* Approved A Securities-Fraud Theory on Analogous Facts.

*SEC v. SolarWinds Corp.*, the case on which defendants place so much reliance, underscores the reasonableness of Baig's belief that Meta engaged in securities fraud. In that decision, a federal court denied dismissal of a securities-fraud claim—*brought by the SEC directly*—premised on a company's affirmative (and false) representations about the efficacy of its cybersecurity protocols— the same species of half-truth that corrupted Meta's 10-K representations. If the SEC's theory survived dismissal in *SolarWinds* when the underlying fraud had to be proven, Baig's belief that Meta was committing fraud for similarly misrepresenting the efficacy of its cybersecurity protocols was undoubtedly reasonable.[8]

---

[8] That the same court dismissed the SEC's separate claims resting on SolarWinds' risk-factor disclosures and internal-controls theories does not help Meta. Those claims failed because the company's disclosures were adequate and there was no allegation about design defect in the controls. Accordingly, *SolarWinds* does not stand for the proposition that a company's specific representations about its cybersecurity practices are lawful when false.

---

### 2. Baig Alleges Misrepresentations to Shareholders.

Meta's 10-Ks made three specific, verifiable claims: that it maintained a comprehensive cybersecurity program under the FTC Privacy Order, possessed effective disclosure controls, and disclosed cybersecurity risks in accord with Item 106. SAC ¶¶ 44–48, 126; RJN: Ex. 1 at 7, 37, 40; Ex. 2 at 7, 38, 41, 56; Dkt. 50-2 at 11, 53, 56; Dkt. 50-3 at 11, 57, 67-68; Dkt. 50-4 at 10, 49, 58-60.

Baig's reports showed each was false: the program did not exist, the controls suppressed rather than disclosed, and daily account compromises climbed from 100,000 to half a million undisclosed. SAC ¶¶ 85, 94, 231. These were not omissions but knowing half-truths. See *Macquarie Infrastructure Corp.*, 601 U.S. at 264. Meta's FY2023 and FY2024 10-Ks repeated the same misrepresentation—it "did not identify any cybersecurity threats"—and Zuckerberg certified it despite Baig's letters showing otherwise. SAC ¶¶ 99, 113, 232(a); Dkt. 50-3 at 67-68; Dkt. 50-4 at 58-60. Gupta's admission that Meta had "known about these issues for a long time" establishes scienter. SAC ¶¶ 106, 232(a).

### 3. Meta Fails to Address All of the SEC Rules At Issue in Count 3.

Meta also ignores the fact that Count Three pleads both a reasonable belief conduct rising to the level of securities fraud—and also conduct that violated SEC rules or regulations. Specifically, the SAC alleges violations of **Rule 14a-9 (false proxy)**, which prohibits any proxy solicitation—even if only negligent—that is false or misleading on a material fact.[9] Baig's whistleblower reports relate directly to Meta's 2022 materially misleading, if not actually false, proxy representation to voting shareholders about the Board's oversight over privacy and data risks, including its compliance with the FTC Order. SAC ¶ 228; RJN: Ex. 3 at 22. Meta has forfeited the right to challenge this by failing to address it in the motion.

The SAC also alleges violations of **SEC Rule 10b-5(a) and (c)**, which prohibit, in addition to false statements also proscribe deceptive conduct and a fraudulent course of business, not merely misstatements, and so that one who participates in a scheme can be liable without personally "making" a statement. *Lorenzo v. SEC*, 587 U.S. 71, 78–79 (2019); *WPP Luxembourg Gamma*

---

[9] Under all SEC rules, an omission is material if its disclosure would have significantly altered the "total mix" of information available to a reasonable investor. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

*Three v. Spot Runner*, 655 F.3d 1039 (9th Cir. 2011). As stated in detail in the Statement of Facts, Baig has alleged an enterprise-wide scheme to flout the Privacy Order, many SEC rules and regulations, and engaged in systematic fraud on investors and regulators. Defendants' failure to mention, much less rebut, this claim requires denial of the motion.

Several other rules, each targeting a different disclosure gap, provide independent support for Count 3 and are unrebutted by Defendants' motion.[10]

### 4.  The SAC Approximates Fraud Pleading As Required by *Van Asdale.*

Baig's pleading approximates the elements of a fraud claim. First, Baig has sufficiently approximated scienter: Zuckerberg certified the false filings after being told the assessments were falsified and that leadership was lying to the auditors. SAC ¶¶ 99, 113, 149; Dkt. 46-3 at 18-19; Dkt. 50-3 at 164; Dkt. 50-4 at 155.

With respect to Defendants' materiality[11] attacks, materiality is a question of fact seldom resolved before a jury sees it, let alone on the pleadings. *United States v. Nicholas*, No. SACR 08-

[10] Items 103 and 303 required disclosure of the aggregate, ongoing exposure from Meta's piecemeal disclosure of over €2 billion in GDPR penalties for the same category of failures, and separately required disclosure of the escalating account-takeover trend Meta's officers received in writing. SAC ¶¶ 99, 136, 232(k); Dkt. 46-3 at 18-19; Dkt. 50-3 at 164. Item 105 required disclosure of that same risk's magnitude. SAC ¶ 56. Item 407 required disclosure of the Board Privacy Committee's actual oversight, which the audit process was designed to defeat. (SAC ¶¶ 187, 228; RJN: Ex. 3 at 22. AS 2201's audit-obstruction theory reaches this same conduct independently: falsified security reports impaired Ernst & Young's ability to identify internal-controls deficiencies, thus damaging the SOX § 404 attestation process on which investors rely. This conduct relates to fraud against shareholders regardless of AS 2201's status as an SEC rule. SAC ¶ 232(f). And Rule 12b-20 independently requires the same disclosures Meta's risk-factor, Privacy Order, and Item 106 omissions each left out. SAC ¶ 232(h).

[11] Of the cases Meta cites for its materiality argument, only two—*Clegg v. Amcor Rigid Packaging USA, LLC,* 2022 WL 23215, at *3 (E.D. Ky. Jan. 3, 2022), and *Gjovik v. Apple Inc*., 2024 WL 2309100, at *12 (N.D. Cal. May 20, 2024)—were even SOX whistleblower cases, and both are inapposite. *Clegg* is an Eastern District of Kentucky case that asked whether inventory discrepancies of $1 million were material standing alone, not whether frank misrepresentations to investors and to SEC are material. Under the Ninth Circuit's own standard, a fact is material if a reasonable investor would consider it important to the total mix of information available. *In re Facebook, Inc. Sec. Litig*., 87 F.4th 934, 950 (9th Cir. 2023). The SEC answered that question for cybersecurity risk when it adopted Item 106, having determined investors need exactly this information. 88 Fed. Reg. 51896 (Aug. 4, 2023). The plaintiff in *Gjovik* conceded that she did not respond "point by point" in her opposition to defendant's attacks on her SOX claim, a circumstance wholly at odds with the instant case. 2024 WL 2309100, at * 12.

00139 CJC, 2008 U.S. Dist. LEXIS 104377, at *5 (C.D. Cal. Dec. 15, 2008) ("materiality is a question of fact that must be decided by a jury"). Baig has sufficiently approximated it in any event: the SAC quantifies Meta's exposure at up to $1 billion (SAC ¶¶ 6, 103), and the Court must accept the pleadings as true at this stage in the litigation.

The Ninth Circuit has expressly rejected defendants' argument that a securities fraud plaintiff must demonstrate an immediate stock price drop. *84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003). The Ninth Circuit specifically rejected the "adoption of a bright-line rule requiring an immediate market reaction" to establish materiality or its consequences in securities fraud cases. The Court reasoned that "the market is subject to distortions that prevent the ideal of a 'free and open public market' from occurring" and "these distortions may not be corrected immediately." *See United States v. Nicholas*, 2008 U.S. Dist. LEXIS 104377, at *5-6 ("[T]he Ninth Circuit has held that statements or omissions may be material notwithstanding a lack of immediate market response after their disclosure to the public.").[12] It follows that if a lack of a one-day stock price movement is insufficient to dismiss a securities fraud case, it is not a sound basis upon which to dismiss this action.[13] .

**G. Count 10: Reports Relating to Mail and Wire Fraud.**

Mail fraud (§ 1341) and wire fraud (§ 1343), both enumerated § 806 predicates, require a fraudulent scheme, a material deception, an intent to defraud, and a transmission. *See Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). The prior order dismissed this Count, finding the original complaint pleaded wire fraud only through systemic failures to protect user data, without alleging a scheme or intent.

---

[12] For example, here Meta's stock price dropped below its pre-filing price two days after this lawsuit was announced and did indeed plummet in the weeks and months thereafter. *See* Dkt. 50-5.

[13] The Ninth Circuit has held that "[i]n evaluating whether an omission relating to cybersecurity is materially misleading, we may consider the SEC's interpretive guidance regarding the adequacy of cybersecurity-related disclosures." *In re Alphabet Sec. Litig.,* 1 F.4th 687, 700 (9th Cir. 2021). "Because cybersecurity incidents may cause a range of substantial costs and harms, reasonable investors would likely find omissions regarding significant cybersecurity incidents material to their decisionmaking." *Id.* at 704-705. Here, Defendants' failure to disclose information that posed serious harm to the company's reputation, customer relationships, and risked significant regulatory action, is material. *Id.* at 703. Thus, Meta's arguments based on loss causation fail.

---

The SAC now pleads each element clearly. The scheme is the sustained representation that WhatsApp maintained a functioning security program despite documented failures, carried out through interstate wire and mail transmissions, and made knowingly, intentionally, and "for the purpose of inducing users to transmit their private data and communications through WhatsApp and inducing business customers to pay per-message Business API fees." SAC ¶¶ 276–80.

Defendants' primary argument misses the point. Meta contends that it "defies common sense" that Gupta and Tsimelzon's receipt of Baig's reports demonstrates that the scheme was knowing and intentional. (Mot. 25.) However, the SAC pleads that the individual defendants' reaction ("manipulating security metrics, ordering deletion of security documentation, and retaliating" SAC ¶ 278) to Baig's reports substantiates that defendants were engaged in deliberate attempt to conceal wrongdoing. Meta's response to Baig's whistleblowing reinforces the reasonableness of Baig's belief that the conduct amounted to criminal fraud. *See Lockheed Martin Corp. v. ARB*, 717 F.3d 1121, 1133 (10th Cir. 2013) (attempted concealment is evidence of intent); *Gladitsch v. Neo@ogilvy, Ogilvy, Mather, WPP Grp. USA, Inc.,* 2012 U.S. Dist. LEXIS 41904 (S.D.N.Y. Mar. 21, 2012), at *24 (S.D.N.Y. Mar. 21, 2012) (denying dismissal of § 806 claim where the employer's reaction to the reports supported reasonableness of the whistleblower's fraud belief).[14]

**H. Count 13: Reports Relating to Shareholder Fraud and Obstructing Proceedings**

Baig's reports related directly to conduct in violation of federal criminal statutes—18 U.S.C. §§ 1512(c) (SAC ¶ 297), 1513(e) (SAC ¶ 298), 1519 (SAC ¶¶ 112, 148), and 1520 (SAC ¶ 296)— each of which is, contrary to Defendants' arguments, a provision of federal law related to fraud

---

[14] Defendants also fault Baig for failing to "identify a single Business API customer supposedly defrauded by Defendants." (Mot. 25.) But Baig is not required to identify an individual victim of the scheme, and economic loss is not a requirement under either law. *See Kousisis v. United States*, 605 U.S. 114, 124 (2025) (wire fraud does not require economic loss; "a defendant violates §1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off"); accord *Liu v. Tutor-Perini Corp.*, No. 2:21-cv-05803-AB-Ex, 2023 U.S. Dist. LEXIS 150845, at *15 (C.D. Cal. July 12, 2023) (employee reasonably believed reporting false test results to regulators by email constituted wire fraud). Baig's allegation that he reasonably believed that Meta used this fraudulent scheme to obtain per-message fees from WhatsApp customers is sufficient. (SAC ¶¶ 279–80(b).)

against shareholders under § 1514A(a)(1)(C).[15]

Section 1519 criminalizes knowingly altering, destroying, concealing, or falsifying a record with intent to impede a matter within a federal agency's jurisdiction, including through omissions. *United States v. Singh*, 979 F.3d 697, 715–16 (9th Cir. 2020). Tsimelzon's deletion order, made the same day Baig was compiling his SEC submission, satisfies § 1519 on its face. SAC ¶¶ 112, 148. Baig's belief that this violated a law "relating to fraud against shareholders" was reasonable. Congress enacted §1519 as part of Title VIII "to protect investors and restore trust in financial markets" after the Enron record destruction that concealed shareholder fraud. *Yates v. United States*, 574 U.S. 528, 532, 541 (2015). And it intentionally placed the provision "together with specialized provisions expressly aimed at corporate fraud and financial audits," not among the broad, general-purpose obstruction statutes. *Id.* at 541.[16]

**VIII. COUNTS 8 AND 9: FILINGS THEMSELVES ARE PROTECTED ACTIVITY.**

Baig's January 17, 2025 OSHA complaint and his November 27 and 30, 2024 Form TCR submissions are protected on the face of Section 806—namely, through 18 U.S.C. § 1514A(b)(1)(A) and § 1514A(a)(1)(A) respectively. *See* SAC ¶¶ 111–14, 148, 150. filings are also independently protected under § 1514A(a)(2), which prohibits retaliation against an employee who participates in "a proceeding *filed or about to be filed* (with any knowledge of the employer)," *even without a reasonable belief that a SOX violation occurred.*[17] 18 U.S.C. § 1514A(a)(2).

Thus, the SOX statute itself makes plain that terminating an employee for filing or being suspected of being about to file is actionable where, as here, the disclosures satisfy Section

---

[15] Section 806 protects employees who report to supervisors or a federal agency. Meta cites no authority requiring a report to law enforcement to be entitled to whistleblower protections.

[16] The other three statutes in Count 13 similarly independently sustain the claim: §1512(c)(2) prohibits impairing records for an official proceeding, which encompasses the deletion order and the standing directive against written findings; § 1513(e) bars retaliation for cooperating with law enforcement regarding a potential federal offense, which reaches SEC staff investigating Baig's TCRs; and § 1520, which prohibits destruction of audits, is implicated by the same falsified assessments fed to Ernst & Young.

[17] Retaining counsel to confront the retaliation and negotiating the tolling agreements that extended his filing deadline, are themselves protected under this same "about to be filed" language — conduct explicable only as preparation for the proceeding Baig went on to file. SAC ¶¶ 13, 164(c).

1514A(a)(1)(A)'s content requirement—reporting the same SEC-rule and shareholder-fraud violations developed throughout this brief.[18] Moreover, the statute does not require an employee to have a reasonable belief that his employer violated any of the predicates for whistleblower protection. *Compare* Mot. 24 *with Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (citation omitted) (reading the analogous Title VII participation clause to protect an employee who "utilizes the tools provided by Congress") *and* SAC ¶¶ 112–14, 148–50.

## IX.   THERE IS NO MERIT TO META'S CLAIMS OF PUFFERY

In response to multiple Counts (e.g., Counts 2, 3, and 5), Meta contends its language at issues was mere "puffery"—vague corporate optimism that cannot support a securities claim. (Mot. 18 [citing *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019); *In re PG&E Corp. Sec. Litig., 80*6 F. Supp. 3d 962, 992, 995 (N.D. Cal. 2025)]). This Court must note that puffery is a defense to a securities-fraud claim itself, not to a claim of retaliation against whistleblower's report that fraud occurred. In any event, puffery means an opinion—a statement no one could check. *Veal*, 423 F. Supp. 3d at 803; *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Meta's statements at issue were not opinions.

For example, Meta repeatedly stated in its SEC filings that it was "maintaining" a privacy program "in connection with" the FTC order, that its disclosure controls were "effective," and that it "had not identified" any material cybersecurity threat. SAC ¶¶ 45–48, 168; RJN: Ex. 1 at 37, Ex. 2 at 38, Ex. 3 at 22; Dkt. 50-2 at 53; Dkt. 50-3 at 57; Dkt. 50-4 at 49. But this was a factual claim: Meta either maintained the FTC-mandated program, or it did not. The puffery argument thus fails.

Given that reasonable minds could disagree as to whether they were statements of opinion or of fact, Baig's SOX whistleblower claims must survive. *Rhinehimer*, 787 F.3d at 811–12.

## X.   INDIVIDUAL DEFENDANTS ARE LIABLE ON FOUR SEPARATE GROUNDS.

Zuckerberg and Cathcart are liable under four independent theories: (1) direct personal participation in the retaliation; (2) personal approval of the termination itself; (3) the "materially involved" standard Meta's own authority supplies; and (4), cat's-paw liability through the

---

[18] Meta's attempt to delve into the *substance* of the OSHA complaint is resolved in the exhaustion section below.

subordinates each officer directed. Because Meta's motion only challenges one basis for liability (the third—which fails for independent reasons as shown below), the motion to dismiss the individual defendants must be denied.

Against this backdrop, the SAC alleges that Zuckerberg and Cathcart personally approved Baig's termination. That is sufficient by itself to compel denial of their motion to dismiss. *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 675 (4th Cir. 2015) (affirming individual SOX liability against a CEO and a board chairman "involved in the decision to terminate").[19] And Congress wrote no CEO exception into Section 806.

Additionally, the personal-approval theory is properly pleaded in the SAC on information and belief, which the Ninth Circuit permits where the facts of an internal decision are "peculiarly within the possession and control of the defendant." *Park v. Thompson*, 851 F.3d 910, 928–29 (9th Cir. 2017). Unlike *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013), *Brinker v. Axos Bank,* No. 22-CV-386-MMA (DDL), 2022 WL 17724408, at *10–11 (S.D. Cal. Dec. 15, 2022), and *Bury v. Force Protection, Inc.*, 2011 WL 2935916, at *2–4 (D.S.C. June 27, 2011), in which courts dismissed claims against senior officers who merely received complaints, Baig's allegation rests on the defendant officers' conduct after receipt.

Third, the case law Meta cites, *Wallender v. Canadian Nat'l Ry. Co.*, 2015 U.S. Dist. LEXIS 199719, at *53 (W.D. Tenn. Feb. 10, 2015), for the "materially involved" standard, found a genuine fact issue at *summary judgment*—not on the pleadings.

Fourth, and finally, cat's-paw liability reaches the individual defendants through the subordinates they directed, because Section 806 requires no animus in the officer himself. *Murray*

---

[19] Importantly, even before their personal approval of Baig's termination, the SAC pleads far more than Zuckerberg and Cathcart's mere knowledge and receipt of a complaint. Cathcart solicited the August 2022 report knowing Baig feared retaliation, told Baig to proceed anyway, and then withdrew from Baig's security work entirely—neither reviewing a single project after October 2022, against a norm of reviewing ten projects a week, nor carrying out his own directive to fix the problems reported. SAC ¶¶ 85, 87, 162(g), 230. Because Meta's promotion process requires a manager's affirmative endorsement, that deliberate disengagement made certain Baig's career would stall. And although Meta says Zuckerberg's engineer allocation is "different from an adverse employment action", it quotes the SAC without the operative clause: the engineers went to those retaliating against Baig "while Baig's team received nothing." (Mot. 26; SAC ¶ 172(k).) This Court has already held that exclusion states retaliation. Dkt. 70 at 13.

*v. UBS Sec., LLC*, 601 U.S. 23, 34 (2024). That rule traces to *Staub v. Proctor Hospital*, 562 U.S. 411, 421–23 (2011), which first held that an official who serves as the conduit for a subordinate's retaliatory animus answers for the adverse action that animus proximately causes.

Baig has pleaded everything Section 806 and Rule 8 require: the defendant officers' own conduct, their stake in suppressing his reports, and the subordinates through whom their approval passed. No plaintiff outside the room where the termination decision was made can plead more.

## XI.   BAIG EXHAUSTED EACH OF HIS CLAIMS[20]

Meta's exhaustion test—that an allegation is unexhausted unless it "appeared in his OSHA complaint"—is not the law. (Mot. 9.) Administrative charges are read "with utmost liberality." *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002); *accord Wallace v. Tesoro Corp.*, 796 F.3d 468, 476 (5th Cir. 2015) (explaining the same exhaustion standard governs Title VII and SOX). As Meta acknowledges, a suit may include any allegation within the scope of OSHA's actual investigation or any investigation that could "reasonably be expected to grow out of" the charge. *Freeman*, 291 F.3d at 636 (citations omitted). Thus, claims need only be "like or reasonably related to the allegations" in the charge and not inconsistent with the plaintiff's original theory of the case. *Id*. (citation omitted).

Every entry on Meta's list either has a documented counterpart in the OSHA complaint or relates to the same subject matter and would naturally be discovered in any reasonable investigation:

| Allegation Meta Contends Never Appeared in the OSHA Complaint | OSHA Compl. ¶¶ |
|---|---|
| FTC for-cause proceeding (May 2023) and half-truths | ¶¶ 17–22,62,92,136,141–42,350 |

[20] Two points deserve brief and succinct correction: The findings in the OSHA proceeding are entitled to no deference in this Court. Once a complainant opts to proceed in federal court after 180 days of filing his SOX complaint with OSHA pursuant to § 1514A(b)(1)(B), the matter proceeds to a *de* novo trial and no precedential value at all is afforded the findings, § 1514A(b)(1)(B); *Stone v. Instrumentation Laboratory Co.*, 591 F.3d 239, 258-60 (4th Cir. 2009) (holding that § 1514A(b)(1)(B) entitles a complainant to *de novo* review "regardless of whether the ALJ conducted a hearing or issued findings," because Congress "afford[ed] no deference to non-final agency findings"). Accordingly, Meta cannot recast OSHA's expedited, non-final screening as a strike supporting dismissal with prejudice. Second, Baig did not "withdraw" allegations under Rule 11 threat: the parties stipulated that Baig disagreed with any characterization of his allegations as false but agreed certain allegations would be clarified. Dkt. 79 at 2.

| Allegation Meta Contends Never Appeared in the OSHA Complaint | OSHA Compl. ¶¶ |
|---|---|
| False 10-K, 10-Q, and proxy statements | ¶¶ 142–43,216,350–51 n.2 |
| Cathcart's withdrawal from Baig's security work | ¶ 96 |
| Zuckerberg's and Cathcart's approval of termination | ¶¶ 72,96,202,205–09,243,251–52,335,347,357 |
| Zuckerberg's and Li's false SEC certifications | ¶¶ 202–03,328,349–50 |
| False FTC and SEC certifications | ¶¶ 19–20, 61, 96, 141–42, 203, 228–29, 292–93, 302, 350 |
| Omitted 10-K loss-contingency footnote and accrual | ¶¶ 15–18,62,136,350,352 |
| Advertising revenue attributed to WhatsApp without GAAP reconciliation (Reg. G) | ¶ 46 |
| False information to E&Y; obstruction of integrated audit | ¶¶ 96,181,202,216,244–45, 250, 262–64, 298, 313, 331–32, 351 |
| Zuckerberg's false January 2024 testimony | ¶ 328 |
| Circumscribed Board-level access audit | ¶¶ 49–50 |
| Business API fees paid in reliance on false representations | ¶ 351 |
| False NSO/Paragon press releases and filings | ¶ 321 |
| Legal Dept.'s privilege-marking to shield compliance records | ¶¶ 139,141,243 |
| Business Case to Banerjee on Privacy-Order violations | ¶¶ 210,217,291,293,347,353 |

For example, an agency investigating misleading cybersecurity omissions would pull the 10-Ks and their certifications, the proxy statements, the current-report record, and the disclosure history of the FTC proceeding the charge describes. Meta's argument that OSHA "had no cause to investigate whether Defendants engaged in shareholder fraud" is simply false: the OSHA complaint describes "misleading omissions in [Meta's] public filings," Dkt. 3 at 109: ¶ 351, objects to "shareholders [sic] fraud," *Id*. at 107-108: ¶ 348, and alleges Meta "invests heavily in internal and external communications with an intent to mislead the regulators, users, employees, investors, etc."

*Id.* at 100: ¶ 321.

Meta cites no case finding non-exhaustion on a record resembling this one; *Freeman, Wallace, Feldman,* and *Erhart* each involved a charge missing an entire category of conduct, not a charge supplemented, before suit, with the theories now pressed. Instead, courts have judged exhaustion liberally in favor of employees. For example, a court found a complaint that alleged only retaliation for whistleblowing for reporting to SEC satisfied exhaustion for a claim alleging retaliation for reporting to supervisors. *Potyondy v. Pac. Coast Energy Co., LP*, 2025 U.S. Dist. LEXIS 116919, at *12–13 (C.D. Cal. Apr. 10, 2025) ("[A] reasonable investigation of the original OSHA complaint would have revealed" the closely related conduct.); *accord Sosa v. Hiraoka*, 920 F.2d 1451, 1458 (9th Cir. 1990). An OSHA complaint is "not expected to meet" Rule 12(b)(6) standards, and the remedy for any gap is to trim an unexhausted predicate, not dismiss the claim. *Erhart,* 612 F. Supp. 3d at 1087.

## XII. THE SAC IS NOT A SHOTGUN PLEADING[21]

A shotgun pleading is one where "a party indiscriminately incorporates assertions from one count to another" in a way that "prevent[s] the opposing party from reasonably being able to prepare a response or simply mak[es] the burden of doing so more difficult." *Gibson v. City of Portland*, 165 F.4th 1265, 1288 (9th Cir. 2026) (*quoting* 5A Wright & Miller's Federal Practice and Procedure § 1326 (4th ed. 2024)). "'Shotgun pleading' describes a class of defects in complaints; it does not supply a brightline rule. It will require judgment on the part of the district courts to determine those complaints that fail to provide the opposing parties and the district court with sufficient notice of the claims and their basis." *Id.* at 1289-90. When Meta has tried this sort of dismissal argument before, courts within this District have denied it where "the allegations are not so indecipherable as to violate Rule 8." *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1005 (N.D. Cal. 2024.)

---

[21] Baig has identified six cases where this Court addressed and dismissed shotgun pleadings. Five of the dismissed complaints were brought by pro se plaintiffs, and the complaint in the one non-pro se case—*First-Citizens Bank & Tr. Co. v. HSBC Holdings PLC*, No. 23-cv-02483-LB, 2024 U.S. Dist. LEXIS 5668, at *34 (N.D. Cal. Jan. 10, 2024)—was dismissed for jumbling the timeline and for lumping most of the defendants together while failing to allege anything about other defendants. This Court still ordered amendment. Unlike in *First-Citizens Bank*, Meta clearly has fair notice of the claims against it.

*CORRECTED* OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

37

Case No. 3:25-CV-07604-LB

*See Dawson v. Meta Platforms, Inc.*, 2026 U.S. Dist. LEXIS 164043, at *31-32 (N.D. Cal. July 23, 2026) (rejecting "shotgun pleading" argument because, "[e]ven if (a) each of Plaintiffs' counts adopts the allegations of the preceding counts and (b) some of the counts assert multiple claims for relief, the complaint's allegations are not so indecipherable so as to violate Rule 8").

The SAC certainly passes the decipherability test. Indeed, if Baig had ended the SAC with Count 1, a single count containing all thirteen discrete theories, some of which are alleged against different defendants based on different misconduct, the resulting complaint would have been far shorter **and** far less clear for Court and counsel to parse.

Moreover, Rule 8(d)(2)–(3) expressly permits pleading overlapping theories in separate counts. Facts appear in multiple counts because they relate to multiple claims. *Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*, 147 F.4th 1341, 1350 (11th Cir. 2025). Thus, Meta's specific complaints have no merit. Rule 10(c) permits each Count to incorporate facts. The SAC asserts facts within each section that are tailored to the specific Count where they appear, not "irrelevant" or "inconsistently alleged." Counts 4 and 6 rest on different rules with different elements pleaded together because the same conduct satisfies both. And overlapping liability among six Defendants simply reflects that the SAC identifies, for each Defendant, the specific conduct his liability rests on. SAC ¶¶ 252, 307. If the Court nonetheless finds a discrete defect, leave to replead—not dismissal with prejudice—is the remedy *Gibson* prescribes. 165 F.4th at 1289–90.

## XIII. CONCLUSION

This record does not present a close question. The Court should deny the motion in full. If the Court finds any discrete deficiency, leave to amend is granted with "extreme liberality," *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Defendants' claimed authority for dismissal with prejudice are entirely distinguishable and must be rejected.

DATED: August 14, 2026              SCHONBRUN SEPLOW HARRIS
                                    HOFFMAN & ZELDES LLP

                                         */s/ Wilmer J. Harris*
                                    By: _____
                                         Wilmer J. Harris
                                         Amanda E. Johnson
                                    *Attorneys for Plaintiff Attaullah Baig*