Wilmer J. Harris, SBN 150407
wharris@sshhzlaw.com
Amanda E. Johnson, SBN 342500
ajohnson@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
715 Fremont Avenue, Suite A
South Pasadena, CA 91030
Telephone: (626) 441-4129
Facsimile: (626) 283-5770

*Attorneys for Plaintiff, Attaullah Baig*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ATTAULLAH BAIG,

Plaintiff,

vs.

META PLATFORMS, INC., a corporation; PINAKI MUKERJI; MARK TSIMELZON; NITIN GUPTA; and DOES 1-10, inclusive,

Defendants.

Case No. 3:25-cv-07604-LB

**PLAINTIFF'S THIRD AMENDED COMPLAINT FOR RETALIATION IN VIOLATION OF THE SARBANES-OXLEY ACT, 18 U.S.C. § 1514A**

**DEMAND FOR JURY TRIAL**

*[Filed pursuant to the Court's September 24, 2026 Order (Dkt. 94)]*

Judge: Hon. Laurel Beeler, U.S. Magistrate Judge

Complaint filed: September 8, 2025
Trial date: Not Set

## I. INTRODUCTION

1. Three billion people trust WhatsApp with their private conversations.[1] They do so on Meta's explicit and repeated assurance that WhatsApp is the "most secure place to have a private conversation."[2] Among them are journalists, dissidents, human rights workers, lawyers, doctors, and government officials, who entrust the platform with their most sensitive communications because of that assurance.

2. Attaullah Baig was WhatsApp's Head of Security. From February 2021 until Meta terminated him effective April 18, 2025, he was the executive responsible for protecting that trust. What he found was that WhatsApp's end-to-end encryption, which functioned as designed, was not by itself enough to make the platform secure, and that the security program required to make the promise meaningful did not exist. Approximately 1,500 WhatsApp engineers, and by 2024 between 20,000 and 65,000 Meta employees, had unrestricted access to user data with no documented business need, no audit trail of who accessed what, and no real-time breach detection. Approximately 100,000 WhatsApp accounts were compromised every day through account takeovers, which hand the attacker every incoming message intended for the user without breaking any encryption. More than 400 million user profile photos were scraped every day by outsiders without users' knowledge. Meta was not reporting any of this to the regulators it had promised to notify or to its investors.

3. The same failures meant that the comprehensive privacy program Meta had promised the United States government it would build and maintain — the program Meta told its investors, year after year in its annual reports, that it was maintaining — had never been built. This action rests not on what Meta told its users, but on what Meta told its investors and on what Meta did to Mr. Baig when he reported the falsity of those statements.

4. Beginning with a letter from his counsel on April 18, 2023, Mr. Baig told Meta that its filings with the Securities and Exchange Commission were false. He raised these concerns with Meta's internal investigators repeatedly, in interviews between May 2023 and February 2025. He wrote

---

[1] *About WhatsApp*, WhatsApp, https://www.whatsapp.com/about (last visited Sept. 30, 2026).

[2] Liv McMahon, *WhatsApp: Mark Zuckerberg Reveals New Privacy Features*, BBC News (Aug. 9, 2022), https://www.bbc.com/news/technology-62464243 (quoting WhatsApp Product Head Ami Vora).

directly to Meta's chief executive officer, Mark Zuckerberg, in January 2024, warning that the conditions he was reporting exposed Meta's investors to serious harm, and in December 2024, he informed the CEO that he had taken his report to the SEC. He reported Meta's false filings directly to the SEC, in two whistleblower submissions in November 2024. And he reported Meta's false filings to OSHA in the administrative complaint he filed on January 17, 2025.

5. Meta's answer was not to correct the filings. It was to dismantle Mr. Baig's career. His supervisors downgraded ratings that had been at the peak of his tenure, denied him promotions, stripped him of the projects he had built, ordered his team's scraping post deleted, rolled back a system that was recovering approximately 25,000 compromised user accounts a day at a five-percent rollout, and fired him—24 days after he told Meta he had filed with OSHA, and about 10 weeks after he told Meta's CEO he had filed with the SEC.

6. This action seeks the make-whole relief that 18 U.S.C. § 1514A provides.

7. This Third Amended Complaint is filed pursuant to the Court's order.[3] It asserts a single claim under 18 U.S.C. § 1514A, undivided into counts. It rests on one theory of protected activity: that Mr. Baig reported that Meta's SEC filings misrepresented its FTC-mandated privacy program and its cybersecurity risks. No paragraph of this complaint is incorporated by reference into any other part of it.

8. Paragraphs 28 through 40 describe what Mr. Baig knew when he was hired and the conditions he found at WhatsApp. Those paragraphs (and the reports he made before April 18, 2023) are pleaded as background bearing on what Mr. Baig believed, whether that belief was reasonable, and what Defendants knew about him, rather than as protected activity. The communications described outside of paragraphs 41 through 49 are pleaded as evidence of Defendants' knowledge or motive, not as protected activity. Similarly, the August 2024 written report to Meta's investigator in paragraph 45 is pleaded for what it shows Defendant Tsimelzon knew and did; the interviews described in paragraphs 45 and 46 are the protected reports.

[3] In filing this Third Amended Complaint, Plaintiff is not voluntarily relinquishing any claims previously pleaded, including those dismissed with prejudice and without leave to amend by the Court's September 18, 2026 Order (ECF No. 93), as amended through the Court's September 24, 2026 Order (ECF No. 94).

## II. JURISDICTION, VENUE, AND EXHAUSTION

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1514A(b)(1)(B).

10. Venue is proper under 28 U.S.C. § 1391(b). Meta's principal place of business (1 Hacker Way, Menlo Park, California 94025) is located in this district, as is WhatsApp's headquarters. A substantial portion of the events giving rise to the claim, including Meta's receipt of Mr. Baig's reports and its decisions alleged, occurred in this district.

11. Mr. Baig filed an administrative complaint with the Secretary of Labor, through OSHA, on January 17, 2025, under 29 C.F.R. § 1980.103, and amended it on April 11, 2025, to add his termination and the events that preceded it. The amended administrative complaint is Exhibit A to the original complaint in this action, ECF No. 3 at 22–115.

12. The administrative complaint alleged retaliation, culminating in his termination, for his reports about WhatsApp's security deficiencies, falsified assessments, and blocked audits. It alleged that Meta "has made misleading omissions in its public filings about the current state of its cybersecurity." ECF No. 3 at 109 (¶ 351). It alleged that when he made his reports he believed he was objecting to "securities fraud, violations of SEC rules and regulations, and shareholders fraud," because of Meta's failure to comply with the FTC Privacy Order and because of "the Company's public statements touting WhatsApp's security that could mislead a reasonable investor." *Id.* at 107–08 (¶¶ 348, 350).

13. Before the January 2025 filing, Mr. Baig and Meta entered into a tolling agreement dated May 6, 2023, and nine amendments to it dated October 31 and December 1, 2023, and January 9, February 7, April 4, May 29, August 6, October 14, and November 27, 2024. Together the agreements tolled the period for filing with OSHA without interruption from May 6, 2023 through January 15, 2025. The agreements recited that Mr. Baig had threatened suit under the Sarbanes-Oxley Act and would otherwise have had to file with OSHA within 180 days of a verbal warning given on November 14, 2022, "as well as other subsequent alleged adverse actions." Mr. Baig filed with OSHA on January 17, 2025, two days after the tolling period ended, which OSHA determined was timely. ECF No. 3 at 23–24. The reports pleaded in paragraphs 41 through 49 are the same course of reports the

administrative complaint described, made to the same recipients and culminating in the same termination. More than 180 days elapsed without a final decision from the Secretary, and Mr. Baig brings this action under 18 U.S.C. § 1514A(b)(1)(B).

## III. PARTIES

14. Plaintiff Attaullah Baig resides in Texas and worked for Meta from his home in Texas and from Meta's offices in Menlo Park, California and London. Meta employed him as Head of Security at WhatsApp from February 2021 until his termination, noticed on February 10, 2025 and effective April 18, 2025.

15. Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California. Its common stock is registered under section 12 of the Securities Exchange Act of 1934 and trades on the NASDAQ under the symbol META. Meta is required to file reports under section 15(d) of that Act and is a covered employer under 18 U.S.C. § 1514A(a). Meta is the parent of WhatsApp LLC.

16. Defendant Nitin Gupta was at all relevant times Vice President and Head of Engineering at WhatsApp. He is sued in his individual capacity as an officer, employee, or agent of Meta under 18 U.S.C. § 1514A(a).

17. Defendant Pinaki Mukerji was Mr. Baig's direct supervisor from June 2021 through May 2024. He is sued in his individual capacity as an officer, employee, or agent of Meta under 18 U.S.C. § 1514A(a).

18. Defendant Mark Tsimelzon was Mr. Baig's direct supervisor from approximately May 2024 through his termination. He is sued in his individual capacity as an officer, employee, or agent of Meta under 18 U.S.C. § 1514A(a).[4]

[4] The Second Amended Complaint also named Mark Zuckerberg, Meta's Chief Executive Officer, and Will Cathcart, the head of WhatsApp, as defendants. The Court's Order dismissed the claims against them without leave to amend on the allegations then before the Court, and without prejudice to a motion for leave to amend under Rule 15(a)(2) if discovery reveals facts showing that either individual participated in the decision to terminate Mr. Baig. (ECF No. 94.) They are described in this complaint as recipients of Mr. Baig's reports and as participants in the events described. No claim is asserted against either of them here.

## IV. THE STATEMENTS IN META'S SEC FILINGS THAT MR. BAIG REPORTED AS FALSE

19. The statements quoted in paragraphs 20 through 27 appear in Meta's Annual Reports on Form 10-K for fiscal years 2020 through 2024 and in its 2022 proxy statement, copies of which are in the record at ECF Nos. 86-2 (fiscal year 2020), 86-3 (fiscal year 2021), 50-2 (fiscal year 2022), 50-3 (fiscal year 2023), 50-4 (fiscal year 2024), and 86-4 (2022 proxy statement), and of which the Court has taken judicial notice. Pinpoint citations are to the ECF page numbers of those copies.

20. On April 23, 2020, the United States District Court for the District of Columbia entered a stipulated order against Meta (then Facebook, Inc.) in the Federal Trade Commission's enforcement action (the "FTC Privacy Order"). The order required Meta, enterprise-wide and for twenty years, to establish and maintain a comprehensive privacy program; to inventory the categories of Covered Information it collected and the systems where that information was stored; to restrict employee access to Covered Information to employees with a documented business need; to maintain systems sufficient to detect and remediate unauthorized access; to report Covered Incidents to the FTC within thirty days of discovery; to certify its compliance to the FTC; and to submit to assessments by an independent third-party assessor.

21. In its FY 2020 Annual Report on Form 10-K, filed on or about January 27, 2021, Meta told investors that it was "implementing a comprehensive expansion of our privacy program in connection with the FTC consent order, including substantial management and board of directors oversight, stringent operational requirements and reporting obligations, prohibitions against making misrepresentations relating to user data, a process to regularly certify our compliance with the privacy program to the FTC, and regular assessments of our privacy program by an independent third-party assessor." ECF No. 86-2 at 38.

22. In its Forms 10-K for fiscal years 2021, 2022, 2023, and 2024 — filed on or about February 2, 2022, February 1, 2023, February 1, 2024, and January 29, 2025 — Meta told investors that it was "maintaining a comprehensive privacy program in connection with the FTC consent order" that included substantial management and board of directors oversight, stringent operational requirements and reporting obligations, a process to regularly certify its compliance to the FTC, and regular

assessments by an independent third-party assessor. ECF No. 86-3 at 39 (fiscal year 2021); ECF No. 50-2 at 53 (fiscal year 2022); ECF No. 50-3 at 57 (fiscal year 2023); ECF No. 50-4 at 49 (fiscal year 2024). Meta's 2022 proxy statement told shareholders that the Board's privacy committee "oversees the risks related to privacy and data use matters, including our compliance with the comprehensive privacy program that we adopted in compliance with our FTC consent order." ECF No. 86-4 at 23.

23. In Item 9A of each Form 10-K for fiscal years 2020 through 2024, Meta's management concluded that Meta's disclosure controls and procedures were designed at a reasonable assurance level and were effective. ECF Nos. 86-2 at 113; 86-3 at 111; 50-2 at 153; 50-3 at 157; 50-4 at 148. Each of those annual reports was filed with a certification of Meta's CEO under Rule 13a-14(a), identified in the exhibit index to each report. ECF Nos. 86-2 at 116; 86-3 at 114; 50-2 at 156; 50-3 at 161; 50-4 at 153.

24. In Item 1A of each Form 10-K for fiscal years 2020 through 2024, Meta described security breaches, improper access to or disclosure of user data, hacking and phishing attacks on its systems, and other cyber incidents as risks that "could harm our reputation and adversely affect our business." ECF Nos. 86-2 at 40; 86-3 at 41; 50-2 at 55; 50-3 at 59; 50-4 at 52. In the reports for fiscal years 2020, 2021, and 2022, Meta stated that it experienced such attacks and incidents "from time to time." ECF Nos. 86-2 at 40; 86-3 at 41; 50-2 at 55. Beginning with the report for fiscal year 2023, Meta stated instead that it "regularly experience[s] such cyber-attacks and other security incidents of varying degrees." ECF Nos. 50-3 at 60; 50-4 at 53.

25. In Item 1C of its Forms 10-K for fiscal years 2023 and 2024, filed under Item 106 of Regulation S-K, Meta described its processes for assessing, identifying, and managing material cybersecurity risks and its board's oversight of those risks, and stated that it "did not identify any cybersecurity threats that have materially affected or are reasonably likely to materially affect" its business strategy, results of operations, or financial condition. ECF Nos. 50-3 at 67–68 (fiscal year 2023); 50-4 at 58, 60 (fiscal year 2024). In each of those reports Meta also stated: "Our internal audit function provides independent assessment and assurance on the overall operations of our cybersecurity and privacy programs and the supporting control frameworks." ECF Nos. 50-3 at 67; 50-4 at 58.

26. In its Form 10-K for fiscal year 2023, Meta disclosed for the first time in an annual

report that the FTC had "initiated an administrative proceeding against us" alleging deficient compliance with the FTC Privacy Order, while stating on the same page of the same report that Meta was maintaining a comprehensive privacy program in connection with that order. ECF No. 50-3 at 57.

27. The FTC Privacy Order required Meta to maintain a single, enterprise-wide privacy program spanning Facebook, Instagram, WhatsApp, and Meta's other platforms. The representations quoted above were about that enterprise-wide program.

## V. WHAT MR. BAIG KNEW WHEN HE WAS HIRED

28. Before joining Meta, Mr. Baig had spent more than twenty years in cybersecurity, including senior roles at major financial institutions.

29. Before he was hired, Mr. Baig knew that in July 2019 the FTC had imposed a $5 billion penalty on Meta, and that in July 2019 the SEC had charged Facebook, Inc., as Meta was then known, with misleading investors by describing the risk of third-party misuse of user data as hypothetical while knowing that Cambridge Analytica had already improperly obtained the data of tens of millions of users — charges Meta paid $100 million to resolve.

30. In connection with joining Meta in January 2021, Mr. Baig reviewed and acknowledged the FTC Privacy Order, which he understood to be a federal court order imposing specific, enforceable obligations on Meta. Meta's compliance training, which he completed annually, used Meta's $100 million SEC settlement as a case study; the training identified noncompliance with the FTC Privacy Order's access-restriction and incident-reporting obligations as conduct the SEC had already treated as material to investors.

31. Mr. Baig's responsibilities as Head of Security gave him direct visibility into WhatsApp's access controls, breach-detection capability, incident-reporting practices, and compliance with the FTC Privacy Order.

## VI. WHAT MR. BAIG FOUND

32. WhatsApp had no inventory of the categories of user data it collected and no inventory of the systems and databases where that data was stored. Meta could not identify what Covered Information WhatsApp held or where it resided.

33. Approximately 1,500 WhatsApp engineers had unrestricted access to user data with no

documented business need. By 2024, Mr. Baig documented specific data-warehouse tables accessible to between 20,000 and 65,000 Meta employees. This was database-level access to account data, metadata, and profile information; Mr. Baig does not allege that WhatsApp's end-to-end encryption was broken.

34. WhatsApp lacked a system to monitor employee access to data or audit trail of which employees accessed which data. Meta could thus neither verify that access was limited to authorized employees nor detect unauthorized internal access as a Covered Incident.

35. WhatsApp had no security operations center and no real-time breach-detection capability. In a meeting Mr. Baig attended, a representative of the central security team stated that Meta had accepted the risk of being unable to respond to a data breach in real time.

36. Approximately 100,000 WhatsApp accounts were being compromised daily through account takeovers. Over 400 million user profile photos were being scraped daily by external parties. Mr. Baig documented that WhatsApp was reporting only a fraction of these incidents to the FTC and to European data-protection authorities. In January 2025 the manager whose team produced WhatsApp's account-takeover metrics told Mr. Baig that the events his team measured were only a fraction of the actual number.

37. Meta's X-Sec security team generated security reports submitted in connection with compliance oversight that Mr. Baig documented as falsified. Mr. Baig also documented that internal audits of these problems were blocked: on October 25, 2023, he formally requested that Meta's internal auditor, Syed Abidi, audit large-scale data-exfiltration risk; Mr. Abidi told Mr. Baig that the proliferation of access to user data and the exfiltration risk were well known to Meta's top leadership. Mr. Baig renewed his request to Internal Audit on January 31 and March 7, 2024 and to Meta's head of governance, risk and compliance on March 11, 2024. Internal Audit's senior director promised to follow up and to correct any misstatement to regulators but failed to do so. The audit was not performed; Mr. Abidi later told Mr. Baig that it was blocked from a higher level. In October 2024, the auditor conducting Meta's European Electronic Communications Code (EECC) audit, to whom Mr. Baig had supplied the same information, excluded five findings from his final report, including the finding on data-warehouse access, and told Mr. Baig in December that he was under pressure to justify

the findings that remained. In May 2024, when Defendant Gupta was presented with the results of a red-team exercise on data exfiltration known internally as JUNGLE, he said: "We have known about these issues for a long time, why are we presenting them now," and "blissful ignorance was better than this." A May 29, 2024 follow-up email from Meta's Red Team Operations Group recorded, as next steps: developing joint Objectives and Key Results (OKRs) capturing "Op JUNGLE remediation work"; preparing "1-2 slides for [Meta's Audit and Risk Oversight Committee (AROC)] capturing security wins from the X-Sec & WhatsApp partnership"; and scheduling a readout to Defendant Gupta and X-Sec engineer Bhavesh Mehta to follow. Defendant Gupta and Mr. Mehta told Mr. Baig that the exercise would be reported to AROC as a positive result.

38. Mr. Baig reported these conditions to his supervisors and to WhatsApp's senior leadership between September 2021 and March 2023, including in a written report following a red-team exercise in 2021, in an August 18, 2022 briefing of WhatsApp's head and its counsel, in a written pre-read circulated in September 2022, in an October 18, 2022 presentation to approximately ten WhatsApp executives, and in a March 2023 recap document stating that WhatsApp "may be violating SEC regulations and laws with our public misrepresentations" and that WhatsApp "risk[ed] additional legal action by the FTC, SEC, IDPC, and other regulators for not meeting our legal obligations." As set out in paragraph 8, these reports are pleaded as background and not as protected activity.

39. In September 2023, Mr. Baig published an internal document titled "WhatsApp Data Security Vision" to WhatsApp employees and to Meta employees whose systems held WhatsApp user data. The document stated that Meta was "required to maintain a comprehensive information security program that is designed to protect the security of Covered Information," citing Section V of the FTC Privacy Order. It set as the objective that "[a]ll systems that contain WhatsApp user data have access controls based on business need, data access monitoring, and alerts configured, and we are able to respond to alerts in a timely fashion commensurate with companies of our size." It scheduled immutable logging of user-data access for the second half of 2023; the review and reduction of access to those with a documented business need, and anomaly detection for unusually large data access, for late 2023 and the first half of 2024; and encryption at rest and at the field level for 2024. Among the questions that Mr. Baig identified in the document as ones asked by regulators were "[w]ho has access

to this data," "[d]o we have immutable data access logs," and "[d]o we have monitoring to detect unauthorized access." Mr. Baig asked Chad Greene, Steve Clarke, Chris Rohlf, and Bhavesh Mehta for comment on the document. None responded.[5]

40. Comparing what he found to what Meta was telling investors, Mr. Baig came to believe that Meta's Forms 10-K were materially misleading: that a program described as maintained had not been built; that controls described as effective were not; and that incidents and noncompliance described as contingent risks were daily, known, and already realized. He held that belief throughout the period covered by this complaint, and he made the reports described below because he held it.

## VII. MR. BAIG'S REPORTS ABOUT META'S SEC FILINGS

41. April 18, 2023 — letter from counsel to Meta's head of WhatsApp. Counsel for Mr. Baig sent a written letter to Will Cathcart, the head of WhatsApp, stating that Mr. Baig had suffered retaliation in violation of the Sarbanes-Oxley Act (SOX) after reporting WhatsApp's systemic cybersecurity failures, and that those failures "implicate Meta's legal obligations to both the Federal Trade Commission (FTC) and the rules and regulations of the Securities and Exchange Commission (SEC)." The letter stated that "in the six months since Mr. Baig raised his cybersecurity concerns with WhatsApp leadership, Meta has not changed its public statements about WhatsApp's security and has made misleading omissions in its public filings about the current state of its cybersecurity." It identified the filing: "On February 2, 2023, Meta released its 10-K, in which it described WhatsApp as 'a simple, reliable, and secure messaging application that is used by people and businesses around the world to communicate and transact in a private way.'" It quoted that annual report's description of cyber incidents as risks that "could harm our reputation and adversely affect our business" and its statement that Meta had "developed systems and processes that are designed to protect our data and user data, to

[5] Section 5 of the Court's September 24, 2026 Amended Order (ECF No. 94) dismissed without leave to amend every theory of protected activity other than that Mr. Baig reported that Meta's filings with the Securities and Exchange Commission misrepresented its FTC-mandated privacy program and its cybersecurity risks and directs that this complaint rest on that theory alone. This complaint therefore pleads as protected activity only the reports described in paragraphs 41 through 49. Mr. Baig does not assert the September 2023 vision document described in this paragraph, or any other communication described elsewhere in this complaint, as protected activity giving rise to liability under 18 U.S.C. § 1514A. Such communications are pleaded as background bearing on the reasonableness of Mr. Baig's belief, on Defendants' knowledge, and on their motive.

prevent data loss, to disable undesirable accounts and activities on our platform, and to prevent or detect security breaches," and it stated that "[a]s Mr. Baig had revealed, WhatsApp could not detect data breaches or guard against improper access to or disclosure of user data." The letter stated that Mr. Baig "believed that Meta was violating SEC rules and regulations by failing to comply with the 2020 Privacy Order and because of the Company's public statements touting WhatsApp's security that could mislead a reasonable investor." And it recounted that Meta had paid $100 million to settle an SEC enforcement action arising from the same facts as the FTC action, in which the SEC "specifically cited to Facebook's use of false impressions regarding the security of user data as a factor in the enforcement action." Each of the subsequent requests for Meta to enter into tolling agreements to preserve Mr. Baig's SOX claims was a further protected activity under SOX.

42. May 10, June 8, and December 15, 2023 — interviews with Meta's internal investigators. Meta's employment investigations team interviewed Mr. Baig on these dates. The May 10 and June 8 interviews, conducted by investigator Brendan Brownfield, were part of the investigation Meta opened in response to Mr. Baig's counsel's April 18, 2023 letter. In these interviews, Mr. Baig told the investigator that Meta was misrepresenting its privacy program and its cybersecurity risks to investors; that Meta's annual Form 10-K representations of a functioning privacy program were materially false in light of the conditions he had documented; and that management had curtailed compliance audits and instructed him not to put compliance failures in writing. The December 15 interview, conducted by investigator Kanita Viranond, was part of the investigation arising from the anonymous negative feedback described in paragraph 58. During that interview, Mr. Baig told the investigator that the security reports the X-Sec team generated were falsified, that the pre-read documents prepared for Defendant Gupta and for Meta's chief information security officer materially misrepresented the facts, and that he had been blocked from raising security risks that could seriously harm Meta and its investors.

43. January 2, 2024 — letter to Meta's chief executive officer. Mr. Baig sent a detailed letter to Meta's CEO, General Counsel Jennifer Newstead, and Meta's Ethics and Compliance team. The letter stated that "[t]he X-Sec team is falsifying cybersecurity reports." Mr. Baig warned that more than 60,000 employees had access to sensitive user data, that Meta had "no defenses or protection against"

an attacker or employee removing large volumes of user records from Meta's corporate boundary, and that "[i]f we fail to remediate these gaps, we are not meeting our legal obligations from the 2020 FTC Order." He reported approximately 250,000 daily account takeovers on Facebook and approximately 30,000 daily account takeovers on WhatsApp (paragraph 80). In the letter, Mr. Baig explained that he had asked both ISSO-GRC and Meta's Internal Audit function to audit the conditions he was reporting but had not heard back from either. He estimated that remediating the failures would require "a significant new investment of at least $100 million+ or a major re-prioritization, and possibly a major restructuring." The letter told Meta's CEO what those conditions meant for Meta's investors: "A large-scale data breach will expose Meta, our users, and our investors to serious harm. Meta could lose billions of dollars in market cap, and we may face several regulatory penalties, lawsuits, etc." It closed by stating that Mr. Baig was "simply trying to remediate the serious cybersecurity gaps that can harm Meta, its users, and its investors." In warning that the falsification of cybersecurity reports "can result in criminal penalties," Mr. Baig cited the criminal conviction of Uber's former chief security officer for concealing a data breach from regulators, and the SEC's enforcement action against SolarWinds Corp. and its chief information security officer. Meta filed its fiscal year 2023 Form 10-K approximately one month later, on February 1, 2024. ECF No. 50-3 at 164.

44. January 29, February 5, and February 7, 2024 — interviews with Meta's internal investigators. Meta investigator Brownfield interviewed Mr. Baig on these dates in connection with the investigation that Meta opened in response to the January 2, 2024 letter. Mr. Baig gave the investigators the documents he had sent to Meta's CEO and told them that Meta was failing to report Covered Incidents to the FTC, that its resulting compliance certifications were false, and that these failures made Meta's investor-facing representations about its privacy compliance program materially false. In these interviews Mr. Baig repeated that the X-Sec team's security reports were falsified and that the pre-read documents prepared for Defendant Gupta and for Meta's chief information security officer materially misrepresented the facts, told the investigator that Meta's internal audit function was itself compromised, and emphasized that "[w]e are a $1.5 trillion company now" and that not having the cybersecurity controls posed a very significant risk to the company.

45. July 11, August 30, and October 25, 2024 — interviews with Meta's internal

investigators. Investigator Brownfield interviewed Mr. Baig on these dates in a continuing investigation of Mr. Baig's reports of escalating retaliation against him and his team and of the blocking of his team's projects, for which Mr. Baig supplied documents throughout 2024. The July 11 interview followed Defendant Tsimelzon's May 29, 2024 warning. During the July 11 interview, Mr. Baig described the projects that had been blocked and Defendant Gupta's statement that he would not "let a security guy speak," and provided documents on the blocked projects and the negative feedback. In August 2024, Mr. Baig reported to the investigator in writing that, after he told Defendant Tsimelzon that Meta's internal auditor had identified the same gaps he had been reporting, Tsimelzon "questioned the sanctity of the audit to a point that I felt that I had to lie to the auditors to get a good PSC review" and "tried to make the audit about collaboration and team effort wherein everyone has to agree on what we are going to tell the auditors"; that he expected the auditor's findings to be suppressed; and that the auditor had told him the team under audit was "not telling the truth and hiding things from the auditor."

46. Across these interviews, Mr. Baig told the investigator that Meta was misleading investors, that the failures he reported were not being corrected, that Meta's internal audit function was broken, and that the retaliation against him and his team was escalating. He provided supporting documentation, including the May 24, 2024 JUNGLE red-team results and Meta's plan to present it as a security win, as well as the suppression of the risk assessment of WAFFLE, the project to allow users to log into WhatsApp with their Facebook credentials.

47. November 27 and November 30, 2024 — two Forms TCR to the SEC. Mr. Baig filed two whistleblower submissions with the SEC (Submission Nos. 17327-599-017-967 and 17329-786-669-484), which he categorized as complaints about "Material misstatement or omission in a company's public filings or financial statements, or a failure to file," and specifically "False/misleading financial statements." The November 27 submission reported that Meta and WhatsApp had "serious Cybersecurity gaps" that were "in direct violation of" the FTC Privacy Order, that "[t]o the best of my knowledge they have not disclosed these Cybersecurity gaps either to the SEC or the FTC," that data-warehouse tables holding user data "could be accessed by 60000+ employees," and that Meta was "significantly underreporting scraping covered incidents to the FTC"; it identified the conduct as

ongoing. The November 30 submission added supporting documents.[6]

48. December 4, 2024 — second letter to Meta's CEO. Mr. Baig wrote to Meta's CEO again, by email, as an update to his January 2, 2024 letter. He reported that "the cybersecurity posture of Meta/WhatsApp has not improved by much except on paper," that the 23-engineer staffing budget allocated after his January letter had gone entirely to other teams, and that "the retaliation has increased by orders of magnitude and has expanded to most of my team." He wrote that he raised concerns with colleagues only when they were putting their interests above the company's and "[w]hen they are not being truthful to the auditors and the regulators," and he told the chief executive officer: "I have now filed a complaint with the SEC under the Whistleblower Retaliation Protection Program." Meta filed its fiscal year 2024 Form 10-K approximately two months later, on or about January 29, 2025. ECF No. 50-4 at 155.

49. January 17, 2025 — Mr. Baig filed a complaint with OSHA (paragraphs 11 through 13) alleging that Meta had "made misleading omissions in its public filings about the current state of its cybersecurity," quoting the Form 10-K statements he contended were misleading, and alleging that he believed he was reporting securities fraud, violations of SEC rules and regulations, and fraud on shareholders. ECF No. 3 at 107–09 (¶¶ 348, 350–51).

50. On the same day, Mr. Baig's counsel notified Meta's outside counsel, Jeanine Conley Daves of Littler Mendelson P.C., by email that Mr. Baig had filed a SOX complaint with OSHA that day. Ms. Conley Daves had signed tolling agreements for Meta, including the ninth amendment described in paragraph 13.

51. In each report described in paragraphs 41 through 49, Mr. Baig conveyed in substance that Meta's public filings with the SEC misrepresented the state of the FTC-mandated privacy program and the state of Meta's cybersecurity risks, and that Meta's investors were being misled, or that he had reported that conduct to the SEC. He made each report because he believed that to be true, and his

[6] Mr. Baig's submissions to the Securities and Exchange Commission and the administrative complaint described in paragraph 49 are pleaded as protected activity because of the conduct they reported, and not as filings that are protected without regard to their content. The Court's September 24, 2026 Amended Order (ECF No. 94) dismissed that independent theory and directed that these filings be pleaded as part of the single claim asserted here.

experience, his training at Meta, and the conditions he had documented gave him reason to believe it.

52. The conduct that Mr. Baig reported violated Rule 10b-5, 17 C.F.R. § 240.10b-5; Rule 12b-20, 17 C.F.R. § 240.12b-20; Rule 13a-14, 17 C.F.R. § 240.13a-14; Rule 14a-9, 17 C.F.R. § 240.14a-9; Item 105 of Regulation S-K, 17 C.F.R. § 229.105; and Item 106 of Regulation S-K, 17 C.F.R. § 229.106; and constituted fraud against Meta's shareholders within the meaning of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and 18 U.S.C. § 1348.[7]

## VIII. WHAT DEFENDANTS KNEW

53. Meta knew of Mr. Baig's reports. Meta's counsel received the April 18, 2023 letter. Meta's employment investigations team, principally investigator Brendan Brownfield, took Mr. Baig's statements in the interviews between May 2023 and February 2025 (paragraphs 42, 44, 45, 46, and 55). Meta opened one of those investigations in response to the April 18, 2023 letter from Mr. Baig's counsel, and it opened another in response to Mr. Baig's January 2, 2024 letter to its CEO. Meta's CEO, general counsel, and Ethics and Compliance team received his January 2, 2024 letter, and its CEO received his December 4, 2024 letter. Meta's outside counsel, Ms. Conley Daves, signed tolling agreements for Meta, received notice of the OSHA filing on January 17, 2025, and arranged the February 4, 2025 interview. In June 2024, Meta's internal auditor told Mr. Baig that his data-access concern had been escalated to Meta's chief financial officer, who oversees Internal Audit and signs the certifications described in paragraph 23, and to its chief privacy officer.

54. Defendant Tsimelzon knew of Mr. Baig's reports. Defendant Tsimelzon was Mr. Baig's supervisor from May 2024 through his termination. His May 29, 2024 written warning prompted the investigation in which Mr. Baig was interviewed on July 11, 2024, and he remained Mr. Baig's supervisor during the August 30 and October 25, 2024 interviews. At the August 8, 2024 review meeting, Defendant Tsimelzon told Mr. Baig that he had seen Defendant Mukerji's prior downward

[7] These provisions are identified pursuant to section 5(1) of the Court's Order, which permits Mr. Baig to identify the SEC rules and statutes he contends the reported conduct violated. (ECF No. 94.) They are identified once, as part of the single claim pleaded here, and not as separate theories or counts. Mr. Baig does not reassert any theory that the Order dismissed, including those premised on the SEC's books-and-records, auditor, internal-controls, and disclosure-controls rules, on Items 1.05 and 8.01 of Form 8-K, on Rule 21F-17, or on the mail, wire, and obstruction statutes.

feedback, that he had "aligned" the rating with Defendant Gupta, and that he would not hear Mr. Baig's side due to the number of people complaining about him — statements Mr. Baig recorded that month in a written report to Meta's investigator. Defendant Tsimelzon knew by then that Mr. Baig was cooperating with Meta's internal auditor; before the JUNGLE follow-up meeting, he messaged Mr. Baig asking whether he would raise issues. He reprimanded Mr. Baig for his November 4, 2024 written communication about WhatsApp's obligation to report scraping incidents to the FTC. On December 6, 2024, two days after his second letter to Meta's CEO, Mr. Baig told him he was meeting Meta's security auditor about findings from the auditor's interviews of Mr. Baig. Defendant Tsimelzon insisted on attending with others, replying: "if we are discussing with the regulator what we should do — I think we need the right people in the meeting."

55. Defendants Gupta and Mukerji knew of Mr. Baig's reports. Both were named in them. On March 7, 2023, counsel for Mr. Baig wrote to Meta's head of WhatsApp, copying the head of WhatsApp Legal, and stated that Mr. Baig had retained counsel and had claims against Meta for retaliation in violation of SOX and demanded preservation of evidence concerning his reports about WhatsApp's cybersecurity risks and Meta's related public and regulatory communications. Defendant Mukerji ordered Mr. Baig on April 14, 2023 to stop raising FTC Privacy Order concerns — five weeks after that letter and four days before counsel's April 18, 2023 letter — and was the subject of the investigation prompted by that letter. Defendant Gupta was the subject of Mr. Baig's disclosures about the pre-read documents prepared for Gupta and the X-Sec team's decision not to act on data-exfiltration risk. Mr. Baig told Meta's investigators in early 2024 that resources allocated in response to his January 2, 2024 letter had been directed away from his team. On January 23, 2025, six days after Mr. Baig notified Meta of his OSHA filing, Ms. Conley Daves replied on the same email thread to schedule an interview, writing that "since early December 2024, your client has provided several documents to Meta's internal investigator in support of his claims of additional retaliation." Investigator Brownfield interviewed Mr. Baig on February 4, 2025, six days before Meta terminated him. In that interview, Mr. Baig reaffirmed to Brownfield the substance of his January 2 and December 4, 2024 letters and told him that the problems he had reported remained uncorrected. He told Brownfield that WhatsApp's Integrity team was manipulating its account-takeover metrics and that there was legal risk from the

company's failure to report the problem to users or the regulators. Mr. Baig warned that there was "very big exposure to the company."

56. Mr. Baig told Meta's chief executive officer in December 2024 that he had filed with the SEC. On January 17, 2025, his counsel notified Meta's outside counsel by email that he had filed with OSHA that day.

## IX. THE ACTIONS TAKEN AGAINST MR. BAIG FOLLOWING HIS REPORTS

57. Before the reports described above, Mr. Baig's record at Meta was strong. Defendant Mukerji rated him "Exceeded Expectations" in February 2022 and told him in July 2022 that he had put his name up for promotion. In early 2022 Meta granted him an equity refresher of 1,283 restricted stock units, worth approximately $293,178 at grant. Before April 2023, his year-end ratings were "Exceeded Expectations" (February 2022) and "Consistently Met Expectations" (February 2023).

58. July 18, 2023 — Gregory Heimbuecher, a security engineer on the X-Sec team and Mr. Baig's principal point of contact on that team, told Mr. Baig not to be "the guy that people hate to work with" and said that Mr. Baig's comments about data exfiltration risk made his team look like "idiots." In October 2023, after Mr. Baig raised further data-exfiltration concerns, anonymous negative feedback about Mr. Baig was submitted through Meta's employee relations channel and recapped to him by an Employee Relations Business Partner on October 18, 2023. On information and belief, this negative feedback was submitted by Mr. Heimbuecher. Mr. Baig bases that belief on the content of the feedback, which complained of his "asking for 24 hour turn arounds" — a request he had made only in his dealings with Mr. Heimbuecher — and on the fact that Mr. Heimbuecher, as Mr. Baig's point of contact on that team, was among those who had submitted positive feedback about Mr. Baig's collaboration in June 2023.

59. December 14, 2023 — Steve Clarke and Chad Greene—members of Meta's X-Sec security team whose falsified security reports and refusal to act on data-exfiltration risk Mr. Baig had been reporting—approached Defendant Mukerji with unsolicited negative feedback about Mr. Baig. Another X-Sec engineer, Mr. Mehta, submitted negative feedback shortly afterward. The same feedback was conveyed to Defendant Gupta.

60. December 26, 2023 — Defendant Mukerji sent Mr. Baig an email stating that Mr.

Baig's collaboration problems had caused the X-Sec team to drop data exfiltration from its quarterly plan. Data exfiltration was the gap the X-Sec team had itself declined to address despite Mr. Baig's reports.

61. January through May 2024 — Meta allocated 23 additional engineers in response to Mr. Baig's January 2, 2024 letter. Defendant Gupta directed that these additional resources be allocated to the teams and managers who were the subject of Mr. Baig's reports. Mr. Baig's security team, however, did not receive any additional staffing.

62. March 4, 2024 — Defendant Mukerji rated Mr. Baig "Consistently Met Expectations" for the fiscal year 2023 cycle—two levels below the "Significantly Above Expectations" rating that Mukerji issued in August 2023 while the investigation stemming from the April 2023 letter was pending, and after stating in the August 2023 review that he would very likely be promoted in February 2024. The rating decrease occurred around nine weeks after Mr. Baig's January 2, 2024 letter to Meta's CEO and less than four weeks after Meta's investigators last interviewed Mr. Baig about that letter. The review credited him with delivering the Data Security vision but attributed the lowered rating to "feedback around relationship building, collaboration, and partnership expectations with XFNs." Defendant Mukerji denied him the promotion, and due to the rating, Mr. Baig received a smaller bonus, smaller formulaic equity grant, smaller salary increase, and no discretionary equity.

63. May 2024 — On information and belief, Defendant Gupta reassigned Mr. Baig to report to Defendant Tsimelzon, a London-based director who had previously blocked multiple projects Mr. Baig led. Mr. Baig bases that belief on Defendant Gupta's authority over engineering at WhatsApp, Defendant Tsimelzon's reporting relationship to Defendant Gupta, and Defendant Gupta's direction of the engineer allocation described in paragraph 61 during the same period. The reassignment gave Defendant Tsimelzon eleven direct reports where other engineering directors reporting to Defendant Gupta had approximately three.

64. May 29, 2024 — within a month of becoming his supervisor, Defendant Tsimelzon sent Mr. Baig an email headed "Feedback I'm receiving," stating that he had "been receiving unsolicited feedback from others around collaboration challenges," that "effective collaboration is a key expectation of a manager" and "one of the 4 axes of EM PSC calibration," and that "this is pretty

concerning." The email identified no source.

65. August 8, 2024 — Defendant Tsimelzon gave Mr. Baig a "Below Expectations" mid-year rating, the lowest of his tenure. The review acknowledged his team's impact and his standing as "the security domain expert," but based the poor rating on his collaboration deficiencies, which included "conflating what's a legal requirement vs. your opinion."

66. October 21, 2024 — Defendant Tsimelzon denied Mr. Baig architectural authority over WhatsApp's account-security work, including the WAFFLE project, citing "collaboration issues." In a one-to-one meeting in which Mr. Baig raised the dispute between his security team and WhatsApp's Integrity team over the WAFFLE account-takeover risk, which Mr. Baig had reported as suppressed, Mr. Baig proposed that a single architect be given authority to decide account-security questions. Defendant Tsimelzon acknowledged that Mr. Baig was the right person for the role, but stated that he could not have it "due to collaboration issues." The meeting came four days after Mark Hatton, the Integrity team lead on the other side of that dispute, submitted negative collaboration feedback about Mr. Baig.

67. November 4, 2024 — Mr. Baig wrote to Defendant Tsimelzon and others that WhatsApp was obligated under Part IX of the FTC Privacy Order to report the mass scraping of user profile data as Covered Incidents, and that WhatsApp was significantly under-reporting those incidents to the FTC and to European data-protection authorities—the same reporting failures that Mr. Baig had told Meta's investigators on October 25, 2024 was among the ways Meta was misleading investors. That same day, Defendant Tsimelzon responded by reprimanding Mr. Baig for raising WhatsApp's "legal obligations." The reprimand came 10 days after Mr. Baig's October 25, 2024 interview, in which he told investigators that Meta was misleading investors, and 23 days before he filed his first Form TCR.

68. November 27, 2024 — Defendant Tsimelzon directed the deletion of a post by Sebastian Messmer, an engineer on Mr. Baig's team, in the WhatsApp Security group on Meta's internal network. Written as a mock advertisement — "Scrapers: Buy your own 10,000 WhatsApp accounts for $2,000 or less!" — the post showed that scrapers could defeat WhatsApp's rate limits and account bans by renting phone numbers for twenty cents each. Defendant Tsimelzon told colleagues, including

WhatsApp's legal team, that the post was "completely unacceptable," and wrote to Mr. Baig and a member of that team: "I say remove the post," stating that even a "closed" post "is visible to everyone in a group, which is 700+ people." Mr. Baig deleted it that morning, Pacific time, and Defendant Tsimelzon replied that "raising security issues is allowed and encouraged! It just needs to be done in the right way." Mr. Baig filed his first Form TCR with the SEC that evening.

69. December 19, 2024 — Defendant Tsimelzon took the Post-Compromise Account Recovery (PCR) project, which was Mr. Baig's team's solution for recovering hacked accounts (then live for five percent of WhatsApp users and recovering approximately 25,000 compromised accounts a day) away from Mr. Baig's team. That morning, he told the 26-member project group that "the single engineering decision maker and accountable person is Mark Hatton" and that the group should "ignore any other communication on this subject." He also announced that "we are disabling this feature for the New Years" and minutes later gave the following invitation: "if anybody has any concerns about collaboration issues on this project — please send me a message. I'll be very happy to receive feedback!" Mr. Hatton then stopped all work on PCR, directed its rollback to zero users, effective the next day, and paused the project pending a January 15, 2025 decision on transferring it to his own team.

70. Late 2024 — Meta denied two patent proposals Mr. Baig had submitted for the PCR and Covert Messaging solutions he had developed. No patent proposal of his had been denied before. Every prior proposal had been handled directly by Meta's outside patent counsel, without the involvement of his managers. For these two, Mr. Baig was required to submit through a portal, and they were denied by a lawyer in Meta's legal department, whose identity is known to Meta. The stated reason for one denial was changed after it was given, and Mr. Baig received two denial notices for the same proposal stating different reasons.

71. January 2025 — Despite receiving budget to hire approximately 250 additional engineers, Defendant Gupta excluded Mr. Baig's security team entirely from the allocation of new staff. Mr. Baig learned of the exclusion between January 25 and February 5, 2025, after his counsel notified Meta's counsel on January 17, 2025 that he had filed with OSHA.

72. February 10, 2025 — In a form email from its "Leadership Team," Meta notified Mr. Baig that it was "accelerating performance terminations during the year-end cycle" and that "due to

your performance, your employment is being terminated." A notification letter signed by Janelle Gale, Vice President, People, set his termination for April 18, 2025. The termination email recorded Mr. Baig's 2024 year-end rating as "Met Most Expectations" and confirmed a performance bonus on that rating. On information and belief, Defendant Tsimelzon, as Mr. Baig's supervisor, recommended the termination, and Defendant Gupta, to whom Tsimelzon reported, approved it as part of Meta's February 2025 performance cycle. Mr. Baig bases that belief on the fact that Defendant Tsimelzon issued the May 29, 2024 written warning and the August 2024 rating, on Defendant Gupta's supervisory authority over Defendant Tsimelzon and over engineering at WhatsApp, on Defendant Tsimelzon's statement that he had aligned his August 2024 rating with Defendant Gupta, on Meta's statement that the termination was "due to your performance," and on the fact that the performance record which Meta cites as justification for his termination was created by Defendants Mukerji and Tsimelzon, members of the X-Sec team, and the cross-functional partners described in paragraph 76. The termination came 24 days after Mr. Baig told Meta he had filed an OSHA complaint, 6 days after his final interview with Meta's investigators, approximately 10 weeks after he notified the CEO of his SEC filing, and approximately 11 weeks after Defendant Tsimelzon directed the deletion of his team's scraping post.

## X. THE CONNECTION BETWEEN MR. BAIG'S REPORTS AND THE ACTIONS TAKEN AGAINST HIM

73. Each adverse action identified in paragraphs 58 through 72 followed a report detailed in paragraphs 41 through 49, and in most instances followed it within days or weeks. The termination came 24 days after Mr. Baig notified Meta of his OSHA complaint and 6 days after Meta's investigator interviewed him about the letter disclosing his SEC filing.

74. Mr. Baig's performance ratings correlated with his reports rather than his work. Meta's performance system recorded Mr. Baig at his peak — "Significantly Above Expectations" in August 2023 — while it was investigating the April 2023 letter. After that investigation closed, and nine weeks after the January 2, 2024 letter, Defendant Mukerji dropped his rating two levels. Within a month after taking over as a supervisor, Defendant Tsimelzon issued a written warning, and within four months, a "Below Expectations" rating.

75. Each time Mr. Baig took a report outside Meta, he faced adverse action within days or weeks. On December 4, 2024, he told Meta's CEO that he had filed with the SEC; Defendant Tsimelzon ordered the PCR rollback fifteen days later, and, on information and belief, Meta denied both of Mr. Baig's pending patent proposals after December 4, 2024. Meta was notified of his OSHA filing on January 17, 2025; that month, his team was excluded from the 250-engineer allocation, and Meta terminated him 24 days later. The same pattern held for Mr. Baig's reports inside Meta. Ten days after Mr. Baig's October 25, 2024 report to investigators that Meta was misleading investors, Defendant Tsimelzon reprimanded him for raising "legal obligations." Twenty-three days later, Defendant Tsimelzon directed the deletion of his team's scraping post, hours before Mr. Baig filed his first Form TCR.

76. Colleagues who had documented positive assessments of Mr. Baig reversed them after he made specific reports. Nick Gardner gave positive collaboration feedback in June 2023 and negative feedback on June 10, 2024, after Mr. Baig raised the Irish Data Protection Commission (IDPC) certification. Uzma Barlaskar gave positive feedback and filed a patent jointly with Mr. Baig in 2022, then gave negative feedback in late July 2024, when Defendant Tsimelzon solicited it, after Mr. Baig raised profile scraping risk. Each reversal is recorded with a timestamp in Meta's performance management system.

77. Defendants' contemporaneous instructions show that they understood Mr. Baig's reports to implicate the mandated comprehensive privacy program. Defendant Mukerji told him on April 14, 2023: "I don't want you to talk about FTC [Privacy Order] unless it is with [WhatsApp attorney] Yannick [Carapito]. I am serious." On March 24, 2023, Mr. Baig's skip-level manager, Suren Verma, directed him not to put WhatsApp's FTC noncompliance in writing, as it could be discoverable in a future lawsuit. Defendant Tsimelzon's November 4, 2024 instruction not to raise "legal obligations" (paragraph 67) was the third time he had reprimanded Mr. Baig for doing so—first on or about July 17, 2024, after Mr. Baig sent him a written account of the data-exfiltration risk, and again in the August 8, 2024 review.

78. On January 30, 2024, immediately after receiving Mr. Baig's report of a false IDPC certification, Defendant Gupta permanently ceased all one-to-one instant-message communication with

Mr. Baig. On October 13, 2023, X-Sec security team member Steve Clarke asked Mr. Baig, "How would the FTC feel, if they knew that it is possible for someone to take a three-terabyte file containing user data and move it outside of Meta?" — and then directed him not to raise data-exfiltration risk in meetings with Meta's chief information security officer or with Defendant Gupta.

79. Defendants had a specific reason to want Mr. Baig's reports about Meta's filings to stop. The statements in Meta's filings that Mr. Baig reported as false described the privacy and security program that Defendants ran. Had Meta credited Mr. Baig's reports, it would have had to disclose to investors that it was not implementing the comprehensive privacy program required by the FTC Order, and these failures would be attributable to Defendants.

80. Meta's performance and compensation system sharpened that motive. Under Meta's Performance Summary Cycle, engineering leaders and their teams are rated, paid, and promoted on the metrics they report upward. Mr. Baig documented that WhatsApp's Integrity team adjusted its reported account-takeover metrics around performance cycles. The December 2024 deployment of PCR to five percent of users revealed approximately 500,000 account takeovers a day, far above the 100,000 daily account takeovers that WhatsApp reported throughout the year. But Defendants even further deflated the figures toward the end of a performance cycle to approximately 30,000 a day. Accurate reporting would have exposed the true security conditions of the platform and threatened Defendants' ability to enjoy favorable reviews and compensation based on misrepresented security metrics.

81. The words of Defendants and the teams around them make the motive clear. Defendant Tsimelzon's stated reason for directing the deletion of the scraping post on November 27, 2024 was that it was visible to the 700-plus members of the group. When Mr. Baig's team asked why its risk assessment had been left out of the WAFFLE project, the project team answered that including it would "make us look bad" and that WhatsApp "needed to grow … at any cost." Defendant Gupta's reaction to the JUNGLE findings in May 2024 was that "blissful ignorance was better than this," and the follow-up plan was to present the exercise to the Board's audit committee as "security wins." After Mr. Baig reported the September 30, 2024 scraping finding, Sandeep Hebbani, Meta's Director of Engineering for Central Privacy, blocked Mr. Baig's team from logging the attackers' phone numbers in the incident-tracking system — the data needed to report the scrapers to the FTC.

82. The adverse actions compounded one another; each was entered into Mr. Baig's performance record at Meta. Defendant Mukerji made the first negative entries in his record, which he continued making through March 2024. Members of the X-Sec team whose falsified assessments and blocked audits Mr. Baig had reported — Gregory Heimbuecher, on information and belief, in October 2023, and Steve Clarke, Bhavesh Mehta, and Chad Greene in December 2023 — each added entries. Mr. Baig learned that Mr. Mehta sent Defendant Gupta his feedback by email. Defendant Tsimelzon added the May 29, 2024 warning and the August 2024 rating to Mr. Baig's record within four months of becoming his supervisor. When Meta terminated Mr. Baig on February 10, 2025, it gave that record as the reason.

83. That performance record determines compensation, promotion, and continued employment at Meta. It provided the asserted, pretextual basis for Meta's decision to terminate Mr. Baig, which it claimed was "due to your performance."

84. Meta gave shifting and unsupported reasons for its actions. The December 26, 2023 email blamed Mr. Baig for the X-Sec team's own decision. In his May 29, 2024 warning email, Tsimelzon identified no project, incident, or individual that was the source of Mr. Baig's "collaboration" problems. Indeed, the only deficiency Meta cited for Mr. Baig was his "collaboration." But the collaboration complaints entered in Mr. Baig's record in 2023 came from members of the X-Sec team whose falsified assessments and refusal to remediate data-exfiltration risk Mr. Baig was reporting. Those entered in 2024 came from cross-functional partners who had previously *praised* his collaboration and only reversed after specific reports, as described in paragraph 76, and upon the solicitation of Defendant Tsimelzon in late July 2024.

## XI. DAMAGES

85. From the FY 2023 cycle, Mr. Baig lost a promotion, larger bonus, larger formulaic and discretionary equity grant, and salary increase.

86. Mr. Baig's termination, decided as part of Meta's February 2025 performance cycle, cost him the promotion, the formulaic bonus and equity grant, the discretionary equity, and the salary increase for which he would have been eligible in that cycle absent the retaliation, and he forfeited unvested restricted stock units.

87. Since April 18, 2025, Mr. Baig has lost salary, bonuses, vested and unvested equity, employer retirement contributions, health and disability and life insurance coverage, and has incurred the costs of seeking substitute employment. He has suffered diminished future earning capacity and the loss of career trajectory and seniority.

88. Mr. Baig has suffered damage to the professional reputation he had built over twenty years. He has suffered humiliation, mental anguish, and emotional distress, and the physical consequences of prolonged stress, for which he has incurred and will incur medical expenses.

## XII. CLAIM FOR RELIEF

***Retaliation in Violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A (All Defendants)***

89. Meta is a company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 and is required to file reports under section 15(d) of that Act. Defendants Gupta, Mukerji, and Tsimelzon were at the relevant times officers, employees, or agents of Meta.

90. Mr. Baig engaged in activity protected by § 1514A(a)(1). In his reports described in paragraphs 41 through 49, he provided information to persons with supervisory authority over him, Meta employees with authority to investigate misconduct, and the SEC, regarding conduct that he reasonably believed violated rules and regulations of the SEC and provisions of federal law relating to fraud against shareholders. He also filed an OSHA complaint (paragraphs 11 through 13) reporting the same and participated in the resulting proceeding.

91. Defendants knew of that activity, as described in paragraphs 53 through 56.

92. Defendants discharged Mr. Baig and otherwise discriminated against him in the terms and conditions of his employment, as described in paragraphs 58 through 72.

93. Mr. Baig's protected activity was a contributing factor in each of those actions, as described in paragraphs 73 through 84.

94. As a result, Mr. Baig has suffered harm described in paragraphs 85 through 88.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Attaullah Baig respectfully requests that this Court:

a. Enter judgment for Mr. Baig and against Defendants;

b. Order reinstatement with the seniority status Mr. Baig would have had but for the

retaliation, or award front pay in lieu of reinstatement;

c. Award back pay with interest under 18 U.S.C. § 1514A(c)(2)(B);

d. Award special damages, including litigation costs, expert witness fees, and reasonable attorneys' fees, under 18 U.S.C. § 1514A(c)(2)(C);

e. Award compensatory damages for emotional distress and reputational harm;

f. Award prejudgment and post-judgment interest; and

g. Grant such other relief as the Court deems just and proper.

DATED: October 13, 2026

SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP

*/s/Wilmer J. Harris*
By: ______________________________
Wilmer J. Harris
Amanda E. Johnson
*Attorneys for Plaintiff Attaullah Baig*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: October 13, 2026

SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP

*/s/Wilmer J. Harris*
By: ______________________________
Wilmer J. Harris
Amanda E. Johnson
*Attorneys for Plaintiff Attaullah Baig*