PAUL HASTINGS LLP
Elena R. Baca (SB# 160564)
elenabaca@paulhastings.com
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, California 90071-2228
Telephone: 1(213) 683-6000
Facsimile: 1(213) 627-0705

Paul C. Evans (*pro hac vice*)
paulevans@paulhastings.com
Jeffrey A. Sturgeon (*pro hac vice*)
jeffreysturgeon@paulhastings.com
Daniel S. Richards (*pro hac vice*)
danrichards@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: 1(212) 318-6000

Attorneys for Defendants
META PLATFORMS, INC., PINAKI MUKERJI,
MARK TSIMELZON, AND NITIN GUPTA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ATTAULLAH BAIG,

Plaintiff,

vs.

META PLATFORMS, INC., PINAKI MUKERJI, MARK TSIMELZON, NITIN GUPTA, WILL CATHCART AND MARK ZUCKERBERG,

Defendants.

CASE NO. 3:25-CV-07604-LDB

**DECLARATION OF ELENA R. BACA IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION TO DISMISS IN PART AND STRIKE**

Hearing Date: December 3, 2026
Time: 9:30 a.m.
Courtroom: B, 15th Floor
Judge: Hon. Laurel D. Beeler

**DECLARATION OF ELENA R. BACA**

I, Elena R. Baca, hereby declare as follows:

1. I am an attorney duly licensed to practice law in the State of California. I am a partner at the law firm of Paul Hastings LLP, counsel of record for Defendants Meta Platforms, Inc., Pinaki Mukerji, Mark Tsimelzon, and Nitin Gupta (collectively, "Defendants"), in the above-captioned lawsuit. I have personal knowledge of the facts contained herein or know of such facts by my review of the files maintained by Paul Hastings LLP in the normal course of its business, and, if called upon to do so, could and would competently testify thereto.

2. Attached hereto as **Exhibit A** is a true and correct copy of the Occupational Health and Safety Administration's February 13, 2025, findings with respect to Plaintiff Attaullah Baig's OSHA complaint.

3. Attached hereto as **Exhibit B** is a true and correct copy of the April 18, 2023, letter sent by Attaullah Baig's counsel to Will Cathcart.

4. Attached hereto as **Exhibit C** is a true and correct copy of Attaullah Baig's January 2, 2024, letter to Mark Zuckerberg.

5. Attached hereto as **Exhibit D** is a true and correct copy of Attaullah Baig's December 4, 2024, email to Mark Zuckerberg.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of October 2026, at Los Angeles, California.

______________________________
Elena R. Baca

# EXHIBIT A

U.S. Department of Labor
Occupational Safety and Health Administration
San Francisco Federal Building
90 7th Street, Suite 2650
San Francisco, CA 94103

**Via Electronic Mail**
February 13, 2025

Attaullah Baig
1712 Boscello Court
Leander, TX 78641
atbaig2002@yahoo.com

Re: Meta / Attaullah Baig / 301048149

Dear Attaullah Baig:

This is to acknowledge receipt of your whistleblower retaliation complaint, which was filed on January 17, 2025 against Meta (Respondent) under the Sarbanes-Oxley Act (SOX), 18 U.S.C.A. §1514A. In brief, your complaint alleged that, from approximately September 2021 through January 2024, you raised concerns to managers about data vulnerabilities that could allow Respondent engineers to move or steal users' data, possible violations of Security and Exchange Commission (SEC) regulations, and filing a SEC complaint. On November 14, 2022, Respondent issued you a documented verbal warning about supposed unprofessional communications. On February 24, 2023, you received a performance evaluation that was "one step" lower than your previous evaluation. On August 8, 2024, Respondent issued you a "Below Expectations" performance review, citing employee feedback critical of your lack of collaboration. On about December 4, 2024, you notified Respondent CEO of your SEC complaint. On February 10, 2025, Respondent involuntarily terminated your employment.

This letter is also to notify you that the Secretary of Labor, acting through their agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), San Francisco Region, issues the following findings:

**Secretary's Findings**

The complaint alleges that on or about November 14, 2022, Respondent issued Complainant a documented verbal warning. On January 17, 2025, Complainant filed a complaint with the Acting Secretary of Labor alleging retaliation in violation of SOX. Complainant and Respondent entered into multiple voluntary tolling agreements running from May 6, 2023 through January 15, 2025. 173 days elapsed between the warning on November 14, 2022 and the beginning of the tolling agreement. Complainant filed the complaint two days after the tolling agreements expired. As this complaint was filed within 180 days of the alleged adverse action, it is deemed timely.

Respondent is covered under the SOX because Respondent is a company within the meaning of 18 U.S.C. §1514A in that the company is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §78o(d)). Complainant is covered under the SOX because Complainant is an employee within the meaning of 18 U.S.C. §1514A.

As a result of the investigation, the burden of establishing that Complainant was retaliated against in violation of SOX cannot be sustained. Complainant's allegations did not make a prima facie showing. Complainant's asserted protected activity likely does not qualify as objectively reasonable under SOX. Even if there is reasonable protected activity, there is no reasonable expectation of a nexus between the asserted protected activity and the adverse actions. This is largely due to intervening events related to Respondent raising repeated concerns about Complainant's performance and/or behavior, according to documents provided by Complainant.

Respondent and Complainant have 30 days from the receipt of these Findings to file objections and to request a hearing before an Administrative Law Judge (ALJ). If no objections are filed, these Findings will become final and not subject to court review. Objections must be filed in writing with:

**Primary method** - via email to: OALJ-Filings@dol.gov

**Secondary method** (if unable to file via email) via hard copy submission to:

Chief Administrative Law Judge
Office of Administrative Law Judges
U.S. Department of Labor
200 Constitution Ave NW
Room S-4325
Washington, DC 20210
Phone: (202) 693-7300
Fax: (202) 693-7365

*With copies to*:

Meta
ATTN: Alan Thomas, Employee
Relations 1 Hacker Way
Menlo Park, CA 94205
alanthomas@meta.com

James D. Wulff
Regional Administrator
U.S. Department of Labor – OSHA
90 7th Street, Suite 2650
San Francisco, CA 94103
Email: osha-sfo-wb@dol.gov

In addition, please be advised that the U.S. Department of Labor does not represent any party in the hearing; rather, each party presents his or her own case. The hearing is an adversarial proceeding before an ALJ in which the parties are allowed an opportunity to present their evidence for the record. The ALJ who conducts the hearing will issue a decision based on the evidence and arguments presented by the parties. Review of the ALJ's decision may be sought from the Administrative Review Board, to which the Acting Secretary of Labor has delegated responsibility for issuing final agency decisions under the Act. A copy of this letter has been sent to the Chief Administrative Law Judge along with a copy of your complaint.

The rules and procedures for handling cases under the SOX can be found in Title 29 of the Code of Federal Regulations, Part 1980 and may be obtained at www.whistleblowers.gov.

Sincerely,
RYAN HIMES
Digitally signed by RYAN HIMES
Date: 2025.02.13 10:01:44 -08'00'
Ryan Himes
Assistant Regional Administrator

cc: Meta Human Resources
Chief Administrative Law Judge, USDOL
U.S. Securities & Exchange Commission
Civil Fraud Division, USDOJ

# EXHIBIT B

KATZ BANKS KUMIN

**Alexis Ronickher, Partner**
**Phone: 202-299-1140**
**Email: Ronickher@katzbanks.com**

**CONFIDENTIAL;**
**FOR SETTLEMENT PURPOSES ONLY[1]**

By Electronic and First-Class Mail
April 18, 2023

Mr. Will Cathcart
Head of WhatsApp
Meta Platforms, Inc.
1601 Willow Road
Menlo Park, California 94025
wcathcart@meta.com

Re: Attaullah Baig v. Meta Platforms, Inc.

Dear Mr. Cathcart:

As you know from my letter dated March 7, 2023, Attaullah Baig, Head of Security at WhatsApp, has retained the law firm of Katz Banks Kumin LLP to represent him with respect to his employment claims against Meta Platforms, Inc. ("Meta" or "the Company").[2] As detailed below, after reporting WhatsApp's systemic cybersecurity failures and related legal violations, Mr. Baig has suffered retaliation in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, and California's whistleblower law, Cal. Lab. Code § 1102.5, that has already resulted in significant economic, emotional, and physical harm.

For years, Meta has publicly represented that it prioritizes user data security for WhatsApp – which is the world's most active and popular mobile messaging app, with about two billion monthly active users – and has relentlessly built and touted WhatsApp's brand as private and secure. As Mr. Baig learned, however, WhatsApp lacked the basic information necessary to have a functional cybersecurity posture that protects user data – WhatsApp did not know what user data it had, where user data was stored, and who had access to the user data.

When Mr. Baig informed WhatsApp leadership about its deficient cybersecurity and his concerns that those deficiencies meant that WhatsApp was not compliant with its legal obligations, his supervisors immediately began to retaliate against him. They subjected him to

---

[1] This letter is sent for settlement purposes only and may not be used for any other purpose, pursuant to Rule 408 of the Federal Rules of Evidence and any similar state or local rules.

[2] This letter discusses events that happened prior to when the Company changed its name from Facebook Inc. to Meta. The name "Facebook" is used when specifically referencing the Company during its pre-Meta era.

micromanaging, criticism, a verbal warning, and attempts to retaliate against his subordinates, culminating in a reduced and negative performance review that blocked his promotion and limited the increase in his compensation. To date, the retaliation persists, with Mr. Baig's supervisors continuing to berate him for raising his concerns that Meta is not in compliance with its legal obligations and continuing to micromanage and unfairly criticize him and his work.

The cybersecurity failures that Mr. Baig identified are systemic in scope and implicate Meta's legal obligations to both the Federal Trade Commission (FTC) and the rules and regulations of the Securities and Exchange Commission (SEC), among other law. Moreover, Meta faces significant liability for retaliating against Mr. Baig. Below we have detailed the factual and legal basis for the legal claims he will assert if the parties cannot reach a prompt resolution. Mr. Baig has been seriously harmed by the actions of Meta, and he is fully committed to litigating this matter if our settlement efforts do not prove successful.

## I. Factual Background

### A. Meta has repeatedly faced public scrutiny for its security failures that culminated in record breaking settlements with the FTC and SEC.

Prior to Mr. Baig's joining the Company in January 2021, Facebook had already faced extensive scrutiny from federal agencies and the public concerning its security and data practices. In 2011, the Federal Trade Commission (FTC) announced a broad settlement with Facebook that required Facebook to respect the privacy wishes of its users and engage in regular privacy audits for 20 years.[3] The eight-count FTC complaint that preceded the settlement alleged that Facebook had mishandled its users' personal information by making that information public, allowing advertisers to access personally identifiable user information, and sharing user information with outside application developers, contrary to Facebook's representations to its users.[4] As a result of the FTC's complaint, the FTC announced a proposed settlement with Facebook in 2011 – which the FTC officially approved in 2012 (2012 Privacy Order) – that required Facebook to "not misrepresent in any manner, expressly or by implication, the extent to which it maintains the privacy or security of covered information," which included, *inter alia*, "(d) a mobile or other telephone number; (e) photos and videos; (f) Internet Protocol ("IP") address, User ID or other persistent identifier; [or] (g) physical location."[5] Moreover, it required

---

[3] Somini Sengupta, *F.T.C. Settles Privacy Issue at Facebook*, N.Y. TIMES (Nov. 29, 2011), https://www.nytimes.com/2011/11/30/technology/facebook-agrees-to-ftc-settlement-on-privacy.html.

[4] U.S. Fed. Trade Comm'n, *In the Matter of Facebook, Inc.*, (No. C-0923184), Complaint (July 27, 2012), *available* at: https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120810facebookcmpt.pdf.

[5] U.S. Fed. Trade Comm'n, *In the Matter of Facebook, Inc.*, (No. C-0923184), Decision and Order (July 27, 2012), *available* at: https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120810facebookdo.pdf.

Facebook to "establish and implement, and thereafter maintain, a comprehensive privacy program that is reasonably designed to (1) address privacy risks related to the development and management of new and existing products and services for consumers, and (2) protect the privacy and confidentiality of covered information."[6]

Just a few years later, however, Facebook faced further public scrutiny over its handling of user data once again. In 2018, the FTC launched an investigation into Facebook after public reporting revealed that political consulting firm Cambridge Analytica had improperly harvested and used the personal information of over 50 million Facebook users.[7] Following a yearlong investigation by the FTC, in July 2019, the Department of Justice (DOJ) filed a complaint on behalf of the FTC against Facebook, alleging that Facebook had violated its privacy promises to consumers and subsequently violated the 2012 Privacy Order and the Federal Trade Commission Act (FTC Act).[8] Specifically, the DOJ alleged that Facebook allowed third-party developers access to user data despite public announcements to the contrary. The DOJ also alleged that Facebook did not maintain a reasonable privacy program that safeguarded the privacy, confidentiality, and integrity of user information, as required by Part IV of the 2012 Privacy Order.

As a result of this complaint, the FTC and Facebook entered into a modified privacy order (2020 Privacy Order), which the FTC announced in July 2019[9] and formally approved in August 2020.[10] As part of this settlement, Facebook agreed to pay a $5 billion penalty, the largest-ever fine by the federal government against a technology company and almost 20 times greater than the largest privacy or data security penalty ever imposed worldwide. Pursuant to the 2020 Privacy Order, the FTC required Facebook to "restructure its approach to privacy from the corporate board-level down" and prohibited Facebook from making misrepresentations regarding

---

[6] *Id.*

[7] Julia Carrie Wong, *Facebook To Be Fined $5bn for Cambridge Analytica Privacy Violations – Reports*, GUARDIAN (July 12, 2019), https://www.theguardian.com/technology/2019/jul/12/facebook-fine-ftc-privacy-violations.

[8] U.S. v. Facebook, Inc., (Case No. 19-cv-2184), Complaint (July 24, 2019), *available* at: https://www.ftc.gov/system/files/documents/cases/182_3109_facebook_complaint_filed_7-24-19.pdf.

[9] U.S. Federal Trade Comm'n, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook* (July 24, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions-facebook.

[10] U.S. Federal Trade Comm'n, *FTC Gives Final Approval to Modify FTC's 2012 Privacy Order with Facebook with Provisions from 2019 Settlement* (Apr. 28, 2020), https://www.ftc.gov/news-events/news/press-releases/2020/04/ftc-gives-final-approval-modify-ftcs-2012-privacy-order-facebook-provisions-2019-settlement.

the collection, use, or disclosure of certain user information.[11] This "Covered Information" is defined in the 2020 Privacy Order as "information from or about an individual consumer" including, but not limited to: first and last name; geolocation; mobile or telephone number; photos and videos; and IP address. The 2020 Privacy Order is in effect until 2040.

Importantly, the 2020 Privacy Order placed restrictions and imposed requirements not only on Facebook as a whole, but also specifically on WhatsApp,[12] especially as to how the entities collect and handle Covered Information. Under Part VII of the 2020 Privacy Order, Facebook and WhatsApp were required to establish and maintain a "comprehensive privacy program" that "protects the privacy, confidentiality, and Integrity of the Covered Information collected, used, or shared by Respondent." The Order defined Integrity as "the protection of information from unauthorized destruction, corruption, or falsification." Moreover, the Order requires that Facebook and WhatsApp:

(1) Assess and document, at least once every twelve (12) months, internal and external risks in each area of its operation (e.g., employee training and management; developer operations; partnerships with Covered Third Parties; sharing of Covered Information with Covered Third Parties or Facebook-owned affiliates; product research, design, and development; and product marketing and implementation) to the privacy, confidentiality, or Integrity of Covered Information that could result in the unauthorized access, collection, use, destruction, or disclosure of such information.

(2) Design, implement, maintain, and document safeguards that control for the material internal and external risks identified by Respondent in response to Part VII.D. Each safeguard shall be based on the volume and sensitivity of the Covered Information that is at risk, and the likelihood that the risk could be realized and result in the unauthorized access, collection, use, destruction, or disclosure of the Covered Information.[13]

The 2020 Privacy Order further stipulated that Facebook and WhatsApp must have in place safeguards that include "designing, implementing, and maintaining access policies and controls that limit employee access to any table(s) or other comparable data storage units known

[11] *Id.*

[12] U.S. Fed. Trade Comm'n, *In the Matter of Facebook, Inc.*, (No. C-4365), Order Modifying Decision and Order (Apr. 27, 2020), available at: https://www.ftc.gov/system/files/documents/cases/c4365facebookmodifyingorder.pdf. The order defined "Respondent" to include WhatsApp for the purposes of Parts VII, the Mandated Privacy Program, and VIII, Independent Privacy Program Assessments.

[13] *Id.* at Part VII.D-E.

to contain Covered Information to only those employees with a business need to access such Covered Information." Moreover, under Part VII, the Order placed restrictions on WhatsApp's sharing of Covered Information with any other Facebook affiliate: "Specifically with respect to Respondent's sharing of Covered Information with any other Facebook-owned affiliate, Respondent shall design, implement, maintain, and document safeguards that control for risks to the privacy, confidentiality, and Integrity of such Covered Information, based on the volume and sensitivity of such Covered Information that is at risk, and the likelihood that the risk could be realized and result in the unauthorized access, collection, use, destruction, or disclosure of the Covered Information."

At roughly the same time that the 2020 Privacy Order was announced, the Securities and Exchange Commission (SEC) announced its settlement of charges against Facebook for making misleading disclosures regarding the risk of misuse of Facebook user data. For over two years, Facebook knew that third-party developer Cambridge Analytica had misused Facebook user data, yet Facebook presented the risk of misuse of user data as merely hypothetical in statements in SEC filings such as "our users' data *may* be improperly accessed, used or disclosed."[14] To settle the charges, Facebook agreed to pay $100 million.[15]

WhatsApp, which Facebook bought in 2014, has also faced significant fines from regulatory bodies for its data practices. For instance, in September 2021, the Irish Data Privacy Commissioner (IDPC) fined WhatsApp €225 million for issues related to WhatsApp's compliance with European Union General Data Protection Regulation (GDRP) rules on data transparency in 2018.[16] This scrutiny has continued into Mr. Baig's employment with Meta. In January 2023, the IDPC fined WhatsApp Ireland an additional €5.5 million for an issue involving misuse of data.[17]

---

[14] U.S. Securities & Exchange Comm'n v. Facebook, Inc., (Case No. 3:19-cv-04241), Complaint (July 24, 2019), *available* at: https://www.sec.gov/litigation/complaints/2019/comp-pr2019-140.pdf.

[15] U.S. Securities & Exchange Comm'n, *Facebook to Pay $100 Million for Misleading Investors About the Risks It Faced From Misuse of User Data* (July 24, 2019), https://www.sec.gov/news/press-release/2019-140#:~:text=Without%20admitting%20or%20denying%20the,%2C%20and%20Rules%2012b%2D20%2C

[16] Conor Humphries, *WhatsApp Fined a Record 225 mln Euro by Ireland Over Privacy*, REUTERS (Sep. 2, 2021), https://www.reuters.com/technology/irish-data-privacy-watchdog-fines-whatsapp-225-mln-euros-2021-09-02/.

[17] Ian Curran, *Data Protection Commission Fines WhatsApp Additional €5.5m over GDPR Breach*, IRISH TIMES (Jan. 19, 2023), https://www.irishtimes.com/business/2023/01/19/data-protection-commission-hands-whatsapp-additional-55m-gdpr-fine/.

B. **Mr. Baig, a cybersecurity and privacy expert, joins WhatsApp as its Head of Security, and he quickly discovers systemic cybersecurity problems.**

Mr. Baig has over 20 years of experience as a computer engineer and has specialized in cybersecurity for over 15 years. Prior to joining Facebook in 2021,[18] Mr. Baig had led engineering teams and designed cybersecurity and data protection systems for companies such as PayPal, Capital One, Mastercard, nextToken, and Amazon, including serving as Head of Security Architecture & Engineering at Capital One and Chief Technology Officer at nextToken.

Based on this proven track record in privacy and cybersecurity, Facebook recruited and hired Mr. Baig to be a Level-1 Manager beginning in January 2021. During Mr. Baig's five-week onboarding period in Facebook "Bootcamp," Suren Verma, Head of Server Engineering at WhatsApp, persistently recruited him to join WhatsApp as its Head of Security. He began that role in February 2021.[19] In this role, which Mr. Baig currently holds, he is responsible for protecting WhatsApp users and their user data from data breaches, hackers, and other compromises.

Initially, Mr. Baig reported directly to Mr. Verma. In June 2021, however, Mr. Baig began reporting to Pinaki Mukerji, Head of Privacy Engineering. Despite reporting directly to Mr. Mukerji, Mr. Baig continued to have regular contact with Mr. Verma, who often preferred to meet directly with Mr. Baig.

Mr. Baig spent his initial six months at the Company onboarding, learning about the Company, and ensuring that the projects that had been in progress when he joined successfully continued. Mr. Baig's successful transition into his role was acknowledged in his first performance review that he received in August 2021. Mr. Baig received a "Meets All Expectations" rating, with no areas of improvement listed. In the meeting, Mr. Mukerji told Mr. Baig it was standard practice that, for an employee's first rating cycle, the employee would receive either a "meets all" or a "meets most" rating.

Mr. Baig, however, soon learned that WhatsApp's cybersecurity posture had serious deficiencies. In September 2021, Mr. Baig conducted a "red team exercise" – a simulation of a cybersecurity attack to reveal vulnerabilities – with the help of Facebook's Central Security team, which is responsible for providing tooling (both hardware and software) and security consulting support to all of Facebook, including WhatsApp. This exercise revealed that any WhatsApp engineer with production access – roughly 1,500 engineers – could move or steal WhatsApp user data, such as users' address book with friends' contact information, without a trace. Mr. Baig's shared this concerning finding with Mr. Verma in verbal conversations.

---

[18] Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. in late 2021.

[19] Mr. Baig's internal job title is Software Engineering Manager.

Given this finding and other indications Mr. Baig had begun to observe that the WhatsApp cybersecurity posture had significant problems, Mr. Baig thought it was critical to figure out if WhatsApp knew the basic information necessary for a functioning cybersecurity program: (1) what user data it was collecting; (2) where and how it was storing the data; and (3) who had access to it. On about five occasions between September 2021 and September 2022, Mr. Baig raised his concerns with Mr. Verma that WhatsApp needed to determine if it had this basic information, but Mr. Verma ignored him. Instead, Mr. Verma directed Mr. Baig to do what his predecessor had done: work on application security, write "fuzzers," a software testing method intended to reveal software defects and vulnerabilities, and spend his time on other, more short-sighted protects. WhatsApp's cybersecurity posture was made even worse by the fact that the Company refused to allocate more than around 10 engineers to the Security team at any point, despite WhatsApp having about 1,200 engineers in total. This lack of staff meant that Mr. Baig was unable to take proactive, big picture action to remedy the systemic cybersecurity vulnerabilities. Making the matter worse, WhatsApp's performance and reward structure for engineers focused on lines of code and keeping the WhatsApp site and mobile app functioning, so the engineers in WhatsApp were disincentivized from working on these systemic cybersecurity issues that were not solved by writing lines of code and did not relate to the WhatsApp site and mobile app functioning.

Despite Mr. Verma's refusal to engage on protecting user data and the staffing challenges, in February 2022, Mr. Baig created a product requirements document for the Privacy Infra team to build a comprehensive data classification and a data handling system. This was the first step in figuring out what user data WhatsApp had collected and where it was stored. The Privacy Infra team prioritized other projects, and when Mr. Baig raised this issue to Mr. Mukerji, Mr. Mukerji supported the Privacy Infra team's prioritization of those other projects.

In Spring 2022, an internal audit initiated by Meta's Board found that the unmonitored production access engineers had posed a "high risk" to WhatsApp infrastructure because such access could result in the WhatsApp site being brought down. The cause of this serious vulnerability had the same root cause as the user data privacy concerns that Mr. Baig had raised in September 2021 after the red team exercise. Mr. Baig and his team proposed two solutions – instituting an audit trail of all actions taken by engineers and filtering out harmful computer commands that could allow engineers to bring down the WhatsApp site. The server engineering Director to whom Mr. Verma delegated the audit did not commit to implementing the solution until the audit item was escalated by the auditors.

Even while he repeatedly raised his concerns that WhatsApp had systemic cybersecurity problems to Mr. Verma and Mr. Mukerji, Mr. Baig continued to receive positive feedback and assessments. In February 2022, Mr. Baig received a performance rating of "Exceeded Expectations," and his managers discussed with him the possibility of him receiving a promotion in the next six to twelve months. In the writeup Mr. Mukerji provided as part of Mr. Baig's performance review, Mr. Mukerji wrote, among other positive statements, that "Attaullah demonstrated deep security skill and product centric thinking," and "Attaullah and security team

made great progress on multiple 'understand' projects despite little help/engagement initially from Product Management." Notably, Mr. Mukerji rated Mr. Baig an Exceeded Expectations in "People Management" and a "Meets All" in Collaboration. On the basis of this positive performance review, Mr. Mukerji's performance summary cycle letter stated, "Based on your accomplishments and the results that you delivered in H2 2021, your performance assessment is exceeds expectations. This means that during that time, you consistently exceeded the high expectations at your level across all your responsibilities and produced results that set an example for those around you. You consistently exhibited very strong performance."

Accordingly, Meta awarded Mr. Baig a 6.13% increase in total cash compensation, i.e., salary plus bonus incentive. Moreover, Meta also awarded Mr. Baig an "equity refresher grant" of 1,283 restricted stock units (RSUs), which were worth $293,178 at the time and would vest in 1/16th of these RSUS on each quarterly vest date beginning May 15, 2022.

At the beginning of 2022, Meta switched from a semi-annual to a yearly performance cycle. Accordingly, instead of a full performance assessment, in July 2022, Mr. Baig had a "TouchPoint feedback session," a half yearly check-in and feedback session, albeit less formal than the annual review process, which Meta refers to as the "Performance Summary Cycle" or "PSC" for short. This midyear review was positive and focused mostly on Mr. Baig's growth and trajectory towards promotion to the next level during the next full performance review in February 2023.

### C. <u>Mr. Baig Reports WhatsApp's systemic cybersecurity failures to WhatsApp's leadership.</u>

In summer of 2022, there were two cybersecurity incidents that impacted WhatsApp: one involving a messaging app called HeyMods that impacted WhatsApp users, and a data breach at Twilio, a company that partners with WhatsApp, that impacted a limited number of WhatsApp users. In the aftermath of these security incidents, on August 18, Mr. Baig met with Head of WhatsApp Will Cathcart, WhatsApp Vice President of Global Communications Carl Woog, Director & Associate General Counsel Jessica Romero, and Associate General Counsel Brady Freeman. In this meeting, Mr. Baig briefly talked about WhatsApp's systemic cybersecurity deficiencies, raising the concerns he had been raising with Mr. Verma and Mr. Mukerji for nearly a year. Specifically, Mr. Baig told Mr. Cathcart that WhatsApp security was dangerously understaffed – it had about ten engineers working on security, while a comparably sized company had around 200 – and WhatsApp was not focusing on systemic security issues. At the end of the meeting, Mr. Cathcart asked Mr. Baig to create a report on how WhatsApp can respond to such cybersecurity threats and incidents for a follow-up meeting with the same group.

The follow-up meeting was initially scheduled for September 8, 2022. In preparation for this meeting, Mr. Baig prepared a pre-read document for the above group that detailed WhatsApp's systemic cybersecurity failings. Since Mr. Verma and Mr. Mukerji were not to attend the meeting, they did not receive the pre-read.

Although the content of WhatsApp messages is secure and encrypted, WhatsApp was failing to protect and secure a host of other user data elements, including users' profile photos, phone numbers, friends' phone numbers and other contact information, IP address, and the data concerning the last time at which a user logged in. In drafting the pre-read and preparing for the meeting, Mr. Baig identified six critical issues concerning this data:

(1) WhatsApp does not know what user data it is collecting: WhatsApp does not have a comprehensive list of all user data elements WhatsApp collects. Mr. Baig understood that laws such as the California Consumer Privacy Act (CCPA) and the European Union's GDPR require WhatsApp to know and disclose which user data elements WhatsApp collects. Additionally, since WhatsApp did not know what data it is collecting, it could not have a successful privacy program, as required by the 2020 Privacy Order, because WhatsApp could not protect data or honor its user agreements without knowing which data it collects and for what business purpose.

(2) WhatsApp does not know where it stores the user data it collects: WhatsApp does not have a comprehensive inventory of all systems where it stores user data. Lack of a clear data security policy increases the risk of data breach because the Company does not know what user data elements to protect or how to do so. This failure also prevents WhatsApp from properly disclosing to regulators and users the data it collects.

(3) WhatsApp allowed roughly 1,500 engineers – including all WhatsApp engineers and even some Meta engineers – to access user data without restriction, including information that qualifies as Covered Information under the 2020 Privacy Order. The FTC order required WhatsApp to design, implement, maintain, and document safeguards that (1) limit employee access to Covered Information to only those employees with a business need to access Covered Information and (2) control for risks to the privacy, confidentiality, and Integrity of Covered Information with respect to WhatsApp's sharing of Covered Information with other Facebook-owned affiliates. There was no business need for all WhatsApp engineers to have unfettered access to all Covered Information, nor were there any controls in place that Mr. Baig was aware with respect to the access that the Meta engineers had to Covered Information. To paint the gravity of the vulnerability that this places users in, any one of these roughly 1,500 engineers could find and identify an elected official's geographic location while messaging (through their IP address) and see the contact number of who they were messaging.

(4) WhatsApp does not know who has accessed user data: WhatsApp does not have a monitoring system in place for user data access. This means that WhatsApp cannot tell if someone is accessing user data in a suspicious way, and it does not have a process to audit access. This failure compromises user data security. Because WhatsApp cannot monitor employee access, it cannot identify and react to suspicious or improper activity. This inability means that WhatsApp is not meeting its obligation under the 2020 Order to

have a "comprehensive privacy program (Privacy Program) that protects the privacy, confidentiality, and Integrity of the Covered Information collected, used, or shared by Respondent."

(5) WhatsApp cannot discover a data breach even after it has happened. While companies commensurate to WhatsApp's and Meta's size have a 24-hour Security Operations Center (SOC) to detect and respond to anomalous data access, including data breaches, in real time, WhatsApp and Meta lacked, and continue to lack, such an ability. This organizational failure means that WhatsApp and Meta do not know, and hence cannot respond to, data breaches as they occur. The FTC privacy order required Meta to "implement, and thereafter maintain, a comprehensive information security program that is designed to protect the security of Covered Information" and that contains "safeguards appropriate to Respondent's size and complexity, the nature and scope of Respondent's activities, and the sensitivity of the Covered Information." Because a SOC is appropriate for a company of WhatsApp's and Meta's size and complexity and necessary for identifying and responding to data breaches – companies similar in size to Meta such as Amazon, Apple, and Google have one, while companies the size of WhatsApp, such as Indeed, PayPal, and Robinhood also have one – WhatsApp's organizational structure raises compliance issues with the 2020 Order.

(6) Around 50,000 WhatsApp users per day have their accounts compromised – often someone taking over and locking the user out of their account, where they can access Covered Information including photos, groups, phone numbers, contact information, and private messages – but WhatsApp had failed to take adequate action to address this extensive issue.

In the pre-read, Mr. Baig not only raised these issues but also identified that he believed they rose to the level of potential violations of Meta's legal obligations. For instance, he expressly referred to the SEC and FTC settlements in stating, "We have a fiduciary responsibility to protect our users and their data. The penalties can be severe both in terms of brand damage and fines."

On September 8, 2022, ahead of the meeting, Mr. Baig shared the pre-read with the attendees, including Mr. Cathcart. After Mr. Cathcart reviewed the pre-read, he decided to postpone the meeting and to include members of Mr. Baig's management chain in the meeting. In response to news that the meeting was postponed and that his supervisors would now be attending the meeting, Mr. Baig wrote to Mr. Cathcart on WhatsApp expressing concern to Mr. Cathcart that he did not want his managers to feel like he went around them and escalated the failures directly to Mr. Cathcart. He also told Mr. Cathcart that he feared his managers would retaliate against him for reporting these problems to Mr. Cathcart. Mr. Baig feared this retaliation because his managers had ignored the systemic cybersecurity problems for years, which had resulted in the current appalling state of WhatsApp's cybersecurity. In response, Mr.

Cathcart told Mr. Baig to proceed nonetheless and inform his managers that he had prepared the report at Mr. Cathcart's request.

**D. Mr. Baig immediately begins experiencing retaliation because of his cybersecurity report.**

The new meeting was scheduled for September 30, 2022, and it included Mr. Verma as well as WhatsApp Vice President of Engineering Nitin Gupta. In preparation for the meeting, Mr. Verma reviewed Mr. Baig's pre-read for the meeting on September 26, 2022. Mr. Verma immediately contacted Mr. Baig to inform Mr. Baig that he was extremely unhappy about the report. During their conversation on a video call over WhatsApp, Mr. Verma made clear that he was upset about the content of the pre-read and that Mr. Baig would suffer retaliation for the report. Specifically, Mr. Verma told Mr. Baig that it was "the worst doc I have seen in my life" and asked Mr. Baig if he was "going to tell Will [Cathcart] that the whole system is broken?" He then told Mr. Baig that Mr. Gupta would fire him for writing a document like this. Mr. Verma also warned Mr. Baig that Mr. Verma had been working on ensuring that Mr. Baig and his team receive a good compensation package in the upcoming review cycle, and that this document really upset Mr. Verma. Mr. Baig understood Mr. Verma's statement as a not-too-subtle threat.

Mr. Verma's threats immediately became reality. Within days, Mr. Baig began to experience retaliation.

On September 29, Mr. Baig received negative feedback about his performance for the first time. Mr. Mukerji told Mr. Baig that he was not performing well and that the quality of his written work product was insufficient. This feedback was the opposite of the feedback Mr. Baig had received for the prior year and a half, including in June, when Mr. Mukerji had lauded Mr. Baig's "[e]xtreme focus and clarity on project scope, timeline etc." Mr. Baig later learned that Mr. Mukerji had also marked Mr. Baig as "Needs Support" on or before September 30, 2022, for the October 2022 Touchpoint.

In response to Mr. Verma's retaliation, Mr. Baig initially tried to take steps to placate Mr. Verma. After Mr. Verma's angry feedback, Mr. Baig backed away from a systematic diagnosis of WhatsApp's cybersecurity deficiencies. However, on September 30, 2022, when Mr. Baig shared this curtailed document with Mr. Cathcart, Mr. Cathcart cancelled the scheduled follow-up meeting and directed Mr. Baig to return the document's focus to systematic issues.

Meanwhile, Mr. Mukerji's new hostility towards Mr. Baig continued. He began questioning and micromanaging Mr. Baig and his work by creating artificial work and conflicts, looking for situations to show Mr. Baig "Needs Support," and actively soliciting negative feedback on Mr. Baig from Mr. Baig's peers. Previously, Mr. Mukerji had generally not been involved in Mr. Baig's work and almost never reviewed any documents he produced. Now, however, Mr. Mukerji began insisting on reviewing all of Mr. Baig's work product and setting up a series of meetings – about two to three meetings a week – that he required Mr. Baig to

attend in which Mr. Mukerji critiqued Mr. Baig's work and added numerous comments to his work product. Mr. Mukerji sent Mr. Baig harsh and negative messages, such as one on October 6, 2022, that read, "I am questioning your judgment call." This sudden shift in feedback and treatment came as a shock to Mr. Baig and contrasted starkly with the glowing performance reviews he received prior to his sharing of the pre-read with his managers.

In response to Mr. Mukerji's and Mr. Verma's treatment, Mr. Baig raised his concerns about retaliation in a prescheduled call with Lauren Yoon, the Human Resources Business Partner (HRBP) assigned to him. On September 29, 2022, Mr. Baig spoke briefly with Ms. Yoon about the treatment he was experiencing. Mr. Baig informed Ms. Yoon that he was afraid that Mr. Verma and Mr. Mukerji were retaliating against him because of the pre-read. Ms. Yoon told Mr. Baig that she needed time to think the situation through. Over the course of the next weeks, Ms. Yoon pinged Mr. Baig on multiple occasions for a follow up. Mr. Baig responded and set up a meeting for the next week.

Mr. Verma mirrored Mr. Mukerji's treatment of Mr. Baig. To try to resolve the increasing tension, Mr. Baig reached out to Mr. Verma. On October 6, 2022, Mr. Baig met with Mr. Verma. For the first time since Mr. Baig joined Meta, Mr. Verma told Mr. Baig that he was not meeting expectations and needed additional support because Mr. Mukerji had been spending significant time with Mr. Baig to "support" him. "Needs Support" is a term of art at Meta and indicates that a manager is spending too much time with an employee. It can also have dramatic implications for the employee.[20]

In response to this ongoing retaliation, on October 7, Mr. Baig met with Ms. Yoon on a video call. During that meeting, Mr. Baig explained to Ms. Yoon that although he had a great working relationship with both Mr. Mukerji and Mr. Verma before the pre-read, he had noticed a shift in how they were treating him immediately following Mr. Baig's raising of cybersecurity concerns.

Ms. Yoon told Mr. Baig that she would have included Mr. Verma in the creation of the report, even though Mr. Cathcart had expressly told Mr. Baig not to do so. She advised Mr. Baig to speak with Mr. Verma directly about the issue. Ms. Yoon incorrectly told Mr. Baig that Mr. Verma and Mr. Mukerji were not retaliating against Mr. Baig in a legal sense because there was not a "protected category" at issue, by which she meant discrimination or retaliation based on Mr. Baig's membership in a protected class. Mr. Baig told Ms. Yoon that he would soon share a written report on this. On October 10, 2022, Mr. Baig began writing a retaliation report.

On October 17, 2022, Mr. Mukerji had a TouchPoint feedback conversation with Mr. Baig. During the roughly thirty-minute meeting, Mr. Mukerji repeatedly told Mr. Baig that he

---

[20] One "Needs Support" rating may result in a lower PSC rating and placement on a Performance Improvement Plan (PIP). If an employee receives two "Needs Support" ratings in a row, they could be automatically terminated or laid off

was in "Needs Support" territory and required additional support. Mr. Mukerji told Mr. Baig that Mr. Baig needed to secure positive feedback from two teams, Integrity and Data Science, by the end of the year, or his yearly PSC rating would be negatively affected.

This feedback alarmed Mr. Baig, as he had received an "Exceeds Expectations" rating on the prior year's performance review. After the meeting, Mr. Baig had asked Mr. Mukerji and Mr. Verma to help define the accountability model they wanted him to achieve with the Integrity team, but both managers only gave vague, non-actionable feedback, such criticizing Mr. Baig for not collaborating well enough.

**E. <u>Mr. Baig again reports to WhatsApp leadership the systemic cybersecurity failures and faces additional retaliation.</u>**

Despite this ongoing retaliation, on October 18, 2022, after over a month and a half of delay, Mr. Baig gave the presentation to Mr. Cathcart, Mr. Verma, and other WhatsApp Vice Presidents and leadership, roughly ten people in total. At the beginning of the meeting, Mr. Cathcart opened the discussion by telling everyone not to blame Mr. Baig for the report and that Mr. Cathcart took responsibility for the report because Mr. Cathcart had requested that Mr. Baig create it.

The meeting was relatively short because much of the commentary had occurred prior to the meeting through comments on the pre-read that Mr. Baig had prepared and circulated to the group. During the meeting, Mr. Baig said that if WhatsApp did not overhaul its cybersecurity posture, WhatsApp would get sued because of a data breach. At another point during the meeting, Head of Global Public Policy Jonathan Lee, asked, "Are we going to be in the same situation as Mudge at Twitter?" Mr. Lee's question made clear that WhatsApp leaders understood that the cybersecurity problems that Mr. Baig was raising were very serious and implicated Meta's legal and regulatory obligations. By that time, it had been reported that the Twitter whistleblower disclosures had resulted in a Congressional investigation into Twitter[21] and lawmakers encouraging the FTC to investigate Twitter for potential violations of Twitter's FTC consent order regarding data privacy.[22] Mr. Baig also specifically raised his concern that

---

[21] Cat Zakrzewski, *Lawmakers Investigate Twitter Security Chief's Whistleblower Allegations*, WASH. POST (Aug. 23, 2022), https://www.washingtonpost.com/technology/2022/08/23/twitter-whistleblower-congress-investigation/.

[22] *See, e.g.*, Letter from Sen. Richard Blumenthal, Chair, Subcomm. Consumer Prot., Prod. Safety, and Data Sec., United States Senate, to Lina Khan, Chair, Fed. Trade Comm'n. (Aug. 23, 2022) (available at https://www.documentcloud.org/documents/22186797-blumenthals-letter-to-the-federal-trade-commission?responsive=1&title=1) ("I urge the Commission to investigate the allegations and information provided in Mr. Zatko's whistleblower complaint, and to bring enforcement actions against any breaches of its consent decree or business practices that are unfair or deceptive, including bringing civil penalties and imposing liability on individual Twitter executives where appropriate.").

WhatsApp branded itself as secure, yet he knew that WhatsApp had systemic cybersecurity failures that made it fundamentally unsecure. In response, Mr. Woog said that because security is WhatsApp's brand, the issues Mr. Baig raised scared him and called the document a "foundational doc."

Notably, during the meeting, Mr. Verma was visibly angry during the conversation. He was very agitated and was outwardly hostile to Mr. Baig for raising these issues.

At the end of the meeting, Mr. Cathcart directed Mr. Verma to address the systemic cybersecurity problems that Mr. Baig had identified. Mr. Cathcart told Mr. Verma to fix the issues, talk to Meta's Central Security team, and have a follow-up meeting. However, nearly six months later, there has been no follow-up meeting with the same group, and Mr. Verma has not addressed the cybersecurity issues that Mr. Baig identified.

After the meeting, Mr. Baig followed up by sending an email to all the invitees, including Mr. Cathcart, in which he included a link to coverage by *Forbes* of Peiter Zatko and the cybersecurity vulnerabilities he had revealed at Twitter. The topline of the *Forbes* article that Mr. Baig shared stated, "Twitter's former head of cybersecurity accused the social media company of committing fraud and numerous 'egregious' security violations in an explosive whistleblower complaint revealed Tuesday, shaking confidence in the much-maligned platform and sending its stock spiraling."[23] By sharing this article, Mr. Baig made crystal clear that the issues he was raising were about potential legal violations.

The day after the meeting, on October 19, 2022, Mr. Baig filed a formal report of retaliation with Ms. Yoon. Mr. Baig had held off on filing a formal retaliation report since early October because he had previously had a close relationship with Mr. Verma, considered them to be friends, and wanted to see if their relationship could be repaired. However, once Mr. Mukerji told Mr. Baig that he was in "Needs Support" territory during the October 17, 2022, TouchPoint, Mr. Baig realized that the retaliation he was facing was ongoing and likely to continue.

In this complaint, Mr. Baig documented the retaliation he was facing from Mr. Verma and Mr. Mukerji after he circulated his pre-read on September 26, 2022. Mr. Baig described a "sudden shift in conversations" and detailed the conduct described above. In this retaliation report, Mr. Baig reported these developments to Ms. Yoon, "I feel that [I] am being deliberately setup to fail" because of his creation of the pre-read.

Despite Mr. Baig's well-documented allegations, Ms. Yoon never acknowledged the complaint, nor did she reach out to Mr. Baig to interview him. To Mr. Baig's knowledge, there

---

[23] Derek Saul, *Twitter Whistleblower: Here's What Former Security Chief Peiter Zatko Claims*, FORBES (Aug. 23, 2022), https://www.forbes.com/sites/dereksaul/2022/08/23/twitter-whistleblower-heres-what-former-security-chief-peiter-zatko-claims/?sh=3bc76ce7201c.

was no investigation carried out, although Ms. Yoon occasionally messaged Mr. Baig to see how he was doing.

In the aftermath of the October 18, 2022, meeting, Mr. Mukerji continued to micromanage Mr. Baig by sending him a flood of messages daily and arranging for frequent meetings. Although Mr. Mukerji generally had not reviewed Mr. Baig's work before October, he now insisted on reviewing nearly all of it.

On November 14, 2022, Mr. Mukerji and Mr. Verma met with Mr. Baig and presented him with a verbal warning. Mr. Mukerji and Mr. Verma claimed that Mr. Baig had violated Meta's Respectful Communication Policy through "unprofessional and disrespectful" interactions with the Integrity, WhatsApp Payments, and Data Science teams. They alluded to "several instances where word choice, tone or volume of voice, and dismissive and/or belittling behavior has occurred." Additionally, they claimed that they had discussed these thematic concerns during one-on-one meetings, touchpoint feedback, and async[24] but that Mr. Baig had failed to internalize and act on the feedback. Mr. Mukerji and Mr. Verma refused to give Mr. Baig any specifics – claiming instead that everything is confidential – and instructed Mr. Baig not to try to find out any more detail. They told Mr. Baig that he was expected to review the Respectful Communication Policy and inquire about Emotional Intelligence training for managers. They warned Mr. Baig that any further conduct could result in further discipline. They followed up with a documented summary of the conversation.

The next day, on November 15, 2022, Mr. Baig replied via email and stated that while he appreciated this feedback, he had concerns "with the lack of clarity and accuracy of some of the things mentioned here." Mr. Baig wrote that he was hearing the allegations of unprofessional and disrespectful conduct for the first time, contrary to their claim that the thematic concerns had been discussed during one-on-one meetings, touchpoint feedback, and async. Mr. Baig cited to his prior evaluations, which contained no mention of a such problems or any violation of any company policy. To the contrary, Mr. Baig had received positive reviews on his collaboration and communication earlier that year.

Mr. Baig reached out to Employee Relations Business Partner (ERBP) Mona Sawani about the feedback.[25] During a video call, without prompting from Mr. Baig, Ms. Sawani acknowledged that there were two problems with the verbal warning. First, the feedback Mr. Verma and Mr. Mukerji provided was generic and not actionable, which Ms. Sawani told Mr. Verma and Mr. Mukerji before they gave Mr. Baig the verbal warning, yet they issued the warning despite her feedback.

---

[24] An aysnc is an informal communication, typically via message.

[25] Because ERBPs handle verbal warnings, when Mr. Baig reached out to Ms. Yoon, Ms. Yoon directed Mr. Baig to meet with Ms. Sawani.

Second, Ms. Sawani raised concerns about the unusual timing of the complaint that had led to the verbal warning. While the complaint alleged that Mr. Baig's problematic conduct had begun in July 2022, it was not filed until October 2022. Ms. Sawani expressed concern about why the complaint had been filed unusually late. Despite these problems with the complaint and verbal warning, Mr. Baig subsequently learned that WhatsApp had considered terminating his employment.

In the aftermath of the verbal complaint, Mr. Baig endeavored to take all the steps possible to address the issues raised. He reviewed the Respectful Communication Policy and scheduled an Emotional Intelligence Training for managers, although Meta subsequently cancelled the training, and Mr. Baig remains on a waitlist for the rescheduled training.

Over the subsequent months, however, Mr. Mukerji and Mr. Verma continued to micromanage Mr. Baig's work rather than addressing the cybersecurity issues Mr. Baig had identified. Additionally, as Mr. Verma had threatened in late September 2022, he and Mr. Mukerji attempted to interfere with Mr. Baig's ability to reward the work of his subordinates on the Security team with adequate compensation and promotions. First, Mr. Mukerji did not support a Security team member getting a promotion they deserved. Second, Mr. Mukerji met with the Security team and told them that they were not doing their job well, without citing to any specific basis for that assessment. In response to Mr. Mukerji's treatment, two people left the team. Employees on the Security team expressed frustration to Mr. Baig with Mr. Mukerji's retaliation.

Because Mr. Mukerji exercised such control over Mr. Baig's team members' ratings, on or around January 13, 2023, Mr. Baig spoke with Mr. Gupta to resolve the issue. After Mr. Baig provided Mr. Gupta with a written document supporting his concerns about Mr. Mukerji's conduct towards his subordinates, Mr. Gupta ensured that the Security team received the promotions, ratings, and compensation they deserved.

**F. Mr. Baig receives a retaliatory performance review resulting in significant lost compensation, as well as a lost promotion opportunity.**

Following Mr. Baig's escalation of the compensation issue to Mr. Gupta, Mr. Baig believed that the retaliation he was facing might subside. On January 31, 2023, February 7, 2023, and February 14, 2023, Mr. Baig had meetings with Mr. Mukerji where Mr. Mukerji told Mr. Baig that his performance was perfect except for the collaboration issue. Mr. Mukerji added that Mr. Baig would receive a "Greatly Exceeds Expectations" or even a "Redefines Expectations" rating if he can sort the collaboration issues out and said he was getting Mr. Baig a mentor so Mr. Baig could work to receive a high rating and promotion.

On February 24, 2023, Mr. Baig had his annual PSC performance review. Mr. Baig received a "Consistently Meets Expectations." This rating was one step down from the prior year's "Exceeds Expectations." During his performance review meeting, Mr. Mukerji claimed

that the poor collaboration rating stemmed from the complaint that someone had made against Mr. Baig in October 2022, and had been the basis on which Mr. Mukerji and Mr. Verma had lowered Mr. Baig's performance rating. While Mr. Baig received almost forty pages of peer feedback, Mr. Mukerji cherrypicked the few examples of negative feedback. Additionally, although a "Consistently Meets Expectations" is nominally an average rating, Mr. Baig's supervisors included very negative comments in the "Areas of Improvement" section. Managers doing PSC reviews need to specifically choose to add the "Areas of Improvement" section, and Mr. Baig had never received similar negative feedback in his performance reviews.

On March 3, 2023, Mr. Verma met with Mr. Baig to discuss his rating with him. Mr. Verma informed him that Mr. Baig likely would have received a "Greatly Exceeds Expectations" rating had there not been any collaboration issues, and that a number of Mr. Baig's superior peer were supportive of a higher rating and higher compensation than Mr. Baig received. Mr. Verma, however, also told Mr. Baig that they had contemplated terminating Mr. Baig in November 2022 instead of giving him a verbal warning. Mr. Verma then warned Mr. Baig that he would be terminated if there were another incident.

Mr. Baig's lower rating significantly impacted his promotion prospects and compensation. Because of the review, Mr. Baig did not receive the promotion he had deserved. Had Mr. Baig received a "Greatly Exceeds Expectations" rating or higher, as he should have, Mr. Baig would have received roughly $1 million more in total compensation, a figure that includes a higher bonus, formulaic equity grant, and a discretionary equity grant but does not include the increase in compensation that would have accrued from a promotion. A promotion would have likely included around $40-45,000 in additional base salary, an increase in yearly bonus given the higher compensation, and at least $200,000 more in RSUs.

The discretionary equity grant would have been in the ballpark of a $600,000 value. This discretionary equity grant is not tied to overall performance rating and is instead tied exclusively to "Impact," meaning that Mr. Baig's managers could have given him this equity grant even with his rating at "Consistently Meets Expectations." However, Mr. Verma and Mr. Gupta decided not to award Mr. Baig this significant grant, even though they acknowledged in his performance review that he solved problems that people thought could not be solved, he made "a number of contribution[s]" under "Org Impact," and had "unblocked the team" on several projects. In addition to taking on a manager's responsibilities, Mr. Baig also played the role of an individual contributor product manager and a senior technical lead. An employee of Mr. Baig's experience, who had made the kind of impact acknowledged in the PSC review, should have received the discretionary equity grant.

Just before and after the negative performance review, Mr. Baig continued to face retaliation. Mr. Mukerji continued to manage Mr. Baig in a manner clearly designed to portray Mr. Baig as being incompetent and needing more support, setting him up for further negative feedback, placement on a Performance Improvement Plan, and potential termination. For example, in late February, Mr. Mukerji created fake work by asking Mr. Baig to recreate a

document which had already been widely reviewed and then made close to fifty comments on the one-page document that he directed Mr. Baig to draft. Mr. Mukerji used this document to claim that he was coaching Mr. Baig to help him develop communication skills.

**G. <u>Despite the ongoing retaliation, Mr. Baig continues to press for WhatsApp to address the systemic cybersecurity failures he identified.</u>**

Over the past six months, Mr. Baig repeatedly raised WhatsApp's cybersecurity vulnerabilities and has done all that is within his power to fix the problems but has been stymied by Mr. Verma's refusal to take action. While Mr. Verma initially created a skeleton document in which he raised the possibility of Meta providing WhatsApp's security coverage, Mr. Verma has failed to successfully collaborate with Meta's Central Security team to define the division of responsibility for user data security between Meta and WhatsApp. Because Mr. Cathcart directed Mr. Verma to handle the issue, and Mr. Baig lacks the number of people reporting into him to address systematic issues of this size, Mr. Baig cannot unilaterally begin to address the issues he raised, despite his best efforts to convince his management of the seriousness of the problem.

Even in the face of direct threats to his job, Mr. Baig has continued to raise and press for the resolution of WhatsApp's serious cybersecurity deficiencies.

On March 15, 2023, Mr. Baig had a meeting with Meta's Central Security team, which can offer tooling and consulting support to WhatsApp. During that meeting, and in a subsequent recap he sent out, Mr. Baig reiterated that WhatsApp does not have a comprehensive list of all user data it collects, does not have a comprehensive inventory of all systems where WhatsApp stores user data, does not have a monitoring system in place for user data access, allows 1,500 WhatsApp and Meta engineers to have bulk access to user data in production, and cannot detect a data breach. On the basis of these cybersecurity gaps, Mr. Baig flagged that WhatsApp is, or might be, in breach of the 2020 FTC Privacy Order, in violation of SEC regulations and laws, and "risk additional legal action by the FTC, SEC, IDPC, and other regulators for not meeting our legal obligations." Mr. Baig alerted the Central Security team, "[w]e have not seen much or any progress on the state of security for WhatsApp."

On March 24, 2023, in response to Mr. Baig's disclosures during the meeting with Central Security, Mr. Verma spoke with Mr. Baig multiple times. On the first call, Mr. Verma took an angry tone with Mr. Baig. First, he told Mr. Baig that Mr. Baig was confusing the Central Security team with his discussion of cybersecurity vulnerabilities and that the issues that Mr. Baig was raising were not important. Instead, Mr. Verma thought a more theoretical discussion on incident types for application security was more important, even though those issues did not relate to cybersecurity of user data, which was the primary issue. Mr. Verma also claimed that by raising concerns about Meta's legal obligations, Mr. Baig was "making it about people and not about the issues," while in fact Mr. Baig's focus was on getting clear answers to

the division of responsibility for user data security between Meta and WhatsApp from Meta's Central Security team.

Second, Mr. Verma told Mr. Baig that he did not want Mr. Baig to state that WhatsApp was non-compliant with the FTC order in writing. Mr. Verma told Mr. Baig that Mr. Baig was not a lawyer and should not be making those judgments, even though Mr. Baig knew the cybersecurity vulnerabilities and WhatsApp's obligations under the FTC privacy order well. Mr. Verma added that if Mr. Baig had a concern, he should speak with a lawyer and make sure any statements about non-compliance with the FTC order were covered by the attorney-client privilege. Mr. Verma expressed concern that if there were a lawsuit, Mr. Baig's statements about WhatsApp's non-compliance with the FTC order could become discoverable. Mr. Verma directed Mr. Baig to speak with an attorney, Yannick Carapito, about his concerns.

In a brief second call, which occurred just minutes later, Mr. Verma attempted to dial back some of his earlier statements. He assured Mr. Baig that his earlier conversation was not a big issue, but then pivoted and instructed Mr. Baig to only speak to a lawyer about Meta not meeting its legal obligations.

On April 14, 2023, Mr. Mukerji also expressed his anger at Mr. Baig for talking about FTC compliance, telling Mr. Baig, "I don't want you to talk about FTC [Privacy Order] unless it is with [WhatsApp attorney] Yannick [Carapito]. I am serious."

Mr. Baig has suffered extensive harm from Meta's retaliation against him. Because of the performance review, Mr. Baig has lost out on the opportunity for promotion and has suffered financial damage of at least $1 million from the lower compensation he received this year alone. As a result of this treatment, Mr. Baig began to suffer physically and emotionally. Because of the stress of the retaliatory micromanaging, Mr. Baig suffered from anxiety, sleeplessness, restlessness, and health and family issues. Consequently, he gained weight, and his blood pressure shot up. This harm – financial, physical, and emotional – has deeply impacted Mr. Baig and his family.

## II. Legal Claims

Meta's actions against Mr. Baig violate the anti-retaliation provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A (SOX), and the California general whistleblower law, California Labor Code § 1102.5.

### A. Retaliation in Violation of the Sarbanes-Oxley Act

SOX makes it unlawful for a public company, like Meta, to discharge or otherwise discriminate against any employee for providing information about which the employee reasonably believes constitutes mail fraud, wire fraud, bank fraud, securities fraud, violation of any SEC rule or regulation, or violation of any provision of federal law relating to fraud against

shareholders. 18 U.S.C. § 1514A(a)(1). For this report to be protected, the employee must provide the information to a supervisor, a person working for the employer who has the authority to investigate, discover, or terminate misconduct, or externally to the federal government. 18 U.S.C. § 1514A(a)(1).

To prevail on his SOX claim, Mr. Baig will need to prove, by a preponderance of the evidence, that: (1) he engaged in protected whistleblowing activity; (2) Meta knew that he engaged in the protected activity; (3) he suffered an adverse action; and (4) the protected activity was a contributing factor in the adverse action. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009).[26] As detailed below, Mr. Baig can easily make this *prima facie* showing. Once Mr. Baig makes that *prima facie* showing, the burden shifts to Meta to demonstrate by clear and convincing evidence that it would have taken the same adverse action in the absence of the protected activity. *See Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010).

**i. Mr. Baig repeatedly engaged in protected activity.**

Mr. Baig repeatedly engaged in protected activity beginning in August 2022 when he warned WhatsApp leadership of WhatsApp's systemic cybersecurity failures. These instances included: (1) Meeting with Mr. Cathcart and other WhatsApp leadership and disclosing WhatsApp's cybersecurity failures; (2) drafting and sharing the pre-read, which flagged security issues, with Mr. Cathcart on September 8 and with Mr. Verma on September 26, 2022; (3) discussing cybersecurity failures detailed in the pre-read with Mr. Cathcart and Mr. Verma; (4) presenting his report at the meeting on October 18, 2022, with Mr. Cathcart and other WhatsApp VPs; and (5) raising these issues in the Central Security meeting and subsequent post-read document he shared on March 15, 2023.

When making these disclosures, Mr. Baig believed that Meta was violating SEC rules and regulations by failing to comply with the 2020 Privacy Order and because of the Company's public statements touting WhatsApp's security that could mislead a reasonable investor. Mr. Baig knew that Facebook had settled an FTC enforcement action against it for deficient data privacy for an unprecedented $5 billion, resulting in the 2020 Privacy Order. In tandem with that FTC settlement, Facebook had also reached a settlement of $100 million with the SEC for securities violations emanating from the same nucleus of facts as the FTC action against the Company. Additionally, Mr. Baig knew that Congress was encouraging the FTC to investigate Twitter for the exact same type of deficient cybersecurity posture that he was reporting, which further enforced his concern that Meta was in violation of its 2020 Privacy Order, which could subject it to more record-breaking fines and further action by the FTC and SEC.

[26] If forced to litigate his SOX claim, Mr. Baig will bring it in the Northern District of California, where Meta is headquartered. 28 U.S.C. § 1391(b)(1).

Mr. Baig was particularly concerned about regulatory action because Meta had for years publicly touted WhatsApp as a safe and secure platform. For example, in August 2022, Product Head Ami Vora said, "We believe WhatsApp is the most secure place to have a private conversation,"[27] despite over 1,500 engineers having access to a user's data, including IP address, geographic location, contact information, and profile picture. Moreover, in the six months since Mr. Baig raised his cybersecurity concerns with WhatsApp leadership, Meta has not changed its public statements about WhatsApp's security and has made misleading omissions in its public filings about the current state of its cybersecurity. On February 2, 2023, Meta released its 10-K, in which it described WhatsApp as "a simple, reliable, and *secure* messaging application that is used by people and businesses around the world to communicate and transact in a private way."[28] (emphasis added.)

Mr. Baig's belief that Meta was in violation of SEC rules and regulations was a good-faith, reasonable belief, under both a subjective and objective standard. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1000 (9th Cir. 2009) ("[T]o trigger the protections of the Act, an employee must also have (1) a subjective belief that the conduct being reported violated a listed law, and (2) this belief must be objectively reasonable.")[29] Mr. Baig held a subjective belief that

[27] Liv McMahon, *WhatsApp: Mark Zuckerberg Reveals New Privacy Features*, BBC (Aug. 9, 2022), https://www.bbc.com/news/technology-62464243.

[28] Meta, Inc., 2022 Annual Report (Form 10-K) (Feb. 2, 2023), *available* at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/e574646c-c642-42d9-9229-3892b13aabfb.pdf. Moreover, Meta presented potential cybersecurity risks as mere hypotheticals. In its discussion of "Risks Related to Data, Security, and Intellectual Property," Meta stated, "Security breaches, improper access to or disclosure of our data or user data, other hacking and phishing attacks on our systems, or other cyber incidents *could* harm our reputation and adversely affect our business." (emphasis added). Meta stated further, "we have developed systems and processes that are designed to protect our data and user data, to prevent data loss, to disable undesirable accounts and activities on our platform, and to *prevent or detect security breaches*." (emphasis added). It added, "We experience such cyber-attacks and other security incidents of varying degrees from time to time" and "[w]e may also be unsuccessful in our efforts to enforce our policies or otherwise remediate any such incidents." As Mr. Baig had revealed, WhatsApp could not detect data breaches or guard against improper access to or disclosure of user data.

[29] Though it is likely that actual violations did – and continue to – occur, an actual violation is not necessary to meet the element of protected activity; Mr. Baig's reasonable belief that a violation was imminent was sufficient. *See Smith v. Chicago Bridge & Iron Co.*, N.V., No. 4:16-CV-1089, 2017 WL 2619342, at *4 (S.D. Tex. June 16, 2017) ("Smith does not need to prove that there was, in fact, a SOX violation in order to show that his belief was reasonable."); *Sylvester v. Parexel Int'l LLC*, ARB No. 07-123, ALJ Nos. 2007-SOX-39 and 42, 2011 WL 2165854, at *13 (Dep't of Labor May 25, 2011) ("A whistleblower complaint concerning a violation about to be committed is protected as long as the employee reasonably believes that the violation is likely to happen."). Furthermore, even if Mr. Baig belief was mistaken that the employer engaged in conduct that constitutes a violation of one of the six enumerated categories, as long as it is reasonable, it is protected. *See Hendrick v. ITT Engineered Valves,*

Meta was potentially violating SEC rules and regulations, as evidenced by his statements in the pre-read about the serious legal ramifications at the time. *See id.* at 1002 (SOX protections "include all good faith and reasonable reporting of fraud, and [that] there should be no presumption that reporting is otherwise, absent specific evidence" of bad faith"). Mr. Baig wrote, "We have a fiduciary responsibility to protect our users and their data. The penalties can be severe both in terms of brand damage and fines," referring to the SEC and FTC settlements. Mr. Baig also raised the possibility of financial penalties in the October 18 meeting. Moreover, after the October 18 meeting, Mr. Baig sent all the meeting invitees, including Mr. Cathcart, Mr. Gupta, and Mr. Verma, an article about Peiter "Mudge" Zatko, who had testified to Congress the month earlier that Twitter "leadership misled its Board of Directors, regulators, and the public" regarding its security failures and the FTC's ongoing investigation of Twitter for similar data issues.[30] The *Forbes* article Mr. Baig sent stated that Mr. Zatko "accused the social media company of committing fraud and numerous 'egregious' security violations" and "claimed Twitter has made repeated 'false and misleading statements' to the FTC about its user security and privacy measures."[31] The article emphasized the stock implications of Mr. Zatko's allegations, referring to the "Big Number" of "4.5%," which reflected "how much Twitter stock is down in Tuesday morning trading amid a broader market rise."[32] Additionally, in the March 15 Central Security meeting, Mr. Baig further indicated that WhatsApp is, or might be, in violation of SEC rules and regulations, the FTC privacy order, and other law.

A plaintiff is not required to "expressly state [] that Defendants are engaged in illegal conduct related to fraud" to gain SOX's protections. *See Fraser v. Fiduciary Tr. Co. Int'l*, 417 F. Supp. 2d 310, 323 (S.D.N.Y. 2006); *see also Sequeira v. KB Home*, 716 F. Supp. 2d 539, 553–54 (S.D. Tex. 2009) (Plaintiff "does not have to expressly state that the company is engaged in illegal conduct, to satisfy section 806"). Thus, by referring to legal action, penalties, and Twitter, Mr. Baig went well above SOX's bar for protected activity, and Meta executives' concerned reactions provide further evidence that they understood the nature and reasonableness of Mr. Baig's complaints. *See Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1377 (N.D. Ga. 2004)) (holding that the plaintiff's complaints could constitute protected activity

---

*LLC*, No. 1:16-CV-204-SA-DAS, 2018 WL 837600, at *3 (N.D. Miss. Feb. 12, 2018) (citing *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 477 (5th Cir. 2008)).

[30] *See Written Statement of Peiter ("Mudge") Zatko United States Senate Judiciary Committee* (Sep. 13, 2022), https://www.judiciary.senate.gov/zatko-testimony-for-press?download=1.

[31] Derek Saul, *Twitter Whistleblower: Here's What Former Security Chief Peiter Zatko Claims*, FORBES (Aug. 23, 2022), https://www.forbes.com/sites/dereksaul/2022/08/23/twitter-whistleblower-heres-what-former-security-chief-peiter-zatko-claims/?sh=3bc76ce7201c.

[32] *Id.*

because the individuals to whom they were addressed understood the serious nature of the plaintiff's allegations).

Mr. Baig's belief was also objectively reasonable, a standard which the Ninth Circuit has described as a "minimal threshold requirement." *See Wadler v. Bio-Rad Lab'ys, Inc.*, 916 F.3d 1176, 1187 (9th Cir. 2019) (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009)). As detailed above, Meta's failure to adequately protect user data and its misleading public statements to the contrary had resulted in a $100 million settlement to resolve an enforcement action against it in which the SEC alleged "violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") and Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 12b-20, 13a1, 13a-13, and 13a-15(a) thereunder."[33] In fact, the SEC specifically cited to Facebook's use of false impressions regarding the security of user data as a factor in the enforcement action it took when announcing the $100 million settlement with Facebook.[34] Because of the prior SEC charge and ultimate settlement with the SEC over misleading statements about security, Mr. Baig reasonably believed that Meta's actions constituted violations of SEC rules and regulations, as well as potentially securities and shareholder fraud. *See Wadler*, 916 F.3d at 1188 (plaintiff's awareness of employer's past legal issues and "red flags" supports objective reasonableness of employee's belief). The fact that Mr. Baig spoke with attorneys about the issues is further evidence of the reasonableness of his belief. *See Barker v. UBS AG*, No. 3:09-CV-2084 CFD, 2011 WL 283993, at *3 (D. Conn. Jan. 26, 2011) (plaintiff's approaching the head of legal compliance "indicates that she believed her supervisors were unlawfully encouraging her to conceal important information that had legal significance for shareholders").

**ii. WhatsApp leadership knew Mr. Baig engaged in protected activity.**

There is no question that Meta knew that Mr. Baig engaged in protected activity. Mr. Baig's raised these legal issues directly with WhatsApp's top leaders, as well as his supervisors. These leaders made statements that clearly indicated they understood that his report implicated potential legal violations. Additionally, in the aftermath of the meeting, Mr. Baig sent a follow-up email to Mr. Cathcart, Mr. Gupta, Mr. Verma, and the other invitees to and attendees of the October 18 meeting in which he linked to press coverage by *Forbes* of Mr. Zatko with the message "Here is a link to what Jonathan talked about at the end." Further, Mr. Verma has since

---

[33] U.S. Securities & Exchange Comm'n v. Facebook, Inc., (Case No. 3:19-cv-04241), Complaint (July 24, 2019), *available* at: https://www.sec.gov/litigation/complaints/2019/comp-pr2019-140.pdf.

[34] U.S. Securities & Exchange Comm'n, *Facebook to Pay $100 Million for Misleading Investors About the Risks It Faced From Misuse of User Data* (July 24, 2019), https://www.sec.gov/news/press-release/2019-140#:~:text=Without%20admitting%20or%20denying%20the.%2C%20and%20Rules%2012b%2D20%2C

yelled at Mr. Baig to stop raising his concerns that Meta is violating the 2020 Privacy Order and ordered him to only put his concerns in documents marked attorney-client privilege so that his concerns would not later be discoverable. This conduct by WhatsApp leaders makes clear that they knew Mr. Baig was reporting concerns about legal violations, not just cybersecurity issues.

**iii. Mr. Baig suffered adverse employment actions.**

Mr. Baig has suffered multiple actionable adverse actions. An adverse action for a retaliation claim is generally actionable when it is "harmful enough that it well might have dissuaded a reasonable worker from engaging in statutorily protected whistleblowing," *see Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, (2006) (Title VII retaliation claims), although courts in the Ninth Circuit have stated that the standard under SOX is even broader than under *Burlington Northern* and includes unfavorable employment actions that are "more than trivial, either as a single event or in combination with other deliberate employer actions alleged." *See Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1075 (S.D. Cal. 2017) (adopting "an expansive view of adverse action," although *Burlington Northern* is a "helpful interpretive tool") (citing *Menendez v. Haliburton, Inc.*, ARB Case Nos. 09-002, 2011 WL 4915750 (ARB Sept. 13, 2011)); *see also Guitron v. Wells Fargo Bank*, N.A., No. C 10-3461 CW, 2012 WL 2708517, at *16 (N.D. Cal. July 6, 2012), *aff'd sub nom. Guitron v. Wells Fargo Bank, NA*, 619 F. App'x 590 (9th Cir. 2015) ("adverse action" in the SOX context is broader than under the *Burlington Northern* "materially adverse" test, although *Burlington Northern* continues to be a "helpful guide.").

Such adverse actions include downgrading of performance ratings, reduction of bonus compensation, and failure to promote, as Mr. Baig experienced. *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (issuance of an undeserved negative performance review and refusal to consider for promotion are adverse employment actions for Title VII retaliation claims); *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1075 (S.D. Cal. 2017) (holding that allegations that employer downgraded plaintiff's performance rating, adversely affected his bonus, and threatened and harassed plaintiff satisfy the adverse action requirement under SOX); *Guitron v. Wells Fargo Bank, N.A.*, No. C 10-3461 CW, 2012 WL 2708517, at *16 (N.D. Cal. July 6, 2012), *aff'd sub nom. Guitron v. Wells Fargo Bank, NA*, 619 F. App'x 590 (9th Cir. 2015) (plaintiffs' claims that they suffered suspension and poor performance reviews satisfy a *prima facie* element of unfavorable personnel action); *see also Peterson v. California, Dep't of Corr. & Rehab.*, No. 1:10-cv-01132-BAM, 2012 WL 1604660, at *7 (E.D. Cal. May 7, 2012), aff'd, 542 F. App'x 553 (9th Cir. 2013) ("A denied promotion, even if only temporarily, represents an adverse employment action" for purposes of Title VII race discrimination claim).

Similarly, the verbal warning – which included a documented, written recap that warned of "future discipline" – that Mr. Baig received on November 14, 2022, is an adverse employment action under SOX. *Fonseca v. Sysco Food Servs. Of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) ("A warning letter or negative review also can be considered an adverse employment action" for a Title VII discrimination claim); *Mendez v. St. Alphonsus Reg'l Med. Ctr., Inc.*, No.

1:12-CV-00026-EJL, 2014 WL 6077608, at *22 (D. Idaho Nov. 13, 2014) ("[T]he Court finds that Miller's May 7 verbal warning and her May 18 written warning—both of which focused on the need for Mendez to improve his job performance, obey managers' instructions, and avoid negative or inappropriate communication with coworkers—constitute adverse employment actions" for purposes of Title VII discrimination claim.). The warning included a threat that "any future conduct along these lines could result in further discipline" and thereby satisfies the ARB's adverse action standard, which states that verbal reprimands are adverse employment actions when "coupled with a reference to potential discipline." *See Williams v. American Airlines Inc.*, ARB No. 09-018, ALJ No. 2007-AIR- 004, slip op. at 10-11 (ARB Dec. 29, 2010). Courts in the Ninth Circuit have favorably cited *Williams*. *See, e.g.*, *Guitron v. Wells Fargo Bank, N.A.*, No. C 10-3461 CW, 2012 WL 2708517, at *16 (N.D. Cal. July 6, 2012), *aff'd sub nom. Guitron v. Wells Fargo Bank, NA*, 619 F. App'x 590 (9th Cir. 2015).

**iv. Mr. Baig can show that his protected activity was a contributing factor in WhatsApp's adverse actions.**

Mr. Baig can easily show that his protected activity was a contributing factor in the adverse employment actions he faced. "A contributing factor is any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision." *See Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1195 (9th Cir. 2019) (internal quotations and citations omitted). As the Department of Labor has emphasized, under the contributing factor standard, "[t]he protected activity need only play some role, and even an '[in]significant' or '[in]substantial' role suffices." *Palmer v. Canadian Nat'l Ry.*, ARB Case No. 16-035, ALJ No. 2014-FRS-154, slip op. at 53 (Dep't of Labor Sept. 30, 2016) (en banc). Mr. Baig can easily clear this low bar.[35]

The close temporal proximity between Mr. Baig's protected activity and the adverse actions is classic evidence of causation. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.") (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)). Mr. Baig began to face retaliation almost immediately after Mr. Verma became aware of his protected activity by reading the pre-read on September 26. Just two days after that report, Mr. Mukerji's interactions with Mr. Baig drastically shifted

[35] Showing an employer's wrongful motive is not a component of a SOX claim in the Ninth Circuit. *See Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010) ("A prima facie case does not require that the employee conclusively demonstrate the employer's retaliatory motive"). However, Mr. Baig would be able to show the wrongful motive of his direct manager, Mr. Mukerji, and his skip manager, Mr. Verma. The extensive cybersecurity failures that Mr. Baig identified and raised placed both Mr. Mukerji and Mr. Verma in a poor light because those vulnerabilities occurred on their watch. *See Smith v. Chicago Bridge & Iron Co.*, N.V., No. 4:16-CV-1089, 2017 WL 2619342, at *6 (S.D. Tex. June 16, 2017) (holding that plaintiff raised a genuine issue of fact regarding employer's motives; plaintiff argued that manager of the HR Department had a motive to retaliate against him because plaintiff had "requested the audit that brought to light large-scale problems in HR—the department [the manager] managed").

and he began giving Mr. Baig negative feedback for the first time and micromanaging his work. Indeed, Mr. Baig learned during the TouchPoint conversation on October 17 that Mr. Mukerji marked Mr. Baig as "Needs Support" between September 26 and September 30. The shift was so drastic that Mr. Baig raised his concerns to Human Resources on October 7, 2022, and filed a retaliation complaint on October 19 because of Mr. Mukerji's ongoing hostile treatment. Then, less than a month after the October 18 meeting, at which Mr. Baig engaged in additional protected activity, and only six weeks after Mr. Verma reviewed the pre-read, Mr. Baig received a verbal warning and later learned that he was almost terminated at that time. Mr. Verma and Mr. Mukerji have both claimed that this verbal warning impacted Mr. Baig's February 2023 performance rating, which in turn affected his compensation and blocked his promotion. This close temporal proximity between Mr. Baig's protected activity and the adverse actions is sufficient to raise an inference of causation. *See Van Asdale*, 577 F.3d at 1003 (two and a half month gap between protected activity and termination could allow a reasonable fact finder to infer causation under SOX); *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (In First Amendment retaliation case, "three to eight months is easily within a time range that can support an inference of retaliation."); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (causation can be inferred when the first adverse employment action took place less than three months after an employee's protected activity); *Kelley v. Billings Clinic*, No. CV 12-74-BLG-SHE-CSO, 2014 WL 223377, at *19 (D. Mont. Jan. 21, 2014), *report and recommendation adopted*, No. CV 12-74-BLG-SHE, 2014 WL 496948 (D. Mont. Feb. 6, 2014) ("The Ninth Circuit generally has held that a period of less than three months between a plaintiff's protected activity and an adverse employment action is sufficient to raise an inference of causation.")

Mr. Baig will not need to rely on temporal proximity alone to prove causation. The drastic change in his managers' change in attitude towards him after he had engaged in protected activity is strong evidence of causation. *See Porter v. California Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005) ("[C]ircumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" of causation.); *Lancaster v. Norfolk S. Ry. Co.*, ARB No. 2019–0048, ALJ No. 2018–FRS–00032, slip op. at 7 (ARB Feb. 25, 2021) ("Contributing factor causation may be proven indirectly by circumstantial evidence, such as . . . an employer's antagonism or hostility toward a complainant's alleged protected activity . . . or a change in the employer's attitude toward the complainant after he or she had engaged in protected activity.") Prior to the pre-read, Mr. Baig had a good relationship with Mr. Mukerji and Mr. Verma. However, as he reported to Ms. Yoon in October 2022, their attitudes towards him changed drastically two days after Mr. Verma reviewed Mr. Baig's pre-read and has remained hostile since. Moreover, the change in PSC reviews – from exceeds expectations to consistently meets expectations with "areas of improvement" – is further evidence of causation. *See Coppinger-Martin v. Solis*, 627 F.3d 745, 751 (9th Cir. 2010) (plaintiff alleging temporal proximity of several months between protected activity and employer eliminating her job and a dramatic change in performance evaluations after engaging protected activity was sufficient to meet prima facie causation showing). Mr. Verma's hostility towards Mr. Baig's protected activity is also evidenced by his openly berating Mr. Baig for raising concerns that Meta is violating the FTC order, including telling him that "you shouldn't be talking about the FTC

order," questioning why Mr. Baig has read the FTC order, and ordering him to ensure that all his reports about potential legal violations were covered by attorney-client privilege so that they would not be discoverable.

The close temporal proximity between Mr. Baig's protected activity and the adverse actions, his supervisors' hostility towards Mr. Baig after his protected activity, and Mr. Baig's positive performance record before his protected activity easily meet the "low bar" required to show that his protected activity was a contributing factor to the adverse actions. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1004 (9th Cir. 2009) ("[G]iven the close proximity of Shawn's termination to his alleged protected activity, his seemingly positive record at IGT, and the dearth of specific evidence in the record supporting Johnson's and Matthews's claims about his performance, a reasonable fact finder could find that Shawn's protected activity contributed to his termination.").

**v. Meta will not be able to meet its high burden of proving by "clear and convincing evidence" that it would have taken the same adverse action absent Mr. Baig's protected activity.**

Since Mr. Baig will be able to show that his protected activity was a contributing factor to the adverse actions taken against him, to avoid liability, Meta would have to show by "clear and convincing evidence" that it would have taken the same employment actions even in the absence of the complainant's protected activity. 29 C.F.R. § 1980.104(e)(4). Such a showing is a heavy burden that the Ninth Circuit has described as requiring "an abiding conviction that the truth of the factual contentions' at issue is 'highly probable.'" *See Lawson v. PPG Architectural Finishes, Inc.*, 982 F.3d 752, 759 (9th Cir. 2020), certified question answered, 12 Cal. 5th 703, 503 P.3d 659 (2022) (quoting *Mondaca-Vega v. Lynch*, 808 F.3d 413, 422 (9th Cir. 2015)).

Prior to Mr. Baig's protected activity, he had received glowing performance reviews, including an "Exceeds Expectations" rating in February 2022, and in July 2022, a discussion about his imminent promotion during the next performance review cycle. Because of his strong performance, Mr. Baig would not have received a verbal warning or lower performance rating in the absence of his protected activity. Indeed, Meta's justification for the adverse actions – Mr. Baig's alleged poor collaboration and communication skills – is blatantly pretextual given that his supervisors did not have a problem with his collaboration prior to his protected activity and his supervisor's demonstrable campaign to denigrate his communication skills after his protected activity. This evidence of pretext serves as further evidence of retaliation. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (affirming evidentiary principle that a party's dishonesty about a material fact can be evidence of guilt).

**B. <u>Retaliation in Violation of California Whistleblower Law, Labor Code Section 1102.5.</u>**

Mr. Baig also has a strong claim under Section 1102.5 of the California Labor Code, which is California's general whistleblower protection statute. Section 1102.5 protects employees from retaliation who have disclosed a violation of law, rule or regulation to a supervisor, to another employee with authority to investigate or correct the violation, or to a government agency.

As a threshold issue, Section 1102.5 applies to Meta's retaliation against Mr. Baig because the retaliatory decision-making and conduct occurred in California. *See Leibman v. Prupes*, No. 2:14-CV-09003-CAS, 2015 WL 3823954, at *8 (C.D. Cal. June 18, 2015) (holding that the relevant inquiry is whether the "conduct which gives rise to liability occurs in California") (internal quotations and citations omitted)). Here, Meta is headquartered in California and the retaliatory decision-makers primarily work in California: Mr. Mukerji lives in and works from California, and Mr. Verma is regularly in California for work. Additionally, Mr. Baig so frequently works in California – forty-one workdays in 2022 alone – that he had to pay California state taxes in 2022. Furthermore, Mr. Cathcart and Mr. Gupta also live and work in the state. These extensive contacts with the state enable Mr. Baig to bring a whistleblower claim under California state law.[36]

Section 1102.5 incorporates a "nearly identical burden-shifting framework for the adjudication of whistleblower cases" as SOX. *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 715 (2022). To prevail, "the plaintiff [must] establish, by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action. . . . Once the plaintiff has made the required showing, the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity." *See Vatalaro v. Cnty. of Sacramento*, 294 Cal. Rptr. 3d 389, 398 (2022) (citing *Lawson*, 12 Cal. 5th at 716). Mr. Baig can easily establish, by a preponderance of the evidence, that retaliation for his protected activities was a contributing factor in the employment decision.

Section 1102.5 protects employees who disclose information that the employee has reasonable cause to believe violates federal law, which includes, but is not limited to, the federal

[36] California courts granting summary judgment to the employer on the extraterritorial application of Section 1102.5 have done so only when none of the allegedly retaliatory employment decisions were made in states other than California. *See, e.g., Eng. v. Gen. Dynamics Mission Sys., Inc.*, No. EDCV18908JGBSHKX, 2019 WL 2619658, at *8 (C.D. Cal. May 8, 2019), *aff'd*, 808 F. App'x 529 (9th Cir. 2020) ("Here, all employment decisions regarding Plaintiff were made in Georgia."); *Weinberg*, 2017 WL 6543822, at *6 ("Plaintiff does not allege that any retaliatory decision-making occurred in California.").

law enumerated in SOX. *See* Cal. Lab. Code § 1102.5(b). As one court has described, Section 1102.5 encompasses a "sweeping breadth." *Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062, 1108 (S.D. Cal. 2020). Thus, the protected activity that Mr. Baig engaged in under SOX enumerated above, also constitutes protected activity under Section 1102.5.

Section 1102.5, however, protects a broader category of disclosures than SOX. *See id.* (stating that Labor Code Section 1102.5's scope is "much broader than" SOX because it "encompasses violations of a 'state or federal statute' or 'a local, state, or federal rule or regulation'"). This means that any information that Mr. Baig disclosed that he reasonably believed violated other federal and state law is protected under Section 1102.5 even if it were to not be protected under SOX. As discussed above, Mr. Baig reasonably believed that Meta's deficient cybersecurity posture either violated or imminently would violate the FTC Act and the 2020 Privacy Orders, particularly given that Congress was urging the FTC to investigate Twitter for the same type of cybersecurity deficiencies. Each of Meta's violations of the 2020 Privacy Order violates the FTC Act. *See* 15 U.S.C. § 45(l) ("Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation.").

Additionally, Mr. Baig reasonably believed that the information he shared disclosed a violation of the California Consumer Privacy Act (CCPA) of 2018. For example, the CCPA provides, "[a] business that collects a consumer's personal information shall, at or before the point of collection, inform consumers as to the categories of personal information to be collected and the purposes for which the categories of personal information shall be used. A business shall not collect additional categories of personal information or use personal information collected for additional purposes without providing the consumer with notice consistent with this section. A business shall provide the information specified in subdivision (a) to a consumer only upon receipt of a verifiable consumer request." *See* California Consumer Privacy Act, California Civil Code § 1798.100. Mr. Baig informed WhatsApp leadership and his managers that WhatsApp does not know which data it is collecting and where it is storing the data. Mr. Baig reasonably believed that these deficiencies meant that WhatsApp has been in violation of the above CCPA requirements.

For the same reasons detailed above, Mr. Baig will be able to show that his protected activity was a contributing factor for the adverse employment decision he has suffered. Under Section 1102.5's contributing factor standard, Mr. Baig may satisfy his burden of proving unlawful retaliation "even when other, legitimate factors also contributed to the adverse action." *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 713–14, 503 P.3d 659, 664 (2022). Mr. Baig can show that the temporal proximity, sudden shift in his supervisors' attitudes towards him, and pretextual reasons given for the adverse employment actions are sufficient to infer causation. As similarly discussed above, Meta will be unable to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity.

## III. Conclusion

At the request of WhatsApp leadership, and despite his express warnings that he would likely face retaliation, Mr. Baig came forward and detailed the serious cybersecurity failings that WhatsApp currently suffers. Instead of protecting him so that he could work to remediate WhatsApp's deficient cybersecurity and ensure that WhatsApp is meeting its legal obligations to its users, the Company has allowed Mr. Baig's supervisors to retaliate against him, causing him significant economic, physical, and emotional distress.

While Mr. Baig is prepared to litigate his legal claims to remedy the harm he has suffered, at this time he is willing to enter into settlement discussions to try to reach a private, amicable resolution. Any such resolution, however, must compensate Mr. Baig for the harm that this retaliation has caused him.

If you are interested in entering into such a settlement dialogue, please reach out to me as soon as possible, but no later than April 28, 2023. If we do not hear from Meta by that date, Mr. Baig's will move forward with filing his SOX charge with the U.S. Occupational Safety and Health Administration (OSHA) in preparation to litigate his SOX claim in federal court.[37]

Sincerely,

Alexis Ronickher
Attorney for Attaullah Baig

cc: Andrea Kirkpatrick, Esquire, Head of WhatsApp Legal (andreak@meta.com)
Mr. Attaullah Baig

[37] Upon Mr. Baig's filing of his OSHA charge, OSHA will be required to forward the charge to the Securities and Exchange Commission. 29 C.F.R. § 1980.104(a).

# EXHIBIT C

Outlook

**Retaliation re: Raising Cybersecurity Gaps with Leadership (Ethics and Compliance Issue)**

**From** Attaullah Baig <atbaig@meta.com>
**Date** Tue 1/2/2024 2:58 AM
**To** Ethics <ethics@meta.com>; Mark Zuckerberg <mz@meta.com>; Jennifer Newstead <jnewstead@meta.com>

Hi Mark, Jennifer and Ethics and Compliance team,

Apologies for this email in the new year. I didn't want to send it over the holidays.

# TL;DR

- I lead the WhatsApp Security team, and the team is severely understaffed to fulfill its mission to protect WhatsApp and its users.
- There are several serious cybersecurity gaps in WhatsApp.
- I have faced retaliation in the past for raising the cybersecurity gaps to leadership, which resulted in financial loss and emotional distress for me.
- Given the macro environment in the company at that time. I didn't have enough time to escalate the cybersecurity gaps or the retaliation, to the highest levels within the company.
- I am currently facing retaliation once again from the X-Sec team and my management.
- The X-Sec team is falsifying cybersecurity reports. Falsifying cybersecurity reports can result in criminal penalties
    - Uber CISO
    - Solarwinds and their CISO

*All document links below are copies of original documents which can help in a confidential investigation.

*P.S: A section on systemic issues that are preventing us from doing the right thing. This is from the eyes of a Meta employee (me) who loves to work here and do the right thing for the company.

# What are the Cybersecurity Gaps

Below is an example of how most cybersecurity data breaches occur

Either a malicious employee or an external attacker that has compromised the identity of a Meta Employee (who has access to user data), downloads a large number of user records onto their laptop and moves this data outside of Meta's corporate boundary via Google drive, WhatsApp, Signal, etc. We know that 60,000+ employees have access to sensitive user data. We know for fact that this attack is possible today.

Once the data is outside Meta's corporate boundary, it is legally considered a data breach. We have no defenses or protection against this type of attack. If we fail to remediate these gaps, we are not meeting our legal obligations from the 2020 FTC Order [refer to Section V].

A large-scale data breach will expose Meta, our users, and our investors to serious harm. Meta could lose billions of dollars in market cap, and we may face several regulatory penalties, lawsuits, etc.

## Systemic Issues Preventing us for Fixing These Gaps

- Meta is a great company to work for and we spend a lot on privacy
- However please note that it is one thing for regulators to accuse us of misusing user data, but it is much more damaging for the company, if we cannot safeguard user data and it is available publicly or on the dark web.
- We are not focusing enough on this problem relative to privacy e.g.: In WhatsApp there are a lot more people protecting WhatsApp user data from being accidentally used by Meta than there are people protecting WhatsApp user data from hackers.
- As per my observation, we don't have the talent, skillset, reward structure or org structure to address the gaps above.
- There are many inexperienced teams that are solving cybersecurity problems in the name of privacy, integrity, ML, registration, etc. As a result, our users are suffering and we have about 250K daily Account Takeovers (ATOs) in Facebook, 30K daily ATOs in WhatsApp, etc.
- In my experience with other companies, these problems are solved by security teams that have experience in this space and they report to the CISO / Head of Security.
- I also observed that most people are putting their PSC ahead of what is good for the company and our users. They are focusing on metrics such as "how many Meta employees did we catch this half that are spying on other Meta users?", "how many privacy incidents did we detect this half", etc.
- The cybersecurity attack mentioned above happens once in 10-20 years in the lifetime of a company. The work required to mitigate it cannot easily be quantified in a typical PSC metric.
- Fixing these systemic issues would require either a significant new investment of at least $100 million+ or a major re-prioritization, and possibly a major restructuring.

# Whistleblower Retaliation: Timeline of Events

- I joined Meta in January 2021 and started with WhatsApp soon after in February 2021.
- I requested a Red Team exercise (via my predecessor) for exfiltration of WhatsApp user data in May 2021.
- We completed the exercise and published our findings in October 2021.
- I raised the cybersecurity gaps above with my skip (Suren Verma) but was unsuccessful in getting his attention.
- As a follow up to the Twilio data breach of August 2022 (which involved WhatsApp user data), Will Cathcart (Head of WhatsApp) requested me to create a confidential report bypassing my management.
- I started facing retaliation from Suren, as soon as he saw a version of the above report.
- The retaliation continued until March 2023, and I suffered financial loss and emotional distress.
- Suren was re-orged from my management chain in May 2023.
- The retaliation paused and I along with my team continued to fix cybersecurity issues to the best of our ability with very limited staffing.
- We also started engaging with the X-Sec team in October 2022 to understand the accountability model between X-Sec and WhatsApp Security.
- I never got clear answers from X-Sec on who is accountable for what.
- Given the staffing shortage, I started working with the Internal Abuse Detection and Response (IDR) team within X-Sec, to secure assistance from them in terms of additional tooling, staffing, etc. to be able to detect and prevent a large-scale data breach.
- Things were going really in the beginning, and this is the feedback I received from the X-Sec team in June 2023 in the PSC tool.

***What are 1-2 things Attaullah is doing well? Consider their work and impact, and how they collaborated with you. Use***

***bullets and share specific examples and suggestions. --------------------------------------------------------------------------***

- ***Sharing Business Context to inform priorities***
  - *Throughout H1 Attaullah did an excellent job informing our working group within XDR of the larger business and organizational contexts regarding WhatsApp Security. This context from Attaullah was critical to understanding what surfaces the XDR team should prioritize, and how to frame the work we are doing to the WhatsApp Org.*
- ***Advocating for internal alignment to support security initiatives***
  - *There are many pressing security priorities within the WhatsApp org, and given the tight headcount environment we are in, we have been prepared for challenging discussions on how to fund security initiatives. Attaullah did an effective job as a liaison between Security and WhatsApp contextualizing our work, how it relates to the privacy of our users, and why it should be staffed urgently. This alignment is helping unblock high priority detection and response projects that make WhatsApp users safer.*

***What are 1-2 things Attaullah could be doing better? Consider their work and impact, and how they collaborated with you.***

***Use bullets and share specific examples and suggestions.*** ---------------------------------------------------------------------------

*It's been a pleasure working with Attaullah in H1 across a broad variety of WhatsApp security initiatives. The only constructive feedback I have is around communicating early and often around upcoming deadlines to avoid UBN work on the XDR side. Earlier in April we received a request for a one-pager outlining the current state and proposed work in ~24 hours, which required dropping other projects to quickly pull together the requested information.*

*With that being said, since this event we have been closely aligned with no other surprises. I could not be happier with the recent collaboration and visibility.*

- The IDR team then completed a security assessment of one small attack surface named the WhatsApp Admin Tool (a tool used by internal employees to administer WhatsApp user accounts).
- Their assessment and subsequent report however only focused on Insider Abuse and Detection, wherein an insider who has a relationship with a Meta user constantly spies on that user using internal tools (e.g., a Meta employee spying on a romantic partner).
- Their assessment and report did not mention anything about the cybersecurity gaps above including the possibility of large-scale data breaches by external third parties.
- We started having check-ins with Nitin Gupta (Head of Engineering for WhatsApp) and Guy Rosen (Chief Information Security Officer of Meta).
- We had our first check-in on July 17, 2023. The X-Sec team did not allow me to surface the gaps above in the pre-read document that the attendees of this meeting would receive, including Nitin and Guy.
- Prevented from reporting these concerns in the body of the pre-read itself, I left some comments in the pre-read asking for clarification on the priority of issues we are fixing as opposed to what we are not fixing, that is, clarification as to whether the X-Sec team was prioritizing internal abuse over external cyberthreats.
- One of the engineers from the IDR/X-Sec team (Gregory Heimbuecher) was very unhappy with my comments and met with me on July 18, 2023.
- Among other things, Gregory made the following statements to me about the comments I added to the pre-read:
    - *“Attaullah, don't be the guy that people hate to work with.”*
    - *“You made us all look like idiots” by exposing our gaps.*
- We had our second check-in on Aug 30, 2023. The X-Sec team again did not allow me to report the gaps above in the pre-read.
- In the second check-in meeting, I verbally raised them in the meeting, by stating “It is one thing to detect if Guy has blocked me and am looking at Guy’s WhatsApp profile, and it is a totally different thing to detect and stop me from taking a large number of user records from WhatsApp/Meta” and addressing these gaps is necessary to meet Meta’s and WhatsApp’s legal obligations from the 2020 FTC Consent Order.

- I also sent this 1:1 message to Guy right after this meeting

  *"Hi Guy - Thanks very much for spending time to secure WhatsApp user data which is accessible via WhatsApp Admin Tool. I am glad, we are making good progress by prioritizing logging, etc.*

  *On the detections side, I have been trying to ask the same question for sometime now. I am glad we agreed to have a detection workshop.*

  *For context the question am asking folks is*
  *What would keep you up at night?*
  *1. Me as an attacker looking at your WhatsApp profile which includes your Address Book, Group Membership, Last Known IP / Location, etc. vs*
  *2. Me taking 100 M+ WhatsApp user records containing the same set of information so I can sell this on dark web*

  *I understand we may not have the maturity to address the threat in (2), which is fine. Do we have this on the detection's roadmap?"*
- I met with the X-Sec team on September 11, 2023, to discuss cyberthreats.
- During this meeting the X-Sec team was suppressing me again from talking about cyberthreats and only wanted to talk about insider abuse.
- I politely asked Josh Ryder (Gregory's manager) a question: "What keeps you up at night?".
- He was very visibly unhappy with me and answered "you" "you think Meta doesn't have a comprehensive information security program" and he refused to address my concern.
- Given the collaboration challenges, I reached out to Gregory on October 4, 2023, so we could mutually exchange feedback and find a path forward. Gregory postponed our meeting.
- On October 18, 2023, Alan Thomas, an Employee Relations Business Partner reached out to me, and we met shortly thereafter.
- Alan shared that he got some feedback on me and shared this feedback verbally with me

  *"The three main points are:*
  - ** The feelings received from xfns after talking with you that they lack work proficiencies/acumen to work on and complete projects*
  - ** A general feeling that demands from you are being placed on them (XFNs) without sufficient notice and lead time to complete these milestones. Examples given were around asking for 24 hour turn arounds*
  - ** A sudden pivot in pre-established alignment and documentation regarding work that derails and surprises XFNs. No prior discussions happened to talk through these pivots."*
- Based on the feedback, I understood that it came from Gregory or someone in the X-Sec team, so I explained my experience to Alan, and the depth of the cybersecurity issues I wanted to raise but had been blocked from raising. This seemed to surprise him.
- Alan said he would send a recap of our whole conversation by email.

- Alan, however, later sent me an email recap with only the feedback that he received from the other party without mentioning what we discussed.
- This one-sided narrative got me concerned that Employee Relations also sought to suppress my reporting of the cybersecurity gaps.
- I exchanged a few emails with Alan on this topic. He has since connected me with another team that I am working with.
- In the meantime, I reached out to Chad Greene and asked for advice and feedback.
- Chad advised me not to bring up cyberthreats in the meetings with Nitin and Guy. I agreed. I privately shared my concern with Nitin and told him that I will not be bringing them up again in the next check-in.
- Steve Clarke reached out to me 1:1 and acknowledged that he fully understands the cybersecurity risks to the company but asked me not to bring them up in the meetings with Nitin and Guy. Steve also said he will be following up with me on the cyberthreats.
- We had our third check-in on October 30, 2023, and Nitin acknowledged the above cybersecurity gaps in that meeting.
- I published a vision for data security for WhatsApp.
- I reached out to Chad Greene, Steve Clarke, Chris Rohlf, and Bhavesh Mehta for feedback on this vision/strategy and I got no feedback from them and there were no follow ups on cyberthreats.
- I created several documents below to drive alignment
    - What success looks like between WhatsApp and IDR
    - Document to get alignment between X-Sec and WhatsApp on threat prioritization
    - Document to get alignment within WhatsApp on threat prioritization
- I reached out to ISSO-GRC to do an audit of the above cyberthreats.
- I reached out to Internal Audit to do an audit of the above cyberthreats.
- I have not heard back from either of these teams.
- The X-Sec team performed a Quarterly Security Assessment (QSR) for WhatsApp for Q3, 2023 and the cyberthreats listed above were missing.
- The X-Sec team (Michael Whiteman, Lucas Fisher, Chris Rohlf and others) reached out to me on December 8, 2023, for a prep meeting for the WhatsApp QSR for Q4, 2023.
- The pre-read this time again was missing the above cyberthreats. The X-Sec team coerced me to agree to this false security report.
- They wanted me to re-engage in another exercise with the IDR team on Internal Abuse without any mention of the above cyberthreats.
- I quoted Edward George, a Meta lawyer who suggested either Internal Audit or ISSO-GRC as the right team to do this type of an audit.
- I also said that in the cybersecurity world, the team that provides the solution doesn't audit themselves. This is against the cybersecurity norms and principles.
- Anthony Osborne reached out to me on December 12, 2023, and requested my support for a smooth WhatsApp Q4 QSR. Anthony did not say that I should not bring up the above cyberthreats.
- The topic of large-scale data breach came up in the chat group (of the QSR meeting to be held on Dec 14, 2023). Nitin Gupta and Guy Rosen were present in this chat group.
- Here are the two things I said in that chat group

Message 1:

*"@silent Thanks @Chad*

*The specific attack scenario we are talking about here is*

*Either a malicious employee or an attacker that has compromised the identity of a Meta Employee (who has access to user data), downloads a large number of user records onto their laptop and moves this data outside of Meta's corporate boundary via Google drive, WhatsApp, Signal, etc.*

*We know for fact that this attack is possible today. Once the data is out, it is legally considered a data breach. How can we detect, respond and prevent this type of an attack?. The typical industry standard for handling this type of an attack is to detect and respond within minutes. We would love to see, if this is captured in your roadmap."*

Message 2:

*"Thanks Steve for acknowledging the threat. I want to make sure I highlight the great collaboration our teams have. Among many things*

*1. We partnered closely with X-Sec on client application security and as a result WhatsApp app is the most secure app as measured my payouts on Zerodium*

*2. We recently launched(or in the process of launching) an industry standard VM management for WhatsApp*

*3. We partnered closely with Isaac Elbaz and team to get an approval from S-Circle to fund encryption at rest for ZippyDB (https://fb.workplace.com/groups/2155869527941535/permalink/2270049976523489/)*

*On the topic of Data Security / Data Breach*

*1. I want to make sure we separate out my passion from the legal obligations of the company*

*2. This topic dates back to 2021*

*3. We started re-engaging with X-Sec in October 2022 to clarify the accountability model for this*

*4. I am happy to chat 1:1 or have a separate discussion on this, but please note WhatsApp leadership is very much interested in looking at a committed roadmap from X-Sec on this topic"*

*5. We are going through our roadmap planning and this is the only red-line we have in our roadmap (https://docs.google.com/document/d/1qB21WwuRYHPtXpd3XgEhZRIPDd53XDSE70vX3i_qndo/edit)"*

- The X-Sec team reached out to my manager Pinaki Mukerji on December 14, 2023, after my messages in the chat group and shared strong negative unsolicited feedback about the meeting that happened on December 8, 2023. I wonder why they didn't bring it up before this date or in the meeting they had with me and Pinaki on Dec 12, 2023.
- Pinaki gave me strong negative verbal feedback on December 15, 2023.
- Pinaki has no prior experience in cybersecurity and privacy. Pinaki has in the past retaliated against me at the direction of my previous skip level manager Suren.
- I believe Pinaki is currently retaliating against me at the direction of X-Sec leadership (Chad Greene, Steve Clarke and Bhavesh Mehta).
- Pinaki sent me a follow-up email on Dec 26, 2023, falsely accusing me of numerous things.
- Here is the email Pinaki sent to me.

*"Hi Attaullah,*

*Thanks for the chat on Friday, 12/15. As mentioned during that call, I continue to receive unsolicited feedback regarding your XFN collaboration which is concerning because we have discussed M1 Engineering Manager expectations and behaviors previously.*

***Focus areas:***

*Collaboration*

*Strategy*

*During a meeting with XFNs, as the EM of WhatsApp Security, you were tasked with a focus of engagement around insider abuse of user data where your reaction was to not participate in developing a threat model for WhatsApp Infra. You mentioned specifically in that meeting that you did not trust that team. After observing your reaction, the XFN team dropped the large scale data exfil from the QSR. As you know, this is a critical priority for WhatsApp as well as for the FOA.*

*Your lack of participation has implications across the XFN teams that share the decision-making responsibilities in this space. Furthermore, you did not engage in conversations with me to discuss your concerns prior to raising them with the XFN team and refusing to engage with them. According to the feedback, your method of communication delayed the broader security strategy across X-Sec and WhatsApp to quickly detect and prevent large scale data exfil.*

*I personally continue to see collaboration challenges that we have been discussing throughout the year. As an example, the collaboration challenges in prioritization with the Admin Tool Team in July/August. Additionally, last week's conversation with Nitin, Dick, you and me discussing the disconnect between the joint prioritization and my observations around collaboration challenges regarding the large data exfil with the XDR team which resulted from the lack of trust and respect for that team.*

*The expectation we continue to talk about is to hold the M1 bar in stakeholder management. My expectation here is that you generate processes and mechanisms to close the gaps above and we'll discuss it in our next 1:1 on Jan 19 2024.*

*Thanks,*

*Pinaki"*

- Among many other false accusations, the X-Sec team is saying "*your method of communication delayed the broader security strategy across X-Sec and WhatsApp to quickly detect and prevent large scale data exfil*"
  - This is a false accusation.
  - The X-Sec team and my management have been aware of the cyberthreats since at least September 2021.
  - As mentioned above in the systemic issues section, we need a significant change to mitigate the risk of a large-scale data breach.
- I will discuss the rest of the email with Pinaki and/or my skip Nitin and/or my ERBP.

# Conclusion

Given the seriousness of the ongoing cybersecurity gaps, it concerns me that the X-Sec team have repeatedly attempted to prevent me from surfacing these gaps to Nitin and Guy, who have the authority within their organizations to help the company address these gaps. And when I refused to be silenced, I was reported to Employee Relations, and then they shared unsolicited strong false negative feedback with my manager as tactics to intimidate me into silence.

The X-Sec team is 400+ people, and I remain concerned that my management is acting on their feedback. I have solid documented evidence as listed above in numerous internal docs, that can prove my attempts to raise and remediate these cybersecurity gaps.

The X-Sec team and Pinaki are painting a pattern of uncooperativeness, when I am simply trying to remediate the serious cybersecurity gaps that can harm Meta, its users, and its investors. I see this as an abuse of the feedback and the performance management system and as a retaliation against me for raising concerns about these cybersecurity gaps.

Thanks

# EXHIBIT D

Outlook

**Updates since my January 2, 2024 email**

**From** Attaullah Baig <atbaig@meta.com>
**Date** Wed 12/4/2024 11:35 AM
**To** Mark Zuckerberg <mz@meta.com>

Hi Mark,

I hope you are well. I am sending you a quick update since my last email on January 2, 2024. I will start with a little bit of information about myself first before the update.

**How I live the values of Meta, Metamates, Me**

- I took a team of 8 engineers with no prior experience in cybersecurity, built a comprehensive cybersecurity team and landed significant impact.
  - The scope and the charter of the team can easily match that of a VP level at Meta (not accounting for the innovations and the patents).
  - Happy to debate a/c priv on this with anyone.
- I treat the company money like my own.
  - This can be seen from the airfares I book, the price I pay for hotels, etc. in my expense reports.
  - I don't use roaming while travelling internationally because it would cost the company $5 a day and instead buy a local data plan.
- I treat all Metamates with respect and only raise concerns
  - When they are putting their interests above the interests of the company, and
  - When they are not being truthful to the auditors and the regulators.
- When there was no other choice, I had to do something for myself and my team (metamates).
- Regarding our values, I think there is something important missing from "Meta, Metamates, Me" and in my opinion that is what makes or breaks our company.

**Updates since my January 2, 2024 email**

- There are a number of things that have changed in the company since January 2, 2024
    - e.g: Revamped Annual Required Training (ART), increased staffing budget for cybersecurity teams, etc.
    - Unfortunately the cybersecurity posture of Meta/WhatsApp has not improved by much except on paper.
- My understanding is that you allocated a staffing budget of 23 FTEs plus OPEX but the WhatsApp Security team got nothing from it.
- On the other hand, the retaliation has increased by orders of magnitude and has expanded to most of my team.
    - My team and I describe this as harrasment and torture.
    - We have made several reports about this to HR.
- Meta wants me to enter into a “protected mediation” to negotiate my departure from the company.
    - Isn’t this against Meta’s own Whistleblower and Non-Retaliation policy?.
    - My kids are asking me “Why do you need to leave the company dad when you are doing great things for users?”. What should I tell them?.
- I have now filed a complaint with the SEC under the Whistleblower Retaliation Protection Program.

Thanks
Attaullah