Wilmer J. Harris, SBN 150407
wharris@sshhzlaw.com
Amanda E. Johnson, SBN 342500
ajohnson@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
715 Fremont Avenue, Suite A
South Pasadena, CA 91030
Telephone: (626) 441-4129
Facsimile: (626) 283-5770

*Attorneys for Plaintiff, Attaullah Baig*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ATTAULLAH BAIG,

Plaintiff,

vs.

META PLATFORMS, INC., a corporation; PINAKI MUKERJI; MARK TSIMELZON; NITIN GUPTA; and DOES 1-10, inclusive,

Defendants.

Case No. 3:25-CV-07604-LB

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT OR, IN THE ALTERNATIVE, MOTION TO DISMISS IN PART AND STRIKE**

Date: December 3, 2026

Time: 9:30 a.m.

Ctrm.: B, 15th Floor

Judge: Hon. Laurel Beeler, U.S. Magistrate Judge

Complaint filed: September 8, 2025
Trial date: Not Set

## TABLE OF CONTENTS


I. INTRODUCTION .......... 8
II. STATEMENT OF FACTS .......... 9
A. The Court Sustained the Claim on One Theory and Ordered It Repleaded, in Shorter Form, Limited to That Theory. .......... 9
B. Meta Told Its Investors, Year After Year, That It Was Maintaining the Privacy Program the FTC Required. .......... 10
C. Mr. Baig Found That the Program Had Never Been Built. .......... 10
D. Beginning April 18, 2023, Mr. Baig Repeatedly Told Meta Its SEC Filings Were False. .......... 11
E. The Managers Mr. Baig Named Then Dismantled His Career, and Meta Fired Him. .......... 12
III. ARGUMENT .......... 13
A. The TAC Is Measured Against the Orders the Court Already Entered. .......... 13
B. The Motion Is Unauthorized Reconsideration Barred by Civil Local Rule 7-9. .......... 14
1. Defendants Ask the Court to Overrule Its Own Order. .......... 14
2. Defendants Sought No Leave and Could Satisfy None of Rule 7-9's Grounds. .......... 14
3. There Is No Basis to Depart from the Order. .......... 15
C. Defendants Offer No Argument for Dismissing the Claim Against Meta Itself. .......... 15
D. The Knowledge Challenge Is Forfeited, and the Rest Was Rejected Before. .......... 16
1. The Knowledge Challenge Was Available Twice and Is Forfeited. .......... 16
2. The Court Rejected Every Other Defense Defendants Raised Against the SAC. .......... 17
E. The TAC Pleads Each Individual Defendant's Knowledge. .......... 18
1. Constructive Knowledge Suffices, and the TAC Pleads It with Specific Facts. .......... 18
2. Defendants' Authorities Do Not Help Them, and Timing Completes the Inference. .......... 22
F. The Reports Must Be Read Together, Beginning with Counsel's April 2023 Letter. .......... 23
1. Objective Reasonableness and Knowledge Turn on the Whole Course of Reports. .......... 23
2. Mr. Baig Reported, and Meta Knew, That Its Filings Misled Investors. .......... 24
G. Every Report Defendants Ask the Court to Excise Is Protected. .......... 26
1. The Forms TCR Reported That Meta's Filings Omitted Its Cybersecurity Gaps. .......... 27

2. The January 2, 2024 Letter Told the Certifying Officer That Investors Were at Risk. ........... 27

3. The December 4 Email and Mr. Baig's Interviews Reported Investors Were Misled. ........... 29

4. Paragraphs 22 Through 26 Support Finding Reasonableness. ........... 30

H. Nothing in the TAC Exceeds the Order, and Rule 12(f) Reaches None of It. ........... 30

1. Motions to Strike Are Disfavored, Require Prejudice, and Do Not Test the Merits. ........... 30

2. The Tolling Sentence Is Shorthand for Paragraph 13, Not a New Theory. ........... 31

I. Any Deficiency Should Be Cured by Leave to Amend. ........... 31

IV. CONCLUSION ........... 32

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 13

*BBL, Inc. v. City of Angola*,
809 F.3d 317 (7th Cir. 2015) .......... 26

*Bobreski v. J. Givoo Consultants, Inc.*,
ARB No. 09-057 (ARB June 24, 2011) .......... 23

*Broam v. Bogan*,
320 F.3d 1023 (9th Cir. 2003) .......... 32

*Castner v. First Nat'l Bank of Anchorage*,
278 F.2d 376 (9th Cir. 1960) .......... 15

*Choochagi v. Barracuda Networks, Inc.*,
60 Cal. App. 5th 444 (2020) .......... 22

*Cohen v. Fred Meyer, Inc.*,
686 F.2d 793 (9th Cir. 1982) .......... 22, 23

*Coppinger-Martin v. Solis*,
627 F.3d 745 (9th Cir. 2010) .......... 18

*Dawson v. Entek Int'l*,
630 F.3d 928 (9th Cir. 2011) .......... 23

*DeLeon v. Wells Fargo Bank, N.A.*,
No. 10-CV-01390-LHK, 2010 U.S. Dist. LEXIS 112941 (N.D. Cal. Oct. 22, 2010) .......... 31

*Eastman v. Apple, Inc.*,
No. 18-cv-05929-JST, 2019 U.S. Dist. LEXIS 141423 (N.D. Cal. Aug. 20, 2019) .......... 17

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .......... 31, 32

*Foman v. Davis*,
371 U.S. 178 (1962) .......... 31

*Frezza v. Google Inc.*,
No. 5:12-cv-00237-RMW, 2013 U.S. Dist. LEXIS 57462 (N.D. Cal. Apr. 22, 2013) .......... 32

*Garcia v. Walmart, Inc.*,
No. 1:23-CV-03116-MKD,
2026 U.S. Dist. LEXIS 216684 (E.D. Wash. Sept. 23, 2026) .......... 21

*Green v. ADT, LLC*,
No. 16-cv-02227-LB, 2016 U.S. Dist. LEXIS 130826 (N.D. Cal. Sept. 23, 2016) .......... 8, 17

*Halliburton, Inc. v. Admin. Review Bd.*,
771 F.3d 254 (5th Cir. 2014) .......... 27

*Hartranft v. Encore Capital Group, Inc.*,
543 F. Supp. 3d 893 (S.D. Cal. 2021) ....................22

*Hashimoto v. Dalton*,
118 F.3d 671 (9th Cir. 1997) ....................31

*Hernandez v. Spacelabs Med., Inc.*,
343 F.3d 1107 (9th Cir. 2003) ....................9, 18, 21, 23

*In re Apple iPhone Antitrust Litig.*,
846 F.3d 313 (9th Cir. 2017) ....................17

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
753 F. Supp. 3d 849 (N.D. Cal. 2024)....................26

*Interpipe Contracting, Inc. v. Becerra*,
898 F.3d 879 (9th Cir. 2018) ....................13

*Johnson v. City of Shelby*,
574 U.S. 10 (2014) (per curiam)....................31

*Kama v. Mayorkas*,
107 F.4th 1054 (9th Cir. 2024) ....................23

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ....................26

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ....................28

*Lenk v. Monolithic Power Systems, Inc.*,
No. CV-23-02083-PHX-SHD, 2026 U.S. Dist. LEXIS 190337 (D. Ariz. Aug. 24, 2026)....................22

*Little v. Pac. Seafood Procurement, LLC*,
No. 23-cv-01098-AGT, 2025 U.S. Dist. LEXIS 28473 (N.D. Cal. Jan. 17, 2025)....................26

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) (en banc) ....................31

*Loth v. City of New York*,
No. 20 Civ. 9345 (GBD), 2021 U.S. Dist. LEXIS 180027 (S.D.N.Y. Sept. 21, 2021)....................22

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024) ....................27

*Murray v. UBS Sec., LLC*,
601 U.S. 23 (2024) ....................16, 23

*Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) ....................16

*Pierce v. E. Bay Mun. Util. Dist.*,
No. 24-1260, 2026 U.S. App. LEXIS 25168 (9th Cir. Aug. 20, 2026) ....................22

*Platte Anchor Bolt, Inc. v. IHI, Inc.*,
352 F. Supp. 2d 1048 (N.D. Cal. 2004)....................31

*Poland v. Chertoff*,
494 F.3d 1174 (9th Cir. 2007) .......... 16

*Raad v. Fairbanks North Star Borough School District*,
323 F.3d 1185 (9th Cir. 2003) .......... 23

*Ruckus Wireless, Inc. v. Netgear, Inc.*,
No. C 08-2310 PJH, ECF No. 112 (N.D. Cal. May 28, 2013) .......... 31

*SEC v. SolarWinds Corp.*,
741 F. Supp. 3d 37 (S.D.N.Y. 2024) .......... 28

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011) .......... 16

*Van Asdale v. Int'l Game Tech.*,
577 F.3d 989 (9th Cir. 2009) .......... passim

*Wadler v. Bio-Rad Labs., Inc.*,
916 F.3d 1176 (9th Cir. 2019) .......... 23, 27

*Whittlestone, Inc. v. Handi-Craft Co.*,
618 F.3d 970 (9th Cir. 2010) .......... 30

*Zeyen v. Bonneville Joint Dist.*,
114 F.4th 1129 (9th Cir. 2024) .......... 15

*Zinn v. Am. Commercial Lines, Inc.*,
ALJ No. 2009-SOX-025 (ALJ Nov. 19, 2012) .......... 23

**Statutes**

18 U.S.C. § 1514A .......... passim

18 U.S.C. § 1514A(a)(1)(C) .......... 26

18 U.S.C. § 1514A(a)(2) .......... 22, 24, 31

**Rules**

Fed. R. Civ. P. 8 .......... 10, 32

Fed. R. Civ. P. 9(b) .......... 16, 18

Fed. R. Civ. P. 10(b) .......... 10

Fed. R. Civ. P. 11 .......... 14, 18

Fed. R. Civ. P. 11(c)(2) .......... 32

Fed. R. Civ. P. 12(b)(6) .......... 17, 26

Fed. R. Civ. P. 12(c) .......... 17

Fed. R. Civ. P. 12(f) .......... 26, 30
Fed. R. Civ. P. 12(g)(2) .......... 8, 17
Fed. R. Civ. P. 12(h)(2) .......... 17
Fed. R. Evid. 201(b) .......... 18
N.D. Cal. Civ. L.R. 7-9 .......... 8, 15
N.D. Cal. Civ. L.R. 7-9(a) .......... 14
N.D. Cal. Civ. L.R. 7-9(b) .......... 14
N.D. Cal. Civ. L.R. 7-9(c) .......... 14

**Regulations**

17 C.F.R. § 229.105 (Regulation S-K, Item 105) .......... 27
17 C.F.R. § 229.106 (Regulation S-K, Item 106) .......... 27, 30
17 C.F.R. § 240.13b2-1 (SEC Rule 13b2-1) .......... 29
17 C.F.R. § 240.13b2-2 (SEC Rule 13b2-2) .......... 29
29 C.F.R. § 1980.104(e)(2)(ii) .......... 22, 27

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendants Meta Platforms, Inc. and the individual defendants, Pinaki Mukerji and Mark Tsimelzon, the successive supervisors of Plaintiff Attaullah Baig ("Mr. Baig"), and Nitin Gupta, head of engineering at Meta's WhatsApp unit, move for the third time to dismiss. This Court has already decided most of what Defendants ask. It held that each report Defendants attack plausibly pleads protected activity under Section 806 of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A, and that the claim "survives on that theory against Meta, Gupta, Mukerji, and Tsimelzon." (Am. Order, ECF No. 94 ("Order") at 2, 28.) To challenge that ruling, Defendants needed leave under Civil Local Rule ("Civ. L.R.") 7-9, which governs reconsideration. They did not seek it, yet ask this Court to dismiss the claim with prejudice. The motion should be denied on that ground alone.

The same is true of Defendants' contention that they lacked the knowledge SOX requires. The Court held that the Second Amended Complaint ("SAC") "alleges the employer knowledge the statute requires" (Order at 24), and Defendants, again without complying with Rule 7-9, ask the Court to hold that the Third Amended Complaint, ECF No. 99 ("TAC"), does not.

The motion has a further procedural defect: Defendants' first two motions to dismiss never challenged whether the currently remaining individual defendants had the requisite knowledge of Mr. Baig's whistleblowing. As Judge Beeler has recognized, the filing of an amended complaint "will not revive the right to present by motion defenses that were available but were not asserted in a timely fashion prior to the amendment of the pleading." *Green v. ADT, LLC*, No. 16-cv-02227-LB, 2016 U.S. Dist. LEXIS 130826, at *15 (N.D. Cal. Sept. 23, 2016) (Beeler, M.J.); *see* Fed. R. Civ. P. 12(g)(2).

On the merits, Defendants fail to engage with the Ninth Circuit's rule that either actual or constructive knowledge of Mr. Baig's years of whistleblowing suffices: the question is whether the employer "knew or suspected, actually or constructively," that the employee engaged in protected activity. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009). The motion quotes that standard (Defs.' Mot., ECF No. 103 ("Mot.") at 17-18) but then proceeds to argue as if actual knowledge[1] were the sole means of satisfying the SOX knowledge element (*id.* at 18-20). Even

[1] The TAC more than adequately pleads actual knowledge in any event. (TAC ¶¶ 53-56; Part III.E.1.)

suspicion that an employee is a whistleblower suffices. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1113-14 (9th Cir. 2003).

The TAC pleads far more than suspicion. Mr. Baig was WhatsApp's Head of Security. He found that the privacy program Meta told its investors, year after year, it was "maintaining" under the Federal Trade Commission's ("FTC") 2020 privacy order (the "FTC Privacy Order") had never been built. (TAC ¶¶ 22, 32-36.) Beginning with his counsel's April 18, 2023 letter, he told Meta that its filings with the Securities and Exchange Commission ("SEC") were false: to the head of WhatsApp, to Meta's investigators in nine interviews, to the chief executive officer ("CEO") who certified those filings, and to the SEC. (*Id.* ¶¶ 41-49, 55.) The managers those reports named then dismantled his team and his record and, the TAC alleges, recommended and approved his termination twenty-four days after Meta's counsel learned of his complaint to the Occupational Safety and Health Administration ("OSHA"). (*Id.* ¶¶ 50, 55, 61-72.) Defendants do not challenge, as protected activity, the April 18, 2023 letter, the May 10 and June 8, 2023 and early-2024 interviews in which Mr. Baig called Meta's "investor-facing representations" "materially false," or the OSHA complaint (*see* Mot. at 21; TAC ¶¶ 41-42, 44, 49), so the claim survives on unchallenged reports whatever the Court decides about the rest.

## II. STATEMENT OF FACTS

### A. The Court Sustained the Claim on One Theory and Ordered It Repleaded, in Shorter Form, Limited to That Theory.

The Court dismissed the original complaint with leave to amend in March 2026, holding that it did not plead what Mr. Baig had reported about Meta's SEC filings, that Mark Zuckerberg, Meta's CEO, and Will Cathcart, the head of WhatsApp, were not alleged to have retaliated, and that, had protected activity been pleaded, "the individual claim against Gupta would survive." (ECF No. 70 at 7-8, 13.) On the SAC, the Court held that Mr. Baig "plausibly pleads protected activity": "[b]eginning with his counsel's April 2023 letter . . . the plaintiff reported that Meta's SEC filings misrepresented its FTC-mandated privacy program and its cybersecurity risks," and "[t]he claim survives on that theory against Meta, Gupta, Mukerji, and Tsimelzon." (Order at 2, 28.) It held the SEC tips, submitted on the SEC's Form TCR (Tip, Complaint, or Referral) (the "Forms TCR"), and the OSHA complaint protected for what they reported, found "the employer knowledge the statute requires," and dismissed

Zuckerberg and Cathcart for lack of participation. (*Id.* at 24-26.) It dismissed the SAC's other legal theories, and because the 203-page SAC did not comply with Rules 8 and 10(b), it ordered repleading, "not dismissal with prejudice," limited to the surviving theory, in no more than 30 pages, with each report identified by date, recipient, and substance and each adverse action by date and actor. (*Id.* at 10, 27-28.) The TAC did that in 28 pages. (TAC ¶¶ 7-8.)

### B. Meta Told Its Investors, Year After Year, That It Was Maintaining the Privacy Program the FTC Required.

In 2020, a federal court entered the FTC Privacy Order against Meta. It required Meta, for twenty years, to maintain a comprehensive privacy program; to inventory the user data it held and where it was stored; to limit employee access to those with a documented business need; to detect and remediate unauthorized access; and to report covered incidents to the FTC within thirty days. (TAC ¶ 20.) In each of its Forms 10-K for fiscal years 2021 through 2024, Meta told investors that it was "maintaining a comprehensive privacy program in connection with the FTC consent order," with board oversight, stringent operational requirements, and independent assessments. (*Id.* ¶ 22; reported false, *id.* ¶¶ 42, 44.) Its 2022 proxy statement told shareholders that the Board's privacy committee oversaw "our compliance with the comprehensive privacy program." (*Id.* ¶ 22; reported false, *id.* ¶ 46.) Each 10-K reported that Meta's disclosure controls were effective, and each carried Zuckerberg's certification as CEO. (*Id.* ¶ 23; reported false, *id.* ¶ 44.) Each described security breaches and improper access to user data as risks that "could" harm the business. (*Id.* ¶ 24; reported misleading, *id.* ¶ 41.) And beginning with fiscal year 2023, Meta told investors that its "internal audit function provides independent assessment and assurance on the overall operations of our cybersecurity and privacy programs." (*Id.* ¶ 25; reported false, *id.* ¶¶ 44, 46.)

### C. Mr. Baig Found That the Program Had Never Been Built.

Mr. Baig came to Meta with more than twenty years in cybersecurity. He knew that the SEC had charged Meta in 2019 with describing as hypothetical a data-misuse risk that had already materialized (charges Meta paid $100 million to resolve), and Meta's own compliance training used that settlement as a case study and identified noncompliance with the FTC Privacy Order's access-restriction and incident-reporting obligations as conduct the SEC had already treated as material to

investors. (TAC ¶¶ 28-30.) As Head of Security, he found that the mandated program had not been built. WhatsApp had no inventory of the user data it held; roughly 1,500 engineers had unrestricted access to user data with no documented business need and no audit trail, and by 2024 specific data-warehouse tables holding user data were accessible to between 20,000 and 65,000 Meta employees; WhatsApp had no real-time breach detection; some 100,000 accounts on WhatsApp were being taken over every day and 400 million profile photos scraped every day; and only a fraction of those incidents were being reported to the FTC. (*Id.* ¶¶ 32-36.) When a red-team exercise (a simulated attack by Meta's own security personnel) confirmed the data-exfiltration risk, Gupta said, "blissful ignorance was better than this," and the plan that followed was to present the exercise to the Board's audit committee as "security wins." (*Id.* ¶¶ 37, 81.) Comparing what he found to what Meta told its investors, Mr. Baig came to believe that Meta's Forms 10-K were materially misleading. (*Id.* ¶ 40.)

### D. Beginning April 18, 2023, Mr. Baig Repeatedly Told Meta Its SEC Filings Were False.

On April 18, 2023, Mr. Baig's counsel wrote to Cathcart, copying the head of WhatsApp Legal. (Decl. of Elena R. Baca, ECF No. 103-1 at 2-3, 8.) The letter stated that Meta "has made misleading omissions in its public filings about the current state of its cybersecurity," identified the February 2023 Form 10-K, quoted its risk-factor language, and stated that Mr. Baig believed Meta was violating SEC rules "because of the Company's public statements touting WhatsApp's security that could mislead a reasonable investor." (TAC ¶ 41.) It devoted most of its account to retaliation by Mr. Baig's supervisor, Mukerji, and announced an OSHA filing. (ECF No. 103-1 at 18-26, 37.) The parties agreed to toll the limitations period and ultimately entered into nine amendments. (TAC ¶ 13.)

Meta opened an investigation in response to the letter. In interviews on May 10 and June 8, 2023, Mr. Baig told Meta's investigator that Meta was misrepresenting its privacy program and cybersecurity risks to investors and that Meta's Form 10-K representations of a functioning privacy program were materially false. (TAC ¶ 42.) On December 15, 2023, he told a second investigator that the security reports generated by Meta's central security team ("X-Sec") were falsified, that the briefing documents prepared for Gupta and Meta's chief information security officer ("CISO") ("pre-reads") materially misrepresented the facts, and that he had been blocked from raising risks "that could seriously harm Meta and its investors." (*Id.*)

On January 2, 2024, Mr. Baig wrote to Zuckerberg, Meta's general counsel, and its Ethics and Compliance team. He reported that the X-Sec team was "falsifying cybersecurity reports"; that more than 60,000 employees had access to sensitive user data; that Meta had "no defenses" against mass exfiltration; and that "[a] large-scale data breach will expose Meta, our users, and our investors to serious harm. Meta could lose billions of dollars in market cap." (TAC ¶ 43.) He named Mukerji as retaliating against him. (ECF No. 103-1 at 45.) Zuckerberg certified Meta's fiscal year 2023 Form 10-K about a month later. (TAC ¶¶ 22, 43.) Meta opened a second investigation, and in interviews on January 29, February 5, and February 7, 2024, Mr. Baig told Meta that its compliance certifications were false and that these failures made "Meta's investor-facing representations about its privacy compliance program materially false." (*Id.* ¶ 44.)

In three further interviews, on July 11, August 30, and October 25, 2024, Mr. Baig told Meta's investigator that it was misleading investors, that its internal audit function (the function Meta's 10-K told investors provided "independent assessment and assurance") was broken, and that the red-team results were to be portrayed to the Board's audit committee as a security win. (TAC ¶¶ 25, 45-46, 81.) On October 25, he identified WhatsApp's under-reporting to the FTC of scraping incidents (automated mass harvesting of user data) as "among the ways Meta was misleading investors." (*Id.* ¶ 67.)

On November 27 and 30, 2024, Mr. Baig filed two Forms TCR with the SEC, each under the category "Material misstatement or omission in a company's public filings or financial statements, or a failure to file." (TAC ¶ 47.) He reported that Meta's "serious Cybersecurity gaps" violated the FTC Privacy Order and that "[t]o the best of my knowledge they have not disclosed these Cybersecurity gaps either to the SEC or the FTC." (*Id.*) On December 4, 2024, he wrote to Zuckerberg again: Meta's cybersecurity posture "has not improved by much except on paper"; he raised concerns "[w]hen [colleagues] are not being truthful to the auditors and the regulators"; and "I have now filed a complaint with the SEC under the Whistleblower Retaliation Protection Program." (*Id.* ¶ 48.) On January 17, 2025, he filed with OSHA, alleging that Meta had "made misleading omissions in its public filings." Mr. Baig's counsel notified Meta's outside counsel that same day. (*Id.* ¶¶ 49-50.)

### E. The Managers Mr. Baig Named Then Dismantled His Career, and Meta Fired Him.

Before the reports, Mr. Baig's record was strong. (TAC ¶ 57.) In August 2023, while the

investigation of the April 2023 letter was pending, Mukerji rated him "Significantly Above Expectations," the peak of his tenure, and told him he would very likely be promoted. (*Id.* ¶¶ 62, 74.) Once that investigation closed, and nine weeks after the January 2, 2024 letter, Mukerji dropped the rating two levels and denied him the promotion. (*Id.* ¶¶ 62, 74.) Gupta directed the new engineers elsewhere and, on information and belief, reassigned Mr. Baig to Tsimelzon. (*Id.* ¶¶ 61, 63.) Within a month, Tsimelzon issued a written warning; within four, a "Below Expectations" rating he said he had "aligned" with Gupta, faulting Mr. Baig for "conflating what's a legal requirement vs. your opinion." (*Id.* ¶¶ 54, 64-65.) Ten days after the October 25 interview, Tsimelzon reprimanded him for raising "legal obligations." (*Id.* ¶ 67.) On November 27, he ordered Mr. Baig's team's scraping post deleted; Mr. Baig filed his first Form TCR that evening. (*Id.* ¶ 68.) Fifteen days after the December 4 email, Tsimelzon took away the account-recovery project Mr. Baig's team had built. (*Id.* ¶¶ 69, 75.) In January 2025, Gupta excluded Mr. Baig's team from a 250-engineer allocation. (*Id.* ¶ 71.) On January 23, 2025, six days after the OSHA notice, Meta's outside counsel wrote that Mr. Baig had "provided several documents to Meta's internal investigator" and arranged a further interview; on February 4, in an interview with Meta's investigator, Mr. Baig "reaffirmed to Brownfield the substance of his January 2 and December 4, 2024 letters." (*Id.* ¶¶ 55, 73.)

On February 10, 2025 — six days after that interview, twenty-four days after Meta's counsel learned of the OSHA complaint, and about ten weeks after Mr. Baig told Zuckerberg that he had gone to the SEC — Meta's "Leadership Team" notified him that he was being terminated "due to your performance," in an email that recorded his 2024 rating as "Met Most Expectations" and confirmed a performance bonus on it. (TAC ¶ 72.) On information and belief, Tsimelzon recommended the termination and Gupta approved it, on a record Mukerji and Tsimelzon had built. (*Id.* ¶¶ 72, 82-83.)

## III. ARGUMENT

### A. The TAC Is Measured Against the Orders the Court Already Entered.

The Court accepts the TAC's allegations as true and construes them in Mr. Baig's favor, *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886-87 (9th Cir. 2018); Order at 8, using "judicial experience and common sense," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A Section 806 claim requires protected activity; that the employer "knew or suspected, actually or constructively," that the

employee engaged in it; an unfavorable personnel action; and circumstances suggesting a contributing factor. *Van Asdale*, 577 F.3d at 996; Order at 9. The protected-activity threshold is "minimal," *Van Asdale*, 577 F.3d at 997, 1001; Order at 9, and no misstatement need be identified "with a lawyer's precision," Order at 15. Mr. Baig easily meets this minimal threshold.

**B. The Motion Is Unauthorized Reconsideration Barred by Civil Local Rule 7-9.**

**1. Defendants Ask the Court to Overrule Its Own Order.**

The Order held protected, by name, counsel's April 2023 letter, the 2023 and 2024 investigator statements, the January and December 2024 letters to Zuckerberg, the Forms TCR, and the OSHA complaint. (Order at 2, 15, 19, 22 n.59, 24, 28; Part III.F.2.) Defendants ask the Court to set aside four of those holdings: that the Zuckerberg letters report cybersecurity and FTC matters, not disclosure failures (Mot. at 23-25; *contra* Order at 2, 14-15); that the investigator statements are "cybersecurity disclosures" (Mot. at 22-23; *contra* Order at 2, 5, 15, 19); that the Forms TCR report only FTC noncompliance (Mot. at 25-27; *contra* Order at 22 n.59, 24 (they "reported a failure to inform investors of material cybersecurity risks and misleading statements in Meta's SEC filings")); and that the filing statements the Court relied on to find the belief reasonable should be stricken (Mot. at 27-30; *contra* Order at 15-16). Defendants concede that the Court "previously accepted" the SAC's characterization of the letters and Forms TCR and "relied on" them "in finding the submissions protected." (Mot. at 10, 25-26.) The motion also asks the Court to reverse its employer-knowledge holding (Order at 24; *see* Mot. at 21) and its rulings on OSHA's findings and the Rule 11 dispute (Order at 7 nn.19, 23). Defendants identify no fact or authority it lacked on September 18, 2026, when the Order first issued.

**2. Defendants Sought No Leave and Could Satisfy None of Rule 7-9's Grounds.**

"No party may notice a motion for reconsideration without first obtaining leave of Court to file the motion." Civ. L.R. 7-9(a). Leave requires new facts or law the movant "did not know," a change of law, or a "manifest failure by the Court to consider material facts or dispositive legal arguments," Civ. L.R. 7-9(b), and the motion may not "repeat any oral or written argument" previously made, Civ. L.R. 7-9(c). The letters and Forms TCR are not new facts: the SAC described and quoted the letters to Zuckerberg and the Forms TCR (SAC, ECF No. 81, at ¶¶ 99, 112-13, 136, 149), Defendants characterized all three in their motion to dismiss the SAC without filing the letters (ECF No. 84-1 at 9-

11, 23, 30), and the Court relied on the SAC's account of them (Order at 5-6, 15, 24); Defendants now attach the letters for the first time (ECF No. 103-1 at 38-50); only the label has changed. Nor is the TAC a new pleading in any sense that matters: it pleads the same reports the Order held protected, in the form the Order required, and the same knowledge allegations against Gupta, Mukerji, and Tsimelzon that the SAC pleaded and Defendants did not challenge. (Order at 4-6, 27; TAC ¶¶ 41-49, 53-56.) Defendants could satisfy none of Rule 7-9's grounds and did not try.

**3. There Is No Basis to Depart from the Order.**

On July 16, 2026, the Court announced that Judge Beeler will conclude her service effective November 12, 2026. (Pl.'s Req. for Judicial Notice ("RJN") Ex. C.) The judges of a single court "should not attempt to overrule the decisions of each other" in the same case "except for the most cogent reasons," *Castner v. First Nat'l Bank of Anchorage*, 278 F.2d 376, 379-80 (9th Cir. 1960); a successor "should not reconsider the ruling of a predecessor" absent clear error working manifest injustice, intervening controlling authority, or substantially different evidence, *Zeyen v. Bonneville Joint Dist.*, 114 F.4th 1129, 1138 (9th Cir. 2024); and Rule 7-9 binds a successor judge no less.

**C. Defendants Offer No Argument for Dismissing the Claim Against Meta Itself.**

Defendants ask the Court to dismiss the TAC "in its entirety" and "with prejudice," including the claim against Meta itself (Mot. at 10, 30), but their only argument is that three *individuals* are not alleged to have known of the reports (*id.* at 9, 17-21): the recipients' knowledge, they say, does not count unless someone "passed his reports" to Gupta, Mukerji, or Tsimelzon (*id.* at 9, 18-19), a rule the statute does not state, and the Order did not apply.

The motion concedes that Meta knew. The element is that "the *employer* knew or suspected, actually or constructively" (Mot. at 17-18 (quoting Order at 9) (emphasis added)), and Defendants concede that the reports "went to Cathcart, Zuckerberg, Meta's General Counsel and Ethics and Compliance team, Meta's internal investigators, the SEC, and Meta's outside counsel" (Mot. at 9). Every recipient but the SEC *is Meta*, and the TAC pleads more: two investigations opened in response to counsel's letter and the letter to Zuckerberg; escalations to the chief financial and chief privacy officers; and same-day notice of the OSHA filing to the outside counsel who had signed the tolling agreements. (TAC ¶¶ 13, 41-44, 48, 50, 53, 56.) The Court held that these allegations plead "the

employer knowledge the statute requires" (Order at 24), a holding Defendants acknowledge (Mot. at 21) and ask the Court to reconsider without leave (Part III.B.1).

Defendants' premise that "Baig does not allege that any recipient of his reports took any adverse action against him" (Mot. at 16) likewise fails. Meta received the reports, and Meta fired him, six days after the interview its outside counsel arranged, at which he reaffirmed his letters to the CEO. (Part II.E; TAC ¶¶ 55, 72-73.) That is the transmission Defendants call unpleaded, from the OSHA notice to the termination in twenty-four days, and Defendants cite no authority confining a corporation's knowledge under Section 806 to the managers a plaintiff identifies as having recommended the decision.

Nor does it help the defense to insist that Gupta and Tsimelzon alone fired him. The notice came from a "Leadership Team" (TAC ¶ 72); who approved the decision, and what each knew, is "peculiarly within the possession and control of the defendant," *Park v. Thompson*, 851 F.3d 910, 928-29 (9th Cir. 2017); Order at 25; *see* Fed. R. Civ. P. 9(b), and the Court reserved that question for discovery (Order at 26). The TAC names "the managers to whom he reported," whom the Court found the plausible decisionmakers (*id.* at 25), and pleads why: Tsimelzon was his supervisor, Gupta his supervisor's supervisor, and Gupta controlled the allocations and reassignment. (TAC ¶¶ 54, 61, 63, 72.) And Meta fired Mr. Baig on a performance record built by Mukerji, Tsimelzon, and the X-Sec team whose falsified reports he had exposed, and Mukerji and Tsimelzon knew what he was reporting. (TAC ¶¶ 54, 72, 82-83; Part III.E.1.) An employer that acts on a record built by others answers for the motive behind it, *Staub v. Proctor Hosp.*, 562 U.S. 411, 419-22 (2011); a biased subordinate who "influenced or was involved in the decision or decisionmaking process" taints it, *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007); and Section 806 requires no retaliatory intent, *Murray v. UBS Sec., LLC*, 601 U.S. 23, 32-35 (2024). In short, the claim against Meta proceeds in any event.

### D. The Knowledge Challenge Is Forfeited, and the Rest Was Rejected Before.

#### 1. The Knowledge Challenge Was Available Twice and Is Forfeited.

This is the third time Defendants have chosen their individual targets. Their first motion challenged Gupta, and the Court held that his involvement was sufficiently pleaded: "the individual claim against Gupta would survive" had protected activity been pleaded. (ECF No. 70 at 13; Order at

26.) They challenged neither Mukerji nor Tsimelzon. Defendants' second motion did not seek dismissal of any individuals other than Zuckerberg and Cathcart, and as to them argued the opposite of lack of knowledge: "their mere knowledge of Baig's alleged concerns does not state claims against them individually." (ECF No. 84-1 at 8, 32.) The Court agreed that knowledge is not enough without "participation in the adverse action," dismissed those two, and sustained the claim "against Meta, Gupta, Mukerji, and Tsimelzon." (Order at 2, 25-26, 28.)

Defendants now argue that the three remaining individuals participated but did not know. That argument was available both times: the SAC pleaded the same recipients, investigations, and actions, including Mukerji's April 14, 2023 instruction, which Defendants' own brief recited. (*See* Order at 4-6, 26; ECF No. 84-1 at 20.) Rule 12(g)(2) bars a further Rule 12 motion "raising a defense or objection that was available to the party but omitted from its earlier motion." An amended complaint "will not revive the right to present by motion defenses that were available but were not asserted." *Green*, 2016 U.S. Dist. LEXIS 130826, at *15-16 (reaching the late arguments only because the plaintiff had not "squarely raise[d] the issue," there was "no indication of dilatory conduct," and judicial economy favored it); *accord Eastman v. Apple, Inc.*, No. 18-cv-05929-JST, 2019 U.S. Dist. LEXIS 141423, at *5-6 (N.D. Cal. Aug. 20, 2019). The TAC is not a new pleading in any sense that matters; it adds no defendant, claim, or theory. (Part III.B.2.) Rule 12(h)(2) preserves the defense for an answer, a Rule 12(c) motion, or trial, not a third Rule 12(b)(6) motion, and although the Ninth Circuit forgives a late Rule 12(b)(6) motion when deciding it expedites the case rather than delays it, *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318-20 (9th Cir. 2017), neither is true here: Mr. Baig raises the bar squarely, and a third motion that repeats arguments the Court rejected against a claim it sustained neither expedites the case nor narrows it.

**2. The Court Rejected Every Other Defense Defendants Raised Against the SAC.**

Apart from challenges to particular legal theories and to Zuckerberg and Cathcart, the Court rejected every substantive defense in Defendants' motion to dismiss the SAC (ECF No. 84-1 at 7-34): (a) shotgun-pleading dismissal with prejudice (*id.* at 13-15; *contra* Order at 10); (b) failure to exhaust (ECF No. 84-1 at 15-17; *contra* Order at 10-11); (c) "an engineering dispute," not a SOX case (ECF No. 84-1 at 7-8; *contra* Order at 2, 15, 18-19); (d) that the reports were "reports of cybersecurity issues,

not reports about any failure to disclose cybersecurity deficiencies in Meta's Form 10-K," the argument the Court recorded and rejected (ECF No. 90 at 12; *contra* Order at 15 & n.41); (e) the belief had to track every element of a private securities action and was unreasonable because the share price rose (ECF No. 84-1 at 24, 28; *contra* Order at 13 & n.36); (f) puffery, no duty to confess noncompliance, and curative disclosures (*id.* at 24-26; *contra* Order at 17-18); (g) Forms TCR "vague and never sent to Meta" and an OSHA complaint outside covered law (ECF No. 84-1 at 23, 30; *contra* Order at 24, 28); and (h) OSHA's dismissal (ECF No. 84-1 at 7; *contra* Order at 7 n.23).[2] The new motion repeats the third, fourth, seventh, and eighth of these under new headings. There is no basis to depart from the Court's prior order.[3]

### E. The TAC Pleads Each Individual Defendant's Knowledge.

#### 1. Constructive Knowledge Suffices, and the TAC Pleads It with Specific Facts.

Defendants argue the TAC "offers three instances" of the individual defendants' knowledge. (Mot. at 19.) It pleads nineteen (TAC ¶¶ 53-56), most of which they never engage (Mot. at 17-20). The individuals dispute only knowledge (*id.* at 15-20), but the element is satisfied where the defendant "knew *or suspected*, actually *or constructively*" (Part III.A (emphasis added)); *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010); knowledge "may be alleged generally," Fed. R. Civ. P. 9(b). A factfinder may infer that a supervisor who learned a complaint had been made "knew or suspected" who made it, and "[w]hat-did-he-know-and-when-did-he-know-it questions" are "often inappropriate for resolution on summary judgment," *Hernandez*, 343 F.3d at 1113-14, and no fitter for the pleadings.

***Nitin Gupta.*** Gupta was WhatsApp's Head of Engineering and Mr. Baig's second-level supervisor. (TAC ¶¶ 16, 63, 72.) The TAC pleads that he:

(a) directed the 23 engineers Meta assigned "in response to Mr. Baig's January 2, 2024 letter" away from Mr. Baig's team to the managers who were the subject of his reports (TAC ¶ 61), words Defendants' motion omits (Mot. at 15) and never addresses;

[2] Mr. Baig objects to notice of the truth of OSHA's preliminary findings (ECF No. 103-1 at 4-6), dated three days after the termination and resting on "documents provided by Complainant," Fed. R. Evid. 201(b), but not to notice of the other documents' existence and contents (*see* Order at 7 n.23).

[3] Defendants' renewed "false allegations" charge (Mot. at 11) is a dispute that "does not matter" (Order at 7 n.19); Mr. Baig agreed only to clarify, and no Rule 11 motion was filed (ECF No. 79 at 2).

(b) was the subject of Mr. Baig's December 2023 and early-2024 reports to Meta's investigators that the pre-reads prepared for him "materially misrepresented the facts," made in the interviews in which Mr. Baig called Meta's investor-facing representations false (TAC ¶¶ 42, 44, 55);

(c) received the red-team results in May 2024, said "blissful ignorance was better than this," and said the exercise would be reported to the audit committee as a positive result, which Mr. Baig reported to the investigators (TAC ¶¶ 37, 45-46, 81);

(d) ceased all one-to-one communication with Mr. Baig on January 30, 2024, the day after Mr. Baig's first interview in the January 2 investigation and immediately after Mr. Baig raised a false regulatory certification with him (TAC ¶¶ 44, 78);

(e) received the X-Sec team's negative feedback about Mr. Baig in December 2023 (TAC ¶ 59), "aligned" the below-expectations rating with Tsimelzon (*id.* ¶ 54), and, on information and belief, reassigned Mr. Baig to Tsimelzon and approved his termination (*id.* ¶¶ 63, 72); and

(f) had been told by Mr. Baig of the very gaps the January 2 letter reported and acknowledged them and was the "skip" (skip-level manager) with whom the letter said Mr. Baig would discuss his manager's accusations (ECF No. 103-1 at 44, 47).

An executive who directs the company's response to a letter can be inferred to know of it.

***Mark Tsimelzon.*** Tsimelzon was Mr. Baig's supervisor from May 2024 through termination, and his May 29, 2024 warning prompted the investigation in which Mr. Baig was interviewed on July 11, August 30, and October 25, 2024. (TAC ¶¶ 18, 45, 54, 64.) The TAC pleads that he:

(a) was the subject of Mr. Baig's August 2024 written report to the investigator that Tsimelzon "questioned the sanctity of the audit" and sought one "wherein everyone has to agree on what we are going to tell the auditors" (TAC ¶¶ 8, 45);

(b) told Mr. Baig at the August 8, 2024 review that he had seen Mukerji's downward feedback and had "aligned" the rating with Gupta (TAC ¶ 54);

(c) knew Mr. Baig was cooperating with Meta's internal auditor and messaged him before the red-team follow-up meeting to learn whether he would raise issues (TAC ¶ 54);

(d) received Mr. Baig's November 4, 2024 written communication about under-reporting of

scraping incidents, which Mr. Baig had told the investigator ten days earlier was "among the ways Meta was misleading investors," and reprimanded him, for the third time, for raising "legal obligations" (TAC ¶¶ 54, 67, 77);

(e) ordered Mr. Baig's team's scraping post deleted on November 27, 2024, hours before Mr. Baig filed his first Form TCR, because 700 people could see it (TAC ¶¶ 68, 81);

(f) two days after the December 4, 2024 email to Zuckerberg, responded to Mr. Baig's planned meeting with Meta's security auditor, "if we are discussing with the regulator what we should do — I think we need the right people in the meeting" (TAC ¶ 54); and

(g) fifteen days after that email, took the account-recovery project from Mr. Baig's team, and, on information and belief, recommended the termination (TAC ¶¶ 69, 72, 75).

Defendants call the December 6 message "irrelevant" only by paraphrasing it as Tsimelzon "insist[ing] on attending" a meeting (Mot. at 20); Mr. Baig had said auditor, and Tsimelzon said regulator. Their argument that the rest concerns "conduct the Court has held is not protected" (*id.*) misconceives the element: a supervisor who reprimands an employee for raising the subject the employee has just reported to investigators as a fraud on investors, and deletes the employee's documentation of it hours before the SEC filing, can be inferred to have known or suspected what the employee was reporting. (TAC ¶¶ 67–68, 72; *see Van Asdale*, 577 F.3d at 996 (knew or suspected, actually or constructively).) That the Court found no allegation that Tsimelzon knew the SEC filing was coming (Order at 22) does not bear on whether he knew of the internal reports he was reacting to—the knowledge Section 806 requires.

***Pinaki Mukerji.*** Mukerji was Mr. Baig's supervisor from June 2021 through May 2024. (TAC ¶ 17.) The TAC pleads that he:

(a) was the subject of the investigation Meta opened in response to counsel's April 18, 2023 SOX letter (TAC ¶¶ 42, 55), which devotes most of its factual account to his conduct (ECF No. 103-1 at 18-26) and describes Mr. Baig's March 2023 report to WhatsApp leadership as a report that WhatsApp "is, or might be, in violation of SEC rules and regulations" (*id.* at 29; *see als, id.* at 25);

(b) was named again in the January 2, 2024 letter to Zuckerberg, the general counsel, and Ethics

and Compliance, "I believe Pinaki is currently retaliating against me," which prompted a second investigation (ECF No. 103-1 at 45, 47; TAC ¶¶ 44, 53);

(c) five weeks after counsel's March 7, 2023 letter gave notice of Mr. Baig's SOX claims, and four days before the April 18 letter, ordered him: "I don't want you to talk about FTC [Privacy Order] unless it is with [WhatsApp attorney] Yannick [Carapito]. I am serious." (TAC ¶¶ 55, 77);

(d) received unsolicited negative feedback on December 14, 2023 from the X-Sec team whose falsified reports Mr. Baig was reporting, and used it twelve days later to blame Mr. Baig for that team's own decision (TAC ¶¶ 59-60); and

(e) rated Mr. Baig "Significantly Above Expectations" in August 2023, while the investigation of the April 2023 letter was pending, then dropped him two levels and denied the promotion once it closed, nine weeks after the January 2 letter and four weeks after the investigators last interviewed him about it (TAC ¶¶ 62, 74).

Defendants' answer is that what the individuals knew of was conduct the Court has held unprotected (Mot. at 18, 20). That confuses the subject of a report with the report: the subjects it lists (the FTC-reporting obligation, the audit, the pre-reads) are the subjects of reports the Court held protected "insofar as he reported them as rendering Meta's filings . . . misleading" (Order at 19), as the pre-read reports did (TAC ¶¶ 42, 44). Their rejoinder that being investigated "does not establish" knowledge (Mot. at 19) concerns proof, not pleading, and ignores "constructively"; the subject of two investigations into retaliation for Mr. Baig's reports at least "suspected" what they concerned, *Hernandez*, 343 F.3d at 1113-14; *see Garcia v. Walmart, Inc.*, No. 1:23-CV-03116-MKD, 2026 U.S. Dist. LEXIS 216684, at *3-4 (E.D. Wash. Sept. 23, 2026) (awareness of investigation into plaintiff's complaints supported inference of supervisor's knowledge). Defendants' reliance on the August 2023 rating (Mot. at 20) proves the point: Defendants themselves say the rating came "while the resulting investigation was pending," conceding that Mukerji knew of the investigation, and a peak rating while it was open and a two-level drop once it closed show he knew what it concerned. (TAC ¶¶ 62, 74.) That the April 14 instruction predates the first protected report (Mot. at 20) is why the TAC pleads it as what Mukerji knew, not as an adverse action; it followed the March 7 letter giving notice that Mr. Baig had

retained counsel on SOX claims about "Meta's related public and regulatory communications." (TAC ¶¶ 8, 55, 77.) That the April 18 letter was marked "for settlement purposes only" (Mot. at 13, 18) did not stop Meta from investigating Mukerji over it (TAC ¶¶ 42, 55), and a manager is not investigated over a letter without learning why.

Read together, as the Court read the reports themselves (Order at 15), these facts leave no room to infer that managers whom counsel's letters named, whom Meta investigated in response to Mr. Baig's reports, who directed Meta's response to his letter to Zuckerberg, and who reprimanded him over "legal obligations" and "the regulator" never knew or suspected that he was reporting.

**2. Defendants' Authorities Do Not Help Them, and Timing Completes the Inference.**

None of Defendants' authorities purport to contravene the controlling Ninth Circuit precedent that requires denial of their motion. For example, Defendants' lead case, *Lenk v. Monolithic Power Systems, Inc.*, No. CV-23-02083-PHX-SHD, 2026 U.S. Dist. LEXIS 190337, at *13 (D. Ariz. Aug. 24, 2026), was a vexatious pro se litigant's fifth suit against his former employer (*id.* at *1-2) that alleged no employer knowledge at all. *Lenk* applied the Title VII awareness rule of *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982), to Title VII and state-law retaliation claims; the SOX count was not before the court (*Lenk*, 2026 U.S. Dist. LEXIS 190337, at *15 n.5). The "actual knowledge" sentence Defendants quote (Mot. at 18) holds only that an announced intent to file is not a filing under § 1514A(a)(2); it cites no SOX authority, cannot be squared with "actually or constructively" or 29 C.F.R. § 1980.104(e)(2)(ii), and is met on its own terms, because Meta knew Mr. Baig "actually filed" with the SEC and OSHA (TAC ¶¶ 48, 50, 56). *Choochagi v. Barracuda Networks, Inc.*, 60 Cal. App. 5th 444 (2020), is a state-law summary-judgment decision, which the Ninth Circuit read as a case in which "the ultimate decision makers were unaware of the employee's complaint," while upholding the inference that a report reached decisionmakers in the ordinary course. *Pierce v. E. Bay Mun. Util. Dist.*, No. 24-1260, 2026 U.S. App. LEXIS 25168, at *4-6 (9th Cir. Aug. 20, 2026) (mem.). *Loth v. City of New York*, No. 20 Civ. 9345 (GBD), 2021 U.S. Dist. LEXIS 180027 (S.D.N.Y. Sept. 21, 2021), applied an actual-knowledge standard to a complaint alleging only that the supervisor "could have seen" an overtime request; *Hartranft v. Encore Capital Group, Inc.*, 543 F. Supp. 3d 893, 927 (S.D. Cal. 2021), forbids only unreasonable inferences. The Title VII cases, *Raad v. Fairbanks North Star Borough*

*School District*, 323 F.3d 1185, 1197 (9th Cir. 2003), *Cohen*, 686 F.2d at 796, and *Kama v. Mayorkas*, 107 F.4th 1054, 1062 (9th Cir. 2024), addressed what a plaintiff must *prove* at summary judgment; those decisions infer knowledge from circumstance, *Hernandez*, 343 F.3d at 1113-14, and Section 806's "constructively" asks less still. None of Defendants' cases requires a plaintiff to plead, before discovery, who inside the company told whom, and the Department of Labor, applying the same standard, holds that a complainant "is not required to prove 'direct personal knowledge' on the part of the employer's final decision-maker," because "[t]he law will not permit an employer to insulate itself from liability by creating layers of bureaucratic ignorance" between its managers and its decision-maker. *Zinn v. Am. Commercial Lines, Inc.*, ALJ No. 2009-SOX-025, slip op. at 18 (ALJ Nov. 19, 2012) (Declaration of Wilmer J. Harris, ("Harris Decl. Ex. D); *see Bobreski v. J. Givoo Consultants, Inc.*, ARB No. 09-057 (ARB June 24, 2011) (Harris Decl. Ex. E).

"[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity," *Van Asdale*, 577 F.3d at 1003 (citation omitted), and knowledge from the same evidence, *Dawson v. Entek Int'l*, 630 F.3d 928, 936-37 (9th Cir. 2011). Here, each adverse action closely followed a report, from the rating nine weeks after the January 2 letter to the termination twenty-four days after the OSHA notice and six days after the final interview, each justified by "collaboration" complaints from those he had reported. (TAC ¶¶ 62, 67-69, 72-76, 82-84.) That sequence pleads knowledge and contributing factor alike. *Murray*, 601 U.S. at 28, 35.

**F. The Reports Must Be Read Together, Beginning with Counsel's April 2023 Letter.**

**1. Objective Reasonableness and Knowledge Turn on the Whole Course of Reports.**

Defendants read each report in isolation. (Mot. at 22-27.) However, as the Court has already held, "[p]rotected activity requires a subjective belief that the reported conduct violated a listed law and an objectively reasonable belief, <u>judged from the perspective of a reasonable person with the employee's training and experience</u>. *Id.* at 1000–01; *Wadler v. Bio-Rad Labs., Inc.*, 916 F.3d 1176, 1187–88 (9th Cir. 2019)." Order at 9 (emphasis added). Moreover, the knowledge element turns on what the employer "knew or suspected." *Van Asdale,* 577 F.3d. at 996. Neither can be judged from one email in a vacuum, and the Order did not: it drew a line in time, "[b]eginning in April 2023, the plaintiff's reports referred to Meta's SEC filings and its investors" (Order at 4, 15), and treated what

followed as one "course of reports" (Order at 11) that, "in substance," told Meta its filings misdescribed the mandated program and investors were being misled (*id.* at 2, 15, 28).

Reading the reports that way honors the Court's rejection of the theory that, because the filings mention the FTC Privacy Order, "every report of noncompliance" with it reported a false filing (Order at 14), because the FTC program is not a law the filings merely mention. The GDPR, the CCPA, and Europe's digital regulations appear in Meta's Forms 10-K only as risks of "compliance failures"; the FTC program is the one regime Meta affirmatively told investors it was "maintaining." (TAC ¶ 22; *see* ECF No. 86-3 at 10, 15, 17-18, 39.) A report that the one program Meta represented as built lacks those components, or rests on falsified assessments, is a report that a particular statement in the filings is untrue, as the Order framed protected activity. (Order at 14, 19.) Reports of noncompliance with Irish or foreign privacy law (*id.*) fall outside that line; every report Defendants challenge falls within it.

**2. Mr. Baig Reported, and Meta Knew, That Its Filings Misled Investors.**

On March 7, 2023, counsel told the head of WhatsApp, copying the head of WhatsApp Legal, that Mr. Baig had claims under the Sarbanes-Oxley Act and demanded preservation of evidence concerning his reports and "Meta's related public and regulatory communications." (TAC ¶ 55.) That month, Mr. Baig's recap document told WhatsApp leadership that WhatsApp "may be violating SEC regulations and laws with our public misrepresentations." (*Id.* ¶ 38.) From May 2023 through January 2025, Meta signed a tolling agreement and nine amendments reciting that Mr. Baig had threatened suit under the Act, a reminder, renewed every few months, that a SOX proceeding was "about to be filed." (*Id.* ¶ 13; 18 U.S.C. § 1514A(a)(2).) With one exception (the December 15, 2023 interview), the same investigator, Brendan Brownfield, took every one of his interview statements, beginning with the investigation Meta opened over counsel's April 18 letter. (TAC ¶¶ 42, 44-46, 53, 55.) Against that backdrop, the TAC pleads: (1) **April 18, 2023, counsel's letter** ("misleading omissions in its public filings"; the February 2023 Form 10-K; SEC rules; an OSHA filing to follow). *Known to* the heads of WhatsApp and WhatsApp Legal; Meta opened an investigation of which Mukerji was the subject. (TAC ¶¶ 41-42, 55; ECF No. 103-1 at 27-28, 37; Order at 2, 4, 15, 28.) (2) **May 10 and June 8, 2023, investigator interviews** (Form 10-K representations about the program "materially false"). *Known to* Meta's investigator. (TAC ¶¶ 42, 55; Order at 4-5, 15.) (3) **December 15, 2023, investigator interview**

(pre-reads for Gupta and the CISO "materially misrepresented the facts"; risks that "could seriously harm Meta and its investors"). *Known to* Meta's investigator. (TAC ¶¶ 42, 55; Order at 15, 19.) (4) **January 2, 2024, letter to Zuckerberg** (falsified reports; FTC Order violations; harm to "our investors" and "billions of dollars in market cap"; SolarWinds). *Known to* Zuckerberg, the general counsel, and Ethics and Compliance; Meta opened a second investigation; Gupta directed the engineers allocated in response; Mukerji was named. (TAC ¶¶ 43-44, 53, 61; ECF No. 103-1 at 45; Order at 2, 5, 15-16.) (5) **January 29, February 5, and February 7, 2024, investigator interviews** (certifications false; "investor-facing representations . . . materially false"; internal audit compromised). *Known to* Meta's investigators; Gupta cut off one-to-one contact the day after the first interview. (TAC ¶¶ 44, 78; Order at 15, 19, 21 n.57.) (6) **July 11, August 30, and October 25, 2024, investigator interviews** (Meta misleading investors; the "independent" internal audit function broken; under-reporting "among the ways Meta was misleading investors"). *Known to* Meta's investigator and to Tsimelzon, whose warning prompted the investigation and who reprimanded Mr. Baig on the scraping subject ten days later. (TAC ¶¶ 25, 45-46, 54, 67; Order at 5, 15, 19, 22 n.59.) (7) **November 27 and 30, 2024, Forms TCR** ("[m]aterial misstatement or omission in a company's public filings"; gaps "not disclosed . . . to the SEC or the FTC"). *Known to* Zuckerberg, told of the filing December 4. (TAC ¶¶ 47-48; Order at 5-6, 15, 24, 28.) (8) **December 4, 2024, email to Zuckerberg** (improved "except on paper"; concerns raised "[w]hen [colleagues] are not being truthful to the auditors and the regulators"; "filed a complaint with the SEC"). *Known to* Zuckerberg; two days later, Tsimelzon invoked "the regulator." (TAC ¶¶ 48, 54; Order at 2, 6, 15, 24.) (9) **January 17, 2025, OSHA complaint** ("misleading omissions in its public filings"; fraud on shareholders). *Known to* Meta's outside counsel, who had signed the tolling agreements, notified the same day. (TAC ¶¶ 49-50; Order at 11, 24, 28.)

No reasonable recipient holding counsel's SOX letter and a running series of tolling agreements could have read any report in that course as anything but a continuation of counsel's report. Requiring the predicate re-sent with every email would demand the "lawyer's precision" the Court has held unnecessary (Order at 15). Meta itself read the reports together: it opened investigations in response to them, and its managers reacted to Mr. Baig's reports regarding "legal obligations" and misleading statements to "the regulator." (TAC ¶¶ 42, 44, 54, 67, 77.)

**G. Every Report Defendants Ask the Court to Excise Is Protected.**

Defendants' principal argument is that, quoted rather than summarized, the reports say less than the SAC claimed for them (Mot. at 24-26). The premise misreads the Order: the Court asked for each report's substance, "including what the plaintiff said about Meta's SEC filings *or* its investors" (Order at 27 (emphasis added)); the test is disjunctive, and the question is whether the reports, read in context and in Mr. Baig's favor, "convey" a reasonable belief in a securities violation (*id.* at 13-14). The documents Defendants placed in the record may be considered for what they say, but not to "dispute facts stated in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 994, 1002-03 (9th Cir. 2018). Defendants' request to "dismiss" twelve paragraphs under Rule 12(b)(6) and strike eight under Rule 12(f) mistakes the vehicle. Rule 12(b)(6) "doesn't permit piecemeal dismissals of parts of claims," *Little v. Pac. Seafood Procurement, LLC*, No. 23-cv-01098-AGT, 2025 U.S. Dist. LEXIS 28473, at *9 (N.D. Cal. Jan. 17, 2025) (quoting *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015)), as this district has told Meta, *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 875 (N.D. Cal. 2024) ("Motions to dismiss should not be used for piecemeal purposes."). The Court's earlier partial ruling addressed distinct legal theories (Order at 19-24, 28), not reports within the one theory that survives. Nor would excising a report narrow "discovery, summary judgment, and trial" (Mot. at 10, 21): a report held not independently protected remains evidence of belief, knowledge, and motive, as the TAC pleads its pre-April 2023 reports (TAC ¶ 8), and as the Court itself used the FTC-noncompliance facts in finding the belief reasonable (Order at 16).

*Van Asdale* supplies the yardstick, and Defendants never engage its facts. Shawn Van Asdale's reports were oral, to IGT's general counsel and a product vice president, and the general counsel did not believe he had used the words "fraud" or "fraud on shareholders." 577 F.3d at 992-93, 997. What sufficed was that he said Anchor's executives "knew more than they were saying," that the general counsel came away with the "impression" that he believed IGT had been misled, and that his two conversations were read together as "suggesting further inquiry." *Id.* at 992-93, 997, 1001-02. Every report Defendants challenge was in writing or made to Meta's own investigators, persons "who ha[ve] the authority to investigate, discover, or terminate misconduct," § 1514A(a)(1)(C), and each said more than Shawn Van Asdale did. Defendants would require of written reports to the CEO and the SEC what

the Ninth Circuit did not require of a conversation in the general counsel's office.

**1. The Forms TCR Reported That Meta's Filings Omitted Its Cybersecurity Gaps.**

Mr. Baig filed his Forms TCR as reports of a "[m]aterial misstatement or omission in a company's public filings," stating that Meta had "not disclosed these Cybersecurity gaps either to the SEC or the FTC." (TAC ¶ 47.) A company discloses to the SEC through its filings, so that is a report that Meta's filings omitted the gaps, a violation of Item 106 of SEC Regulation S-K, which "imposes affirmative disclosure obligations about cybersecurity risk management" (Order at 17 (citing 17 C.F.R. § 229.106(b)-(c))), and of Item 105, 17 C.F.R. § 229.105. A belief that an SEC rule was violated requires no fraud, *Wadler,* 916 F.3d at 1187, 1189, and Item 106's affirmative duties take the report outside the pure-omission rule of *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263-64 (2024). (Order at 17.) The Court has so held. (Order at 24; *see also id.* at 22 n.59.)

The intake answers are not a "label" (Mot. at 26): the form's first two questions ask the tipster to identify what he is reporting, and Mr. Baig's answers, "[m]aterial misstatement or omission in a company's public filings" and the nearest of 18 subcategories on a fixed menu (Decl. of Attaullah Baig ("Baig Decl.") Ex. 2), identify to the agency the violation reported. The under-reporting the Order held unprotected was under-reporting to the FTC (Order at 14), and the "financial statements" subcategory does not negate the category selected; the Court's "nothing to do with accounting" remark concerned the books-and-records theory (Order at 19-20). No inference may be drawn from what Mr. Baig did not attach (Mot. at 26); his December 31, 2024 supplement attached a complaint identifying FY2022 Form 10-K statements as misleading, and he can plead it (*see* Part III.I). The employer must know of the protected activity, not read it, 29 C.F.R. § 1980.104(e)(2)(ii); the CEO was told of the SEC filing (TAC ¶ 48), which the Court held suffices (Order at 24). A confidential tip to the SEC can support a SOX claim, *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 262-63 (5th Cir. 2014).

**2. The January 2, 2024 Letter Told the Certifying Officer That Investors Were at Risk.**

The January 2 letter was not a complaint about engineering priorities. It went to the officer who certifies Meta's annual reports, eight months after counsel told Meta its filings made "misleading omissions." (TAC ¶¶ 23, 41, 43.) It reported that the X-Sec team was "falsifying cybersecurity reports" (*id.* ¶ 43), reports the Order holds protected when tied to the filings (Order at 19); that gaps left Meta

"not meeting our legal obligations from the 2020 FTC Order," the one program Meta's 10-K told investors it was "maintaining" (Part III.F.1); that a breach "will expose . . . our investors to serious harm" and cost "billions of dollars in market cap" (ECF No. 103-1 at 40); and that "[t]he X-Sec team and my management have been aware of the cyberthreats since at least September 2021" (ECF No. 103-1 at 47), the knowledge element of the fraud theory the Court found reasonably believed (Order at 18). It told the certifying officer that Meta's internal audit function and its security-compliance group, asked to audit those threats, had not responded (TAC ¶ 43; ECF No. 103-1 at 44); one month later the same officer certified the first Form 10-K to state that "[o]ur internal audit function provides independent assessment and assurance" over the program (TAC ¶ 25). It invoked SolarWinds, which the Court recognized sustained fraud claims "premised on a company's false statements about its cybersecurity practices" (TAC ¶¶ 22, 43; Order at 16 (citing *SEC v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 80-83 (S.D.N.Y. 2024)), by hyperlink: "Solarwinds and their CISO" linked to the SEC's release charging SolarWinds with fraud because its "public statements about its cybersecurity practices and risks were at odds with its internal assessments," and "Uber CISO" linked to the Department of Justice release on an officer who "executed a scheme to prevent any knowledge of the breach from reaching the FTC." (Baig Decl. Ex. 1; RJN Exs. A, B.) The links are part of the email Meta placed in the record, and the incorporation doctrine "applies with equal force to internet pages as it does to printed material," *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Defendants' answers do not survive the email. They read the *SolarWinds* reference as a warning about criminal penalties (Mot. at 24), but read consistently, the email warned of exposure to investors, the SEC, and prosecutors alike. It reported facts, not risks: 250,000 daily account takeovers on Facebook and 30,000 on WhatsApp, more than 60,000 employees with access, "no defenses" against exfiltration, a team that "is falsifying" reports, and security leadership's own framing, "you think Meta doesn't have a comprehensive information security program," in the vocabulary of the 10-K. (ECF No. 103-1 at 39-44.) Reporting that the 10-K's "could" risks had already happened is reporting the half-truth the Court found reasonably believed (Order at 16, 18), and a warning to the certifying officer, a month before the annual report, that known failures exposed investors to billions in losses is a report that investors were not being told. That is not the ordinary cost of a breach, which every investor bears,

and so not the "might matter to investors" report the Order excluded (Order at 13); it is the loss investors suffer when a company that told them it was "maintaining" the mandated program, and described these risks as hypothetical, is shown to have known otherwise, the theory on which the SEC charged Meta in 2019 (TAC ¶ 29) and SolarWinds in 2023 (Order at 16). The SAC phrase Defendants say the TAC "abandons" (Mot. at 24) described Rules 13b2-1 and 13b2-2, which the Order barred from repleading. (Order at 19-20, 27-28; TAC ¶ 52 n.7.) The letter offered its documents for "a confidential investigation," the "further inquiry" *Van Asdale* protects. Mr. Baig then reported that "Meta's investor-facing representations about its privacy compliance program [were] materially false" (TAC ¶¶ 44, 53).

**3. The December 4 Email and Mr. Baig's Interviews Reported Investors Were Misled.**

Defendants call the December 4 email a "values" statement (Mot. at 25), but their own brief calls it "an update to his January letter" (*id.* at 14), as its subject line says (ECF No. 103-1 at 49-50). It told the same CEO that Meta's posture had improved only "on paper," that Mr. Baig raised concerns "[w]hen [colleagues] are not being truthful to the auditors and the regulators," and that he had "filed a complaint with the SEC." (TAC ¶ 48.) Defendants read the middle statement as hypothetical (Mot. at 25); in an update to a letter reporting falsified cybersecurity reports, read in Mr. Baig's favor, it reports that the untruthfulness occurred, and "on paper" is not about pace when the author had told the same officer eleven months earlier that reports were being falsified. Telling the CEO of the SEC filing supplied the employer knowledge the statute requires (Order at 24), which is not "nothing" (Mot. at 25); it is the plainest "suggesting further inquiry," *Van Asdale*, 577 F.3d at 1001-02. The Court has twice credited this email (Order at 15, 24). Meta certified the annual report anyway. (*Id.* at 18.)

Defendants likewise dismiss the December 15, 2023 and 2024 interviews as "cybersecurity disclosures" and "misleading investors" as "a label, not a report." (Mot. at 22-23.) Each was made to investigators who already had Mr. Baig's account of which filings were false (Part III.F.2, items (2)-(6); TAC ¶¶ 45-46), and the Court credited statements of exactly that kind (Order at 5, 15 (crediting reports that Meta was "lying to investors")); the TAC pleads them as reports that Meta was "misleading investors" (TAC ¶¶ 46, 67). Defendants' complaint that the TAC does not say in which 2024 interview he said it (Mot. at 23) asks more than the Order did; the October 25 statement alone suffices. Falsified pre-reads and a broken internal audit function are protected when reported as rendering the filings,

"including the statement about its internal audit function," misleading. (TAC ¶¶ 25, 42, 45-46; Order at 19.) The December 15, 2023 report that pre-reads for Gupta and the CISO were falsified and "could seriously harm Meta and its investors" is the harm-to-shareholders framing the Order credited (Order at 15, 19) and the chain the Court described, from falsified internal information to an audit committee that "received a false picture" (*id.* at 16). Defendants' footnote that the internal-audit statement was never "tied" to Item 1C, the cybersecurity section of Form 10-K that implements Item 106 (Mot. at 27 n.7), overlooks the unchallenged paragraph 44, in which Mr. Baig told the investigator the "internal audit function was itself compromised" and Meta's "investor-facing representations" were "materially false," days after the FY2023 10-K first made that statement. The "pipeline" theory failed because those reports never mentioned investors or filings (Order at 14). The statement that under-reporting was "among the ways Meta was misleading investors" is the opposite (TAC ¶ 67; Order at 14-15, 22 n.59).

**4. Paragraphs 22 Through 26 Support Finding Reasonableness.**

Paragraphs 22 through 26 are not reports (TAC ¶¶ 8, 51); they plead what Meta's filings said, the measure of Mr. Baig's belief, which the Order directed him to cite with pinpoints (Order at 27) and relied on in finding his belief reasonable (*id.* at 15-16). Defendants' "never reported" quotations (Mot. at 28) come from the Order's treatment of other statements and a fraud-on-users theory (Order at 11, 23), not these filings, and their own background concedes that the TAC pleads statements "some of which Baig alleges he reported as false" (Mot. at 12). Most were reported in terms: the April 18 letter quoted the risk-factor language of paragraph 24 (ECF No. 103-1 at 28 n.28); Mr. Baig told the investigators that the program representations of paragraph 22 were materially false, that the certifications of paragraph 23 were false, and that the internal audit function of paragraph 25 was broken (TAC ¶¶ 42, 44, 46; Order at 21 n.57); and paragraph 26 pleads once, as directed, the theory the Court called "the same theory under different labels" (Order at 19). Paragraph 25's internal-audit statement is one the Order itself named. (*Id.*) They carry out the Order's instruction; they add no theory.

**H. Nothing in the TAC Exceeds the Order, and Rule 12(f) Reaches None of It.**

**1. Motions to Strike Are Disfavored, Require Prejudice, and Do Not Test the Merits.**

Rule 12(f) reaches "redundant, immaterial, impertinent, or scandalous matter," not allegations said to fail as a matter of law. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974-75 (9th Cir.

2010). Motions to strike are disfavored and denied unless the matter "could have no possible bearing on the subject of the litigation" and the movant shows prejudice. *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004). Defendants' only asserted prejudice, "expand[ed] discovery" (Mot. at 10, 21) into reports the Court has held protected, is the case, not prejudice. Defendants' authorities concern amended pleadings that added new *claims*, *DeLeon v. Wells Fargo Bank, N.A.*, No. 10-CV-01390-LHK, 2010 U.S. Dist. LEXIS 112941, at *9 (N.D. Cal. Oct. 22, 2010); *Ruckus Wireless, Inc. v. Netgear, Inc.*, No. C 08-2310 PJH, ECF No. 112, at 2 (N.D. Cal. May 28, 2013); the TAC adds none (Order at 27). Paragraphs 1 and 2 assert no theory; paragraph 3 says the action "rests not on what Meta told its users, but on what Meta told its investors." (TAC ¶ 3.) They plead the conditions the Court relied on in holding the belief reasonable (*id.* ¶ 2; Order at 16), and the "most secure place to have a private conversation" statement Defendants say was "never reported" was quoted in the April 18, 2023 letter itself as a statement that "could mislead a reasonable investor." (ECF No. 103-1 at 27-28; TAC ¶ 41.)

**2. The Tolling Sentence Is Shorthand for Paragraph 13, Not a New Theory.**

Paragraph 41's tolling sentence (Mot. at 29) is shorthand for the tolling agreements pleaded in full in paragraph 13, compressed to one line to meet the Order's 30-page limit and its bar on incorporation by reference. (TAC ¶¶ 7, 13; Order at 27.) The Court relied on "the parties' tolling agreements" to find that Meta knew "an OSHA complaint was coming" (Order at 24), and the recital of the November 14, 2022 warning (Mot. at 29) fixed the earliest deadline the agreements tolled; the claims tolled were the SOX claims counsel asserted in March and April 2023. (TAC ¶ 13.) The requests kept before Meta a SOX proceeding that was, in the statute's words, "about to be filed," 18 U.S.C. § 1514A(a)(2); *cf. Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997); and a label is no ground to strike, *Johnson v. City of Shelby*, 574 U.S. 10, 11-12 (2014) (per curiam); Order at 24 n.69.

**I. Any Deficiency Should Be Cured by Leave to Amend.**

Leave to amend is granted with "extreme liberality," *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003), unless amendment would be futile, *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc), and there has been no "repeated failure to cure" a knowledge argument never raised before, *Foman v. Davis*, 371 U.S. 178, 182 (1962). Defendants' "four

opportunities" (Mot. at 30) count a complaint dismissed with leave, a pleading withdrawn within Rule 11(c)(2)'s safe harbor, and a complaint sustained. Defendants assert no prejudice, the factor that "carries the greatest weight," *Eminence Capital*, 316 F.3d at 1052; and their own *Frezza v. Google Inc.*, No. 5:12-cv-00237-RMW, 2013 U.S. Dist. LEXIS 57462, at *10-11, *15 (N.D. Cal. Apr. 22, 2013) (Mot. at 30), dismissed with prejudice only a claim that had twice failed the same element. If any allegation is found wanting, Mr. Baig requests leave to amend; amendment would not be futile.[4]

## IV. CONCLUSION

The motion should be denied in its entirety, and Defendants directed to answer within fourteen days.

DATED: November 10, 2026

SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP

*/s/Wilmer J. Harris*
By: ______________________________
Wilmer J. Harris
Amanda E. Johnson
*Attorneys for Plaintiff Attaullah Baig*

[4] The TAC easily surmounts the short, plain statement Rule 8 requires and the Ninth Circuit's minimal threshold for pleading a SOX claim. However, should this Court decide differently, Mr. Baig can allege, among other facts, that the pre-reads for WhatsApp's quarterly security reviews in December 2023 and December 2024 included the SEC's cybersecurity-disclosure rules; that Gupta and Mukerji received the December 2023 pre-read and attended that review (*see* ECF No. 103-1 at 44), and Gupta and Tsimelzon received the December 2024 pre-read and attended that review; that shortly before the December 3, 2024 review he told Tsimelzon, one-on-one, that those rules require accurate disclosure and that falsifying cybersecurity reports carries liability for Meta and for Tsimelzon personally; that shortly after the April 18, 2023 letter, when he and Mukerji discussed its concerns, including that WhatsApp could not detect a breach, Mukerji responded, "we never said we will prevent a breach"; that Meta's investigator discussed each of the three letters with him in the interviews that followed; that December 2023 messages in an end-to-end encrypted WhatsApp group chat among Mr. Baig, Gupta, Mukerji, and one other manager reached the investigator from one of the other participants; that he supplemented his Forms TCR on December 31, 2024, identifying Form 10-K statements as misleading, and on January 25, 2025, attaching his OSHA complaint; and that the February 4, 2025 interview was itself a report. *See Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003).